## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JANET HOWARD, TANYA WARD JORDAN, JOYCE MEGGINSON, JANICE GUINYARD, WILLIAM BURNS, DENNIS GOSIER, PHILIPPE MORRIS, COLONEL LOVETT, MICHELE PEYTON, JEANETTE DEVINS, ANTHONY WASHINGTON, BARBARA LORETZ, and QUEEN JONES, individually and on behalf of a class of all other persons similarly situated,** | ) ) ) ) ) ) ) ) ) ) | **RELATED ACTION:** Case No. 1:04-cv-00756 |
| **Plaintiffs,** | ) ) | **JUDGE PAUL FRIEDMAN** |
| **v.** | ) ) | |
| **CARLOS M. GUTIERREZ, Secretary, United States Department of Commerce,** | ) ) ) ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) ) ) | |

## CLASS ACTION COMPLAINT

1.  **"Separate, but equal."** These words are a sorry slogan for this country's long and shameful history of racial bias against African-Americans.

2.  This lawsuit demonstrates that for the United States Department of Commerce, ("Commerce"), "**separate and unequal**" is alive and well and flourishes with undiminished vigor. African-American employees at Commerce have systematically been denied equal pay, equal benefits and equal opportunities for promotion. White supervisors at Commerce have told African-Americans that certain jobs are "reserved for whites" and have stated to white employees, "You are tall and blonde, you will do well here."

I.    **OVERVIEW**

3.    Ms. Janet Howard ("Ms. Howard"), an African-American female and twenty-two year employee of Commerce, filed a timely Class Complaint with an Equal Employment Opportunity Counselor on February 22, 1995 (Janet Howard, et al. v. Donald L. Evans, Secretary, U.S. Department of Commerce, EEOC No. 100-A1-7429X, Agency No. 95-55-0278) ("EEO Class Complaint").  Ms. Howard alleged that Commerce engaged in race discrimination against her and a class of similarly situated African-American employees who worked for Commerce in the metropolitan area of the District of Columbia.

4.    Specifically, the EEO Class Complaint alleges that Commerce has maintained a system of racially discriminatory and subjective employment practices with respect to promotions, awards, performance ratings, career-enhancing work assignments, timely training for advancement, and job assignments.  The gravamen of the EEO Class Complaint is that Commerce's subjective decision-making has prevented African-Americans as a group from advancing according to their merit.  That subjective decision-making has led, and continues to lead, to discriminatory denials of promotion and other discriminatory employment decisions that adversely affect job advancement, including performance evaluations, job assignments, training, awards and recognition.  As Ms. Howard was once informed by her supervisor, the promotion she was in line for was traditionally reserved for "white males."  That same supervisor was overheard saying to a white female, "You are tall and blonde; you will do well here."

5.    During the ten years since Ms. Howard filed her EEO Class Complaint, the claims of the class have languished in EEOC purgatory.  The Office of Federal Operations ("OFO") certified a department-wide class on July 20, 2000, pointing to statistical information which raised the strong inference that African-American employees of Commerce "were being denied career advancement opportunities to white-collar positions, GS-9 through GS-15 or equivalent

level white collar non-GS positions . . . because of their race." July 20, 2000 OFO Decision in

Howard v. Department of Commerce, at 10.

6.    During the past ten years, African-American and non-African-American Commerce employees have filed hundreds of complaints alleging race discrimination and retaliation; have produced an expert opinion from the nation's leading performance appraisal expert regarding the subjective, unfair appraisal system in place at Commerce; have produced statistics that conclusively demonstrate a pattern of race discrimination in pay and promotions; and have submitted over one hundred and twenty-five survey forms evidencing race discrimination. Despite that history, Commerce has remained non-responsive in its investigation and treatment of discrimination claims made by its employees.    After ten years of discovery and motions practice, certification of a class, partial decertification, extraordinary delay at the administrative level, and increased levels of futility, anger, confusion, and frustration among class members, Plaintiffs bring this action in the United States District Court for the District of Columbia to redress the racial discrimination evident throughout Commerce.

## II.    NATURE OF THE ACTION

7.    This class action is brought by eleven African-Americans and two whites who are current and former employees of Commerce's offices in the metropolitan area of Washington, D.C.  Commerce consists of fifteen bureaus.  The thirteen Plaintiffs ("Class Representatives"), Janet Howard, Tanya Ward Jordan, Joyce Megginson, Janice Guinyard, William Burns, Dennis Gosier, Philippe Morris, Colonel Lovett, Michele Peyton, Jeanette Devins, Anthony Washington, Barbara Loretz, and Queen Jones bring this action on behalf of themselves and the class of persons they seek to represent, to redress the race discrimination and retaliation they and others have suffered while working at Commerce.

8.    The Class Representatives seek to represent African-American and non-African-

American employees of Commerce who have been subjected to one or more aspects of the systemic race discrimination described in this Complaint, including, but not limited to: (a) discriminatory policies, practices and/or procedures in selection, promotion and advancement; (b) disparate pay; (c) a hostile work environment and race-based harassment; and (d) retaliation in the workplace. The systemic race discrimination described in this Complaint has been, and is, continuing in nature.

9.     The Class Representatives are seeking, on behalf of themselves and the class they seek to represent, declaratory and injunctive relief, including, but not limited to, affirmative restructuring of Commerce's selection and compensation procedures, training and other terms and conditions of employment; back pay; front pay; compensatory and nominal damages; and attorneys' fees, costs and expenses to redress Commerce's discriminatory and retaliatory employment policies, practices and/or procedures.

## III.     RELATED ACTION

10.     Plaintiffs file this Complaint as a Related Action to <u>Janet Howard v. Donald Evans</u>, Secretary, U.S. Department of Commerce Case No. 1:04-cv-00756 ("Howard's Individual Action"), which alleges that Commerce violated Title II of the ADA by denying Ms. Howard a reasonable accommodation as retaliation for her anti-discrimination activities at Commerce. A First Amended Complaint adding a Rehabilitation Act claim was filed July 26, 2004. Commerce filed a Motion to Dismiss which was granted in part and denied in part on September 30, 2005. Specifically, Ms. Howard's ADA claims were dismissed; her Rehabilitation Act claim remains.

11.     Relating these two suits causes no harm to the Defendant. There has been no discovery in Howard's Individual Action. Each action includes Janet Howard as a plaintiff; each action includes Commerce as a Defendant; and each action implicates the same or similar protected activity and substantial common issues of fact. Both involve retaliation against Commerce

employees who speak out against race discrimination in their workplace. Relating these two actions is also matter of judicial efficiency. Both suits will involve similar and, in part, overlapping discovery.

## IV.    JURISDICTION AND VENUE

12.    This Court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), *et seq.*, as amended ("Title VII") and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, as amended ("The Rehab Act"), to redress and enjoin employment practices of Commerce in violation of these statutes.

13.    Venue is proper in the District of Columbia because Commerce is headquartered in the District of Columbia, Commerce does business in the District of Columbia, the business records of Commerce are maintained in the District of Columbia and because many of the unlawful practices described herein occurred in the District of Columbia.

14.    The District of Columbia is the most logical forum in which to litigate the claims of the Class Representatives and the proposed class in this case. Commerce is headquartered in Washington, District of Columbia. Further, Class Representatives reside in and around the District of Columbia, and work in and around the District of Columbia.

## V.    CONDITIONS PRECEDENT TO SUIT UNDER TITLE VII

15.    The Plaintiffs have fulfilled all precedent conditions necessary to the institution of this action under Title VII.

## VI.    PROCEDURAL HISTORY

### A.    The Howard Complaint

16.    After years of suffering racial discrimination, Janet Howard, an African-American female and a Commerce employee since 1983, contacted an EEO Counselor. Ms. Howard filed

5

her EEO Class Complaint on February 22, 1995.  In her EEO Class Complaint, Ms. Howard alleges that Commerce engaged in race discrimination against a class of African-American Commerce employees.

**B.    Class Members Have Relied on the Pendency of the Class Action Since 1995**

17.    Since 1995, a great amount of publicity has surrounded this lawsuit's EEOC predecessor.  A Web site regarding this class action matter against Commerce has been created (http://www.feldf.com); rallies have been held throughout the District of Columbia; fundraising efforts have been ongoing for years to support the litigation; and there have been extensive communications between Ms. Howard and class members, and between Commerce and class members.

18.    In a letter from Leroy J. Warren, Chairman of the NAACP Federal Sector Task Force to William Daley, Secretary of Commerce, dated September 16, 1999, Warren describes the complaints received by the NAACP of race discrimination at Commerce:

> The NAACP has for many years been the recipient of a number of very serious allegations of [rampant employment discrimination routinely faced by many racial minorities employed by the Department of Commerce] . . . . Today's Protest Demonstration is being conducted because of the non-responsiveness of  senior Commerce officials to what the Task Force strongly believes are legitimate complaints of employment discrimination, racism, abuse of authority, and an overall lack of equality and justice within Commerce.  ***The EEO program at Commerce is basically malfunctioning and inoperative***.

Letter from Leroy J. Warren, Jr., Chairman, NAACP Federal Sector Task Force, to William Daley, Secretary of Commerce, dated September 16, 1999 (emphasis in original).

19.    Given the publicity history of the Howard EEO Class Complaint, it is reasonably certain that thousands of absent class members have relied on the pendency of this class action.

**C.      The EEOC Provisionally Certifies a Class of African-American Employees Throughout Commerce**

20.     On July 20, 2000, after five years of litigation, the Equal Employment Opportunity Commission ("EEOC" or "Commission") certified a class of African-American employees at Commerce. The EEOC held that, "[a]fter a review of the entire record," the class should be certified on a provisional basis. EEOC Decision Certifying Class at 8. The Court certified a class of:

> African-American, non-supervisory employees and former employees of the agency's Headquarters' offices in the metropolitan area of Washington, D.C., who allegedly have been denied career advancement to one or more white collar positions in the agency's Headquarters' offices at grade levels GS-9 through GS-15 levels, or equivalent level white collar non-GS positions, and who may have been denied related promotional opportunities in those same offices, based on their race during the period of time beginning two years prior to the filing of the class complaint on February 22, 1995, and continuing to the date a final determination is rendered on the class complaint claim.

EEOC Decision Certifying Class at 15.

21.     The Commission certified this class because "existing information suggests that significant numbers of African-American employees have been denied advancement to [GS-9 through GS-15 or equivalent] positions and, thus, that common questions of fact and law exist as to those positions." Id.

