UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JANET HOWARD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1968 (JDB) |
| | ) | |
| CARLOS M. GUTIERREZ, Secretary, | ) | |
| United States Department of Commerce, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION TO DISMISS ALL INDIVIDUAL CLAIMS, TO DISMISS CERTAIN CLASS CLAIMS, AND TO STRIKE ALL CLASS CLAIMS

Pursuant to Fed. R. Civ. P. 12(b)(3), (b)(6), and 23, and Local Rule 23.1(b), Defendant Carlos M. Gutierrez, Secretary of the U.S. Department of Commerce ("Defendant"), hereby moves to dismiss the individual claims of all named plaintiffs; to dismiss the class claims that exceed the scope of the administrative class complaint; and to strike all class claims for failure to meet the requirements for class certification. In support of this motion, Defendant respectfully refers the Court to the attached memorandum of points and authorities.

Because this is a dispositive motion, the undersigned has not consulted with Plaintiffs' counsel before filing it. See LCvR 7(m).

Respectfully submitted,

_____
/s/
KENNETH L. WAINSTEIN, D.C. Bar #451058
United States Attorney

_____
/s/
R. CRAIG LAWRENCE, D.C. Bar #171538
Assistant United States Attorney

_____/s/_____
STRATTON C. STRAND, D.C. Bar #464992
Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JANET HOWARD, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1968 (JDB) |
| | ) | |
| CARLOS M. GUTIERREZ, Secretary, | ) | |
| United States Department of Commerce, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS ALL INDIVIDUAL CLAIMS, TO DISMISS CERTAIN CLASS CLAIMS, AND TO STRIKE ALL CLASS CLAIMS</u>

Defendant Carlos M. Gutierrez, Secretary of the U.S. Department of Commerce, respectfully submits this memorandum of points and authorities in support of his consolidated dispositive motions.

## I.  INTRODUCTION

After spending untold resources, including hundreds of thousands of dollars; after filing volumes of pleadings and hundreds of thousands of pages of documents; and after enduring more than a decade in an administrative process where favorable rulings were reversed for further consideration and interminable reconsideration and the most significant adverse ruling was issued *sua sponte* and without any prior briefing, the Department of Commerce respectfully requests this Court to pronounce the obvious:  Plaintiffs' claims have all along been fundamentally and irreparably flawed.

Underlying this action is the highly implausible premise that, for over a dozen years and through different administrations, a changing cast of political appointees of both major political

parties at the highest levels of the Department colluded with senior-level career officials at all fifteen Commerce Department bureaus to indulge a pervasive, Department-wide policy of race discrimination against African-Americans at all grade levels and job classifications in direct contravention of the tapestry of statutory, regulatory, negotiated, and promulgated civil rights edicts.  These incredible, and quintessentially "across-the-board," class claims do not on their face, and in light of the Department's decentralized personnel structure never can, satisfy the requirements for class certification.

The defects in Plaintiffs' class claims are only compounded by additional infirmities to the individual claims and to certain class claims that are raised for the first time in the Complaint at bar.  Defendant submits herein numerous grounds for disposition of them all.

## II.  STATEMENT OF FACTS

A.    **Prior Administrative Proceedings, 1995 To 2005**

1.    **1995-1997:  The Administrative Complaint, the First Dismissal, and the First OFO Decision**

Janet Howard, an Export Compliance Specialist at the Department's Bureau of Industry and Security, filed the underlying administrative complaint in this action on February 22, 1995.  See EEOC Compl., attached hereto as Exhibit ("Exh.") A.  That complaint alleged that the Department discriminated against African-Americans "in the area of promotions, awards, performance ratings, career enhancement work assignments, timely training for advancement, and all other resource support readily available to the majority,"  and also engaged in class retaliation.  See id. at 1-4.  The complaint did not delineate the class "by name and specific location of employees," but did state that a more precise definition of the class would be

produced if required. See id. at 2.

The complaint was transferred to the Equal Employment Opportunity Commission ("EEOC"), following which the Department moved to dismiss it on the grounds that it failed to establish any of the applicable class certification requirements of 29 C.F. R. § 1614.204(a), viz., numerosity, commonality, typicality and adequacy of representation. Then-presiding EEOC Administrative Judge ("AJ") Brady agreed, and the Department issued a decision dismissing the complaint. See Howard v. Dep't of Commerce, EEOC Case No. 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X (June 30, 1995), Exh. B. Ms. Howard obtained counsel and appealed to the EEOC's Office of Federal Operations ("OFO"), which vacated the dismissal and remanded for a determination of whether the complaint met the standards for commonality and typicality set forth in General Telephone Company of the Southwest v. Falcon, 457 U.S. 147 (1982). See Howard v. Dep't of Commerce, EEOC App. No. 01956455, 1997 WL 314807 (June 4, 1997) ("Howard I"), Exh. C at 5.

**2.    1997-2001:  Ms. Howard's Response to AJ's Request for Information, the Disqualification of Ms. Howard as Class Agent, and the Second OFO Decision**

On remand, then-presiding AJ Brown issued a formal request asking that Ms. Howard "define the scope of the class more specifically." In response, Ms. Howard stated that "[t]he class comprises 'all *non-supervisory* Department of Commerce, *Washington, D.C. Headquarters employees* that [sic] are of African-American decent. [sic]" See Howard Response, Exh. D at 2 (emphases added).

Ms. Howard also produced an organizational chart of the Department on which an "X" had been drawn through the boxes for the Bureau of the Census ("Census"), the U.S. Patent and

Trademark Office ("PTO"), the National Institute of Standards and Technology ("NIST").[1] See

Exh. D ("Howard Response") at 3. These entities are located outside of Washington, D.C. in

Maryland or Virginia.[2] See Declaration of John J. Phelan III ("Phelan Decl."), Exh. E at ¶ 5.

Ms. Howard explained, "[a]n X over the unit shows that these bureaus are *not* part of the class."

See Exh. D (Howard Response) at 3 (emphasis added). At the bottom of the organization chart

the Class Agent added the following: "NOTE: Included in Class are all *Non-Supervisory* African

American NOAA employees employed at *Washington, D.C. Headquarters ONLY*." See id.

(emphasis added; capitalization in original).[3]

Thereafter, AJ Brown concluded that Ms. Howard could not adequately represent the

class, and remanded the case to the Department to allow for the selection of a new Class Agent.

See Howard v. Dep't of Commerce, EEOC Case Nos. 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X, 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X (Mar. 24,

1999), Exh. F at 4. The Department issued a final agency decision adopting the AJ's

recommendation, Ms. Howard obtained new counsel, and appeals were taken.

OFO again reversed, holding that Ms. Howard could adequately represent the class. See

Howard v. Dep't of Commerce, EEOC App. No. 01994518, 2000 WL 33542684 (July 20, 2000)

("Howard II"), Exh. G, at 15. However, Howard II decided more than simply the issue raised on

appeal. OFO also decided class certification issues that had neither been addressed by the

---

[1] There were also Xs through the Office of the Chief Economist of the Economic and Statistics Administration and through the entire Under-Secretariat of Technology. See Exh. D (Howard Response) at 3.

[2] NIST is also located in Boulder, Colorado. See Exh. E (Phelan Decl.) at ¶ 5.

[3] The National Oceanic and Atmospheric Administration (NOAA) has headquarters offices in both Silver Spring, Maryland and Washington, D.C. See Exh. E (Phelan Decl.) at ¶ 5.

decision below, nor presented by the parties on appeal, nor briefed by any party either before the

AJ or on appeal; and OFO *sua sponte* certified the class complaint "on a provisional basis."[4]  <u>See</u>

<u>id.</u> at 9-15.  The class was defined as:

> African-American, non-supervisory employees and former employees of the agency's Headquarters' offices *in the metropolitan area of Washington, D.C.*, who allegedly have been denied career advancement to one or more white collar positions in the agency's Headquarters' offices at grade levels GS-9 through GS-15 levels*, or equivalent level white collar non-GS positions*, and who may have been denied *related promotional opportunities* in those same offices based on their race during the period of time beginning two years prior to the filing of the class complaint on February 22, 1995, and continuing to the date a final determination is rendered on the class complaint claim.  Related promotional opportunities include training, assignments, details, awards, etc., that would have enhanced a class member's qualifications for promotion to such a position, whether the promotion would have been a career ladder promotion, a competitive promotion, or an accretion of duties promotion.

<u>See</u> <u>id.</u> at 15 (emphases added).

The source of the class definition is not clear.  By defining the geographical scope of the

class as including "the metropolitan area of Washington, D.C.," <u>Howard II</u> *sua sponte* expanded

the provisional class to encompass Census, NIST, NTIS, PTO, as well as NOAA offices in Silver

Spring, MD.  The effect of including "equivalent level white collar non-GS positions" was to

encompass non-GS employees who serve under either the Demonstration Project ("Demo

Project") or under the Alternative Personnel Management System ("APMS") at NIST.[5]

<u>Howard II</u> also denied certification of the class claim of retaliation on the ground that the

---

[4]  OFO repeatedly emphasized the provisional nature of both its certification decision and its commonality determination, and also specified that either party "may move to narrow the coverage of the class complaint" upon the completion of discovery.  <u>See</u> Exh. G (<u>Howard II</u>) at 16.

[5]  The specifics of the Demo Project and APMS, are detailed below.

record did not support a determination that the numerosity requirement had been satisfied, id. at 10, and made clear that OFO's provisional certification was limited to class promotion claims and that its use of the term "related promotional opportunities" was not meant to certify independent class claims on those allegations.[6]

OFO later refused the Department's request for reconsideration of Howard II, but stated that, "[a]t the close of discovery, the agency may renew its contentions that the class should be decertified . . . [or] limited to employees who work in the Herbert C. Hoover building in downtown Washington, D.C." See Howard v. Dep't of Commerce, EEOC App. No. 01994518 (Feb. 26, 2001) ("Reconsideration Decision"), Exh. H at 2.

### 3.    2002-2005:  Redefinition of the Provisional Class And Dismissal Of the Administrative Action

On December 17, 2002, the Department moved to redefine the class to restore it to its original scope of including only employees in Washington, D.C. rather than in the metropolitan area of Washington, D.C.  Ms. Howard was afforded  more than ninety days to respond, and she timely responded both pro se and through counsel.  Those responses included no claim or suggestion that the class should extend beyond the Washington, D.C., metropolitan area or include supervisory, wage grade, foreign service or uniformed employees; nor did she argue that

---

[6]     "[T]he means by which the agency allegedly accomplishes the alleged career advancement discrimination should not be treated as independent claims of discrimination . . . Instead, proven instances, if any, in which white employees have been given preferential treatment over African-American employees in ways that facilitated their career advancement, e.g., in the provision of developmental training career-enhancing assignments, outstanding performance appraisal ratings, and awards, should be treated as relevant evidence supporting the class claim of career advancement discrimination."

See Exh. G (Howard II) at 11.

compensation, harassment or selection claims should be included as class claims. See Letter from Howard to AJ Kravetz (Jan. 2, 2003), Exh. I at 1, 2; see also Class Agent's Opposition to the Agency's Motion to Redefine (March 21, 2003), Exh. J. Then-presiding AJ Henry granted the Department's motion and ordered the provisional class redefined to encompass only the Department's headquarters' offices in Washington, D.C. See Order of August 20, 2003, Exh. K.

Thereafter, the Class Agent obtained substitute class counsel and was given permission by then-presiding AJ Kravetz to seek reconsideration of AJ Henry's Order redefining the class. Briefing on the reconsideration motion was completed on May 13, 2004. Nowhere in her filings on the motion for reconsideration did the Class Agent claim or suggest that the class extended beyond that which had been provisionally certified by Howard II.[7] The motion to reconsider was still pending 18 months later when, on September 27, 2005, class counsel informed the EEOC of his intent to file a civil action "on this matter." On September 30, 2005, AJ Kravetz issued a Notice of Withdrawal dismissing the complaint from the administrative process. See Notice of Withdrawal dated September 30, 2005, Exh. L. The Complaint in this action was filed on October 5, 2005.

## B.    The Department of Commerce

Fifteen unique bureaus perform the diverse functions of the Department of Commerce. See Declaration of Deborah A. Jefferson (Jefferson Decl.), Exh. M at ¶¶ 5, 6. To manage its diverse and highly trained workforce, the Department has established decentralized and

---

[7] The filings in the administrative process relating to the redefinition of the class are voluminous, and the Department does not anticipate that plaintiffs will contend that her filings evidence any contention that the class should then have been expanded beyond the provisional certification. Therefore, they are not produced at this time. The Department will produce those filings as exhibits accompanying a reply brief, if necessary.

independent personnel offices, and provided each bureau with the authority to develop and implement its own personnel policies and practices.  See id. at ¶¶ 10-14, 23-25.  Each bureau has in fact utilized this delegated authority to do so.  See id. at ¶¶ 25, 26.  Moreover, each bureau makes promotion and other personnel decisions independently from the other bureaus.  See id. Finally,  promotions and other personnel decision-making processes at the bureaus invariably involve objective and quantifiable considerations.  See e.g., Declaration of Margaret Focarino ("Focarino Decl."), Exh. N at ¶¶ 3-4, 6; Declaration of Robert Kirkner ("Kirkner Decl."), Exh. P at ¶¶ 13, 17-18 ; Declaration of Deborah Martin ("Martin Decl."), Exh. Q at  ¶ 11; Declaration of Vickers B. Meadows ("Meadows Decl."), Exh. R at ¶¶ 14, 17, 24; Declaration of Michael Osver ("Osver Decl."), Exh. S at  ¶ 3; Declaration of Eduardo Ribas ("Ribas Decl."), Exh. T at ¶¶ 18-20; Declaration of Bobby Russell ("Russell Decl."), Exh. U at ¶¶ 4, 7; Declaration of Tyra Dent Smith ("Smith Decl."), Exh. V at ¶¶ 24, 29; Declaration of James Valdez ("Valdez Decl."), Exh. W at ¶¶ 5-6; Declaration of Dr. William R. Ott ("Ott Decl."), Exh. X at ¶¶ 4-7 .

### 1.    The Department Is Large and Organizationally Complex

The Department of Commerce is a large, multi-dimensional, internally diverse,  and organizationally complex federal agency.  See Exh. M (Jefferson Decl.) at ¶ 4.  It carries out a broad range of diverse responsibilities through bureaus, offices, services, and organizations located in every state, the District of Columbia, and overseas.  The Department's overarching responsibilities include job creation, economic growth, sustainable development, and improved living standards for all Americans.  See id.  Its more specific responsibilities include, among many others, such wide-ranging functions as: conducting the national Census; operating the National Weather Service; administering patent and trademark laws; enforcing trade agreements;

promoting minority-owned businesses; developing, maintaining, and analyzing a system of business cycle indicators; and developing measurement standards and technology.  See id.

In pursuit of its goals, the Department employs more than 40,000 employees in 15 discrete bureaus,[8] each with its own very distinctive responsibilities.  See id. at ¶ 5.  The Department has a fundamentally decentralized structure with authority—and personnel authority in particular—concentrated at the bureau level.  See Exh. E (Phelan Decl.) at ¶ 3.[9]  The fifteen bureaus that comprise the Department of Commerce are:

- the Bureau of Economic Analysis ("BEA");

- the Bureau of Industry and Security ("BIS");

- the Bureau of the Census ("Census");

---

[8]  The official term for 14 of these 15 organizational entities—all but the Office of the Secretary ("OS")—is "operating unit."  See Exh. E (Phelan Decl.) at Attachment ("Attach.") 1 (Departmental Organizational Order (DOO) 1-1), § 3.c.  OS is not an operating unit.  Rather, it is the general management arm of the Department and provides the principal support to the Secretary in formulating policy and in providing advice to the President. It provides program leadership for the Department's functions and exercises general supervision over the operating units. It also directly carries out program functions as may be assigned by the Secretary, and provides, as determined to be more economic or efficient, administrative and other support services for designated operating units.  See id. at Attach 1(DOO 1-1), § 3.a.; see also Exh. M (Jefferson Decl.) at ¶ 8. All 15 entities will hereinafter be referred to as "bureaus."

[9]  Organizationally, six Under Secretaries, two Assistant Secretaries, and a Director report to the Secretary of Commerce.  See Exh. E (Phelan Decl.) at ¶ 4, Attach 1 (DOO Organizational Chart); see also Exh. M (Jefferson Decl.) at ¶ 15.  Four of the Under Secretariats—NOAA, ITA, BIS, and PTO—are comprised of single bureaus, while BEA, Census, and ESA are within the Under Secretariat for Economic Affairs, and NIST, NTIS, and TA are within the Under Secretariat for Technology.  Nevertheless, for all purposes relevant to this case (other than certain matters concerning officials in the Senior Executive Service, (see Exh. M (Jefferson Decl.) at ¶ 15), all are functionally independent bureaus.  On the organizational chart, TA may be the "parent" of NIST and NTIS, and ESA may be the "parent" of Census and BEA, but TA does not control or oversee non-SES personnel policy or practices at NIST or NTIS, and ESA neither controls nor oversees non-SES personnel practices or policy at BEA or Census.  See Exh. M (Jefferson Decl.) at ¶¶ 15-16; Exh. E (Phelan Decl.) at ¶ 4.

- the Economic Development Administration ("EDA");

- the Economics and Statistics Administration ("ESA");

- the International Trade Administration ("ITA");

- the Minority Business Development Agency ("MBDA");

- the National Institute of Standards and Technology ("NIST");

- the National Oceanic and Atmospheric Administration ("NOAA");

- the National Telecommunications and Information Administration ("NTIA");

- the National Technical Information Service  ("NTIS");

- the Office of the Inspector General ("OIG");

- the Office of the Secretary ("OS");

- the U.S. Patent and Trademark Office ("PTO"); and

- the Technology Administration ("TA").[10]

As discussed more fully below, the fifteen bureaus vary considerably in size and

complexity.  A few are relatively small entities.  For example ESA, MBDA, and TA each has

100 or fewer employees.  See Exh. M (Jefferson Decl.) at Attachs. 11, 13, 21.  Other bureaus are

---

[10]  Nine of the Department's bureaus—BIS, EDA, ESA, ITA, MBDA, NTIA, OIG, OS, and
TA—are headquartered in the Herbert C. Hoover Building in Washington, D.C.  BEA is
headquartered elsewhere in Washington, D.C.  Four bureaus have headquarters offices outside of
Washington, D.C. proper:  Census in Suitland, MD; NIST, in Gaithersburg, MD; NTIS, in
Springfield, VA; and PTO, in Alexandria, VA.  NOAA has headquarters offices in both the
Hoover Building and in Silver Spring, MD.  See Exh. M (Jefferson Decl.) at ¶ 7.

The basic functions, management structure and organizational arrangements of the Department of
Commerce are prescribed by Department Organizational Orders (DOOs).  DOOs are issued for
each Secretarial Officer, Departmental Office, and Operating Unit of the Department of
Commerce.  The DOOs together with organizational charts for each bureau are provided as
attachments accompanying Exh. E (Phelan Decl.) at Attachs. 1-26.

themselves very large and complex organizations. For example, Census has more than 13,000 employees,[11] NOAA has approximately 12,500 employees, and PTO has approximately 7,500 employees. See id. at Attachs. 15, 20.

### 2. The Department Has A Diverse Workforce

Not surprisingly, given its numerous functions, the Department's workforce is remarkably diverse. This diversity is demonstrated most vividly in the sheer number and range of different jobs at the Department of Commerce.[12]

Large Range of Different Jobs. Since 1995, Commerce has employed people in 346 different occupational series,[13] or distinctive types of jobs, ranging from attorneys to budget analysts to geographers and zoologists. See Exh. M (Jefferson Decl.) at ¶ 9. Currently, the Department has employees in 275 occupational series. See id. Moreover, jobs often differ significantly even within an occupational series. Often, this difference is clearly reflected in different job titles. For example, an Export Compliance Specialist, which is a position in the 1101 occupational series in BIS, will have different job duties and require different knowledge, skills, and abilities than an Import Policy Analyst in ITA, a job that is also in the 1101

---

[11] This does not include employees hired for Decennial Censuses. See Exh. M (Jefferson Decl.) at Attach. 9.

