**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**WASHINGTON FIELD OFFICE**
**1400 L STREET, N.W., SUITE 200**
**WASHINGTON, D.C. 20005**

_____

JANET HOWARD, *et al.*                              |
                                                    |
                        Complainants,               | **CLASS ACTION**
                                                    |
                                                    |
                                                    | EEOC No.  100-A1-7429X
DONALD L. EVANS,                                    |
SECRETARY,                                          |
U.S. DEPARTMENT OF COMMERCE,                        |
                                                    | Agency No. 95-55-0278
                        Agency.                     |
_____                   |


# PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR RECONSIDERATION OF JUDGE HENRY'S DECERTIFICATION ORDER, OR IN THE ALTERNATIVE, THEIR MOTION TO SUBCLASS THE D.C. METROPOLITAN BUREAUS


**Sanford, Wittels, & Heisler, LLP**
2121 K Street, N.W. Ste. 700
Washington, D.C. 20037
202-942-9124

**Law Offices of Grant E. Morris**
7 Dupont Circle, Ste. 250
Washington, D.C. 20036
202-331-4707

Attorneys for plaintiffs and the class

## TABLE OF CONTENTS

I.    INTRODUCTION

II.   SUMMARY OF ARGUMENT

    A.    The OFO's Department-wide Certification

    B.    DOC's Motion To "Redefine The Class"

    C.    Six Compelling Factors Support A Washington, D.C. Metropolitan Class

III.  PROCEDURAL HISTORY

    A.    THE HOWARD COMPLAINT

    A.    CLASS MEMBERS HAVE RELIED ON THE PENDENCY OF THE CLASS ACTION SINCE 1995

    B.    THE COMMISSION PROVISIONALLY CERTIFIES A CLASS OF AFRICAN-AMERICAN EMPLOYEES  THROUGHOUT THE DOC

    D.    JUDGE HENRY NARROWS THE CLASS

    A.    JUDGE KRAVETZ GRANTS PLAINTIFFS' MOTION FOR LEAVE TO FILE A MOTION FOR RECONSIDERATION

IV.   OVERVIEW OF THE DOC

    A.    THE DOC: A HIGHLY CENTRALIZED AGENCY WITH BRANCH OFFICES IN THE METROPOLITAN D.C. AREA

        0.    The Office Of The Secretary Is The Nerve Center Of The DOC

        0.    The DOC Organization Chart Reveals The Arbitrariness of Judge Henry's Decertification Order – Which Eviscerated Approximately 85% of the Class

        3.    All DOC Bureaus Are Subject to Department-Wide Personnel Policies

    B.    THE OFFICE OF THE SECRETARY – THROUGH ITS OHRM ARM – DISSEMINATES PERSONNEL POLICY AND EXPECTS ADHERENCE BY ALL CONSTITUENT BUREAUS

V.      ARGUMENT

        A.      STANDARD OF REVIEW

        A.      DOC'S PERFORMANCE APPRAISAL SYSTEM ("BEAUTY IS IN THE EYE OF THE BEHOLDER") IS RIDDLED WITH SUBJECTIVITY AND VIRTUALLY GUARANTEES RACIAL BIAS

                1.      The Role of Performance Appraisals At The DOC

                2.      Dr. David Martin, Plaintiffs' Expert, Concludes That DOC's Performance Appraisal System Is Flawed

                3.      A White Witness, Dennis Gosier, Employed At The DOC Since 1970, Confirms The Arbitrary and Subjective Personnel Reviews Of African-American Employees

                4.      "Beauty Lies In The Eyes Of The Beholder": Anecdotal Evidence From African-American Employees At The DOC Illustrates The Subjective Nature Of The Performance Appraisals

        B.      DOC'S SELECTION PROCESS HAS DISPARATELY IMPACTED AFRICAN-AMERICANS

                2.      Statistical Evidence Of Racial Discrimination At DOC Exists Throughout Its Bureaus, Including the Outside Bureaus

                3.      Anecdotal Evidence Of Racial Discrimination At DOC Exists Throughout Its Bureaus, Including the Outside Bureaus

                        a.      One hundred twenty-five survey forms have been submitted by African-American employees at the DOC

                        a.      Extensive Anecdotal Evidence Illustrates The Pervasive Race Discrimination Throughout The DOC

                4.      Class Agent Howard Has Been Affected By The Discriminatory Selection Process

D.    THIS COURT SHOULD REINSTATE THE CLASS CERTIFIED BY THE COMMISSION AS ALL THE REQUIREMENTS FOR CLASS CERTIFICATION PURSUANT TO RULE 23 ARE SATISFIED

    1.    Rule 23 Requirements

    2.    Plaintiffs Have Satisfied Rule 23(a) Requirements
       .    The Class Is Sufficiently Numerous To Make Joinder Impracticable

       b.    Common Questions Of Law And Fact Unite The Claims Of The Class Agent And The Class

          i.    Overview

          ii.    *Falcon* and Disparate Impact

          iii.    Decentralization Does Not Defeat Commonality

          i.    Class Certification and Trial Implicate Common Witnesses, Common Documents, Common Legal Issues, Common Disputed Facts, and Common Statistical Evidence

          v.    Commonality Is Satisfied In This Matter

       a.    The Claims Of The Class Agent Are Typical Of The Claims Of The Class

       b.    The Class Agent Is An Adequate Representative Of The Class

       c.    Class Agent Janet Howard's Intent Has Been And Remains To Represent A Class Of African-American Employees Throughout The Department of Commerce

       d.    The Proposed Class Satisfies The Requirements Of Rule 23(b)(2)

       g.    The Proposed Class Can Also Be Certified Under Rule 23(b)(3)

VI.    IF THIS COURT REJECTS THE COMMISSION'S CERTIFICATION OF THE DEPARTMENT-WIDE CLASS, THIS COURT MAY, ALTERNATIVELY, SUBCLASS THE FIVE METROPOLITAN D.C. BUREAUS

    A.    The Applicable Law On Subclassing

    B.    African-American Employees Of The Four Outside Subclasses Share A Uniform Interest. Anecdotal Evidence, Internal DOC Affirmative Action Reports And Statistical Evidence All Confirm That African-American Employees From (1) Census; (2) The United States Patent And Trademark Office; (3) The National Oceanic And Atmospheric Administration; and (4) The National Institute Of Standards And Technology Are Victims Of Pervasive Racial Discrimination. Consequently, The Court Should Grant Plaintiffs' Motion To Subclass These Four Outside Offices.

        a.    DOC Internal Affirmative Action Reports

        ii.    Anecdotal Proof: Survey Forms Filled Out By African-American Employees, In The DOC, Including The Outside Bureaus, Demonstrates That Such Employees Experience Uniform Racial Discrimination Throughout The Metropolitan Washington, D.C. Area

        iii.    Statistical Evidence Confirms The Existence Of Racial Discrimination At The Outside Bureaus

    C.    General Considerations That Warrant Certification Of Census, PTO, NOAA and NIST Subclasses

    C.    The Court Should Certify A Subclass Of Current and Former African-American Employees From The Bureau Of The Census

        .    The Two Proposed Class Agents For The Census Bureau Will Fairly And Adequately Represent This Subclass

        .    Confirmatory Evidence By White Employee Dennis Gosier That Census Engages In A Policy Of Institutionalized Race Discrimination Against African-Americans

    E.    The Court Should Certify A Subclass Of Current And Former African-American Employees From The United States Patent And Trademark Office ("PTO")

        i.    The Proposed Class Agent For USPTO Will Fairly And Adequately Represent This Subclass

F.    The Court Should Certify A Subclass Of Current And Former African-American Employees From The National Oceanic And Atmospheric Administration ("NOAA")

    i.    The Two Proposed Class Agents For NOAA Will Fairly And Adequately Represent This Subclass

G.    The Court Should Certify A Subclass Of Current And Former African-American Employees From The National Institute of Standards and Technology ("NIST")

    i.    The Proposed Class Agent For NIST Will Fairly And Adequately Represent This Subclass

    ii.    Additional Factors Justify Granting An NIST Subclass

    .    Subclassing of the Four Outside Office Bureaus Alleviates Any Potential Manageability Problems

VII.    CONCLUSION

## <u>TABLE OF AUTHORITIES</u>

<u>**page**</u>

### **FEDERAL CASES**

<u>Advocate Health Care v. Mylan Labs, Inc.</u>, 202 F.R.D. 12  (D. D.C. 2001)

<u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591  (1997)

<u>Anderson v. Garner</u>, 22 F. Supp. 2d 1379 (N.D. Ga. 1997)

<u>Appleyard v. Wallace</u>, 754 F.2d 955 (11th Cir. 1985)

<u>Avagliano v. Sumitomo Shoji America Inc.</u>, 103 F.R.D. 562 (S.D.N.Y. 1984)

<u>Bergal v. Metropolitan Waste Control Comm.</u>, 873 F.2d 1166 (8th Cir. 1989)
(per curiam)

<u>Binion v. Metropolitan Pier and Exposition Authority</u>, 163 F.R.D. 517 (N.D. Ill. 1995)

<u>Bynum v. District of Columbia</u>, 217 F.R.D. 43 (D. D.C. 2003)

<u>Caridad v. Metro-North Commuter R.R.</u>, 191 F.3d 283 (2d Cir. 1999)

<u>Cox v. American Cast Iron Pipe Co.</u>, 784 F.2d 1546 (11th Cir.) *cert denied*, 479 I/S/ 883 (1986)

<u>Crown Cork & Seal Co. v. Parker</u>, 462 U.S. 345  (1983)

<u>District Council 37, AFSCM v. New York City Department of Parks and Recreation</u>, 113 F.3d
347 (2nd Cir. 1997)

<u>Eisen v. Carlisle & Jacquelyn</u>, 417 U.S. 156 (1974)

<u>Eubanks v. Billington</u>, 110 F.3d 87 (D.C. Cir. 1997)

<u>Federman v. Empire Fire & Marine Ins. Co.</u>, No. 73 Civ. 4516-LFM, 1974 WL 452 (S.D.N.Y.
Oct. 1, 1974)

<u>Fink v. National Savings and Trust Company</u>, 772 F.2d 951 (D.C. Cir. 1985)

<u>Flourney v. Goldin</u>, 1998 EEOPUB LEXIS 894 (1998)

General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 155 (1982)

German v. Fed. Home Loan Mortgage Corp., 885 F. Supp. 537, 552 (S.D.N.Y. 1995)

Griffen v. Carlin, 755 F.2d 1516 (11th Cir. 1985)

Gunnells v. Healthplan Servs., 2003 U.S. App. LEXIS 22337, *, *53-58, 348 F.3d 417 (4th Cir. S.C. 2003)

Hartman v. Duffey, 19 F.3d 1459 (D.C. Cir. 1994)

Hartman v. Powell, No. 00-5356, 2001 WL 410461 (D.C. Cir. Mar. 15, 2001)

Hartman v. Wick, No. 77-2019, 1988 U.S. Dist. LEXIS 14908 (D.D.C. April 15, 1988)

In re Blech Sec. Litig., 187 F.R.D. 97 (S.D.N.Y. 1999)

In re Bristol Bay Alaska, Salmon Fishery Antitrust Litig., 78 F.R.D. 622 (W.D. Wa. 1978)

In re Broadhollow Funding Corp., 66 B.R. 1005 (Bankr. E.D.N.Y. 1986)

In re S. Cent. States Bakery Prods. Antitrust Litig. 86 F.R.D. 407 (M.D. La 1980)

In re GM Corp. Engine Interchange Litig., 594 F.2d 1106 (7th Cir. 1979)

In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12 (D.D.C. 2001)

In re Pepco Employment Litig., 1992 U.S. Dist. LEXIS 18648 (D.D.C. 1992)

In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124

In re Vitamins Antitrust Litig., 209 F.R.D. 251 (D. D.C. 2002)

In re Workers' Compensation, 130 F.R.D. 99 (D. Minn. 1990)

International Bhd. Of Teamsters v. United States, 431 U.S. 324 (1977)

Jarvaise v. Rand Corporation, 212 F.R.D. 1 (D.D.C. 2002)

Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332 (11th Cir. 1984)

Lang v. Star Herald, 107 F.3d 1308 (8th Cir. 1997)

Lewis v. National Football League, 146 F.R.D. 5 (D.D.C. 1992)

Lundquist v. Security Pacific Automotive Financial Services Corp., 993 F.2d 11 (2d Cir. 1993)

McReynolds v. Sodexho Marriott Services, Inc., 208 F.R.D. 428 (D.D.C. 2002)

Moten v. Moler, 1995 EEOPUB LEXIS 3215, *18 (1995)

Morgan v. UPS of AM., 169 F.R.D. 349 (E.D. Mo. 1996)

Neal v. Moore, 1994 U.S. Dist. LEXIS 21339 (D.D.C. 1994)

Paxton v. Union National Bank, 688 F.2d 552 (8th Cir. 1982), cert. denied

460 U.S. 1083 (1983)

Payne v. Abbott Laboratories, 1999 U.S. Dist. LEXIS 2443, p. *14 (N.D. Ill. 1999)

Piazza v. EBSCO Ind., Inc., 273 F.3d 1341 (11th Cir. 2001)

Pigford v. Glickman, 182 F.R.D. 341(D.D.C.1998)

Robinson v. Metro-North Commuter R.R., 267 F.3d 147 (2nd Cir. 2001)

Segar v. Smith, 738 F.2d 1249 (D.C. Cir. 1984)

Senter v. General Motors Corp., 532 F.2d 511 (6th Cir. 1976)

Shipes v. Trinity Indus., 978 F.2d 311 (5th Cir. 1993)

Simon v. Philip Morris Inc., 124 F. Supp. 2d 46 (E.D.N.Y. 2000)

Sirota v. Econo-Car Int'l, Inc., 61 F.R.D. 604 (S.D.N.Y. 1974)

Stewart v. Rubin, 948, F. Supp. 1077, 1088 (D.D.C. 1996), aff'd, 124 F.3d 1309 (D.C. Cir. 1997)

Thomas v. Albright, 139 F.3d 227 (D.C. Cir. 1998)

Thompson v. City of New York, 164 A.D. 2d 773, 774 (1st Dept. 1990)

Thomas v. Powell, 247 F.3d 260 (D.C. Cir. 2001)

Trout v. Garrett, 780 F. Supp. 1396 (D.D.C. 1991)

U.S. v. Preiser, 172 F. Supp. 660 (S.D.N.Y. 1974)

United States Parole Commission v. Geraghty, 445 U.S. 388, 100 S. Ct. 1202, 63 L. Ed. 2d 479
(1980)

Wagner v. Taylor, 836 F.2d 578 (D.C. Cir. 1987)

Watson v. Fort Worth Bank and Trust, 487 U.S. 977 (1988)

Williams v. Colorado Springs Sch. Dist., 641 F.2d 835 (10th Cir. 1981)

Yaffe v. Powers, 454 F.2d 1362 (1st Cir. 1972)

**ADMINISTRATIVE CASES**

In the Matter of Steven E. Heath and U.S. Postal Service, Post Office, 2003 ECAB LEXIS 1271,
P.*17(U.S. Dept. of Labor, Employees Compensation Appeals Board, July 15, 2003)

In the Matter of Pamela I. Holmes and U.S. Postal Service, Bulk Mail Center, 1998 ECAB
LEXIS 184, (U.S. Dept. of Labor, Employees Compensation Appeals Board, June 22,
1998)

In the Matter of Vivian S. Penick and Department of the Army, Martin Army Hospital, 1994
ECAB LEXIS 3163, (U.S. Dept. of Labor, Employees Compensation Appeals Board,
March 24, 1994)

In the Matter of Terrance R. Stath and U.S. Postal Service, Covina Post Office, 1992 ECAB
LEXIS 1314, (U.S. Dept. of Labor, Employees Compensation Appeals Board, February
6, 1992)

**STATUTES OR REGULATIONS**

5 C.F.R. Section 430.208(c) 2004, Title 5, Volume 1 (Perfomance Management)

29 C.F.R. Sections 1614.204(d)(6); 1614.204(d)(7); 1614.405(a)

Fed. R. Civ. P. 23(a)(1)

Fed. R. Civ. P. 23(b)(2)

Fed. R. Civ. P. 23(b)(3)

Fed. R. Civ. P. 23(c)(1)

Fed. R. Civ. P. 23(c)(4)

## MISCELLANEOUS

Department Administrative Order (DAO) 202-430 (Performance Appraisal)

DOC Affirmative Employment Program for Minorities and Women, FY 1994 Accomplishment
    Report and FY 1995 Plan Update

DOC Affirmative Employment Program for Minorities and Women, FY 1995 Accomplishment
    Report and FY 1996 Plan Update

DOC Affirmative Employment Program for Minorities and Women, FY 1996 Accomplishment
    Report and FY 1997 Plan Update

DOC Affirmative Employment Program for Minorities and Women, Annual Affirmative
    Employment Program Accomplishment Report FY 1997

DOC Affirmative Employment Program for Minorities and Women, Annual Affirmative
    Employment Program Accomplishment Report FY 1998

DOC Affirmative Employment Program for Minorities and Women, FY 1999 Accomplishment
    Report and FY 2000 Plan Update

DOC Affirmative Employment Program for Minorities and Women, FY 2000 Accomplishment
    Report and FY 2001 Plan Update

DOC Department Administrative Order 202-250 § 6.01, § 6.02, § 6.04

DOC Department Organization Order Series 10-5, Assistant Secretary for Administration,
    February 27, 1990; January 22, 1991; January 15, 1993

DOC Department Organization Order Series 35-2B, Bureau of the Census, May 1, 1998

DOC Department Administrative Order Series, Delegation of Authority for Personnel
    Management, March 3, 1988

DOC Department Organization Order Series, National Institute of Standards and Technology,
    July 11, 1995

DOC Department Organization Order Series, National Oceanic and Atmospheric Administration,
    February 12, 1990

DOC Department Organization Order Series 20-10, Amendment 1, Office of Civil        Rights, April 25, 1991

DOC Department Organization Order Series 20-10 Amendment 2, Office of Civil Rights, January 21, 1999

EEOC's Annual Report on the Employment of Minorities, Women and People with Disabilities in the Federal Government for the Fiscal Year 1998

Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, Section  (3d ed. 1992)

8 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulations* (2d ed. 1997)

Letter from Leroy J. Warren, Jr., Chairman, NAACP Federal Sector Task Force, to William Daley, Secretary of Commerce, September 16, 1999

Memorandum in Support of Department's Motion to Subclass the Provisional Class by Bureau, at 15

OFO Decision, July 20, 2000

Wright, Miller & Kane, <u>Federal Practice and Procedure</u>  (1986)

## VIII.   __INTRODUCTION__

In this paradigmatic racial discrimination class action, class agent Janet Howard moves

for reconsideration of Judge Varice Henry's Decertification Order dated August 20, 2003. (App.

A, Ex 7).[1]   Judge Henry granted the Department of Commerce's Motion to Redefine the Class,

and virtually eliminated the entire class previously certified by the Office of Federal Operations

("OFO") on July 20, 2000.  (App. A, Ex 1)

The OFO certified a class comprised of current and former African-American employees

of the Department of Commerce's Headquarters' offices **in the metropolitan area of**

**Washington, D.C.,** consisting of 15 bureaus.  Id.

In his Order, Judge Henry excised 5 of these 15 bureaus of the OFO-certified class, thus

removing approximately 4500 of the 5300 class members.[2]   Without offering any rationale or

factual support, Judge Henry in a sweeping decision, limited certification to the Department of

Commerce's African-American employees in Washington, D.C. proper, and decertified the class

of African-American Department of Commerce employees in the D.C. metropolitan area.  By so

ruling, Judge Henry effectively wiped out approximately 85% of the previously certified class.

With the first branch of this motion, plaintiffs now move for reconsideration and to

reinstate the OFO's certification of a D.C. metropolitan-wide class of African-American DOC

employees.   (Throughout this brief, Department of Commerce is referred to as "DOC,"

"Defendant," "Department," "Commerce," or "the Agency").

Plaintiffs rely on such established seminal decisions as McReynolds v. Sodexho Marriott

Services, Inc., 208 F.R.D. 428 (D.D.C. 2002) ("McReynolds"), wherein the court certified a

---

1        The exhibits referenced in this Brief are included in the accompanying Plaintiffs' Appendix
(hereafter referred to as "App.")
2        These numbers represent a snapshot of African-American employees in the 15 bureaus as of
October 1, 2003.

race-discrimination class action and rejected defense objections virtually identical to the arguments urged by the Department before Judge Henry.  Those objections include:  (1) the company was too geographically dispersed; (2) the company was divided into too many different divisions; and (3) personnel decision-making was too decentralized to permit certification.  The McReynolds court held that plaintiffs' anecdotal evidence of discriminatory hiring, statistical proof that African-Americans were underrepresented in higher-echelon positions, and the company's subjective employment and promotion criteria, all raised common and predominating issues warranting class certification.

In the alternative, Plaintiffs here move to subclass the Washington, D.C. Metropolitan bureaus – *i.e.*, African-American employees of four of the five Department of Commerce Bureau Offices located outside Washington, D.C., in the D.C. metropolitan area.[3]  (hereafter the "***D.C. Metropolitan Subclass***")  Specifically, plaintiffs are moving to subclass:

1. the Bureau of the Census (Census);
2. the National Institute of Standards and Technology (NIST);
3. the National Oceanic and Atmospheric Administration (NOAA); and
4. the U.S. Patent and Trademark Office (PTO).

As this brief demonstrates, Plaintiffs have met every required element for a department-wide class of all African-Americans throughout the 15 DOC bureaus.  The DOC has uniformly subjected its African-Americans employees to the same discriminatory practices resulting in lack of employment or advancement opportunities as compared to white employees.   Thus, this Court must remedy Judge Henry's erroneous decertification Order which leaves the overwhelming majority of DOC's African-American employees without an effective avenue for relief.

