## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JANET HOWARD, TANYA WARD JORDAN, and JOYCE MEGGINSON, individually and on behalf of a class of all other persons similarly situated, | ) ) ) ) | Case No. 1:04-cv-00756 |
| Plaintiffs, | ) ) | |
| v. | ) ) | JUDGE JOHN D. BATES |
| CARLOS M. GUTIERREZ, Secretary, United States Department of Commerce, | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

### I.  OVERVIEW OF THIS ACTION

1.      Plaintiffs bring this action to redress racial discrimination in promotion and related promotional opportunities on behalf of current and former African-American, non-supervisory (at grade levels GS-9 through GS-15, or equivalent level white collar non-GS positions), salaried employees of the Department of Commerce's ("Commerce") bureaus throughout the metropolitan area of Washington, D.C.

2.      Commerce's uniform policies regarding performance appraisals, promulgated by the main office and applicable across Bureaus, adversely affect promotions and related promotional opportunities for African-Americans for positions at GS-9 through GS-15.

3.      The performance appraisals allow for a broad range of managerial discretion and therefore serve as a conduit for excessive subjectivity and race discrimination, which results in a disparate impact on African-Americans in violation of Title VII.

4.     Statistical evidence demonstrates that African-American employees of Commerce are grossly underrepresented in GS-9 through 15 levels, and overwhelming anecdotal evidence illustrates Departmental race discrimination in advancement and promotion.

## II.    HISTORY OF THE CASE

5.     Ms. Janet Howard, an African-American female and twenty-two year employee of Commerce, filed a timely Class Complaint with an Equal Employment Opportunity Counselor on February 22, 1995 (Janet Howard, et al. v. Donald L. Evans, Secretary, U.S. Department of Commerce, EEOC No. 100-A1-7429X, Agency No. 95-55-0278) ("EEO Class Complaint"). Ms. Howard alleged that Commerce engaged in race discrimination against her and a class of similarly situated African-American employees who worked for Commerce in the metropolitan area of the District of Columbia.

6.     Specifically, the EEO Class Complaint alleges that Commerce has maintained a system of racially discriminatory and subjective employment practices with respect to promotions, awards, performance ratings, career-enhancing work assignments, timely training for advancement, and job assignments.  This subjective decision-making in performance evaluations has prevented African-Americans as a group from advancing according to their merit, and it has disadvantaged African-Americans in the areas listed above.  As Ms. Howard was once informed by her supervisor, the promotion she was in line for was traditionally reserved for "white males."  That same supervisor was overheard saying to a white female, "You are tall and blonde; you will do well here."

7.     In the ten years since Ms. Howard filed her EEO Class Complaint, the claims of the class languished in EEOC purgatory.  The Office of Federal Operations ("OFO") certified a department-wide class on July 20, 2000, pointing to statistical information which raised the

strong inference that African-American employees of Commerce "were being denied career advancement opportunities to white-collar positions, GS-9 through GS-15 or equivalent level white collar non-GS positions . . . because of their race." July 20, 2000 OFO Decision in <u>Howard v. Department of Commerce</u>, at 10.

8.      Since 1995, Commerce employees have filed hundreds of complaints alleging race discrimination; have produced an expert opinion from the nation's leading performance appraisal expert regarding the subjective, unfair appraisal system in place at Commerce; have produced statistics that demonstrate a pattern of race discrimination in pay and promotions; and have submitted over one hundred and twenty-five survey forms evidencing race discrimination. Despite that history, Commerce has remained non-responsive in its investigation and treatment of discrimination claims made by its employees. After ten years of discovery and motions practice, certification of a class, partial decertification, extraordinary delay at the administrative level, and increased levels of futility, anger, confusion, and frustration among class members, Plaintiffs brought this action in the United States District Court for the District of Columbia to redress the racial discrimination evident throughout Commerce.

## III.    <u>NATURE OF THE ACTION</u>

9.      This class action is brought by three African-Americans who are current and former employees of Commerce's offices in the metropolitan area of Washington, D.C., including bureaus in southern Maryland and northern Virginia. Commerce consists of fifteen bureaus. The three Plaintiffs ("Class Representatives"), Janet Howard, Joyce Megginson and Tanya Ward Jordan, bring this action on behalf of themselves and the class of persons they seek to represent, to redress the race discrimination they and others have suffered while working at Commerce.

10.     The Class Representatives seek to represent African-American employees of Commerce who have been subjected to one or more aspects of the systemic race discrimination described in this Complaint, namely failure to promote or failure to provide related promotional opportunities such as awards, career-enhancing work assignments, and timely training for advancement.  The systemic race discrimination described in this Complaint has been, and is, continuing in nature.

11.     The Class Representatives are seeking, on behalf of themselves and the class they seek to represent, declaratory and injunctive relief, including affirmative restructuring of Commerce's performance appraisals and promotion procedures; back pay; front pay; and attorneys' fees, costs and expenses to redress Commerce's discriminatory policies, practices and/or procedures.

## IV.     JURISDICTION AND VENUE

12.     This Court has jurisdiction of the class claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), *et seq.*, as amended ("Title VII"), and Class Representative Tanya Ward Jordan's individual claim pursuant to the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, as amended ("The Rehab Act"), to redress and enjoin employment practices of Commerce in violation of these statutes.

13.     Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practice is alleged to have been committed in this judicial district.

14.     The District of Columbia is also the most logical forum in which to litigate the claims of the Class Representatives and the proposed class in this case.  Commerce is headquartered in Washington, District of Columbia and the performance evaluation procedures challenged here issue from its centralized Office of Human Resources Management of the Office

of the Secretary.  Further, Class Representatives reside in and around the District of Columbia, and work in the District of Columbia.

## V.    CONDITIONS PRECEDENT TO SUIT UNDER TITLE VII

15.    The Plaintiffs have fulfilled or are fulfilling all precedent conditions necessary to the institution of this action under Title VII.

## VI.    PROCEDURAL HISTORY

### A.    The Howard Complaint

16.    After years of suffering racial discrimination, Janet Howard, an African-American female and a Commerce employee since 1983, contacted an EEO Counselor.  Ms. Howard filed her EEO Class Complaint on February 22, 1995.  In her EEO Class Complaint, Ms. Howard alleges that Commerce engaged in race discrimination against a class of African-American Commerce employees.

### B.    Class Members Have Relied on the Pendency of the Class Action Since 1995

17.    Since 1995, a great amount of publicity has surrounded this lawsuit's EEOC predecessor.  A Web site regarding this class action matter against Commerce has been created (http://www.feldf.com); rallies have been held throughout the District of Columbia; fundraising efforts have been ongoing for years to support the litigation; and there have been extensive communications between Ms. Howard and class members, and between Commerce and class members.

18.    In a letter from Leroy J. Warren, Jr., Chairman of the NAACP Federal Sector Task Force to William Daley, Secretary of Commerce, dated September 16, 1999, Warren describes the complaints received by the NAACP of race discrimination at Commerce:

The NAACP has for many years been the recipient of a number of very serious allegations of [rampant employment discrimination routinely faced by many racial

> minorities employed by the Department of Commerce] . . . . Today's Protest
> Demonstration is being conducted because of the non-responsiveness of senior
> Commerce officials to what the Task Force strongly believes are legitimate
> complaints of employment discrimination, racism, abuse of authority, and an
> overall lack of equality and justice within Commerce. ***The EEO program at
> Commerce is basically malfunctioning and inoperative***.

Letter from Leroy J. Warren, Jr., Chairman, NAACP Federal Sector Task Force, to William

Daley, Secretary of Commerce, dated September 16, 1999 (emphasis in original).

19.    Given the publicity throughout the history of the <u>Howard</u> EEO Class Complaint,

it is reasonably certain that thousands of absent class members have relied on the pendency of

this class action.