22.     The Commission found that the "class complaint states a claim that the agency has delayed and limited, and continues to delay and limit, the career advancement of class members because of their race," and that there was sufficient evidence in the record to support that claim. Id. at 10.

23.     The Commission held that the class complaint satisfied the commonality requirement, given that it appeared that "common standards govern agency promotion and

7

performance appraisal decisions in the Washington, D.C. metropolitan area." Id. at 11. Such common standards include: the agency's issuance of a Department Administrative Order (DAO), implementing the federal merit promotion policy agency-wide; and the agency's promulgation of agency-wide principles governing the issuance of performance appraisals.

24.    In addition, the Commission took administrative notice of the information in the EEOC's Annual Report on the Employment of Minorities, Women and People with Disabilities in the Federal Government for the Fiscal Year 1998 ("EEOC Report"), which documented the following:

- The average white collar grade for the agency's white employees was 10.60, while the average white collar grade for the agency's black employees was 8.78. EEOC Report, Table I-16.

- The discrepancies in grade level were also evident in professional positions where the average grade for white agency professional employees in FY 1998 was 12.77 while the average grade for black agency professional employees was 11.62. EEOC Report, Table I-17.

- The percentage of black employees in the agency's white collar positions GS-9 and above in FY 1998 declines as the grade level increases. In contrast, the percentage of white employees in the agency's white collar positions increased in the higher-graded positions.

The Commission also noted that the record contains:

- Several affidavits and over forty unsworn survey forms that were completed in September 1998 which indicate that numerous individual class members believe they have been denied advancement-related opportunities based on their race.

- Hundreds of race discrimination complaints agency-wide.

The Commission found that the complainant possesses the same interest and has suffered the same injury as the members of the class. The Commission also found that numerosity and adequacy were satisfied.

**D.    Judge Henry Narrows the Class**

25.    On December 17, 2002, in a 53-page brief, Commerce moved to narrow coverage of the class by eliminating approximately 85% of the class members from the class. In response, Plaintiffs' prior counsel filed a one-and-one-half page opposition.

26.    On August 20, 2003, in a one-page Order, Judge Henry granted Commerce's Motion, ruling that the class should be redefined by eliminating all Commerce bureaus outside Washington, D.C. Judge Henry offered no rationale for his ruling and cited nothing in the record to support his ruling.

27.    On October 2, 2003, Plaintiff Janet Howard registered a *pro se* Opposition to the Department's Motion to Redefine the class.

**E.    Judge Kravetz Grants Plaintiffs' Motion For Leave to File a Motion For Reconsideration**

28.    At the end of 2003, Kator, Parks & Weiser withdrew as counsel for Plaintiffs and the class.

29.    Plaintiffs hired new lead class counsel, David Sanford of Sanford, Wittels & Heisler, LLP, who entered this matter on or about January 12, 2004. Grant Morris of the Law Offices of Grant Morris is class co-counsel.

**F.    No Opinion Or Guidance From Court Relating to Class Issues Since April 2004**

30.    Plaintiffs filed a Motion for Reconsideration of Judge Henry's Narrowing of the Class on March 5, 2004. That Motion for Reconsideration has been fully briefed without opinion or guidance from presiding Judge Kravetz since April of 2004. In April 2004, Judge

Kravetz assured the parties that he would grant or deny the motion for reconsideration within months.  However, after several telephone conferences with Judge Kravetz and the parties, no opinion has been rendered.  After waiting approximately eighteen months in addition to the decade this case had already spent in litigation, Plaintiffs made the decision to file in this Court.

31.      Upon receipt of Plaintiffs' declaration of intent to file a classification in federal court, Judge Kravetz dismissed this suit's administrative predecessor in an Order dated September 30, 2005.

VII.    PARTIES

   A.    **Class Representatives**

32.      **Class Representative Janet Howard** is an African-American resident of Virginia. Ms. Howard has been employed at Commerce from approximately 1983 until the present.

33.      **Class Representative Tanya Ward Jordan** is an African-American resident of Maryland.  Ms. Ward Jordan has been employed at Commerce from approximately 1987 until the present.

34.      **Class Representative Joyce Megginson** is an African-American resident of Maryland.  Ms. Megginson has been employed at Commerce from approximately 1971 until the present.

35.      **Class Representative Janice Guinyard** is an African-American resident of Washington, D.C.  Ms. Guinyard has been employed at Commerce from approximately 1984 until the present.

36.      **Class Representative William Burns** is an African-American resident of Washington, D.C.  Mr. Burns has been employed at Commerce from approximately 1962 until the present.

37.     **Class Representative Dennis Gosier** is a white resident of Maryland.    Mr. Gosier has been employed at Commerce from approximately 1970 to the present.

38.     **Class Representative Philippe Morris** is a white resident of Maryland.    Mr. Morris has been employed at Commerce from approximately 1988 to the present.

39.     **Class Representative Colonel Lovett** is an African-American resident of Maryland.  Mr. Lovett was employed at Commerce from approximately 1976 until 2000.

40.     **Class Representative Queen Jones** is an African-American resident of Maryland. Ms. Jones has been employed at Commerce from approximately 1989 until the present.

41.     **Class Representative Anthony Washington** is an African-American resident of Maryland.  Mr. Washington has been employed at Commerce from approximately 1985 until the present.

42.     **Class Representative Barbara Loretz** is an African-American resident of Maryland.  Ms. Loretz has been employed at Commerce from approximately 1973 to the present.

43.     **Class Representative Michele Peyton** is an African-American resident of Washington, D.C. Ms. Peyton has been employed at Commerce from approximately 1970 until the present.

44.     **Class Representative Jeanette Devins** is an African-American resident of Virginia. Ms. Devins has been employed at Commerce from approximately 1970 until the present.

**B.     Defendant**

45.     **Defendant United States Department of Commerce** is a government entity doing business in Washington, D.C.  and is an employer under 42 U.S.C. § 2000e(b).

46.    Commerce is a highly centralized departmental agency in the Executive Branch of the United States Government.  To accomplish Commerce's goal to "foster, promote and develop the foreign and domestic commerce," the Department is divided into fifteen interrelated bureaus, including ten interior bureaus in Washington, D.C. and five exterior metropolitan area bureaus.

47.    The interior bureaus include: the Office of the Inspector General ("OIG"); the Office of the Secretary ("OS"); the International Trade Administration ("ITA"); the Bureau of Industry and Security ("BIS"); the Economic Development Administration ("EDA"); the Minority Business Development Agency ("MBDA"); the National Telecommunications and Information Administration ("NTIA"); the Economics and Statistics Administration ("ESA"); the Technology Administration ("TA"); and the Bureau of Economic Analysis ("BEA").

48.    The exterior bureaus include: the Bureau of the Census ("Census"); the National Institute of Standards and Technology ("NIST"); the National Oceanic and Atmospheric Administration ("NOAA"); the United States Patent and Trademark Office ("PTO"); and the National Technical Information Service ("NTIS").

49.    Each bureau is subject to the centralized control of well-established Department of Commerce policies, with directives being issued by the Office of Human Resources Management of the Office of the Secretary ("OHRM") to all bureaus in Washington, D.C. and the metropolitan area.  Commerce Department personnel policies are tightly controlled and directed by OHRM, which bears ultimate responsibility for the racially discriminatory employment practices that the metropolitan-wide class of African-American employees complains of in this case.

50.    **Secretary Carlos Gutierrez** is the thirty-fifth United States Secretary of Commerce.  He was sworn in on February 7, 2005.

## VIII. ALLEGATIONS OF THE CLASS REPRESENTATIVES

**Commerce Headquarters**

51.    **Class Representative Janet Howard** has been employed by Commerce for approximately twenty-two years as a non-supervisory employee.

52.    In the course of Ms. Howard's employment, Commerce has subjected Ms. Howard to discrimination in employment based on her race, African-American, by denying her promotions in favor of less senior, less qualified white employees, subjecting her to reprisal for speaking out against Commerce's pervasive race discrimination in employment, and subjecting her to a racially hostile work environment and other forms of discrimination.

53.    The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Ms. Howard's employment at Commerce. Because of Commerce's promotion system and how it is used, Ms. Howard has been denied opportunities that are available to white employees. Ms. Howard's supervisor used subjective decision making to discriminate against Ms. Howard because of her race and her EEO activities.

54.    Since 1983, when Ms. Howard was hired by Commerce, she has been discriminated against and retaliated against on several occasions. For example, in approximately 1986, Ms. Howard applied for a GS-9 position and was told that the position was reserved for white males. In approximately 1992, Ms. Howard completed performance evaluations for African-American employees she was supervising, only to have her white male supervisor reject her recommendations. He subsequently gave the employees significantly lower ratings.

55.    In 1995, Ms. Howard filed a classwide complaint alleging race discrimination at Commerce, alleging that she and a similarly situated class of African-American employees had

been denied promotions in favor of less qualified white employees, subject to disparate terms and conditions of employment, a hostile work environment, and other forms of discrimination.

56.    One example of the discrimination Ms. Howard has experienced was when, from 1996 to 1998, six GS-12 Export Compliance Specialist vacancies were announced in Ms. Howard's office.

57.    Ms. Howard applied for each position and though qualified, was not selected. Ms. Howard's white supervisor, Tom Andrukonis ("Mr. Andrukonis"), did not call Ms. Howard in for an interview for any of the positions.

58.    Another example of discrimination occurred during the 1996-1998 period, when Mr. Andrukonis hired a white male whose skills were unrelated to the duties listed in the GS-12 Export Compliance Specialist vacancy announcement.   The skills required for the position related directly to the very duties Ms. Howard was performing daily.

59.    On another occasion, Mr. Andrukonis decided to cancel a vacancy so he would not have to hire Ms. Howard to fill it.

60.    In an investigative report, Mr. Andrukonis said that "Janet does good work and she makes the office look good, but it carries no particular weight."

61.    Ms. Howard was denied a promotion for the 1801 series GS-12 position for five years before she finally received a GS-12 promotion.  She received that promotion at the exact same time the GS-7's whom Ms. Howard had supervised received their promotions to GS-12.

62.    In 1999, a GS-13 1803 Export Compliance Specialist position was announced.

63.    Although Ms. Howard was qualified for the position, she was not considered because the subjective decision making by her supervisor had prevented her from advancing to a GS-12 in a timely manner.