[12] At some bureaus, specifically, BEA, ESA, NTIS, TA, and PTO, all or almost all employees work in the Washington, DC, metropolitan area. Others, have a considerable number or a considerable percentage of employees stationed elsewhere. Total employee counts and figures showing DC metropolitan area and non-metropolitan area subtotals for each bureau are set forth at Exh. M (Jefferson Decl.) at Attach. 22.

[13] The U.S. Office of Personnel Management ("OPM") has classified subgroups of positions that involve a particular kind of work into "occupational series," each assigned a specific numerical code. See OPM Handbook of Occupational Groups and Families at 4 (2001), available at http://www.opm.gov/fedclass/gshbkocc.

-11-

occupational series.  <u>See</u> Exh. Q (Martin Decl.) at ¶ 26.   Such differences exist within bureaus as

well, and may or may not be reflected in different job titles.  For example, the job titles Patent

Examiner-Engineering and Patent Examiner-Food Technology—two positions in the same

occupational series in PTO—clearly reflect distinctive qualifications.  <u>See</u> Exh. R (Meadows

Decl.) at ¶ 23.  In addition, two employees in ITA, one in Market Access and Compliance whose

work focuses on a specific geographic market and the other in Manufacturing and Services who

focuses on the aerospace industry, will be in the same occupational series and both will be called

International Trade Specialists, but nevertheless will have very different skill sets, and are not

fungible.  <u>See</u> Exh. Q (Martin Decl.) at ¶ 26.

     <u>Numerous Pay Systems</u>.  The range of jobs at the Department also is reflected in the

variety of pay systems that Commerce operates.  Full-time permanent Commerce employees are

paid under one of seven pay systems:  (1) the General Schedule ("GS"), a graded pay system

established under the Classification Act of 1949 that covers most white-collar employees;[14]

(2) the Federal Wage System ("WG"), a uniform pay-setting system established in 1972 for blue-

collar employees who are paid by the hour, <u>see</u> 5 U.S.C. 5342 ; (3) the Senior Executive Service

("SES"), a performance-based pay system that applies to the Department's senior managers, <u>see</u>

5 U.S.C. 5382; (4) the performance-based pay system that applies to white collar NIST

employees under the Alternative Personnel Management System ("APMS"), as authorized by the

National Technology Transfer and Advancement Act of 1995 (Public Law 104-113, March 7,

---

[14] Additionally, OPM has established special salary rates for patent professionals at PTO that do
not apply to any employees elsewhere in the federal government, under which covered employees
earn salaries several percentage points above the regular General Schedule. <u>See</u> Exh. R
(Meadows Decl.) at ¶ 27.

1996), and as promulgated in 52 Fed. Reg. 37,082 (Oct. 2, 1987); (5) the separate performance-based system that applies to white collar employees at certain bureaus and units under the Demonstration Project ("Demo Project"), codified at 64 Fed. Reg. 52810 (Sept. 30, 1999); (6) the Foreign Service Act of 1980 as amended, codified at 22 U.S.C. Chapter 52, that applies to ITA's foreign service officers ("FSO"); or (7) the allowance for commissioned officers, which applies to NOAA's Uniformed Corps ("UC"), one of the seven uniformed services of the United States, see 33 U.S.C. Chapter 43 §§ 3301 et seq. See Exh. M (Jefferson Decl.) at ¶¶ 17-18.

### 3. Each of the Department's Bureaus Has Its Own Mission and Specialized Workforce[15]

Each of the Department's bureaus has its own mission and correspondingly unique workforce. The specialized nature of the bureaus' workforces and their distinctive missions is evidenced by the scant personnel movement among bureaus. From 1995 through 2005, there were 11,696 competitive promotions Department-wide, less than 1.5% of which involved employees moving from one bureau to another. See Exh. M (Jefferson Decl.) at Attach. 24.

Bureau of Economic Analysis. BEA, the Department's central economic research organization on the functioning of the economy, collects economic data, conducts research and analysis, develops and implements estimation methodologies, and produces such closely watched economic statistics as its cornerstone national income and product accounts, which feature estimates of gross domestic product and related measures. See Exh. E (Phelan Decl.) at Attach. 22 (DOO 35-1A); see also Exh. Q (Martin Decl.) at ¶ 7.D.

---

[15] The following sets forth the functions and structure of the bureaus at present and is generally accurate over the temporal scope of the claims made in Plaintiffs' complaint. Each bureau has had some modifications to their functions and structure over time, none of which are relevant to the instant motion.

-13-

BEA has four primary program units:  (1) National Economic Accounts, which has a Government Division and a National Income and Wealth Division; (2) International Economics, which has a Balance of Payment Division and an International Investment Division; (3) Regional Economics, which has a Measurements Division and an Analysis Division; and (4)  Industry Accounts.[16]  See Exh. E (Phelan Decl.) at Attach. 23 (DOO 35-1B).

BEA has approximately 500 employees.  Economists are the predominant occupational series at BEA, constituting  more than half (56%) of all employees at BEA, and more than half (58%) of all DOC economists work for BEA.  See Exh. M (Jefferson Decl.) at Attach. 7.

Bureau of Industry and Security.  BIS advances national security, foreign policy, and economic objectives by ensuring an effective export control and treaty compliance system and promoting continued U.S. strategic technology leadership.  For example, BIS administers and enforces dual-use export controls to stem the proliferation of weapons of mass destruction and the means of delivering them, to halt the spread of weapons to terrorists or countries of concern, and to further important U.S. foreign policy objectives.  See Exh. E (Phelan Decl.) at Attach. 21 (DOO 10-16); see also Exh. Q (Martin Decl.) at ¶ 7.A.

 BIS has three program units:  (1) Export Administration, which has offices of:  National Security and Technology Controls:  Non-Proliferation and Treaty Compliance; Strategic Industries and Economic Security; and Exporter Services; (2) International Programs; and (3) Export Enforcement, which is composed of three Offices:  Export Enforcement, Export Analysis, and Anti-Boycott Compliance.  See Exh. E (Phelan Decl.) at Attach. 20 (DOO 50-1).

---

[16]  Like all other bureaus, BEA also has a Director's (or analogous head of bureau) Office and at least one separate administrative and management unit.

BIS has approximately 350 employees.  See Exh. M (Jefferson Decl.) at Attach. 8.  The predominant job titles at BIS are Trade and Industry Analyst, Export Compliance Specialist, and Export Policy Analyst.  See Exh. Q (Martin Decl.) at ¶ 7.A.

Bureau of the Census.  Census, "the nation's fact finder," conducts the decennial census of population and housing, demographic and economic censuses, and more than 200 annual surveys.  Its mission is to be the preeminent collector and provider of timely, relevant, and quality data about the people and economy of the United States.  See Exh. E (Phelan Decl.) at Attach. 14 (DOO 35-2A).  Census has four primary program components:  (1) Economic Programs, which conducts the Economic Census every five years and develops, collects, analyzes, and publishes numerous economic surveys; (2) Decennial Census, which conducts the constitutionally mandated decennial census of population; (3) Demographic Programs, which develops, collects, analyzes, and publishes numerous surveys regarding social conditions; and (4) Methodology and Standards, which plans, conducts, and evaluates statistical research, methodology, and methodological standards.  Each program component contains from 3 to 7 divisions.  See id. at Attach. 15 (DOO 35-2B).

Census has more than 13,000 employees.  Statisticians are the predominant occupational series at Census, constituting 27 % of the Census workforce in the Washington, DC area.  See Exh. M (Jefferson Decl.) at Attach. 9.

Economic Development Administration.  EDA works with state and local governments, Indian Tribes, regional economic development districts, and public and private nonprofit organizations to address problems associated with long-term economic distress, as well as sudden and severe economic dislocations.  See Exh. E (Phelan Decl.) at Attach. 25 (DOO 45-1).

-15-

EDA awards grants to improve or develop transportation facilities, water and sewer systems, industrial parks, technology training centers, and telecommunications facilities, and also grants that leverage other public and private capital to establish revolving loan funds for business retention, expansion, or new enterprise development.  See id.

EDA has approximately 180 employees.  Much of the work of developing, processing, administering, and monitoring EDA's various assistance programs is undertaken in six Regional Offices located throughout the country.  See Exh. M (Jefferson Decl.) at Attach. 22.

Economics and Statistics Administration.  ESA is responsible for the analysis and development of policies on economic and statistical issues, and on issues affecting broad sectors of the domestic economy in response to the needs and interests of the Secretary or Deputy Secretary.  See Exh. E (Phelan Decl.) at Attach. 16 (DOO 10-9).  The Under Secretary's principal responsibilities include: economic forecasting; consultation with the private sector on economic and broad economic sectoral developments; and policy analysis and development in the areas of economic policy.  See id.

ESA has approximately 50 employees.  Economists constitute the predominant occupational series at ESA.  See Exh. M (Jefferson Decl.) at Attach. 11.

International Trade Administration.  ITA promotes world trade, and strengthens the international trade and investment position of the U.S. by advancing a competitive global market environment and the commercial success of U.S. business clients and by addressing unfair trade practices and removing trade barriers that adversely impact U.S. industry.  See Exh. E (Phelan Decl.) at Attachs. 32-33 (DOOs 10-3 and 40-1); see also Exh. Q (Martin Decl.) at ¶ 4.

ITA has four primary program units:  (1) The US and Foreign Commercial Service, which

contains two Assistant Secretariats—Domestic Operations, with more than 100 offices in the

United States, and International Operations, with more than 150 offices overseas—and offers

export assistance to American businesses seeking to expand in international markets;

(2) Manufacturing and Services is the government's link to American industry identifying trade

opportunities for specific products or services; (3) Market Access and Compliance works to

ensure other nations' compliance with their trade agreements and to identify and eliminate trade

impediments; and (4) the Import Administration, which enforces laws and agreements to prevent

unfairly traded imports.  See Exh. E (Phelan Decl.) at Attach. 33 (DOO 40-1); see also Exh. Q

(Martin Decl.) at ¶ 5.

ITA has approximately 1,700 employees.  Trade specialists are the predominant

occupational series at ITA, constituting 40% of ITA's workforce.  See Exh. M (Jefferson Decl.)

at Attach. 12.

Minority Business Development Agency.  MBDA promotes the ability of minority-owned

businesses to grow and compete in the global economy through programs that facilitate access to

financing, markets, education, and technology.  See Exh. E (Phelan Decl.) at Attach. 26 (DOO

25-4A).  MBDA funds a network of Minority Business Development Centers, Native American

Business Development Centers, Business Resource Centers, and Minority Business Opportunity

Centers located throughout the country.  These centers offer a range of business services to

minority entrepreneurs.  Much of the work providing assistance to these centers is performed in

the bureau's five Regional Offices, where more than half the bureau's employees are stationed.

See Exh. E (Phelan Decl.) at Attach. 27 (DOO 25-4B); see also Exh. M (Jefferson Decl) at ¶ 22.

The predominant occupational series at MBDA, which has fewer than 100 employees, is

-17-

general business and industry.  See Exh. M (Jefferson Decl.) at Attach. 13.

National Institute of Standards and Technology.  NIST's mission is to "develop and promote measurement, standards, and technology to enhance productivity, facilitate trade, and improve the quality of life."  See Exh. E (Phelan Decl.) at Attach. 10 (DOO 30-2A).  NIST's seven Laboratories pursue a broad range of cutting-edge research that advances the nation's technology infrastructure. The laboratories are the Electronics & Electrical Engineering Laboratory, the Manufacturing Engineering Laboratory, the Chemical Science & Technology Laboratory, the Physics Laboratory, the Materials Science and Engineering Laboratory, the Building & Fire Research Laboratory, and the Information Technology Laboratory.  See id. at Attach. 11 (DOO 30-2B).

NIST has almost 3,000 employees.  Physicists, the predominant occupational series at NIST, and chemists combine to constitute 20% of the NIST workforce.  See Exh. M (Jefferson Decl.) at Attach. 14; see also Exh. P (Kirkner Decl.) at ¶ 16.

National Oceanic and Atmosphere Administration.  NOAA's mission is to "describe and predict changes in the Earth's environment, and conserve and wisely manage the Nation's coastal and marine resources."  See Exh. E (Phelan Decl.) at Attach. 8 (DOO 10-15); see also Exh. T (Ribas Decl.) at ¶ 3.  It has five distinct operational components:  (1) the National Marine Fisheries Service ("NMFS"); (2) the National Ocean Service ("NOS"); (3) Oceanic and Atmospheric Research ("OAR"); (4) the National Weather Services ("NWS"); and (5) the National Environmental Satellite, Data, and  Information Service ("NESDIS").  NMFS rebuilds and maintains sustainable fisheries, promotes the recovery of protected species, and maintains the health of coastal marine habitats.  See Exh. T (Ribas Decl.) at ¶ 3.A.  NOS serves as the

nation's principal advocate for marine stewardship by providing the science, information management, and leadership necessary to balance the environmental and economic well-being of the nation's coastal resources.  See id. at ¶ 3.B.  OAR conducts experiments to better understand natural processes, and develops new analytical and forecast tools to improve weather services. See id. at ¶ 3.C.  NWS provides weather, hydrologic, and climate forecasts and warnings and is the nation's sole official voice for issuing warnings during life-threatening weather situations. See id. at ¶ 3.D.  NESDIS  provides and ensures timely access to global environmental data from satellites and other sources.  See Exh. E (Phelan Decl.) at Attach. 9 (DOO 25-5); see also Exh. T (Ribas Decl.) at ¶ 3.E.

NOAA has more than 12,400 employees.  Meteorologists are the predominant occupational series at NOAA, constituting 20% of NOAA's workforce.  Cartographers, oceanographers, and fishery biologists, combine to account for 10% of NOAA's workforce, and almost all (98.7%) DOC employees in those five occupational series work for NOAA.  See Exh. M (Jefferson Decl.) at Attach. 15; see also Exh. T (Ribas Decl.) at ¶ 17.

National Telecommunications and Information Administration.  NTIA is the President's principal adviser on telecommunications and information policy issues:  It works with other Executive Branch agencies to develop and present national policy on these issues.  NTIA represents the Executive Branch in telecommunications and information policy activities; manages the radio frequency spectrum; performs telecommunications research; and administers infrastructure and telecommunications facilities grants.  See Exh. E (Phelan Decl.) at Attach. 28 (DOO 25-7).

NTIA has five line offices:  (1) the Office of Spectrum Management, which ensures the

efficient, use of the radio frequency spectrum both nationally and internationally; (2) the Office of Policy Analysis and Development; (3) the Office of International Affairs; (4) the Institute for Telecommunication Sciences, which is NTIA's research and engineering laboratory; and (5) the Office of Telecommunications and Information Applications, which provides telecommunications facilities grants. See id.

NTIA has approximately 250 employees. Electronics engineers, the predominant occupational series at NTIA, and telecommunications specialists constitute 40.97% of NTIA's workforce. See Exh. M (Jefferson Decl.) at Attach. 16; see also Exh. Q (Martin Decl.) at ¶ 23.

National Technical Information Service. NTIS is the nation's largest central resource for government-funded scientific, technical, engineering, and business-related information. See Exh. E (Phelan Decl.) at Attach. 12 (DOO 30-7A). NTIS accomplishes this mission through two major programs: (1) information collection and dissemination to the public; and (2) production and other services for federal agencies. See id. at Attach. 13 (DOO 30-7B).

NTIS has approximately 150 employees. The predominant job at NTIS is customer service representative in the 1101 occupational series (General Business and Industry). See Exh. M (Jefferson Decl.) at Attach. 17; see also Exh. P (Kirkner Decl.) at ¶ 23.J.

Office of Inspector General. OIG's statutory mission is to promote economy, efficiency, and effectiveness, and detect and prevent waste, fraud, abuse, and mismanagement in the programs and operations of the Department. OIG fulfills its responsibilities by conducting audits, investigations, and an array of inspections, evaluations, and reviews. See Exh. E (Phelan Decl.) at Attach. 30 (DOO 23-1).

OIG contains four program units: (1) the Office of Audits; (2) the Office of Inspections

-20-

and Program Evaluations; (3) the Office of Investigations; and (4) the Office of Systems Evaluation.  See id.

OIG has approximately 120 employees.  More than 48% of OIG employees are either auditors or criminal investigators.  See Exh. M (Jefferson Decl.) at Attach. 18.

Office of the Secretary.  OS is the Department of Commerce's general management arm, which supports the Secretary in formulating policy and advising the President.  OS provides program leadership for the Department's functions and exercises general oversight of its operating agencies.  See Exh. E (Phelan Decl.) at Attach. 1 (DOO 1-1).

In addition to the immediate Office of the Secretary, OS includes subordinate offices that have Department-wide responsibilities or perform special program functions directly on behalf of the Secretary.  See id. at Attach. 3 (DOO 10-5).  The two largest subordinate offices of OS are: (1) the Chief Financial Officer and Assistant Secretary for Administration ("CFO/ASA"), which consists of nine Directorates that are responsible for a range of administrative functions; and (2) the Office of General Counsel ("OGC"), which provides legal services to the Department.[17] See id.

OS has approximately 830 employees.  Attorneys constitute almost 20% of OS's workforce and are the predominant occupational series in OS.  See Exh. M (Jefferson Decl.) at Attach. 19.

---

[17] Four legal offices—the Offices of General Counsel of PTO and NOAA and the Offices of Chief Counsel for EDA and NTIA—receive their funding and personnel allocations from, and are organizationally within, their respective bureaus.  Thus, these four legal offices are not included as subordinate offices of OGC and the approximately 350 attorneys who work in them are counted as employees of their respective bureaus, not as employees of OS.  See http://www.ogc.doc.gov/main_office.html.

Patent and Trademark Office.  PTO grants, issues, and disseminates information on patents and trademarks.  See Exh. E (Phelan Decl.) at Attach. 6 (DOO 10-14).  Although subject to numerous organizational restructurings over the period of time encompassed by this civil action, PTO has maintained two principal operating components, Trademarks and Patents, each headed by a Commissioner.  See Exh. E (Phelan Decl.) at Attach. 7 (DOO 30-3).  PTO has approximately 7,500 employees.  More than 60% of PTO's workforce are patent examiners.  See Exh. M (Jefferson Decl.) at Attach. 20; Exh. R (Meadows Decl.) at ¶ 21.

Technology Administration.  The smallest of the Department of Commerce's bureaus with less than 20 employees, TA works to maximize technology's contribution to the country's economic growth by advocating for technology in the federal policy-making process, expanding opportunity for high-technology business , and promoting the development and commercialization of innovations and state-of-the-art technologies.  See Exh. E (Phelan Decl.) at Attach. 18 (DOO 10-17); see also http://www.technology.gov/Offices.htm.

**4.      The Department Has Numerous Decentralized Human Resources Offices**

Human resource management of the various bureaus is decentralized, and the source of human resources management of each of the bureaus is discrete.  See Exh. M (Jefferson Decl.) at Attach. ¶¶ 9-14, 23-26.

The Department has 15 human resources ("HR") offices.  The Office of Human Resources Management ("OHRM"), a Directorate within ASA/CFO, implements Government-wide and Departmental policies, employee programs and activities in all aspects of human resources management and administration.  See id. at ¶ 2.  In addition, Census, ITA, NIST, NOAA, OS, OIG, and PTO each have had their own HR office in the Washington D.C.

metropolitan area throughout the pendency of the preceding EEOC administrative process and current civil action.  See Exh. M (Jefferson Decl.) at ¶ 10.[18]

The HR offices servicing each of the bureaus are not components or satellite offices of the Department's OHRM or OS's Office of Human Resources Operations.  Rather, each is a component of its respective bureau, with delegated personnel management authority.  See Exh. M (Jefferson Decl.) at ¶ 23, 25.  Consequently, the heads of the bureau HR offices are not employees of OS or of OHRM; rather, they are employees of their respective bureaus, and were each selected by, are evaluated by, and report to a high-level administrator within their respective bureaus.  See id. at 23; see also Exh. P (Kirkner Decl.) at ¶ 4; Exh. Q (Martin Decl.) at ¶ 2; Exh. R (Meadows Decl.) at ¶ 1; Exh. T (Ribas Decl.) at ¶ 2; Exh. V (Smith Decl.) at ¶ 2.