### IX.    SUMMARY OF ARGUMENT

### A.    The OFO's Department-wide Certification

---

3    To date, Plaintiffs are not moving for a subclass of NTIS Bureau plaintiffs because a subclass agent has yet to be identified.  Plaintiffs reserve the right to move for subclassing of the NTIS at a later date.

In an exhaustive and scholarly opinion, the OFO certified a department-wide class on July 20, 2000 composed of:

> African-American, non-supervisory employees and former employees of the Agency's [Department of Commerce] Headquarters' offices *in the metropolitan area of Washington, D.C.*, who allegedly have been denied career advancement to one or more white collar positions in the agency's Headquarters' offices at grade levels GS-9 through GS-15, or equivalent level white collar non-GS positions, and who may have been denied related promotional opportunities in those same offices based on their race during the period of time beginning two years prior to the filing of the class complaint on February 22, 1995, and continuing to the date a final determination is rendered on the class complaint claim.

July 20, 2000 OFO Decision, at 10 (emphasis added) (App. A, Ex 1). Additionally, OFO pointed to statistical information which raised the strong inference that African-American employees of the Department of Commerce "were being denied career advancement opportunities to white-collar positions, GS-9 through GS-15 or equivalent level white collar non-GS positions . . . because of their race." Id.

The OFO found that the case at bar readily fulfills the commonality, typicality, numerosity, and adequacy-of-representation elements necessary for class certification. OFO's Decision noted that:

> the class complaint 1 satisfies the commonality requirement. The [DOC] has acknowledged that it has issued a Department Administrative Order (DAO) implementing the federal merit promotion policy agency-wide. The agency admittedly also has promulgated agency-wide principles governing the issuance of performance appraisals. **Thus, it appears that common standards govern agency promotion and performance appraisal decisions in the Washington, D.C. metropolitan area.**

Id. at 11 (emphasis added).

Yet, in the face of this careful analysis by the OFO, Judge Henry, without articulating a single cogent reason or, indeed, any reason, granted the Department's "motion to redefine" and cavalierly swept aside the OFO's metropolitan-wide class ruling. (App. A, Ex 7) Judge Henry

deleted all Commerce Department bureau offices located outside the city limits of Washington, D.C. This eliminated approximately 85% of the African-American employee class covered by the OFO's certification.

The following chart is a snapshot of the African-American workforce in the DOC as of October 1, 2003, and demonstrates how drastically Judge Henry removed most of the African-Americans covered by the OFO's class-wide finding. By eliminating the 5 bureaus located "outside" D.C., Judge Henry removed 4464 employees out of the initial 5344 employees in the class certified by the OFO, thus leaving only 880 members in the class.

| *DOC BUREAUS* | *AFRICAN-AMERICAN EMPLOYEES* |
|---|---|
| ALL 15 DOC BUREAUS | NUMBER OF EMPLOYEES IN THE DEPARTMENT-WIDE CLASS: **5344** |
| *ELIMINATED* "OUTSIDE" BUREAUS: *NOAA, PTO, CENSUS, NIST, NTIS* | *NUMBER OF ELIMINATED AFRICAN AMERICAN EMPLOYEES*: **4464** |
| REMAINING "D.C." BUREAUS: *OS, OIG, ESA, BEA, BIS, EDA, ITA, MDNA, NTIA, TA* | NUMBER OF REMAINING AFRICAN AMERICAN EMPLOYEES IN D.C. CLASS: **880** |

**B.    DOC's Motion To "Redefine The Class"**

In its motion to redefine the class by eliminating the outside offices from class coverage, the Department of Commerce raised two central, but baseless arguments. First, Commerce claimed that Class Agent Janet Howard herself wanted to limit the class to Headquarters' offices in Washington, D.C. Second, Commerce claimed that Plaintiffs failed to meet requirements of commonality and typicality.

With respect to DOC's contention that Ms. Howard intended to limit the class, the Department relied on a 1998 document in which Ms. Howard allegedly indicated via an "X" mark, drawn over the "outside" offices, that she was not representing African-American employees at these offices. As fully described below (pgs. 64-68), the DOC's contention regarding Ms. Howard's intent is false. Agent Howard's complaint unambiguously denominates the metropolitan area as the target for class certification; the parties, including the Department, have always proceeded on the premise that plaintiffs seek a metropolitan-wide class; the documents cited herein clearly support a nine-year litigation battle implicating all 15 of DOC's bureaus; and Class Agent Howard's accompanying declaration supports Ms. Howard's claim that her intent was and remains to represent a class of African-American employees department-wide in the Washington, D.C. metropolitan area.

Significantly, during almost the entire course of this litigation, the Department never raised Ms. Howard's purported desire to confine the class to the D.C. city limits.  Not until December 2002, when the Department moved to narrow the class before Judge Henry, did the DOC refer to the 1998 document which supposedly betrays Howard's intention to confine the class to Washington, D.C.  Even after July 2000, when the OFO ordered a metropolitan area certification and the Department moved for reconsideration, Commerce stayed steadfastly silent about the 1998 document.  Nowhere in its reconsideration motion did the Department ever contend that Class Agent Howard wanted to limit the class to Headquarters' offices in Washington, D.C.

Moreover, when class notice went out after the OFO's Decision, the mailings were sent to employees at all bureaus in the Washington, D.C. **metropolitan area**.  Not once during the entire notice process did the Department complain that notification should be limited to

Washington, D.C. because Agent Howard allegedly wished for a narrow, Washington, D.C. class.

The Department's nearly six-year silence about the 1998 document and Ms. Howard's supposed desire to circumscribe the class within the geographic confines of Washington, D.C. qualify as a poster child for waiver. Thus, the Department should not have been permitted to advance that argument before Judge Henry.

The Department's second argument in favor of narrowing the class is its misleading contention that a metropolitan-area based certification was too broad because differences in Commerce's personnel policies and decentralized decision-making in the outside offices defeated commonality and typicality. And, in a most disingenuous and cynical argument, amounting to the claim "everyone discriminates; don't focus on us," the DOC claims that the statistical disparities between white and black employees at the DOC "simply reflect demographics common throughout the federal government." DOC Motion to Redefine at 30. (App. A, Ex 4)

As set forth more fully below, Administrative Judge Henry erroneously granted the Motion to Redefine the Class filed by the DOC. This Court should reinstate the OFO's original certification ruling which covers Department of Commerce employees in the entire Washington, D.C. metropolitan area. The evidence in favor of metropolitan area certification is now much stronger than the facts which initially convinced OFO to certify a D.C. metropolitan class in July, 2000.

**C.    Six Compelling Factors Support A Washington, D.C. Metropolitan Class**

Six compelling factors support a Washington, D.C. metropolitan class. First, the evidence proves that personnel decisions in the DOC are highly centralized, with directives being

issued by the Office of Human Resources Management of the Office of the Secretary (OHRM) to all bureaus in Washington, D.C. **and the metropolitan area**. Commerce Department personnel policies are tightly controlled and directed by OHRM, which bears ultimate responsibility for the racially discriminatory employment practices that the metropolitan-wide class of African-American employees complains of in this case. Thus, a metropolitan bureau hews as closely to the personnel dictates of OHRM as does Headquarters offices in the equally unfriendly confines of Washington, D.C.

Second, the geographic boundaries that the defendant postulated between the ten D.C. "headquarters" bureaus and the five "outside" D.C. bureaus, as grounds for decertification, are artificial and meaningless distinctions contradicted by the evidence. The Secretarial Officers (*i.e.*, the operating unit heads) of NOAA and PTO (two of the excised "outside" bureaus) are in fact under DOC mandate part of the central Office of the Secretary. Additionally, NOAA houses approximately 170 employees in the D.C. headquarters. The three other supposedly "specialized" outside bureaus, Census, NIST, and NTIS (also excised by Judge Henry), are actually integrally part of and controlled by two parent bureaus that Judge Henry's order left in the class:

.    the Technology Administration bureau, based in D.C., which oversees NTIS and NIST, and

.    the Economics and Statistics Administration (ESA), also based in D.C., which oversees Census.

Third, "smoking-gun" documents from within the Department's files reveal that when the Department makes employment decisions, **either in Washington, D.C. or the outside offices**, it uses excessively subjective factors, and these factors operate to deny equal opportunity to African-American employees. In the words of an expert Appeals Employment Examiner

hired by DOC, when a supervisor makes personnel decisions, **"BEAUTY IS IN THE EYE OF THE BEHOLDER."**  See Tanya Ward Jordan Decl. Attachment at (App. H, Ex 24). Unfortunately, black is **not** beautiful in the eyes of Commerce Department personnel managers, and this explains why African-American employees do not get a fair chance for advancement and job opportunities within the Department.

Fourth, a torrent of anecdotal evidence from DOC's African-American employees – 21 declarations supporting this motion – confirms that class members are routinely denied promotions because of their race and subjected to a hostile if not downright vicious work environment.  For example, Class Agent Howard overheard her white superior tell a white employee, "You're tall and blonde, you'll do well here."  "Buckwheat" was one term of endearment a DOC supervisor bestowed on an African-American employee within the last month.  Another class member had her office furniture wrecked and her work area barricaded by hostile white personnel.

Fifth, Plaintiffs are producing the declaration of one of the nation's leading experts in performance appraisal systems, Dr. David Martin.  For years, Dr. Martin has assisted several federal agencies with preparing and implementing their performance appraisal systems, and he has decades of experience in teaching, publishing books and articles, consulting, and training employees (including hundreds of federal employees) in the area of performance appraisals. After reviewing performance appraisal "standards" at the DOC, Dr. Martin concludes that Commerce's performance appraisal system permits an excessive amount of subjectivity, allowing raters to inject bias and discrimination in the ratings.  Dr. Martin concludes that the DOC's performance appraisal system is "**probably the worst system [he has] critiqued**."

Sixth, and finally, statistical evidence reveals that a disproportionate number of African-American employees are denied access to advancement and higher-paying positions within the Department of Commerce. Statistics show that, for example, in 1998, the percentage of African-Americans in GS levels 5 – 15 declined at DOC as the GS level increased, while the percentage of white employees increased as the GS levels increased.  See App. A, Ex 1.  The percentage of African-Americans at GS-11 was 13.51%, at GS-12 the percentage was 14.25%, and at GS-13 the percentage dropped significantly to 9.6%.  The percentage of white employees at GS-11 was 76.61%, at GS-12, it was 76.93%, and at GS-13 it jumps up to 80.48%.  See App. E.

The data illustrate the increasing disparity between African-Americans and white employees at DOC as GS level increases, when viewed by groupings, *i.e.*, GS 5-8, GS 9-12, and GS 13-15 (Id):

| GS Level | African-American | White |
|:---:|:---:|:---:|
| GS-5 - GS-8 | 35.9% | 57.3% |
| GS-9 - GS-12 | 20.2% | 69.5% |
| GS-13 - GS-15 | 7.1% | 83.3 |

Without any rational basis, Judge Henry gutted the previously certified class. Therefore, Plaintiffs respectfully request that this Court reinstate OFO's initial class ruling which encompasses African-American employees at Commerce Department offices in the Washington, D.C. metropolitan area.  Common issues of law and fact regarding the DOC's discriminatory treatment of African-American employees strongly support reinstatement of the OFO's original metropolitan area class.  Alternatively, should this Court believe that a metropolitan class is too broad, Plaintiffs' motion for subclassing four of the five outside bureaus should be granted.  The Department has

9

already conceded in a prior motion that subclassing is appropriate. Plaintiffs' brief at pages 72-91, *infra*, illustrates that subclassing is often used in discrimination class actions in order to overcome possible manageability and commonality obstacles.

### X.    PROCEDURAL HISTORY

#### A.    THE HOWARD COMPLAINT

After years of suffering racial discrimination, Janet Howard, an African-American female and a Department of Commerce (DOC) employee since 1983, contacted an EEO Counselor. She filed a timely class complaint on February 22, 1995 ("Howard Complaint"). Ms. Howard alleges that the DOC engaged in race discrimination against a class of African-American employees who worked for the DOC **in the metropolitan area of Washington, D.C.**

Specifically, the <u>Howard</u> Complaint alleges that the DOC has maintained a system of racially discriminatory and subjective employment practices with respect to promotions (both competitive and career ladder), awards, performance ratings, career-enhancing work assignments, timely training for advancement, and job assignments. Howard Complaint at 1-4. The gravamen of the Complaint is that the DOC's subjective decision-making has prevented African-Americans as a group from advancing according to their merit. That subjective decision-making has led, and continues to lead, to discriminatory promotion denials and other discriminatory employment decisions that adversely affect job advancement, including performance evaluations, job assignments, training, awards and recognition.

#### C.    CLASS MEMBERS HAVE RELIED ON THE PENDENCY OF THE CLASS ACTION SINCE 1995

Since 1995, a great amount of publicity has surrounded this lawsuit. A Web site regarding this class action matter against the DOC has been created (http://communities.msn.com/feldf); rallies have been held throughout the District of Columbia; fundraising efforts have been ongoing for years to support the litigation; and there have been extensive communications between the Class Agent and class members, and between the Department of Commerce and class members.

In a letter from Leroy J. Warren, Chairman of the NAACP Federal Sector Task Force to William Daley, Secretary of Commerce, dated September 16, 1999, Warren describes the complaints received by the NAACP of race discrimination at the DOC:

> The NAACP has for many years been the recipient of a number of very serious allegations of [rampant employment discrimination routinely faced by many racial minorities employed by the Department of Commerce] . . . . Today's Protest Demonstration is being conducted because of the non-responsiveness of senior Commerce officials to what the Task Force strongly believes are legitimate complaints of employment discrimination, racism, abuse of authority, and an overall lack of equality and justice within Commerce. ***The EEO program at Commerce is basically malfunctioning and inoperative***.

Letter dated September 16, 1999 Letter from Leroy J. Warren, Jr., Chairman, NAACP Federal Sector Task Force, to William Daley, Secretary of Commerce (emphasis in original).

Given the history of publicity of the Howard matter, it is reasonably certain that thousands of absent class members have relied on the pendency of this class action.

### D.    THE COMMISSION PROVISIONALLY CERTIFIES A    CLASS OF AFRI

On July 20, 2000, after five years of litigation, the EEOC certified a class of African-American employees at the DOC. The EEOC held that, "[a]fter a review of the

entire record," the class should be certified on a provisional basis. EEOC Decision

Certifying Class at 8. (App. A, Ex 1). The Court certified a class of:

> African-American, non-supervisory employees and former employees of the
> agency's Headquarters' offices **in the metropolitan area of Washington, D.C.,**
> who allegedly have been denied career advancement to one or more white collar
> positions in the agency's Headquarters' offices at grade levels GS-9 through GS-
> 15 levels, or equivalent level white collar non-GS positions, and who may have
> been denied related promotional opportunities in those same offices, based on
> their race during the period of time beginning two years prior to the filing of the
> class complaint on February 22, 1995, and continuing to the date a final
> determination is rendered on the class complaint claim. (emphasis added).

EEOC Decision Certifying Class at 15. (App. A, Ex 1)

The Commission clarified that "[r]elated promotional opportunities include

training, assignments, details, awards, etc., that would have enhanced a class member's

qualifications for promotion to such a position, whether the promotion would have been a

career ladder promotion, a competitive promotion, or an accretion of duties promotion."

Id. at 10.

The Commission certified this class because "existing information suggests that

significant numbers of African-American employees have been denied advancement to

[GS-9 through GS-15 or equivalent] positions and, thus, that common questions of fact

and law exist as to those positions." Id.

The Commission found that the "class complaint states a claim a claim that the

agency has delayed and limited, and continues to delay and limit, the career advancement

of class members because of their race," and that there was sufficient evidence in the

record to support that claim. Id. at 10.

The EEOC held that the class complaint satisfied the commonality requirement,

given that it appeared that "common standards govern agency promotion and

performance appraisal decisions in the Washington, D.C. metropolitan area." Id. at 11.
Such common standards include: the agency's issuance of a Department Administrative
Order (DAO), implementing the federal merit promotion policy agency-wide; and the
agency's promulgation of agency-wide principles governing the issuance of performance
appraisals.

In addition, the Commission took administrative notice of the information in the
EEOC's Annual Report on the Employment of Minorities, Women and People with
Disabilities in the Federal Government for the Fiscal Year 1998 ("EEOC Report"), which
documented the following:

● The average white collar grade for the agency's white employees was
10.60, while the average white collar grade for the agency's black employees was 8.78.
EEOC Report, Table I-16.

● The discrepancies in grade level were also evident in professional
positions where the average grade for white agency professional employees in FY 1998
was 12.77 while the average grade for black agency professional employees was 11.62.
EEOC Report, Table I-17.

● The percentage of black employees in the agency's white collar positions
GS-9 and above in FY 1998 declines as the grade level increases. In contrast, the
percentage of white employees in the agency's white collar positions increased in the
higher graded positions.

The Commission also noted that the record contains:

●    Several affidavits and over forty unsworn survey forms that were completed in September 1998 which indicate that numerous individual class members believe they have been denied advancement-related opportunities based on their race.

●    Hundreds of race discrimination complaints agency-wide.

The Commission found that the complainant possesses the same interest and has suffered the same injury as the members of the class.  Id. at 10.  The Commission also found that numerosity and adequacy were satisfied.  Id. at 14.

The Court noted that "after completion of discovery pursuant to 29 C.F.R. Section 1614.20(f), one or both parties may move to narrow the coverage of the class complaint and/or establish additional subclasses."

### D.    JUDGE HENRY NARROWS THE CLASS

On December 17, 2002, in a 53-page brief, the DOC moved to narrow coverage of the class by eliminating approximately 85% of the class members from the class.  In response, plaintiffs' prior counsel filed a one-and-a-half page opposition.

On August 20, 2003, in a one-page Order, Judge Henry granted DOC's Motion, ruling that the class should be redefined by eliminating all Outside Bureaus.  See Judge Henry's Order, App. A, Ex. 7.  Judge Henry offered no rationale for his ruling and cited nothing in the record to support his ruling.

### B.    JUDGE KRAVETZ GRANTS PLAINTIFFS' MOTION FOR LEAVE TO FILE A MOTION FOR RECONSIDERATION

At the end of 2003, Kator, Parks & Weiser withdrew as counsel for Plaintiffs and the class.  Plaintiffs' current counsel Grant Morris entered this matter in December 2004.  Plaintiffs' co-counsel, David Sanford of Sanford, Wittels & Heisler, LLP, entered this matter in January 2004.  After receiving word from the DOC that it planned to send

Notice to class members notifying them that they were excluded from the class, plaintiffs' lead counsel requested a hearing with the Court. A hearing was held with Judge Kravetz in January 2004. At that hearing, Judge Kravetz granted plaintiffs' oral motion for leave to file a motion to reconsider Judge Henry's one-page Order. Upon oral motion, Judge Kravetz granted plaintiffs' oral motion to file their Motion for Reconsideration on March 1, 2004.

## XI.   OVERVIEW OF THE DOC

### B.   THE DOC: A HIGHLY CENTRALIZED AGENCY WITH BRANCH OFFICES IN THE METROPOLITAN D.C. AREA

#### 0.   The Office Of The Secretary Is The Nerve Center Of The DOC

The DOC is a highly centralized departmental agency in the Executive Branch of the United States Government. At its core is the Office of the Secretary (OS), the nerve center for the entire DOC. The Secretary of Commerce ("Secretary") has oversight over and responsibility for the Department as a whole.

To accomplish DOC's goal to "foster, promote and develop the foreign and domestic commerce," the Department is divided into fifteen inter-related bureaus.[4] Each bureau has its own Undersecretary or Operating Unit Head, who reports to and is part of the management Office of the Secretary. (See DOO Order 1-1 § 3, App B, Ex 1).

Discovery in this case reveals that overall personnel management of the

---

4 Today DOC consists of 15 bureaus: the Bureau of Industry and Security (BIS), the Economics and Statistics Administration (ESA), the Bureau of Economic Analysis (BEA), the Bureau of the Census (Census), the Economic Development Administration (EDA), the International Trade Administration (ITA), the Minority Business Development Agency (MBDA), the National Oceanic and Atmospheric Administration (NOAA), the National Telecommunications and Information Administration (NTIA), the Patent and Trademark Office (PTO), the Technology Administration (TA), the National Institute of Standards and Technology (NIST), the National Technical Information Service (NTIS), as well as the central DOC staff offices, including the Office of the Secretary ("OS"), and the Office of the Inspector General (OIG).

Department's roughly 30,000 employees stems from the OS.  The OS issues department-wide personnel policies and directives.  These policies and directives <u>must</u> be followed and adhered to by all the bureaus.

Contrary to the impression the Department tried to create in their decertification arguments before Judge Henry, the five metropolitan D.C. offices are not each running their own mini-Commerce Departments.  Rather, each bureau is subject to the centralized control of well-established DOC policies.

The Office of the Secretary is central to "Departmental Management," and:

> provides executive direction and coordination for program activities as well as centralized services to the bureaus.  It also oversees promulgation and implementation of Departmental and government-wide policies and initiatives."  DOO 1-1 (App. B, Ex 1)[5]

The Secretary's control, authority and independence is set forth in the Department's Mission Statement:

> ***The Secretary determines the functions to be carried out by the principal organizational components and the authorities exercised by the principal officers of the Department.  These are normally prescribed by the Secretary in Department Organization Order (DOOs).***

(<u>Id</u>.)

Likewise, DOO 1-1 confirms the overall supervisory role of the OS.  Department Organization Order (DOO) 1-1 states:

> *The Office of the Secretary is the general management arm of the Department* and provides the principal support to the Secretary in formulating policy and in providing advice to the President. *It provides program leadership for the Department's functions and exercises general supervision over the operating units.*  (<u>Id</u>.)

---

5 The Office of the Secretary "consists of the Secretary, certain Secretarial Officers, designated staff immediately serving those officials, and a number of Departmental Offices, which have Department-wide functions or perform special program functions directly on behalf of the Secretary."  DOO 1-1 § 3(a)2.