**C.    The EEOC Provisionally Certifies a Class of African-American Employees
Throughout Commerce**

20.    On July 20, 2000, after five years of litigation, the Equal Employment

Opportunity Commission certified a class of African-American employees at Commerce. The

EEOC held that, "[a]fter a review of the entire record," the class should be certified on a

provisional basis. EEOC Decision Certifying Class at 8. The Court certified a class of:

> African-American, non-supervisory employees and former employees of the
> agency's Headquarters' offices in the metropolitan area of Washington, D.C., who
> allegedly have been denied career advancement to one or more white collar
> positions in the agency's Headquarters' offices at grade levels GS-9 through GS-
> 15 levels, or equivalent level white collar non-GS positions, and who may have
> been denied related promotional opportunities in those same offices, based on
> their race during the period of time beginning two years prior to the filing of the
> class complaint on February 22, 1995, and continuing to the date a final
> determination is rendered on the class complaint claim.

EEOC Decision Certifying Class at 15.

21.    The Commission certified this class because "existing information suggests that significant numbers of African-American employees have been denied advancement to [GS-9 through GS-15 or equivalent] positions and, thus, that common questions of fact and law exist as to those positions." Id.

22.    The Commission found that the "class complaint states a claim that the agency has delayed and limited, and continues to delay and limit, the career advancement of class members because of their race," and that there was sufficient evidence in the record to support that claim. Id. at 10.

23.    The Commission held that the class complaint satisfied the commonality requirement, given that it appeared that "common standards govern agency promotion and performance appraisal decisions in the Washington, D.C. metropolitan area." Id. at 11. Such common standards include: the agency's issuance of a Department Administrative Order (DAO), implementing the federal merit promotion policy agency-wide; and the agency's promulgation of agency-wide principles governing the issuance of performance appraisals.

24.    In addition, the Commission took administrative notice of the information in the EEOC's Annual Report on the Employment of Minorities, Women and People with Disabilities in the Federal Government for the Fiscal Year 1998 ("EEOC Report"), which documented the following:

   ▪ The average white collar grade for the agency's white employees was 10.60, while the average white collar grade for the agency's black employees was 8.78. EEOC Report, Table I-16.

- The discrepancies in grade level were also evident in professional positions where the average grade for white agency professional employees in FY 1998 was 12.77 while the average grade for black agency professional employees was 11.62. EEOC Report, Table I-17.

- The percentage of black employees in the agency's white collar positions GS-9 and above in FY 1998 declines as the grade level increases. In contrast, the percentage of white employees in the agency's white collar positions increased in the higher-graded positions.

The Commission also noted that the record contained:

- Several affidavits and over forty unsworn survey forms that were completed in September 1998 which indicate that numerous individual class members believe they have been denied advancement-related opportunities based on their race.

- Hundreds of race discrimination complaints agency-wide.

The Commission found that the complainant possessed the same interest and suffered the same injury as the members of the class. The Commission also found that numerosity and adequacy were satisfied.

**D.    Judge Henry Narrows the Class**

25.    On December 17, 2002, in a 53-page brief, Commerce moved to narrow coverage of the class by eliminating approximately 85% of the class members from the class. In response, Plaintiffs' prior counsel filed a one-and-one-half page opposition.

26.    On August 20, 2003, in a one-page Order, Judge Henry granted Commerce's Motion, ruling that the class should be redefined by eliminating all Commerce bureaus outside

8

Washington, D.C.  Judge Henry offered no rationale for his ruling and cited nothing in the record to support his ruling.

27.    On October 2, 2003, Plaintiff Janet Howard registered a *pro se* Opposition to the Department's Motion to Redefine the Class.

**E.    Judge Kravetz Grants Plaintiffs' Motion For Leave to File a Motion For Reconsideration**

28.    At the end of 2003, Kator, Parks & Weiser withdrew as counsel for Plaintiffs and the class.

29.    Plaintiffs hired new lead class counsel, David Sanford of Sanford, Wittels & Heisler, LLP, who entered this matter on or about January 12, 2004.  Grant Morris of the Law Offices of Grant Morris is class co-counsel.

**F.    No Opinion Or Guidance From Court Relating to Class Issues Since April 2004**

30.    Plaintiffs filed a Motion for Reconsideration of Judge Henry's Narrowing of the Class on March 5, 2004.  That Motion for Reconsideration was fully briefed without opinion or guidance from presiding Judge Kravetz since April of 2004.   In April 2004, Judge Kravetz assured the parties that he would grant or deny the motion for reconsideration within months.  However, after several telephone conferences with Judge Kravetz and the parties, no opinion was rendered.  After waiting approximately eighteen months in addition to the decade this case had already spent in litigation, Plaintiffs made the decision to file in this Court.

31.    Upon receipt of Plaintiffs' declaration of intent to file a classification in federal court, Judge Kravetz dismissed this suit's administrative predecessor in an Order dated September 30, 2005.

## VII.   PARTIES

### A.   Class Representatives

32.   **Class Representative Janet Howard** is an African-American resident of Virginia. Ms. Howard has been employed at Commerce from approximately 1983 until the present.

33.   **Class Representative Joyce Megginson** is an African-American resident of Maryland.  Ms. Megginson has been employed at Commerce from approximately 1971 until the present.

34.   **Class Representative Tanya Ward Jordan** is an African-American resident of Maryland.  Ms. Ward Jordan has been employed at Commerce from approximately 1987 until the present.

### B.   Defendant

35.   **Defendant United States Department of Commerce** is a government entity doing business in Washington, D.C.,  and is an employer under 42 U.S.C. § 2000e(b).

36.   Commerce is a highly centralized departmental agency in the Executive Branch of the United States Government.  To accomplish Commerce's goal to "foster, promote and develop the foreign and domestic commerce," the Department is divided into fifteen interrelated bureaus, including ten interior bureaus in Washington, D.C. and five exterior metropolitan area bureaus.

37.   The interior bureaus include: the Office of the Inspector General ("OIG"); the Office of the Secretary ("OS"); the International Trade Administration ("ITA"); the Bureau of Industry and Security ("BIS"); the Economic Development Administration ("EDA"); the Minority Business Development Agency ("MBDA"); the National Telecommunications and

Information Administration ("NTIA"); the Economics and Statistics Administration ("ESA"); the Technology Administration ("TA"); and the Bureau of Economic Analysis ("BEA").

38.     The exterior bureaus include: the Bureau of the Census ("Census"); the National Institute of Standards and Technology ("NIST"); the National Oceanic and Atmospheric Administration ("NOAA"); the United States Patent and Trademark Office ("PTO"); and the National Technical Information Service ("NTIS").

39.     Each bureau is subject to the centralized control of well-established Department of Commerce policies, with directives being issued by the Office of Human Resources Management of the Office of the Secretary ("OHRM") to all bureaus in Washington, D.C. and the metropolitan area.   Commerce Department personnel policies are tightly controlled and directed by OHRM, which bears ultimate responsibility for the racially discriminatory employment practices that the metropolitan-wide class of African-American employees complains of in this case.

40.     **Secretary Carlos Gutierrez** is the thirty-fifth United States Secretary of Commerce.  He was sworn in on February 7, 2005.

## VIII.   ALLEGATIONS OF THE CLASS REPRESENTATIVES

41.     **Class Representative Janet Howard** has been employed by Commerce for approximately twenty-two years as a non-supervisory employee.  She is currently employed in the Bureau of Export Administration.

42.     In the course of Ms. Howard's employment, Commerce has subjected Ms. Howard to discrimination in employment based on her race, African-American, by denying her promotions in favor of less senior, less qualified white employees, and subjecting her to a racially hostile work environment and other forms of discrimination.

43.     The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Ms. Howard's employment at Commerce.  Because of Commerce's promotion system and how it is used, Ms. Howard has been denied opportunities that are available to white employees.  Ms. Howard's supervisor used subjective decision making to discriminate against Ms. Howard because of her race.