64.     In December 1999, two vacancies for GS-13 positions in Ms. Howard's unit were to be posted on a Monday.  By that time, Ms. Howard had served enough time in-grade to compete for the GS-13 level.  On the Monday that the vacancies were to be posted, Mr. Andrukonis rescinded the vacancies.

65.     Approximately two months later, the two GS-13 slots were posted in an announcement for Division Directors.  Ms. Howard applied for the position in her office, but was not selected.

66.     Ms. Howard believes the rescinding of the vacancies and her non-selection for the position is clear evidence of Commerce's subjective decision making.  Ms. Howard also believes this subjective decision making is evidence of further retaliation against her because of her Class Action Complaint.

67.     On July 11, 2001, Ms. Howard moved for a Temporary Restraining Order to prevent Mr. Andrukonis from removing her from her office.

68.     Prior to July 22, 2001, Ms. Howard had requested, with support from the department's physician, reasonable accommodation for a medical condition.  Instead of receiving a reasonable accommodation, Ms. Howard was placed on a Performance Improvement Plan (PIP).  Ms. Howard believes the denial of a reasonable accommodation was because of her race, African-American.

69.     During this time, Ms. Howard's rating was undeservedly and subjectively lowered to "marginal."   Commerce management told Commerce's physician that Commerce had a "strategy to get rid of Janet."

70.     On May 11, 2004, Ms. Howard filed suit in this Court alleging violations of the Americans with Disabilities Act, and an amended complaint adding counts for Title VII and Rehabilitation Act violations.

71.     As a result of Commerce's discriminatory actions, Ms. Howard has suffered extreme harm.

72.     **Class Representative Tanya Ward Jordan** ("Ms. Ward Jordan") has been employed by Commerce at the Office of the Secretary for approximately eighteen years.

73.     In approximately June 1998, Ms. Ward Jordan began working at the Office of Executive Budgeting and Assistance Management ("OEBAM") as a Management and Program Analyst, a GS-14 level position.

74.     In the course of Ms. Ward Jordan's employment, Commerce has subjected her to discrimination in employment based on her race, African-American, by denying her promotions in favor of less senior, less qualified white employees, subjecting her to reprisal for speaking out against Commerce's pervasive race discrimination in employment, and subjecting her to a racially hostile work environment and other forms of discrimination.

75.     The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Ms. Ward Jordan's employment at Commerce.  Because of Commerce's promotion system and how it is used, Ms. Ward Jordan has been denied opportunities that are available to white employees.  Ms. Ward Jordan's supervisor used subjective decision making to discriminate against Ms. Ward Jordan because of her race and her EEO activities.

76.     Ms. Ward Jordan also served as the Departmental Management's ("DM") audit liaison. In this capacity, Plaintiff was responsible for reporting on functions, activities and initiatives related to DM funds.  As a part of the routine business of her job as audit liaison, Ms. Ward Jordan regularly handled documents containing information that identified areas of concern to civil rights groups.

77.     In addition to maintaining active involvement in the pending racial discrimination Class Action lawsuit as described above, Ms. Ward Jordan has been actively involved in the Ronald H. Brown Chapter of the Blacks in Government ("BIG") organization, a volunteer employee organization that seeks to advance equity, excellence and opportunity in the workplace and counsels employees who have reported disparate treatment by Commerce officials; the NAACP Federal Sector Task Force ("NAACP Task Force"), an organization that addresses discrimination in personnel issues within the federal government; the No Fear Coalition, an organization that informs employees of their rights under the Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002 ("No Fear Act"); the Federal Employees Legal Defense Fund ("FELDF"), a non-profit organization that educates workers regarding their EEO rights and provides financial support for litigating employment discrimination claims; and the Congress Against Racism and Corruption in Law Enforcement, a civil rights group that addresses police brutality, racial profiling and abuses in law enforcement.

78.     Despite Ms. Ward Jordan's repeated notification to Commerce that managers were subjecting her and other African-Americans to illegal racial discrimination, Commerce managers have continued to discriminate against Ms. Ward Jordan and other African-Americans. In addition, Ms. Ward Jordan has been subjected to retaliation for her stated opposition to Commerce's discriminatory employment practices.

79.     For example, on approximately October 2, 2000, Ms. Ward Jordan filed a formal complaint alleging that she was denied a career-enhancing position as the Department of Commerce's GS-15 Diversity Program Manager due to her race, African-American, and in retaliation for previous EEO activity.

80.     The position was advertised on May 15, 2000. On May 24, 2000, the Director of OHRM asked who had applied for the position. After seeing that Ms. Ward Jordan had applied

for the position, after the vacancy closed, Commerce "reassigned" a Caucasian of Hispanic origin to the position.

81.    For example, on or about July 18, 2003, Otto Wolff ("Mr. Wolff"), Chief Financial Officer and Assistant Secretary for Administration ("CFO/ASA"), a white male, transferred Ms. Ward Jordan from the Office of Executive Budgeting within OEBAM to the Office of Budget ("OB") under the direction of Barbara Retzlaff ("Ms. Retzlaff"), a white female.

82.    Ms. Ward Jordan was the only employee within the Office of Executive Budgeting ("OEB") transferred to OB's Systems and Policy Division.  All other OEB staff members were transferred to the Office of Financial Management ("OFM") under the CFO/ASA realignment.

83.    Pursuant to Ms. Ward Jordan's medical disabilities, Ms. Ward Jordan's office at the OEBAM had been equipped with a window and a thermostat.

84.    By comparison, the small, dusty office to which Ms. Ward Jordan was reassigned lacked adequate ventilation, and was poorly lit, and otherwise failed to offer Ms. Ward Jordan reasonable accommodation for her medical disabilities.

85.    As Ms. Ward Jordan became aware that there were at least three vacant offices with windows, thermostats and better ventilation, Commerce's actions can only be considered harassing and retaliatory.

86.    Ms. Ward Jordan complained to Commerce managers regarding the retaliation to which she was being subjected, including Ms. Retzlaff and Peter Maxey, a white male, to no avail.  Ms. Ward Jordan additionally complained to Bernadette Worthy, a black female, of Commerce's Office of Civil Rights ("OCR").

87.    OCR failed to redress Ms. Ward Jordan's complaints of discrimination and retaliation.  Commerce specifically denied Ms. Ward Jordan's reasonable requests to be placed in vacant offices that met Ms. Ward Jordan's medical needs.

88.    Further, in her new position, a GS-14 level position, at OB, Ms. Ward Jordan was required to report to a GS-13 level white male.  The GS-15 Director position had been left vacant.

89.    After Ms. Ward Jordan raised concerns about reporting to a lower level employee, Ms. Retzlaff chose not to allow Ms. Ward Jordan to serve as "Acting Director."  She then appointed Doug Allis, a white male on Ms. Retzlaff's staff, to act in a dual capacity.

90.    Because of Commerce's failure to provide her with a reasonable accommodation and because of its reassignment of Ms. Ward Jordan, Ms. Ward Jordan filed a motion for a temporary restraining order and a preliminary injunction *pro se* against Commerce with the U.S. District Court for the District of Columbia on March 5, 2004.

91.    Also on March 5, 2004, Judge Richard Leon held a hearing at which Ms. Ward represented herself.  Judge Leon denied the temporary restraining order but delayed ruling on the motion for a preliminary injunction until the issue was fully briefed.

92.    On or about March 7, 2004, Ms. Ward Jordan was reassigned from the OB to the Office of Financial Management ("OFM").  At this time, Ms. Ward Jordan was unjustly denied her "audit liaison" duties, given lower-visibility responsibilities, assigned financial statement analysis and other tasks she had never performed in her 26 years of government service, placed under the close supervision of Julie Tao, an Asian-American employee, at the same GS level as she.  Ms. Ward Jordan was simultaneously informed that the new "pay for performance" system would require her to operate "with no supervision" in order to successfully attain maximum

performance, and was denied bonus opportunities that she had previously enjoyed and to which she continued to be entitled.

93.    Commerce's actions were not motivated by business necessity, did not impact similarly situated white employees, and did not impact Commerce employees who had not spoken out regarding Commerce's racial discriminatory practices.  Commerce took these actions against Ms. Ward Jordan solely in retaliation for her outspokenness against racial discrimination, including serving as a Class Leader in Janet Howard's EEO Complaint, and in order to prevent Ms. Ward Jordan from performing her job responsibilities as DM audit liaison, including her responsibility for handling documents containing information that identified areas of concern to civil rights groups.  These documents contained information that was potentially useful in aiding Ms. Ward Jordan's efforts against racial discrimination, including those in support of the EEO Complaint.

94.    Judge Leon denied Ms. Ward Jordan's motion for a preliminary injunction on December 3, 2004.  He also dismissed her Title VII claims.

95.    On August 10, 2005, Judge Leon also dismissed Ms. Ward Jordan's DCHRA and ADA claims.

96.    **Class Representative Joyce Megginson** ("Ms. Megginson") is a member of a protected class, African-American.

97.    Ms. Megginson has been employed for approximately 34 years by  the U.S. Department of Commerce, assigned to the National Telecommunications and Information Administration ("NTIA").

98.    In the course of Ms. Megginson's employment, Commerce has subjected her to discrimination in employment based on her race, African-American, by denying her promotions in favor of less senior, less qualified white employees, subjecting her to reprisal for speaking out

against Commerce's pervasive race discrimination in employment, and subjecting her to a racially hostile work environment and other forms of discrimination.

99.    The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Ms. Megginson's employment at Commerce.  Because of Commerce's promotion system and how it is used, Ms. Megginson has been denied opportunities that are available to white employees.  Ms. Megginson's supervisor used subjective decision making to discriminate against Ms. Megginson because of her race and her EEO activities.

100.    Ms. Megginson has been actively involved in the Ronald H. Brown Chapter of the Blacks in Government ("BIG") organization, a volunteer employee organization that seeks to advance equity, excellence and opportunity in the workplace and counsels employees who have reported disparate treatment by Commerce officials; the NAACP Federal Sector Task Force ("NAACP Task Force"), an organization that addresses discrimination in personnel issues within the federal government; the No Fear Coalition, an organization that informs employees of their rights under the Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002 ("No Fear Act"); and the Federal Employees Legal Defense Fund ("FELDF"), a non-profit organization that educates workers regarding their EEO rights and provides financial support for litigating employment discrimination claims.