---

[18] Additionally, NOAA also has HR offices in Boulder, CO, Norfolk, VA, Seattle, WA., and Kansas City, MO (see Exh. T (Ribas Decl.) at ¶ 6); Census has an HR office in Jeffersonville, IN. (see Exh. V (Smith Decl.) at ¶ 5);  NOAA'S Uniformed Corps has its own personnel office in Silver Spring, MD (see Exh. T (Ribas Decl.) at ¶ 6); and, ITA has a human services office for its Foreign Service Officers (see Exh. Q (Martin Decl.) at ¶ 3; see also Exh. M (Jefferson Decl.) at ¶ 10).

The Census HR office is its Human Resources Division ("HRD") (see Exh. V (Smith Decl.) at ¶ 2); NOAA's HR office is called the Workforce Management Office (see Exh. T (Ribas Decl.) at ¶ 2); NIST's HR office is its Human Resources Management Division ("HRMD") (see Exh. P (Kirkner Decl.) at ¶ 2); ITA's HR office is its Office of Human Resource Management ("ITA/OHRM") (see Exh. Q (Martin Decl.) at ¶ 2); OS's HR office is its Office of Human Resources Operations (see Exh. M (Jefferson Decl.) at ¶ 23); and PTO has its Office of Human Resources (see Exh. R (Meadows Decl.) at ¶ 2).  Since October 2005, OIG has independently contracted with another government agency, the Treasury Department's Bureau of Public Debt, for HR services; previously OIG operated its own HR office.  See Exh. M (Jefferson Decl.) at ¶ 16.  Since 2005, EDA has contracted with a private independent contractor to provide it with HR services. See id. at ¶ 11.  ITA/OHRM, in addition to providing personnel services for ITA, also services BIS, MBDA, NTIA, and BEA.  See Exh. Q (Martin Decl.) at ¶ 7.  Similarly, NIST's HRMD, in addition to servicing NIST, also provides personnel services for NTIS and TA.  See Exh. P (Kirkner Decl.) at ¶ 6.  ESA has been serviced by the Census's HRD since February 14, 1996; previously, ESA was serviced by ITA/OHRM.  See Exh. M (Jefferson Decl.) at ¶ 14.

-23-

### 5.    Department Employees Work Under Six Different Personnel Systems

Department employees serve under one of six different personnel systems, three of which—General Schedule, the Alternative Personnel Management System, and the Demonstration Project—are the most prevalent.[19]  See Exh. M (Jefferson Decl.) at ¶ 18 & Attach. 23.  Most employees, approximately 28,000, serve under the GS system.  See id. ¶ 31 & Attach. 23.  Approximately 7,000 DOC employees serve under either APMS or the Demo Project.  See id.  APMS is in operation at NIST and applies to all of that bureau's approximately 3,000 employees, excepting wage-grade employees who are under the GS system.  See Exh. P (Kirkner Decl.) at ¶ 12.  The Demo Project applies to more than 4,000 employees of BEA, NTIA, TA, three of NOAA's five operational offices, and six units within CFO/ASA in OS.[20]  See Exh. M

---

[19] SES executives, Foreign Services Officers, and NOAA Uniformed Corps Officers, who total approximately 800 Department employees, each serve under distinctive personnel systems (see Exh. M (Jefferson Decl.) at ¶¶ 5, 18 & Attach. 22; Exh. T (Ribas Decl.) at 6. The SES was established by the Civil Service Reform Act of 1978 , and covers managerial, supervisory, and policy positions above GS-15 that are not filled by Presidential appointment with Senate confirmation. There are four types of SES appointments: career, noncareer, limited term, and limited emergency.  OPM manages the overall SES personnel program and provides the day-to-day oversight of and assistance to Federal agencies in developing, selecting, and managing the SES employees. Within the allocations OPM authorizes, each federal agency determines which positions will be established in the SES. OPM has developed executive core qualifications that are the primary selection criteria for SES positions.  OPM also convenes Qualifications Review Boards (QRBs) to provide independent peer review of candidates proposed for initial career appointment to the SES.  An SES candidate cannot be appointed to the position until the QRB certifies his/her executive qualifications.  See Exh. M (Jefferson Decl.) at 19; Guide to the Senior Executive Service, U.S. Office of Personnel Management (February 2004); http://www.opm.gov/ses.  For further information regarding the specifics of the FSO and UC personnel systems see 22 U.S.C. Chapt. 52 and http://www.noaacorps.noaa.gov/cpc, respectively.

[20] At NOAA the Demo Project applies to the Office of Oceanic and Atmospheric Research, the National Environmental Satellite, Data, and Information Service, and the National Marine Fisheries Service. See Exh. T (Ribas Decl.) at ¶ 13. The units of CFO/ASA that participate in the Demo Project are Office of Management and Organization, the Office of Administrative Services, OHRM, Security, the Office of Acquisition Management, and Office of Financial

(Jefferson Decl.) at ¶¶ 20, 31& Attach. 23; see also Exh. Q (Martin Decl.) at ¶ 7.D.1-2.

General Schedule.  Under the traditional GS system, which is also in effect at most federal agencies, employees are in a career ladder of numbered GS-levels, or "grades," based upon OPM classification standards and additional bureau-established qualification requirements for each occupational series, and sometimes job title.  Compensation is tied to grade level in accordance with OPM promulgated salary tables that include  locality adjustments, and is further tied to "steps" within grades that are generally obtained by years of service.  GS employees advance in grade either by obtaining  non-competitive career ladder promotions after serving a specified amount of time in grade and satisfying established performance standards or by competing for an announced vacancy to a higher graded position. See Exh. M (Jefferson Decl.) at ¶ 21.

Alternative Personnel Management System.  The APMS  system replaces the GS system with a classification system featuring four career paths and five pay bands;[21] employees are evaluated through peer comparison and ranking;  pay increases are tied to performance; performance-recognition bonuses, recruitment allowances, and retention allowances are available;  final decision authority over performance scores, pay increases, and bonuses is vested in Pay Pool Managers; and managerial and supervisory training is provided to all employees.  See Exh. P (Kirkner Decl.) at ¶ 12; see also Exh. T (Ribas Decl.) at 13; Exh. Q (Martin Decl.) at

Management.  See Exh. M (Jefferson Decl.) at ¶ 20.

[21] While it retains the GS occupational series, OPM classification standards are not used.  The four new career paths are scientific and engineering (ZP), which incorporates scientists such as physicists; scientific and engineering technicians (ZT), which include electronics technicians; administrative (ZA), including human resources management; and support (ZS), which encompasses clerical assistants.  See Exh. P (Kirkner Decl.) at ¶ 12.

¶ 7.D.2 .

Demonstration Project.  The Demo Project, which is similar to APMS, provides those offices that have adopted it with the authority to experiment with specific personnel system innovations otherwise prohibited by law or regulation. Those bureaus and covered operational offices that operate under the Demo Project  have replaced the traditional GS classification with four career paths and five pay bands; make discretionary "retention payments;" require individual supervisors to use the Automated Classification System, the Duties and Responsibilities and Knowledge, Skills, and Abilities systems to classify positions, and then to certify that the position has been classified consistently with the most applicable published standards.[22]

6.    **Each Bureau Has Independent Personnel Authority and Distinct, Bureau-Specific Personnel Policies and Practices that Rely Upon Objective Criteria For Making Assessment, Promotion, and Other Personnel Decisions**

Each[23] of the bureaus has been delegated considerable autonomy over their personnel

---

[22] The Demo Project is codified at 64 Fed. Reg. 52,810 et seq. (Sept. 30, 1999) and is implemented by NOAA's Demonstration Project Operating Manual, which is available at http://ohrm.doc.gov/employees/demo_project/demopr_procedures.  While the Demo Project is patterned after the APMS they are not identical systems.  NIST modified its performance management system in October 2005 in ways  the Demo Project did not.  Thus, for example, under APMS, critical elements of performance are evaluated on a scale with a total weight of 10 points, whereas under the Demo Project employees are rated on a 100 point scale and then ranked by performance score within a peer group. Cf. Exh. P (Kirkner Decl.) at ¶¶ 12.I & 21.B. Also, although substantively similar, APMS and the Demo Project, are so administratively distinctive as to be separate personnel systems.  See Exh. M (Jefferson Decl.) at ¶ 18.

[23]  Except PTO and OIG, whose independence and autonomy regarding personnel matters are statutorily prescribed.  Congress established PTO as "an agency of the United States" within the Department, directing it to "exercise independent control of its . . . personnel decisions and processes."  35 U.S.C. § 1.  Under the Inspector General Act of 1978, 5 U.S.C. app. § 1 et seq. ("IGA"),  OIG acts as an "independent" office within the Department,  under "the general supervision only" of the Secretary or the Deputy Secretary of the Department, with authority "to select, appoint, and employ such officers and employees as may be necessary . . . ."  Id., §§ 2(3), 3(a) and 6(a)(7).  Thus, the Department's delegation of  human resource management

matters, including, most importantly, independent authority over all[24] matters relevant to

Plaintiffs' class claims.  Departmental Administrative Order ("DAO") 202-250, § 5, issued July

26, 1996, delegates to each bureau the authority "to make human resource management

decisions, to administer human resources programs and activities, and to effect personnel

actions."[25]  See Exh. M (Jefferson Decl.) at ¶¶ 24-26 & Attach. 3 (DAO 202-250).

      Specifically, the Department has broadly delegated to each bureau authority to:

- implement a bureau-specific Merit Assignment Plan, which governs promotion and evaluation practices;

- grant bureau-specific awards;

- administer a bureau-specific training and development program;

- take position classification actions and personnel placement actions in administrative management areas without grade-level restriction; and

- redelegate classification decision-making to any supervisory or managerial level for certain positions, to establish performance plans and ratings, and to justify performance appraisal by a single summary rating rather than element-by-element.

See Exh. P (Kirkner Decl.) at ¶ 9; see also Exh. Q (Martin Decl.) at ¶ 8-9; see also Exh. R

(Meadows Decl.) at ¶ 8; see also Exh. T (Ribas Decl.) at ¶¶ 5, 10-11; see also Exh. V (Smith

Decl.) at ¶¶ 14-16.

---

responsibilities to the bureaus, states, "[t]he authority of the Inspector General to select, appoint, and conduct all personnel management activities is conferred by law and is not delegated under this Order."  See Exh. M (Jefferson Decl.) at Attach. 3 (DAO 202-250, id. at § 3.04).

[24]  Excepting certain personnel matters regarding SES employees, regarding which OHRM retains authority.  See Exh. M (Jefferson Decl.) at ¶ 15.

[25]  Between 1993 and the issuance of DAO 202-250, the Department permitted, under a series of memoranda and other documents, the individual bureaus much of the same broad latitude in developing their own personnel policies and practices.  See Exh. M (Jefferson Decl.) at ¶ 24 & Attachs. 1-2.

In short, each of the fifteen DOC bureaus has the independent authority—within the general confines of Department directives[26]—to develop and implement specific policies and practices concerning the promotion, evaluation, and assessment of its employees, and each has the independent responsibility for all  promotions decisions at issue in this case.  <u>See</u> Exh. M (Jefferson Decl.) at ¶ 25.  The authority and responsibility for implementing these policies resides and is exercised entirely within each of the bureaus, and they are not bound in the exercise of that authority by the human resources policies or practices developed or used in any other bureaus, including the larger bureaus whose human resource offices provide their HR services.[27]  <u>See</u> <u>id.</u> at ¶ 26.

### a.    MAPs, CBAs, Awards, and Training

Each bureau has implemented its own personnel practices by, <u>inter alia</u>, adopting a bureau-specific Merit Assignment Plan ("MAP"),[28]  negotiating one or more bureau-specific

---

[26]  With a few exceptions, (<u>e.g.</u>, the recently issued DAO concerning performance evaluations which is discussed <u>infra</u> at note 33) general Department-wide guidance or policies, set forth as DAOs, do not exceed the scope of guidance or prescriptions from federal entities, such as OPM or the EEOC, that are independent of the Department of Commerce, that promulgate policies or mandates of general applicability to federal agencies or the federal workforce ad do not contain Department-wide restrictions, limitations, or obligations upon the various bureaus beyond that which is required by the "central agency" guidance. <u>See</u> Exh. M (Jefferson Decl.) at ¶ 22.  In so stating, it warrants note that management philosophies and strategies are subject to modification under changed circumstances and different leadership.

[27] <u>See</u> note 18, <u>supra</u>.

[28] Census, ITA, NIST and PTO have each adopted their own MAP that contains bureau-specific variations from a Department suggested MAP. <u>See</u> Exh. M (Jefferson Decl.) at ¶ 26; <u>see also</u> Exh. V (Smith Decl.) at ¶ 18; <u>see also</u> Exh. Q (Martin Decl.) at ¶ 11; <u>see also</u> Exh. P (Kirkner Decl.) at ¶ 11; <u>see also</u> Exh. R (Meadows Decl.) at ¶¶ 10-11, respectively.  The remaining bureaus adopted the Department's suggested MAP as their own.  <u>See</u> Exh. M (Jefferson Decl.) at ¶ 26.

collective bargaining agreements ("CBAs")[29] integrating various personnel policies,[30] or

participating in a demonstration project. See Exh. M (Jefferson Decl.) at ¶¶ 25-26; see also Exh.

V (Smith Decl.) at ¶ 17.

_____

[29]  The Department has approximately 14 labor unions, one – the National Weather Service
Employees Organization (NWSEO) -- with National Consultation Rights, and approximately 41
bargaining units. See Exh. S (Osver Decl.) at  ¶ 6.  Census has had a CBA with the American
Federation of Government Employees (AFGE), Local 2782, for over 30 years (see Exh. V (Smith
Decl.) at ¶¶ 19);  ITA has a CBA with the American Foreign Service Association (AFSA) (see
Exh. Q (Martin Decl.) at ¶ 12); MBDA has a labor agreement with National Federation of
Federal Employees (NFFE), Local 1008 (see id.); NOAA has over 20 different CBAs (see Exh. T
(Ribas Decl.) at ¶ 16); NTIS has a CBA with NFFE and the International Association of
Machinists and Aerospace Workers, AFL-CIO (IAMAW) (see Exh. P (Kirkner Decl.) at ¶ 23.I);
and for all times relevant to this action PTO has contracted multiple labor agreements with the
National Treasury Employees Union (NTEU), Locals 243 and 245 and with the Patent Office
Professional Association (POPA) (see Exh. R (Meadows Decl.) at ¶¶ 12-14.)

[30]  Thus, each bureau establishes its own awards system.  In many instances awards are based
upon objective measures. Census, for example, , inter alia, created the Census Awards and
Recognition System ("CARS") a unique computerized program that monitors awards via
electronic initiations, routing and approval and also reviews the equity of awards, such as the
Director's Award for Innovation, awarded by a nine-member selection panel that grades
nominees on creativity (30%), effectiveness (20%), significance (20%), and risking-taking
behavior.  See Exh. V (Smith Decl.) at ¶ 25; see also e.g., Exh. Q (Martin Decl.) at ¶ 15.B, (ITA
Under Secretary and Customer Service monetary awards et al.); Exh. Q (Martin Decl.) at ¶ 16
(BEA); Exh. Q (Martin Decl.) at ¶ 17 (MBDA) ; Exh. R (Meadows Decl.) ¶¶ 12 - 14, 18 (PTO
performance awards, Productivity Gainsharing Awards, Pendency Reduction Awards et al. based
upon production); Exh. P (Kirkner Decl.) at ¶ 14 (NIST performance pay increases and cash
bonuses governed by APMS)).  Numerous and varied training and career development programs
are also developed and administered at the bureau level.  Census, for example, has, inter alia: a
Rotational Program, which encourages voluntary personnel exchange between divisions; its
Economic Directorate University, which offers continuing educational opportunities to survey
statisticians; the Census Corporate University, which is affiliated with a consortium of local
universities and offers five undergraduate and graduate certificate programs for competency-
based professional skills; a Mid-Career Program, which provides developmental work-study
assignments for GS-12 and higher employees; various Competency Guides; and a working
Career Resource Center providing career-enhancement activities. See Exh. V (Smith Decl.) at
¶ 26; see also, e.g., Exh. P (Kirkner Decl.) at ¶ 15 (NIST training programs); Exh. Q (Martin
Decl.) at ¶ 18 (ITA training programs); Exh. R (Meadows Decl.) at ¶¶ 19-20 (PTO training
programs); and Exh. T (Ribas Decl.) at ¶ 15 (NOAA training programs).

The Census MAP, for example, requires, inter alia: (1) at least 7 workdays of posting for each vacancy; (2) that Census HRD evaluate the candidates based on their application materials and create a "best qualified list" of up to 10 competitive candidates to send to the selecting official; (3) each competitive permanent Census candidate be interviewed, except in special circumstances; (4) that selecting officials document whether qualified candidates were contacted or interviewed, their decisions, and whether selectees declined; (5) a specific complaint process; and (6) that all vacancies be filled subject to competition from among the best qualified candidates available on the basis of merit, fitness, and qualifications without regard to, among other characteristics, race, color, or national origin. See Exh. V (Smith Decl.) at ¶ 18.[31]

### b.    Performance Evaluations

Currently, the Department has four distinct employee performance appraisal systems: 5-level, 2-level (pass/fail), Demonstration Project (Demo Project), and the Alternative Personnel Management System (APMS). While the four systems include the basic tenets common to all appraisal systems, each system employs specific, objective requirements unique to that system. See Exh. S (Osver Decl.) at ¶¶ 3, 8.[32] Consistent with Departmental policy, the Department's bureaus have developed and customized bureau-specific performance appraisal systems that are responsive to their unique business needs and organizational cultures, and these various

---

[31] Elsewhere, as examples of the different policies in effect at the various bureaus: the NOAA National Weather Service MAP, established by Agreement with the NWSEO, inter alia, permits that union to place a representative on each rating board. See Exh. T (Ribas Decl.) ¶ 16.F; see also, e.g., Exh. P (Kirkner Decl.) at ¶ 13.E (NIST candidates have the right to review records used to evaluate them); Exh. R (Meadows Decl.) at ¶ 11 (PTO MAP requires 5 days posting.)

[32] See also e.g., Exh. N (Focarino Decl.) at ¶ 3; Exh. X (Ott Decl.) at ¶¶ 4-7; Exh. U (Russell Decl.) at ¶¶ 4-5.

evaluation systems have changed over time.  See id. at ¶ 4.[33]

### c.    Promotions

Procedures and standards for promotion decisions vary according to bureau-specific

personnel policies and also for particular positions, or jobs.  A presentation setting forth those

standards for all 275 occupation series at the Department would fill scores of pages.  Instead, the

following highlights the objective standards and procedures that limit individual subjectivity in

promotion decisions for the predominant jobs at the Department's larger bureaus:  statisticians at

Census, meteorologists at NOAA, and patent examiners at PTO.[34]

CENSUS (statisticians).  To be eligible for a vacancy to a higher-level position, a

---

[33]    Specifically, since 1995 and continuing to the present eight bureaus – BIS, EDA, MBDA, NTIA, NTIS, OIG, OS  and PTO – have operated under a 5-level rating system.  In 1998 three bureaus – Census, ESA and ITA adopted a 2-tiered pass/fail rating system.   NIST has operated under the APMS since 1995, which currently has a 6-level system, except that NIST  WG employees, who are not under the APMS, have had a version of the 2-tiered appraisal system, since 1997.  Since 1998, BEA has operated under the Demo Project, which employs a multi-level rating system with a 100 point rating scale, as have certain units of NTIA, NOAA, OS, and TA. After briefly transitioning to a 3-level system, those parts of NOAA not under the Demo Project have since 1998 operated under a 2-tiered evaluation system, while those parts of NTIA and OS not under the Demo Project have operated under a 5-level rating system.  See Exh. S (Osver Decl.) at ¶ 4.

In October 2005, the Department amended Department Administrative Order (DAO) 202-430, and established a new 5-level performance management system for all employees except PTO and those in the Demo Project and AMPS.  Eight bureaus have transitioned to the new system. They are BIS, ESA, ITA, MBDA, NIST (non-AMPS), NTIA (non-Demo Project), NTIS, and OS. OIG is scheduled to transition to the new 5-level system in June 2006.  Three more bureaus are scheduled to transition to the new 5-level system in October 2006.  They are Census, EDA, and NOAA (non-Demo Project).   PTO remains on their five-level under their own performance based organization (PBO) authority.  See Exh. S (Osver Decl.) at ¶ 5.