Moreover, the Secretary of the DOC -- the top of the Organizational tree -- reserves to itself "coequal" authority in personnel management of all 15 bureaus encompassed by the OFO's class order.  (DOO 1-1 § 2.05, App B, Ex 1)

     **0.**      **The DOC Organization Chart Reveals The Arbitrariness of Judge Henry's Decertification Order – Which Eviscerated Approximately 85% of the Class**

DOC's published Organizational Chart best reveals the tight-knit structure of the Department.  (see Charts which follow this section).  The Office of the Secretary is the supreme, controlling office, and all fifteen constituent bureaus are subject to its domain.

To aid the Court, Plaintiffs attach hereto, copies of the Department's Organizational Charts on the next two pages (from April 1997 and February 2004). These Charts graphically represent the interrelatedness of the fifteen bureaus encompassed by the OFO's July 2000 department-wide certification order.[6]

The Charts show that all DOC bureaus fall under the purview of the Office of the Secretary.  Additionally, DOO 1-1 states that the heads of these bureaus (or Operating Units) are "Secretarial Officers." These officers are nonetheless a part of the Office of the Secretary, whether or not they are physically located in the OS.  See DOO 1-1 §§ 3(a)2, 3(b)1, 3(c)1. (App. B, Ex. 1)

Further, three of the bureaus eliminated by Judge Henry – NTIS, NIST, and Census -- are actually divisions of bureaus located at the D.C. Headquarters building on 14th Street and Constitution Avenue.  NTIS and NIST are overseen by the Technology Administration bureau (TA) and Census is overseen by the Economics and Statistics Administration bureau (ESA).  See Charts, at 19-20, infra.  Additionally, nearly 170

---

[6] But for a few name changes in the Bureaus, the basic organizational structure of the Department has remained the same.

NOAA employees work out of this D.C. office.  (<u>See</u> Ward Jordan Supplemental Declaration at ¶5.) (App. H, Ex. 24).  And OIG and OS, headquartered in D.C., have their own employees working out of offices outside D.C. proper in Maryland and Virginia. (Jefferson Decl., as cited by DOC in its Brief in Support of Motion to Redefine, at 11.)

The Organizational Charts also reveal that, in granting defendant's motion to decertify, Judge Henry's Order fails to make any rational division for African-Americans among the various remaining bureaus.  Instead, by adopting wholesale the defendant's decertification demands, Judge Henry arbitrarily eliminated all five DOC branches proposed by the Department.

Nearly 4,500 African-Americans are now excluded from a remedy by Judge Henry's decertification order.  (<u>See</u> App E, Ex 3)  An Organizational Chart, attached below, illustrates the scope of Judge Henry's ruling, which cut nearly 4500 African Americans out of the class.  A red X on the chart indicates a bureau excised by Judge Henry's decertification order:

3.  **All DOC Bureaus Are Subject to Department-Wide Personnel Policies**

All of the DOC bureaus – including the five eviscerated from the class by the decertification order – are subject to a centralized system of department-wide personnel policies.  The Office of the Secretary issues these standard policies through its Human Resources Management office (OHRM), which administers a department-wide human resources management program.  The Office of the Secretary/OHRM mandates a uniform set of policies and protocols for all the DOC bureaus' personnel practices, including hiring, evaluations and promotions.

Moreover, OS/OHRM requires that all 30,000+ DOC employees (except certain management) be reviewed annually on standard evaluation forms.  All African-Americans, whether in the five excised bureaus, or in the remaining ten bureaus, receive reviews on these standardized forms.  DAO-430, Section 3.01(b), (App. B, Ex. 16); DAO 202-250 Section 6,  (App. B, Ex. 12); OHRM website (App. C, Ex. 9,17,32).

DOC regularly publishes and updates its personnel policies, and has done so throughout the class period, in the Department Administrative Order 202 series.  Department Administrative Orders "*document and mandate continuing policies, standards requirements, and procedures prescribed by the Office of the Secretary for department-wide application.*"  Office of Management and Organization Website, http://www.osec.doc.gov/omo/what%20we%20do.htm.  DOC stipulates a full array of 34 department-wide employment policies and practices which all bureaus – including the five decertified here – <u>must follow</u>, including:

1)  General Employment (DAO 202-300);

2)  Merit Assignment Program (DAO 202-335);

3)  Employee Development (DAO 202-410);

4)  Performance Appraisal (DAO 202-430):

5)  Incentive Awards Program (DAO 202-451);

6)  Position Classification (DAO 202-511);

7)  Administrative Grievance System (DAO 202-771); plus

twenty-seven other distinct personnel areas.  (App. B, Ex. 24).

In addition to these thirty-four areas, the OS issues centralized DOC personnel

policies for:

1)  Federal Equal Employment Opportunity Recruitment Program (DAO 215-3);

2)  Affirmative Action Plans, Programs and Related Activities  (DAO 215-4);

3)  Collection and Management of Racial and National Origin and Medical

Disability Data  (DAO 215-7);

4)  Filing Discrimination Complaints  (DAO 215-9); and

other personnel-oriented policies.  (App. B, Ex. 24).

The Director of Human Resources ("HR Director") is the focal point for all

agency personnel decisions.[7]  As the head of OHRM, a division of the Office of the

Secretary,  the  HR  Director  "*has Department-wide staff responsibilities for the*

*development, administration and oversight of policies and programs for human resources*

*management.*"  (DOO 20-8 § 4)  Further, the HR Director leads the Human Resources

Council:

> which is comprised of bureau Human Resources Managers, to ensure
> close coordination of Department human resources policies and practices,
> to disseminate timely human resources information, and to solicit bureau
> views on human resources policy making.  Id.

---

7 The Director of Human Resources carries out his/her duties through the Office of Human Resource
Management ("OHRM"), which, to that end, "has been delegated all authorities and responsibilities vested
in the Assistant Secretary [and thus, in the Director of Human Resources] for the development and
management of all human resource policies and programs."

(App. B, Ex. 3)

The HR Director has ultimate responsibility to ensure that the DOC's centralized,

Department-wide personnel goals are met.  Through constant monitoring and oversight of

all fifteen bureaus, the Director scrutinizes:

> administration of pay, bonuses and incentives; administration of leave and
> hours of work; administration of payroll support and time-and-attendance
> controls; workforce planning, recruitment and employment; training and
> career development; employee recognition; morale and performance
> appraisal; employee relations, benefits, and services; labor management
> relations; workers compensation; organizational restructuring guidance,
> …oversight of unique human resources systems such as the Foreign
> Service and the National Oceanic and Atmospheric Administration
> Commissioned Corps, as well as innovations and projects such as the
> National Institute of Standards and Technology Alternative Personnel
> System and Commerce Demonstration Project, …evaluation of human
> resources management activities Department-wide; examination of
> adherence to merit principles and prevention of prohibited personnel
> practices; the promotion of effective human resources management; and
> the development of policies and procedures…

DOO 20-8 § 4 (App. B, Ex. 3).

The above-described employment and personnel practices make clear that this

Department is run by centralized fiat, not by some loose network of bureaus each running

their own satellite states to their own prerogative.

### C.   The Office of the Secretary – through its OHRM Arm – Disseminates Personnel Policy and Expects Adherence By All Constituent Bureaus

DOC, through the Office of Human Resources Management (OHRM) establishes,

implements and oversees department-wide personnel policies.  These policies are

communicated department-wide through prevalent written and web-based media to all

bureaus.  Indeed, the OHRM maintains a website that contains a human resources "How

To" manual for managers and supervisors.  (Appendix C, generally).

OHRM reiterates throughout its directives that compliance with DOC central personnel policies is mandatory.  While bureaus may have some flexibility in dealing with individual employee decisions, there can be no mistake that central DOC directives are the final authority and that bureaus are prohibited from independently implementing personnel policies that vary from DOC policy.  For example,  the OHRM web site states:

> HRM accountability is a shared responsibility between you and the Human Resources (HR) Office.  All HRM actions must comply with the Merit System Principles (MSP), the foundation of the Civil Service, and not to be proscribed by a Prohibited Personnel Practice (PPP).  However, compliance with the MSPs and PPPs is only a starting point.  All HRM actions must also comply with controlling laws, regulations and agency policy.  This Handbook will help you understand the general procedures to follow in carrying out your human resource responsibilities.

Appendix C, Ex. 4; see also "HR delegations of Authority," DAO 202-250 (App. B, Ex. 12).

Centralization of DOC personnel practices occurs through a multiplicity of directives, mandating:

- **Standard Forms:**   All bureaus must use standard forms, including Standard Form 50B (SF-50B) "Notification of Personnel Action," Standard Form 52 (SF-52) "Request for Personnel Action," and CD-516 "Classification and Performance Management Record."  DAO 202-250, Section 6 (App. B, Ex. 12)

- **Limitations on Secretarial Delegation of Authority:**  "*Limitations are placed on the delegations of authority to enable the Secretary . . . [t]o assure equity in the application of Departmental policies.*"  DOC Department Administrative Order Series, Delegation of Authority for Human Resources Management, March 3, 1988 (DAO 202-250, Section 1.02) (App. B, Ex. 12).

- **OS Responsibilty for EEOC Compliance:**  Assistant Secretary for Administration is responsible for administrative management of all

bureaus, and ensures bureau compliance with Civil Rights Act of 1964, Equal Employment Opportunity Act of 1972, and other applicable statues prohibiting racial discrimination in employment. DOC Department Organization Order Series 10-5, Assistant Secretary for Administration, February 27, 1990; January 22, 1991; January 15, 1993 (DOO 10-5) (App. B, Ex. 2).

- **Centralized Civil Rights Compliance:** Office of Civil Rights and Title VII compliance centralized in Office of the Secretary , (DOC Department Organization Order Series 20-10 Amendment 2, Office of Civil Rights, January 21, 1999) (DOO 20-10) (App. B, Ex. 4).

- **Affirmative Action Plans Emanate from Secretary's Office:** Director of Office of Civil Rights (a) prepares, manages, implements, monitors, and evaluates all DOC affirmative employment program plans, (b) provides policy guidance and technical assistance to operating units (f) promotes equal opportunity training; (g) conducts EEO evaluation programs which *measure operating unit compliance with requirements of appropriate law, regulations and Department policies*; . . . (h) ensures Department's compliance with legal, regulatory and oversight agency requirements (DOC Department Organization Order Series 20-10, Amendment 1, Office of Civil Rights, April 25, 1991) (DOO 20-10) (App. B, Ex. 4).

\* \* \*

In addition, all bureaus within the DOC develop their policies and procedures relating to the prohibition of racial discrimination in employment so as to ensure that these policies and procedures conform with Departmental standards. For example:

- **NOAA's Discrimination Policies:** "[NOAA's] Personnel and Civil Rights Office shall . . . [d]evelop policies and procedures for NOAA's personnel, civil rights, and organizational analysis programs *consistent with Departmental guidance*." (emphasis added) (DOC Department Organization Order Series, National Oceanic and Atmospheric Administration, February 12, 1990) (App. B, Ex. 5)

- **NIST's Discrimination Policies:** "[NIST]'s Civil Rights Office shall . . . conduct activities to insure equal employment opportunities (EEO) at NIST, including Affirmative Action, Federal Equal Opportunity Recruitment Program efforts . . . and *reporting of NIST EEO Complaints to the Department of Commerce* . . . ." (emphasis added) (DOC

Department Organization Order Series, National Institute of Standards and Technology, July 11, 1995) (App. B, Ex. 6)

- **Census' Discrimination Policies:** "[Census's] Equal Employment Opportunity Officer shall provide guidance and assistance to Bureau officials in Equal Employment Opportunity matters, and shall plan and direct the Bureau's Equal Employment Opportunity and Affirmative Action programs *consistent with Departmental guidance and policies* . . . ." (emphasis added) (DOC Department Organization Order Series 35-2B, Bureau of the Census, May 1, 1998) (App. B, Ex. 9).

* * *

The Office of the Secretary is empowered by Department Orders reaffirming that Office's <u>Department-wide</u> personnel management oversight responsibilities.    For example:

- **Department-wide staff responsibility** by Human Resources Director for "**all aspects of human resources management and administration …** including employee recognition, morale, and performance appraisal. DOO 20-8, Section 4(a) (App. B, Ex. 3)

- **Department-wide** maintenance, approval and collection, and reporting by HR Director of "**bureau-specific automated human resources systems**." DOO 20-8, Section 4(b) (App. B, Ex. 3)

- "**<u>Department-wide</u> policies, programs, tools, systems and activities** in the areas of labor-management relations and partnerships . . . training and career management" issue from Office of Workforce Programs (a division of OHRM) DOO 20-8, Section 5(b) (App. B, Ex. 3)

- "**<u>Department-wide</u> policies** … recruitment, placement and utilization … diversity outreach … compensation; pay policy" planned and developed by Office of Employment, Diversity and Classification Programs (in the OS). DOO 20-8 (App. B, Ex. 3).

- **Department-wide policies** for "executive resources management" flows from Office of Executive Resources (a division of OHRM) DOO 20-8, Section 5(d) (App. B, Ex. 3).

- * *

- 

26

A literal forest of evidence produced by the Department so far in discovery – i.e., documents, forms, manuals, etc. – reaffirms centralization in personnel policies and practices.  (App. D)  Numerous documents explicitly state that the policies or practices contained in or referred to by the document are "Department policy."  And many other documents direct the managers to perform functions "consistent with Departmental guidance and policies."[8]

* * *

Finally, responsibility for the Department's discrimination against its African-American employees ultimately rests with the centralized Office of the Secretary.  For it is here, that DOC is supposed to:

> [d]evelop and administer the personnel management policies and programs of the Department, including the direction, administration, and processing of all matters involving personnel. . . .[**and] [c]onduct activities to ensure equal employment opportunity in the Department, including affirmative action for employees, and job applicants, and to ensure nondiscrimination in Federally-assisted programs, activities, and projects**.   (emphasis added)

DOO 20-10 (App. B, Ex. 4)

The OS's Director for Civil Rights is charged with protecting against precisely the form of extensive, Department-wide discrimination manifest in this case.   The Director for Civil Rights has:

> Department-wide staff responsibility for ensuring EEO, including affirmative action, for employees and job applicants within the

---

8 Some of these include: U.S. Department of Commerce Performance Appraisal System for the General Workforce; Demonstration Project Personnel Management System Guidelines For Setting Pay Upon Promotion; Demonstration Project Performance Management Record, Performance Appraisal and Position Review; United States Office of Personnel Management General Schedule Supervisory Guide; National Archives and Records Administration General Records Schedules; Bureau of the Census Organizational Manual; ITA Quarterly Stars Award; Important Facts and Critical Dates to Remember; Summary of the Merit Assignment Program; Merit Assignment Program Rating Worksheet Instructions; Awards Generally; Quality Step Increase; Special Achievement Awards Guidelines; Delegation of Authority-Time Off Awards; Honors Awards Program; NIST Administrative Manual, Functional Statements; and others.

> Department . . . [shall] [d]evelop, direct, and coordinate Department programs, policies, and activities to ensure the accomplishment of EEO and civil rights responsibilities, and evaluate the implementation of these actions . . . [p]rocess EEO complaints within the Department and ensure that remedies ordered as a result of discrimination complaints or affirmative action initiatives.

Id.

All roads lead to the Department's Office of the Secretary in assessing culpability for Commerce's class-wide discrimination against African-Americans.  It is, in fact, the Office of Civil Rights, a division of the OS, that is charged with the responsibility to "[p]repare Department affirmative employment program plans" which offer "solutions or alternatives" to the continuing discrimination suffered by its African-American workforce.  It is clear that the Office of the Secretary has failed and continues to fail to address adequately the rampant discrimination to which its African-American workforce is subjected.  Id.

**XII.    ARGUMENT**

**THE OFO'S METROPOLITAN-WIDE CLASS CERTIFICATION SHOULD BE REINSTATED.  ALTERNATIVELY, FOUR OF THE FIVE D.C. METROPOLITAN "OUTSIDE" OFFICES SHOULD BE SUB-CLASSED.**

**A.    STANDARD OF REVIEW**

As this motion addresses Judge Henry's decision to virtually decertify the entire class previously approved by the OFO, and because Judge Henry issued his ruling without holding a hearing and with no findings of fact or law, see 29 C.F.R. Section 1614.204(d)(7), this Court should apply a *de novo* standard of review and base its decision upon a preponderance of the evidence.  29 C.F.R. Section 1614.405(a).

Courts routinely apply a de novo standard of review where courts fail to make finding of fact.  See e.g.,  In the Matter of Steven E. Heath and U.S. Postal Service, Post Office, 2003 ECAB LEXIS 1271, P.*17(U.S. Dept. of Labor, Employees Compensation Appeals Board, July 15, 2003), (where hearing officer failed to make findings of fact, a *de novo* decision should be made upon remand); In the Matter of Pamela I. Holmes and U.S. Postal Service, Bulk Mail Center, 1998 ECAB LEXIS 184, (U.S. Dept. of Labor, Employees Compensation Appeals Board, June 22, 1998), (same); In the Matter of Vivian S. Penick and Department of the Army, Martin Army Hospital, 1994 ECAB LEXIS 3163, (U.S. Dept. of Labor, Employees Compensation Appeals Board, March 24, 1994), (same); In the Matter of Terrance R. Stath and U.S. Postal Service, Covina Post Office, 1992 ECAB LEXIS 1314, (U.S. Dept. of Labor, Employees Compensation Appeals Board, February 6, 1992) (in accord).

Because Judge Henry did not explain why he was narrowing the class, it is entirely possible that he predicated his ruling on either the Department's first argument (the Class Agent's purported wish to retain a D.C.-only class), or the DOC's second contention (a metropolitan class was too broad to certify); or both arguments #1 and #2. Consequently, Judge Henry may well have believed that an expansive metropolitan class satisfied all of Rule 23's requirements, but that he was constrained by Agent Howard's alleged desires to stay within the boundaries of the District of Columbia in certifying the class against the DOC.

However, beyond any reasonable doubt, Ms. Howard wanted the broader metropolitan class, not the limited D.C. certification the Department advocated before Judge Henry.  Unfortunately, plaintiffs' prior attorneys "opposed" the Department's 53-

page motion to redefine the class with a pro-forma one-and-a-half (1 ½) page brief.  In their skeletal response, plaintiffs' now-departed counsel contented themselves with arguing that DOC was rehashing old arguments on its motion to narrow the class.  But this was not true.  In fact, DOC was concocting the entirely new position that Ms. Howard did not want a metropolitan class.  Plaintiffs' counsel did not recognize the new argument and consequently let it go uncontested.

This gross omission may have given the green light for Judge Henry to guillotine 85% of the class.  The rights of thousands of discriminated-against African-American employees in the DOC should not be compromised based on former counsel's failure to vigorously prosecute the claims on behalf of the class.

Given the palpable injustice flowing from Judge Henry's reversal of the OFO's metropolitan-wide class certification, and the opacity of Judge Henry's ruling – Plaintiffs do not know why Judge Henry did what he did– reargument and reinstatement of the original class are imperative.   For, as a distinguished appeals court emphasized in <u>Thompson v. City of New York</u>, 164 A.D. 2d 773, 774 (1st Dept. 1990) – **"We grant reargument recognizing that no party to any litigation has a vested right to have a court perpetuate its own errors."**

Lastly, Judge Henry offered no rationale for his decision, citing neither caselaw nor the record, and he failed to consider subclasses as an alternative.  Because of Judge Henry's refusal to offer a rationale for a significant decision affecting the ability of thousands of employees, who have suffered and continue to suffer racial discrimination at DOC, to validate their civil rights; Judge Henry's failure to consider subclasses; and

Judge Henry's omission in holding a certification hearing, this Court should review Judge

Henry's Order *de novo*.

    **D.  DOC'S PERFORMANCE APPRAISAL SYSTEM ("BEAUTY IS IN THE EYE OF THE BEHOLDER") IS RIDDLED WITH SUBJECTIVITY AND VIRTUALLY GUARANTEES RACIAL BIAS**

    **1.    The Role of Performance Appraisals At The DOC**

Performance appraisal ratings are recognized by the federal government as being

"very important to the career of a Federal civil service employee."  Office of Human

Resources Management Web Cite,  managers/how_eval_performance.htm at 1, attached

at App. C, Ex. 9.  The cite continues:

> [Performance appraisals] are used in a variety of critically important ways.
> For example, performance ratings have an impact during a reduction-in-
> force (RIF).  A performance rating is also a factor in making promotion
> selections, and in most cases in determining who will receive a
> performance award. . . . In short, the performance rating that you give an
> employee can have a major impact on the employee's career.

Id.  (App. C, Ex. 9).

Emphasizing the importance of the results of the appraisal process, the cite notes that the

results "are to be used as a basis for training, rewarding, reassigning, promoting, reducing

in grade, retaining, or removing employees."  Id.

The DOC mandates the use of performance standards at either five or two rating

levels.  "For bureaus using five rating levels, the standards . . . are generic and cannot be

changed."  Id.

    **2.    Dr. David Martin, Plaintiffs' Expert, Concludes That DOC's Performance Appraisal System Is Flawed**

Dr.  David  Martin,  a  Professor  of  Management  and  Human  Resources

Management at the Kogod School of Business Administration of American University,

specializes in, among other areas, performance appraisal and organizational management.[9]

Having reviewed performance appraisal forms used by the DOC, Dr. Martin concludes that "there are several areas where the [DOC performance appraisal system] is deficient." Dr. Martin Affidavit, at 2 (App. G, Ex. 1).

Those deficient areas, in summary form, are as follows:

● Transition from generic to specific elements in the evaluation

● Failure of the DOC to require that the standards for performance be determined and presented to the employee prior to the beginning of the rating period

● Failure of the DOC to require that employees be made aware of what is required to receive an "outstanding," "commendable," "marginal," or "unacceptable," rating for each element prior to the beginning of the rating period.

● The "subjectivity [in the performance appraisal system] allows raters to inject any non-work related issue such as bias, discrimination, personal like/dislike, or any other characteristic which would wrongly influence an employee's performance rating." Id. at 1.

● "[A]ny human resource decision, such as promotion, pay, training, etc. which is based on this type of performance appraisal is also flawed." Id. at 2.