44.     Since 1983, when Ms. Howard was hired by Commerce, she has been discriminated against on several occasions.  For example, in approximately 1986, Ms. Howard applied for a GS-9 position and was told that the position was reserved for white males.  In approximately 1992, Ms. Howard completed performance evaluations for African-American employees she was supervising, only to have her white male supervisor Thomas Andrukonis reject her recommendations.  He subsequently gave the employees significantly lower ratings.  Mr. Andrukonis would not discuss the difference in ratings with Howard, nor would he reconsider his decisions.

45.     In approximately 1984 or 1985, Ms. Howard overheard her supervisor saying to a white female "you are tall and blonde, you'll do well here."

46.     In approximately 1989, Ms. Howard asked Personnel Specialist Jean Cheeks how long she would be held in a lateral position without being promoted.  Cheeks responded:  "Until a reasonable manager comes along."

47.     In 1995, Ms. Howard filed a classwide complaint alleging race discrimination at Commerce, alleging that she and a similarly situated class of African-American employees had been denied promotions in favor of less qualified white employees, subject to disparate terms and conditions of employment, a hostile work environment, and other forms of discrimination.

12

48.    One example of the discrimination Ms. Howard has experienced was when, from 1996 to 1998, six GS-12 Export Compliance Specialist vacancies were announced in Ms. Howard's office.

49.    Ms. Howard applied for each position and though qualified, was not selected. Ms. Howard's white supervisor, Mr. Andrukonis, did not call Ms. Howard in for an interview for any of the positions.

50.    Another example of discrimination occurred during the 1996-1998 period, when Mr. Andrukonis hired a white male whose skills were unrelated to the duties listed in the GS-12 Export Compliance Specialist vacancy announcement.  The skills required for the position related directly to the very duties Ms. Howard was performing daily.

51.    On another occasion, Mr. Andrukonis decided to cancel a vacancy so he would not have to hire Ms. Howard to fill it.

52.    In an investigative report, Mr. Andrukonis said that "Janet does good work and she makes the office look good, but it carries no particular weight."

53.    Ms. Howard was denied a promotion for the 1801 series GS-12 position for five years before she finally received a GS-12 promotion.  She received that promotion at the exact same time the GS-7's whom Ms. Howard had supervised received their promotions to GS-12.

54.    In 1999, a GS-13 1803 Export Compliance Specialist position was announced.

55.    Although Ms. Howard was qualified for the position, she was not considered because the subjective decision making by her supervisor had prevented her from advancing to a GS-12 in a timely manner.

56.    In December 1999, two vacancies for GS-13 positions in Ms. Howard's unit were to be posted on a Monday.  By that time, Ms. Howard had served enough time in-grade to compete for the GS-13 level.  However, Mr. Andrukonis rescinded the vacancies.

57.    Approximately two months later, the two GS-13 slots were posted in an announcement for Division Directors.  Ms. Howard applied for the position in her office, but was not selected.

58.    In approximately 1993, after receiving a "fully successful" rating, Class Agent Howard supervisor explained that she received that rating because she was a "rookie."

59.    Prior to July 22, 2001, Ms. Howard had requested, with support from the department's physician, reasonable accommodation for a medical condition.  Instead of receiving a reasonable accommodation, Ms. Howard was placed on a Performance Improvement Plan (PIP).  Ms. Howard believes the denial of a reasonable accommodation was because of her race.

60.    In approximately 2002, Ms. Howard's rating was undeservedly and subjectively lowered to "marginal."

61.    As a result of Commerce's discriminatory actions, Ms. Howard has suffered extreme harm.

62.    **Class Representative Joyce Megginson** is a member of a protected class, African-American.

63.    Ms. Megginson has been employed for approximately 34 years by the U.S. Department of Commerce, assigned to the National Telecommunications and Information Administration ("NTIA").

64.    In the course of Ms. Megginson's employment, Commerce has subjected her to discrimination in employment based on her race, African-American, by denying her promotions

14

in favor of less senior, less qualified white employees, and subjecting her to a racially hostile work environment and other forms of discrimination.

65.    The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Ms. Megginson's employment at Commerce. Because of Commerce's promotion system and how it is used, Ms. Megginson has been denied opportunities that are available to white employees. Ms. Megginson's supervisor used subjective decision making to discriminate against Ms. Megginson because of her race.

66.    For example, in approximately 1995, after Ms. Megginson had – for years – been trying unsuccessfully to advance to the GS-11 Program/Management Analyst career ladder, her supervisor, a white male named William B. Gamble, told Ms. Megginson, in substance: "Joyce, you can work for me for ten years and I will never promote you. The only way I will ever promote you is if Fred Wentland [a white male in her department at a higher level] dies in a plane crash. Then and only then will I promote you to a GS-12 or 13."

67.    Ms. Megginson's supervisor, Mr. Gamble invented various pretexts to unfairly and discriminatorily suppress Ms. Megginson's advancement.

68.    Ms. Megginson's claims that her supervisor's excuses were arbitrary and subjective – and adverse to African-Americans – are confirmed by the fact that while she was languishing at GS-9, at least seven other white employees at NTIA, who were either below or at Ms. Megginson's level, achieved promotions to higher levels during the 1990s.

69.    Finally, in approximately 1995, Ms. Megginson accepted a GS-11 position in NTIA, and a promotion was prepared. However, the promotion was withdrawn.

70.    Per Commerce policy, all employees were supposed to receive mid-point

employment reviews and ratings.  However, Ms. Megginson was singled out by repeatedly not receiving such reviews and ratings.  This negatively impacted her and prevented her from receiving cash awards given to other employees at Commerce.  In fact, in approximately 1996, all the white employees who served under Ms. Megginson's supervisor, Mr. Gamble, (for more than 120 days) shared in a $25,500 award.

71.    In approximately 1996 or 1997, Ms. Megginson was the only one in her office who had not been given a performance evaluation.

72.    Ms. Megginson frequently asked Mr. Gamble how she could improve and what she needed to do to get a higher rating on her performance evaluations.  All Mr. Gamble would say was that there were no job enhancing assignments and, even if there were, there was no money to support a promotion.

73.    As a result of Defendant's discriminatory actions, Ms. Megginson has suffered extreme harm.

74.    **Class Representative Tanya Ward Jordan** has been employed by Commerce at the Office of the Secretary for approximately eighteen years.

75.    In approximately June 1998, Ms. Ward Jordan began working at the Office of Executive Budgeting and Assistance Management ("OEBAM") as a Management and Program Analyst, a GS-14 level position.

76.    In the course of Ms. Ward Jordan's employment, Commerce has subjected her to discrimination in employment based on her race, African-American, by denying her promotions in favor of less senior, less qualified white employees and subjecting her to a racially hostile work environment and other forms of discrimination.

16

77.    The subjective decision making associated with promotions, cash awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Ms. Ward Jordan's employment at Commerce.  Because of Commerce's promotion system and how it is used, Ms. Ward Jordan has been denied opportunities that are available to white employees.  Ms. Ward Jordan's supervisor used subjective decision making to discriminate against Ms. Ward Jordan because of her race.

78.    Ms. Ward Jordan also served as the Departmental Management's ("DM") audit liaison. In this capacity, Plaintiff was responsible for reporting on functions, activities and initiatives related to DM funds.  As a part of the routine business of her job as audit liaison, Ms. Ward Jordan regularly handled documents containing information that identified areas of concern to civil rights groups.

79.    Despite Ms. Ward Jordan's repeated notification to Commerce that managers were subjecting her and other African-Americans to illegal racial discrimination, Commerce managers have continued to discriminate against Ms. Ward Jordan and other African-Americans.

80.    For example, on approximately October 2, 2000, Ms. Ward Jordan filed a formal complaint alleging that she was denied a career-enhancing position as the Department of Commerce's GS-15 Diversity Program Manager due to her race, African-American.