101.    For example, in approximately 1995, after Ms. Megginson had – for years – been trying unsuccessfully to advance to the GS-11 Program/Management Analyst career ladder, her supervisor, a white male named William B. Gamble ("Mr. Gamble"), told Ms. Megginson, in substance: "Joyce, you can work for me for ten years and I will never promote you.  The only way I will ever promote you is if Fred Wentland [a white male in her department at a higher level] dies in a plane crash.  Then and only then will I promote you to a GS-12 or 13."

102.    Although the NTIA was supposed to follow the standard criteria for promoting employees at Commerce, based upon their demonstrating abilities and skills to perform at a higher level regardless of race, Ms. Megginson's supervisor, Mr. Gamble, disregarded the criteria for advancement, and invented various pretexts to suppress Ms. Megginson's advancement.

103.    Ms. Megginson's claims that her supervisor's excuses were arbitrary and subjective – and adverse to African-Americans – are confirmed by the fact that while she was languishing at GS-9, at least seven other white employees at NTIA, who were either below or at Ms. Megginson's level, achieved promotions to higher levels during the 1990s.

104.    Finally, in 1995, Ms. Megginson accepted a GS-11 position in NTIA, and a promotion was prepared.  However, the promotion was withdrawn because Ms. Megginson would not drop her complaints, which had nothing to do with her accepting the GS-11 position.

105.    Per Commerce policy, all employees were supposed to receive mid-point employment reviews and ratings.  However, Ms. Megginson was singled out by repeatedly not receiving such reviews and ratings.  This negatively impacted her and prevented her from receiving cash awards given to other employees at Commerce.  In fact, in approximately 1996, all the white employees who served under Ms. Megginson's supervisor, Mr. Gamble, (for more than 120 days) shared in a $25,500 award.

106.    In approximately 1996 or 1997, Ms. Megginson was the only one in her office who had not been given a performance evaluation.  After repeatedly asking Mr. Gamble, her white supervisor, when he was going to rate her, Mr. Gamble called her into his office.  At that time, he gave Ms. Megginson some work and said "About your evaluation, I am not ready to do that yet.  By the way, how are those [EEO] complaints you filed against me coming?"

107.    Ms. Megginson frequently asked Mr. Gamble how she could improve and what

she needed to do to get a higher rating on her performance evaluations. All Mr. Gamble would say was that there were no job enhancing assignments and, even if there were, there was no money to support a promotion.

108. As a result of Defendant's discriminatory actions, Ms. Megginson has suffered extreme harm.

**Bureau of the Census**

109. **Class Representative Janice Guinyard** ("Ms. Guinyard") is a member of a protected class, African-American, and is a resident of Washington, D.C.

110. Ms. Guinyard has been employed by the Commerce Bureau of the Census ("Census") for approximately twenty-one years as a non-supervisory employee.

111. In the course of Ms. Guinyard's employment, Commerce has subjected her to discrimination in employment based on her race, African-American, by denying her promotions in favor of less senior, less qualified white employees, subjecting her to reprisal for speaking out against Commerce's pervasive race discrimination in employment, and subjecting her to a racially hostile work environment and other forms of discrimination.

112. The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Ms. Guinyard's employment at Commerce. Because of Commerce's promotion system and how it is used, Ms. Guinyard has been denied opportunities that are available to white employees. Ms. Guinyard's supervisor used subjective decision making to discriminate against Ms. Guinyard because of her race.

113. For example, in 1998 Ms. Guinyard applied for an advertised position as Supervisory Employee Development Specialist, Chief Workforce Development Branch, a GS-14 level position. She was approximately a GS-13, Step 7 at the time. She was selected as among

the most highly qualified applicants for the position, given that her supervisor, Marilia Matos, told Ms. Guinyard that she did not need to interview Ms. Guinyard for the position because she knew Ms. Guinyard's qualifications. Ms. Guinyard was rejected in favor of a white male, Tom Christman.

114.    Another example occurred in December 1999, when Ms. Guinyard applied for an advertised position as Ombudsman in the Office of the Secretary, a GS-14 level position. Subsequent to Ms. Guinyard's application, the position was eliminated.

115.    Yet another example occurred in January 2000, when Ms. Guinyard applied for an advertised position as Supervisory Employee Development Specialist at the Census Bureau, a GS-14 level position. Ms. Guinyard was selected as among the three most highly qualified applicants for the position. She was interviewed by Sandra Duckett ("Ms. Duckett") and Colleen Woodard ("Ms. Woodard"). Ms. Guinyard was rejected for the position, as the position was cancelled and re-posted.

116.    In July 2000, Ms. Guinyard applied for a re-advertised position as Supervisor Employee Development Specialist, a GS-14 level position. Ms. Guinyard was selected as among the three most highly qualified applicants for the position. Given that she had already been interviewed for this position in about April 2000, Ms. Guinyard was not given another interview. Ms. Guinyard was rejected for the position in favor of a white female, Joyce Bayse.

117.    In May 2003, Ms. Guinyard applied for a Program Analyst position at the Bureau of Economic Analysis, a GS-14 level position. Ms. Guinyard was selected as among the three most highly qualified applicants for the position. She was interviewed by Brian Groves. Ms. Guinyard was rejected for the position in favor of a white employee.

118.    In approximately 1997, Ms. Guinyard's white supervisor, Romeo Munzos ("Mr. Munzos"), applied white-out to Ms. Guinyard's performance evaluation form in order to alter the

pre-printed values of the ratings for each area of evaluation. Mr. Munzos decreased the weight placed upon the areas in which Ms. Guinyard had performed at the highest, or "Outstanding" level, and increased the weight placed upon the areas in which she had performed at the second highest, or "Commendable" level.

119.    Mr. Munzos's chicanery resulted in Ms. Guinyard receiving an overall evaluation at the "Commendable" level. If the performance evaluation had been computed according to the same standards that were applied to white employees' performance evaluations, Ms. Guinyard would have received a performance evaluation at the highest, or "Outstanding" level, which would have facilitated Ms. Guinyard's receipt of a promotion to a supervisor position. Similarly situated white employees who received "Outstanding" performance evaluations were subsequently promoted to supervisor positions.

120.    After Ms. Guinyard filed a charge of discrimination regarding the discriminatory performance evaluation, Commerce retaliated against her by subjecting her to greater scrutiny, harsher discipline, and denying her training and other employment-enhancing job opportunities that were provided to similarly situated white employees around the same time.

121.    Commerce's reprisal included, but was not limited to, requiring Ms. Guinyard to submit a doctor's excuse regarding a one-day absence while refraining from requesting white employees to provide doctors excuses for one-day absences and denying Ms. Guinyard training opportunities in late 1997.

122.    After Mr. Munzos retired in or about 1998, his position of Supervisory Employee Development Specialist, Chief Workforce Development Branch, became available. A white, male employee was selected to assume Mr. Munzos's former responsibilities.

123.    When the white, male employee sought alternative employment in or about late 1999, Ms. Guinyard applied for the position. Ms. Guinyard was interviewed for the Supervisory

Employee Development Specialist, Chief Workforce Development Branch position by Sandra Duckett, an African-American female, and Colleen Woodward, a white female. At that time, Ms. Duckett worked in the Census Human Resources Division. Ms. Woodward was working as a contractor. She had previously been employed as Director of Human Resources at the Patent Trade Office ("PTO") and Deputy Director of Human Resources at Census, a position in which she had served as Ms. Duckett's supervisor.

124.    Following Ms. Guinyard's interview, rather than selecting Ms. Guinyard for the position, in approximately July 2000, Census re-posted the opening for the Supervisory Employee Development Specialist, Chief Workforce Development Branch position.

125.    As Ms. Guinyard was fully qualified for the position and had performed well at her interview, Commerce's re-posting of the Supervisory Employee Development Specialist, Chief Workforce Development Branch position can only be understood as a deliberate attempt to avoid promoting Ms. Guinyard, an African-American, into a GS-14 level, supervisory position.

126.    As a result of Commerce's discriminatory actions, Ms. Guinyard has suffered extreme harm.

127.    **Class Representative William Burns** ("Mr. Burns") is a member of a protected class, African-American.

128.    Mr. Burns has been employed by the Commerce Bureau of the Census ("Census"), for approximately forty-two years as a non-supervisory employee.

129.    In the course of Mr. Burns's employment, Commerce has subjected him to discrimination in employment based on his race, African-American, by denying him promotions in favor of less senior, less qualified white employees, subjecting him to reprisal for speaking out against Commerce's pervasive race discrimination in employment, and subjecting him to a racially hostile work environment and other forms of discrimination.

26

130. The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Mr. Burns's employment at Commerce. Because of Commerce's promotion system and how it is used, Mr. Burns has been denied opportunities that are available to white employees. Mr. Burns's supervisor used subjective decision making to discriminate against Mr. Burns because of his race.

131. Mr. Burns was hired by Commerce in approximately October 1962 as an Electronic Technician, a GS-5 level position, working at Census. His current position at Census, which he has held since 2002, is Computer Operation Monitor, a GS-12 position.

132. A continuing example of Commerce's discrimination against Mr. Burns is the fact that, for the past twenty-five years, Commerce has forced Mr. Burns to undergo repeated lateral transfers at the GS-12 level, while failing to promote him to the GS-13 level or higher.

133. From 1979 through the present, every time Mr. Burns has observed that a promotional opportunity to a GS-13 level Information Specialist position has been posted, he has applied. Each time, Mr. Burns was well qualified. Each time, Mr. Burns was rejected. And, each time, a non-African-American employee filled the vacancy.

134. Since 1979, instead of promoting Mr. Burns, Commerce has gradually eroded his duties and subjected him to other demoralizing and humiliating employment actions despite his consistently good work performance, continual quest to obtain additional education and job-related skills, and dedicated service.

135. For example, in approximately 1995, a newly transferred, younger, white, female employee, Ann Gwynn ("Ms. Gwynn"), was given many of Mr. Burns's significant job responsibilities by Rich Tully ("Mr. Tully"), a white manager. From about 1995 through about 1997, Ms. Gwynn received an increasing amount of Mr. Burns's work responsibilities.

27

136.    In approximately June 1997, Ms. Gwynn was promoted to a GS-13 position (Information Specialist, formerly "Computer Specialist").