[34]  The standards and procedures used for making promotion decisions for physicists at NIST, not discussed herein, are set forth in Exh. P (Kirkner Decl.) at ¶¶ 16-18 and Exh. X (Ott Decl.) at ¶¶ 3-8.

statistician candidate must meet specific educational and experience qualifications.[35]  In addition,

each GS level has its own additional educational and/or experience requirements.[36]  See Exh. V

(Smith Decl.) at ¶¶ 27-30; Exh. U (Russell Decl.) at ¶ 8.

     Career ladder (that is, non-competitive) promotions are based upon performance.  See

---

[35] The basic entry level qualifications requirements for a statistician are either (A) a degree that included 15 semester hours in statistics (or in mathematics and statistics, provided that at least six semester hours were in statistics), and nine additional semester hours in one or more specified fields of study or (B) an appropriate combination of the courses in (A) and experience in a full range of professional statistical work such as: (a) sampling, (b) collecting, computing, and analyzing statistical data, and (c) applying statistical technique such as measurement of central tendency, dispersion, skewness, sampling error, simple and multiple correlation, analysis of variance, and tests of significance.  See Exh. V (Smith Decl.) at ¶ 28.

[36] GS-9 statisticians must have a master's degree or two years of progressively higher level graduate education leading to a master's or equivalent graduate degree, or at least 1 year of specialized experience equivalent to at least a GS-7. GS-11 statisticians must have: a Ph.D. degree or three years of progressively higher level graduate education leading to a Ph.D. or equivalent doctoral degree, or at least 1 year of specialized experience equivalent to at least a GS-9. GS-12 or higher statisticians must have at least 1 year of specialized experience equivalent to at least the next lower grade.   See Exh. V (Smith Decl.) at ¶ 29.  In addition, the specialized knowledge that a GS-9 statistician must have includes: knowledge of statistical theories and techniques to resolve problems related to the review, analysis, and research of data; knowledge of organizational programs, terminology, procedures, and standards to apply to assigned projects; the ability to analyze factual information, trends, and to write technical reports on assigned studies; and the  ability to perform this work with minimal supervisor direction outside of the defined objectives, priorities, and deadlines. A GS-11 statistician must also be able to: evaluate critical factors relative to job assignments, draw rational inferences, and prepare technical reports of findings and methods; and initiate investigations, select and modify statistical techniques, evaluate alternatives to determine the appropriate methodology and procedures, and  prepare documentation of his/her procedures and findings.  A GS-12 or higher statistician also must have the ability to: analyze factual information and evaluate significant factors in order to solve complex problems with statistical data and to prepare comprehensive reports; plan, research, and implement the full scope of investigative projects requiring the application of statistical theory; adapt a variety of methods and develop new procedures to statistical projects; evaluate the statistical limitations and specify the range of logically possible explanations; and be prepared to recommend new or improved methods of statistical analysis.  See Exh. U (Russell Decl.) at ¶ 8.C.

Exh. U (Russell Decl.) at ¶ 3.  Critical elements[37] of performance are generally evaluated against

nine generic performance indicators.  Some of the indicators are subjective. Others, however, are

objectively quantifiable.[38] See id. at ¶ 4. Census is currently on a two-tiered pass/fail appraisal

system.  If the statistician meets the generic indicators and supplemental standards for their

critical elements they will receive a passing score of  "Meets Expectations," and otherwise

satisfies time-in-grade requirements, including demonstrating the ability to perform at the next

higher grade level they usually receive a career-ladder promotion.  See id. at ¶¶ 5-6.

    For all competitive promotions and many new hires, Census uses the Automated

Commerce Employment System (ACES, or QuickHire), an internet-based announcement and

application receipt system.[39]  In the Economic Directorate, for example, the selecting official

conducts a job analysis and drafts eligibility criteria involving specific knowledge skills and

abilities necessary to perform the job.  Selecting officials then develop questions on education

_____

[37] Examples of performance elements for statisticians in the Economic Directorate include:
develop electronic census report forms and instruction sheets; develop edit plans; develop
tabulations and publication plans for the 2002 Census; draft text and support files for the 2002
Census publications; develop clerical procedures and specifications; develop analytical plans for
the 2002 Census; test the 2002 edits; test the processing routines; test the 2002 data tabulation
and publication system; prepare test data sets that are accurate and comprehensive; provide
accurate, timely information on products, services, and program activities; update supervisor on
continuing work assignments.   See Exh. U (Russell Decl.) at ¶ 5.

[38] For example, one of the generic indicators is "timeliness," which evaluates whether work is
completed " according to established deadlines;" another is "accountability," which assesses
whether the statistician "accepts responsibility for work products and services over which he/she
has control".  Other indicators, while not inherently quantifiable, are nevertheless objectively
determinable.  For example, one indicator requires "accuracy and thoroughness with work that is
correct and complete, " and another asks if "written work is . . . grammatically correct." See
Exh. U (Russell Decl.) at ¶ 4.

[39] When posting vacancy announcements for new hires for statisticians, math statisticians, and IT
specialists, Census uses OPM's Electronic Hiring System (EHS).  Exh. U (Russell Decl.) at ¶ 7.

-33-

training and experience used to rate and rank an applicant's qualifications.[40]  Questions are

weighted based on the importance and relevance to the job qualifications.  Candidates apply by

responding to these questions and submitting a resume, specifically addressing the qualifications

in the announcement.  See id. at ¶ 7.A-B.  Census/HRD  reviews the applications, eliminates

those who do not minimally qualify,  ranks the candidates according to a predetermined

numerical scoring system, and submits a list of best-qualified candidates to the selecting official

without disclosing ranks or scores.  The selecting official interviews all best-qualified candidates

and makes a selection based on qualifications, as indicated in the application and interview.  See

id. at ¶ 7.E.

NOAA (meteorologists).  Meteorologist[41] career-ladder promotions at NOAA, which

---

[40] A set of sample questions follow:
1. Do you have experience processing economic censuses?
2. Do you have experience working with large, complex business firms consisting primarily of retail, wholesale, foodservice, or accommodation establishments to resolve conceptual data reporting problems?
3. Do you have experience planning, writing, testing, or revising edits to evaluate and/or impute data?
4. Do you have experience writing or modifying problem resolution specifications and procedures for clerical staff?
5. Do you have experience working with interactive editing systems to resolve data reporting problems of retail, wholesale, foodservice, or accommodation establishments?
6. Do you have experience analyzing summary data from economic censuses?
7. Do you have experience using the North American Industry Classification System to classify retail, wholesale, foodservice, or accommodation establishments?
8. Do you have experience giving technical directions to junior, less-experienced survey statisticians (or other professional series employees)?
9. Do you have experience monitoring projects and communicating project status to supervisors and other senior level staff?
See Exh U (Russell Decl.) at ¶ 7.C.

[41]  NOAA uses the Department's established position description library for all meteorologist positions, except that if for a particular position an appropriate position description is not in the

usually are determined by the candidate's immediate supervisors, require: at least 52 weeks at

the next lower grade; a current rating of "Meets or Exceeds Expectations;" demonstrated ability

to perform at the next grade; sufficient grade-determining work; the absence of any

administrative restrictions on the promotion; and satisfaction of grade qualification

requirements.[42]  See Exh. W (Valdez Decl.) at ¶¶ 4-5.

Competitive selections of NOAA meteorologists also involves the computerized ACES

system.[43]  The selecting official chooses questions for inclusion on the vacancy announcement

from the ACES question library.  Applicants electronically submit their application materials,

including answers to those questions, following which ACES automatically determines the basic

qualifications and eligibility of each applicant and ranks eligible applicants based on their

responses, which NOAA human resources staff ("WFMO") then review.  WFMO then submits a

---

library,  the supervisor, in conjunction with other subject matter experts and/or the Human
Resources Office, develops a specific position description based on the classification standards
issued by OPM.  See Exh. W (Valdez Decl.) at ¶ 5.A.  Career-ladder potential for meteorologists
depends upon their particular position.  Some meteorologist positions have career-ladder
potential; others do not, depending upon the needs of the particular unit when the position is
filled.  For example,  meteorologists at the Meteorological Development Lab (MDL) generally
are hired at the GS-5 or GS-7 level with career ladder promotion potential to GS-12, although
they can be hired at any grade level within that range, while meteorologist vacancies at Office of
Climate Water and Weather Services (OCWWS) are generally filled at the GS-12 level or higher.
See id. at ¶ 4.

[42] The qualification standards for NOAA meteorologists, including the specialized education and
experience requirements for grade levels 9 though 12 are set forth at Exh. T (Ribas Decl.) at
¶¶ 17-20.

[43]  Eligibility for all competitive vacancies is routinely made as extensive as possible in an
attempt to ensure the best qualified workforce.  See Exh. W (Valdez Decl.) at ¶ 6.A.

list certifying the ten best qualified applicants to the selecting official.[44] See id. at ¶ 6.B.

The routine practice is for a panel of at least three persons, including the selecting official and at least one person outside the unit where the position will be filled, to independently score the certified candidates to determine who among them will be interviewed. A new panel, composed of the members of the first panel that reviewed the application materials plus at least one other individual, then interviews the chosen candidates. The panel asks each and every candidate the same predetermined questions that relate to the skills, abilities and knowledge that are sought for the position. Each panelist individually evaluates each candidate's response to each question according to a set of predetermined criteria, which are scored in writing, generally on a three-level rating, according to a predetermined matrix. See id. at ¶ 6.C-D. After the interview, the panelists convene to discuss their evaluations of the interviewed applicants, and then make a recommendation to the selecting official.[45] Selecting officials may select any of the best qualified, but generally accept the recommendation of the interview panel. See id. at ¶ 6.D.

PTO (patent examiners). Patent examiners work in a production driven environment.

---

[44] If only non-Department candidates are being considered, the list generally includes the top 3 to 5 candidates. Prior to the use of automated systems, NWS would convene panels consisting of 3-4 individuals to review applications based on a predetermined crediting plan. The reviewing panel would always include at least one subject matter expert from outside the unit. See Exh. W (Valdez Decl.) at ¶¶ 6.B.

[45] In the event two or more of the interviewed applicants are determined by the panel to have been too close to distinguish, a third panel is convened with additional members to re-interview the top candidates. This panel asks more specific and more focused questions. Again, only predetermined questions are asked and all re-interviewed candidates are asked the same set of questions. As in the first interview, the scoring and evaluating process for this second group interview is done in writing by each panelist individually according to a set of predetermined criteria which are scored according to a predetermined matrix. The panelists then meet to discuss their evaluations of the re-interviewed applicants. The candidate evaluated most highly by the panel will be offered the position. See Exh. W (Valdez Decl.) at ¶ 6.F.

Career Ladder promotions for PTO Patent Examiners[46], which may start at the GS-5 grade level and end with promotion to the GS-13 grade level, require satisfaction of the critical elements of their Performance Appraisal Plan ("PAP")[47], demonstrated ability to perform at the next higher grade level[48], and satisfaction of time in grade requirements[49].  See Exh. N (Focarino Decl.) at ¶ 3.  PTO does not use ACES to announce patent examiner vacancies, but instead uses its own web-based electronic vacancy announcement system, the Job Application Rating System, which allows it to maintain a standing inventory register for patent examiner positions.

---

[46] Patent Examiners' work involves the utilization of the basic and advanced concepts of the natural sciences, the techniques of all branches of engineering and of the industrial arts, and the application of those aspects of procedural and substantive law generally, and of the statutory and case law applied to patents specifically, which are applicable to the patent examining process. See Exh. R (Meadows Decl.) at ¶ 21.  The minimum qualifications for patent examiners who specialize certain engineering and applied physical science fields, including the specialized experience required for grades 9 through 12 are set forth in Exh. R (Meadows Decl.) at ¶¶ 23-26.

[47] Those critical elements include "Productivity," "Quality," and "Workflow Management." Productivity is the primary indicator of whether an Examiner is ready for promotion to the next grade level.  Productivity goals are quantitative factors strictly calculated according to examination time and expected output.  After the Examiner serves a one-year probationary period, the promotion standards are the same for each Examiner at each grade level.  Productivity goals are adjusted for the technology area.  For example, the Examiners examining televisions have 23.6 hours per application at a GS-12 grade, whereas the Examiners examining batteries have 19.7 hours at a GS-12 grade.  Whether an Examiner satisfies this factor is entirely based on the individual's gross output. See Exh. N (Focarino Decl.) at ¶ 3.A-C.

[48] Career ladder promotions for Examiners are governed by a series of labor agreements and long standing practices with POPA, pursuant to which, the examiner must work at a rate of at least half-way between the requirement of the present grade and the requirement for the next higher grade to demonstrate the ability to meet production requirements of that higher grade.  See Exh. R (Meadows Decl.) ¶ 14.

[49] Patent Examiners hired at the GS-5, 7, or 9 grade levels are eligible for a one-time accelerated promotion after six months in grade.  Other than the one-time accelerated promotion, the time in grade requirement is 52 weeks.  See Exh. N (Focarino Decl.) at ¶ 3.D.

The Signature Authority ("Sig") program generally[50] establishes the promotion standards and requirements for Examiners moving from the GS-13 grade level to the GS-14 grade level through accretion of duties.[51]  Under the Sig Program,  an Examiner at the GS-13 grade level who has been in grade and performed each element of their PAP at least at the "Fully Successful" level for a minimum of ten consecutive pay periods (eligibility period) is granted temporary Partial Signatory Authority to make non-patentability decisions on applications.  The grant of temporary Partial Signatory Authority begins a trial period consisting of thirteen (13) consecutive pay periods.  In order to achieve permanent Partial Signatory Authority, the Examiner must complete at least 700 hours of actual examining time in paid status during this period, and perform all elements of the Partial Signatory Authority PAP at least at the Fully Successful level. PTO awards temporary Full Signatory Authority to make all patentability decisions on applications to Examiners with permanent Partial Signatory Authority at the GS-13 grade level who have been in grade and performed for a minimum of ten consecutive pay periods at least at the Fully Successful performance level in each element of their PAP.  The grant of temporary Full Signatory Authority begins a trial period of thirteen (13) consecutive pay periods, during which  the Examiner must complete at least 700 hours of actual examining time in paid status and perform the elements of the Signatory Authority PAP at least at the Fully Successful level to

---

[50] OPM has assigned a "point total" to Examiners at each grade, The minimum point total for a GS-13 Examiner is 55 points.   In addition to the Sig Program, GS-13 Examiners can earn the 10 extra credit points required to attain the GS-14 grade in a number of ways known as "Extra Credit Items," which are discussed more fully infra in the discussion of Examiner promotions from GS-14.  See Exh. N (Focarino Decl.) at ¶ 5.

[51] Successful completion of the Sig program accords Examiners the ability to sign all their work. Until then, all work must also be signed by an Examiner with the full signatory authority (a Primary Examiner).  See Exh. N (Focarino Decl.) at ¶ 4.

achieve permanent Full Signatory Authority, whereupon the Examiner will be promoted to the

GS-14 grade level (Primary Examiner).  See Exh. N (Focarino Decl.) at ¶ 4.A-D.

Primary Examiners have several means to obtain a promotion to the GS-15 grade level.

They  may choose to compete for bargaining and non-bargaining unit GS-15 positions that are

advertised as they become available, qualifications for which are set forth in each vacancy

announcement.  More often, GS-14 Examiners attain promotion to a GS-15 position by earning

the 10 additional required points by demonstrating Extra Credit Items[52] on one or more of five

tracks:  Ph.D/Doctorate Level (which earns 10 points); Masters Level (which earns 5 points);

Generalist (which earns 5points); Senior Examiner (which earns 5 points); and/or Expert (which

earns 10 points).  See id. at ¶ 6.  For example,[53] a Primary Examiner may qualify for promotion

on the Ph.D/Doctorate Level track by possessing a Masters Degree and at least 1/3 of the

required hours for a Ph.D in a subject matter directly related to the technology area in the

Examiner's docket; the technical subject matter encompassed by the Primary Examiner's docket

embraces technological concepts which cannot normally be acquired in a Bachelors/Masters

curriculum, which the Examiner has thoroughly mastered, and which arise in a significant

number of cases on which the Examiner works at least 50% of the time; the Examiner's

supervisors certify that the Examiner has demonstrated by the quality of his work that he employs

a Ph.D. level knowledge of the technology examined and legal criteria necessary for determining

patentability; and, the Examiner is recognized as an authority in the technology, as demonstrated

---

[52] See note 50, supra.

[53] The specifics of the Extra Credit Item requirements for each track are set forth in Exh. N
(Focarino Decl.) at ¶ 6.B.1-5.

by publications, awards by technical societies, presentations or papers to symposia, or by leading training programs, or providing guidance for policy development. See Exh. N (Focarino Decl.) at ¶ 6.B.1.

### III.  SUMMARY OF ARGUMENT

Plaintiffs bring this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq., purporting to represent "all African-American and non-African-Americans who are, or have been, employed by [the Department of] Commerce ["DOC" or "Commerce"] and have experienced race discrimination or have been retaliated against for acting against race discrimination" at any time from 1993 through the present.  Compl. ¶ 254. Plaintiffs' 296-paragraph complaint challenges an alleged department-wide "system of racially discriminatory and subjective employment practices with respect to promotions, awards, performance ratings, career-enhancing work assignments, timely training for advancement, and job assignments;" alleged department-wide disparity in pay between African-Americans and non-African-Americans; alleged department-wide hostile work environment directed at African-Americans; and alleged department-wide retaliation against both African-Americans and non-African-Americans who oppose racial discrimination.  See Compl. ¶¶ 4, 8; and Counts One and Two.

Neither the named plaintiffs' individual claims nor their purported class claims may go forward.  The individual claims of nine Plaintiffs—Burns, Gosier, Morris, Lovett, Peyton, Devins, Washington, Loretz, and Jones—must be dismissed for improper venue.  The individual claims of Plaintiff Howard must be dismissed as untimely, and the individual claims of the two remaining Plaintiffs, Jordan and Megginson, must be dismissed, respectively, on *res judicata*

grounds and for failure to exhaust administrative remedies.[54]  Further, the class claims far exceed in scope the class claims Plaintiff Howard asserted in her administrative class complaint; those claims that Plaintiffs seek to assert here that were not asserted below must be dismissed for failure to exhaust administrative remedies.  Finally, all of the class claims must be stricken because Plaintiffs' "across-the-board" allegations of disparate-treatment race discrimination, hostile-environment race discrimination, and retaliation on behalf of both African-Americans and non-African-Americans and involving a host of different job actions and job classifications across fifteen distinct Department of Commerce bureaus each with their own bureau-specific personnel policies and procedures fail to meet the commonality, typicality, and adequacy-of-representation requirements of Fed. R. Civ. P. 23(a) and the requirements of Fed. R. Civ. P. 23(b).[55]

## IV.  MOTION TO DISMISS ALL INDIVIDUAL CLAIMS

The individual claims of all twelve named class members fail as a matter of law—for either improper venue, failure to exhaust administrative remedies, failure to timely file suit, or on *res judicata* grounds—and therefore must be dismissed.  Moreover, because their individual claims fail, these purported class representatives are ineligible to bring class claims, and their class claims themselves also fail.  See East Texas Motor Freight System Inc. v. Rodriguez, 431 U.S. 395, 403-06 (1977) (upholding trial court's dismissal of class allegations where three named plaintiffs' individual claims had been dismissed because named plaintiffs were not "members of

---

[54] On December 21, 2005, Janice Guinyard took a voluntary dismissal without prejudice of her claims.  See Dkt. 12.

[55] In addition, as discussed below, Planitiffs have failed to comply with LCvR 23.1(b) by not moving for class certification within 90 days of filing their complaint.

the class of discriminatees they purported to represent" and therefore could not "'fairly and adequately represent the interests of the class.'") (quoting Fed. R. Civ. P. 23(a)).

A.    **The Individual Claims of Nine Named Plaintiffs Should be Dismissed Because Venue is Improper and Transfer Would Not Be In the Interests of Justice**

      1.     **Venue Is Lacking for Nine of The Twelve Named Plaintiffs**

Pursuant to 42 U.S.C. § 2000e-16(d), Title VII actions against the federal government are controlled by a special venue provision, 42 U.S.C. § 2000e-5(f)(3),[56] which provides as follows:

> [A Title VII] action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office.