As a result of these deficiencies, Dr. Martin concludes that the DOC's

---

9 See Dr. David Martin's Resume, attached at App. G, Ex. 1. Dr. Martin has served as a consultant for, among many entities, the Bureau of Mines, the CIA, the City of Baltimore, the Department of the Navy, the Department of State. In addition, Dr. Martin has performed as an expert witness and advisor to counsel in employment law cases; has published in many research and empirical journals; and has co-authored five books. His corpus includes numerous articles on performance appraisals. Most significantly for the case at bar, Dr. Martin has conducted performance appraisal consulting since 1978 at entities including, but not limited to: Department of the Interior, (where he trained all SES); Bureau of Mines; Department of the Army; the CIA; GAO; and the Department of State.

Performance Appraisal system, as indicated by the performance appraisals he reviewed, are "flawed by the excessive amount of subjectivity which is permitted in arriving at the rating for the individual elements.  The use of the performance appraisals which contain the excessive subjectivity cited above for any human resource action (promotion, pay, training, separation, etc.) is certainly questionable."  Id.

> 3.    **A White Witness, Dennis Gosier, Employed At The DOC Since 1970, Confirms The Arbitrary and Subjective Personnel Reviews Of African-American Employees**

Dennis Gosier is currently employed as a Social Science Analyst by the DOC.  He joined the DOC, Census Bureau, in 1970.  In his role as Chief Steward and EEO representative, he has personally attempted to assist more than 100 African-Americans redress discrimination suffered at the DOC.  In a declaration, attached hereto, Gosier writes:

White managers also frequently deny African-Americans advancement with subjective, negative assessments.  Managers will label employees as "not having shown leadership."  In addition, managers will single out an employee's supposedly negative performance despite having the same performance exhibited by white employees.  For example, the case of African-American Renaldo Simpson is representative of an employee with superior reviews from a Black supervisor at Level 9, but consistently negative reviews from a White supervisor."  Gosier Decl. at pars. 23-24 (App. H, Ex. 17).

> 4.    **"Beauty Lies In The Eyes Of The Beholder"**: Anecdotal Evidence From African-American Employees At The DOC Illustrates The Subjective Nature Of The Performance Appraisals

**Tanya Ward Jordan**, an African-American employee in the Office of the Secretary at the DOC for approximately seventeen years, currently is the Departmental

Management's audit liason.   In about 1996, Jordan filed a personnel grievance after receiving what she alleged to be an unfair rating.  Jordan had been recommended by her team leader, Larry Tyler (a black male) to receive and "Outstanding rating."   However, Tyler informed Jordan that he had to reduce her rating because the second line supervisor, Ted Johnson, instructed Tyler that there was a "predetermined performance level."   The predetermined performance level meant that Tyler could only give out a maximum of two "Outstanding" ratings.  Consequently, Jordan's rating was lowered to "Commendable."  (See App. H, Ex. 24)

However, a white female, who also was recommended to receive an "Outstanding" rating, did not have her rating subsequently lowered.

In addition to the negative impact this enforced distribution system had on Tanya Ward Jordan and countless other African-American employees, **this bell curve is a clear violation of federal regulations.**    "The method for deriving and assigning a summary level may not limit the use of particular summary levels (i.e. establish a forced distribution of summary levels)." 5 C.F.R. Section 430.208(c) 2004, Title 5, Volume 1 (Perfomance Management).[10]   Indeed, such forced distribution is a violation of DOC's own policies:  "Pre-established distributions of expected levels of performance (e.g., requiring supervisors to rate on a bell curve) shall not be permitted, since such distributions would interfere with appraisal of actual performance against standards." DAO 202-430 (Perfomance Appraisal  (App. B, Ex. 16).

To further inflame the injury already suffered by Jordan, DOC's appeals examiner, Mr. Thomas Hyland, an outside investigator paid and hired by DOC to render

---

10  See also Fed. Register 1979 at 3448, "An appraisal system must not include any controls such as a requirement to rate on a bell curve, that prevent fair appraisals of performance in relation to the performance standards."

a finding in Jordan's grievance process, wrote the following in his Report on Findings and Recommendations:

> The basic problem in any performance appraisal rests in the fact that regardless of how objective one tries to make the performance appraisal process, the facts are that for positions where a work product is not inherently quantifiable but rather must be viewed in the relatively subjective terms of quality, timeliness, cost-effectiveness, etc., '**beauty (the overall rating) lies in the eyes of the beholder**.'  (emphasis added)

Jordan Decl. Attachments (App. H, Ex. 24).

This remark, made in the context of a formal grievance, is nothing short of extraordinary and highlights the very problem at the DOC:  performance appraisals at DOC are highly subjective and that subjectivity negatively impacts African-American employees.

This subjectivity was, remarkably, further highlighted by the DOC's Acting CFO/ASA, Ray Kammer, Jr., who in sustaining the second level supervisor's position in downgrading Jordan's "Outstanding" rating to a "Commendable" rating, noted that Jordon had "done an **excellent** job during [her] rating period." (emphasis added).  Jordan Decl. at par. 8; App. H, Ex. 24).  Apparently, Kammer did not appreciate the synonymy between the adjectives "outstanding" and "excellent."  See Microsoft Word Thesaurus.

Jordan, in her accompanying Declaration, notes how the DOC's performance appraisal system negatively impacted her in promotional opportunities, cash awards, quality step increases, RIF credits, and the way in which she is viewed by supervisors. Jordan Declaration at par. 16.  Id.

Finally, Jordan attaches to her Declaration an email from the former Chief Financial Officer and Assistant Secretary for Administration, Mr. Scott Gould.  Gould, in his email sent to administration employees on November 21, 1997, admits that he is

"convinced that [the DOC] need[s] to do much more to develop [its] management and leadership skills here in Administration, especially the skills managers need to coach, advise and counsel employees about performance issues. . . ." Jordan Decl. at par 15; Gould accompanying email. Id.

Despite Gould's refreshing admission and call for change, the DOC has continued to implement and oversee a performance appraisal system which allows for a great amount of subjectivity and, as such, is inadequate. See, generally, Dr. Martin Expert Declaration, attached hereto at App. G, Ex. 1.

The Class Agent has suffered similarly under the DOC's flawed performance appraisal system:

- **Janet Howard, the Class Agent**, an African-American employee at the Bureau of Export Administration ("BXA"), asked Personnel Specialist Jean Cheeks how long she would be held in a lateral position without being promoted. Cheeks responded: "Until a reasonable manager comes along." Howard Decl. at par. 9 (App. H, Ex. 1)

- Class Agent Howard became qualified under the DOC's system to conduct performance appraisals in 1992. However, Howard was given no formal training in how to conduct the appraisals. Howard Decl. at par. 10. (App. H, Ex. 1)

- Class Agent Howard conducted appraisals of seven employees; subsequently, Howard's supervisor, Tom Andrukonis, conducted appraisals of the seven employees himself. The scores were markedly lower when Andrukonis did the evaluation. Andrukonis would not discuss the difference in ratings with Howard, nor would he reconsider his decisions. Howard Decl. at par. 11. (App. H, Ex. 1)

- After receiving a "fully successful" rating, Class Agent Howard's supervisor explained that she received that rating because she was a "rookie." Howard Decl. at par. 12. (App. H, Ex. 1)

- The subjective decision-making associated with cash awards, promotions, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Class Agent Howard's employment at the DOC. Because of the performance appraisal system and how it is used, Class Agent Howard was denied opportunities that are available to white employees. Howard Decl. par. 19. (App. H, Ex. 1)

Class members have suffered similarly under the DOC's flawed performance appraisal system. For example:

- **Class member Joyce Megginson** has been employed with the DOC for about thirty-two years. Due to subjective performance reviews by a white supervisor, Megginson has been unable to progress beyond the GS-9 level.

- The subjective performance appraisals allow Megginson's white manager to say with impunity: "The only way I will ever promote you is if Fred Wentland [a white male in Megginson's department at a higher level] dies in a plane crash." Megginson Decl. at par. 7. App. H, Ex. 2.

- **DOC employee William C. Burns** has received discriminatory performance evaluations since 1979. Burns Decl. at par. 15. App. H, Ex. 19.

- **DOC employee Janice L. Guinyard** claims that her supervisor applied white out to her performance evaluation form "in order to alter the pre-printed values of the ratings for each area of evaluation." The supervisor "decreased the weight placed upon the areas in which [Guinyard] had performed at the highest, or "Outstanding" level, and increased the weight placed upon the areas in which [Guinyard] had performed at the second highest, or "Commendable" level." This resulted in Guinyard receiving an overall evaluation at the "Commendable" level. Guinyard Decl. at par. 16. App. H, Ex. 18.

- **DOC employee Denise Miller** has been unable to advance beyond a GS-7 position at the PTO, having received "unfair and inaccurate performance appraisals designed to halt and/or have halted [her] progress because of [her] race." Miller Decl. at par. 4. App. H, Ex. 9.

## E. DOC'S SELECTION PROCESS HAS DISPARATELY IMPACTED AFRICAN-AMERICANS

To prove disparate impact, a plaintiff must show that defendant based an employment decision on a criterion that, although racially neutral, nevertheless impermissibly disadvantages individuals of one race more than the other. McReynolds v. Sodexho Marriott Services, Inc., supra, 208 F.R.D. at 440; see also Lang v. Star Herald, 107 F.3d 1308, 1314 (8th Cir. 1997) (quotation omitted) (plaintiff "must offer 'statistical evidence of a kind and degree sufficient to show that the practice in question has caused

the exclusion' of benefits because the beneficiaries would be [African-American.])"

1. **Statistical Evidence Of Racial Discrimination At DOC Exists Throughout Its Bureaus, Including the Outside Bureaus**

Throughout its bureaus, DOC employs a disproportionate number of whites in GS 9 through GS 15 level positions and SES professional positions as compared to African-American employees. See, e.g. the following bar graphs representing the racial composition of the DOC workforce (GS 9-15 and SES levels from March 1993 through January 1997).

According to Fiscal Year 1997 statistics:

- At NOAA, white employees held **90.8%** of 5485 professional positions; whereas African-Americans held **3.9%**;

- At ESA, white employees held **80%** of 33 professional positions; African-Americans held **2.4%**;

- At ITA, white employees held **88%** of 122 professional positions; African-Americans held **3.2%**; and

- At NTIA, white employees held **100%** of 86 professional positions; African-Americans held **none**.

(Howard Discovery Responses)

Complaints of Discrimination based on Race and/or Color are routinely filed by African-American employees throughout the DOC bureaus. Between October 1992 and August 1998, of the 492 Discrimination Complaints filed by African-American Commerce employees, 327 Discrimination Complaints **(or 66%)** were from the "outside" bureaus:

38

- **100** Complaints were filed by African-American employees in the National Oceanic and Atmospheric Administration (NOAA);

- **108** Complaints were filed by African-American employees in the Patent and Trademark Office (PTO);

- **15** Complaints were filed by African-American employees in the National Institute of Standards and Technology (NIST);

- **103** Complaints were filed by African-American employees in the Bureau of the Census (Census); and

- **1** Complaint was filed by an African-American employee in the National Technical Information Service (NTIS);

(Bates No. Howard 1294)

Throughout the Department of Commerce, African-Americans are selected for positions at the GS-13 levels, or higher, at rates lower than their overall representation at DOC. From October 1, 1998 to February 28, 1999, DOC filled 283 positions at the GS-13 level and higher∗. Of these, 219, or 77%, were white; 26, or 9%, were African-American. The numbers are comparable throughout the DOC's Outside Bureaus:

- Census filled 48 positions at the GS-13 level or higher. Of these, 36, or 75%, were white; six, or 13%, were African-American;

- NOAA filled 102 positions at the GS-13 level or higher. Of these, 88, or 86%, were white; four, or 4%, were African-American;

- PTO filled 41 positions at the GS-13 level or higher. Of these, 27, or 66%, were white; three, or 7%, were African-American;

- NIST filled 16 positions at the GS-13 level or higher. Of these, 11, or 69%, were white; one, or 6%, was African-American; and

- NTIS filled 7 positions at the GS-13 level or higher. Of these, 6, or 86%, were white; one, or 14%, was African-American.

Bates No. Howard 3009 (App. E, Ex. 1)

---

∗ The document relied upon for this information was provided by OHRM in March 1999, however, it is possible that the data may be reported for 1997.

Throughout the DOC, African-Americans are selected for positions of Career SES and GS-15 at rates lower than their overall representation at DOC. In 1997, of the 95 DOC hires at the Career SES level, 81, or **85.3%, were white∗**; 12, or **12.6%, were African-American**. Of 591 DOC hires at the GS-15 level, 453, or **76.6%, were white**; 59, or **10%, were African-American**. The numbers are comparable throughout the DOC's Outside Bureaus:

- At Census, 83.3% of Career SES hires were white; 16.7% were African-American. For GS-15 hires, 76.4% were white; 10.4% were African-American;

- At NOAA, 93.1% of Career SES hires were white; 3.4% were African-American. For GS-15 hires, 92.6%were white; 3.4% were African-American;

- At PTO, 83.3% of Career SES hires were white; 16.7% were African-American. For GS-15 hires, 65.9%were white; 8.9% were African-American;

- At NIST, <u>100%</u> of Career SES hires were white; <u>none</u> were African-American. For GS-15 hires, 75% were white; 7.1% were African-American; and

- At NTIS, <u>100%</u> of Career SES hires were white; <u>none</u> were African-American. For GS-15 hires, <u>100%</u> were white; <u>none</u> were African-American.

Analysis of Hires Since January 1. 1997, Bates No. 3037 (App. E, Ex. 2)

Statistics show that in 1998, the percentage of African-Americans in the higher GS levels, declined at DOC as the GS level increased, while the percentage of white employees increased as the GS levels increased. <u>See</u> App. E, Ex. 4. The percentage of African-Americans at GS-11 was 13.51%, at GS-12 the percentage was 14.25%, and at GS-13 the percentage dropped significantly to 9.6%. The percentage of white employees

---

∗ The document relied upon for this data was produced by OCR in February 2000. It is not clear if the data is for FY 1997, or for the period 1997-1999.

at GS-11 was 76.61%, at GS-12, it was 76.93%, and at GS-13 it jumps up to 80.48%.  Id.

The data illustrate the increasing disparity between African-Americans and white employees at DOC as GS level increases, when viewed by groupings, i.e., GS 5-8, GS 9-12, and GS 13-15:

| GS Level | African-American | White |
|----------|------------------|-------|
| GS-5 - GS-8 | 35.9% | 57.3% |
| GS-9 - GS-12 | 20.2% | 69.5% |
| GS-13 - GS-15 | 7.1% | 83.3% |

See App. E.  See also Bar Graphs illustrating  racial disparity in GS 9 through GS 15 and SES levels from March 1993 through January 1997, below.

Statistical data shows that there is a substantial disparity in pay between African-Americans and white employees at DOC∗.  For example, analysis of the salaries paid at NIST in 2001 shows that for employees who have been at NIST for thirty-five years or less, white males made an average of $83,238 (+/- $4,239), and white females made an average of $80,569.50 (+/- $5,452).  In stark contrast, African-Americans who had been at NIST for thirty-five years or less made an average of $74, 913.50 (+/- $11,091.50).  See App. E, Ex. 5. ∗∗.   White males who worked at NIST for thirty-five years or longer made an average of $84,273 (+/- $4,210.25), white females made an average of $80,892.50 (+/- $5,448.75), and African-Americans made an average of $76,310.25 (+/- $11,405.75).  Id.  A breakdown of employment grouping by education, i.e., doctorate, master's degree, bachelor's degree, and less than bachelor's degree, shows that this disparity exists within each grouping, and is thus, not attributable to a difference

---

∗ NIST is the only bureau for which salary data has been provided.
∗∗ These numbers are an average derived from the data provided in the appendix.

in education levels. Id.

The Department has had ample notice of its rampant, systemic discrimination and has continually failed to redress its discriminatory policies, practices, and procedures:

- "As of September 1994, over one-half of all white, black, Hispanic, and American Indian/Alaska Native women continue to be concentrated in the entry grades (GS-01 through GS-08), while over three-quarters of the black men and Asian American/Pacific Islander women were dispersed throughout grades GS-1 through GS-12."

(DOC Affirmative Employment Program for Minorities and Women, FY 1994 Accomplishment Report and FY 1995 Plan Update at p. 8, Bates No. 7745) (App. F)

- "As of September 1995 . . . [b]lack men comprised 5.0 percent of all GS and SES positions. They exceeded this rate at the following grade ranges – GS-05 through GS-08, and GS-09 through GS-12, and fell below it at GS-01 through GS-04, GS-13 through GS-15, and in the SES . . . . **38.5 percent of black men were employed at GS-08 and below . . . . [L]ess than 1%, or 0.9%, were in the SES**. "The mode GS grade range for this group was GS-09 through GS-12.

- "Black women made up 13.3 percent of GS and SES jobs. They exceeded this rate at the      GS-05 through GS-08 range only – an indication of concentration. They comprised less  than 13.3 percent in . . . GS-09 through GS-12 and GS-13 through GS-15 grade ranges as well as the SES.  **Nearly 2/3 of all black women, or 64.9 percent, are employed in grades at GS-08 and below.  Employment rates decline considerably at GS-13 and above.  Only one black woman was in the SES**." (emphasis added)

(DOC Affirmative Employment Program for Minorities and Women, FY 1995 Accomplishment Report and FY 1996 Plan Update at p. 8, Bates No. 7690)  (App. F).

- "As of September 1996 . . . [b]lack men comprised 5.1 percent of all GS and SES positions.  They exceeded this rate in grade ranges GS-05 through GS-08 and GS-9 through GS-12.  They fell below it at . . . GS-13 through GS-15 and in the SES.  **Over one-third (37.6 percent) of [black men] worked at GS-08 and below . . . .**

  "Black women made up 13.2 percent of GS and SES jobs.  They exceeded this rate at the      GS-05 through GS-08 range . . . an indication of concentration . . . .  **Nearly two-thirds of all black women, of 62.3 percent, were employed in grades at GS-08 and below**."          (emphasis added)

(DOC Affirmative Employment Program for Minorities and Women, FY 1996 Accomplishment Report and FY 1997 Plan Update at p. 8, Bates No. 7630) (App. F)

44

- "As of September 1997 . . . [b]lack men comprised 4.9 percent of all employees in GS and SES positions.  They exceeded this rate in grade ranges GS-05 through GS-08 and GS-9 through GS-12.  They fell below it at . . . GS-13 through GS-15 and in the SES.  ***Over one-third (35.6 percent) of these employees worked at GS-08 and below*** . . . .

  "Black women made up 13.1 percent of employees in the GS and SES.  They exceeded this rate at the GS-05 through GS-08 ranged – an indication of concentration.  ***Nearly two-thirds of all Black women, or 61.1 percent, were employed in grades at GS-08 and below."***

  "Action Item" for GS 13-15: "Improve the representation of women of all races . . . and [b]lack men in this grade range above 9/97 levels." (emphasis added)

(DOC Affirmative Employment Program for Minorities and Women, Annual Affirmative Employment Program Accomplishment Report FY 1997 at p. 8, 37, Bates No. 7578, 7607) (App. F).

- "As of September 1998 . . . [b]lack men comprised 5.3 percent of all employees in GS and SES positions.  They reached or surpassed this rate in grade ranges GS-05 through GS-08 [and] GS-9 through GS-12.  They fell below it at . . . GS-13 through GS-15.  ***Almost one-third were employed at GS-08 and below*** . . . .

  "Black women made up 13.3 percent of employees in the GS and SES.  ***Almost two-    thirds were concentrated in grades GS-08 and below, while almost one-third were found in grades GS-09 through 12.***  Less than 10 percent of Black women were employed in the GS-13 through GS-15 grade range." (emphasis added)

(DOC Affirmative Employment Program for Minorities and Women, Annual Affirmative Employment Program Accomplishment Report FY 1998 at p. 10-11, Bates No. 7525-26)  (App. F).

- "Black men comprised 5.3 percent of all employees in GS and SES positions.  They surpassed this rate in grade ranges GS-05 through GS-08 and GS-9 through GS-12, where over two-thirds were concentrated.  Black men were below 5.3 percent in . . . GS-13 through GS-15 and the SES.. . .

  "Black women made up 13.2 percent of employees in the GS and SES.  ***Almost half were concentrated in grades GS-05 through GS-08.  Almost a third were employed in grades GS-09 through GS-12***, and less than one-eighth were in grades GS-13 through GS-15.  Fewer [sic] than one percent of Black women were employed in the SES." (emphasis added)

(DOC Affirmative Employment Program for Minorities and Women, FY 1999 Accomplishment

Report and FY 2000 Plan Update at p. 7, Bates No. 7467) (App. F).

- "African-American men comprised 3.9 percent of all employees in GS and SES positions. *They surpassed this rate in the GS-9 through GS-12 grade range, where almost one-third were employed*.. . .

   "African-American women made up 9.4 percent of employees in the GS and SES. *Almost two-thirds were concentrated in grades GS-05 through GS-08 and GS-09 through GS-12* . . . . Just under three one thousandth were employed in the SES."

(DOC Affirmative Employment Program for Minorities and Women, FY 2000 Accomplishment Report and FY 2001 Plan Update at p. 7, Bates No. 7411) (App. F)

5.      **Anecdotal Evidence Of Racial Discrimination At DOC Exists Throughout Its Bureaus, Including the Outside Bureaus**

a.      **One hundred twenty-five survey forms have been submitted by African-American employees at the DOC**

One hundred twenty-five survey forms submitted by current and former African-American employees evidence race discrimination at the DOC.[11]  Surveys were distributed to African-American Commerce employees in February 2004.  To date, approximately 125 surveys have been returned.  These surveys provide data concerning the types of discrimination (in promotions, training, performance evaluation, awards, work assignment, hostile environment, and racial harassment) that African-American employees at various Commerce bureaus report that they have experienced.  The responses of the approximately 125 surveys received to date overwhelmingly demonstrate that African-American employees experience racial discrimination throughout Commerce's bureaus in metropolitan Washington, D.C., including the District of Columbia, Maryland, and Virginia, and that Commerce subjects African-Americans throughout its bureaus to similar kinds of racial discrimination in employment.