81.    The position was advertised on May 15, 2000.  On May 24, 2000, the Director of OHRM asked who had applied for the position.  After seeing that Ms. Ward Jordan had applied for the position, after the vacancy closed, Commerce "reassigned" a Caucasian of Hispanic origin to the position.

82.    On or about July 18, 2003, Otto Wolff, Chief Financial Officer and Assistant Secretary for Administration ("CFO/ASA"), a white male, transferred Ms. Ward Jordan from the

Office of Executive Budgeting within OEBAM to the Office of Budget ("OB") under the direction of Barbara Retzlaff, a white female.

83.     Ms. Ward Jordan was the only employee within the Office of Executive Budgeting ("OEB") transferred to OB's Systems and Policy Division.  All other OEB staff members were transferred to the Office of Financial Management ("OFM") under the CFO/ASA realignment.

84.     Pursuant to Ms. Ward Jordan's medical disabilities, Ms. Ward Jordan's office at the OEBAM had been equipped with a window and a thermostat.

85.     By comparison, the small, dusty office to which Ms. Ward Jordan was reassigned lacked adequate ventilation, and was poorly lit, and otherwise failed to offer Ms. Ward Jordan reasonable accommodation for her medical disabilities.

86.     At least three vacant offices in the vicinity of Ms. Ward Jordan's office had windows, thermostats and better ventilation.

87.     Ms. Ward Jordan complained to Commerce managers regarding the treatment to which she was being subjected, including Ms. Retzlaff and Peter Maxey, a white male, to no avail.  Ms. Ward Jordan additionally complained to Bernadette Worthy, a black female, of Commerce's Office of Civil Rights ("OCR").

88.     OCR failed to redress Ms. Ward Jordan's complaints of discrimination. Commerce specifically denied Ms. Ward Jordan's reasonable requests to be placed in vacant offices that met Ms. Ward Jordan's medical needs.

89.     Further, in her new position, a GS-14 level position, at OB, Ms. Ward Jordan was required to report to a GS-13 level white male.  The GS-15 Director position had been left vacant.

90.    After Ms. Ward Jordan raised concerns about reporting to a lower level employee, Ms. Retzlaff chose not to allow Ms. Ward Jordan to serve as "Acting Director." She then appointed Doug Allis, a white male on Ms. Retzlaff's staff, to act in a dual capacity.

91.    In about 1996, Ms. Ward Jordan filed a personnel grievance after receiving what she alleged to be an unfair rating. Jordan had been recommended by her team leader, Larry Tyler (a black male) to receive and "Outstanding rating."

92.    However, Mr. Tyler informed Ms. Ward Jordan that he had to reduce her rating because the second line supervisor, Ted Johnson, instructed Mr. Tyler that there was a "predetermined performance level."

93.    The predetermined performance level meant that Mr. Tyler could only give out a maximum of two "Outstanding" ratings. Consequently, Ms. Ward Jordan's rating was lowered to "Commendable."

94.    However, a white female, who also was recommended to receive an "Outstanding" rating, did not have her rating subsequently lowered.

95.    To further inflame the injury already suffered by Ms. Ward Jordan, DOC's appeals examiner, Mr. Thomas Hyland, an outside investigator paid and hired by DOC to render a finding in Ms. Ward Jordan's grievance process, wrote the following in his Report on Findings and Recommendations:

> The basic problem in any performance appraisal rests in the fact that regardless of how objective one tries to make the performance appraisal process, the facts are that for positions where a work product is not inherently quantifiable but rather must be viewed in the relatively subjective terms of quality, timeliness, cost-effectiveness, etc., 'beauty (the overall rating) lies in the eyes of the beholder.' (emphasis added).

96.    As a result of Defendant's discriminatory actions, Ms. Ward Jordan has suffered extreme harm.

IX.    **OVERVIEW OF PLAINTIFFS' DISPARATE IMPACT CLAIMS**

97.    Overall personnel management of the Department's roughly 30,000 employees stems from the OS.  The OS issues department-wide personnel policies and directives.  These policies and directives must be followed and adhered to by all the bureaus.

98.    The Secretary of the DOC -- the top of the Organizational tree -- reserves to itself "coequal" authority in personnel management of all 15 bureaus encompassed by the OFO's class order.

99.    All of the DOC bureaus are subject to a centralized system of department-wide personnel policies.  The Office of the Secretary issues these standard policies through its Human Resources Management office (OHRM), which administers a department-wide human resources management program.  The Office of the Secretary/OHRM mandates a uniform set of policies and protocols for the DOC bureaus' personnel practices, including evaluations and promotions.

100.    OS/OHRM requires that all 30,000+ DOC employees (except certain management) be reviewed annually on standard evaluation forms.

101.    The HR Director has ultimate responsibility to ensure that the DOC's centralized, Department-wide personnel goals are met.  Through constant monitoring and oversight of all fifteen bureaus, the Director scrutinizes:

> administration of pay, bonuses and incentives; administration of leave and hours of work; administration of payroll support and time-and-attendance controls; workforce planning, recruitment and employment; training and career development; employee recognition; morale and performance appraisal; employee relations, benefits, and services; labor management relations; workers compensation; organizational restructuring guidance, . . . oversight of unique human resources systems …evaluation of human resources management activities Department-wide; examination of adherence to merit principles and prevention of prohibited personnel practices; the promotion of effective human resources management; and the development of policies and procedures. . . .

102.    The Office of the Secretary is empowered by Department Orders reaffirming that

Office's Department-wide personnel management oversight responsibilities.  For example:

> Department-wide staff responsibility by Human Resources Director for "all aspects of human resources management and administration . . . including employee recognition, morale, and performance appraisal.

103.    Responsibility for the Department's discrimination against its African-American employees ultimately rests with the centralized Office of the Secretary.  For it is here, that DOC is supposed to:

> [d]evelop and administer the personnel management policies and programs of the Department, including the direction, administration, and processing of all matters involving personnel. . . . [and] [c]onduct activities to ensure equal employment opportunity in the Department, including affirmative action for employees, and job applicants, and to ensure nondiscrimination in Federally-assisted programs, activities, and projects.   (emphasis added)

104.    The OS's Director for Civil Rights is charged with protecting against precisely the form of extensive, Department-wide discrimination manifest in this case.   The Director for Civil Rights has:

> Department-wide staff responsibility for ensuring EEO, including affirmative action, for employees and job applicants within the Department . . . [shall] [d]evelop, direct, and coordinate Department programs, policies, and activities to ensure the accomplishment of EEO and civil rights responsibilities, and evaluate the implementation of these actions . . . [p]rocess EEO complaints within the Department and ensure that remedies ordered as a result of discrimination complaints or affirmative action initiatives.

105.    Performance appraisal ratings are recognized by the federal government as being "very important to the career of a Federal civil service employee."

106.    Commerce's Office of Human Resources Management website states:

> [Performance appraisals] are used in a variety of critically important ways.  For example, performance ratings have an impact during a reduction-in-force (RIF).  A performance rating is also a factor in making promotion selections, and in most cases in determining who will receive a performance award. . . . In short, the performance rating that you give an employee can have a major impact on the employee's career.

107.    Emphasizing the importance of the results of the appraisal process, the website notes that the results "are to be used as a basis for training, rewarding, reassigning, promoting, reducing in grade, retaining, or removing employees."

108.    The DOC mandates the use of performance standards at either five or two rating levels.  "For bureaus using five rating levels, the standards . . . are generic and cannot be changed."

## X.    COMMERCE'S PERFORMANCE EVALUATION PROCESS IS EXCESSIVELY SUBJECTIVE

109.    Dr. David Martin, a Professor of Management and Human Resources Management at the Kogod School of Business Administration of American University, specializes in, among other areas, performance appraisal and organizational management.   For years, Dr. Martin has assisted several federal agencies with preparing and implementing their performance appraisal systems, and he has decades of experience in teaching, publishing books and articles, consulting, and training employees (including hundreds of federal employees) in the area of performance appraisals.