137.    Census's discriminatory policies, practices, and procedures have severely limited Mr. Burns's opportunities for professional advancement and achievement compared to similarly situated white individuals who were hired around the same time as he.

138.    For example, Tom DiNenna ("Mr. DiNenna") and Howard Hamilton ("Mr. Hamilton"), white males, were hired at the GS-3 level in the early sixties and have subsequently been promoted to GS-16 level positions, the highest promotions possible at the Bureau (as compared to Department) level.

139.    Mr. DiNenna's and Mr. Hamilton's career track positions and movement are representative of many white employees' career track.  African-American employees are not typically offered such career ladder opportunities.

140.    As a result of Commerce's discriminatory actions, Mr. Burns has suffered extreme harm.

141.    **Class Representative Dennis Gosier** ("Mr. Gosier") is a white male residing in Maryland.

142.    Mr. Gozier joined Commerce in 1970, and has been employed consistently since then in Census.  He is currently a Social Science Analyst at the GS-12 level.

143.    In the course of Mr. Gosier's employment, Commerce has subjected him to reprisal for speaking out against Commerce's pervasive race discrimination in employment and has subjected him to a racially hostile work environment and other forms of discrimination.

144.    Throughout his employment at Census, Mr. Gosier has witnessed a policy of widespread, institutionalized race discrimination against African-Americans, resulting in

preferential treatment of white employees receiving job promotions and advancement over no less qualified African-Americans.

145.    As a white person, Mr. Gosier was protected from the racism at Commerce, but since approximately 1985-93 when he was a Chief Steward in the American Federation of Government Employees, and later as an EEO representative from 1993 to present, he has seen a pattern and practice of discrimination in promotions and hiring against African-Americans that has resulted in the following:

- Denying African-American employees' promotions to higher GS levels at the Census Bureau;

- Showing preferential treatment to whites in promotional opportunities;

- Denying African-Americans adequate or appropriate training necessary to advance to the next level;

- Moving African-Americans to different positions at the same level which hinders progression to the next GS level; and

- Arbitrary and subjective negative personnel reviews of African-Americans that have resulted in thwarting of employment advancement.

146.    In Mr. Gosier's roles as Chief Steward and EEO representative, he has personally attempted to help more than a hundred African-Americans remedy their discrimination.

147.    Mr. Gosier believes that there are likely hundreds of individual African-Americans who have remained victimized by not bringing their own cases forward – either out of fear of reprisal or fear of creating an even more hostile work environment than already exists.

148.    Mr. Gosier alleges that African-Americans are forced to work in a hostile work environment and are wary about asserting their rights to equal treatment.

149.    In his capacity as an EEO representative, Mr. Gosier has been retaliated against by Commerce for trying to assist African-Americans in pursuit of their employment grievances.

150.    For example, in or about 2003, Census falsely charged Mr. Gosier with being absent without leave (AWOL) when he was performing his legitimate and approved responsibilities assisting African-Americans with their employment grievance claims against Commerce.

151.    Mr. Gosier has since filed his own claim of employment discrimination against Commerce to stop this wrongful retaliation and reinstate his good employment record.

152.    From approximately 1993 to present, Mr. Gosier has carried approximately 10-14 cases per month for African-Americans pursuing charges of race discrimination, which routinely involve claims alleging failure to be promoted.

153.    A large amount of the lack of advancement has been between GS-12 and the higher levels, which generally demarcates the line where more management-type responsibilities are achieved.  However, lack of advancement for African-Americans continues at all levels.

154.    Three harmful tactics that white Commerce managers have used to hinder the advancement of African-Americans have been to (i) lateralize, (ii) detail, and/or (iii) limit training availabilities to minorities.

155.    Lateralizing employees is a technique whereby the white manager moves the African-American employee to a job that requires them to learn new duties and lose the advantage of the experience they had in the prior job in terms of promotional opportunities.

156.    Detailing employees is a method of temporarily moving African-American employees to another office from their permanent position.  In this way, the manager can favor non-minority employees by posting available positions while the African-American is away from his regular office.

157.    White managers have also hidden training by not "publicly" posting new training availability.  The white managers tipped off certain favored white employees who learned of and took the training, and were then "qualified" for advancement to the next level.

158.    Another way in which white managers prevent job advancement of African-Americans is to offer training to the employee population (for example, as part of an EEO settlement), but then not offer African-Americans an opportunity to use the training to further their advancement.  Employees will be given certain training, then told at the completion of the training that there are no positions available for which that training made them eligible.

159.    White managers also frequently deny African-Americans advancement with subjective, negative assessments. Managers will label employees as "not having shown leadership."  Or managers will single out an employee's supposedly negative performance despite the same performance being exhibited by white employees.

160.    Commerce has created a climate of fear in which African-Americans are afraid to challenge Commerce's adverse decisions against them – decisions which keep minorities bottled up at lower GS levels.  And those persons who seek to try to remedy the abuses, as Mr. Gosier has done, are targeted as well in retaliatory actions by their departments.

161.    In 2004, Mr. Gosier filed an EEO complaint against the Department of Commerce, but it was stayed on April 19, 2004 pending the outcome of Janet Howard's class action suit against Commerce.

162.    As a result of Commerce's actions, Mr. Gosier has suffered extreme harm.

163.    **Class Representative Philippe Morris** ("Mr. Morris") is a white resident of Maryland.

164.    Mr. Morris is a Survey Statistician, level GS-12, in Census and has been with Census for approximately seventeen years.

165.    In the course of Mr. Morris's employment, Commerce has subjected him to reprisal for speaking out against Commerce's pervasive race discrimination in employment and has subjected him to a racially hostile work environment and other forms of discrimination.

166.    On or about April 27, 2004, Chris Blackburn, a white male and Mr. Morris's immediate supervisor, told Mr. Morris that Ken Hansen ("Mr. Hansen"), another white male and Branch Chief, wanted to meet with Mr. Morris.  The meeting started off with Mr. Hansen stating that it had gotten back to "them" that Mr. Morris was helping an African-American co-worker, Aronda Stovall ("Ms. Stovall"), with performing her job and they told Mr. Morris to stop helping her.

167.    Ms. Stovall would come across the hall to Mr. Morris's desk and ask him about the new computer system, which was common for the employees to do – ask a co-worker – as they all tried to learn the new systems.  At times she would ask him questions about her assigned industries as he had been assigned those industries for about three years (approximately 1996 to 1999).  It was common for surveyors to ask co-workers about various aspects of the job from time to time.  In fact, the Division Chief, William Bostic, Jr.,  has said numerous times that those in the division should all help each other to perform their jobs to the best of their abilities.

168.    In or about April 2004, Mr. Hansen told Mr. Morris that he knew that Mr. Morris was trying to get promoted to GS-13 and that by helping Ms. Stovall, Mr. Morris was presenting a "perception" that was "hindering" his chances to get that promotion.

169.    Mr. Morris asked Mr. Hansen to clarify and all he kept saying was, "Well, you know what I mean," never willing to answer in specifics.

170.    Mr. Morris's supervisors at Commerce informed him that they believed Ms. Stovall was circumventing the chain of command by asking Mr. Morris for assistance instead of going to her supervisor or Branch Chief.

171.    Mr. Morris's supervisors at Commerce also told Mr. Morris that he was not disturbing the office's work and that he was doing an excellent job -- however, they said he needed to change his behavior and attitude, referring to his efforts to offer assistance to Ms. Stovall.  Mr. Morris's supervisors told him that if he did as they told him, his chances for promotion were greatly improved.  In other words, if Mr. Morris continued to assist his co-worker, he would not be promoted.

172.    After that incident, Mr. Morris got a call from Ms. Stovall, who told Mr. Morris that she had met with her supervisor, James Hinckley, and Branch Chief Robert Reinard, a white male, who had advised her that she needed to stop asking Mr. Morris for assistance.  Ms. Stovall reported to Mr. Morris that Mr. Reinard had also told her her asking Mr. Morris for assistance was hurting Mr. Morris' chances for promotion.

173.    After speaking, Ms. Stovall and Mr. Morris went to the Union for assistance and to find out what recourse was available to them.   Upon hearing their story, Union Representative Jaquelin Dotson ("Ms. Dotson") told Ms. Stovall and Mr. Morris of their options and they selected mediation.

174.    The mediation meeting was held on or about May 13, 2004.  Mr. Morris was represented by Ms. Dotson.  Judy Dodds ("Ms. Dodds"), the white Assistant Division Chief, Mr. Hansen and Mr. Blackburn were there for the Department of Commerce.  They said that Mr. Morris helping Ms. Stovall was showing favoritism.

175.    Ms. Dodds also told Mr. Morris earlier in 2000 that she had seen him laughing with his now former supervisor, and that was a fact in his being denied a promotion at that time. Mr. Morris told Ms. Dodds that it was interesting that the rationale for his not being promoted in 2000 was that he was laughing with his African-American supervisor and that now Mr. Morris

was not being promoted because he was helping an African-American co-worker.  Mr. Morris told Ms. Dodds that this sounded like racism to him, but she did not respond.

176.    On approximately Tuesday, June 22, 2004, Mr. Morris met Ms. Dotson in the Union office and she advised him that Commerce had dismissed the matter.  Subsequently, Ms. Dotson called the Office of the General Counsel and there was a conference call between an attorney from the Office of the General Counsel, Mr. Morris, and Ms. Dotson.

177.    The attorney, William Monahan, told Mr. Morris that the claim by Ms. Stovall had been resolved, and that therefore Mr. Morris's complaint was moot.

178.    Because of Commerce's actions, Mr. Morris has experienced extreme harm.

**NIST**

179.    **Plaintiff Colonel Lovett** ("Mr. Lovett") is a member of a protected class, African-American.

180.    Mr. Lovett was employed Commerce in the  National Institute for Standards and Technology ("NIST") for approximately twenty-three years as a GS-14 managerial employee.

181.    In the course of Mr. Lovett's employment, Commerce has subjected him to discrimination in employment based on his race, African-American, by denying him promotions in favor of less senior, less qualified white employees and subjecting him to a racially hostile work environment and other forms of discrimination.

182.    The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Mr. Lovett's employment at Commerce.  Because of Commerce's promotion system and how it is used, Mr. Lovett has been denied opportunities that are available to white employees.  Mr. Lovett's supervisor used subjective decision making to discriminate against Mr. Lovett because of his race.