As the Court has explained, Congress intended to limit venue in Title VII cases to those jurisdictions concerned with the alleged discrimination, and the venue determination must be based on a "commonsense appraisal" of how the events in question arose.  Spencer, 209 F. Supp. 2d. 15, 17-19 (D.D.C. 2002)  See also Stebbins v. State Farm Mutual Auto., Ins. Co., 413 F. 2d 1100, 1102 (D.C. Cir. 1969), cert. denied, 396 U.S. 895 (1969); Hayes v. RCA Service Co., 546 F. Supp. 661, 663 (D.D.C. 1982).

In a putative class action Title VII case, each named plaintiff must establish proper venue in order for the court to consider his claims.  Quarles v. Gen'l Investment & Development, 260 F.

---

[56] Thus, 28 U.S.C. § 1391(e) does not provide a separate basis for venue.  See 28 U.S.C. § 1391(a) (provision applicable "except as otherwise provided by law"); see also Johnson v. Payless Drug Stores Northwest, Inc., 950 F.2d. 586 (9th Cir. 1991).  Accord Spencer v. Rumsfeld, 209 F. Supp. 2d 15, 17 (D.D.C. 2002); Amirmokri v. Abraham, 217 F. Supp. 2d 88, 90 (D.D.C. 2002)

Supp. 2d 1, 13 (D.D.C. 2003).  In Quarles, four named plaintiffs sought to bring a Title VII class action in this Court.  Id. at 3.  One of the named plaintiffs was able to establish proper venue here.  The other three named plaintiffs, however, did not meet the requirements of 42 U.S.C. § 2000e-5(f)(3).  Id. at 9.  Plaintiffs argued that, in a class action, only one of the named plaintiffs must meet the venue requirements of the statute in order for all the plaintiffs' claims to be properly before the Court.  Id. at 8.  The Court specifically rejected this argument, holding that Title VII's venue statute cannot be "broadly construed to permit a class representative to bring suit in a jurisdiction where he cannot personally satisfy the venue requirements of the statute." Id. at 13.  Accordingly, the Court ruled that the remaining three named plaintiffs' claims were subject to dismissal.  Id.

In the case at bar, nine of the 12 named plaintiffs cannot meet the venue requirements of 42 U.S.C. § 2000e-5(f)(3):  Plaintiffs Burns, Gosier, Morris, Lovett, Peyton, Devins, Washington, Loretz, and Jones.  At all times relevant to this action, Plaintiffs Burns, Gosier, and Morris have worked at the Census office in Suitland, Maryland, and they assert their individual claims based on conduct allegedly occurring at that office.  See Exh. V(Smith Decl.) at ¶ 6.  See also Compl. ¶¶ 128, 131-39 (Burns); ¶¶ 145-61 (Gosier); and ¶¶ 166-77 (Morris).  Thus, the unlawful employment practices they challenge allegedly occurred in Maryland.  As shown in Ms. Smith's declaration, Census's personnel records are maintained and administered on site at the Suitland facility.  See Exh. V (Smith Decl.) at ¶ 5.  Finally, none of these three plaintiffs allege that they would have worked in the District of Columbia absent discrimination.  Because the Department of Commerce—through the Census bureau—can be found in Maryland, Plaintiffs Burns, Gosier, and Morris may only bring their individual claims in a Maryland district court.

For the entirety of his employment with the Department of Commerce, Plaintiff Lovett, a former employee, worked at NIST's office in Gaithersburg, Maryland. See Exh. P (Kirkner Decl.) at ¶ 19. Lovett asserts his individual claims based on conduct allegedly occurring at that office. See Compl. ¶¶ 180, 184-94. See also Exh. P (Kirkner Decl.) at ¶ 19. Thus, the unlawful employment practices Lovett challenges allegedly occurred in Maryland. As shown in Mr. Kirkner's declaration, NIST's personnel records are maintained and administered on site at the Gaithersburg facility. See Exh. P (Kirkner Decl.) at ¶ 7. Finally, Lovett does not allege that he would have worked in the District of Columbia absent discrimination. Because the Department of Commerce—through NIST—can be found in Maryland, Plaintiff Lovett may only bring his individual claims in a Maryland district court.

At all times relevant to this action, Plaintiffs Peyton and Devins worked at the PTO office, which was always in Virginia, and they assert their individual claims based on conduct allegedly occurring at that office (both when it was located in Crystal City, and at its current location in Alexandria). See Exh. R (Meadows Decl.) ¶¶ 4, 5. See also Compl. ¶¶ 197, 200-04 (Peyton); and ¶¶ 207, 210-220 (Devins). Thus, the unlawful employment practices they challenge allegedly occurred in Virginia. As shown in Mr. Meadows's declaration, PTO's personnel records are maintained and administered on site at the Alexandria facility. See Exh. R (Meadows Decl.) ¶ 3. Finally, neither Peyton nor Devins alleges that they would have worked in the District of Columbia absent discrimination. Because the Department of Commerce—through PTO—can be found in Virginia, Plaintiffs Peyton and Devins may only bring their individual claims in a Virginia district court.

Finally, Plaintiffs Washington, Loretz, and Jones work at the NOAA office in Silver

Spring, Maryland, and they assert their individual claims based on conduct allegedly occurring at that office.  See Exh. T (Ribas Decl.) at ¶ 7; see also Compl. ¶¶ 223, 226-30 (Washington); ¶¶ 233, 236-41 (Loretz); and ¶¶ 244, 247-51 (Jones)[57].  Thus, the unlawful employment practices they challenge allegedly occurred in Maryland.  As shown in Mr. Ribas's declaration, NOAA's personnel records are maintained and administered on site at the Silver Spring facility.  See Exh. T (Ribas Decl.) at ¶ 6.  Finally, none of these three plaintiffs allege that they would have worked in the District of Columbia absent discrimination.  Because the Department of Commerce—through NOAA—can be found in Maryland, Plaintiffs Washington, Loretz, and Jones may only bring their individual claims in a Maryland district court.

### 2.    The Individual Claims That Lack Venue Should Be Dismissed Because Transfer Would Not Be In the Interests of Justice

When an action is filed in an improper venue, the Court must either transfer it to a proper venue or dismiss it outright.  As provided in 28 U.S.C. § 1406(a):

> The district court of a district in which is filed a case laying venue in the wrong division or district *shall* dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

28 U.S.C. § 1406(a) (emphasis added).  The decision whether to transfer or dismiss a case that has been filed in an improper jurisdiction rests in the sound discretion of the district court.  Naartex Consulting Corp. v. Watt, 722 F. 2d 779 (D.C. Cir. 1983), cert. denied, 467 U.S. 1210 (1984) (citing Wright, Miller & Cooper, Federal Practice & Procedure § 3827 at 170 (1976)).  In Title VII cases, the district court has the same discretion to dismiss rather than transfer as in any

---

[57] While Washington and Loretz have at all relevant times worked at the Silver Spring office, Jones has also worked at NOAA's office in Washington, D.C.  However, Wayne Wilmot, the manager whose actions she specifically complains of, at all times worked in Silver Spring.  See Compl. ¶¶ 247, 251; Exh. T (Ribas Decl.) at ¶¶ 7, 9.

other case.  Hayes, 546 F. Supp. at 665; Washington v. General Elec. Corp., 686 F. Supp. 361

(D.D.C. 1988).  Transfer is the usual remedy.  See 17 James Wm. Moore et al., Moore's Federal

Practice - Civil ¶ 111.34 [1] (3d ed. 1999).  However, the court is not obliged to transfer where

the claims suffer from substantive defects.  Naartex Consulting Corp., 722 F. 2d at 785, 789-93;

cf. Rowe v. Internal Revenue Service, No. 82-2942 U.S. Dist. LEXIS 18751 at * 5 (D.D.C.

March 7, 1983) (if action is barred by res judicata "considerations of economy of judicial time

and public policy favoring certainty of legal relationships compel the Court to go beyond the

venue determination and dismiss the action with prejudice . . . .").

Here, the individual claims of Plaintiffs Lovett, Morris, Devins, Loretz, and Washington

all suffer substantive defects; thus, transferring these plaintiffs' claims would be inconsistent

with the interests of justice and judicial economy.  Specifically, Plaintiffs Lovett and Morris

never pursued their claims in the administrative process; a substantial portion of Plaintiff

Devins's individual claims are estopped by the terms of a settlement agreement; and Plaintiff

Loretz's and Plaintiff Washington's claims are untimely filed.

Plaintiffs Lovett and Morris.  Federal employees may file a civil action only after

exhausting their administrative remedies.  42 U.S.C. § 2000e-16(c).  Under rulemaking authority

delegated by Title VII, see 42 U.S.C. § 2000e-16(b), the EEOC has "established detailed

procedures for the administrative resolution of discrimination complaints, including a series of

time limits for seeking informal adjustment of complaints, filing formal charges, and appealing

agency decisions to the Commission."  Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir.

1997); 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity).  Specifically, an

aggrieved employee must first consult a counselor within 45 days of the alleged discrimination to

-46-

attempt informal resolution and file a formal complaint within 15 days of receiving notice that the matter has not been resolved informally in counseling. 29 C.F.R. §§ 1614.105(a)(1) and (d) and 1614.106(a) and (b).

Compliance with these procedures and time lines is mandatory. "Complainants must timely exhaust these administrative remedies before bringing their claims to court." Bowden, 106 F.3d at 437; Williams v. Munoz, 106 F. Supp. 2d 40, 42 (D.D.C. 2000) ("timely administrative charge is a prerequisite to initiation of a Title VII action"). The Supreme Court has instructed that in Title VII cases "strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'" National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 108 (2002)(quoting Mohasco Corp. v. Silver, stated in, 447 U.S. 807, 825 (1980)); see also Washington v. Washington Metro. Area Transit Auth., 160 F.3d 750, 752 (D.C. Cir.1998).

Neither Plaintiff Lovett nor Plaintiff Morris ever contacted a counselor regarding the individual claims alleged here, and neither ever filed a formal complaint with the Department.[58]

---

[58] Nor can Lovett or Morris be excused from their failing to have timely sought pre-complaint counseling or for not having filed a formal complaint. Each individual plaintiff in a Title VII class action need not exhaust his administrative remedies if at least one member of the plaintiff class has met the exhaustion requirement. Albemarle Paper Co. v. Moody, 422 U.S. 405, 414 (1975). However, the "critical factor" in determining whether an individual Title VII plaintiff can rely on a another's filing is "the similarity of the two complaints." Foster v. Gueory. 655 F.2d 1319 (D.C. Cir. 1981). Lovett alleges that he was a GS-14 managerial employee and was denied promotions to other supervisory positions. Compl. ¶¶ 180-194. Morris alleges that he is white. Compl. ¶ 163. The only underlying administrative complaint in this case upon which either Lovett or Morris arguably could rely to excuse their having failed to file their own individual complaints—Ms. Howard's class complaint—never encompassed managerial employees or the denial of promotions to supervisory positions and alleged only discrimination against African-Americans. See infra at Part V.B. Thus, the individual complaints of Lovett and Morris are markedly dissimilar from Ms. Howard's class complaint and had to have been pursued separately in the administrative process as a condition of bringing suit.

Having failed to exhaust their administrative remedies, Plaintiffs Lovett and Morris are barred from pursuing their claims in court, and their individual claims must be dismissed.

Plaintiff Devins. On December 17, 1997, Plaintiff Devins entered into a Settlement Agreement with the Department resolving any and all Title VII claims arising prior to that date. See Declaration of Kathryn H. Anderson (Anderson Decl.), Exh. Y at ¶ 14 and Attach 11. When a case is settled extra-judicially with a clause requiring a waiver of right to bring future suit on the issues being settled, the specified claims generally will be barred in future litigation under principles of contract law that look to enforce the parties' intent. Village of Kaktovik, 689 F.2d 222, 230 (D.C. Cir. 1982); Sirmans v. Caldera, 138 F. Supp. 2d 14, 19, 34 (D.D.C. 2001); Carter v. Rubin, 14 F. Supp.2d 22, 34 (D.D.C.1998). See also Levinson v. United States, 969 F.2d 260, 264 (7th Cir.1992). Ms. Devins presents numerous allegations involving events that precede her settlement agreement with the Department. See Compl. ¶¶ 210-213. To the extent Plaintiff Devins seeks to raise allegations that predate the parties' December 17, 1997 Agreement, those claims are must be dismissed under principles of contract law.

Plaintiffs Loretz and Washington. Aggrieved federal employees who exhaust their administrative remedies under Title VII have the right to bring a timely civil action on their complaints. 42 U.S.C. § 2000e-16©. The civil action must be brought within 90 days of the complainant's receipt of the Agency's Final Agency Decision ("FAD"), or if the FAD is appealed to the EEOC, within 90 days of receipt of the EEOC's final decision on appeal. 29 C.F.R. 1614.407(a) and (c).

a.     On February 3, 1994 Plaintiff Loretz filed an administrative complaint of discrimination alleging that, because of her race, she had not been selected for a GS-12  position

awarded to Teresa Bedell.  See Exh. Y(Anderson Decl.) at ¶ 16 and Attach. 16 (Agency

Complaint No. 94-54-0071).  On December 12, 1996, the Department issued a FAD on that

complaint finding no discrimination.  That FAD advised Ms. Loretz of her options, including her

right to bring a civil action within 90 days.  See id.  Ms. Loretz did not file a civil action within

90 days of her receipt of the FAD, or at any time prior to this action.  Id. at ¶ 16.

        The Complaint at bar includes an allegation that, "in approximately 1993," a GS-12

position Plaintiff Loretz applied for was awarded "to a less qualified white employee, Teresa

Bedell."  Comp. ¶ 236.  This is clearly the same claim that was the subject of Plaintiff Loretz's

1994 administrative complaint, and thus is time-barred by almost nine years and must be

dismissed.

        b.      On April 19, 1996, Plaintiff Washington filed a complaint of discrimination

alleging that because of his race and in retaliation for prior EEO activity he had, since January

1995, been required to troubleshoot the SONY HDD as a Computer Operator, GS-332-9, non-

professional series while similarly situated non-African-American employees performed the

same duties as higher grade professional Computer Specialists.  Id.  at ¶ 15.C and Attach. 13

(Agency Complaint No. 96-56-0195).

        On January 15, 1997, the Department issued a FAD rejecting his claims.  The FAD

advised Mr. Washington of his options, including his right to bring a civil action within 90 days.

Mr. Washington did not file a civil action within 90 days of receipt of the FAD, or at any time

prior to this action.  Id. at ¶ 15.C and Attach. 15.

        On June 18, 1996, Plaintiff Washington filed another complaint of discrimination

alleging that he had been discriminated against on account of his race and subjected to reprisal

for his prior EEOC activity in that higher educational qualifications were demanded of African-Americans employees to change from a non-professional to a professional series than were required of white employees, and that white employees were continually advanced ahead of African-Americans with equal or more higher education. Id. at ¶ 15.D and Attach. 14 (Agency Complaint No. 96-56-0265).

Mr. Washington appealed the Department's FAD to the EEOC, which sustained the finding of no discrimination on August 6, 1999. That decision advised Mr. Washington of his right to bring a civil action within 90 days. Id. at Attach 15 (EEOC Appeal No. 01972451). Plaintiff Washington did not file a civil action within 90 days of receipt of the EEOC's decision, or at any time prior to this action.

Plaintiff Washington's individual claims in this action encompass those made in his two administrative complaints. See Compl. ¶¶ 228-29. Since Plaintiff Washington is seeking to litigate in this action claims that have long been time-barred, these aspects of his individual claims must be dismissed.[59]

In sum, the individual claims of five of the nine plaintiffs for whom venue is lacking

---

[59] Nor can Loretz or Washington be excused from their failures to timely file civil actions based on their exhausted administrative complaints. The limitations period for filing an individual action is tolled as to all asserted members of a purported class by the filing of a class action. Crown, Cork & Seal Co., Inc. v. Parker, 462, U.S. 345, 354 (1983); Delgado v. Ashcroft, 368 F. Supp.2d. 3, 14-15 (D.D.C. 2004) (individual complaint in a class action dismissed because not filed within 90 day limitations period). However, no federal class action asserting claims encompassing those for which Loretz and Washington had a right to sue and of which they were putative members was pending during the 90-day filing periods applicable to any of Loretz's or Washington's administratively-exhausted complaints. Thus, the 90-day limitations period that commenced for Ms. Loretz on December 12, 1996, and those that commenced for Mr. Washington on January 15, 1997 and August 16, 1999, were not tolled and have expired.

suffer serious substantive defects; for that reason, the claims of these five plaintiffs should be dismissed rather than transferred.  See Naartex Consulting Corp., 722 F. 2d at 785, 789-93. Moreover, all improperly-venued individual claims should be dismissed because a presumption underlying a preference for transfer that applies in most situations—that plaintiffs desire to proceed in the proper forum—does not apply with the same force where, as here, those individual claims are being severed from a class action.  In this situation, there is a greater likelihood that the improperly-venued individual plaintiffs will elect not to pursue their claims individually in another court than would be the situation if those claims had not been brought together with the class claims.  Therefore, transfer of those individual claims for which venue is lacking would not necessarily serve, and, indeed, could well dis-serve, the interests of judicial economy.

**B.**     **The Individual Claims of the Three Plaintiffs for Whom Venue is Proper Must Be Dismissed**

   **1.**     **None of Ms. Howard's Administrative Complaints Provide a Basis for Her Individual Claims in this Action Because of Untimeliness, Principles of Contract Law Relating to Settlement Agreements, *Res Judicata*, and Her Failure to Exhaust Administrative Remedies**

   Ms. Howard has filed twenty-one administrative complaints against the Department of Commerce alleging discrimination of various kinds and for various impermissible purposes.  See Exh. Y (Anderson Decl.) at ¶ 5.  None, however, provide a basis upon which she can proceed with her individual claims in this action.  One complaint, Howard 6,[60] is her class complaint; it contains no individual allegations, and is discussed fully below.  Eight of Ms. Howard's complaints long ago exhausted the administrative process, the 90-day limitation for filing suit has

---

[60] The numerical designation of Ms. Howard's administrative complaints used herein tracks the designations employed in the Anderson Declaration where they are numbered chronologically.

expired, and they are time-barred.[61]   29 C.F.R. 1614.407(a) and ©; Morgan, 536 U.S. at 110;

Bowden, 106 F.3d at 437; Williams v. Munoz, 106 F. Supp. 2d 40, 42 (D.D.C. 2000); see also

Wilson v. Pena, 79 F.3d 154 (D.C. Cir. 1996); Holley v. Dep't of Veterans Affairs, 165 F.3d 244,

246 (3d Cir. 1999).   Two of Ms. Howard's administrative complaints were resolved by

Settlement Agreements, and are barred by principles of contract law.[62]   See, e.g., Sirmans, 138 F.

Supp. 2d at 19, 34.   Ms. Howard previously has filed suit on four of her administrative

complaints, and is precluded from litigating those claims here either by application of res judicata

or because they are unrelated claims.[63]   See United States v. Mendoza, 104 S. Ct. 568, 571

(1984); Montana v. United States, 440 U.S. 147, 153 (1979); American Employers Insurance

Company v. American Security Bank, 747 F.2d 1493, 1498 (D.C. Cir. 1984); I.A.M. National

---

[61] Specifically, Howard 1 and Howard 2 exhausted the administrative process with a decision by EEOC's Office of Federal Operations (OFO) that affirmed the findings of no discrimination as to each complaint on June 30, 1992.  See Exh. Y (Anderson Decl.) at ¶¶ 5.A and 5.B.  Howard 5, Howard 7, and Howard 8 were the subject of an OFO decision of September 22, 1999 that sustained the no discrimination findings as to each.  Id. at ¶¶ 5.E, 5.G, and 5.H.  Howard 11 was the subject of a FAD issued on August 16, 1999 that accepted the administrative judge's recommendation and found no discrimination, and Ms. Howard did not appeal that determination.  Id. at ¶ 5.K.  Howard 12 was the subject of a FAD issued on February 7, 2000 that found no discrimination, and Ms. Howard did not appeal that determination. Id. at ¶ 5.L. Finally, Howard 13 was dismissed as untimely on August 25, 1999, and Ms. Howard did not appeal that determination. Id. at ¶ 5.M.