---

11 The 125 surveys in the accompanying Appendix (at App. I) do not include the numerous surveys already part of the record in this matter, and considered by the OFO in granting metropolitan certification.

Twenty four African-American employees from the Bureau of the Census ("Census"), have submitted surveys.  **Seventeen of these twenty-four African-American respondents, or 71%, have been denied a promotion.**  Sixteen, or 67%, have failed to receive training. Thirteen report a hostile work environment, and twelve have been harassed by white Census supervisors.  Fourteen African-American respondents indicate that Census has failed to provide them with employment-enhancing work assignments.  Fourteen respondents report that they have received unfair performance evaluations, and thirteen have been denied cash awards.  (See Census surveys, App. I)

Thirty-seven African-American employees from the National Oceanic and Atmospheric Administration ("NOAA") have submitted surveys.  **Of the thirty-seven respondents, twenty-six, or 70%, have been denied a promotion.**  Nineteen African-American NOAA respondents have been denied training.  Twenty-one report a hostile environment, and twelve have been harassed by white supervisors.  Twenty-two, or 59%, of NOAA respondents have been denied an employment-enhancing work experience.  Eighteen African-American respondents have been unfairly evaluated.  NOAA has denied nineteen of the thirty-seven respondents cash awards. (See NOAA surveys, App. I).

Thirty-one African-American employees of the Commerce's United States Patent and Trademark Office ("USPTO") have returned surveys.  **Twenty-one, or 68%, have been denied a promotion.**  Fourteen report that they have been denied training.  Nineteen African-American respondents have received an unfair performance evaluation, and twelve have been denied a cash award.  Of the thirty-one respondents, fifteen have been denied the opportunity to complete an employment-enhancing work assignment.  Fourteen indicate that USPTO creates a hostile work environment, and eleven African-American respondents have been subjected to racial

harassment.  (See PTO surveys, App. I).

Considering the sum of all surveys received (including those for which the respondent's Bureau assignment was inadvertently omitted or illegible), **75% of African-American Commerce respondents report that they have been denied promotions.**  Commerce has denied 58% of African-American respondents training opportunities.  53% have received an unfair performance evaluation; 56% have been denied a cash award.  Commerce has denied 58% of African-American respondents employment-enhancing work opportunities.  54% report a hostile work environment, and 43% have been subjected to racial harassment by white Commerce supervisors.  (See Commerce surveys, App. I)

The conclusion drawn from these surveys is clear: African-American employees throughout Commerce's bureaus in metropolitan Washington, D.C., including the District of Columbia, Maryland, and Virginia, report that they have been discriminated against based on their race, including racial discrimination in denial of promotions, denial of training, denial of awards, denial of employment-enhancing work assignments, unfair performance evaluation, hostile work environment, and racial harassment.  Racial discrimination at Commerce is clearly widespread and systematic.

> **b. Extensive Anecdotal Evidence Illustrates The Pervasive Race Discrimination Throughout The DOC**

In support of this motion to reinstate the Metropolitan-wide class, twenty-one African-American employees of DOC have submitted declarations attesting to a persistent pattern of racial discrimination in the Department. These employees with a combined work experience of 508 years of experience, and an average of 24.1 years of employment per employee, described a chilling atmosphere in the DOC where African-Americans are routinely denied promotions and

subjected to a hostile work environment and racial harassment.

To assist the court in getting a picture of what is like to be an African-American in the DOC, this brief will quote excerpts from class members' declarations.  Class members' own words give a truer flavor or working conditions in the DOC than dry legal verbiage ever could.

But before plaintiffs present relevant language, Plaintiffs will summarize the declaration of Dennis Gosier, a *white* DOC employee and EEO representative in the Department.  Mr. Gosier's declaration confirms beyond any doubt that the Department actively discriminates against African-Americans, and this fortifies the need for class certification so that aggrieved employees will have a chance to win relief.

     (i)　　　　**Declaration of Dennis Gosier, a White DOC Employee, Describes Racial Discrimination Against African-Americans in the Department.**

Mr. Gosier has been with the Department since 1970, and has been an EEO representative from 1993 to the present. Gosier Decl., par. 5, 10.  (App. H, Ex. 17). Mr. Gosier describes how he witnessed first-hand the Census Bureau's discrimination against African Americans. He witnessed a pattern and practice of discrimination in promotions and hiring against African-Americans that has resulted in the following:

- Denying African American employees' promotions to higher GS levels at the Census Bureau;

- Showing preferential treatment to whites in promotional opportunities;

- Denying African Americans adequate or appropriate training necessary to advance to the next level;

- Moving African American to different positions at the same level which hinders progression to the next GS level; and

- Arbitrary and subjective negative personnel reviews of African Americans that

have resulted in thwarting of employment advancement  Gosier Decl. at pars. 7, 10.  (App. H, Ex. 17)

**Excerpts From African-Americans Employee Declarations Demonstrating Denial Of <u>Promotions And Hostile Work Environment</u>**

All twenty one African-Americans report that they have been denied promotions within the Department based on race.  Here are some examples:

<u>**Denial Of Promotions**</u>

1) **Class Agent Janet Howard**

"[M]y immediate supervisor told me that . . . **the position I currently held was . . . reserved for white males** . . . and was overheard saying to a white female "you are tall and blonde, you'll do well here."  Decl., par. 8 (App. H, Ex. 1).

2) **Joyce Megginson**

*"Joyce, you can work for me for 10 years and I will never promote you.  The only way I will ever promote you is if Fred Wentland (a white male in my department at a higher level) dies in a plane crash. Then and only then will I promote you to GS-12 or 13."*  Megginson Decl (App. H, Ex. 2)

1) **Charmae Taliaferro**

*"In 1999, I was denied a promotion to Program Specialist, a GS-9 level position, in favor of an equally or less qualified white employee.  In 1999, I was denied a promotion to Decennial Specialist, a GS-7 position.  After being interviewed for the position, a white manager, Thomas McNeal, told me that I was well-qualified for the promotion and would likely be selected.  However, a less qualified white female was selected for the position."* Taliaferro Decl at pars. 7, 8 (App. H, Ex. 3)

2) **Luis A. Gyles**

*"In approximately 2001, my supervisor, Peter Lydon, a white male, told me that I would receive a GS-11 position.  Shortly after making this declaration, however, I was inexplicably transferred from my current department, Office of Scientific Operation ("OSO") to the Office of Scientific Technology ("OST"), where I was told that no GS-11position was available.  A white employee, Mike Clark, was subsequently transferred into my former position at OSO.  Clark, who possessed only a GED, had previously been working as a GS-7 employee.  In addition,*

*Clark had significantly less experience than I."* Gyles at par. 7 (App. H, Ex. 14)

**3)    Claude Travis**

*"For example, in 1997, I applied for a promotion to an XS-14 Lithographic Supervisor position, a position equivalent to the GS-12 level of employment. The position was awarded to Bob Hall, a less qualified, less experienced white employee who did not possess a degree.  Bob Hall was subsequently promoted to a GS-14 level position.*" Travis Decl. at par 7 (App. H, Ex. 20*).*

**<u>Hostile Work Environment</u>**

**b)    Ernestine Gladden**

*"On approximately February 6, 2004, Dar Davis, a white, female, Commerce manager and my direct supervisor, subjected me to racial harassment, humiliation, and mental anguish.  Davis made racial comments regarding Buckwheat, an African American character on the television show "Little Rascals."  In addition, Davis addressed me as "Buckwheat," including saying "Okay, Buckwheat" in response to my actions and/or statements.  In September 1998, Brian Grove, a white manager, made references to slavery by referring to Sonia Jones, an African American Program Assistant, as "cheap labor" in a way that had distinctly racial overtones.  Grove often referred to African American employees as constituting his "people."  When Grove had previously made racial comments, I notified him that referring to African American as 'his' constituted a reference to slavery as it involved the idea of ownership.  I requested that Grove refrain from further racial comments; however, Grove continued to make racial comments.*"  Gladden Decl. at pars. 9, 12 (App. H, Ex. 13).

**c)    Denise Miller**

*"The vacant Program Analyst position was filled by Leslie Fansler, a white female from CAFC.  After she was hired, I heard that either the solicitor or deputy solicitor made the comment that the new Analyst looked better than "the others", and all the "other" women in my office are African-American.  In approximately 2001, Nancy Slutter, a white female, was acting deputy solicitor. She was rude to the African-Americans in my office, treating us harshly and being verbally abusive.  She would, for example, throw things across our desks instead of handing them to us.  She treated the white paralegals much more cordially, and I filed an EEO complaint.  After I filed the complaint, Commerce retaliated against me by subjecting me to greater scrutiny and harsher discipline."*  Miller Decl. at pars. 7, 8 (App. H. Ex. 9).

**d)    Stephanie L. Rolle**

> *"After the final decision on my [discrimination] claim, PTO retaliated against me and I was subjected to racial harassment and a racially hostile work environment. Specifically, I began to notice that things I left on my desk had been moved around. Later, I noticed things missing from my desk. Things continued to escalate and one morning when I came in to work I found that someone had blockaded access to my desk with chairs. The breaking point came when I returned to my work station to find that large pieces of the modular furniture had been torn, and my name plate was missing. James Murphy, my supervisor at the time, strolled casually by my desk and said "cheap furniture."* Rolle Decl. at par. 8 (App. H, Ex. 6).

### 6. Class Agent Howard Has Been Affected By The Discriminatory Selection Process

Class Agent chronicles in her declaration twenty years of systemic racial discrimination at the Department. First hired in 1983 at the Bureau of Industry & Security "BIS" (formerly Bureau of Export Administration "BXA"), Ms. Howard has been consistently denied promotions for twenty years in favor of white employees.

**Repeated Denials of Promotions/Retaliation:** In 1986, Ms. Howard's white supervisor refused to promote her from GS-7/11 to the next GS-9 series level, telling her that the position was traditionally reserved for "***white males.***" Howard Decl., para 5 (App. H, Ex. 1). This same supervisor who was overheard saying to a white female:

**"You are tall and blonde, you will do well here."**

Left with no choice but to file an EEO complaint, Ms. Howard eventually received vindication when the presiding Administrative Judge Pembrook Scott ruled in 1990 that "***Systemic Race Discrimination***" exists at the BXA, now BIS.

In 1992, Ms. Howard again filed an EEO complaint, this time *on the recommendation of Judge Scott,* for retaliation. (Id at 9) Ms Howard had again come up against the racial wall of preferences in employment advancement. After complaining about not being promoted, Ms.

Howard was told by her personnel specialist that Ms. Howard could expect to remain in her same position "***until a reasonable manager comes along***." (Id)

From 1994-1998, Ms. Howard was again passed over for promotions to GS-12 level in favor of white employees. To add insult, one of the promoted employees took off so much time from work that Ms. Howard had to do the absent employee's work, and Ms. Howard's supervisor Tom Andrukonis had to call the woman at home to inform her of her promotion. (Id at 14). Supervisor, Tom Andrukonis vetted his true subjective beliefs in a written investigative report prepared on Ms. Howard:

**"Janet does good work and she makes the office look good, but it carries no particular weight."** Howard Decl., para 19 (App. H, Ex. 1)

Ms. Howard finally received at GS-12 promotion after 5 years of impediments.

Unfortunately, Ms. Howard's efforts to remedy employment wrongs suffered by herself and other African Americans were not over. Her actions as class agent in this case led to further retaliation against her by the Department, when her supervisor inexplicably withdrew GS-13 vacancies Ms. Howard applied for.

Finally, Ms. Howard learned from her DOC physician that Commerce management had "***a strategy to get rid of Janet***." (Id at 20)

**Subjectivity in Performance Evaluations:** Ms. Howard also experienced first-hand the subjectivity in personnel evaluations recognized by plaintiffs' expert. In 1992, Ms. Howard conducted performance appraisals of seven African Americans under her supervision, which appraisals were then redone by her white male supervisor. After her supervisor lowered all Ms. Howard's ratings, and refused to discuss any reasons for his mark-downs, Ms. Howard concluded that there could be no other explanation for his actions but racial bias.

Ms. Howard also suffered from subjective ratings herself, when a white male supervisor (Jay Hatfield) gave her an atypically low rating, explaining that she was a "*rookie*" and he (Hatfield) had been similarly subjected to low ratings by his own prior supervisor.

### D.    THIS COURT SHOULD REINSTATE THE CLASS CERTIFIED BY THE COMMISSION AS ALL THE REQUIREMENTS FOR CLASS CERTIFICATION PURSUANT TO RULE 23 ARE SATISFIED

#### 1.    Rule 23 Requirements

The district court has "broad discretion in deciding whether to permit a case to proceed as a class action." Hartman v. Duffey, 19 F.3d 1459, 1471 (D.C. Cir. 1994). Parties seeking class certification must satisfy all of the prerequisites for class certification under Rule 23(a) and at least one subsection of Rule 23(b). Class certification should be determined "at an early practicable time" after commencement of the action and may be conditional, altered, or amended "before a decision on the merits." Fed. R. Civ. P. 23(c)(1)(a).

Certification neither requires nor permits courts to determine the merits, In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 21 (D.D.C. 2001), and therefore the court is not authorized to conduct a preliminary inquiry on the merits to justify class certification. Wagner v. Taylor, 836 F.2d 578, 587 (D.C. Cir. 1987). Because the present inquiry only extends to the validity of plaintiffs' proposed classes, the 'court must modulate the intensity of its review of plaintiffs' evidence ...." In re Pepco, 1992 U.S. Dist. LEXIS 18648 (D.D.C. 1992)

The legal standard is whether the evidence establishes a "reasonable basis for crediting [plaintiffs'] assertion[s]." Wagner , at 587 n. 57 (quoting Kuck v. Berkey Photo, Inc., 81 F.R.D. 736, 739 (S.D.N.Y 1979). A more extended probe of plaintiffs' evidence would be both unnecessary and ill-advised. Preliminary exploration is sufficient to determine the propriety of

class certification.  See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974).  Indeed, "it is inappropriate for a court to resolve material factual disputes on a motion for class certification. Kuck, supra., 81 F.R.D. at 739.

Rule 23's requirements are met if plaintiffs have made a "specific presentation" of facts demonstrating a "reasonable basis for crediting the assertion that the aggrieved individuals do exist in the broader class they propose." Wagner, 836 F.2d at 587, n.57.  This is just such a case where "the aggrieved individuals do exist in the broader class they propose."  The Class Agent brings this case on behalf of all African-American employees employed by the DOC at any time from February 22, 1993 to the present (the "Class Period") in positions GS 9 through GS 15.

Rule 23 of the Federal Rules of Civil Procedure  Rule 23 serves two principal purposes: (1) to promote efficiency and economy of litigation through the avoidance of a multiplicity of suits and the introduction of cumulative evidence; and (2) to protect the rights of aggrieved individuals who might be afraid to take the affirmative step of presenting claims on an individual basis.  Crown Cork & Seal Co. v. Parker, 462 U.S. 345, 350 (1983).  The Rule requires that:  (1) the class be so numerous that joinder of all the members is impracticable; (2) questions of law or fact be common to the class; (3) the claims or defenses of the representative parties be typical of the class; and (4) the representative parties fairly and adequately protect the interests of the class.


As held by the U.S. Supreme Court in General Tel. Co. of the Southwest v. Falcon, 457 U.S. 147 (1982), itself a Rule 23(b)(2) class action, the judicial economy and efficiency in cases such as this, where class members are adversely affected by a common procedure, make certification under Rule 23(b)(2) particularly compelling:

Class relief is "peculiarly appropriate" when the issues involved are

55

> common to the class as a whole" and when they "turn on questions of law applicable in the same manner to each member of the class." For in such cases, "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23."

Falcon, 457 U.S. at 155 (internal citations omitted).

If there is any doubt, all uncertainties should be resolved in favor of certifying a broad class. For, as stated by a leading authority on class actions:

> Employment class actions are an excellent means to eradicate widespread or institutional-scale discrimination. Employment discrimination is particularly amenable to class treatment. Fears of retaliation, lack of witnesses and the difficulty of obtaining counsel may keep individual employees from bringing viable actions. The class action can provide a superior mechanism by which to prove wide scale discrimination by providing broader discovery opportunities, a more powerful litigation posture and, when applicable, tolling of the statute of limitations. ." 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, Section 3.01, at 3-4, §24:1, p. 5). (4th ed 2002)

### 2.    Plaintiffs Have Satisfied Rule 23(a) Requirements

### .    The Class Is Sufficiently Numerous To Make Joinder Impracticable

Rule 23(a)(1) requires that the "class [be] so numerous that joinder of all members is impracticable . . ." Fed. R. Civ. P. 23(a)(1). "Only when joinder is impracticable is there a need for a class action device." 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, Section 3.01, at 3-4 (3d ed. 1992).

As the court stated in Bynum v. District of Columbia, 217 F.R.D. 43, 47 (D. D.C. 2003), "[The numerosity] element does not require plaintiffs to prove the exact number of class members; rather they need only provide a reasonable basis for their estimate of the putative class size." See also Stewart v. Rubin, 948, F. Supp. 1077, 1088 (D.D.C. 1996), aff'd, 124 F.3d 1309 (D.C. Cir. 1997) (numerosity satisfied by 245-member class dispersed nationwide).

The putative class in the case at bar is too numerous to make joinder practicable.  Here, the proposed class has over 6,000 members for the period from February 22, 1993 to the present. Based on the number of DOC employees who were in a position to have been affected by the DOC's discriminatory promotional policies, practices and procedures, and the impracticability of joining an additional great number of past and future employees, the class sought herein must be held to be too numerous for joinder to be practicable.  McReynolds v. Sodexho Marriott Services, Inc., 208 F.R.D. 428, 440 (D. DC. 2002) (245-member class spread throughout the country satisfies numerosity requirement); Jarvaise v. Rand Corporation, 212 F.R.D. 1, 5 (D.D.C. 2002) (If potential number of plaintiffs exceeds 40, numerosity is satisfied).

### b.    Common Questions Of Law And Fact Unite The Claims Of The Class Agent And The Class

### i.    Overview

Rule 23(a)(2) requires that there be "common questions of law or fact among the members of the class."  A plaintiff alleging discrimination can successfully demonstrate "a common policy of discrimination" sufficient to satisfy Rule 23(a)(2) by:  (1) marshaling statistical data that African-Americans are significantly underrepresented in higher grade positions; (2) presenting anecdotal evidence of discrimination; and (3) showing that the Department's selection practices are determined by subjective criteria which foster an environment conducive to discrimination against minorities.  McReynolds v. Sodexho Marriott Services, Inc., supra, 208 F.R.D. at 441-443.[12]

---

12   See also Morgan v. UPS of AM., 169 F.R.D. 349, 355 (E.D. Mo. 1996) (citations omitted) ("Commonality is met if a common issue pervades all the class members' claims . . . Commonality does not require that all legal claims be identical but instead  requires that one or more significant questions of law or fact be common to the class."); Paxton v. Union National Bank, 688 F.2d 552, 561 (8th Cir. 1982), cert. denied, 460 U.S. 1083 (1983); 1 Newburg on Class Action, Section 3.10 (1992)).

### ii.    *Falcon* and Disparate Impact

"[D]isparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests.  In either case, a facially neutral practice, adopted without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices."  <u>Watson v. Fort Worth Bank and Trust</u>, 487 U.S. 977, 990 (1988).[13]

**Use of subjective promotional practices have repeatedly been held to meet the requirements of 23(a)(2).**  <u>See</u>, <u>e.g.</u>, <u>Falcon</u>, 457 U.S. at 159 n. 15 ("Significant proof that an employer operated under a general policy of discrimination conceivably could justify a class . . . if the discrimination manifested itself . . . in the same general fashion, such as through entirely subjective decision making processes"); <u>see also</u> <u>Shipes v. Trinity Indus.</u>, 978 F.2d 311, 316 (5th Cir. 1993) ("use of entirely subjective personnel processes that operate to discriminate . . . satisfy the commonality and typicality requirements").

See additionally, <u>Shores v. Publix Super Markets, Inc.</u>, 1996, U.S. Dist. LEXIS 3381, p. *18 (M.D. Fla. 1996) ("[A]t the preliminary certification stage, subjectivity is one common factor the Court may consider. . . .  Indeed, several courts have held that allegations of similar discriminatory employment practices, such as the use of entirely subjective personnel processes that operate to discriminate satisfy the commonality and typicality requirements of Rule 23(a))."; <u>McClain v. Lufkin Indust., Inc.</u>, 187 F. R.D. 267, 279 (E.D. Tex. 1999) ("The first indicia of commonality is that the employment practices challenged . . . are by nature wide spread in their

---

13 <u>See</u> <u>also</u> <u>Bergal v. Metropolitan Waste Control Comm.</u>, 873 F.2d 1166 (8th Cir. 1989) (per curiam) (disparate impact analysis may be applied to subjective decision making); <u>District Council 37, AFSCM v. New York City Department of Parks and Recreation</u>, 113 F.3d 347, 351 (2nd Cir. 1997) ("[D]isparate impact claims can also be used to challenge subjective employment practices . . . "); <u>Griffen v. Carlin</u>, 755 F.2d 1516, 1523 (11th Cir. 1985) ("use of the disparate impact theory to challenge the end result of multi-component selection processes and to challenge subjective elements of those processes is appropriate").

impact.  Allegations of  . . .  subjective personnel processes . . . satisfy the commonality and typicality requirements of Rule 23(a)).”