110.    Dr. Martin reviewed examples of performance reviews from Census (Samuel Reynolds, 1996-1999), Headquarters/Office of the Secretary (Janet Howard, 1995-96), Headquarters/Office of Human Resource Management (John Austin, 1998), and the Patent and Trademark Office (John Kuong, 2000).

111.    Having reviewed performance appraisal forms used by the DOC, Dr. Martin concluded that "there are several areas where the [DOC performance appraisal system] is deficient."

112.    Those deficient areas, in summary form, are as follows:

- Transition from generic to specific elements in the evaluation.

- Failure of the DOC to require that the standards for performance be determined and presented to the employee prior to the beginning of the rating period.

- Failure of the DOC to require that employees be made aware of what is required to receive an "outstanding," "commendable," "marginal," or "unacceptable," rating for each element prior to the beginning of the rating period.

- The "subjectivity [in the performance appraisal system] allows raters to inject any non-work related issue such as bias, discrimination, personal like/dislike, or any other characteristic which would wrongly influence an employee's performance rating." Id. at 1.

- "[A]ny human resource decision, such as promotion, pay, training, etc. which is based on this type of performance appraisal is also flawed."

113.    As a result of these deficiencies, Dr. Martin concluded that the DOC's Performance Appraisal system, as indicated by the performance appraisals he reviewed, are "flawed by the excessive amount of subjectivity which is permitted in arriving at the rating for the individual elements.   The use of the performance appraisals which contain the excessive subjectivity cited above for any human resource action (promotion, pay, training, separation, etc.) is certainly questionable."

114.    Dr. Martin concluded that the DOC's performance appraisal system is "probably the worst system [he has] critiqued."

## XI.    STATISTICAL   EVIDENCE   CLEARLY   DEMONSTRATES   THAT COMMERCE'S EVALUATION SYSTEM HAS A DISPARATE IMPACT ON AFRICAN-AMERICAN EMPLOYEES

115.    Statistics show that, for example, in 1998, the percentage of African-Americans in GS levels 5 – 15 declined at DOC as the GS level increased, while the percentage of white employees increased as the GS levels increased.   The percentage of African-Americans at GS-11 was 13.51%, at GS-12 the percentage was 14.25%, and at GS-13 the percentage dropped

significantly to 9.6%.    The percentage of white employees at GS-11 was 76.61%, at GS-12, it was 76.93%, and at GS-13 it jumps up to 80.48%.

116.    Throughout its bureaus, DOC employs a disproportionate number of whites in GS 9 through GS 15 level positions and SES professional positions as compared to African-American employees.  See, e.g. the following bar graphs representing the racial composition of the DOC workforce (GS 9-15 and SES levels from March 1993 through January 1997).

117.    According to Fiscal Year 1997 statistics:

- At NOAA, white employees held 90.8% of 5485 professional positions; whereas African-Americans held 3.9%;

- At ESA, white employees held 80% of 33 professional positions; African-Americans held 2.4%;

- At ITA, white employees held 88% of 122 professional positions; African-Americans held 3.2%; and

- At NTIA, white employees held 100% of 86 professional positions; African-Americans held none.

118.    Administrative complaints of discrimination based on race and/or color are routinely filed by African-American employees throughout the DOC bureaus.  Between October 1992 and August 1998, of the 492 discrimination complaints filed by African-American Commerce employees, 327 discrimination complaints (or 66%) were from the "outside" bureaus:

- 100 complaints were filed by African-American employees in the National Oceanic and Atmospheric Administration (NOAA);

- 108 complaints were filed by African-American employees in the Patent and Trademark Office (PTO);

- 15 complaints were filed by African-American employees in the National Institute of Standards and Technology (NIST);

- 103 complaints were filed by African-American employees in the

Bureau of the Census (Census); and

- 1 complaint was filed by an African-American employee in the National Technical Information Service (NTIS).

119.    Throughout the Department of Commerce, African-Americans are selected for positions at the GS-13 levels, or higher, at rates lower than their overall representation at DOC. From October 1, 1998 to February 28, 1999, DOC filled 283 positions at the GS-13 level and higher? Of these, 219, or 77%, were white; 26, or 9%, were African-American.  The numbers are comparable throughout the DOC's Outside Bureaus:

- Census filled 48 positions at the GS-13 level or higher.  Of these, 36, or 75%, were white; six, or 13%, were African-American;

- NOAA filled 102 positions at the GS-13 level or higher.  Of these, 88, or 86%, were white; four, or 4%, were African-American;

- PTO filled 41 positions at the GS-13 level or higher.  Of these, 27, or 66%, were white; three, or 7%, were African-American;

- NIST filled 16 positions at the GS-13 level or higher.  Of these, 11, or 69%, were white; one, or 6%, was African-American; and

- NTIS filled 7 positions at the GS-13 level or higher.  Of these, 6, or 86%, were white; one, or 14%, was African-American.

120.    Throughout the DOC, African-Americans are selected for positions of GS-15 at rates lower than their overall representation at DOC.  Of 591 DOC hires at the GS-15 level, 453, or 76.6%, were white;  59, or 10%, were African-American.   The numbers are comparable throughout the DOC's Outside Bureaus:

- At Census, 76.4% of GS-15 hires were white; 10.4% were African-American;

- At NOAA, 92.6% of GS-15 hires were white; 3.4% were African-American;

- At PTO, 65.9% of GS-15 hires were white; 8.9% were African-American;

- At NIST, 75% of GS-15 hires were white; 7.1% were African-American; and

- At NTIS, 100% of GS-15 hires were white; none were African-American.

121.    Statistics show that in 1998, the percentage of African-Americans in the higher GS levels declined at DOC as the GS level increased, while the percentage of white employees increased as the GS levels increased.    The percentage of African-Americans at GS-11 was 13.51%, at GS-12 the percentage was 14.25%, and at GS-13 the percentage dropped significantly to 9.6%.  The percentage of white employees at GS-11 was 76.61%, at GS-12, it was 76.93%, and at GS-13 it jumps up to 80.48%.

122.    The data illustrate the increasing disparity between African-Americans and white employees at DOC as GS level increases, when viewed by groupings, i.e., GS 5-8, GS 9-12, and GS 13-15:

| GS Level | African American | White |
|----------|------------------|-------|
| GS-5 - GS-8 | 35.9% | 57.3% |
| GS-9 - GS-12 | 20.2% | 69.5% |
| GS-13 - GS-15 | 7.1% | 83.3% |

## XII.    COMMERCE HAS BEEN ON NOTICE OF SYSTEMIC DISCRIMINATION FOR YEARS

123.    The Department has had ample notice of its rampant, systemic discrimination and has continually failed to redress its discriminatory policies, practices, and procedures. According to the DOC Affirmative Employment Program for Minorities and Women, FY 1994 Accomplishment Report and FY 1995 Plan Update:

124.    "As of September 1994, over one-half of all white, black, Hispanic, and American Indian/Alaska Native women continue to be concentrated in the entry grades (GS-01 through GS-08), while over three-quarters of the black men and Asian American/Pacific Islander

26

women were dispersed throughout grades GS-1 through GS-12."

125.    "As of September 1995 . . . [b]lack men comprised 5.0 percent of all GS and SES positions.  They exceeded this rate at the following grade ranges – GS-05 through GS-08, and GS-09 through GS-12, and fell below it at GS-01 through GS-04, GS-13 through GS-15, and in the SES . . . . 38.5 percent of black men were employed at GS-08 and below . . . .  The mode GS grade range for this group was GS-09 through GS-12."