183.    Mr. Lovett received a Bachelor of Science degree from Howard University in 1964. He attended the University of Michigan and obtained sixteen credit hours in mechanical engineering before he transferred to Northeastern University in Boston, Massachusetts. Mr. Lovett received a master's degree in mechanical engineering in 1971. He completed a second Masters degree in engineering management from Northeastern University in 1973.

184.    In approximately 1996 or 1997, Mr. Lovett was denied a promotion to a GS-15 position to be head of the metric program. This program facilitated a conversion to the metric system, and the knowledge, skills, and abilities needed for the position were advertised as requiring a physical scientist or general engineer background.

185.    Instead of reviewing candidates for this position, NIST decided to withdraw the position and re-advertised the position with another set of requirements.

186.    As a result of the change, a new position was advertised and a white male attorney was selected. This individual selected did not meet any of the previously announced requirements for the position.

187.    Shortly after the hiring of the white attorney, Mr. Lovett had a meeting regarding the selection process with a white male employee who was Chief of Technology Services. He told Mr. Lovett the selection of the attorney was a "political situation" and that Ray Kramer, who was the Director of NIST, "wanted the attorney in this position."

188.    In 1998, Mr. Lovett applied for the position as Chief of the Fabrication and Technology Division, a GS-15 position. The principal requirements for this position were knowledge of machines, management experience, and computer-added manufacturing ("CAM") software.

189.    Mr. Lovett was never interviewed for the position. Instead, a white male, Richard Rhorer, was selected.

190.    Mr. Lovett believes that he was better qualified for the position than the individual selected because of several factors.  First, Mr. Lovett had the prerequisite background experience and at that time was Chairman of the Technical Committee that develops standards on machining centers and turning centers.   This Committee develops American national standards and this experience was essential for the position.

191.    In addition, Mr. Lovett was teaching CAM at Howard University at that time, thus adding to his level of knowledge and skills.

192.    The former Chief of the Fabrication and Technology Division, a white male, Adrian Moll, had only a GED degree. NIST was able to get the candidate of their pre-selected choice into the position by changing the job description from a mechanical engineer, which would have required a degree, to a facilities manager.

193.    In approximately 1999, Mr. Lovett applied for a position in the Office of Standards, Physical Standards, a GS-15 level position.  This position required a background in national and international standards.  Mr. Lovett was not interviewed for the position, which was given to a white male.  Mr. Lovett believes that he was well-qualified for the position, having had ten years of chairing technical standards committee and working with a United States Technical Advisor Group ("TAG").

194.    In addition, between 1994 and 1999, Mr. Lovett applied for approximately six other positions in the GS-14 through GS-15 range.  Each time, despite his being qualified for each and every position, Mr. Lovett was rejected.

195.    As a result of Defendant's discriminatory actions, Mr. Lovett has suffered extreme harm.

**PTO**

196.    **Class Representative Michele Peyton** ("Ms. Peyton") is a member of a protected class, African-American.

197.    Ms. Peyton has been employed by Commerce at the United States Patent and Trademark Office ("PTO") for approximately 34 years as an hourly/non-supervisory employee.

198.    In the course of Ms. Peyton's employment, Commerce has subjected her to discrimination in employment based on her race, African-American, by denying her promotions in favor of less senior, less qualified white employees and subjecting her to a racially hostile work environment and other forms of discrimination.

199.    The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Ms. Peyton's employment at Commerce. Because of Commerce's promotion system and how it is used, Ms. Peyton has been denied opportunities that are available to white employees. Ms. Peyton's supervisor used subjective decision making to discriminate against Ms. Peyton because of her race.

200.    Ms. Peyton was hired by Commerce in approximately 1970 as a Clerk/Typist, a GS-2 level position, at PTO. By 1986, Ms. Peyton had progressed to a GS-11 level Patent Technician position. Despite continuous applications for promotion, Ms. Peyton's career has been dead-ended for the past eighteen years as she has continued to work in the same GS-11 level Patent Technician position.

201.    For example, Ms. Peyton has applied for positions, including Technical Information Specialist, Employee Relations Specialist, Labor Relations Specialist, Technical Information Specialist, Program Analyst, Management Analyst, EEO Specialist, HR Classification & Staffing Specialist, and Human Relations Specialist. In each case, the position

was awarded to an equally or less qualified white individual.

202.    During the mid-1990's, Ms. Peyton requested that her director, Harold Smith, a white male, provide her with a detail assignment in which she could receive training that would allow her to advance and broaden her skills, subsequent to completing the Executive Leadership Training Program and college training.

203.    In approximately 1994, the employees who had progressed through the Patent Technician Program to GS-11 level Patent Technician positions, but those who had not subsequently advanced their employment were detailed to lower level work. This work included application processing and other tedious, unfulfilling, non-employment enhancing responsibilities, at the GS-8/9 level.

204.    White Commerce managers, including Harold Smith, a director, and Nicholas Godici, a Commissioner for Patents, were involved in this decision. The employees affected were predominantly African-American. Only one white Patent Application Assistant was affected. That white employee was subsequently transferred to a position performing different, preferable responsibilities with promotion potential to higher grade levels.

205.    As a result of Defendant's discriminatory actions, Ms. Peyton has suffered extreme harm.

206.    **Class Representative Jeanette Devins** ("Ms. Devins") is a member of a protected class, African-American.

207.    Ms. Devins has been employed by Commerce at the PTO for approximately thirty-four years.

208.    In the course of Ms. Devins's employment, Commerce has subjected her to discrimination in employment based on her race, African-American, by denying her promotions in favor of less senior, less qualified white employees, subjecting her to reprisal for speaking out

38

against Commerce's pervasive race discrimination in employment, and subjecting her to a racially hostile work environment and other forms of discrimination.

209.    The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Ms. Devins's employment at Commerce.  Because of Commerce's promotion system and how it is used, Ms. Devins has been denied opportunities that are available to white employees.  Ms. Devins's supervisor used subjective decision making to discriminate against Ms. Devins because of her race.

210.    For example, while working as an Employee Development Specialist position from 1994 to 1998, Ms. Devins was unable to obtain a promotion to the GS-12 level, even though the Employee Development Specialist position had "career ladder" promotion potential to the GS-12 level.  Another African-American Employee Development Specialist at the GS-11 level, Carolyn Bush ("Ms. Bush"), was likewise unable to progress to the GS-12 level.  Ms. Bush and Ms. Devins were the only Employment Development Specialists who were prevented from advancing to the GS-12 level.  In contrast, white employees in their office progressed to the GS-12 level and beyond around the same time.

211.    On four occasions in 1997, Ms. Devins applied for a Personnel Staffing & Classification Specialist position, a GS-11/12 level position.  In each case, the position was awarded to an equally or less qualified white applicant.

212.    In 1997, Ms. Devins applied for a Personnel Management Specialist position, a GS-11/12 level position.  This position was awarded to an equally or less qualified white applicant.

213.    On three occasions in 1997, Ms. Devins applied for an Employee Relations Specialist position, a GS-11/12 level position.  In each case, the position was awarded to an

equally or less qualified white employee.

214.    In 2000, Ms. Devins applied for an Employee Relations Specialist position. Commerce notified Ms. Devins that she was qualified for the position but was not selected. An equally or less qualified white applicant received the position.

215.    In 2001, Ms. Devins applied for a Senior EEO Specialist position. This position was "cancelled."

216.    In late 2002, Ms. Devins applied for a promotion to a Labor Relations Specialist position, a GS-13 level position with promotion potential to the GS-14 level. Ms. Devins was interviewed for the position in January 2003 by Joyce Ong ("Ms. Ong"), an Asian-American female, David Dalke, a white male, and Audrey Britt, an African-American female. Although Ms. Devins was subsequently placed on the list of the best qualified candidates for the Labor Relations Specialist position, she was ultimately denied the promotion in favor of three equally or less qualified white males, Eric Adam, Steve Martin, and Mitch Berkemper, none of whom were currently employed at PTO.

217.    After finding out that she had not been selected for the position, Ms. Devins emailed Ms. Ong, inquiring how she might improve her credentials in preparation for subsequent promotional opportunities. Ms. Devins did not receive a response from Ms. Ong.

218.    Ms. Devins has also observed that several positions are segregated according to race. Certain positions, including Labor Relations Specialist, Employee Relations Specialist, and Human Relations Specialist, are predominantly white. These positions all have career ladder promotion potential to the GS-13 level. Other, less preferable positions, including Technical Information Specialist, are predominantly African-American. The Technical Information Specialist has career ladder promotion potential only to the GS-12 level. In addition, the Program Analyst position, which has career ladder promotion potential to the GS-12 level, is

predominantly African-American, whereas the Management and Program Analyst position, which has career ladder promotion potential to the GS-13 level, is predominantly white.

219.    Ms. Devins's current supervisor, Mario Campo ("Ms. Campo"), a white female, creates a hostile work environment for African-American employees.  For example, Ms. Campo has subordinated Darnella Kindred ("Ms. Kindred"), an African-American GS-13 level employee, and Ms. Devins to Junish Arora ("Mr. Arora"), a South Asian GS-12 level employee, by making Mr. Arora her "special assistant."  Despite the fact that Mr. Arora was a junior employee, Ms. Campo required Ms. Kindred and Ms. Devins to report to Mr. Arora, gave him preferable office space, and offered Mr. Arora and white employees additional training opportunities while denying Ms. Devins training opportunities around the same time.

220.    Ms. Devins has observed that African-American employees working as Patent and Trademark Examiners, a GS-13 level position, in the "partial signatory program" are systematically denied the opportunity to progress into the "full signatory program" and obtain promotions to GS-14 level employment.  By comparison, white GS-13 Patent and Trademark Examiners, by comparison, pass into the "full signatory program" and obtain promotions to GS-14 level employment with greater facility.

221.    As a result of Commerce's discriminatory actions, Ms. Devins has suffered extreme harm.

**NOAA**

222.    **Class Representative Anthony Washington** ("Mr. Washington") is a member of a protected class, African-American.

223.    Mr. Washington has been employed by Commerce for approximately twenty-one years as an hourly/non-managerial employee, at the Bureau of the National Oceanic and Atmospheric Administration ("NOAA").

224.   In the course of Mr. Washington's employment, Commerce has subjected him to discrimination in employment based on his race, African-American, by denying him promotions in favor of less senior, less qualified white employees and subjecting him to a racially hostile work environment and other forms of discrimination.