[62] Specifically, Howard 3 was resolved by Settlement Agreement on July 11, 1994, and Howard 4 was resolved by settlement agreement on July 11, 1994.  See Exh. Y (Anderson Decl.) at ¶¶ 5.C and 5.D and Attach. 1.

[63] Specifically, Howard 9 was litigated in federal district court, and a judgment was entered March 30, 1999 rejecting Ms. Howard's claims.  See Exh. Y (Anderson Decl.) at ¶ 5.I.  A judgment was entered in Howard 10 on March 30, 1998 rejecting Ms. Howard's claims.  See Id. at ¶ 5.J and Attach. 7; Howard v. Evans, Civ. Action No.  97-2877 (D.D.C.).  Howard 16 and the failure to accommodate claim of Howard 18 are being litigated in Howard v. Evans, Civ. Action No. 04-0756 (D.D.C.), which action this court previously determined is unrelated to the one at bar. See Exh. Y (Anderson Decl.) at ¶¶ 5.P and 5.R and Attach. 9.

Pension Fund v. Industrial Gear Manufacturing Company, 723 F.2d 944, 947 (D.C. Cir. 1983);

Jack Faucett Associates, Inc. v. American Telephone and Telegraph Company, 566 F. Supp. 296,

299 (D.D.C. 1983); Cutler v. Hayes, 549 F. Supp. 1341, 1343 (D.D.C. 1983).  Finally, six of Ms.

Howard's complaints are still pending in the administrative process, and she thus has not

exhausted her administrative remedies with regard to any claims based on those complaints.[64]

> ### 2.     The Individual Claims of Plaintiffs Jordan and Megginson Are Barred, Respectively, by *Res Judicata* and Title VII's Statute of Limitations

Under the related doctrines of res judicata and collateral estoppel, a final judgment on the

merits of an action precludes the parties from relitigating issues that were or could have been

finally decided; and once a court has decided an issue of fact or law necessary to its judgment,

that decision may preclude relitigation of the issue in a suit on a different cause of action

involving a party to the first action.  Allen v. McCurry, 449 U.S. 90, 94 (1980); United States v.

Mendoza, 104 S. Ct. 568, 571 (1984); Montana v. United States, 440 U.S. 147, 153 (1979);

American Employers Insurance Company v. American Security Bank, 747 F.2d 1493, 1498

(D.C. Cir. 1984); I.A.M. National Pension Fund v. Industrial Gear Manufacturing Company, 723

F.2d 944, 947 (D.C. Cir. 1983); Jack Faucett Associates, Inc. v. American Telephone and

Telegraph Company, 566 F. Supp. 296, 299 (D.D.C. 1983); Cutler v. Hayes, 549 F. Supp. 1341,

---

[64] Specifically, Howard 14, Howard 15, Howard 17, Howard 19, Howard 20, and Howard 21 are all still pending in the administrative process, as are those claims from Howard 18 that were not severed and brought in Howard v. Evans, Civ. Action No. 04-0756 (D.D.C.).  See Exh. Y (Anderson Decl.) at ¶¶ 5.N, 5.O, 5.Q, 5.S, 5.T, and 5.U and Attach. 9; see note 63, supra.  Ms. Howard's plethora of administrative complaints combined with the insufficient specificity of many of her individual allegations here make it impossible to definitively correlate specific allegations in the Complaint with particular administrative complaints.  Therefore, the Department moves, in the alternative, for a more definite statement of Ms. Howard's individual claims under Fed. R. Civ. P 12(e).

1343 (D.D.C. 1983).

Application of the doctrine of collateral estoppel "represents a decision that the needs of judicial finality and efficiency outweigh the possible gains of fairness or accuracy from continued litigation of an issue that previously has been considered by a competent tribunal." Nasem v. Brown, 595 F.2d 801, 806 (D.C. Cir. 1979). Application of the doctrine thereby serves to relieve parties of the burdens of multiple lawsuits; conserves judicial resources; minimizes the risk of forum-shopping, piecemeal litigation, and inconsistent decisions; and provides finality in the resolution of disputes. United States v. Mendoza, 104 S. Ct. at 571; Cutler v. Hayes, 549 F. Supp. at 1343; see Hardison v. Alexander, 655 F.2d 1281, 1288 (D.C. Cir. 1981).

Plaintiff Jordan already has litigated in federal court the very claims she seeks to assert in this lawsuit. Specifically, Jordan brought the same claims pled here in Jordan v. Evans, Civil Action 04-356 (D.D.C.). See Jordan, First Amended Complaint, attached hereto as Exhibit AA. The Court dismissed Jordan's Title VII claims with prejudice by Memorandum Opinion dated December 3, 2004, a copy of which is attached hereto as Exhibit BB. The Court dismissed her disability claims by Memorandum Opinion dated August 10, 2005, a copy of which is attached hereto as Exhibit CC. Under the doctrine of res judicata, these rulings bar Jordan from relitigating the same claims in the instant case.

Similarly, Plaintiff Megginson previously asserted the same claims pled here in Megginson v. Daley, Civil Action 97-2970 (D.D.C.), which she filed on December 12, 1997. See Megginson, Amended Complaint, attached hereto as Exhibit DD. On October 27, 2000, she took a voluntary dismissal of her case without prejudice. See Court's Order, attached hereto as Exhibit EE. While her claims were timely filed in Megginson v. Daley (see Exhibit DD at ¶ 4,

reciting that she received the Agency's FAD on September 23, 1997), her filing of the same

claims as part of the instant lawsuit is far outside Title VII's 90-day limitations period.

Accordingly, Plaintiff Megginson's individual claims must be dismissed.  See 42 U.S.C. 2000e-

16(c); 29 C.F.R. 1614.408.  See also Wilson v. Pena, 79 F.3d 154 (D.C. Cir. 1996); Holley, 165

F.3d at 246.

### V.  MOTION TO DISMISS THE CLASS CLAIMS THAT EXCEED THE SCOPE OF THE ADMINISTRATIVE COMPLAINT

**A.    Standard of Review**

Under Title VII, courts have authority only to hear claims that are (1) contained in the

plaintiff's administrative complaint or claims "like or reasonably related" thereto, and (2) claims

for which the plaintiff exhausted administrative remedies.  Powell v. Castaneda, 390 F. Supp.2d

1, 8 (D.D.C. 2005) (quoting Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995)).  The

Congressional purpose in enacting the Title VII voluntary settlement and conciliatory procedures

illuminates the importance of exhausting the administrative remedies prior to instituting suit in

district court.  "'The principal functions of the EEOC filing requirement' are to enable 'the

EEOC to provide the alleged wrongdoer with notice and to permit possible conciliation.'"

Medina v. Reinhardt, 686 F.2d 997, 1013 (D.D.C. 1982) (quoting Foster v. Gueory, 655 F.2d

1319, 1323 (D.C. Cir. 1981)).  "[T]he exhaustion requirement is intended to give the agency the

opportunity to right any wrong it may have committed."  McRae v. Librarian of Congress, 843

F.2d 1494, 1496 (D.C. Cir. 1988).

Title VII's statutory language and legislative history reflect a firm congressional

preference for the resolution of employment discrimination disputes through informal

administrative processes over adjudication in court.  As one court explained:

> By establishing the EEOC, Congress provided an inexpensive and
> uncomplicated remedy for aggrieved parties, most of whom were poor and
> unsophisticated.  Conciliation also was designed to allow a respondent to
> rectify or explain his action without the public condemnation resulting
> from a more formal proceeding.  Furthermore, the absence of direct
> government coercion was thought to lessen the antagonism between
> parties and to encourage reasonable settlement.  The need for voluntary
> compliance was stressed since more coercive remedies were likely to
> inflame respondents and encourage them to employ subtle forms of
> discrimination.

Kinsey v. Legg Mason & Co., 60 F.R.D. 91, 95 (D.D.C. 1973).

Courts liberally construe factual contentions in charges of discrimination in order to

accomplish the purposes of the Civil Rights Act.  Id. at 97.  They do so because "[a] large

number of the charges with the EEOC are filed by ordinary people unschooled in the

technicalities of the law . . . ."  Evans v. Frito-Lay, 1974 WL 1148 * 5 (N.D. Ohio).  Therefore, a

court should determine whether "the scope of the judicial complaint is limited to the scope of the

EEOC investigation which can reasonably be expected to grow out of the charge of

discrimination."  Park v. Howard University, 71 F.3d 904, 907 (D.C. Cir. 1995); Kinsey, 60

F.R.D. at 96 (applying the Sanchez v. Standard Brands, Inc., 431 F.2d 455 (5th Cir. 1970) rule).

Nevertheless, courts remain loathe to deprive the alleged wrongdoer of notice and

frustrate the purpose of the administrative process.  Park, 71 F.3d at 907 (stating that "[a] court

cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the

Title VII administrative process."); see Kinsey, 60 F.R.D. at 97 (stating "[i]f parties were given

complete freedom to litigate claims of discrimination never presented to the EEOC for

investigation and conciliation, it would result in the frustration of the statutory scheme and

policies favoring informal persuasion and voluntary compliance.").  This is true in class actions,

as well as individual cases.  See Evans, 1974 WL 1148 at *5.  Moreover, a major reason for the

solicitude accorded complainants—that most are poor and unsophisticated, see Kinsey, 60 F.R.D.

at 95—applies with significantly less, if any, weight for federal employees than for many others.

**B.**    **Many of Plaintiffs' Class Claims Exceed the Scope of the Administrative Class Complaint**

Significant portions of Plaintiffs' class claims are barred because they were never raised

in the preceding administrative process.

At their most expansive, the class claims considered in the administrative process were

(1) retaliation; and (2) discrimination in promotions and related promotional opportunities

brought on behalf of a class of African-American non-supervisory salaried employees at the

Department's headquarters offices in the Washington, D.C. metropolitan area.  See supra  at Part

II.A.2.  Claims of discrimination in selection, or hiring, and compensation, or pay, were never

raised or considered in the administrative process; neither was a class hostile environment, or

harassment, claim ever presented to or considered  by the EEOC independent of the Class

Agent's class retaliation claim.  Plaintiffs present these, and possibly other,[65] class claims for first

---

[65]  The allegations in the Complaint are remarkably open-ended and vague. .  See, e.g., Compl.
¶ 254 ("who . . . have experienced race discrimination").   It is thus unclear whether Plaintiffs are
asserting other class claims that are also neither like nor related to those that were at issue before
the EEOC.  To the extent that Plaintiffs are articulating any additional new class claims, they
must be dismissed.  For example, in the administrative process, job assignments were alleged to
be discriminatory, and the EEOC considered them as promotion-related opportunities and thus
part of the promotion claim.  However, throughout the EEOC process, the term "job
assignments" referred to and was understood as tasks that employees were given.  If, as it
appears, Plaintiffs are here challenging the positions into which employees are placed upon hire,
they are asserting new claims unrelated to those at issue below, and those claims must be
dismissed.  See e.g., Compl. ¶¶ 139 ("African-American[s] . . . are not typically offered such
career ladder opportunities); 218 (" positions are segregated according to race"), 277 ('excluding
African-Americans from traditionally white positions), and 258 ("two separate workforces . . . .
[o]ne, . . . which is primarily white . . . [t]he other . . . which is primarily African American").

time in this action.  Plaintiffs also assert their class claims on behalf of a class that is vastly larger

and significantly different than the class that was at issue in the preceding EEOC process.  At no

time in that process was the class ever contemplated as including supervisory employees, wage

grade employees,  SES employees, foreign service officers, members of NOAA's Uniformed

Corps, or any of the thousands of Department employees who work across the country and

throughout the world outside of the Washington, DC metropolitan area.

Moreover, Ms. Howard had multiple opportunities and ample time—more than ten

years—in the administrative process within which to include the claims that are asserted for the

first time in this complaint, and she did not do so.  To the contrary, she knowingly and explicitly

defined and limited the scope of her administrative charge.  See supra at Part II.A and Exh. D.

Nor was Ms. Howard an unsophisticated novice in the requirements of the administrative

process; she is a seasoned veteran of the process and a prolific filer with 21 complaints filed

against the Department since 1988.  See Exh. Y (Anderson Decl.) at ¶ 5.   And Ms. Howard was

not left to her own lay devices in the prior administrative proceedings; rather she was represented

before the EEOC by a host of experienced counsel and  the EEOC's changing cast of AJs took a

very active role assisting her in framing and defining the class claims.[66]  Indeed, it was the

EEOC—not Ms. Howard—that unilaterally expanded the class beyond the Class Agent's

asserted and intended geographical scope to include the entire Washington, DC metropolitan

_____

[66] The formal Requests for Information that the EEOC AJs issued to the Class Agent were
comprehensive, detailed and clearly designed to assist in defining the scope and nature of her
claims.  See e.g., Letter from Matthew Bradley, EEOC AJ, to Janet Howard and William Biglow,
Esq., DOC counsel (Apr. 12, 1995) attached hereto as Exh. FF; Letter from Kathryn Brown,
EEOC AJ, to Michael Subit, Esq., class counsel, and William Biglow, Esq. (Aug. 4, 1998)
attached hereto as Exh. GG.

area.  Moreover, Ms. Howard voluntarily abandoned the administrative process at a time of her

choosing before that process had run its full course.

On no occasion during that lengthy administrative process with its numerous filings and

conferences and constant stream of correspondence and conversations did Ms. Howard or class

counsel ever suggest, much less contend, that she also was challenging hiring practices, alleging

discrimination in pay, or pursuing a class claim of harassment.  Nor did she, either personally or

through counsel, ever suggest or contend that she was proceeding on behalf of non-African-

Americans, hourly employees, supervisors, foreign service officers, members of the SES,

members of NOAA's Uniformed Corp, or on behalf of any current or former DOC employee

employed elsewhere than at a Headquarters' office in the Washington, D.C., metropolitan area.

The claims that Plaintiffs seek to assert for the first time before this court are vastly larger

and substantively different from the claims at issue before the EEOC.  Simply put, claims of

retaliation and discrimination in promotion are unlike and not related to claims of discrimination

in hiring or pay, or of harassment.  Contreras v. Ridge, 305 F. Supp. 2d 126, 134 (D.D.C. 2004)

(claims of harassment/hostile work environment and compensation not reasonably related to

class claim of denial of promotions and promotions-related activity); Kidane v. Northwest

Airlines, 4 F. Supp. 2d 12, 16 (D.D.C. 1999) (discriminatory demotion and discharge not

sufficiently related to hostile work environment claim); Chacko v. Patuxent Institution, 429 F.3d

505, 509 (4th Cir. 2005)("[a] claim will also typically be barred if the administrative charge

alleges one type of discrimination—such as discriminatory failure to promote—and the claim

encompasses another type—such as discrimination in pay and benefits"); Park, 71 F.3d at 907

(dismissing claim of national origin hostile work environment where administrative charge

-59-

alleged discrimination based on national origin).

The class on whose behalf Plaintiffs seek to proceed is also significantly larger and substantively different than the class at issue before the EEOC. Indeed, by including supervisors, SES, foreign service, wage grade employees, and employees outside the Washington area, Plaintiffs are seeking to litigate on behalf of a class that is more than twice as large as the class that was before in the EEOC at its most expansive. Simply put, a class definition that the charging party knowingly and explicitly limited to a specific geographical area and a specified occupational group is unlike and unrelated to a geographically and occupationally unrestricted definition. That is particularly so where, as here, the restrictions reflect material distinctions among purported class members.[67]

Allowing Plaintiffs to litigate substantial class claims in this action that were not presented in the EEOC process would contravene Congress's purpose in making administrative exhaustion a statutory prerequisite to suit. To allow these expanded claims to proceed unfairly would deprive the DOC of its right to prior notice of those allegations and of its statutorily provided opportunity to determine whether they could be resolved informally prior to suit. In light of the size and scope of the new claims, such unfairness would be egregious.

In sum, Plaintiffs' class claims of discrimination in hiring and pay, and their class allegations of harassment, as well as any other claims not presented to or considered by the

---

[67] Specifically, such material distinctions arise from the inclusion of: (1) supervisors and SES employees who in many instances will be responsible for the employment practices that Plaintiffs challenge and have interests that can be expected to be at odds with other class members, see infra at Part VI.C.4; (2) different personnel systems, such as those for the Uniformed Corps and for foreign service officers, see supra at Part II.B.5 and note 19, and (3) five additional human resource offices that operate outside the Washington, D.C. metropolitan area, see supra at Part II.B.4 and notes 18 and 19.

EEOC, must be dismissed because Plaintiffs failed to exhaust their administrative remedies as Title VII requires.  Assuming they are otherwise permitted to proceed, Plaintiffs can only pursue class promotion and related promotional opportunities claims and a class retaliation claim on behalf of certain current and former African-American, non-supervisory white-collar employees of the Department's Headquarters' offices in the metropolitan area of Washington, D.C.

### VI.  MOTION TO STRIKE ALL CLASS CLAIMS

Plaintiffs' class claims fail on three grounds.  First, Plaintiffs have failed to timely move for class certification.  Second, Plaintiffs failed to timely file their class administrative complaint. And third, Plaintiffs' class claims cannot satisfy the requirements of Fed. R. Civ. P. 23.

### A.    Plaintiffs Have Failed to Comply with Local Rule 23.1(b)

Local Rule 23.1(b) requires that:  "Within 90 days after the filing of a complaint in a case sought to be maintained as a class action, unless the court in the exercise of its discretion has extended this period, the plaintiff *shall* move for a certification . . . that the case may be so maintained. . . .  A defendant may move at any time to strike the class action allegations or to dismiss the complaint."  (Emphasis added).  Plaintiffs filed this complaint on October 5, 2005, but still have not moved for class certification.  For this reason alone, Plaintiffs' class claims should be stricken.  See Thomas v. Knight, 257 F. Supp. 2d 86, 91 n.5 (D.D.C. 2003) ("In addition, the Court notes that although the plaintiff has asserted a class action claim, he has failed to file a motion to certify the class within 90 days of the filing of the complaint as required by this Court's Local Rule 23.1(b). . . .  Therefore, this Court will deny the plaintiff's request for class certification and consider his claim only with respect to himself as an individual.").  See also Martin v. Middendorf, 1977 WL 821, *2 (D.D.C. 1977) (refusing to reconsider order

denying class certification on ground, *inter alia*, that "the 90-day deadline for seeking class

action certification . . . expired long before counsel filed the instant motion.").

**B.      The Class Claims Must Be Stricken For Failure to Exhaust the Administrative Process Because Plaintiff Howard Failed to Timely Contact an EEO Counselor On Her Administrative Class Complaint**

Janet Howard is the only plaintiff in the case at bar who attempted to pursue a class

administrative complaint.  See generally Exh. Y (Anderson Decl.).  Indeed, it is Ms. Howard's

class complaint upon which Plaintiffs rely for their contention that they have satisfied all

necessary conditions precedent to the filing of this action.  See Compl. ¶¶ 2, 15.  Because

Plaintiff Howard failed to timely contact an EEO counselor on her administrative class

Complaint, however, the prerequisites to suit on her class claims have not been satisfied.

Howard first contacted Commerce's Office of Civil Rights ("OCR") to seek counseling

regarding her class claims on October 21, 1994.  See Exh. Y (Anderson Decl.), Attach. 3

(Howard's Letter of December 16, 1994), and Attach. 6 (Class Action Counselor's Report) at 1.

In the counseling process, she identified the following as her complaint:  "Racial Discrimination

against African Americans based on the preponderance of incidents of African Americans being

discriminated against by DOC officials in promotion, awards, recognition and training."  Id. at

Attach. 4 (Class Action Response[68]) at 1.  On February 10, 1995, the EEO Counselor gave

Howard notice of her right to file a formal class complaint within 15 days.  Id. at Attach. 5

(Notice of Right to File).  On February 22, 1995, Howard filed the formal class complaint that is

the subject of this lawsuit.  Id. at Attach 2 (Complaint of Discrimination); see also Compl. ¶ 55.

---

[68] The document is misdated as January 20, 199**4**.  The actual date of the letter was January 20, 1995, as is clear from the fact that it responds to a letter requesting information about the class claim dated January 17, 199**5** (attached hereto as Exhibit JJ).