The Supreme Court in <u>Falcon</u> held that “[c]lass relief is ‘peculiarly appropriate’ when the issues are common to the class as a whole’ and when they ‘turn on questions of law applicable in the same manner to each member of the class.’” 457 U.S. at 155.  The Court then provided the following example:  “If petitioner used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test would satisfy the commonality and typicality requirements of Rule 23(a).” <u>Id.</u> at 159 n. 15.  Indeed, it has long been held that disparate impact cases necessarily “satisfy the commonality and typicality requirements of Rule 23(a).  <u>Falcon</u>, 457 U.S. at 159, n. 15.[14]

### iii.    Decentralization Does Not Defeat Commonality

The <u>McReynolds</u> Court held that commonality will be found even where the plaintiffs seek to represent employees in different divisions with decentralized decision-making.  <u>Id</u> at 208 F.R.D. at 443, n. 23.  This, notwithstanding that discrimination extends over a number of company divisions whose operations are decentralized.   Under <u>McReynolds</u>, a plaintiff successfully establishes commonality where, as here, statistical and anecdotal evidence of racially-based animus is combined with proof of subjective hiring practices.  <u>Supra</u>, 208 F.R.D. 428, 442-443.

As the class agent here is challenging the use of these common discriminatory components

---

14 A disparate impact method of proof and trial is particularly suited for class certification and does not depend upon individualized evidence from the members of the class in order to establish class-wide liability or a judgment for injunctive relief.  <u>See</u> <u>Robinson v. Metro-North Commuter R.R.</u>, 267 F.3d 147, 160 (2nd Cir. 2001) (“As with the liability phase of a pattern-or-practice disparate treatment claim, statistical proof almost always occupies center stage in a prima facie showing of a disparate impact claim.”).

per se, and not merely the individualized manifestations of their use, the fact that the common

components may vary to some degree or be applied somewhat differently by different decision-

makers is of no legal consequence.  See Morgan, 169 F.R.D. at 356 (decentralized decision-

making does not defeat certification of a class.  The personnel policies "include the subjective,

decentralized system of decision-making which the plaintiffs allege is discriminatory.")

McReynolds stresses that to adopt **"defendant's view of the commonality test would
preclude class certification … against any company that has decentralized its personnel
policies … This position would permit companies to escape Title VII class actions by
minimizing the amount of control that they exercise over individual managers."** Supra, 208

F.R.D. at 443-444, n. 23.  Such a strategy is precisely what Commerce would have this Court

embrace.  Much of DOC's brief in support of its Motion to Redefine the Class highlighted what

it contends are decentralized policies.  Plaintiffs refute that contention in detail herein, and show

that it is factually inaccurate.  But, in any event, even assuming *arguendo* that the DOC is

decentralized, such decentralization does not defeat commonality.

Indeed, decentralization strengthens the need for class certification because it

demonstrates that the contested policies, practices, and procedures are so loose and subjective

that the promotional decisions made pursuant to them can vary from one decision-maker to

another.  It is just such random subjectivity in the hands of the decision-maker which requires

certification in this case.  See, Caridad v. Metro North Commuter R.R., 191 F.3d 283, 292 (2d

Cir. 1999); Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1557-58 (11th Cir.) cert. denied,

479 U.S. 883 (1986); McReynolds, supra., at 443-444.

> **ii.    Class Certification and Trial Implicate Common Witnesses, Common
> Documents, Common Legal Issues, Common Disputed Facts, and
> Common Statistical Evidence**

The same questions of law and fact will be answered in the context of a class trial as in the context of an individual trial in this case.  A trial on behalf of the class and the class agent will involve a common set of witnesses and documents, a common set of disputed subsidiary facts that must be resolved, and a common set of subsidiary legal issues (including common defenses asserted by the DOC).  The class agent will testify regarding specific instances in which the challenged procedure has illegally prevented her movement to higher positions with the DOC.  Common statistical evidence will then be used to prove her individual claims as well as the claims of the class.

Such an analysis was the central concern of the Supreme Court in <u>Falcon</u>.  There, the Court held that certification was appropriate where a common method of trial would "advance the efficiency and economy of litigation which is a principal purpose of the procedure," but certification was inappropriate where "the individual and class claims might as well have been tried separately."  <u>Id.</u>, 457 U.S. at 159.  In <u>Falcon</u>, the individual claim was one of disparate impact in failing to promote the named plaintiff, while the class claim was one of disparate impact relying upon class-wide, statistical disparities.  Such a disjunction of the class and individual claims is not present here.  Rather, there is a single, unified theory and method of trial in the case at bar.  Both the individual and class claims will follow the same proof of disparate impact analysis, whether tried as a class or individual action.

### v.    Commonality Is Satisfied In This Matter

Plaintiffs here challenge the DOC's common, subjective selection procedure for GS-9 through GS-15 positions and the components which make up the procedure under a disparate impact theory of liability.  The DOC's defense in this case, as in any disparate impact case, will

involve common questions of fact and law, focusing on the common question of whether the Defendant is able to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. Section 2000e-2(k)(1)(A)(i). Therefore, class certification is appropriate.

The class agent in this matter, in her individual claims and the claims brought on behalf of the class, challenges systemic discrimination in the administration of the DOC's selection procedure for promotions in GS-9 through GS-15. Plaintiffs have presented statistical evidence that Commerce Department African-American employees are grossly underrepresented in GS-9-15 levels. Plaintiffs provided overwhelming anecdotal evidence illustrating Departmental discrimination in advancement and promotion. Finally, plaintiffs demonstrated that Commerce relies on markedly subjective factors – "beauty is in the eye of the beholder" – when making personnel decisions. Thus, this claim is common to both the class agent and all class members. The common claim regarding this selection procedure is that it disproportionately impacts negatively African-American promotional applicants at each stage of the procedure.

The discriminatory aspects of the selection procedure challenged by the class agent in her individual claims and her class claims involve common components, including the overall selection of African-Americans for vacant GS-9 through GS-15 positions; the selection of African-Americans to be trained for and receive employment-enhancing work experience; and the final selection of African-Americans for GS-9 through GS-15 positions. A common practice linking these components is the unfettered, subjective decision-making used to select applicants for these vacant positions. "Allegations of similar discriminatory employment practices, **such as the use of entirely subjective personnel processes that operate to discriminate, satisfy the commonality and typicality requirements of Rule 23(a)."** Thomas v. Lufkin Indust., Inc., 187

F. R.D. 267, 279 (E.D. Tex. 1999); <u>Shores v. Publix Super Markets, Inc.</u>, 1996, U.S. Dist. LEXIS 3381, p. *18 (M.D. Fla. 1996).

> **e.    The Claims Of The Class Agent Are Typical Of The Claims Of The Class**

Whether or not Class Agent Howard will succeed with her claims is not pertinent to the typicality inquiry.    <u>In re Pepco</u>, supra, 1992 U.S. Dist. LEXIS 18648, at *44.    To prove typicality, plaintiffs must show that the named class representative claims to have suffered similar injuries from the same or similar employment practices as did members of the class. <u>Wagner</u>, <u>supra</u>, 836 F.2d at 591; <u>In re Pepco</u>, 1992 U.S. Dist. LEXIS 18648, at 14.    An unsuccessful applicant for one particular job can challenge discriminatory hiring for different job categories where "the primary practices used to discriminate in the different categories are themselves similar." <u>Hartman</u>, 19 F.3d at 1471.    That a plaintiff's job is not identical to that of other class members does not make the plaintiff's atypical.    "Typicality is not defeated because of the varied promotional opportunities at issue, or  the differing qualifications of plaintiffs and class members." <u>Wagner</u>, 836 F.2d at 591 (internal quotation omitted); <u>see also</u>, <u>Advocate Health Care v. Mylan Labs, Inc.</u>, 202 F.R.D. 12, 27 (D. D.C. 2001) (differences among class members don't mandate a finding of atypicality, as long as the claims arise out of the same legal or remedial theory. Class members need not be clones of each other).[15]

---

15 <u>See also</u>, <u>*In re* Vitamins Antitrust Litigation</u>, 209 F.R.D. 251, 261 (2002), ("[t]here is nothing in Rule 23(a)(3) which requires the named plaintiffs to be clones of each other or other class members."); <u>Senter v. General Motors Corp.</u>, 532 F.2d 511 (6th Cir. 1976); <u>Anderson v. Garner</u>, 22 F. Supp. 2d 1379, 1385 (N.D. Ga. 1997) ("The requirement may be satisfied 'even though varying fact patterns support the claims or defenses of individual class members.'"); <u>Kornberg v. Carnival Cruise Lines, Inc.</u>, 741 F.2d 1332, 1337 (11th Cir. 1984) (stating that "a sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same . . . pattern or practice and are based on the same legal theory"); <u>Appleyard v. Wallace</u>, 754 F.2d 955, 958 (11th Cir. 1985); <u>Caridad</u>, 191 F.3d at 293 (typicality "does not require that the factual background of each named plaintiff's claim be identical to that of all class members."); 7A Wright, Miller & Kane, Federal Practice and Procedure, Section 1764, at 235-41.

At bar, the Class Agent's claims are typical of those of the class. This case is predicated on the common issue of the adverse impact of the Defendant's subjective selection practices upon African-Americans. As noted above, it has long been held that disparate impact cases necessarily "satisfy the commonality and typicality requirements of Rule 23(a)." <u>Falcon</u>, 457 U.S. at 159, n. 15. The Class Agent in the case at bar applied for and was denied promotions to vacancies at the GS-9 through GS-15 level, although she was qualified for these positions. Thus, her claims arise from the same event or course of conduct as the claims of the class, and those claims will proceed under the same legal theory.

The Class Agent will also seek the same relief for herself as she does for the class, including injunctive and declaratory judgments and back-pay. Moreover, the Class Agent, and all other African-Americans with pending claims against the DOC, intend to present exactly the same evidence at trial on the merits if there is one class trial or scores of individual trials, including the same historical, anecdotal, and statistical evidence. Structural modifications of the DOC's selection procedure further require class certification, involving one trial on the merits for the Class Agent and the class. Class certification and one trial will lead to less of a chance for inconsistent remedies and relief than would numerous individual trials.

<b>f.    The Class Agent Is An Adequate Representative Of The Class</b>

Rule 23(a)(4) permits certification of a class only if "the representative parties will fairly and adequately protect the interests of the class." This adequacy of representation requirement focuses on "concerns about the competency of class counsel and conflicts of interest." <u>General Tel. Co. of Southwest v. Falcon</u>, 457 U.S. 147, 157 n.13 (1982).

In this matter, there are no conflicting interests between the Class Agent and the proposed

class.  There is also no legitimate question about current class counsel's competence and its means to prosecute this case as a class action.  Plaintiffs' counsel in this matter have significant nationwide experience in litigating employment discrimination class actions and are highly qualified to prosecute the claims of the class.  For years, they have successfully represented other classes in both the employment discrimination field and in other areas of Federal and state litigation.  See Class Counsel's Motion for Entry of Appearance.  The attorneys now representing plaintiffs have sufficient time and skill to vigorously prosecute the class claims in the case at bar.

> **g.    Class Agent Janet Howard's Intent Has Been And Remains To Represent A Class Of African-American Employees Throughout The Department of Commerce**

The record clearly establishes that Howard intended, and the EEOC and Commerce acknowledged, that the putative class comprised African-American employees of the Agency's Headquarters' offices in the ***metropolitan*** area of Washington, D.C., including offices in the District of Columbia, Maryland and Virginia.  Howard's original, February 22, 1995 Complaint of Class-Wide Discrimination initiated her case by defining the class of African-American Commerce employees that she sought to represent as "employees within the ***Washington, D.C. metropolitan area***." (emphasis added) (February 22, 1995 Howard Complaint of Discrimination).  Howard was informed, and believed, that African-American employees throughout Commerce's bureaus in metropolitan Washington, D.C. were suffering race discrimination.  (February 6, 2004 Howard Declaration at ¶4, attached at App. H, Ex. 1). Howard did seek, and continues to seek, to represent a class of all African-American Commerce employees working in bureaus throughout metropolitan Washington, D.C. (Id. at ¶4).

Throughout this litigation, Administrative Judge Decisions have recognized, referred to,

and relied upon Howard's original class definition.  A June 4, 1997 EEOC Decision specified that: "With respect to the four prerequisites for certification (i.e., numerosity, commonality, typicality, and representation), the class agents argued in their complaint that: the class constituted a significant number, exceeding 75 employees within the ***metropolitan area***." (emphasis added) (June 4, 1997 Blumenthal Decision, attached at App. A, Ex. 13).  In addition, a July 20, 2000 Decision acknowledged that Howard "filed a timely class complaint, dated February 22, 1995 . . . . Therein, she alleged discrimination based on race and retaliation against a class of African-American employees who worked for the agency in the ***metropolitan area of Washington, D.C***."  (emphasis added) (July 20, 2000 Certification Decision, attached at App. A, Ex. 1).

The class was certified in February 2001, and notice was sent to potential class members consisting of "all African-American, non-supervisory employees and former employees of the agency's Headquarters' offices in the ***metropolitan area of Washington, D.C.*** . . ." (emphasis added) (On May 18, 2001 Notice, attached at App. A, Ex. 8).  On May 14, 2001, the EEOC's Order Acknowledging Class Complaint defined the class it had certified as being "composed of African-American, non-supervisory employees and former employees of the agency's headquarters' offices in the ***metropolitan area of Washington, D.C.***" (emphasis added) (May 14, 2001 Odom Order Acknowledging Class Complaint, attached at App. A, Ex. 9).

Furthermore, the submissions of Commerce itself demonstrate its acknowledgement, acceptance, and reliance upon the fact that the class that Howard sought to represent, and, before the Order relating to Commerce's Motion for Reconsideration, represented, consisted of African-American Commerce employees in the metropolitan area of Washington, D.C., including Maryland and Virginia.  In its June 8, 2001 Interrogatories, Commerce specified that: "'Agency'

refers to the Department of Commerce and all organizations, bureaus, offices and services within

the Department of Commerce" without qualification or limitation to Washington, D.C. offices,

only (June 8, 2001 Agency's Interrogatories).  Commerce further argued that: "Moreover, this

class action involves Headquarters' offices employees in the ***metropolitan area of Washington,***

***D.C.***  Thus, only information pertaining to promotions and promotional opportunities in the

Agency's Headquarters' offices in the Washington, D.C. area is relevant." (emphasis added)

(August 14, 2001 Agency's Objections and Responses to Class Agent's Requests For

Production).

In addition, Commerce specifically delineated bureaus in the District of Columbia.,

***Maryland and Virginia*** as those whose non-supervisory African-American employees should be

considered Class Members:

> The Agency's March 16, 2001 correspondence noted that there were 15 bureaus that fell within the EEOC's class notification requirements which, in relevant part, limited potential class members to the ***Washington, D.C. metropolitan area***.  Those bureaus with offices in the Washington, D.C. metropolitan area include: 1) Office of the Secretary (OS); 2) Economic Development Administration (EDA); 3) Minority Business Development Agency (MBDA); 4) Bureau of Export Administration (BXA); 5: Bureau of Economic Analysis (BEA); 6) Economics and Statistics Administration (ESA); 7) International Trade Administration (ITA); 8) Office of the Inspector General (OIG); 9) National Telecommunications and Information Administration (NTIA); 10) Technology Administration (TA); 11) National Oceanic and Atmospheric Administration (NOAA); 12) National Institute of Standards and Technology (NIST); 13) Bureau of the Census (Census); 14) National Technical Information Services (NTIS); and 15) Patent and Trademark Office (PTO)." (emphasis added)

(August 14, 2001 Agency's Objections and Responses to Class Agent's RFP) (App. A, Ex. 10).

Commerce also clarified that non-supervisory African-American employees of the *Maryland* office of NOAA should be considered potential Class Members: "As the Department advised the Class Agent, 'headquarters' offices' for NOAA were defined as *Silver Spring, MD* and Washington, D.C. in the creation of the database. This is the common understanding of the location of NOAA headquarters' offices, and this was also *the definition agreed to by the parties* and used to send notices to class members following the provisional certification." (emphasis added) (May 24, 2002 U.S. Department of Commerce's Motion to Clarify The Term "Headquarters' Offices" As Applied To The National Oceanic And Atmospheric Administration, attached at App. A, Ex. 11).

The Agency focuses their argument for narrowing the class on Howard's August 4, 1998 Responses to EEOC Inquiry ("Responses"), in which Commerce alleges that Howard limited the putative class in the above-captioned matter to African-American employees in Commerce's Washington, D.C. offices only. When the Responses were submitted, however, Howard and her prior attorneys had terminated their relationship, and she had not yet signed a retainer with alternative counsel. Thus, Howard did not have appropriate legal guidance when the Responses were submitted. See, e.g., Kokal v. Massanar, 163 F. Supp.2d 1122, 1129 (N.D. Cal. 2001) (finding greater leniency applies to a plaintiff unrepresented by counsel during the administrative process, and such plaintiff will not be readily deemed to have waived arguments not raised during unrepresented state.) While Howard cannot recall drafting the Responses, she has declared that she did not fully understand either the Inquiries or the Responses that she submitted. (Id. at ¶6).

Howard has further declared that these Responses "can only be considered an aberration in light of a record that overwhelmingly refers to, relies upon, and supports" her original

definition of the class in the February 22, 1995 Howard Complaint of Discrimination.  (Id. at ¶5).
Additionally, in two 2003 letters to Administrative Judge Joel A. Kravetz of the EEOC, Howard
denied having agreed to limit the class and reiterated that her intent was to represent a class "as
originally framed in the class complaint filed 2/22/95 (which specifically covers the **Washington
Metropolitan area**, thereby encompassing DC, Maryland and Virginia headquarter offices)."
(emphasis added) (January 2, 2003 Howard Correspondence to Judge Kravetz, and October 2,
2003 Howard Correspondence to Kravetz, attached at App. A, Ex. 12).

Howard maintains that she has always intended, and continues to intend, to seek to
represent a class of African-American Commerce employees working throughout the
metropolitan Washington, D.C. area, including bureaus in the District of Columbia, Maryland
and Virginia. (February 6, 2004 Howard Declaration at ¶7, attached at App. H, Ex. 1).  Both the
EEOC and the Agency have given credence to, depended upon, supported, and developed
Howard's original intent in the ensuing litigation in this matter.  The overwhelming evidence in
the record is clear:  Howard's original intent was to represent a class comprised of African-
American Commerce employees throughout metropolitan Washington, D.C., including the
District of Columbia, Maryland and Virginia.

### h.     The Proposed Class Satisfies The Requirements Of Rule 23(b)(2)

In addition to the four requirements of Rule 23(a), the Court must consider whether the
proposed class action satisfies the requirements of any of the subsections of Rule 23(b), of which
subsections (b)(2) and (3) are relevant to this case.

Rule 23(b)(2) permits class actions for declaratory or injunctive relief where "the party
opposing the class has acted or refused to act on grounds generally applicable to the class."  Fed.
R. Civ. P. 23(b)(2).   The drafters of the rule contemplated that money damages may be

recoverable by the members of a Rule 23(b)(2) class, so long as "the appropriate final relief [does not] relate[] exclusively or predominately to money damages." Fed. R. Civ. P. 23(b)(2) Advisory Committee's Note; see also <u>Morgan</u>, 169 F.R.D. at 358 ("Injunctive or declaratory relief must be the predominant relief sought for the class . . . However, a request for monetary relief does not preclude Rule 23(b)(2) certification unless the request for monetary relief predominates.") (citations omitted).

Rule 23(b)(2) has two requirements: defendant's conduct must be "generally applicable" to the class, and final injunctive or declaratory relief must be requested for the class. Wright, Miller, & Kane, <u>Federal Practice and Procedure</u>, Section 1775 at 448-49 (1986). Both are present here.

This case falls squarely within the parameters of a Rule 23(b)(2) class action. First, DOC's agency-wide subjective decision-making process applies to the class as a whole and injunctive and declaratory relief is not only appropriate, but essential. Rule 23(b)(2) was specifically adopted to govern civil rights cases, such as this one. <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 615 (1997). This Circuit has clearly held that certification under 23(b)(2) is appropriate notwithstanding the existence of monetary claims, even where a portion of such monetary relief takes the form of "damages," rather than "equitable relief," such as back pay. <u>See, e.g.</u>, <u>Thomas v. Albright</u>, 139 F.3d 227, 235 (D.C. Cir. 1998). Backpay is considered class-wide "equitable" relief for which Rule 23(b)(2) certification was designed. <u>See, e.g.</u>, <u>Hartman v. Powell</u>, No. 00-5356, 2001 WL 410461, at *2 (D.C. Cir. Mar. 15, 2001) (holding that settlement that provided individualized <u>Teamsters</u> hearings before Special Master to decide individual class members' back pay claims is "consistent with class certification under Rule 23(b)"). Significantly, courts have routinely awarded class-wide backpay damages without the

70

need for individualized hearings.  See, e.g., Hartman v. Wick, No. 77-2019, 1988 U.S. Dist. LEXIS 14908, at *4 (D.D.C. April 15, 1988); Trout v. Garrett, 780 F. Supp. 1396, 1407-08 (D.D.C. 1991).

Albright affirmed the settlement of a Title VII class action under (b)(2) even though the class sought (and received) $3.8 million in "monetary relief," which included "up to $575,000" to be paid to a few individual class members chosen on the basis of, among other things, "the severity of the discrimination and the degree of economic hardship they had suffered."  139 F.3d at 229 (emphasis added).  Indeed, the class was "properly certified under Rule 23(b)(2) "without allowing class members to opt out."  Thomas v. Powell, 247 F.3d 260, 265 (D.C. Cir. 2001). Similarly, in Stewart, supra, 948 F. Supp. at 1092, the court held the class should be certified under Rule 23(b)(2) because, even though plaintiffs demanded (and the settlement provided) more than $4 million in compensatory damages, in light of the extensive equitable relief (including back-pay eligibility) money damages could not be said to predominate.

The presence of damage claims does not itself destroy the presumption of cohesiveness. Eubanks v. Billington, 110 F.3d 87, 96 (D. C. Cir. 1997); Thomas v. Albright, 139 F.3d 227, 236 (D. C. Cir. 1998).  Cohesiveness is eroded only where the damage claims of some class members are "different in kind" from those of others.  Powell, supra, 247 F.3d at 265 (quoting Albright, 139 F.3d at 236).  A court may allow (b)(2) certification if it finds:  (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits.  Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 164 (2nd Cir. 2001). .