126.    According to the DOC Affirmative Employment Program for Minorities and Women, FY 1995 Accomplishment Report and FY 1996 Plan Update:

127.    "Black women made up 13.3 percent of GS and SES jobs.  They exceeded this rate at the GS-05 through GS-08 range only – an indication of concentration.  They comprised less than 13.3 percent in . . . GS-09 through GS-12 and GS-13 through GS-15 grade ranges as well as the SES.  Nearly 2/3 of all black women, or 64.9 percent, are employed in grades at GS-08 and below.  Employment rates decline considerably at GS-13 and above.  Only one black woman was in the SES."

128.    "As of September 1996 . . . [b]lack men comprised 5.1 percent of all GS and SES positions.  They exceeded this rate in grade ranges GS-05 through GS-08 and GS-9 through GS-12.  They fell below it at . . . GS-13 through GS-15 and in the SES.  Over one-third (37.6 percent) of [black men] worked at GS-08 and below . . . ."

129.    According to the DOC Affirmative Employment Program for Minorities and Women, FY 1996 Accomplishment Report and FY 1997 Plan Update:

130.    "Black women made up 13.2 percent of GS and SES jobs.  They exceeded this rate at the GS-05 through GS-08 range . . . an indication of concentration . . . .  Nearly two-thirds of all black women, of 62.3 percent, were employed in grades at GS-08 and below."

131.    "As of September 1997 . . . [b]lack men comprised 4.9 percent of all employees in GS and SES positions.  They exceeded this rate in grade ranges GS-05 through GS-08 and GS-9 through GS-12.  They fell below it at . . . GS-13 through GS-15 and in the SES.  Over one-third (35.6 percent) of these employees worked at GS-08 and below . . . ."

132.    "Black women made up 13.1 percent of employees in the GS and SES.  They exceeded this rate at the GS-05 through GS-08 ranged – an indication of concentration.  Nearly two-thirds of all Black women, or 61.1 percent, were employed in grades at GS-08 and below."

133.    According to the DOC Affirmative Employment Program for Minorities and Women, Annual Affirmative Employment Program Accomplishment Report FY 1997:

134.    "Action Item" for GS 13-15: "Improve the representation of women of all races . . . and [b]lack men in this grade range above 9/97 levels."

135.    "As of September 1998 . . . [b]lack men comprised 5.3 percent of all employees in GS and SES positions.  They reached or surpassed this rate in grade ranges GS-05 through GS-08 [and] GS-9 through GS-12.  They fell below it at . . . GS-13 through GS-15.  Almost one-third were employed at GS-08 and below . . . ."

136.    According to the DOC Affirmative Employment Program for Minorities and Women, Annual Affirmative Employment Program Accomplishment Report FY 1998:

137.    "Black women made up 13.3 percent of employees in the GS and SES.  Almost two-thirds were concentrated in grades GS-08 and below, while almost one-third were found in grades GS-09 through 12.  Less than 10 percent of Black women were employed in the GS-13 through GS-15 grade range."

138.    "Black men comprised 5.3 percent of all employees in GS and SES positions.  They surpassed this rate in grade ranges GS-05 through GS-08 and GS-9 through GS-12, where

over two-thirds were concentrated.  Black men were below 5.3 percent in . . . GS-13 through GS-15 and the SES.. . ."

139.    According to the DOC Affirmative Employment Program for Minorities and Women, FY 1999 Accomplishment Report and FY 2000 Plan Update:

140.    "Black women made up 13.2 percent of employees in the GS and SES.  Almost half were concentrated in grades GS-05 through GS-08.  Almost a third were employed in grades GS-09 through GS-12, and less than one-eighth were in grades GS-13 through GS-15.  Fewer [sic] than one percent of Black women were employed in the SES."

141.    "African-American men comprised 3.9 percent of all employees in GS and SES positions.  They surpassed this rate in the GS-9 through GS-12 grade range, where almost one-third were employed."

142.    According to the DOC Affirmative Employment Program for Minorities and Women, FY 2000 Accomplishment Report and FY 2001 Plan Update:

143.    "African-American women made up 9.4 percent of employees in the GS and SES.  Almost two-thirds were concentrated in grades GS-05 through GS-08 and GS-09 through GS-12 . . . . Just under three one thousandth were employed in the SES."

## XIII.  PLAINTIFFS HAVE ANECDOTAL EVIDENCE OF THE IMPACT OF COMMERCE'S RACE DISCRIMINATION

144.    Plaintiffs also have substantial anecdotal evidence showing that a racially hostile work environment existed at Commerce, demonstrating that the disadvantage African-American employees suffer is based upon discriminatory animus.

145.    For example, Dennis Gosier is currently employed as a Social Science Analyst by the DOC.  He joined the DOC, Census Bureau, in 1970.  In his role as Chief Steward and EEO representative since 1993, he has personally attempted to assist more than 100 African-

29

Americans redress discrimination suffered at the DOC.

146.    According to Gosier, white managers also frequently deny African-Americans advancement with subjective, negative assessments.  Managers will label employees as "not having shown leadership."  In addition, managers will single out an employee's supposedly negative performance despite having the same performance exhibited by white employees.

147.    Mr. Gosier has witnessed a pattern and practice of discrimination in promotions against African-Americans that has resulted in the following:

- Denying African-American employees' promotions to higher GS levels at the Census Bureau;

- Showing preferential treatment to whites in promotional opportunities;

- Denying African-Americans adequate or appropriate training necessary to advance to the next level;

- Moving African-American to different positions at the same level which hinders progression to the next GS level; and

- Arbitrary and subjective negative personnel reviews of African-Americans that have resulted in thwarting of employment advancement.

148.    In 1999, African-American Commerce employee Charmae Taliaferro was denied a promotion to Program Specialist, a GS-9 level position, in favor of an equally or less qualified white employee.

149.    In 1999, Ms. Taliaferro was denied a promotion to Decennial Specialist, a GS-7 position.  After being interviewed for the position, a white manager, Thomas McNeal, told Ms. Taliaferro that she was well-qualified for the promotion and would likely be selected.  However, a less qualified white female was selected for the position.

150.    In approximately 2001, African-American Commerce employee Luis Gyles's supervisor, Peter Lydon, a white male, told Mr. Gyles that he would receive a GS-11 position.

Shortly after making this declaration, however, Mr. Gyles was inexplicably transferred from his current department, Office of Scientific Operation ("OSO") to the Office of Scientific Technology ("OST"), where he was told that no GS-11 position was available.

151.    A white employee, Mike Clark, was subsequently transferred into Mr. Gyles' former position at OSO.  Clark, who possessed only a GED, had previously been working as a GS-7 employee.  In addition, Clark had significantly less experience than Mr. Gyles did.

152.    In 1997, African-American Commerce employee Claude Travis  applied for a promotion to an XS-14 Lithographic Supervisor position, a position equivalent to the GS-12 level of employment. The position was awarded to Bob Hall, a less qualified, less experienced white employee who did not possess a degree.  Bob Hall was subsequently promoted to a GS-14 level position.

153.    Ernestine Gladden, another African-American Commerce employee, experienced overt racial hostility at Commerce.  On approximately February 6, 2004, Dar Davis, a white female, Commerce manager and Ms. Gladden's direct supervisor, subjected Ms. Gladden to racial harassment, humiliation, and mental anguish.  Davis made racial comments regarding Buckwheat, an African American character on the television show "Little Rascals."

154.    In addition, Davis addressed Ms. Gladden as "Buckwheat," including saying "Okay, Buckwheat" in response to Ms. Gladden's actions and/or statements.  In September 1998, Brian Grove, a white manager, made references to slavery by referring to Sonia Jones, an African American Program Assistant, as "cheap labor" in a way that had distinctly racial overtones.

155.    Mr. Grove often referred to African-American employees as constituting his "people."  When Mr. Grove had previously made racial comments, Ms. Gladden notified him

that referring to African American as "his" constituted a reference to slavery as it involved the idea of ownership.