225.   The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Mr. Washington's employment at Commerce.   Because of Commerce's promotion system and how it is used, Mr. Washington has been denied opportunities that are available to white employees.   Mr. Washington's supervisor used subjective decision making to discriminate against Mr. Washington because of his race.

226.   Mr. Washington was hired by Commerce in August 1985.   He was hired as a temporary GS-7 employee.   From August 1985 to July 1999, he worked as a Computer Operator at the Patent & Trademark Office ("PTO"), including a promotion to a permanent GS-7 position in 1989.   In approximately 1999, Mr. Washington was promoted to the GS-9 level.

227.   In approximately July 1999, he transferred laterally to a Computer Specialist position, a GS-9 level position, at the National Oceanic and Atmospheric Administration ("NOAA") in Silver Spring, Maryland.   He continues to work in this capacity.   He remains at the GS-9 level.

228.   In approximately 1997, Mr. Washington was denied a promotion to GS-11/12 in favor of less qualified white individuals, including Ed Miller ("Mr. Miller").   Numerous additional well-qualified African-American Computer Operators, including John Woodley, Vanessa Samda, Vernon Robertson, Sandria Craig, and Josh Branson, were also denied the position in favor of white individuals.

229.   Mr. Miller, whose previous experience included working as a bill collector,

subsequently requested that Mr. Washington train him in the responsibilities of the GS-11/12 position.   Mr. Washington timely filed a Complaint of Discrimination regarding this discriminatory denial of promotion but received no relief.

230.   Whereas Mr. Washington worked as a temporary Computer Operator for four years before being made permanent, Mr. Miller was hired as a temporary Computer Operator around 1994, was made permanent shortly thereafter, and progressed to the GS-12 level by 1999.

231.   As a result of Commerce's discriminatory actions, Mr. Washington has suffered extreme harm.

232.   **Class Representative Barbara Loretz** ("Ms. Loretz") is a member of a protected class, African-American.

233.   Ms. Loretz has been employed by Commerce at NOAA for approximately thirty-four years.

234.   In the course of Ms. Loretz's employment, Commerce has subjected her to discrimination in employment based on her race, African-American, by denying her promotions in favor of less senior, less qualified white employees and subjecting her to a racially hostile work environment and other forms of discrimination.

235.   The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Ms. Loretz's employment at Commerce.   Because of Commerce's promotion system and how it is used, Ms. Loretz has been denied opportunities that are available to white employees.   Ms. Loretz's supervisor used subjective decision making to discriminate against Ms. Loretz because of her race.

236.   For example, in approximately 1993, Ms. Loretz applied for a GS-12 position. Her white supervisor awarded the position to a less qualified white employee, Teresa Bedell

("Ms. Bedell").    Further, Ms. Loretz's supervisor waited until Ms. Bedell returned from

maternity leave, months after the announcement was posted, to award her the position.    Ms.

Loretz had more time in grade and more time with NOAA than Ms. Bedell.

237.    In approximately 2000, Ms. Loretz learned that a GS-12 position for which she

was qualified was about to be announced.    Her supervisor, Kirby Jean, discouraged Ms. Loretz

from applying, saying "I'm going to advertise the '12' but it's not yours; yours will be out in

three or four months."    After Ms. Loretz told him she would apply for it anyway, Commerce

elected not to advertise the position.    Several months later, a different GS-12 position was

advertised, and Ms. Loretz applied for it and was selected.

238.    In another example of discriminatory behavior against African-Americans in Ms.

Loretz's division is that she was asked to do a "special project" in order to qualify for a

promotion.    Her white coworkers were not subjected to the same additional requirements to

qualify for promotion.    Ms. Loretz is aware of at least one other incident in which an African-

American employee in her division was also required to do a special project in order to qualify

for a promotion.

239.    Ms. Loretz has repeatedly requested and applied for training opportunities for

which she was qualified.    She was denied each of these training opportunities while her white

coworkers' requests for training were granted.

240.    From the 1990's to the present, Ms. Loretz has continually attempted to advance

her employment at Commerce.    In each case, the position was awarded to an equally or less

qualified white individual.

241.    For example, in approximately 2002, Ms. Loretz applied for a GS-13 position in

the Quality Assurance Division.    The position was given to a less qualified white employee.

Since that time, Ms. Loretz has not applied for other GS-13 positions because she believes that

such a position would not be awarded to an African-American employee.

242.    As a result of Commerce's discriminatory actions, Ms. Loretz has suffered extreme harm.

243.    **Class Representative Queen Jones** ("Ms. Jones") is a member of a protected class, African-American.

244.    Ms. Jones has been employed by Commerce at NOAA for approximately sixteen years.

245.    In the course of Ms. Jones's employment, Commerce has subjected her to discrimination in employment based on her race, African-American, by denying her promotions in favor of less senior, less qualified white employees, subjecting her to reprisal for speaking out against Commerce's pervasive race discrimination in employment, and subjecting her to a racially hostile work environment and other forms of discrimination.

246.    For example, the subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Ms. Jones's employment at Commerce.  Because of Commerce's promotion system and how it is used, Ms. Jones has been denied opportunities that are available to white employees.  Ms. Jones's supervisor used subjective decision making to discriminate against Ms. Jones because of her race.

247.    In 1990, Ms. Jones was promoted to the GS-7 level, and she has been a GS-7 for fifteen years.  Ms. Jones has applied for GS-8 positions but has always been denied because her performance evaluations are not good enough.  The reason they are not good enough is because her manager, Wayne Wilmot, behaves discriminatorily towards her and evaluates her on a harsher basis than he does white employees.

248.    On several occasions, Ms. Jones has indicated that she wanted training, but her

manager will only let her participate in training that helps her in her current position, not training that will let her advance.  Other, white employees are allowed to participate in training that will help them advance.

249.    Twice, Ms. Jones has been turned down when she has applied for a leadership program because of her race.  Ms. Jones believes that if she had not been denied training, she would be a GS-12 by now.

250.    Another example of discrimination occurred when Ms. Jones was supposed to complete two timecards.  The people whose timecards she was supposed to complete told her manager that she had said she was too busy when she had not said so.  Ms. Jones was disciplined, yelled at, and written up, whereas white employees were not disciplined for such actions.  Ms. Jones filed an EEO complaint regarding this incident.

251.    Ms. Jones has been subjected to constant harassment by her manager, Wayne Wilmot, based upon her race.  For example, he monitors her activity whenever she is away from her desk, interrogating her about where she has been, even if she was only away a few minutes.

252.    As a result of Commerce's discriminatory actions, Ms. Jones has suffered extreme harm.

## IX.    CLASS ACTION ALLEGATIONS

### A.    Class Definition

253.    The Class Representatives seek to maintain claims on their own behalf and on behalf of a class of African-American and non-African-American current and former Commerce employees under Rule 23 of the Federal Rules of Civil Procedure.  Each of the Class Representatives is a member of the proposed class.

254.    The class consists of all African-Americans and non-African-Americans who are, or have been, employed by Commerce and have experienced race discrimination or have been

retaliated against for acting against race discrimination at any time during the applicable liability period.  Upon information and belief, there are hundreds, if not thousands, of members of the proposed class.

### B.    Numerosity and Impracticability of Joinder

255.    The persons whom the Class Representatives seek to represent are too numerous to make joinder practicable.  The proposed class consists of over one hundred former, current, and future African-American applicants and employees who have been, are, or will be employed by Commerce. Commerce's pattern and practice of racial discrimination also makes joinder impracticable by discouraging African-Americans from applying or pursuing employment opportunities, thereby making it impractical and inefficient to identify many members of the class prior to determination of the merits of Commerce's class-wide liability.

### C.    Common Questions of Law and Fact

256.    The discriminatory treatment in which Plaintiffs have been subjected is manifested by such policies and/or patterns or practices as denying African-American employees desirable promotional opportunities, job assignments, training, management positions, compensation, bonuses, and other benefits and conditions of employment on the same terms applied to white employees

257.    In particular, Commerce deters African-American employees from seeking promotions, management positions, and desirable job assignments; fails to select African-Americans for desirable job assignments and positions; and fails to enforce policies prohibiting racial discrimination and retaliation.

258.    As a result of the illegal policy and/or patterns or practices described herein, there are in fact two separate workforces at Commerce. One workforce, which is primarily white, enjoys preferential treatment, better job opportunities, and a swift path to advancement into

management positions. The other workforce, which is primarily African-American, holds a disproportionate share of the lowest level positions, is denied equal terms and conditions of employment and, with few exceptions, has not been allowed to advance to better positions.

259.    Commerce has created and maintained a system-wide employment policy of race-based disparate treatment, which limits the employment opportunities for African-Americans in various aspects of Commerce's employment operation including, but not limited to, job selections. Commerce's selection practices and procedures have had disparate impact on the plaintiffs and the class they seek to represent.

260.    This action in part seeks to enjoin Commerce from pursuing specific illegal policies and/or practices that have injured and continue to injure Plaintiffs and other African-American employees and applicants for employment with Commerce in all aspects of Commerce's employment operations.

261.    Commerce's illegal policy is premised on an invidious and racially discriminatory animus directed against African-American people. It is specifically calculated to deny members of the African-American race equal treatment and opportunities guaranteed by 42 U.S.C. §2000 *et seq.*

**D.    Typicality of Relief Sought**

262.    The relief necessary to remedy the claims of the Class Representatives is the same as that necessary for the class. The Class Representatives seek the following relief for their individual claims and those of the class: 1) a declaratory judgment that Commerce has engaged in systemic racial discrimination in limiting the employment opportunities of African-Americans to lower classifications and compensation; 2) a declaratory judgment that Commerce has engaged in retaliation against African-Americans and non-African-American employees who speak out in opposition against race discrimination at Commerce; 3) a permanent injunction

against such continuing discrimination as described in (1) and (2) above; 4) restructuring of Commerce's selection and compensation procedures so that African-Americans are able to learn about and fairly compete in the future for better classifications, compensation levels, and terms and conditions of employment traditionally enjoyed by white employees; 5) restructuring of Commerce's workforce so that African-Americans are assigned to the classifications, locations and compensation levels they would have now held in the absence of Commerce's past racial discrimination; and 6) damages, back-pay, and other equitable remedies necessary to make all Class Representatives and the class they seek to represent whole from Commerce's past discrimination and retaliation.