Howard's October 21, 1994, contact with OCR to seek informal counseling was untimely. Specifically, under the applicable regulations a putative class agent is required to seek counseling within 45 days of the alleged discrimination.[69]  As the Supreme Court has instructed, a Title VII claimant must timely pursue administrative remedies "or lose the ability to recover for it." Morgan, 536 U.S. at 110.  Here, Ms. Howard failed to identify any discriminatory act that had occurred within 45 days of when she first sought counseling on October 21, 1994.  See Exh. Y (Anderson Decl.) at Attach. 4 (Class Action Response) at 1.  To the contrary, in her formal complaint of class discrimination filed on February 22, 1995, Howard specifically averred that the "date on which the most recent discrimination took place" was August 5, 1994.  Id. at Attach. 2 (Complaint of Discrimination) at 1.  That date obviously was not within 45 days of October 21, 1994.  Having failed to timely initiate EEO counseling, Howard lost her right to pursue the claims that are the subject of both the class administrative complaint and this lawsuit.[70]

## C.     Plaintiffs' Class Claims Do Not Satisfy the Requirements of Rule 23

Plaintiffs seek to pursue class claims on behalf of all African-American and non-African-

---

[69] 29 C.F.R. § 1614.204(b) makes explicit that the requirements of 29 C.F.R. § 1614.105 apply to administrative class complaints.  29 C.F.R. § 1614.105 (a)(1) requires counseling within 45 days of the alleged discrimination.

[70] Federal agencies do not waive a timeliness defense by accepting and investigating an administrative complaint of discrimination.  Brown v. Marsh, 777 F.2d 8, 15 (D.C. Cir. 1985); Boyd v. U.S. Postal Service, 752 F.2d 410, 414 (9th Cir. 1985).  The situation here is unlike Bowden v. U.S., 106 F.3d 433, 438-39 (D.C. Cir. 1997), where the government's failure to challenge timeliness both at the administrative level and in initial suits in the district court and the Court of Claims, combined with the government's prolonging the litigation and its "procedural run-around" of the plaintiff, amounted to a waiver of that defense.  In contrast, the government here is asserting its timeliness defense at its very first judicial opportunity and was in no way responsible for the length of time that this matter languished in the administrative process.

American current and former employees, regardless of job classification, grade level, or work site, who allegedly have experienced race discrimination or retaliation at any of the Department's 15 bureaus at any time since 1993.  See Compl. ¶¶ 8, 253-54.  One class claim, for which only the African-American named plaintiffs seek to be representatives, alleges race discrimination in a "battery" of employment practices, including discriminatory hiring (what Plaintiffs call "selection"), promotion, and advancement; disparate pay; and harassment.  Id. ¶ 8; see also, id., ¶¶ 256-59, 274.[71]  The other class claim, for which all named plaintiffs—African-American and non-African-American—seek to be representatives, alleges that the Department retaliated against class members who complained about race discrimination by, *inter alia*, denying them promotions and subjecting them to "disparate terms and conditions of employment, race discrimination, a hostile work environment and/or other forms of discrimination."  Id. ¶ 286. These "across-the-board" allegations cannot possibly form the basis for a proper class action.

Far from identifying a specific discriminatory or retaliatory practice that affects all purported class members uniformly, Plaintiffs simply jumble together a host of dissimilar individual claims.  The dissimilarities include:  (1) dissimilar protected classes (African-Americans and non-African-Americans); (2) dissimilar types of employer actions (non-selections, non-promotions, transfers, harassment, retaliation); (3) a host of different alleged discriminators; (4) widely dissimilar categories of employees (SES and non-SES, supervisory and non-supervisory, salaried and non-salaried, union and non-union); and (5) dissimilar bureaus

---

[71] The full extent of the class claims Plaintiffs seek to pursue is uncertain given their repeated characterization of their claims as "including but not limited to," see e.g., id. ¶¶ 260, 274, and their repeated use of the non-specific allegation that class members were subjected to "unequal terms and conditions of employment," see e.g., id. ¶ 274, 275.

governed by discrete personnel policies.  The myriad dissimilarities—both as among the named

plaintiffs themselves, and as between the named plaintiffs and the absent class

members—preclude Plaintiffs from establishing commonality, typicality, and adequacy of

representation under Rule 23(a).  In addition, Plaintiffs' inability to identify a discriminatory

practice common to all their claims, combined with their decision to seek significant monetary

relief, prevents them from meeting the requirements of Rule 23(b).

### 1.     Standard of Review

Class certification is governed by Fed. R. Civ. P. 23, the provisions of which are designed

principally to promote the efficient and economical conduct of litigation.  American Pipe &

Constr. Co. v. Utah, 414 U.S. 538, 553 (1974).  A class action generally enables courts "to treat

common claims together, obviating the need for repeated adjudication of the same issues."  In re

General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 783

(3rd Cir.), cert. denied, 116 S. Ct. 88 (1995).  The class action device is "'an exception to the rule

that litigation is conducted by and on behalf of the individual named parties only.'"  General

Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 155 (1982) (quoting Califano v.

Yamasaki, 442 U.S. 682, 700-701, (1979)).

Rule 23(a) of the Federal Rules of Civil Procedure sets forth four prerequisites to a class

action:

> One or more members of a class may sue or be sued as representative parties on
> behalf of all only if (1) the class is so numerous that joinder of all members is
> impracticable, (2) there are questions of law or fact common to the class, (3) the
> claims or defenses of the representative parties are typical of the claims or
> defenses of the class, and (4) the representative parties will fairly and adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a).  If these prerequisites are met, a class action may be maintained if, *inter*

*alia*,

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole;  or (3) the court finds that questions of law or fact common to the members of the class predominate over any questions affecting individualized members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b).  The party seeking class certification bears the burden of proof as to each element.  McCarthy v. Kleindienst, 741 F.2d 1406, 1414 n. 9 (D.C. Cir. 1984).  Failure to prove even one of these elements requires dismissal of the class complaint.  Id.; Kas v. Financial General Bankshares, Inc., 105 F.R.D. 453 (D.D.C. 1985); Pendleton v. Schlesinger, 73 F.R.D. 506, 508 (D.D.C. 1977).

Consistent with the exceptional nature of class actions, the Supreme Court has cautioned that class actions may be certified only where a "rigorous analysis has shown that the requirements of Rule 23(a) have been satisfied."  Falcon, 457 U.S. at 161.  In other words, "actual, not presumed, conformance with Rule 23(a) [is] . . . indispensable."  Id. at 160 (noting potential unfairness to class members bound by unfavorable judgment); see also Wagner v. Taylor, 836 F.2d 578, 594 (D.C. Cir. 1987).  Mere conclusory averments are insufficient to obtain class certification.  See In re American Medical Systems, Inc., 75 F.3d 1069, 1083, 1086 (6th Cir. 1996); Gonzalez v. Brady, 136 F.R.D. 329 (D.D.C. 1991).

 Whether to certify a class is within the broad discretion of the trial court.  Fed. R. Civ. P. 23(c)(1); Hartman v. Duffey, 19 F.3d 1459, 1471 (D.C. Cir. 1994).  Further, while in no way a determination of the merits, inspection of "the circumstances of the case is essential to determine whether the prerequisites of  . . . Rule 23 have been met."  Wagner, 836 F.2d at 587; see also

Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 (1978) ("class determination generally

involves considerations that are enmeshed in the factual and legal issues comprising the

plaintiff's cause of action"); Rodriquez v. U.S. Dept. of Treasury, 131 F.R.D.1, 8 (D.D.C. 1990)

("an analysis of the nature of the proof which will be required at trial is directly relevant to a

determination whether the matters in dispute are principally individual in nature or are

susceptible of proof equally applicable to all class members").

A class action complaint must allege "facts from which [a] district court could reasonably

infer that the mandatory prerequisites of Fed. R. Civ. P. 23(a) [have] been met," Smith v.

Transworld Systems, Inc., 953 F.2d 1025, 1033 (6th Cir. 1992), and deficient class allegations

may be struck. Id.; LCvR 23.1(b) ("A defendant may move at any time to strike the class

allegations or to dismiss the complaint."). As the Supreme Court has instructed, "sometimes the

issues are plain enough from the pleadings to determine whether the interests of the absent

parties are fairly encompassed within the named plaintiff's claim . . . ." Falcon, 457 U.S. at 147.

Moreover, the need to state a factually viable claim at the outset of litigation is particularly

pressing in class actions where the mere filing of a class complaint creates fiduciary obligations

to members of the putative class, upon which putative class members may rely even though a

class has not been certified. United Airlines, Inc. v. McDonald, 432 U.S. 385, 393-94 (1977).

## 2.    "Across-the-Board" Allegations of Discrimination Rarely Meet the Requirements for Class Certification Under Rule 23(a)

As this Circuit has recognized, Rule 23 inquiries in the context of Title VII suits "have

presented courts with a peculiar set of problems." Wagner, 836 F.2d at 588. Recognition of the

fact that "'racial discrimination is by definition class discrimination,' . . . has left uncertain the

degree of permissiveness tolerable in applying the requirements of Rule 23 in Title VII litigation,

and has promoted a difference of opinion as to the proper standard for certifying Title VII

classes." Id. (quoting Falcon, 457 U.S. at 157). Prior to the Supreme Court's landmark opinion

in Falcon, many courts employed an "'across-the-board" approach to Title VII class certification,

in which "any case featuring a proposed class composed of all members of a minority group

connected in some fashion with a particular employer is deemed to present common questions of

law or fact, regardless of individual variations in terms of discriminatory practices suffered or

injuries sustained, merely by virtue of an allegation that racial discrimination had occurred." Id.

These courts "permitted a named plaintiff in one job category to represent employees in another

job category, or a discharged employee to represent current employees, reasoning that although

different members of the class may have been harmed in different ways, 'the Damoclean threat of

a racially discriminatory policy hangs over the racial class [and] is a question of fact common to

all members of the class.'" Id. (quoting Johnson v. Georgia Highway Express, Inc., 417 F.2d

1122, 1124 (5th Cir. 1969)).

In Falcon, the Supreme Court rejected the "across-the-board" approach, overturning a

trial court's certification of a class consisting of both Mexican-American employees who were

denied promotions and Mexican-American job applicants who were denied employment. 457

U.S. at 152, 155. The Supreme Court reasoned that the " across-the-board" approach failed to

"evaluate carefully the legitimacy of the named plaintiff's plea that he is a proper class

representative under Rule 23(a)." Id. at 160. As the Court explained:

> Conceptually, there is a wide gap between (a) an individual' s claim that he has
> been denied a promotion on discriminatory grounds, and his otherwise
> unsupported allegation that the company has a policy of discrimination, and (b)
> the existence of a class of persons who have suffered the same injury as that
> individual, such that the individual' s claim and the class claims will share
> common questions of law or fact and that the individual' s claim will be typical

> of the class claims.  For [the plaintiff] to bridge that gap, he must prove much
> more than the validity of his own claim.  Even though evidence that he was
> passed over for promotion when several less deserving whites were advanced
> may support the conclusion that [the plaintiff] was denied the promotion because
> of his national origin, such evidence would not necessarily justify the additional
> inferences (1) that this discriminatory treatment is typical of [the defendant' s]
> promotion practices, (2) that [the defendant' s] promotion practices are
> motivated by a policy of ethnic discrimination that pervades [the plaintiff' s
> work site], or (3) that this policy of ethnic discrimination is reflected in [the
> defendant' s] other employment practices, such as hiring, in the same way it is
> manifested in the promotion practices.

Id. at 157-58.  Accordingly, the Court held that, " a Title VII class action, like any other class

action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the

prerequisites of Rule 23(a) have been satisfied."  Id. at 160.

    While criticizing the presumption of commonality and typicality inherent in the "across-

the-board" approach, the Supreme Court nevertheless recognized two situations in which

"across-the-board" classes might be appropriate:

> If [the defendant] used a biased testing procedure to evaluate both applicants for
> employment and incumbent employees, a class action on behalf of every
> applicant or employee who might have been prejudiced by the test clearly would
> satisfy the commonality and typicality requirements of Rule 23(a).  Significant
> proof that an employer operated under a general policy of discrimination
> conceivably could justify a class of both applicants and employees if the
> discrimination manifested itself in hiring and promotion practices in the same
> general fashion, such as through entirely subjective decisionmaking processes.
> In this regard, it is noteworthy that Title VII prohibits discriminatory
> employment *practices,* not an abstract policy of discrimination.  The mere fact
> that an aggrieved plaintiff is a member of an identifiable class of persons of the
> same race or national origin is insufficient to establish his standing to litigate on
> their behalf all possible claims of discrimination against a common employer.

457 U.S. at 158, n. 15 (emphasis in original).  Thus, "across-the-board" class actions cannot even

"*conceivably*" be maintained unless they meet the stringent standards set forth in Falcon.

(Emphasis added).

### 3.    Plaintiffs' "Across-the-Board" Claims Lack Commonality

The commonality and typicality requirements of Rule 23 "tend to merge." Falcon, 457

U.S. at 157 n. 13. "Both serve as guideposts for determining whether under the particular

circumstances maintenance of a class action is economical and whether the named plaintiff's

claim and the class claims are so interrelated that the interests of the class members will be

fairly and adequately protected in their absence." Id. As to commonality, this Circuit has

interpreted Falcon as follows: " What the Court demands from those seeking certification of a

class cutting across employment status or job categories is a 'specific presentation' identifying

the questions of law or fact common to the class representative and the members of the class

proposed." Wagner, 836 F.2d at 589 (quoting Falcon, 457 U.S. at 158). Indeed,

> [a]s Falcon made clear, there is more to a showing of commonality than a
> demonstration that class plaintiffs suffered discrimination on the basis of
> membership in a particular group . . . . [A] plaintiff need not isolate the
> particular practice and prove that such practice *caused* the discrimination, [but]
> plaintiffs must make a significant showing to permit the court to infer that
> members of the class suffered from a common policy of discrimination that
> pervaded all of the employer's challenged employment decisions.

Hartman, 19 F.3d at 1472. See also Bynum v. District of Columbia, 217 F.R.D. 43, 46-47

(D.D.C. 2003) ("a single aspect or feature of the claim must be common to *all* proposed class

members.") (emphasis added).

At the outset, it is apparent that Plaintiffs in the case at bar seek to bring a true "across-

the-board" class action. They propose the following class definition: "The class consists of all

African-Americans and non-African-Americans who are, or have been, employed by Commerce

and have experienced race discrimination or have been retaliated against for acting against race

discrimination during the applicable liability period" (i.e. since 1993). See Compl. ¶ 254. They

-70-

purport to represent both "applicants and employees," id. at ¶¶ 255, 260; they make no effort to limit the class to any job category, grade level, personnel system, or bureau; and they seek to challenge a "battery" of employment practices, including discriminatory hiring (what Plaintiffs call "selection"), promotion, job assignments, training, and "other benefits and conditions of employment," as well as disparate pay, harassment, and retaliation. Id. ¶ 8; see also, id., ¶¶ 256-59, 274, 286. Thus, as they candidly acknowledge, they seek prove that Commerce has "created and maintained a system-wide employment policy of race-based disparate treatment," as well as a "pattern of retaliation" against members of all races, "in *all aspects* of [its] employment operations." Id. at ¶¶ 259-60, 265 (emphasis added). By comparison, the Court in Falcon considered the plaintiffs' suit to be an "across-the-board" action because they sought to represent Mexican-Americans in two types of employment decisions: hiring and promotion. 457 U.S. at 152, 155.

It is equally apparent that Plaintiffs can identify no single feature of their claims that is common to all class members. Plaintiffs posit that the "common questions" that must be resolved relative to all prospective class members are: (1) "whether Commerce has engaged in a systemic pattern of racial discrimination against African-Americans"; and (2) "whether Commerce has engaged in a pattern of retaliation against African-American and non-African-American employees who speak out in opposition [to] race discrimination." See Compl. ¶ 265. More than this is required to meet the "specific presentation" requirement of Falcon. Indeed, in Wagner, the plaintiffs proposed just such an alleged "common question of law or fact": "the common threat of discrimination that confronts all members of the class." 836 F.2d at 593. The D.C. Circuit rejected this allegation as plainly insufficient to establish commonality. Id.

In a vain attempt to identify a specific employment practice that operated to discriminate against all proposed class members in the same manner, Plaintiffs suggest that the Department of Commerce engaged in a practice of subjective decision-making.  See Compl. ¶ 275 ("reliance upon subjective procedures and criteria which permit and encourage the incorporation of racial stereotypes and bias"); see also Compl. ¶ 4.  This allegation also is plainly insufficient to establish commonality across such a broad spectrum of job classifications, personnel systems, and grade levels.  First, the allegation misses the point of Falcon, which suggested that commonality conceivably could be established in an "across-the-board" putative class action if an employer manifested a general policy of discrimination through " entirely subjective decisionmaking processes"—not the use of subjective criteria.  See McReynolds, 208 F.R.D. at 441-42.  Indeed, there is nothing inherently suspect about the use of some subjective criteria in hiring and promotion decisions.  See Watson v. Ft. Worth Bank & Trust, 487 U.S. 977, 999 (1988) ("It is self-evident that many jobs . . . require personal qualities that have never been considered amenable to standardized testing.").  Compare Kwon v. Billington, 370 F. Supp. 2d 177, 186 (D.D.C. 2005) ("Title VII's concern that over reliance on subjective criteria might mask discrimination is not meant to render performance in an interview as an irrelevant consideration in personnel decisions."); Horvath v. Thompson, 329 F. Supp. 2d 1, 9 (D.D.C. 2004) (the selecting official "was entitled to emphasize the need for initiative, a quality listed in the job description").

Second, Plaintiffs cannot possibly show that the Department's personnel decision-making processes were entirely subjective.  Defendant's declarations establish conclusively that the various bureaus' discrete hiring, appraisal, promotion, and compensation systems are

characterized by numerous objective processes, including, *inter alia*:

- Collective bargaining agreements ("CBA") between bureaus and various unions which govern:

    - hiring for new positions (e.g., until this year, the CBA at Census required internal candidates to be considered for new career ladder positions before external candidates were considered—Exh. V (Smith Decl. ¶ 20);

    - performance appraisals (e.g., at NOAA, National Weather Service CBA gives covered employees the option of a pre-appraisal meeting to note specific accomplishments, and permits the union to place a union member on rating boards—Exh. T (Ribas Decl.) at ¶ 16) (e.g., at Census, CBA mandates pass/fail rating system—Exh. V (Smith Decl.) at ¶¶ 21, 24 ); and

    - promotions and awards (e.g., at PTO, CBA identifies requirements for career-ladder promotions and for special awards programs—Exh. R (Meadows Decl.) at ¶¶ 13, 14);

- online posting of patent examiner vacancies at PTO through its Job Application Rating System (Exh. R (Meadows Decl.) at ¶ 22), and at other bureaus through ACES (Exh. U (Russell Decl.) at ¶ 7); Exh. M (Jefferson Decl.) at ¶ 27;

- specialized educational and experience qualifications for various job categories (e.g., at NIST, applicants for a physicist vacancy must have a degree in physics or an appropriate combination of education and experience with course work in electricity and magnetism, heat, light, mechanics, and sound—Exh. P (Kirkner Decl.) at ¶ 17) (e.g., at BEA, economist candidates must have a degree in economics—Exh. Q (Martin Decl.) at ¶ 22); see also ¶ 23 (NTIA electronics engineers), ¶ 24 (MBDA business development specialists), ¶ 25 (BIS trade and industry analysts and export compliance specialists, ¶ 20 (ITA trade representatives);

- objective criteria for career-ladder promotions (e.g., at PTO, patent examiners must meet specified productivity requirements—Exh. N (Focarino  Decl.) at ¶ 3);

- systems to prevent favoritism or bias in competitive promotions (e.g., at NOAA's NWS, use of structured panel system, uniform scoring system, and pre-established interview questions for selection of meteorologists—Exh. W (Valdez Decl.) at ¶ 6);

- objective performance criteria (e.g., at Census, quantifiable "generic performance indicators" must be incorporated into employees' performance plans—Exh. V (Smith Decl.) at ¶ 24);

-73-

- systems to prevent favoritism or bias in performance-related compensation (e.g., the APMS, under which NIST operates, vests final decision authority over performance scores, pay increases, and bonuses in Pay Pool Managers—Exh. P (Kirkner Decl.) at ¶ 12.K); and,

- requirements that negative decisions be explained and documented (e.g., at Census, for any performance rating of "Does Not Meet Expectations," the rating official must document her reasons in writing and describe a solution—Exh. V (Smith Decl.) at ¶ 24.D).