The damages claims in this matter do not erode the "assumption of cohesiveness" in light

of the extensive equitable relief sought in the Complaint, which, in addition to backpay eligibility, will benefit the entire class. As in <u>Stewart</u>, such equitable relief benefits all class members, will take several years to implement, and carries a very significant price tag. The Class Agent brings a civil rights action charging the DOC with discrimination against a class of African-Americans. The Class Agent's claim of class-wide discrimination is susceptible to proof of an adverse impact against African-Americans stemming from the DOC's subjective decision-making policies and practices relating to the filling of vacancies at the DOC. Furthermore, the claim of class-wide discrimination is subject to a single injunctive remedy granting relief from the policies and practices. Such injunctive relief necessarily predominates over the monetary relief sought by the class because it is the culmination of proof of class-wide liability for class-wide discrimination.

### g.    The Proposed Class Can Also Be Certified Under Rule 23(b)(3)

Alternatively, this matter can be certified under Rule 23(b)(3), which states that an action can be maintained as a class action when "the court finds that the questions of law or fact common to the members of the class predominates over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "In determining whether common questions of law or fact predominate, liability issues are the primary focus." <u>In re Vitamin Antitrust Litig.</u>, Nos. MISC 99-197(TFH), MDL 1285, 2001 WL 856292, at *4 (D.D.C. July 23, 2001). Additionally, the common issues do not have to have to be dispositive of the litigation. <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>, 202 F.R.D. at 29, An issue will predominate when an element of the claim will be proven on a "simultaneous, class-wide basis." <u>Id</u>.

Predominance is satisfied in the present case because common liability and damages

issues discussed above concerning the DOC's subjective decision-making are major elements of the class members' claims and will shift the burden to the DOC to adduce evidence that discrimination was not its implicated in the subjective decision-making.  If plaintiffs prove a pattern or practice of discrimination, then only limited individualized hearings concerning whether a putative class member applied for a job, was passed over for a job, or was discouraged from applying for a job would be necessary to determine liability.  See International Bhd. Of Teamsters v. United States, 431 U.S. 324, 361-63(1977); Segar v. Smith, 738 F.2d 1249, 1285 (D.C. Cir. 1984); Robinson, supra, 267 F.3d at 159.

The superiority requirement is clearly met in this case as well, because a class action would save judicial resources and prevent the likelihood of inconsistent verdicts. The putative class is comprised of thousands of members.  Unless a class is certified, individual plaintiffs will be required to bear the cost and risk of individual trials on liability and remedy, burdening the judicial system and presenting the potential for inconsistent verdicts.  See, e.g., In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. at 31; Lewis v. National Football League, 146 F.R.D. 5, 8 (D.D.C. 1992).  Given that common issues on liability and damages would predominate and a class action is superior to thousands of individual adjudications, the present matter should be certified under Rule 23(b)(3).16

### XIII. IF THIS COURT REJECTS THE COMMISSION'S CERTIFICATION OF THE DEPARTMENT-WIDE CLASS, THIS COURT MAY, ALTERNATIVELY, SUBCLASS THE FIVE METROPOLITAN D.C. BUREAUS

#### A.    The Applicable Law On Subclassing

---

16 The subcategories of Rule 23(b) are not mutually exclusive.  A class may be certified under more than one category.  See Eubanks v. Billington, 110 F.3d 87, 91 (D.C. Cir. 1997).

When appropriate, an AJ may decide that a class should be divided into subclasses, with each subclass being treated as a class.  See 29 C.F.R. Section 1614.204(d)(6).  EEOC's Management Directive states that "[t]he Administrative Judge has the authority . . . to subdivide [a class]."  MD-110, Ch. 8-5, IV(A) (citing  Hines v. Department of the Air Force, EEOC Req. No. 05940917 (Jan. 29, 1996)).  In addition, EEOC's regulations provide that [a]n Administrative Judge may divide a class into subclasses, and each subclass qualifies as a class. 29 C.F.R. 1614.204(d)(6); cf. FED. R. CIV. P. 23(c)(4) (When appropriate, a class may be divided into subclasses . . . .).[17]  Moreover, the OFO ruling of July 20, 2000, specifically provided that either party could move for subclassing at a later date.  See OFO Decision, at 16, par. 5. (App. A, Ex. 1).

The class of DOC African-American employees in the outside offices can be subclassed; the DOC itself has argued for subclassing in its Motion to Subclass the Provisional Class by Bureau.  Subclassing the Outside Offices would be an effective, manageable, and just alternative, because it would account for bureau-specific differences in factual and legal proof, and group together class members with common interests and factual information.[18]

---

17 Subclasses may be made upon either party's motion.  See MD 110, Ch. 8-5, IV(A); see also, e.g., Sirota v. Econo-Car Int'l, Inc., 61 F.R.D. 604, 607 (S.D.N.Y. 1974) (subclasses made upon defendant's motion); Federman v. Empire Fire & Marine Ins. Co., No. 73 Civ. 4516-LFM, 1974 WL 452, at *7 (S.D.N.Y. Oct. 1, 1974) (same).

18 The power to subclass is a broad one.  In re Blech Sec. Litig., 187 F.R.D. 97, 104 (S.D.N.Y. 1999).  Accordingly, subclasses have been deemed appropriate for an array of salutary purposes:  to alleviate unmanageability, see Simon v. Philip Morris Inc., 124 F. Supp. 2d 46, 77 (E.D.N.Y. 2000);  to facilitate more focused discovery, a more orderly trial, and potentially a more refined approach to mediation and settlement, Pigford v. Glickman, 182 F.R.D. 341, 346 (D.D.C.1998);  to account for class differences in factual or legal proof, see In re GM Corp. Engine Interchange Litig., 594 F.2d 1106, 1129 n.38 (7th Cir. 1979);  to segregate divergent views among the class members, see In re Broadhollow Funding Corp., 66 B.R. 1005, 1010 (Bankr. E.D.N.Y. 1986);  to isolate a distinct variance among particularized facts, see U.S. v. Preiser, 172 F. Supp. 660, 662 (S.D.N.Y. 1974) (suggesting, for a class of inmates in several different prisons, that [s]ubclasses can . . . be created where there is a distinct variance among conditions at the institutions);  and to ensure fairness to different class defendant entities, see German v. Fed. Home Loan Mortgage Corp., 885 F. Supp. 537, 552 (S.D.N.Y. 1995) (Because each defendant in the class action portion of this

Courts and administrative agencies at all levels across the country, including the EEOC, have embraced the concept of subclassing to defeat supposed impediments to class action certification, allowing suits to proceed to forward to resolution via the class action vehicle, where it is the most efficient means to resolve a suit. United States Parole Commission v. Geraghty, 445 U.S. 388, 100 S. Ct. 1202, 63 L. Ed. 2d 479 (1980) (Supreme Court held that while a district court has no *sua sponte* obligation to *construct* subclasses, it *must*, however, consider the creation of subclasses.) (emphasis added); Moten v. Moler, 1995 EEOPUB LEXIS 3215, *18 (1995) (Administrative Judge upheld certification of subclasses where appellant argued that the earlier decision to certify proposed subclasses was proper because there was a unitary and centralized promotion system and that "the existence of different offices with different managers and performance evaluation criteria does not vitiate the commonality of the practices asserted to be discriminatory.").

See also Flourney v. Goldin, 1998 EEOPUB LEXIS 894 (1998) (Administrative Judge reversed Agency decision to dismiss claim based on an agency-wide promotion plan where agency claimed decentralization of decision-making precluded class certification citing Charles v. Department of the Navy, EEOC Request No. 05880256 (November 29, 1988). Administrative Judge distinguished Charles, holding that unlike Charles, where significant discovery had been completed, appellants did not yet possess the information necessary from the Agency to determine the appropriateness of class and subclass certification going forward, and that appellants had presented enough evidence of commonality and typicality that certification of subclasses was appropriate at that time.); In re Pepco Employment Litig., 1992 U.S. Dist. LEXIS

---

suit is a separate legal entity, individually responsible for [the alleged acts], there must be a sub-class for each defendant owner that remains.).

18648 (D.D.C. 1992) (Court certified subclasses where it found that common claims satisfied Fed. R. Civ. P. 23).[19]

Here, each subclass would group together class members with common interests and factual information, and each would involve only the specific factual and legal proof relevant to a particular bureau.  As a result, the outside bureaus will have sufficient and timely notice of the specific charges they face, and the claims, evidence, and legal theories for each subclass will accurately and specifically isolate the issues in contention at each bureau.  Subclassing by bureau will thus ensure that the resources of the parties and the EEOC can be brought to bear in a focused and orderly manner on the specific material issues and claims in contention.

---

19 See also Lundquist v. Security Pacific Automotive Financial Services Corp., 993 F.2d 11, 14 (2d Cir. 1993) ("[W]e also recognize that the court is empowered under Rule 23(c)(4) to carve out an appropriate class – including the construction of subclasses."); Payne v. Abbott Laboratories, 1999 U.S. Dist. LEXIS 2443, p. *14 (N.D. Ill. 1999) ("Thus, the court imagines there may be putative subclasses of plaintiffs in various grade levels or grade level brackets."); Fink v. National Savings and Trust Company, 772 F.2d 951 (D.C. Cir. 1985) ("Contrary to the position that the dissenting opinion adopts, the reviewing court may require the district court to consider on the record the possibility of certifying subclasses … While the court need not take the initiative, Geraghty holds, it must weigh the possibilities of subclasses or of certifying a narrower class.");Avagliano v. Sumitomo Shoji America Inc., 103 F.R.D. 562 (S.D.N.Y. 1984) (Court certified a nationwide class with subclasses of female employees in a Title VII suit finding that courts have similarly certified classes with subclasses where it has been found "(1) that a single policy prevails in several or all of an employees subdivisions, OR (2) subdivisions are not autonomous, OR (3) where there are specific allegations pertaining to more than one location.") (emphasis added)

Accordingly, if the Court elects not to certify a class department-wide, this Court may, in its discretion, divide the class into subclasses by bureau.

**B. African-American Employees Of The Four Outside Subclasses Share A Uniform Interest. Anecdotal Evidence, Internal DOC Affirmative Action Reports And Statistical Evidence All Confirm That African-American Employees From (1) Census; (2) The United States Patent And Trademark Office; (3) The National Oceanic And Atmospheric Administration; and (4) The National Institute Of Standards And Technology Are Victims Of Pervasive Racial Discrimination. Consequently, The Court Should Grant Plaintiffs' Motion To Subclass These Four Outside Offices.**

**b.    DOC Internal Affirmative Action Reports**

DOC instituted a Department-wide program called "*Affirmative Employment Program For Minorities And Women.*"  This program generates "Accomplishment Reports" for each bureau and identifies "problems/barriers" within the bureau.  "Problems/barriers" are defined as **"a situation that exists in which one or more EEO groups do not have full equal employment opportunity."** (App. F.)

Analysis of these reports for the years 1993–2001 reveals that the four outside offices are characterized by significant discriminatory barriers and practices affecting the subclasses of African-American employees in those offices.

**Census**

"*We are significantly below representational levels in some EEO groups in two of our mission related occupations series (Statisticians and Mathematical Statisticians), as well as our Statistical Clerk and Miscellaneous Administrative Series.*"

"*In our Professional occupations and in our Administrative occupations, the below EEO groups are underrepresented and some are significantly underrepresented.*" (App. F, Ex. 1)

**NOAA**

77

*"Minorities and women are not adequately represented in NOAA's mission-related occupations."*

*"Minorities and women are not represented at the GS-13 and above grade levels."*

*"Inadequate/inconsistent training of NOAA managers, supervisors and employees."* (App. F, Ex. 3)

**PTO**

*"Workforce representation for several EEO groups show actionable underrepresentation based upon the PATCOB, major occupations, and grade grouping analysis."*

*"Key managers lack a clear understanding of their specific EEO responsibilities."*

*"Lack of concerted management action to address rising EEO complaints in some cost centers."*

*"PTO lacks a coordinated strategy to address Cultural Diversity Issues facing the workforce and the technological changes required for mission accomplishments."* (App. F, Ex. 2)

**NIST**

*"The number and percentage of Blacks and Hispanics in the Scientific and Engineering career path continue to decline."*

*"The current method used for the collection of information on affirmative action and outreach activities conducted by NIST staff members is inadequate."* (App. F, Ex. 5).

> **ii.**    **Anecdotal Proof: Survey Forms Filled Out By African-American Employees, In The DOC, Including The Outside Bureaus, Demonstrates That Such Employees Experience Uniform Racial Discrimination Throughout The Metropolitan Washington, D.C. Area**

To date, African-American employees in the DOC have returned approximately 125 survey forms regarding employment practices in the Department. These surveys provide data on

the extent to which African-American employees have suffered discrimination in promotions, training, performance evaluation, awards, work assignment, and whether African-Americans have been subjected to racial harassment or a hostile work environment. (See App. I).

Unfortunately, the responses reveal that, particularly in the outside bureaus, African-American employees have been victimized by insidious, racially discriminatory employment practices.

For the Bureau of the Census, twenty-four African-American employees have submitted surveys. Seventeen of these 24 African-American respondents, or 71%, have been denied a promotion. Sixteen, or 67%, have failed to receive training. Thirteen report a hostile work environment, and twelve have been harassed by white Census supervisors. Fourteen respondents report that they have received unfair performance evaluations, and thirteen have been denied cash awards. (App. I).

Thirty-seven African-American employees from the National Oceanic and Atmospheric Administration ("NOAA") have submitted surveys. Of the 37 respondents, twenty-six or 70%, have been denied a promotion. Nineteen African-American NOAA respondents have been denied training. Twenty-one report a hostile environment, and twelve have been harassed by white supervisors. (App. I)

Thirty-one African-American employees of the Commerce's United States Patent and Trademark Office ("USPTO") have returned surveys. Twenty-one, or 68%, have been denied a promotion. Fourteen report that they have been denied training. Nineteen African-American respondents have received an unfair performance evaluation, and twelve have been denied a cash award. Fourteen indicated that USPTO creates a hostile work environment, and eleven African-

American respondents have been subjected to racial harassment. (<u>See</u> USPTO surveys, attached at App. I).

      iii.      **Statistical Evidence Confirms The Existence Of Racial Discrimination At The Outside Bureaus**

Plaintiffs' discussion herein graphically demonstrates that African-American employees in the outside bureaus are subjected to a uniform pattern of discrimination. Specifically, African-Americans are selected for positions of GS-13 or higher at rates considerably lower than their overall representation at DOC.

Census, for example, filled 75% of these higher positions with whites, but only 13% with African-Americans. For PTO, only 7% of GS-13 level or higher positions were represented by African-Americans. NIST filled only 6% of higher-level jobs with African-Americans. And, NOAA was even worse – only 4% of GS-13 level or higher positions were occupied by African-Americans.

Additionally, as our earlier discussion of statistical evidence illustrates, throughout the DOC, **and in particular, for the outside bureaus,** African-Americans are discriminated against for positions of Career SES and GS-15 levels. African-American employees in these high-level jobs are grossly underrepresented when compared with white hires.

In short, statistical evidence makes clear that the African-American employees of the four outside bureaus face a common pattern of racial discrimination in hiring, promotions, and job opportunities.

In the pages which follow, plaintiffs will briefly focus on each of the four metropolitan D.C. bureaus and discuss why these bureaus should be granted subclass certification. To avoid repetition, Plaintiffs will not traverse terrain already traveled in their legal discussion on the

general criteria for certifying an employment discrimination case and will, instead, refer this Court to Plaintiffs discussion of the law, *supra*.

**C.    General Considerations That Warrant Certification Of Census, PTO, NOAA and NIST Subclasses**

All four subclasses meet all of the requisite elements for certification under Rule 23(a), 23(b)(2), and 23(b)(3).

The Census subclass is so numerous that joinder of all members is impracticable.  There are more than 1500 current African-American employees at Census (see Annual Report of No Fear Data, annexed at App. E, Ex. 3), and this number easily hurdles the numerosity threshold. McReynolds, supra, 208 F.R.D. at p. 440.

The USPTO subclass is so numerous that joinder of all members is impracticable.  There are approximately 2,000 African-American employees of PTO, more than enough to vault numerosity.  Id.

The NOAA subclass is so numerous that joinder of all members is impracticable.  More than 800 African-Americans work for NOAA and this figure easily meets the dictate of numerosity.  Id.

The NIST subclass is so numerous that joinder of all members is impracticable.  More than 50 African-Americans have worked for NIST during the class period, and this figure easily meets the dictate of numerosity.  Id.  Jarvaise v. Rand Corporation, 212 F.R.D. 1, 5 (D.D.C. 2002) (If potential number of plaintiffs exceed 40, numerosity is satisfied).

All subclasses begin running from February 22, 1993 and continues to date. Undoubtedly, as is often true in employment discrimination suits, joinder is difficult, if not impossible, because many African-American employees in the four metropolitan bureaus are either intimidated or too frightened of retaliation to bring individual employment actions.

81

There are common issues of law and fact; the claims of the proposed class agents are typical of those of other Census, PTO, NOAA and NIST subclass members; and the class agents will fairly and adequately present the class. Moreover, a class action is a superior remedial method to adjudicate plaintiffs' claims of racial discrimination for the four subclasses.

The common issue affecting the respective subclasses is whether DOC is guilty of employment practices which operate to deny Census', PTO's, NOAA's and NIST's current and former African-American employees an equal opportunity for promotion, advancement, and hiring. The previous discussion in this brief, Plaintiffs' annexed expert affidavit, and the Department's own documents attached as exhibits demonstrate convincingly that DOC has in place defective selection practices, which are excessively subjective and have the effect of discriminating against African-American employees. As Plaintiffs have shown previously, these kinds of selection procedures qualify as quintessential employment discrimination suits eminently suitable for class certification.

### F. The Court Should Certify A Subclass Of Current and Former African-American Employees From The Bureau Of The Census

#### .   The Two Proposed Class Agents For The Census Bureau Will Fairly And Adequately Represent This Subclass

Two proposed class agents stand ready to vindicate the interests of a Census subclass.

*Janice L. Guinyard* is an African-American, and has been employed in the Department since June, 1982. See Declaration of Janice L. Guinyard, at ¶5. (App. H, Ex. 18). From late 1983 to 1995, Ms. Guinyard worked for the Census Bureau as a statistician in various positions of increasing complexity. (Id.)

As Ms. Guinyard describes in her accompanying Declaration, throughout her tenure, she has been subjected to discriminatory treatment and denied advancement and promotions. For

example, in 1998, Ms. Guinyard applied for an advertised position as Supervisory Employee Development Specialist, Chief Workforce Development Branch, a GS-14 position, and even though Ms. Guinyard was selected as among the most highly qualified for the position, she was rejected in favor of a white male.  (Id. at ¶¶9-10)

Again, in August, 1999; December, 1999; January, 2000; May, 2000; July, 2000, through the end of 2000; and May, 2003; Ms. Guinyard applied for a number of higher-level advertised positions within Census, but was always rejected in favor of white or Asian candidates.  (Id. at ¶¶7-14)

When Ms. Guinyard complained about this discriminatory treatment and filed a charge of discrimination, Commerce retaliated against her with greater job scrutiny and harsher discipline. (Id. at ¶17.)

Ms. Guinyard believes that the racial discrimination she has suffered at the Department is similar to the racial discrimination suffered by other class members.  Ms. Guinyard would like to be part of the class action filed by Janet Howard in 1995.  (Id. at ¶19)

*William C. Burns,* an African-American, is the second proposed class agent for the Census subclass.  Mr. Burns has been employed by Census for approximately forty-two years as a non-supervisory employee.  Burns Declaration, ¶3 (App. H, Ex. 19).  As he relates in his Declaration, pervasive race discrimination has existed throughout his career at Census.  Census's discriminatory policies, practices and procedures have severely limited his opportunities for professional advancement and achievement compared to similarly situated white individuals who were hired around the same time as Mr. Burns.  Since 1967, Mr. Burns has regularly applied for promotions for which he was well qualified.  Repeatedly, he has been rejected in favor of equally- or less-qualified white employees.  (Id. at ¶5.)

For example, in 1978, after working as a GS-11 level Electronics Technician for approximately twelve years, Mr. Burns applied for a promotion to a GS-12 Lead Electronics Technician. Although Mr. Burns was selected as "highly qualified" for the position, he was ultimately rejected in favor of three equally or less qualified white applicants. (Id. at ¶7.)

Pervasive race discrimination has existed throughout Mr. Burns' tenure at Census. After computers began being used at Census during the 1960's, many new jobs were created. Many of the individuals who were hired to these new positions were the white family members, white friends, and white neighbors of current white Census employees. Census's discriminatory policies, practices, and procedures have severely limited Mr. Burns' opportunities for professional advancement and achievement compared to similarly situated white individuals who were hired around the same time that he was. (Id. at ¶¶16-17.)

Proposed Class Agent William Burns has witnessed and/or experienced that the Department impedes its African-American employees from acquiring promotional opportunities.

Mr. Burns believes that the racial discrimination he has suffered at Census is consistent with the racial discrimination other African-American employees have also experienced. Mr. Burns would like to be part of this class action and believes he is well-qualified to represent a class of African-American employees at Census. (Id. at ¶¶18, 20)

.    **Confirmatory Evidence By White Employee Dennis Gosier That Census Engages In A Policy Of Institutionalized Race Discrimination Against African-Americans**

Mr. Gosier joined the Department of Commerce in 1970 and has been employed consistently at the Bureau of the Census since then. Gosier Declaration, ¶ (App. H, Ex. 17)

Throughout his employment at Census, Mr. Gosier has witnessed a policy of widespread, institutionalized race discrimination against African-Americans resulting in preferential

treatment of white employees receiving job promotions and advancement over equally or more qualified African-Americans.  (Id. at ¶6.)

As a white insider, Mr. Gosier was protected from these discriminatory employment practices; African-American employees, however, were prime targets of racism at the Department of Commerce.  (Id. at ¶7.)