156.    African-American DOC employee Denise Miller has been unable to advance beyond a GS-7 position at the PTO, having received "unfair and inaccurate performance appraisals designed to halt and/or have halted [her] progress because of [her] race."

157.    Ms. Miller observed that a vacant Program Analyst position in her office was filled by Leslie Fansler, a white female from CAFC. After she was hired, Mr. Miller heard that either the solicitor or deputy solicitor made the comment that the new Analyst looked better than "the others", and all the "other" women in Ms. Miller's office were African-American.

158.    In approximately 2001, Nancy Slutter, a white female, was acting deputy solicitor. She was rude to the African-Americans in Mr. Miller's office, treating Mr. Miller and other African-American employees harshly and being verbally abusive. She would, for example, throw things across their desks instead of handing them. She treated the white paralegals much more cordially.

159.    African-American DOC employee William C. Burns has received discriminatory performance evaluations since 1979.

## XIV.    PLAINTIFFS HAVE SURVEY EVIDENCE OF COMMERCE'S RACIAL DISCRIMINATION

160.    One hundred twenty-five survey forms submitted by current and former African-American employees evidence race discrimination at the DOC. Surveys were distributed to African-American Commerce employees in February 2004. To date, approximately 125 surveys have been returned. These surveys provide data concerning the types of discrimination (in promotions, training, performance evaluation, awards, work assignment, hostile environment, and racial harassment) that African-American employees at various Commerce bureaus report

that they have experienced.  The responses of the approximately 125 surveys received to date overwhelmingly demonstrate that African-American employees experience racial discrimination throughout Commerce's bureaus in metropolitan Washington, D.C., including the District of Columbia, Maryland, and Virginia, and that Commerce subjects African-Americans throughout its bureaus to similar kinds of racial discrimination in employment.

161.    Twenty four African-American employees from the Bureau of the Census have submitted surveys.  Seventeen of these twenty-four African-American respondents, or 71%, have been denied a promotion.  Sixteen, or 67%, have failed to receive training.  Thirteen report a hostile work environment, and twelve have been harassed by white Census supervisors. Fourteen African-American respondents indicate that Census has failed to provide them with employment-enhancing work assignments.  Fourteen respondents report that they have received unfair performance evaluations, and thirteen have been denied cash awards.

162.    Thirty-seven African-American employees from the National Oceanic and Atmospheric Administration have submitted surveys.  Of the thirty-seven respondents, twenty-six, or 70%, have been denied a promotion.  Nineteen African-American NOAA respondents have been denied training.  Twenty-one report a hostile environment, and twelve have been harassed by white supervisors.  Twenty-two, or 59%, of NOAA respondents have been denied an employment-enhancing work experience.  Eighteen African-American respondents have been unfairly evaluated.  NOAA has denied nineteen of the thirty-seven respondents cash awards.

163.    Thirty-one African-American employees of the Commerce's United States Patent and Trademark Office have returned surveys.  Twenty-one, or 68%, have been denied a promotion.  Fourteen report that they have been denied training.  Nineteen African-American respondents have received an unfair performance evaluation, and twelve have been denied a cash

award.  Of the thirty-one respondents, fifteen have been denied the opportunity to complete an employment-enhancing work assignment.  Fourteen indicate that USPTO creates a hostile work environment, and eleven African-American respondents have been subjected to racial harassment.

164.    Considering the sum of all surveys received (including those for which the respondent's Bureau assignment was inadvertently omitted or illegible), 75% of African-American Commerce respondents report that they have been denied promotions.  Commerce has denied 58% of African-American respondents training opportunities.  53% have received an unfair performance evaluation; 56% have been denied a cash award.  Commerce has denied 58% of African-American respondents employment-enhancing work opportunities.  54% report a hostile work environment, and 43% have been subjected to racial harassment by white Commerce supervisors.

## XV.    CLASS ACTION ALLEGATIONS

### A.    Class Definition

165.    The Class Representatives seek to maintain claims on their own behalf and on behalf of a class of African-American current and former non-supervisory Commerce employees under Rule 23 of the Federal Rules of Civil Procedure.  Each of the Class Representatives is a member of the proposed class.

166.    The class consists of all African-American, non-supervisory employees and former employees of Commerce's bureaus in the metropolitan area of Washington, D.C., who have been denied career advancement to one or more white collar positions in the agency's offices at grade levels GS-9 through GS-15 levels, or equivalent level white collar non-GS positions, and who have been denied related promotional opportunities in those same offices,

based on their race during the period of time beginning two years prior to the filing of the administrative class complaint on February 22, 1995, and continuing to the present.

167.    Upon information and belief, there are hundreds, if not thousands, of members of the proposed class.

**B.    Numerosity and Impracticability of Joinder**

168.    The persons whom the Class Representatives seek to represent are too numerous to make joinder practicable.  The proposed class consists of hundreds of former, current, and future African-American employees who have been, are, or will be employed by Commerce.

**C.    Common Questions of Law and Fact**

169.    The discriminatory aspect of the selection procedure for promotions alleged by Plaintiffs involves the common component of the use of excessively subjective performance appraisals, which adversely affect the overall selection of African-Americans for vacant GS-9 through GS-15 or equivalent level white collar non-GS positions, as well as the selection of African-Americans to be trained for and receive employment-enhancing work experience, training and awards.

170.    Commerce's selection practices and procedures for promotions have had a disparate impact on the plaintiffs and the class they seek to represent.

171.    As a result of the illegal policy and/or patterns or practices described herein, there are in fact two separate workforces at Commerce. One workforce, which is primarily white, enjoys preferential treatment, better job opportunities, and a swift path to advancement into management positions. The other workforce, which is primarily African-American, holds a disproportionate share of the lowest level positions, is denied equal terms and conditions of employment and, with few exceptions, has not been allowed to advance to better positions.

172.    This action in part seeks to enjoin Commerce from continuing to utilize excessively subjective performance evaluation procedures that have injured and continue to injure Plaintiffs and other African-American employees of Commerce.

**D.    Typicality of Relief Sought**

173.    The relief necessary to remedy the claims of the Class Representatives is the same as that necessary for the class. The Class Representatives seek the following relief for their individual claims and those of the class: 1) a declaratory judgment that Commerce has engaged in systemic racial discrimination in limiting the employment opportunities of African-Americans to lower classifications and compensation; 2) a permanent injunction against such continuing discrimination as described in (1) above; 3) restructuring of Commerce's performance evaluation procedures so that African-Americans are able to learn about and fairly compete in the future for better classifications, compensation levels, and terms and conditions of employment traditionally enjoyed by white employees; 4) restructuring of Commerce's workforce so that African-Americans are assigned to the classifications, locations and compensation levels they would have now held in the absence of Commerce's past racial discrimination; and 5) injunctive relief, back-pay, and other equitable remedies necessary to make all Class Representatives and the class they seek to represent whole from Commerce's past discrimination and retaliation.

**E.    Adequacy of Representation**

174.    The Class Representatives' interests are coextensive with those of the class in that each seeks to remedy Commerce's discriminatory employment practices so that disparate conditions of work will be eradicated and African-Americans will no longer be segregated in unequal positions and prevented from promotional opportunities. The Class Representatives are able and willing to represent the class fairly and vigorously, as they pursue their common goals

through this action. Plaintiffs' counsel are also qualified, experienced, and able to conduct the litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.  Plaintiffs' counsel in this matter have significant nationwide experience in litigating employment discrimination class actions.  For example, lead class counsel, David Sanford, has been lead class counsel in over 25 class actions nationwide during the past seven years, and is highly qualified to prosecute the claims of the class.  For years, Plaintiffs' counsel have successfully represented other classes in both the employment discrimination field and in other areas of Federal and state litigation, and have sufficient time and skill to vigorously prosecute the class claims in the case at bar.  The combined interest, experience and resources of Plaintiffs and their counsel to litigate competently the class claims of race-based employment discrimination at issue satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### F.    Efficiency of Class Prosecution of Common Claims

175.    Certification of a class of African-Americans similarly situated to the Class Representatives is the most efficient and economical means of resolving the questions of law and fact common to the individual claims of the Class Representatives and the putative class.