### E.    Adequacy of Representation

263.    The Class Representatives' interests are coextensive with those of the class in that each seeks to remedy Commerce's discriminatory employment practices so that (1) racially hostile conditions of work will be eradicated and African-Americans will no longer be segregated in unequal positions and prevented from promotional opportunities, and (2) retaliation against African-Americans and non African-American employees will be eradicated. The Class Representatives are able and willing to represent the class fairly and vigorously, as they pursue their common goals through this action. Plaintiffs' counsel are also qualified, experienced, and able to conduct the litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity. The combined interest, experience and resources of Plaintiffs and their counsel to litigate competently the individual and class claims of race-based employment discrimination at issue, satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### F.    Efficiency of Class Prosecution of Common Claims

264.    Certification of a class of African-Americans and non-African-Americans

similarly situated to the Class Representatives is the most efficient and economical means of resolving the questions of law and fact common to the individual claims of the Class Representatives and the putative class.

265.    The individual claims of the Class Representatives require resolution of the common questions of (1) whether Commerce has engaged in a systemic pattern of racial discrimination against African-Americans; and (2) whether Commerce has engaged in a pattern of retaliation against African-Americans and non-African-American employees who speak out in opposition of race discrimination.

266.    The Class Representatives seek remedies to undo the adverse effects of such discrimination in their own lives, careers and working conditions and to prevent continued racial discrimination and retaliation in the future.

267.    The Class Representatives have standing to seek such relief (1) in part because of the adverse effect that racial discrimination against African-Americans has had on their own interest in working and living in conditions free from the pernicious effects of racial bias and hostility, and (2) in part because of the adverse effect that retaliation against African-Americans and non African-Americans has had on their own interest in working and living in conditions free from the pernicious effects of retaliation.   In order to gain such relief for themselves, as well as for the class members, the Class Representatives must first establish the existence of systemic racial discrimination and retaliation as the premise of the relief they seek. Without class certification, the same evidence and issues would be subject to repeated relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

268.    Certification of the class of African-Americans and non-African-Americans affected by the common question of law and fact is the most efficient and judicious means of presenting the evidence and argument necessary to resolve such questions for the Class Representatives, the putative class and the Defendant.

269.    The Class Representatives' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this Class Complaint. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

**G.    Certification is Sought Pursuant to Fed. R. Civ. P. 23(b)**

270.    Commerce has acted on grounds generally applicable to the class by adopting and following systemic practices and procedures which are racially discriminatory.

271.    Commerce's racial discrimination is its standard operating procedure rather than a sporadic occurrence.  Commerce has refused to act on grounds generally applicable to the class by refusing to adopt or follow selection and compensation procedures which do not have disparate impact or otherwise do not systemically discriminate against African-Americans and by refusing to establish conditions of work that are not hostile to African-American and non African-American employees who oppose the racial discrimination at Commerce.

**<u>COUNT ONE</u>**
**VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. §§ 2000(e), *et seq.*, AS AMENDED**
**RACE DISCRIMINATION – PAY AND PROMOTION**
**(African-American Class Representatives against Defendant)**

272.    African-American Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully

set forth herein.

273.    This Count is brought on behalf of all African-American Class Representatives and the class.

274.    The African-American Class Representatives and the class they seek to represent have been subject to systemic racial discrimination including, but not limited to, a pattern and practice of intentional discrimination and a battery of practices having unlawful disparate impact on their employment opportunities. The systemic means of accomplishing such racial discrimination include, but are not limited to, Commerce's selection procedures, and unequal terms and conditions of employment.

275.    Commerce's selection and compensation procedures incorporate the following racially discriminatory practices: 1) reliance upon subjective procedures and criteria which permit and encourage the incorporation of racial stereotypes and bias of Commerce's predominantly white managerial staff; 2) refusal to establish or follow policies, procedures, or criteria that reduce or eliminate disparate impact and/or intentional racial bias or stereotypes in Commerce's decision making process; 3) pre-selection of whites before vacancies or opportunities become known; and 4) discouragement of applications and expressions of interest by African-Americans through a reputation for racial bias, racially hostile conditions of work, and unequal terms and conditions of employment in such areas as work hours and position assignments.

276.    Commerce's selection procedures have a disparate impact on the African-American Plaintiffs and the class they represent. Such procedures are not valid, job related or justified by business necessity. There are objective and structured selection and compensation procedures available to Commerce which have less disparate impact on African-Americans and

equal or greater validity and job relatedness, but Commerce has refused to consider or to use such procedures.

277.    Commerce's selection procedures have adversely affected the Class Representatives by excluding African-Americans from traditionally white positions.

278.    Commerce has continuously engaged in, condoned and ratified discrimination which constitutes a continuing violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.*, as amended.

279.    Class Representatives have no plain, adequate, or complete remedy of law to redress the wrongs alleged herein, and this suit for back-pay, an injunction other equitable relief, and a declaratory judgment is their only means of securing adequate equitable relief.   The Class Representatives are now suffering and will continue to suffer irreparable injury from Commerce's unlawful policies and practices as set forth herein unless enjoined by this Court.

280.    By reason of Commerce's discriminatory employment practices, the Class Representatives and the members of the proposed class have experienced economic harm, including loss of compensation, back and front pay, other employment benefits, and emotional harm, anguish and humiliation.

281.    By reason of the discrimination suffered at Commerce, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under Title VII.

282.    Attorneys' fees should be awarded under 42 U.S.C. §2000e-5(k).

## COUNT TWO
### VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000e(k), AS AMENDED
### RETALIATION
### (African-American and white Class Representatives against Defendant)

283.    All Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

284.    This Count is brought on behalf of all Class Representatives and the class.

285.    Commerce has retaliated against the Class Representatives and the members of the proposed class because they insisted upon a work environment free of race discrimination and/or because they complained about race discrimination.

286.    Commerce has retaliated against the Class Representatives and the members of the proposed class by subjecting them to retaliatory employment actions, including but not limited to, denying them promotions for which they were qualified and subjecting them to disparate terms and conditions of employment, race discrimination, a hostile work environment and/or other forms of discrimination in violation of Title VII.

287.    Commerce's actions were intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of causing harm to the Class Representatives and the members of the proposed class.

288.    Commerce has continuously engaged in, condoned and ratified retaliation which construes a continuing violation of Title VII of the Civil Rights Act of 1964, 42 U.S. C. § 2000e, et seq., as amended.

289.    As a direct and proximate result of Commerce's aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered

economic losses, mental and emotional harm, anguish and humiliation.

290.    By reason of the retaliation suffered at Commerce, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under Title VII.

291.    Attorneys' fees should be awarded under 42 U.S.C. §2000e-5(k).

### COUNT THREE
### VIOLATION OF 29 U.S.C. §§ 710 *et seq.*, THE REHABILITATION ACT OF 1973
### (Plaintiff Tanya Ward Jordan against Defendant)

292.    Plaintiff Tanya Ward Jordan re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

293.    Commerce has discriminated against Ms. Ward Jordan by denying her reasonable accommodation for her disabilities, including respiratory problems and occupational stress, in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 710 *et seq.*, as amended.

294.    Commerce has conducted itself intentionally, deliberately, willfully, and in callous disregard of the rights of Ms. Ward Jordan.

295.    By reason of Commerce's discrimination, Ms. Ward Jordan is entitled to all legal and equitable remedies available under the Rehabilitation Act.

296.    Attorney's fees should be awarded under 29 U.S.C. §§ 794(a)(1).

### X.    PRAYER FOR RELIEF

Wherefore, Plaintiffs on behalf of themselves and the class members whom they seek to represent request the following relief:

    a.    Acceptance of jurisdiction of this cause;

b.      Certification of the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a), (b)(2) and (b)(3), on behalf of the proposed plaintiff class, and designation of the Plaintiffs as representatives of the class and their counsel of record as class counsel;

c.      Declare and adjudge that Commerce has violated Plaintiffs' rights under Title VII;

d.      A temporary injunction against Commerce and its partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with it, from engaging in any further unlawful practices, policies, customs, usages, racial discrimination and retaliation by defendant set forth herein;

e.      A permanent injunction against Commerce and its partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with it, from engaging in any further unlawful practices, policies, customs, usages, racial discrimination and retaliation by defendant set forth herein;

e.      An Order requiring Defendant to initiate and implement programs that provide (i) equal employment opportunities for African-American employees; (ii) remedy the effect of Commerce's past and present unlawful employment practices; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above;

f.      An Order requiring Defendant to initiate and implement systems of assigning, training, transferring, compensating, and promoting African-American employees in a non-discriminatory manner;

g.      An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (e) and (f), above, which would provide for (i) the monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (e) and (f), above;

h.      An Order restoring Plaintiffs and the class they seek to represent to those jobs they would now be occupying but for Commerce's discriminatory practices;

i.      An Order directing Commerce to adjust the wage rates and benefits for Plaintiffs and the class they seek to represent to the level that they would be enjoying but for Commerce's discriminatory practices;

j.      An award of back pay; front pay; lost job benefits; preferential rights to jobs, and other equitable relief for the Plaintiffs and the class they seek to represent;

k.      An award of compensatory damages in an amount not less than 500 million dollars;

l.      An award of litigation costs and expenses, including reasonable attorney's fees, to the Plaintiffs and class members;

m.      Prejudgment and postjudgment interest; and

n.      Such other and further relief as the Court may deem just and proper.

## XI.    DEMAND FOR JURY

Plaintiffs demand trial by jury of all issues triable of right to a jury.

Respectfully submitted this 5th day of October, 2005.

_____

David Sanford, D.C. Bar No. 457933

Lisa Goldblatt, D.C. Bar No. 456187

**SANFORD, WITTELS & HEISLER, LLP**

2121 K Street, NW

Suite 700

Washington, D.C. 20037

Telephone: (202) 942-9124

Facsimile:  (202) 628-8189


Steven L. Wittels (SLW-8110)

Jeremy Heisler (JH-0145)

**SANFORD, WITTELS & HEISLER, LLP**

545 5th Avenue

Suite 960

New York, NY 10017

Telephone: (646) 723-2947

Facsimile:  (646) 723-2948


Grant Morris, D.C. Bar No. 926253

**LAW OFFICES OF GRANT E. MORRIS**

2121 K Street, NW

Suite 700

Washington, D.C. 20037

Telephone: (202) 661-3510

Facsimile:  (202) 628-8189


*Attorneys for the Plaintiffs*