Thus, Commerce's personnel practices clearly cannot be described as entirely subjective. To the contrary, they are characterized by numerous objective processes and criteria. Compare Vuyanich v. Republic Nat'l Bank of Dallas, 723 F.2d 1195, 1199-200 (5th Cir.1984) ("The district court's finding that the Bank relied on two objective inputs—education and experience—in its necessarily subjective hiring process . . . precludes reliance on this 'general policy of discrimination' exception"); Wilkins v. University of Houston, 654 F.2d 388, 409 n.37 (5th Cir. 1981) ("[W]hile we . . . do not decide the question, it may be that claims of [discrimination] with respect to . . . positions requiring diverse and specialized qualifications relating to education and work experience simply are inappropriate claims for class actions that rely on statistical proof.") (cited with approval in Valentino v. U.S. Postal Service, 674 F.2d 56, 67 (D.C. Cir. 1982)); Garcia v. Veneman, 211 F.R.D. 15, 20 & n. 4 (D.D.C. 2002) ("where, as here, a number of objective factors guide the decision-making process, the proposed class fits less neatly into the *Falcon* exception."); Int'l Union v. LTV Aerospace & Defense Co., 136 F.R.D. 113 (N.D. Tex. 1991) (fact that collective bargaining agreement covered some of the decision-making process precluded finding that process was entirely subjective).[72]

---

[72] It also is instructive to contrast this case with McReynolds, in which the Court certified a narrow class of employees who sought promotion to high-level managerial positions upon a

-74-

The prevalence of objective decision-making processes, and the decentralization of personnel authority among Commerce's various bureaus, make it abundantly clear that resolution of any claim of discrimination by any purported member of the putative class would require a "highly individualized" factual inquiry.  See McCarthy v. Kleindeinst, 741 F.2d 1406 (D.C. Cir. 1984) ("serious drawbacks to the maintenance of a class action are presented where initial determinations, such as the issue of liability vel non, turn upon highly individualized facts").  For instance, determining whether a physicist at NIST was discriminated against in failing to receive a promotion to the ZIP-IV level would necessitate an analysis of how his accomplishments compared to the objective requirements of having twenty or more publications in top refereed journals, senior authorship in 20% or more of the publications, etc.  See Exh. X (Ott Decl.) at ¶ 5. By contrast, commonality only exists where "it is unlikely that differences in the factual backgrounds of each claim will affect the outcome of the legal issue."  Califano, 442 U.S. at 701.

This case is analogous to numerous others in which Courts have declined to certify class actions sought to be maintained on behalf of employees (or applicants) in diverse job types, employed at different facilities with decentralized decision-making, or who were subject to different employment criteria.  See, e.g., Hartman, 19 F.3d at 1474 (declining to affirm class certification encompassing both civil service and foreign service applicants to United States Information Agency); Wagner, 836 F.2d at 581 (affirming lower court's denial of motion to

---

finding that the company's "promotion practices with respect to this group of individuals is entirely subjective."  208 F.R.D. at 443.  The Court based this finding on the facts that positions were filled without being posted at all; that the company allowed each manager to make promotion decisions "based on whatever criteria he or she chooses, with no guidance or rules"; and that hiring managers were not required to document the reasons for their decisions, making them unreviewable.  Id. at 433, 441.  As shown above, none of these features apply to the Department of Commerce's personnel practices.

certify class of all "professional, administrative, and technical employees graded GS-9 and above" at the Interstate Commerce Commission).  Compare Cooper v. Southern Company, 390 F.3d 695, 704, 715 (11th Cir. 2004) (no commonality for putative class claims of discrimination regarding promotion opportunities, performance evaluations, compensation, and hostile environment where workforce was diverse, and management structures, working environments, and criteria for employment decisions varied substantially); Bacon v. Honda of America Mfg., Inc., 370 F.3d 565, 571-72 (6th Cir. 2004) (no commonality for promotion claim where diverse group of workers subject to differing promotion criteria that included objective measures and were spread over numerous departments in different locations); Bradford v. Sears, Roebuck & Co., 673 F.2d 792, 794-95 (5th Cir. 1982) (no commonality where geographically dispersed facilities had autonomy with regard to challenged employment decisions); Stastny v. Southern Bell Tel. & Tel. Co., 628 F2d 267, 278-79 (4th Cir. 1980) ("substantial degree of and perhaps almost complete local autonomy in separate facilities . . . cuts against any inference for class action commonality purposes that local facility practices were imposed or enforced state-wide with respect to a statewide class").  Compare  Valentino, 674 F.2d at 67 ("When the . . . number and diversity of the occupations involved in this case became apparent, the district court might appropriately have revisited the certification to determine whether further trimming, refinement by subdivision, or even retraction was warranted.").

In short, Plaintiffs cannot possibly meet their burden of making a specific presentation of issues of law or fact common to all class members of their proposed "across-the-board" action, as required under Rule 23(a)(2).  This failure, in and of itself, dooms their request for certification.

**4.     The Named Plaintiffs' Claims Are Not Typical of the Proposed Class Claims**

The next requirement of Rule 23(a) is that "the claims or defenses of the representative

parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "[T]he court

must consider whether [the class representatives] suffered injury from a specific discriminatory

promotional practice of the employer in the same manner that the members of the proposed class

did, and whether [the class representatives] and the class members were injured in the same

fashion by a general policy of employment discrimination."  Wagner, 836 F.2d at 591.

A review of the allegations of the 12 named plaintiffs herein makes abundantly clear not

simply that their claims are not typical of the purported class claims.  As shown above, the

policies, standards, procedures, and decision-makers relevant to the promotion and other

employment practices Plaintiffs challenge vary by bureau, and sometimes within bureaus, and by

position.  Seven bureaus—BEA, EDA, ESA, ITA, NTIS, OIG, and TA—are conspicuous in that

not one of the proposed class representatives is, was, or ever sought to be, an employee at any of

them.  Even if decision-making were not decentralized and policies not bureau-specific, it strains

credulity that any of the purported class representatives could have individual discrimination

promotion claims typical of any that a trade representative at ITA or an economist at BEA might

have.  Compare Hines v. Widnall, 334 F.3d 1253 (11th Cir. 2003) (affirming refusal to certify

class of all current, former, and future African-American employees and applicants for jobs at

Eglin Air Force Base on grounds, *inter alia*, that employees would be included in class holding

job classifications to which none of named plaintiffs belonged).

Moreover, with one exception—Janet Howard, an export compliance specialist at BIS—

all of the proposed representatives hold positions and complain that they were denied promotions

to positions that are not among the most predominant either at their particular bureau or Department-wide. Tanya Ward Jordan is a management and program analyst (see Compl. ¶ 73), not an attorney, at OS, and there are objective standards that apply to attorney promotion decisions that apply neither to Ms. Jordan nor any of the other proposed class representatives. Any individual claims of promotion discrimination that any of the proposed class representatives might have would thus not be typical of the discrimination claims that a class member who is an attorney could have. Similarly, William Burns, is a computer operation monitor (id. ¶ 131), not a statistician, at Census. Colonel Lovett, a former NIST managerial employee (id. ¶ 180), was neither a physicist nor a chemist. Anthony Washington, is a computer specialist at NOAA (id. ¶ 227), not a meteorologist, a cartographer, or any other position that predominates at that bureau. Neither Michele Peyton nor Jeanette Devins[73] (id. ¶ ¶ 200, 210), both of whom are PTO employees, are patent examiners. Simply put, any individual discrimination claims that any of the class representatives might have would simply not be typical of claims that the overwhelming majority of the purported class could have.

Further, the allegations made by the named plaintiffs regarding their individual claims refer to particular actions generally within relatively small units of their respective bureaus that concern a very few people in relatively uncommon positions.[74] Each of the allegations is fact-

---

[73] Neither Ms. Megginson's, Ms. Devins's, Queen Jones's, nor Barbara Loretz's current position is identified in the complaint. Departmental records reveal that: Ms. Megginson is currently a management analyst at NTIA, see Exh. Q, (Martin Decl.) ¶ 27; Ms. Devins is currently an employee development specialist at PTO, see Exh. R (Meadows Decl.) ¶ 5; and, at NOAA, Ms. Jones is a secretary and Ms. Loretz is a cartographer. Exh. T (Ribas Decl.) ¶ 7.

[74] Mr. Gosier's allegations are an exception to this pattern in that his string of conclusory statements allege actions by "Commerce," although the individual injury that he claims to have suffered—namely, being "falsely charged with being absent without leave when he was . . . assisting African Americans with employment grievance claims—was, he asserts, an action by

specific, distinctive and limited: in one instance a transfer is at issue (Compl. ¶ 82); another

concerns lateral transfers (id. ¶ 132). One allegation complains of the re-advertising of a vacancy

with new requirements (id. ¶ 185), another that a vacancy announcement was cancelled (id.

¶ 215), and another of the time taken before being made permanent (id. ¶ 230). One allegation

complains of the plaintiff not getting a special assignment (id. ¶ 202), while another complains of

the plaintiff being given special assignments (id. ¶ 238). One allegation concerns the absence of

evaluations (id. ¶¶ 105-06), while another complains of their substance (id. ¶ 247). In two

instances, the allegations of racial animus are intertwined with allegations that the conduct

complained of was based upon the plaintiff's disability. See id. ¶¶ 68, 70, 83, 90. At the same

time, there is not a single allegation that anyone from outside the particular unit within the

specific bureau at which any of the named plaintiffs worked had any involvement with the events

or the decisions of which the named plaintiffs complain. No individual plaintiff (except Ms.

Jordan, who is an OS employee) maintains that anyone from the Office of the Secretary or

OHRM had anything to do with the decisions of which they complain.

The allegations taken together do not identify a common group of managers as

responsible for the decisions of which Plaintiffs' complain; instead each named plaintiff

complains about different individual supervisors. Compare Garcia, 211 F.R.D. at 22

("Commonality is defeated—not only by plaintiffs' inability to correlate the discrimination they

allege with subjective . . . criteria—but also by the large numbers and geographic dispersion of

---

"Census." Compl. ¶¶ 149-150. In any event, not only is there no assertion that this injury Mr.
Gosier claims to have suffered is typical of injuries suffered by the putative class, his activity as
"an EEO representative" for the past 12 years and as a union steward for 12 years before that, id.,
¶¶ 145 and 149, raises individual issues of law and fact atypical of those that would apply to, or
arise in, retaliation claims of other members of that class.

the decision-makers.").  In sum, the claims of the named plaintiffs are not typical of the class

claims and therefore cannot satisfy Rule 23(a)(3).  For this reason as well, Plaintiffs' putative

class claims cannot proceed.

> **5.      The Named Plaintiffs Are Not Adequate Class Representatives**

Finally, Plaintiffs must show that they will "fairly and adequately protect the interests of

the class."  Fed. R. Civ. P. 23(a)(4).   To satisfy this requirement, a "class representative must be

part of the class and possess the same interest and suffer the same injury as the class members."

Rodriguez, 431 U.S. at 403.  As this Circuit has explained, "[b]asic consideration of fairness

require[s] that a court undertake a stringent and continuing examination of the adequacy of

representation by the named class representatives at all stages of the litigation where absent

members will be bound by the court's judgment."  National Association for Mental Health, Inc.

v. Califano, 717 F.2d 1451, 1457 (D.C. Cir. 1983).  In evaluating whether a named plaintiff will

fairly and adequately protect the interests of the class members, this Circuit has "considered two

principal requirements:  1) the named representative must not have antagonistic or conflicting

interests with the unnamed members of the class, and 2) the representatives must appear able to

vigorously prosecute the interests of the class through qualified counsel."  Id. at 1458.  See also

Wagner, 836 F.2d at 595-96.

At the outset, the named plaintiffs do not possess the same interest as the absent class

members.  As shown in Part IV, above, all the named plaintiffs' individual claims fail as a matter

of law.  The Supreme Court in Rodriguez made clear that, where named plaintiffs' individual

claims lack merit, such plaintiffs are not "members of the class of discriminatees they purported

to represent" and therefore cannot "'fairly and adequately represent the interests of the class.'"

431 U.S. at 403-06.  See also Everitt v. City of Marshall, 703 F.2d 207, 211 (5th Cir.), cert.

denied, 464 U.S. 894 (1983) (upholding denial of certification where class representative's

claims were dismissed at trial; once dismissal occurred, class representative no longer was "a

member of the class of discriminatees" she sought to represent, and therefore was ineligible to

represent the class).

    In addition to their not possessing the same interest as members of the putative class, the

named plaintiffs have interests which arguably *conflict* with those of absent class members.

First, while Plaintiffs purport to represent Commerce employees at all grade levels, in all job

classifications, and at all levels of responsibility—from GS-1 clerks, to GS-15 attorney

supervisors, to members of the Senior Executive Service ("SES")—none of the named plaintiffs

holds a position graded higher than GS-14 (Ms. Jordan) (all the rest of the named plaintiffs hold

positions at GS-12 or below), and none of them hold supervisory or SES positions.  See Compl.

¶¶ 51, 61 (Howard); 73 (Jordan); 103-104 (Megginson); 128, 131 (Burns); 142 (Gosier); 164

(Morris); 197, 200; 210 (Devins); 227 (Washington); 236 (Loretz); and 247 (Jones).[75]  This

potential source of conflict raises "a serious question" about the named plaintiffs' ability to

pursue this suit as class representatives.  Wagner, 836 F.2d at 595.  As this Circuit has explained,

"[s]upervisory employees are often inappropriate representatives of nonsupervisory employees

because the structure of the workplace tends to cultivate distinctly different interests between the

two groups.  Although each group shares the interest in freedom from discrimination, potential

conflicts may and do arise within a class including both."  836 F.2d at 595.

---

[75] While Plaintiff Lovett was a GS-14 "managerial" employee when he worked for Commerce, he
had retired by the time this suit was filed.  See Compl. ¶ 180.

In addition, at least two of the named class members in this suit complain of the actions of *other members of the putative class*. Specifically, Ms. Jordan and Ms. Devins complain of decisions made by other African-American employees. See Compl. ¶¶ 86-87, 216. The Court in Wagner considered this precise circumstance—Wagner accused his own supervisor, who was a potential member of the class, of race discrimination—as casting "doubt concerning [a named plaintiff's] suitability to manage the class action." 836 F.2d at 595.

Finally, while the attorneys who seek to represent the proposed class have not yet submitted their credentials, Defendant would note that those attorneys already have made a number of errors which at least call into question their competency to prosecute a Title VII class action. Specifically, opposing counsel:

- improperly sought to designate this case as related to Howard v. Guitierrez, 04-756. See Memorandum Opinion dated December 19, 2005 (Dkt. 11) referring case to Calendar Committee for random reassignment;

- improperly named as a class representative a person who had previously advised counsel that she did not want to be involved in this action. See Exh. Z (Guinyard Decl.) at ¶ 5; Dkt. 12;

- asserted claims in this action not encompassed within the administrative class complaint;

- asserted claims in this action on behalf of named plaintiffs lacking proper venue and whose claims are barred by res judicata and failure to exhaust their administrative remedies; indeed, the Complaint does not even cite the proper venue requirements for Title VII cases. See Compl. ¶ 13;

- failed to comply with Local Rule 23.1(b), which requires a plaintiff seeking to pursue a class action to file a motion for certification within 90 days of the filing of the complaint. Compare Rodriguez, 431 U.S. at 405 ("the named plaintiffs' failure to protect the interests of class members by moving for certification surely bears strongly on the adequacy of the representation that those class members might expect to receive."); and

- misstated that an EEOC complaint filed by named plaintiff Dennis Gosier had

been "stayed on April 19, 2004 pending the outcome of Janet Howard's class action suit against Commerce," <u>see</u> Complaint ¶ 161, when in fact: (1) on May 18, 2004, the EEOC had denied counsel's motion to stay Gosier's complaint "pending resolution of class certification issues" in Ms. Howard's administrative class complaint (which motion counsel had labeled as "Unopposed" when it was in fact opposed by the Department), and had dismissed Gosier's complaint for failure to comply with Orders to initiate discovery, produce a prehearing statement, and produce a witness list, <u>see</u> <u>Gosier v. Evans</u>, EEOC Case No. 120-2004-00250X, (Order of Dismissal of Hearing dated May 18, 2004), Exh. HH; and (2) on December 19, 2005, the EEOC had affirmed the dismissal of Gosier's complaint. <u>See</u> <u>Gosier v. Gutierrez</u>, EEC Appeal No. 01A44851, 2005 EEOPUB LEXIS 5872, Exh. II.

For all these reasons, Plaintiffs cannot carry their burden of showing that they would fairly represent the interests of the class. Thus, Plaintiffs' class claims also fail under Rule 23(a)(4).

**6.    Plaintiffs Cannot Satisfy Rule 23(b) Because the Department Has Not Acted On Grounds Generally Applicable to the Proposed Class and Because the Proposed Class's Damages Claim Eclipses Its Claim for Equitable Relief**

Plaintiffs seek to certify the proposed class under Rule 23(b)(2) on the ground that "Commerce has acted on grounds generally applicable to the class . . . ." <u>See</u> Compl. ¶¶ 270-71. Plaintiffs cannot meet the requirements of Rule 23(b)(2) for two reasons. First, as shown above, they have utterly failed to identify any common policy or practice of the Department that affects all potential members of the class in the same manner. Second, Plaintiffs have sought, as a major component of their relief, compensatory damages. <u>See</u> Compl., Prayer for Relief, ¶ k (seeking "[a]n award of compensatory damages in an amount not less than 500 million dollars"). Because a showing of liability would not automatically entitled any potential class member to damages, determining the amount of damages to which potential class members are entitled would require numerous individualized inquiries and destroy the efficiency of the class mechanism. <u>See</u> <u>Eubanks v. Billington</u>, 110 F.3d 87, 95 (D.C. Cir. 1997) ("the underlying premise of (b)(2)

-83-

certification—that the class members suffer from a common injury that can be addressed by classwide relief—begins to break down when the class seeks to recover back pay or other forms of monetary damages to be allocated based on individual injuries.").

"While the rule itself is silent as to whether and to what extent monetary relief may also be sought, the Advisory Committee Notes on Rule 23 state that (b)(2) certification 'does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.'" Taylor v. District of Columbia Water & Sewer Authority, 205 F.R.D. 43, 47 (D.D.C. 2002). It has not been decided in this Circuit "when, exactly, a claim for monetary relief comes to predominate over a claim for declaratory or injunctive relief." Garcia, 211 F.R.D. at 23. However, under any test, Plaintiffs' claim for monetary damages must be deemed to predominate over their request for declaratory relief. Indeed, while they estimate their class size to be in the range of "hundreds, if not thousands" of members, see Compl. ¶ 254, they seek damages of "not less than 500 million dollars." Thus, each potential class member seeks the maximum amount of compensatory damages available against the federal government under Title VII—$300,000. Such a monetary claim clearly eclipses any type of declaratory relief potential class members might be able to obtain, given the numerous individualized inquiries that would be required to establish that class members actually had been damaged in that amount. Compare Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir.1998) ("monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief. By incidental, we mean damages that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief.") (emphasis in original). Compare also Reeb v. Ohio Dep't of Rehabilitation and Correction, 2006 WL 162836, * 12 (6[th]

-84-

Cir. 2006) ("we hold that, because of the individualized nature of damages calculations for Title VII plaintiffs and the ability of those plaintiffs to bring individual actions, the claims for individual compensatory damages of members of a Title VII class necessarily predominate over requested declaratory or injunctive relief, and individual compensatory damages are not recoverable by a Rule 23(b)(2) class.").

For these reasons, Plaintiffs cannot satisfy the requirements of Rule 23(b)(2), and their class claims must be stricken.

## VII.  CONCLUSION

Based upon the foregoing, all of the named plaintiffs' individual claims should be dismissed; many of the class claims should be dismissed as beyond the scope of the administrative class complaint; and all of the class claims should be stricken for failure to meet the requirements of Fed. R. Civ. P. 23.

Respectfully submitted,

_____/s/_____
KENNETH L. WAINSTEIN, D.C. Bar #451058
United States Attorney

_____/s/_____
R. CRAIG LAWRENCE, D.C. Bar #171538
Assistant United States Attorney

_____/s/_____
STRATTON C. STRAND, D.C. Bar #464992
Assistant United States Attorney