Mr. Gosier witnessed the following discriminatory practices against African-Americans:

- Denial of promotions to higher GS levels at the Census Bureau to African-Americans;
- Preferential treatment to whites in promotional opportunities;
- Denial of adequate or appropriate training necessary to advance to the next level to African-Americans;
- Transference of African-Americans to different positions at the same level which hinders progression to the next GS level; and
- Arbitrary and subjective negative personnel reviews of African-Americans that have resulted in thwarting of employment advancement (Id. at ¶7)

Three harmful tactics that White Census managers have used to hinder the advancement of African-Americans have been to (i) lateralize, (ii) detail, and/or (iii) limit training availabilities to minorities.

Lateralizing employees is a technique whereby the white manager moves the African-American employee to a job that requires them to learn new duties and lose the advantage of the experience they had in the prior job in terms of promotional opportunities.

Detailing employees is a method of temporarily moving African-American employees to another office from their permanent position.  In this way, the manager can favor non-minority employees by posting available positions while the African-American is away from his regular office.  (Id. at ¶7, ¶18-20)

In short, the Census Bureau has created a climate of fear in which African-American employees are afraid to challenge Commerce's adverse decisions – decisions which aim to keep

minorities bottled up at lower GS level positions (Id. at ¶26.)

    **E.    The Court Should Certify A Subclass Of Current And Former African-American Employees From The United States Patent And Trademark Office ("PTO")**

        **ii.    The Proposed Class Agent For USPTO Will Fairly And <u>Adequately Represent This Subclass</u>**

*Jeannette Devins*, an African-American, is the proposed class agent for the USPTO subclass. Ms. Devins has been employed by USPTO for approximately thirty-four years as an hourly/non-supervisory employee. Devins Declaration, ¶3 (App. H, Ex. 16). In the course of her employment, she has been subjected to discrimination in employment based on race. She has been denied training opportunities available to non-African-American employees.

During the mid-70's, Ms. Devins continuously applied for GS-6 positions, but on each occasion, was rejected in favor of equally or less qualified white employees. (Id. at ¶5)

Between 1993 and 1998, Ms. Devins repeatedly applied for numerous additional promotions, such as a Technical Information Specialist position; Program Analyst position; Public Affairs Specialist position; Employee Relations Specialist position; and Labor Relations Specialist position, all jobs Ms. Devins was well-equipped to handle. However, in each case the position was awarded to an equally- or less-qualified white employee. (Id. at ¶¶8-18)

As Ms. Devins describes in her Declaration, during her tenure at USPTO, she has observed that African-American employees working as Patent and Trademark Examiners are systematically denied the opportunity to advance to higher levels of employment, while white Patent and Trademark Examiners are provided such opportunities and do advance. (Id. at ¶¶27-28)

Ms. Devins believes that the racial discrimination she has suffered is consistent with that experienced by other African-American employees. She would like to be part of this class

action.  (Id. at ¶28).

### C. The Court Should Certify A Subclass Of Current And Former African-American Employees From The National Oceanic And Atmospheric Administration ("NOAA")

### ii. The Two Proposed Class Agents For NOAA Will Fairly And Adequately <u>Represent This Subclass</u>

*James Jenkins* is an African-American who was employed at NOAA from 1997 to 2002.

Jenkins Declaration, ¶4 (App. H, Ex. 15)

In his accompanying Declaration, Mr. Jenkins tells how he was repeatedly denied promotions to GS-12 level Printing Specialist in favor of equally- or less-qualified white applicants.  (Id. at ¶5)  He and other African-American employees at NOAA have been subjected to racial harassment, a hostile work environment, disparate terms and conditions of employment, compared to white employees, and other forms of discrimination.  (Id. at ¶6 (a)-(d))

Mr. Jenkins believes that the racial discrimination he has experienced at NOAA is consistent with the racial discrimination suffered by other African-American employees.  (Id. at ¶8)  Mr. Jenkins wants to be part of this class action.  (Id. at ¶7)

*Claude Travis*, an African-American, was employed at NOAA for approximately twenty-five years as a non-supervisory employee.   Travis Declaration, ¶3 (App. H, Ex. 20).  During the course of his employment, Travis was denied promotions to positions for which he was qualified, while equally- or less-qualified white employees were promoted to these positions.  Additionally, Mr. Travis was subjected to unequal terms and conditions of employment compared to white employees and faced a racially hostile work environment and other forms of discrimination.  (Id. at ¶6)

In his Declaration, Mr. Travis describes how, over a period of more than two decades, he was denied training opportunities and promotions because of his race.  For example, in 1997, Mr.

Travis applied for a promotion to an XS-14 Lithographic Supervisor position, a position equivalent to the GS-12 level of employment.  The position was awarded to Bob Hall, a less qualified, less experienced white employee who did not possess a degree.  Bob Hall was subsequently promoted to a GS-14 level position.  In 1998, Mr. Travis applied for a promotion to Printing Specialist, a GS-12 level position.  The position was awarded to Nick Alsop, a less qualified white employee.  (Id. at ¶¶7-8)

White managers have subjected Mr. Travis and other African-American employees at NOAA to closer supervision than similarly situated white employees.

Mr. Travis believes that the racial discrimination he has encountered at NOAA is consistent with the discrimination experienced by other African-American employees.  (Id. at ¶13)  Mr. Travis would like to be part of this class action.  (Id. at ¶12)

### D. The Court Should Certify A Subclass Of Current And Former African-American Employees From The National Institute of Standards and Technology ("NIST")

####     . The Proposed Class Agent For NIST Will Fairly And Adequately Represent This Subclass

*Colonel Denver Lovett*, an African-American, will adequately represent the interests of the NIST sub-class.

As Mr. Lovett stated in his accompanying declaration, he was hired in August 1976 to work for the National Institute of Standards and Technology (NIST).  Mr. Lovett has two Master's degrees in the engineering field, including one from Northeastern University earned in 1973.  Lovett Declaration, ¶4 (App. H, Ex. 11)

Despite his stellar qualifications, Mr. Lovett encountered repeated instances of racial discrimination during his tenure at NIST.  In 1996-97, he was denied a promotion to GS-15 level to head a conversion to the metric system.  A less qualified white male candidate was selected.

(Id. at ¶6)

In 1998 and 1999, Mr. Lovett was again denied promotion which was awarded instead to a less qualified white male. (Id. at ¶¶8, 10). Mr. Lovett believes that the racial discrimination he encountered is consistent with the treatment suffered by other African-American employees at NIST. (Id. at ¶13) Mr. Lovett wants to be part of the above class action and wants to serve as Agent for the NIST subclass. (Id. at ¶12)

### ii.    Additional Factors Justify Granting An NIST Subclass

NIST's own Third Annual Evaluation Report, attached hereto at App. E, Ex. 6, makes the following claim:

> [I]n support occupations the number of minorities hired has actually dropped. Our findings indicate that this change coincides with the introduction of expanded direct hire authority. . . . **[One] explanation is that the use of direct hire authority is more likely to yield white rather than black applicants. This is possible because direct hire authority may lead to reliance on informal recruiting channels.** Research on recruitment . . . indicates that women and minority job candidates tend to use formal job search methods (such as newspaper advertisements, college placement offices, and employment agencies) while white males tend to use more informal methods (such as employee referrals, referrals by candidates' friends and family, and self-initiated applications.) **We speculate that direct hire authority leads managers to pursue informal contacts** (such as referrals from friends and other professional contacts) more frequently than was the case prior to the demonstration project.

Third Annual Evaluation Report, NIST, Id. at 1. (Howard Bates 12556) (emphasis added).

Not surprisingly, NIST speculates, whites are more inclined to hire whites through informal channels. Allowing for such discretion through informal channels is merely one way in which NIST is predominately white, and one way in which NIST's top-tier positions are overwhelmingly white.

### E.    Subclassing of the Four Outside Office Bureaus Alleviates Any Potential Manageability Problems

This case presents no problems of manageability issues under Fed. R. Civ. P.

23(b)(3)(D).[20]  This subsection of Rule 23 provides that "the difficulties likely to be encountered in the management of a class action" are pertinent to finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Courts commonly refer to this, as will we, hereinafter, simply as "manageability."  Although the Agency raises some manageability concerns in the Memorandum in Support of Department's Motion to Redefine the Provisional Class, they are vague and undefined.  (Memorandum in Support of Department's Motion to Redefine the Provisional Class, at pp. 50-52)[21]

The underlying, yet ever-present theme of Rule 23 is that where the use of the class action vehicle is appropriate to ensure fairness to all parties and judicial efficiency, it should be facilitated, not impeded by the law.  In Re: Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 140-141.  (to deny certification under Fed. R. Civ. P. 23(b)(3) solely on the grounds that it would be unmanageable is disfavored and "'should be the exception rather than the rule.'") citing In Re: S. Cent. States Bakery Prods. Antitrust Litig., 86 F.R.D. 407, 423 (M.D. La. 1980) (quoting Manual for Complex litigation § 1.43 n. 72 (1977)); In Re: Workers' Compensation, 130 F.R.D. 99, 110 (D. Minn. 1990) (stating that "dismissal for management reasons is never favored"); In Re: Bristol Bay Alaska, Salmon Fishery Antitrust Litig., 78 F.R.D. 622, 628 (W.D.

---

20 The plaintiffs point out that at this stage of the proceedings, determination of manageability is premature and the burden of proof for the plaintiffs does not extend beyond a showing of commonality, typicality, numerosity and adequacy of representation. Gunnells v. Healthplan Servs., 2003 U.S. App. LEXIS 22337, *, *53-58, 348 F.3d 417 (4th Cir. S.C. 2003)  (application of subsections 23(c)(4)(A) and 23(c)(4)(B) to subsection 23(a) is appropriate, and in fact, to consider manageability under subsection 23(b)(3) before doing so, would render those provisions "superfluous" and "without practical application," a result that "contravenes the well-established prohibition against reading a provision in [this] manner.") See also, Jackson v. Fort Worth National Bank, 1983 U.S. Dist. LEXIS 16404, 33 Fair Empl. Prac. Cas. (BNA) 1317 (N.D. Tex. 1983) (finding that the requirements of Rule 23(a) had been satisfied through vigorous prosecution and presentation of evidence, including witness testimony and supporting exhibits, before addressing the issues of Fed. R. Civ. P. 23(b).)

21 The Agency merely makes a reference to practicality, stating that "[s]imply put, unless limited to the headquarters' offices of the Headquarters Bureaus, this case is too unwieldy and unmanageable to permit a just and efficient resolution."  The Agency does however outline its manageability concerns in its Memorandum in Support of Department's Motion to Subclass the Provisional Class by Bureau, to which we refer below.

Wa. 1978) (stating that dismissal for management reasons, in view of the public interest involved in class actions, should be the exception rather than the rule) (internal quotation marks omitted); 8 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulations* (2d ed. 1997),§ 166.03 [3][b][iv] ("Generally, though, class action status will be denied on the ground of unmanageability only when it is found that efficient management is nearly *impossible*; some courts have stated that there is a presumption against refusing to certify a class on manageability grounds.") (emphasis in original); *see generally* <u>Yaffe v. Powers</u>, 454 F.2d 1362, 1365 (1st Cir. 1972) (stating that "for a court to refuse to certify a class… because of vaguely perceived management problems… discounts too much the power of the court to deal with a class suit flexibly, in response to difficulties as they arise.")

While there are no specifically cited manageability concerns to reply to in this memorandum, the Agency previously outlined some such concerns in an earlier memorandum supporting subclassing by bureau.  After identifying possible manageability problems, the Agency contended that "[s]ubclassing by bureau would alleviate these problems." (Memorandum in Support of Department's Motion to Subclass the Provisional Class by Bureau, at 15)  The Agency suggests that subclassing by bureau would "facilitate an orderly discovery process and hearing" and "ensure that the resources of the parties and the EEOC can be brought to bear in a focused and orderly manner on the specific material issues and claims in contention." <u>Id</u>. The Agency further suggests that subclassing would be more fair in that it addresses the differences, if any, that exist between the bureaus.  <u>Id</u>.

While Plaintiffs maintain that a class as originally certified is manageable (partially in reliance on <u>Neal v. Moore</u> 1994 U.S. Dist. LEXIS 21339 (D.D.C. 1994) (district court for District of Columbia, citing supporting subsequent decisions, read <u>Gen. Tel & Tel v. Falcon</u>, 457

U.S. 147 (1982) to allow across-the-board certification in Title VII class action suits.) (citations

omitted)), dividing the proposed class into subclasses by bureau could facilitate a more orderly

trial.

For the reasons noted herein, plaintiffs submit that, should any manageability issues arise

in the future such that they would be an obstacle to maintaining an across-the-board class,

subclassing by bureau would be an appropriate way to address that problem.

### XIV.   CONCLUSION

William M. Daley, former Secretary of the DOC, wrote to all DOC employees in 2001:

> The key to attracting and maintaining [a productive] workforce is a Department
> that embraces diversity and equal opportunity for all our employees, and stands
> firmly against any activity or behavior that is discriminatory.  As we strive to
> achieve our mission, the Department has a firm commitment to promote true
> diversity.  This is one of our core values. . . Not only is discrimination illegal, it
> contributes to a dysfunctional workplace.  The Department of Commerce cannot
> serve the American public well unless our employees are in a workplace that is
> free from discrimination based on race . . . I call upon each of you to work to
> create an organizational culture that embodies mutual acceptance, inclusion and
> empowerment and firmly rejects all forms of discrimination and harassment.

Secretary Daley was well aware of the pendency of this race discrimination class action

matter against the DOC at the time he wrote that statement in 2001.  He was undoubtedly also

aware of the statistical disparity separating African-American and white employees at the DOC;

the numerous complaints filed by African-American employees alleging race discrimination

against the DOC; and of the failure of the DOC to address fairly and resolve completely the

complaints by African-American employees.

Secretary Daley's recognition that the DOC "cannot serve the American public well

unless [DOC] employees are in a workplace that is free from discrimination based on race"

demonstrates that the DOC is *not* serving the American public well.  Secretary Daley's call upon

DOC employees "to work to create an organizational culture that embodies mutual acceptance,

inclusion and empowerment" is precisely what Janet Howard, Joyce Megginson, Tanya Ward Jordan, and so many other employees are trying to do with this lawsuit:  namely, to change the policies and practices at the DOC so that they, their colleagues, and those who come after them are no longer subject to the pervasive forms of discrimination outlined in this brief and the subject of 9 years of litigation to date.  The DOC should recognize its race problems; it should take immediate steps to resolve this lawsuit; it should take immediate steps to implement injunctive relief; and it should compensate all those individuals who are part of whatever class this Court certifies.

For all of the foregoing reasons, the Court should certify this case as a class action, pursuant to Rule 23(b)(2), or alternatively, Rule 23(b)(3).

Respectfully submitted,

_____
David Sanford
Jeremy Heisler
Steven L. Wittels
Lisa Goldblatt
Dale Graddon
**Sanford, Wittels, & Heisler, LLP**
2121 K Street, N.W. Ste. 700
Washington, D.C. 20037
202-942-9124 (direct)
202-628-8189 (fax)

Grant Morris
**Law Offices of Grant E. Morris**
7 Dupont Circle, Ste. 250
Washington, D.C. 20037
202-331-4707 (direct)

**Class Counsel**

Date:   March 5, 2004

# APPENDICES

## TABLE OF CONTENTS

### APPENDIX A

### *COURT DOCUMENTS*

OFO Decision Provisionally Certifying the Class (July 20,2000)          A-1

The Department's Motion to Subclass the Provisional Class by Bureau          A-2

DOC Memorandum in Support of The Department's Motion to Subclass
the Provisional Class by Bureau (DATE?)          A-3

The Department's Motion to Redefine the Provisional Class          A-4

DOC Memorandum in Support of The Department's Motion to Redefine
the Provisional Class          A-5

Former Plaintiffs' Counsel's Opposition to Motion to Redefine the Class          A-6

Judge Henry's one page Order, granting DOC Motion to Redefine the
Provisional Class (August 20, 2003)          A-7

Notice of Class Certification (May 18, 2001)          A-8

EEOC Order Acknowledging Class Complaint          A-9

Agency's Objections and Responses to Class Agent's Requests For
Production (August 14, 2001)          A-10

DOC Motion to Clarify The Term "Headquarters' Offices As Applied
to the National Oceanic and Atmospheric Administration          A-11

Howard's Correspondence with Judge Kravetz          A-12

Blumenthal Decision (June 4, 1997)          A-13

## APPENDIX B

### *DOO / DAO*

Department Organizational Orders (DOO's)

| | | |
|---|---|---|
| DOO 1-1 | Mission and Organization of DOC | B-1 |
| DOO 10-5 | CFO/ASA | B-2 |
| DOO 20-8 | Director for Human Resources Management | B-3 |
| DOO 20-10 | Office of Civil Rights | B-4 |
| DOO 25-5 | NOAA | B-5 |
| DOO 30-2A, 2B | NIST | B-6 |
| DOO 30-3 | PTO | B-7 |
| DOO 30-7A, 7B | NTIS | B-8 |
| DOO 35-2A, 2B | CENSUS | B-9 |

Department Administrative Orders (DAO's)

| | | |
|---|---|---|
| DAO 200-3 | DOC Administrative Order Series | B-10 |
| DAO 201-7 | Non-discrimination | B-11 |
| DAO 202-250 | Delegation of Authority for HR Management | B-12 |
| DAO 202-300 | Employment (General) | B-13 |
| DAO 202-335 | Merit Assignment Program | B-14 |
| DAO 202-410 | Employee Development | B-15 |
| DAO 202-430 | Performance Appraisal | B-16 |
| DAO 202-451 | Incentive Awards Program | B-17 |
| DAO 202-511 | Position Classification | B-18 |
| DAO 202-771 | Administrative Grievance System | B-19 |
| DAO 215-3 | Federal EEO Program | B-20 |
| DAO 215-4 | Affirmative Action Plans, Programs and Activities | B-21 |
| DAO 215-7 | Collection and Management of Racial Data | B-22 |
| DAO 215-9 | Filing Discrimination Complaints | B-23 |
| DAO 218-7 | Issuing Departmental Regulations | B-24 |
| DAO | Complete Listing | B-25 |

## APPENDIX C

### *OFFICE OF HUMAN RESOURCES (OHRM) WEBSITE*

| | |
|---|---|
| Overview | C-1 |
| Introduction for Managers | C-2 |
| Organization of Manager's Handbook Information | C-3 |
| Who is Accountable for HR Management Decisions? | C-4 |
| How Do I Establish a New Position? | C-5 |
| How Do I Reclassify a Position? | C-6 |
| How Do I Fill a Vacancy? | C-7 |

How Do I Promote Employees?                                           C-8
How Do I Evaluate an Employee's Performance?                          C-9
How Do I Reward an Employee?                                          C-10
How Do I Contribute to an Employee's Career Development?              C-11
How Do I Deal With an Employee's Unacceptable Behavior?              C-12
How Do I Deal With an Employee's Misconduct?                          C-13
What Should I Know About Labor Relations?                            C-14
What Else Do I Need to Know? (overview)                               C-15
Glossary                                                             C-16
Demonstration Project                                               C-17
Human Resources Automated Systems                                   C-18
Within-grade Increases (WGI)                                         C-19
Administrative Grievance Procedure                                  C-20
Alternative Dispute Resolution                                       C-21
Drug Free Workplace Program                                          C-22
Employee Assistance Program                                          C-23
Hours of Duty                                                       C-24
Leave                                                               C-25
What OHRM does                                                       C-26
Functional Responsibilities                                         C-27
DAO Links                                                           C-28
General Pay Manual                                                   C-29
HR Delegations of Authority
     Summary of New HR Delegations                                  C-30
     HR Authorities/Delegations Maintained by DOC                   C-31
DOC Electronic Forms Website and Links to Standard Forms            C-32

## APPENDIX D

### *CENTRALIZATION*

Memoranda, E-Mails, Announcements and other Documents Showing
Centralization                                                       D-1

Forms, Manuals and other Documents, Showing Centralization          D-50

## APPENDIX E

### *STATISTICAL DATA*

OHRM Chart                                                           E-1
OCR Chart                                                           E-2

No Fear Data                                        E-3
White Collar Data                                   E-4
NIST Salary Data                                    E-5
OPM Evaluation Report on NIST                        E-6
Organizational Data


**APPENDIX F**

***AFFIRMATIVE ACTION REPORTS***
    Census                                      F-1
    PTO                                         F-2
    NOAA                                        F-3
    NTIS                                        F-4
    NIST                                        F-5
    Office of the Secretary                     F-6
    OIG                                         F-7
    ITA                                         F-8
    BXA                                         F-9
    NTIA                                        F-10
    ESA                                         F-11
    MBDA                                        F-12


**APPENDIX G**

***PERFORMANCE APPRAISAL EXPERT***

Affidavit of Dr. David Martin                       G-1

Information sent to Dr. David Martin                 G-2


**APPENDIX H**

***DECLARATIONS OF CLASS MEMBERS/DOC EMPLOYEES***

    Janet Howard                                H-1
    Joyce E. Megginson                          H-2
    Charmae Taliaferro                          H-3
    Arlene  Spriggs                             H-4
    Vernetta Southerland                        H-5

Stephanie Rolle                          H-6
Albert Morton                            H-7
Michele Peyton                           H-8
Denise Miller                            H-9
Diane McCrae                             H-10
Colonel D. Lovett                        H-11
Andrea Grant                             H-12
Ernestine Gladden                        H-13
Luis Gyles                               H-14
James Jenkins                            H-15
Jeanette Devins                          H-16
Dennis Gosier                            H-17
Janice Guinyard                          H-18
William Burns                            H-19
Claude Travis                            H-20
Willie Mae Carter                        H-21
Derrick Cobbs                            H-22
Tanya Ward Jordan                        H-23
Tanya Ward Jordan (Supplemental)         H-24

**APPENDIX I**

***CLASS MEMBER SURVEYS***