176.    The individual claims of the Class Representatives require resolution of the common question of whether Commerce has engaged in a systemic pattern of racial discrimination against African-Americans as manifested through its subjective performance evaluation process and the disparate impact on promotions and related promotional opportunities.

177.    The Class Representatives seek remedies to undo the adverse effects of such discrimination in their own lives, careers and working conditions and to prevent continued racial

discrimination in the future.

178.    The Class Representatives have standing to seek such relief in part because of the adverse effect that racial discrimination against African-Americans has had on their own interest in working and living in conditions free from the pernicious effects of racial bias.    In order to gain such relief for themselves, as well as for the class members, the Class Representatives must first establish the existence of systemic racial discrimination as the premise of the relief they seek. Without class certification, the same evidence and issues would be subject to repeated relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

179.    Certification of the class of African-Americans affected by the common question of law and fact is the most efficient and judicious means of presenting the evidence and argument necessary to resolve such questions for the Class Representatives, the putative class and the Defendant.

180.    The Class Representatives' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this Class Complaint. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

**G.    Certification is Sought Pursuant to Fed. R. Civ. P. 23(b)**

181.    Commerce has acted on grounds generally applicable to the class by adopting and following systemic practices and procedures regarding the evaluation of employee's performance which have a racially discriminatory effect.

182.    Commerce's racial discrimination is its standard operating procedure rather than a

38

sporadic occurrence. Commerce has refused to act on grounds generally applicable to the class by refusing to adopt or follow performance review procedures which do not have disparate impact on African-Americans.

**COUNT ONE**
**VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. §§ 2000(e),** *et seq.***, AS AMENDED**
**RACE DISCRIMINATION – FAILURE TO PROMOTE AND PROVIDE RELATED**
**PROMOTIONAL OPPORTUNITIES**
**(Class Representatives and Class against Defendant)**

183.    Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

184.    This Count is brought on behalf of Class Representatives and the class.

185.    The Class Representatives and the class they seek to represent have been subjected to systemic racial discrimination in the form of performance evaluation practices that have an unlawful disparate impact on their employment opportunities.

186.    Commerce's promotional procedures incorporate the following racially discriminatory practices: 1) reliance upon subjective performance appraisal criteria which permit and encourage the incorporation of racial stereotypes and bias of Commerce's predominantly white managerial staff; and 2) refusal to establish or follow policies, procedures, or criteria that reduce or eliminate disparate impact or racial stereotypes in Commerce's decision making process.

187.    Commerce's performance evaluation procedures have a disparate impact on the promotions and related promotional opportunities of African-American Plaintiffs and the class they represent. Such procedures are not valid, job related or justified by business necessity. There are objective and structured performance assessment procedures available to Commerce

which have less disparate impact on African-Americans and equal or greater validity and job relatedness, but Commerce has refused to consider or to use such procedures.

188.    Commerce's procedures have adversely affected the Class Representatives by excluding African-Americans from traditionally white positions.

189.    Commerce has continuously engaged in, condoned and ratified discrimination which constitutes a continuing violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.*, as amended.

190.    Class Representatives have no plain, adequate, or complete remedy of law to redress the wrongs alleged herein, and this suit for back pay, front pay, an injunction, other equitable relief, and a declaratory judgment is their only means of securing adequate equitable relief.   The Class Representatives are now suffering and will continue to suffer irreparable injury from Commerce's unlawful policies and practices as set forth herein unless enjoined by this Court.

191.    By reason of Commerce's discriminatory employment practices, the Class Representatives and the members of the proposed class have experienced economic harm, including loss of back and front pay and other employment benefits.

192.    By reason of the discrimination suffered at Commerce, the Class Representatives and the members of the proposed class are entitled to all equitable remedies available under Title VII.

193.    Attorneys' fees should be awarded under 42 U.S.C. §2000e-5(k).

## COUNT TWO
## VIOLATION OF 29 U.S.C. §§ 710 *et seq.*, THE REHABILITATION ACT OF 1973
### (Plaintiff Tanya Ward Jordan against Defendant)

194.    Plaintiff Tanya Ward Jordan re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

195.    Commerce has discriminated against Ms. Ward Jordan by denying her reasonable accommodation for her disabilities, including respiratory problems and occupational stress, in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 710 *et seq.*, as amended.

196.    Commerce has conducted itself intentionally, deliberately, willfully, and in callous disregard of the rights of Ms. Ward Jordan.

197.    By reason of Commerce's discrimination, Ms. Ward Jordan is entitled to all legal and equitable remedies available under the Rehabilitation Act.

198.    Attorney's fees should be awarded under 29 U.S.C. §§ 794(a)(1).

## XVI.    PRAYER FOR RELIEF

Wherefore, Plaintiffs on behalf of themselves and the class members whom they seek to represent request the following relief:

a.    Acceptance of jurisdiction of this cause;

b.    Certification of the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3), on behalf of the proposed plaintiff class, and designation of the Plaintiffs as representatives of the class and their counsel of record as class counsel;

c.    Declare and adjudge that Commerce has violated Plaintiffs' rights under

Title VII;

d.      A temporary injunction against Commerce and its partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with it, from engaging in any further unlawful practices, policies, customs, usages, racial discrimination by Defendant set forth herein;

e.      A permanent injunction against Commerce and its partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with it, from engaging in any further unlawful practices, policies, customs, usages, racial discrimination by Defendant set forth herein;

f.      An Order requiring Defendant to initiate and implement programs that (i) provide equal employment opportunities for African-American employees; (ii) remedy the effect of Commerce's past and present unlawful employment practices; and (iii) eliminate the continuing effects of the discriminatory practices described above;

g.      An Order requiring Defendant to initiate and implement systems of assigning, training, granting awards, and promoting African-American employees in a non-discriminatory manner;

h.      An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (f) and (g), above, which would provide for (i) the monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (f) and (g), above;

i.      An Order restoring Plaintiffs and the class they seek to represent to those jobs they would now be occupying but for Commerce's discriminatory practices;

j.      An Order directing Commerce to adjust the wage rates and benefits for Plaintiffs and the class they seek to represent to the level that they would be enjoying but for Commerce's discriminatory practices;

k.      An award of back pay; front pay; lost job benefits; preferential rights to jobs, and other equitable relief for the Plaintiffs and the class they seek to represent;

l.      An award of litigation costs and expenses, including reasonable attorney's fees, to the Plaintiffs and class members;

m.      Prejudgment and postjudgment interest; and

n.      Such other and further relief as the Court may deem just and proper.

## XVII.  DEMAND FOR JURY

Plaintiffs demand trial by jury of all issues triable of right to a jury.

Respectfully submitted this 12th day of May, 2006.

_____
David W. Sanford, DC Bar No. 457933
Laura C. Fentonmiller, DC Bar No. 450813
Shayna M. Bloom, MD Bar, Admitted Pro Hac Vice
SANFORD, WITTELS & HEISLER, LLP
2121 K Street, NW
Suite 700
Washington, D.C. 20037
Telephone: (202) 942-9124
Facsimile:  (202) 628-8189

Steven L. Wittels, NY Bar No. SLW-8110
Jeremy Heisler, NY Bar No. JH-0145
SANFORD, WITTELS & HEISLER, LLP

545 5th Avenue
Suite 960
New York, NY 10017
Telephone: (646) 723-2947
Facsimile:  (646) 723-2948

Grant E. Morris, DC Bar No. 926253
**LAW OFFICES OF GRANT E. MORRIS**
2121 K Street, NW
Suite 700
Washington, D.C. 20037
Telephone: (202) 661-3510
Facsimile:  (202) 628-8189
*Attorneys for the Plaintiffs*