UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JANET HOWARD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1968 (JDB) |
| | ) | |
| CARLOS M. GUTIERREZ, Secretary, | ) | |
| United States Department of Commerce, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S RENEWED MOTION TO DISMISS ALL INDIVIDUAL CLAIMS, TO DISMISS CLASS CLAIMS, AND TO STRIKE ALL CLASS CLAIMS

Pursuant to Fed. R. Civ. P. 12(b)(3), (b)(6), and 23, and Local Rule 23.1(b), Defendant Carlos M. Gutierrez, Secretary of the U.S. Department of Commerce, hereby moves to dismiss any and all individual claims of the named Plaintiffs; to dismiss the class claims for failure to exhaust administrative remedies; and to strike the class claims for failure to meet the requirements for class certification. In support of this Motion, Defendant respectfully refers the Court to the attached memorandum of points and authorities with supporting exhibits.

Respectfully submitted,

_____/s/_____

KENNETH L. WAINSTEIN, D.C. Bar #451058
United States Attorney

_____/s/_____

RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

_____/s/_____

PETER S. SMITH, D.C. BAR # 465131
Assistant United States Attorney
Civil Division

555 4th Street, N.W.
Washington, D.C.  20530
(202) 307-0372/FAX: (202) 514-8780

_____/s/_____
MEGAN L. ROSE, N.C. BAR # 28639
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W. - Civil Division
Washington, D.C.  20530
(202) 514-7220

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JANET HOWARD, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1968 (JDB) |
| | ) | |
| CARLOS M. GUTIERREZ, Secretary, | ) | |
| United States Department of Commerce, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS ALL INDIVIDUAL CLAIMS, TO DISMISS CLASS CLAIMS, AND TO STRIKE ALL CLASS CLAIMS**

Defendant Carlos M. Gutierrez, Secretary of the U.S. Department of Commerce, respectfully submits this memorandum of points and authorities in support of his consolidated dispositive motions.

## I.  INTRODUCTION

After spending untold resources, including hundreds of thousands of dollars; after filing volumes of pleadings and hundreds of thousands of pages of documents; and after enduring more than a decade in an administrative process where favorable rulings were reversed , reconsidered and reversed again and the most significant adverse ruling was issued *sua sponte* and without any prior briefing, the Department of Commerce respectfully requests this Court to pronounce the obvious:  Plaintiffs' claims have all along been fundamentally and irreparably flawed. Notwithstanding Plaintiffs' recent efforts to cure the infirmities in their Complaint by amending it and by redefining the putative class in this case, Plaintiffs' First Amended Complaint should be dismissed because, <u>inter alia</u>, they failed to exhaust their administrative remedies and their

putative class action fails to comply with Fed. R. Civ. P. 23 and the Court's Local Rules.

Underlying this action is the highly implausible premise that, for over a dozen years and through different administrations, a changing cast of political appointees of both major political parties at the highest levels of the Department colluded with senior-level career officials at all fifteen Commerce Department bureaus to indulge a pervasive, Department-wide policy of race discrimination against African-Americans in a wide variety of grade levels and job classifications in direct contravention of the tapestry of statutory, regulatory, negotiated, and promulgated civil rights edicts. These incredible, and quintessentially "across-the-board," class claims do not on their face, and in light of the Department's decentralized personnel structure never can, satisfy the requirements for class certification.

The defects in Plaintiffs' class claims are only compounded by additional infirmities in any individual claims they are seeking to advance in this case. Moreover, the class claims set forth in the First Amended Complaint were not exhausted administratively. This Motion presents numerous grounds for the dismissal of this lawsuit.

## II.  BACKGROUND[1]

### A.    Procedural History, 1995 To 2006

#### 1.    1995-1997:  The Administrative Complaint, the First Dismissal, and the First OFO Decision.

Janet Howard, an Export Compliance Specialist at the Department's Bureau of Industry and Security, filed the underlying administrative complaint in this action on February 22, 1995. See EEOC Compl., attached hereto as Exhibit ("Exh.") A. That complaint alleged that the

---

[1] Although proceedings in this Court are de novo, Defendant includes this background information because it is relevant to Defendant's exhaustion arguments.

Department discriminated against African-Americans "in the area of promotions, awards, performance ratings, career enhancement work assignments, timely training for advancement, and all other resource support readily available to the majority," and also engaged in class retaliation. See id. at 1-4. The complaint did not delineate the class "by name and specific location of employees," but did state that a more precise definition of the class would be produced if required. See id. at 2.

The complaint was transferred to the Equal Employment Opportunity Commission ("EEOC"), following which the Department moved to dismiss it on the grounds that it failed to establish any of the applicable class certification requirements of 29 C.F. R. § 1614.204(a), viz., numerosity, commonality, typicality and adequacy of representation. Then-presiding EEOC Administrative Judge ("AJ") Brady agreed, and the Department issued a decision dismissing the complaint. See Howard v. Dep't of Commerce, EEOC Case No. 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X (June 30, 1995), Exh. B. Ms. Howard obtained counsel and appealed to the EEOC's Office of Federal Operations ("OFO"), which vacated the dismissal and remanded for a determination of whether the complaint met the standards for commonality and typicality set forth in General Telephone Company of the Southwest v. Falcon, 457 U.S. 147 (1982). See Howard v. Dep't of Commerce, EEOC App. No. 01956455, 1997 WL 314807 (June 4, 1997) ("Howard I"), Exh. C at 5.

### 2.    1997-2001: Ms. Howard's Response to AJ's Request for Information, the Disqualification of Ms. Howard as Class Agent, and the Second OFO Decision.

On remand, then-presiding AJ Brown issued a formal request asking that Ms. Howard "define the scope of the class more specifically." In response, Ms. Howard stated that "[t]he class comprises 'all *non-supervisory* Department of Commerce, *Washington, D.C. Headquarters*

*employees* that [sic] are of African-American decent. [sic]"  See Howard Response, Exh. D at 7 (emphases added).

Ms. Howard also produced an organizational chart of the Department on which an "X" had been drawn through the boxes for the Bureau of the Census ("Census"), the U.S. Patent and Trademark Office ("PTO"), the National Institute of Standards and Technology ("NIST").[2]  See Exh. D ("Howard Response") at 12.  These entities are located outside of Washington, D.C. in Maryland or Virginia.[3]  See Declaration of John J. Phelan III ("Phelan Decl."), Exh. E at ¶ 5. Ms. Howard explained, "[a]n X over the unit shows that these bureaus are *not* part of the class." See Exh. D (Howard Response) at 7 (emphasis added).  At the bottom of the organization chart the Class Agent added the following:  "NOTE: Included in Class are all *Non-Supervisory* African American NOAA employees employed at *Washington, D.C. Headquarters ONLY*."  See id. (emphasis added; capitalization in original).[4]

Thereafter, AJ Brown concluded that Ms. Howard could not adequately represent the class, and remanded the case to the Department to allow for the selection of a new Class Agent. See Howard v. Dep't of Commerce, EEOC Case Nos. 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X, 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X (Mar. 24, 1999), Exh. F at 4.  The Department issued a final agency decision adopting the AJ's recommendation, Ms. Howard obtained new counsel, and appeals were taken.

---

[2] There were also Xs through the Office of the Chief Economist of the Economic and Statistics Administration and through the entire Under-Secretariat of Technology.  See Exh. D (Howard Response) at 12.

[3] NIST is also located in Boulder, Colorado.  See Exh. E (Phelan Decl.) at ¶ 5.

[4] The National Oceanic and Atmospheric Administration (NOAA) has headquarters offices in both Silver Spring, Maryland and Washington, D.C.  See Exh. E (Phelan Decl.) at ¶ 5.

4

OFO again reversed, holding that Ms. Howard could adequately represent the class.  See

Howard v. Dep't of Commerce, EEOC App. No. 01994518, 2000 WL 33542684 (July 20, 2000)

("Howard II"), Exh. G, at 15.  However, Howard II decided more than simply the issue raised on

appeal.  OFO also decided class certification issues that had neither been addressed by the

decision below, nor presented by the parties on appeal, nor briefed by any party either before the

AJ or on appeal; and OFO *sua sponte* certified the class complaint "on a provisional basis."[5]  See

id. at 9-15.  The class was defined as:

> African-American, non-supervisory employees and former employees of the agency's
> Headquarters' offices *in the metropolitan area of Washington, D.C.*, who allegedly
> have been denied career advancement to one or more white collar positions in the
> agency's Headquarters' offices at grade levels GS-9 through GS-15 levels*, or
> equivalent level white collar non-GS positions*, and who may have been denied
> *related promotional opportunities* in those same offices based on their race during
> the period of time beginning two years prior to the filing of the class complaint on
> February 22, 1995, and continuing to the date a final determination is rendered on the
> class complaint claim.   Related promotional opportunities include training,
> assignments, details, awards, etc., that would have enhanced a class member's
> qualifications for promotion to such a position, whether the promotion would have
> been a career ladder promotion, a competitive promotion, or an accretion of duties
> promotion.

See id. at 15 (emphases added).

The source of the class definition is not clear.  By defining the geographical scope of the

class as including "the metropolitan area of Washington, D.C.," Howard II *sua sponte* expanded

the provisional class to encompass Census, NIST, NTIS, PTO, as well as NOAA offices in Silver

Spring, MD.  The effect of including "equivalent level white collar non-GS positions" was to

---

[5]  OFO repeatedly emphasized the provisional nature of both its certification decision and its
commonality determination, and also specified that either party "may move to narrow the
coverage of the class complaint" upon the completion of discovery.  See Exh. G (Howard II) at
16.

encompass non-GS employees who serve under either the Demonstration Project ("Demo Project") or under the Alternative Personnel Management System ("APMS") at NIST.[6]  As explained <u>infra</u>, Plaintiffs' Amended Complaint imports the EEOC's unwarranted expansion of the putative class, which expanded the scope of the class well beyond Ms. Howard's administrative complaint.

<u>Howard II</u> also denied certification of the class claim of retaliation on the ground that the record did not support a determination that the numerosity requirement had been satisfied, <u>id.</u> at 10, and made clear that OFO's provisional certification was limited to class promotion claims and that its use of the term "related promotional opportunities" was not meant to certify independent class claims on those allegations.[7]

OFO later refused the Department's request for reconsideration of <u>Howard II</u>, but stated that, "[a]t the close of discovery, the agency may renew its contentions that the class should be decertified . . . [or] limited to employees who work in the Herbert C. Hoover building in downtown Washington, D.C."  <u>See</u> <u>Howard v. Dep't of Commerce</u>, EEOC App. No. 01994518 (Feb. 26, 2001) ("Reconsideration Decision"), Exh. H at 2.

---

[6]  The specifics of the Demo Project and APMS, are detailed below.

[7]       "[T]he means by which the agency allegedly accomplishes the alleged career advancement discrimination should not be treated as independent claims of discrimination . . . Instead, proven instances, if any, in which white employees have been given preferential treatment over African-American employees in ways that facilitated their career advancement, e.g., in the provision of developmental training career-enhancing assignments, outstanding performance appraisal ratings, and awards, should be treated as relevant evidence supporting the class claim of career advancement discrimination."

<u>See</u> Exh. G (<u>Howard II</u>) at 11.

3.    **2002-2005:  Redefinition of the Provisional Class And Dismissal Of the Administrative Action**.

On December 17, 2002, the Department moved to redefine the class to restore it to its original scope of including only employees in Washington, D.C. rather than in the metropolitan area of Washington, D.C.  Ms. Howard was afforded  more than ninety days to respond, and she timely responded both pro se and through counsel.  Those responses included no claim or suggestion that the class should extend beyond the Washington, D.C., metropolitan area or include supervisory, wage grade, foreign service or uniformed employees; nor did she argue that compensation, harassment or selection claims should be included as class claims. See Letter from Howard to AJ Kravetz (Jan. 2, 2003), Exh. I at 1, 2; see also Class Agent's Opposition to the Agency's Motion to Redefine (March 21, 2003), Exh. J.  Then-presiding AJ Henry granted the Department's motion and ordered the provisional class redefined to encompass only the Department's headquarters' offices in Washington, D.C.  See Order of August 20, 2003, Exh. K.

Thereafter, the Class Agent obtained substitute class counsel and was given permission by then-presiding AJ Kravetz to seek reconsideration of AJ Henry's Order redefining the class.  Briefing on the reconsideration motion was completed on May 13, 2004.  The motion to reconsider was still pending 18 months later when, on September 27, 2005, class counsel informed the EEOC of his intent to file a civil action "on this matter."  On September 30, 2005, AJ Kravetz issued a Notice of Withdrawal dismissing the complaint from the administrative process.  See Notice of Withdrawal dated September 30, 2005, Exh. L.

4.    **Proceedings in This Court.**

Plaintiffs filed the instant action on October 5, 2005.  Compl., Document No. 1.  On

7

March 17, 2006, Defendant filed a Motion to Dismiss All Individual Claims, to Dismiss Certain

Class Claims, and to Strike All Class Claims.  Def. Motion To Dismiss, Document No. 19.  In an

attempt to cure the deficiencies of their Complaint, Plaintiffs moved for leave to file an Amended

Complaint on June 8, 2006, the same day that they filed their opposition to the Defendant's

Motion.  Documents No. 25, 27.  Plaintiffs' Amended Complaint responds to Defendant's

Motion to Dismiss, inter alia, by omitting ten of the thirteen plaintiffs named in the Complaint.[8]

Plaintiffs also abandon the retaliation and hostile work environment claims they sought to

advance in their initial Complaint.  Plaintiffs' Complaint defined a putative class that seemed to

include all, or nearly all, Department employees.  Plaintiffs' First Amended Complaint defines

the putative class as nearly the same one identified by the EEOC in Howard II: "all African-

American, non-supervisory employees and former employees of Commerce's bureaus in the

metropolitan area of Washington, D.C., who have been denied career advancement to one or

more white collar positions in the agency's offices at grade levels GS-9 through GS-15 levels. . .

."  Am. Compl. at ¶ 166.

By Order dated June 13, 2006, the Court granted Plaintiffs' Motion and subsequently

allowed the filing of Plaintiffs' First Amended Complaint.  See Document No. 28.[9]  On June 22,

2006, the Court entered an order establishing a briefing schedule for Defendant's motion to

dismiss and to strike the class claims in the First Amended Complaint.  On June 23, 2006,

Plaintiffs filed a Motion for Enlargement of Time to Move for Class Certification, and on July 7,

---

[8] Defendant's initial Motion to dismiss had argued, inter alia, that venue did not lie for the claims
of those named plaintiffs.  Def's Memo. at 43 et seq.

[9]  The case caption in Plaintiffs' First Amended Complaint incorrectly cites this action as "Case
No. 1:04-cv-00756," instead of Case No. 1:05-cv-01968.  Am. Compl.

2006, Defendant opposed Plaintiffs' motion. Documents No. 30, 31. For the reasons set forth

below, Plaintiffs' First Amended Complaint should be dismissed with prejudice.

**B.    <u>The Department of Commerce</u>**

Even if considered solely within the Washington, D.C., metropolitan area, the

Department of Commerce is large and organizationally complex. The Department is comprised

of fifteen unique bureaus, which perform its diverse functions. <u>See</u> Declaration of Deborah A.

Jefferson (Jefferson Decl.), Exh. M at ¶¶ 5, 6. To manage its diverse and highly trained

workforce, the Department has established decentralized and independent personnel offices, and

provided each bureau with the authority to develop and implement its own personnel policies and

practices. <u>See</u> <u>id.</u> at ¶¶ 10-14, 23-25. Each bureau has in fact utilized this delegated authority to

do so. <u>See</u> <u>id.</u> at ¶¶ 25, 26. Moreover, each bureau makes promotion and other personnel

decisions <u>independently</u> from the other bureaus. <u>See</u> <u>id.</u> Finally, promotions and other personnel

decision-making processes at the bureaus invariably involve <u>objective</u> and quantifiable

considerations. <u>See</u> <u>e.g.,</u> Declaration of Margaret Focarino ("Focarino Decl."), Exh. N at ¶¶ 3-4,

6; Declaration of Robert Kirkner ("Kirkner Decl."), Exh. P at ¶¶ 13, 17-18; Declaration of

Deborah Martin ("Martin Decl."), Exh. Q at ¶ 11; Declaration of Vickers B. Meadows

("Meadows Decl."), Exh. R at ¶¶ 14, 17, 24; Declaration of Michael Osver ("Osver Decl."), Exh.

S at ¶ 3; Declaration of Eduardo Ribas ("Ribas Decl."), Exh. T at ¶¶ 18-20; Declaration of Bobby

Russell ("Russell Decl."), Exh. U at ¶¶ 4, 7; Declaration of Tyra Dent Smith ("Smith Decl."),

Exh. V at ¶¶ 24, 29; Declaration of James Valdez ("Valdez Decl."), Exh. W at ¶¶ 5-6;

Declaration of Dr. William R. Ott ("Ott Decl."), Exh. X at ¶¶ 4-7.

### 1.    The Department Is Large and Organizationally Complex.

The Department of Commerce is a large, multi-dimensional, internally diverse, and organizationally complex federal agency.  See Exh. M (Jefferson Decl.) at ¶ 4.  It carries out a broad range of diverse responsibilities through bureaus, offices, services, and organizations located in every state, the District of Columbia, and overseas.  The Department's overarching responsibilities include job creation, economic growth, sustainable development, and improved living standards for all Americans.  See id.  Its more specific responsibilities include, among many others, such wide-ranging functions as: conducting the national Census; operating the National Weather Service; administering patent and trademark laws; enforcing trade agreements; promoting minority-owned businesses; developing, maintaining, and analyzing a system of business cycle indicators; and developing measurement standards and technology.  See id.

In pursuit of its goals, the Department employs more than 40,000 employees in 15 discrete bureaus,[10] each with its own very distinctive responsibilities.  See id. at ¶ 5.  The Department has a fundamentally decentralized structure with authority—and personnel authority in particular—concentrated at the bureau level.  See Exh. E (Phelan Decl.) at ¶ 3.[11]  The fifteen

---

[10]  The official term for 14 of these 15 organizational entities—all but the Office of the Secretary ("OS")—is "operating unit."  See Exh. E (Phelan Decl.) at Attachment ("Attach.") 1 (Departmental Organizational Order (DOO) 1-1), § 3.c.  OS is not an operating unit.  Rather, it is the general management arm of the Department and provides the principal support to the Secretary in formulating policy and in providing advice to the President. It provides program leadership for the Department's functions and exercises general supervision over the operating units. It also directly carries out program functions as may be assigned by the Secretary, and provides, as determined to be more economic or efficient, administrative and other support services for designated operating units.  See id. at Attach 1(DOO 1-1), § 3.a.; see also Exh. M (Jefferson Decl.) at ¶ 8. All 15 entities will hereinafter be referred to as "bureaus."

[11] Organizationally, six Under Secretaries, two Assistant Secretaries, and a Director report to the Secretary of Commerce.  See Exh. E (Phelan Decl.) at ¶ 4, Attach 1 (DOO Organizational Chart);

bureaus that comprise the Department of Commerce are:

- the Bureau of Economic Analysis ("BEA");

- the Bureau of Industry and Security ("BIS");

- the Bureau of the Census ("Census");

- the Economic Development Administration ("EDA");

- the Economics and Statistics Administration ("ESA");

- the International Trade Administration ("ITA");

- the Minority Business Development Agency ("MBDA");

- the National Institute of Standards and Technology ("NIST");

- the National Oceanic and Atmospheric Administration ("NOAA");

- the National Telecommunications and Information Administration ("NTIA");

- the National Technical Information Service  ("NTIS");

- the Office of the Inspector General ("OIG");

- the Office of the Secretary ("OS");

- the U.S. Patent and Trademark Office ("PTO"); and

---

see also Exh. M (Jefferson Decl.) at ¶ 15.  Four of the Under Secretariats—NOAA, ITA, BIS, and PTO—are comprised of single bureaus, while BEA, Census, and ESA are within the Under Secretariat for Economic Affairs, and NIST, NTIS, and TA are within the Under Secretariat for Technology.  Nevertheless, for all purposes relevant to this case (other than certain matters concerning officials in the Senior Executive Service, (see Exh. M (Jefferson Decl.) at ¶ 15), all are functionally independent bureaus.  On the organizational chart, TA may be the "parent" of NIST and NTIS, and ESA may be the "parent" of Census and BEA, but TA does not control or oversee non-SES personnel policy or practices at NIST or NTIS, and ESA neither controls nor oversees non-SES personnel practices or policy at BEA or Census.  See Exh. M (Jefferson Decl.) at ¶¶ 15-16; Exh. E (Phelan Decl.) at ¶ 4.

- the Technology Administration ("TA").[12]

As discussed more fully below, the fifteen bureaus vary considerably in size and complexity. A few are relatively small entities. For example ESA, MBDA, and TA each has 100 or fewer employees. See Exh. M (Jefferson Decl.) at Attachs. 11, 13, 21. Other bureaus are themselves very large and complex organizations. For example, Census has more than 13,000 employees,[13] NOAA has approximately 12,500 employees, and PTO has approximately 7,500 employees. See id. at Attachs. 15, 20.

### 2. The Department Has A Diverse Workforce

Not surprisingly, given its numerous functions, the Department's workforce is remarkably diverse. This diversity is demonstrated most vividly in the sheer number and range of different jobs at the Department of Commerce.[14]

---

[12] Nine of the Department's bureaus—BIS, EDA, ESA, ITA, MBDA, NTIA, OIG, OS, and TA—are headquartered in the Herbert C. Hoover Building in Washington, D.C. BEA is headquartered elsewhere in Washington, D.C. Four bureaus have headquarters offices outside of Washington, D.C. proper but still in the "metropolitan area": Census in Suitland, MD; NIST, in Gaithersburg, MD; NTIS, in Springfield, VA; and PTO, in Alexandria, VA. NOAA has headquarters offices in both the Hoover Building and in Silver Spring, MD. See Exh. M (Jefferson Decl.) at ¶ 7. The basic functions, management structure and organizational arrangements of the Department of Commerce are prescribed by Department Organizational Orders (DOOs). DOOs are issued for each Secretarial Officer, Departmental Office, and Operating Unit of the Department of Commerce. The DOOs together with organizational charts for each bureau are provided as attachments accompanying Exh. E (Phelan Decl.) at Attachs. 1-26.

[13] This does not include employees hired for Decennial Censuses. See Exh. M (Jefferson Decl.) at Attach. 9.

[14] At some bureaus, specifically, BEA, ESA, NTIS, TA, and PTO, all or almost all employees work in the Washington, DC, metropolitan area. Others, have a considerable number or a considerable percentage of employees stationed elsewhere. Total employee counts and figures showing DC metropolitan area and non-metropolitan area subtotals for each bureau are set forth at Exh. M (Jefferson Decl.) at Attach. 22.

Large Range of Different Jobs. Since 1995, Commerce has employed people in 346 different occupational series,[15] or distinctive types of jobs, ranging from attorneys to budget analysts to geographers and zoologists. See Exh. M (Jefferson Decl.) at ¶ 9. Currently, the Department has employees in 275 occupational series. See id. Moreover, jobs often differ significantly even within an occupational series. Often, this difference is clearly reflected in different job titles. For example, an Export Compliance Specialist, which is a position in the 1101 occupational series in BIS, will have different job duties and require different knowledge, skills, and abilities than an Import Policy Analyst in ITA, a job that is also in the 1101 occupational series. See Exh. Q (Martin Decl.) at ¶ 26. Such differences exist within bureaus as well, and may or may not be reflected in different job titles. For example, the job titles Patent Examiner-Engineering and Patent Examiner-Food Technology—two positions in the same occupational series in PTO—clearly reflect distinctive qualifications. See Exh. R (Meadows Decl.) at ¶ 23. In addition, two employees in ITA, one in Market Access and Compliance whose work focuses on a specific geographic market and the other in Manufacturing and Services who focuses on the aerospace industry, will be in the same occupational series and both will be called International Trade Specialists, but nevertheless will have very different skill sets, and are not fungible. See Exh. Q (Martin Decl.) at ¶ 26.

Numerous Pay Systems. The range of jobs at the Department also is reflected in the variety of pay systems that Commerce operates. Full-time permanent Commerce employees are

---

[15] The U.S. Office of Personnel Management ("OPM") has classified subgroups of positions that involve a particular kind of work into "occupational series," each assigned a specific numerical code. See OPM Handbook of Occupational Groups and Families at 4 (2001), available at http://www.opm.gov/fedclass/gshbkocc.

13

paid under one of seven pay systems: (1) the General Schedule ("GS"), a graded pay system established under the Classification Act of 1949 that covers most white-collar employees;[16] (2) the Federal Wage System ("WG"), a uniform pay-setting system established in 1972 for blue-collar employees who are paid by the hour, see 5 U.S.C. 5342 ; (3) the Senior Executive Service ("SES"), a performance-based pay system that applies to the Department's senior managers, see 5 U.S.C. 5382; (4) the performance-based pay system that applies to white collar NIST employees under the Alternative Personnel Management System ("APMS"), as authorized by the National Technology Transfer and Advancement Act of 1995 (Public Law 104-113, March 7, 1996), and as promulgated in 52 Fed. Reg. 37,082 (Oct. 2, 1987); (5) the separate performance-based system that applies to white collar employees at certain bureaus and units under the Demonstration Project ("Demo Project"), codified at 64 Fed. Reg. 52810 (Sept. 30, 1999); (6) the Foreign Service Act of 1980 as amended, codified at 22 U.S.C. Chapter 52, that applies to ITA's foreign service officers ("FSO"); or (7) the allowance for commissioned officers, which applies to NOAA's Uniformed Corps ("UC"), one of the seven uniformed services of the United States, see 33 U.S.C. Chapter 43 §§ 3301 et seq. See Exh. M (Jefferson Decl.) at ¶¶ 17-18.

---

[16] Additionally, OPM has established special salary rates for patent professionals at PTO that do not apply to any employees elsewhere in the federal government, under which covered employees earn salaries several percentage points above the regular General Schedule. See Exh. R (Meadows Decl.) at ¶ 27.

14

3.    **Each of the Department's Bureaus Has Its Own Mission and Specialized Workforce.**[17]

Each of the Department's bureaus has its own mission and correspondingly unique workforce.  The specialized nature of the bureaus' workforces and their distinctive missions are evidenced by the scant personnel movement among bureaus.   From 1995 through 2005, there were 11,696 competitive promotions Department-wide, less than 1.5% of which involved employees moving from one bureau to another.  See Exh. M (Jefferson Decl.) at Attach. 24.

Bureau of Economic Analysis.  BEA, the Department's central economic research organization on the functioning of the economy, collects economic data, conducts research and analysis, develops and implements estimation methodologies, and produces such closely watched economic statistics as its cornerstone national income and product accounts, which feature estimates of gross domestic product and related measures.  See Exh. E (Phelan Decl.) at Attach. 22 (DOO 35-1A); see also Exh. Q (Martin Decl.) at ¶ 7.D.

BEA has four primary program units:  (1) National Economic Accounts, which has a Government Division and a National Income and Wealth Division; (2) International Economics, which has a Balance of Payment Division and an International Investment Division; (3) Regional Economics, which has a Measurements Division and an Analysis Division; and (4)  Industry Accounts.[18]  See Exh. E (Phelan Decl.) at Attach. 23 (DOO 35-1B).

_____

[17] The following sets forth the functions and structure of the bureaus at present and is generally accurate over the temporal scope of the claims made in Plaintiffs' complaint.  Each bureau has had some modifications to their functions and structure over time, none of which are relevant to the instant motion.

[18]  Like all other bureaus, BEA also has a Director's (or analogous head of bureau) Office and at least one separate administrative and management unit.

15

BEA has approximately 500 employees. Economists are the predominant occupational series at BEA, constituting more than half (56%) of all employees at BEA, and more than half (58%) of all DOC economists work for BEA. See Exh. M (Jefferson Decl.) at Attach. 7.

Bureau of Industry and Security. BIS advances national security, foreign policy, and economic objectives by ensuring an effective export control and treaty compliance system and promoting continued U.S. strategic technology leadership. For example, BIS administers and enforces dual-use export controls to stem the proliferation of weapons of mass destruction and the means of delivering them, to halt the spread of weapons to terrorists or countries of concern, and to further important U.S. foreign policy objectives. See Exh. E (Phelan Decl.) at Attach. 21 (DOO 10-16); see also Exh. Q (Martin Decl.) at ¶ 7.A.

BIS has three program units: (1) Export Administration, which has offices of: National Security and Technology Controls: Non-Proliferation and Treaty Compliance; Strategic Industries and Economic Security; and Exporter Services; (2) International Programs; and (3) Export Enforcement, which is composed of three Offices: Export Enforcement, Export Analysis, and Anti-Boycott Compliance. See Exh. E (Phelan Decl.) at Attach. 20 (DOO 50-1).

BIS has approximately 350 employees. See Exh. M (Jefferson Decl.) at Attach. 8. The predominant job titles at BIS are Trade and Industry Analyst, Export Compliance Specialist, and Export Policy Analyst. See Exh. Q (Martin Decl.) at ¶ 7.A.

Bureau of the Census. Census, "the nation's fact finder," conducts the decennial census of population and housing, demographic and economic censuses, and more than 200 annual surveys. Its mission is to be the preeminent collector and provider of timely, relevant, and quality data about the people and economy of the United States. See Exh. E (Phelan Decl.) at

16

Attach. 14 (DOO 35-2A). Census has four primary program components: (1) Economic Programs, which conducts the Economic Census every five years and develops, collects, analyzes, and publishes numerous economic surveys; (2) Decennial Census, which conducts the constitutionally mandated decennial census of population; (3) Demographic Programs, which develops, collects, analyzes, and publishes numerous surveys regarding social conditions; and (4) Methodology and Standards, which plans, conducts, and evaluates statistical research, methodology, and methodological standards. Each program component contains from 3 to 7 divisions. See id. at Attach. 15 (DOO 35-2B).

Census has more than 13,000 employees. Statisticians are the predominant occupational series at Census, constituting 27 % of the Census workforce in the Washington, DC area. See Exh. M (Jefferson Decl.) at Attach. 9.

Economic Development Administration. EDA works with state and local governments, Indian Tribes, regional economic development districts, and public and private nonprofit organizations to address problems associated with long-term economic distress, as well as sudden and severe economic dislocations. See Exh. E (Phelan Decl.) at Attach. 25 (DOO 45-1). EDA awards grants to improve or develop transportation facilities, water and sewer systems, industrial parks, technology training centers, and telecommunications facilities, and also grants that leverage other public and private capital to establish revolving loan funds for business retention, expansion, or new enterprise development. See id.

EDA has approximately 180 employees. Much of the work of developing, processing, administering, and monitoring EDA's various assistance programs is undertaken in six Regional Offices located throughout the country. See Exh. M (Jefferson Decl.) at Attach. 22.

17

Economics and Statistics Administration.  ESA is responsible for the analysis and development of policies on economic and statistical issues, and on issues affecting broad sectors of the domestic economy in response to the needs and interests of the Secretary or Deputy Secretary.  See Exh. E (Phelan Decl.) at Attach. 16 (DOO 10-9).  The Under Secretary's principal responsibilities include: economic forecasting; consultation with the private sector on economic and broad economic sectoral developments; and policy analysis and development in the areas of economic policy.  See id.

ESA has approximately 50 employees.  Economists constitute the predominant occupational series at ESA.  See Exh. M (Jefferson Decl.) at Attach. 11.

International Trade Administration.  ITA promotes world trade, and strengthens the international trade and investment position of the U.S. by advancing a competitive global market environment and the commercial success of U.S. business clients and by addressing unfair trade practices and removing trade barriers that adversely impact U.S. industry.  See Exh. E (Phelan Decl.) at Attachs. 32-33 (DOOs 10-3 and 40-1); see also Exh. Q (Martin Decl.) at ¶ 4.

ITA has four primary program units:  (1) The US and Foreign Commercial Service, which contains two Assistant Secretariats—Domestic Operations, with more than 100 offices in the United States, and International Operations, with more than 150 offices overseas—and offers export assistance to American businesses seeking to expand in international markets; (2) Manufacturing and Services is the government's link to American industry identifying trade opportunities for specific products or services; (3) Market Access and Compliance works to ensure other nations' compliance with their trade agreements and to identify and eliminate trade impediments; and (4) the Import Administration, which enforces laws and agreements to prevent

18

unfairly traded imports.  See Exh. E (Phelan Decl.) at Attach. 33 (DOO 40-1); see also Exh. Q
(Martin Decl.) at ¶ 5.

ITA has approximately 1,700 employees.  Trade specialists are the predominant
occupational series at ITA, constituting 40% of ITA's workforce.  See Exh. M (Jefferson Decl.)
at Attach. 12.

Minority Business Development Agency.  MBDA promotes the ability of minority-owned
businesses to grow and compete in the global economy through programs that facilitate access to
financing, markets, education, and technology.  See Exh. E (Phelan Decl.) at Attach. 26 (DOO
25-4A).  MBDA funds a network of Minority Business Development Centers, Native American
Business Development Centers, Business Resource Centers, and Minority Business Opportunity
Centers located throughout the country.  These centers offer a range of business services to
minority entrepreneurs.  Much of the work providing assistance to these centers is performed in
the bureau's five Regional Offices, where more than half the bureau's employees are stationed.
See Exh. E (Phelan Decl.) at Attach. 27 (DOO 25-4B); see also Exh. M (Jefferson Decl) at ¶ 22.

The predominant occupational series at MBDA, which has fewer than 100 employees, is
general business and industry.  See Exh. M (Jefferson Decl.) at Attach. 13.

National Institute of Standards and Technology.  NIST's mission is to "develop and
promote measurement, standards, and technology to enhance productivity, facilitate trade, and
improve the quality of life."  See Exh. E (Phelan Decl.) at Attach. 10 (DOO 30-2A).  NIST's
seven Laboratories pursue a broad range of cutting-edge research that advances the nation's
technology infrastructure. The laboratories are the Electronics & Electrical Engineering
Laboratory, the Manufacturing Engineering Laboratory, the Chemical Science & Technology

19

Laboratory, the Physics Laboratory, the Materials Science and Engineering Laboratory, the Building & Fire Research Laboratory, and the Information Technology Laboratory. See id. at Attach. 11 (DOO 30-2B).

NIST has almost 3,000 employees. Physicists, the predominant occupational series at NIST, and chemists combine to constitute 20% of the NIST workforce. See Exh. M (Jefferson Decl.) at Attach. 14; see also Exh. P (Kirkner Decl.) at ¶ 16.

National Oceanic and Atmosphere Administration. NOAA's mission is to "describe and predict changes in the Earth's environment, and conserve and wisely manage the Nation's coastal and marine resources." See Exh. E (Phelan Decl.) at Attach. 8 (DOO 10-15); see also Exh. T (Ribas Decl.) at ¶ 3. It has five distinct operational components: (1) the National Marine Fisheries Service ("NMFS"); (2) the National Ocean Service ("NOS"); (3) Oceanic and Atmospheric Research ("OAR"); (4) the National Weather Services ("NWS"); and (5) the National Environmental Satellite, Data, and Information Service ("NESDIS"). NMFS rebuilds and maintains sustainable fisheries, promotes the recovery of protected species, and maintains the health of coastal marine habitats. See Exh. T (Ribas Decl.) at ¶ 3.A. NOS serves as the nation's principal advocate for marine stewardship by providing the science, information management, and leadership necessary to balance the environmental and economic well-being of the nation's coastal resources. See id. at ¶ 3.B. OAR conducts experiments to better understand natural processes, and develops new analytical and forecast tools to improve weather services. See id. at ¶ 3.C. NWS provides weather, hydrologic, and climate forecasts and warnings and is the nation's sole official voice for issuing warnings during life-threatening weather situations. See id. at ¶ 3.D. NESDIS provides and ensures timely access to global environmental data from

satellites and other sources.  See Exh. E (Phelan Decl.) at Attach. 9 (DOO 25-5); see also Exh. T (Ribas Decl.) at ¶ 3.E.

NOAA has more than 12,400 employees.  Meteorologists are the predominant occupational series at NOAA, constituting 20% of NOAA's workforce.  Cartographers, oceanographers, and fishery biologists, combine to account for 10% of NOAA's workforce, and almost all (98.7%) DOC employees in those five occupational series work for NOAA.  See Exh. M (Jefferson Decl.) at Attach. 15; see also Exh. T (Ribas Decl.) at ¶ 17.

National Telecommunications and Information Administration.  NTIA is the President's principal adviser on telecommunications and information policy issues:  It works with other Executive Branch agencies to develop and present national policy on these issues.  NTIA represents the Executive Branch in telecommunications and information policy activities; manages the radio frequency spectrum; performs telecommunications research; and administers infrastructure and telecommunications facilities grants.  See Exh. E (Phelan Decl.) at Attach. 28 (DOO 25-7).

NTIA has five line offices:  (1) the Office of Spectrum Management, which ensures the efficient, use of the radio frequency spectrum both nationally and internationally; (2) the Office of Policy Analysis and Development; (3) the Office of International Affairs; (4) the Institute for Telecommunication Sciences, which is NTIA's research and engineering laboratory; and (5) the Office of Telecommunications and Information Applications, which provides telecommunications facilities grants.  See id.

NTIA has approximately 250 employees.  Electronics engineers, the predominant occupational series at NTIA, and telecommunications specialists constitute 40.97% of NTIA's

workforce.  See Exh. M (Jefferson Decl.) at Attach. 16; see also Exh. Q (Martin Decl.) at ¶ 23.

National Technical Information Service.  NTIS is the nation's largest central resource for government-funded scientific, technical, engineering, and business-related information.  See Exh. E (Phelan Decl.) at Attach. 12 (DOO 30-7A).  NTIS accomplishes this mission through two major programs: (1) information collection and dissemination to the public; and (2) production and other services for federal agencies.  See id. at Attach. 13 (DOO 30-7B).

NTIS has approximately 150 employees.  The predominant job at NTIS is customer service representative in the 1101 occupational series (General Business and Industry).  See Exh. M (Jefferson Decl.) at Attach. 17; see also Exh. P (Kirkner Decl.) at ¶ 23.J.

Office of Inspector General.  OIG's statutory mission is to promote economy, efficiency, and effectiveness, and detect and prevent waste, fraud, abuse, and mismanagement in the programs and operations of the Department.  OIG fulfills its responsibilities by conducting audits, investigations, and an array of inspections, evaluations, and reviews.   See Exh. E (Phelan Decl.) at Attach. 30 (DOO 23-1).

OIG contains four program units:  (1) the Office of Audits; (2) the Office of Inspections and Program Evaluations; (3) the Office of Investigations; and (4) the Office of Systems Evaluation.  See id.

OIG has approximately 120 employees.  More than 48% of OIG employees are either auditors or criminal investigators.  See Exh. M (Jefferson Decl.) at Attach. 18.

Office of the Secretary.  OS is the Department of Commerce's general management arm, which supports the Secretary in formulating policy and advising the President.  OS provides program leadership for the Department's functions and exercises general oversight of its

operating agencies.  See Exh. E (Phelan Decl.) at Attach. 1 (DOO 1-1).

In addition to the immediate Office of the Secretary, OS includes subordinate offices that have Department-wide responsibilities or perform special program functions directly on behalf of the Secretary.  See id. at Attach. 3 (DOO 10-5).  The two largest subordinate offices of OS are: (1) the Chief Financial Officer and Assistant Secretary for Administration ("CFO/ASA"), which consists of nine Directorates that are responsible for a range of administrative functions; and (2) the Office of General Counsel ("OGC"), which provides legal services to the Department.[19] See id.

OS has approximately 830 employees.  Attorneys constitute almost 20% of OS's workforce and are the predominant occupational series in OS.  See Exh. M (Jefferson Decl.) at Attach. 19.

Patent and Trademark Office.  PTO grants, issues, and disseminates information on patents and trademarks.  See Exh. E (Phelan Decl.) at Attach. 6 (DOO 10-14).  Although subject to numerous organizational restructurings over the period of time encompassed by this civil action, PTO has maintained two principal operating components, Trademarks and Patents, each headed by a Commissioner.  See Exh. E (Phelan Decl.) at Attach. 7 (DOO 30-3).  PTO has approximately 7,500 employees.  More than 60% of PTO's workforce are patent examiners.  See Exh. M (Jefferson Decl.) at Attach. 20; Exh. R (Meadows Decl.) at ¶ 21.

---

[19] Four legal offices—the Offices of General Counsel of  PTO and NOAA and the Offices of Chief Counsel for  EDA and NTIA—receive their funding and personnel allocations from, and are organizationally within, their respective bureaus.  Thus, these four legal offices are not included as subordinate offices of OGC and the approximately 350 attorneys who work in them are counted as employees of their respective bureaus, not as employees of OS.  See http://www.ogc.doc.gov/main_office.html.

<u>Technology Administration</u>.  The smallest of the Department of Commerce's bureaus with less than 20 employees, TA works to maximize technology's contribution to the country's economic growth by advocating for technology in the federal policy-making process, expanding opportunity for high-technology business , and promoting the development and commercialization of innovations and state-of-the-art technologies.  <u>See</u> Exh. E (Phelan Decl.) at Attach. 18 (DOO 10-17); <u>see also</u> http://www.technology.gov/Offices.htm.

**4.    The Department Has Numerous Decentralized Human Resources Offices.**

Human resource management of the various bureaus is decentralized, and the source of human resources management of each of the bureaus is discrete.  <u>See</u> Exh. M (Jefferson Decl.) at Attach. ¶¶ 9-14, 23-26.

The Department has 15 human resources ("HR") offices.  The Office of Human Resources Management ("OHRM"), a Directorate within ASA/CFO, implements Government-wide and Departmental policies, employee programs and activities in all aspects of human resources management and administration.  <u>See id.</u> at ¶ 2.  In addition, Census, ITA, NIST, NOAA, OS, OIG, and PTO each have had their own HR office in the Washington D.C. metropolitan area throughout the pendency of the preceding EEOC administrative process and current civil action.  <u>See</u> Exh. M (Jefferson Decl.) at ¶ 10.[20]

---

[20] Additionally, NOAA also has HR offices in Boulder, CO, Norfolk, VA, Seattle, WA., and Kansas City, MO (<u>see</u> Exh. T (Ribas Decl.) at ¶ 6); Census has an HR office in Jeffersonville, IN. (<u>see</u> Exh. V (Smith Decl.) at ¶ 5);  NOAA'S Uniformed Corps has its own personnel office in Silver Spring, MD (<u>see</u> Exh. T (Ribas Decl.) at ¶ 6); and, ITA has a human services office for its Foreign Service Officers (<u>see</u> Exh. Q (Martin Decl.) at ¶ 3; <u>see also</u> Exh. M (Jefferson Decl.) at ¶ 10).

The Census HR office is its Human Resources Division ("HRD") (<u>see</u> Exh. V (Smith Decl.) at ¶ 2); NOAA's HR office is called the Workforce Management Office (<u>see</u> Exh. T (Ribas Decl.)

The HR offices servicing each of the bureaus are not components or satellite offices of the Department's OHRM or OS's Office of Human Resources Operations.  Rather, each is a component of its respective bureau, with delegated personnel management authority.  See Exh. M (Jefferson Decl.) at ¶ 23, 25.  Consequently, the heads of the bureau HR offices are not employees of OS or of OHRM; rather, they are employees of their respective bureaus, and were each selected by, are evaluated by, and report to a high-level administrator within their respective bureaus.  See id. at 23; see also Exh. P (Kirkner Decl.) at ¶ 4; Exh. Q (Martin Decl.) at ¶ 2; Exh. R (Meadows Decl.) at ¶ 1; Exh. T (Ribas Decl.) at ¶ 2; Exh. V (Smith Decl.) at ¶ 2.

###### 5.    Department Employees Work Under Six Different Personnel Systems.

Department employees serve under one of six different personnel systems, three of which—General Schedule, the Alternative Personnel Management System, and the Demonstration Project—are the most prevalent.[21]  See Exh. M (Jefferson Decl.) at ¶ 18 & Attach.

---

at ¶ 2); NIST's HR office is its Human Resources Management Division ("HRMD") (see Exh. P (Kirkner Decl.) at ¶ 2); ITA's HR office is its Office of Human Resource Management ("ITA/OHRM") (see Exh. Q (Martin Decl.) at ¶ 2); OS's HR office is its Office of Human Resources Operations (see Exh. M (Jefferson Decl.) at ¶ 23); and PTO has its Office of Human Resources (see Exh. R (Meadows Decl.) at ¶ 2).  Since October 2005, OIG has independently contracted with another government agency, the Treasury Department's Bureau of Public Debt, for HR services; previously OIG operated its own HR office.  See Exh. M (Jefferson Decl.) at ¶ 16.  Since 2005, EDA has contracted with a private independent contractor to provide it with HR services. See id. at ¶ 11.  ITA/OHRM, in addition to providing personnel services for ITA, also services BIS, MBDA, NTIA, and BEA.  See Exh. Q (Martin Decl.) at ¶ 7.  Similarly, NIST's HRMD, in addition to servicing NIST, also provides personnel services for NTIS and TA.  See Exh. P (Kirkner Decl.) at ¶ 6.  ESA has been serviced by the Census's HRD since February 14, 1996; previously, ESA was serviced by ITA/OHRM.  See Exh. M (Jefferson Decl.) at ¶ 14.

[21] SES executives, Foreign Services Officers, and NOAA Uniformed Corps Officers, who total approximately 800 Department employees, each serve under distinctive personnel systems (see Exh. M (Jefferson Decl.) at ¶¶ 5, 18 & Attach. 22; Exh. T (Ribas Decl.) at 6. The SES was established by the Civil Service Reform Act of 1978 , and covers managerial, supervisory, and policy positions above GS-15 that are not filled by Presidential appointment with Senate

23.  Most employees, approximately 28,000, serve under the GS system.  See id. ¶ 31 & Attach.

23.  Approximately 7,000 DOC employees serve under either APMS or the Demo Project.  See

id.  APMS is in operation at NIST and applies to all of that bureau's approximately 3,000

employees, excepting wage-grade employees who are under the GS system.  See Exh. P (Kirkner

Decl.) at ¶ 12.  The Demo Project applies to more than 4,000 employees of BEA, NTIA, TA,

three of NOAA's five operational offices, and six units within CFO/ASA in OS.[22]  See Exh. M

(Jefferson Decl.) at ¶¶ 20, 31& Attach. 23; see also Exh. Q (Martin Decl.) at ¶ 7.D.1-2.

      General Schedule.  Under the traditional GS system, which is also in effect at most

federal agencies, employees are in a career ladder of numbered GS-levels, or "grades," based

upon OPM classification standards and additional bureau-established qualification requirements

for each occupational series, and sometimes job title.  Compensation is tied to grade level in

accordance with OPM promulgated salary tables that include  locality adjustments, and is further

---

confirmation. There are four types of SES appointments: career, noncareer, limited term, and
limited emergency.  OPM manages the overall SES personnel program and provides the day-to-
day oversight of and assistance to Federal agencies in developing, selecting, and managing the
SES employees. Within the allocations OPM authorizes, each federal agency determines which
positions will be established in the SES. OPM has developed executive core qualifications that
are the primary selection criteria for SES positions.  OPM also convenes Qualifications Review
Boards (QRBs) to provide independent peer review of candidates proposed for initial career
appointment to the SES.  An SES candidate cannot be appointed to the position until the QRB
certifies his/her executive qualifications.  See Exh. M (Jefferson Decl.) at 19; Guide to the
Senior Executive Service, U.S. Office of Personnel Management (February 2004);
http://www.opm.gov/ses.  For further information regarding the specifics of the FSO and UC
personnel systems see 22 U.S.C. Chapt. 52 and http://www.noaacorps.noaa.gov/cpc, respectively.

[22] At NOAA the Demo Project applies to the Office of Oceanic and Atmospheric Research, the
National Environmental Satellite, Data, and Information Service, and the National Marine
Fisheries Service. See Exh. T (Ribas Decl.) at ¶ 13. The units of CFO/ASA that participate in the
Demo Project are Office of Management and Organization, the Office of Administrative
Services, OHRM, Security, the Office of Acquisition Management, and Office of Financial
Management.  See Exh. M (Jefferson Decl.) at ¶ 20.

tied to "steps" within grades that are generally obtained by years of service.  GS employees

advance in grade either by obtaining  non-competitive career ladder promotions after serving a

specified amount of time in grade and satisfying established performance standards or by

competing for an announced vacancy to a higher graded position. See Exh. M (Jefferson Decl.) at

¶ 21.

Alternative Personnel Management System.  The APMS  system replaces the GS system

with a classification system featuring four career paths and five pay bands;[23] employees are

evaluated through peer comparison and ranking;  pay increases are tied to performance;

performance-recognition bonuses, recruitment allowances, and retention allowances are

available;  final decision authority over performance scores, pay increases, and bonuses is vested

in Pay Pool Managers; and managerial and supervisory training is provided to all employees.  See

Exh. P (Kirkner Decl.) at ¶ 12; see also Exh. T (Ribas Decl.) at 13; Exh. Q (Martin Decl.) at

¶ 7.D.2 .

Demonstration Project.  The Demo Project, which is similar to APMS, provides those

offices that have adopted it with the authority to experiment with specific personnel system

innovations otherwise prohibited by law or regulation. Those bureaus and covered operational

offices that operate under the Demo Project  have replaced the traditional GS classification with

four career paths and five pay bands; make discretionary "retention payments;" require individual

supervisors to use the Automated Classification System, the Duties and Responsibilities and

_____

[23] While it retains the GS occupational series, OPM classification standards are not used.  The
four new career paths are scientific and engineering (ZP), which incorporates scientists such as
physicists; scientific and engineering technicians (ZT), which include electronics technicians;
administrative (ZA), including human resources management; and support (ZS), which
encompasses clerical assistants.  See Exh. P (Kirkner Decl.) at ¶ 12.

Knowledge, Skills, and Abilities systems to classify positions, and then to certify that the

position has been classified consistently with the most applicable published standards.[24]

6.     **Each Bureau Has Independent Personnel Authority and Distinct, Bureau-Specific Personnel Policies and Practices that Rely Upon Objective Criteria For Making Assessment, Promotion, and Other Personnel Decisions**.

Each[25] of the bureaus has been delegated considerable autonomy over their personnel

matters, including, most importantly, independent authority over all[26] matters relevant to

Plaintiffs' class claims.  Departmental Administrative Order ("DAO") 202-250, § 5, issued July

26, 1996, delegates to each bureau the authority "to make human resource management

decisions, to administer human resources programs and activities, and to effect personnel

---

[24] The Demo Project is codified at 64 Fed. Reg. 52,810 et seq. (Sept. 30, 1999) and is implemented by NOAA's Demonstration Project Operating Manual, which is available at http://ohrm.doc.gov/employees/demo_project/demopr_procedures.  While the Demo Project is patterned after the APMS they are not identical systems.  NIST modified its performance management system in October 2005 in ways  the Demo Project did not.  Thus, for example, under APMS, critical elements of performance are evaluated on a scale with a total weight of 10 points, whereas under the Demo Project employees are rated on a 100 point scale and then ranked by performance score within a peer group. Cf. Exh. P (Kirkner Decl.) at ¶¶ 12.I & 21.B. Also, although substantively similar, APMS and the Demo Project, are so administratively distinctive as to be separate personnel systems.  See Exh. M (Jefferson Decl.) at ¶ 18.

[25]  Except PTO and OIG, whose independence and autonomy regarding personnel matters are statutorily prescribed.  Congress established PTO as "an agency of the United States" within the Department, directing it to "exercise independent control of its . . . personnel decisions and processes."  35 U.S.C. § 1.  Under the Inspector General Act of 1978, 5 U.S.C. app. § 1 et seq. ("IGA"),  OIG acts as an "independent" office within the Department,  under "the general supervision only" of the Secretary or the Deputy Secretary of the Department, with authority "to select, appoint, and employ such officers and employees as may be necessary . . . ."  Id., §§ 2(3), 3(a) and 6(a)(7).  Thus, the Department's delegation of  human resource management responsibilities to the bureaus, states, "[t]he authority of the Inspector General to select, appoint, and conduct all personnel management activities is conferred by law and is not delegated under this Order."  See Exh. M (Jefferson Decl.) at Attach. 3 (DAO 202-250, id. at § 3.04).

[26]  Excepting certain personnel matters regarding SES employees, regarding which OHRM retains authority.  See Exh. M (Jefferson Decl.) at ¶ 15.

28

actions."[27]  See Exh. M (Jefferson Decl.) at ¶¶ 24-26 & Attach. 3 (DAO 202-250).

Specifically, the Department has broadly delegated to each bureau authority to:

- implement a bureau-specific Merit Assignment Plan, which governs promotion and evaluation practices;

- grant bureau-specific awards;

- administer a bureau-specific training and development program;

- take position classification actions and personnel placement actions in administrative management areas without grade-level restriction; and

- redelegate classification decision-making to any supervisory or managerial level for certain positions, to establish performance plans and ratings, and to justify performance appraisal by a single summary rating rather than element-by-element.

See Exh. P (Kirkner Decl.) at ¶ 9; see also Exh. Q (Martin Decl.) at ¶ 8-9; see also Exh. R (Meadows Decl.) at ¶ 8; see also Exh. T (Ribas Decl.) at ¶¶ 5, 10-11; see also Exh. V (Smith Decl.) at ¶¶ 14-16.

In short, each of the fifteen DOC bureaus has the independent authority—within the general confines of Department directives[28]—to develop and implement specific policies and

---

[27] Between 1993 and the issuance of DAO 202-250, the Department permitted, under a series of memoranda and other documents, the individual bureaus much of the same broad latitude in developing their own personnel policies and practices.  See Exh. M (Jefferson Decl.) at ¶ 24 & Attachs. 1-2.

[28]  With a few exceptions, (e.g., the recently issued DAO concerning performance evaluations which is discussed infra at note 33) general Department-wide guidance or policies, set forth as DAOs, do not exceed the scope of guidance or prescriptions from federal entities, such as OPM or the EEOC, that are independent of the Department of Commerce, that promulgate policies and mandates of general applicability to federal agencies or the federal workforce ad do not contain Department-wide restrictions, limitations, or obligations upon the various bureaus beyond that which is required by the "central agency" guidance. See Exh. M (Jefferson Decl.) at ¶ 22.  In so stating, it warrants note that management philosophies and strategies are subject to modification under changed circumstances and different leadership.

practices concerning the promotion, evaluation, and assessment of its employees, and each has

the independent responsibility for all  promotions decisions at issue in this case.  <u>See</u> Exh. M

(Jefferson Decl.) at ¶ 25.  The authority and responsibility for implementing these policies resides

and is exercised entirely within each of the bureaus, and they are not bound in the exercise of that

authority by the human resources policies or practices developed or used in any other bureaus,

including the larger bureaus whose human resource offices provide their HR services.[29]  <u>See</u> <u>id.</u>

at ¶ 26.

       **a.**      **MAPs, CBAs, Awards, and Training**.

Each bureau has implemented its own personnel practices by, <u>inter alia</u>, adopting a

bureau-specific Merit Assignment Plan ("MAP"),[30]  negotiating one or more bureau-specific

---

[29] <u>See</u> note 18, <u>supra</u>.

[30] Census, ITA, NIST and PTO have each adopted their own MAP that contains bureau-specific variations from a Department suggested MAP. <u>See</u> Exh. M (Jefferson Decl.) at ¶ 26; <u>see</u> <u>also</u> Exh. V (Smith Decl.) at ¶ 18; <u>see</u> <u>also</u> Exh. Q (Martin Decl.) at ¶ 11; <u>see</u> <u>also</u> Exh. P (Kirkner Decl.) at ¶ 11; <u>see</u> <u>also</u> Exh. R (Meadows Decl.) at ¶¶ 10-11, respectively.  The remaining bureaus adopted the Department's suggested MAP as their own.  <u>See</u> Exh. M (Jefferson Decl.) at ¶ 26.

collective bargaining agreements ("CBAs")[31] integrating various personnel policies,[32] or

participating in a demonstration project. See Exh. M (Jefferson Decl.) at ¶¶ 25-26; see also Exh.

V (Smith Decl.) at ¶ 17.

---

[31]  The Department has approximately 14 labor unions, one – the National Weather Service
Employees Organization (NWSEO) -- with National Consultation Rights, and approximately 41
bargaining units. See Exh. S (Osver Decl.) at  ¶ 6.  Census has had a CBA with the American
Federation of Government Employees (AFGE), Local 2782, for over 30 years (see Exh. V (Smith
Decl.) at ¶¶ 19);  ITA has a CBA with the American Foreign Service Association (AFSA) (see
Exh. Q (Martin Decl.) at ¶ 12); MBDA has a labor agreement with National Federation of
Federal Employees (NFFE), Local 1008 (see id.); NOAA has over 20 different CBAs (see Exh. T
(Ribas Decl.) at ¶ 16); NTIS has a CBA with NFFE and the International Association of
Machinists and Aerospace Workers, AFL-CIO (IAMAW) (see Exh. P (Kirkner Decl.) at ¶ 23.I);
and for all times relevant to this action PTO has contracted multiple labor agreements with the
National Treasury Employees Union (NTEU), Locals 243 and 245 and with the Patent Office
Professional Association (POPA) (see Exh. R (Meadows Decl.) at ¶¶ 12-14.)

[32]  Thus, each bureau establishes its own awards system.  In many instances awards are based
upon objective measures. Census, for example, , inter alia, created the Census Awards and
Recognition System ("CARS") a unique computerized program that monitors awards via
electronic initiations, routing and approval and also reviews the equity of awards, such as the
Director's Award for Innovation, awarded by a nine-member selection panel that grades
nominees on creativity (30%), effectiveness (20%), significance (20%), and risking-taking
behavior.  See Exh. V (Smith Decl.) at ¶ 25; see also e.g., Exh. Q (Martin Decl.) at ¶ 15.B, (ITA
Under Secretary and Customer Service monetary awards et al.); Exh. Q (Martin Decl.) at ¶ 16
(BEA); Exh. Q (Martin Decl.) at ¶ 17 (MBDA) ; Exh. R (Meadows Decl.) ¶¶ 12 - 14, 18 (PTO
performance awards, Productivity Gainsharing Awards, Pendency Reduction Awards et al. based
upon production); Exh. P (Kirkner Decl.) at ¶ 14 (NIST performance pay increases and cash
bonuses governed by APMS)).  Numerous and varied training and career development programs
are also developed and administered at the bureau level.  Census, for example, has, inter alia: a
Rotational Program, which encourages voluntary personnel exchange between divisions; its
Economic Directorate University, which offers continuing educational opportunities to survey
statisticians; the Census Corporate University, which is affiliated with a consortium of local
universities and offers five undergraduate and graduate certificate programs for competency-
based professional skills; a Mid-Career Program, which provides developmental work-study
assignments for GS-12 and higher employees; various Competency Guides; and a working
Career Resource Center providing career-enhancement activities. See Exh. V (Smith Decl.) at
¶ 26; see also, e.g., Exh. P (Kirkner Decl.) at ¶ 15 (NIST training programs); Exh. Q (Martin
Decl.) at ¶ 18 (ITA training programs); Exh. R (Meadows Decl.) at ¶¶ 19-20 (PTO training
programs); and Exh. T (Ribas Decl.) at ¶ 15 (NOAA training programs).

The Census MAP, for example, requires, inter alia:  (1) at least 7 workdays of posting for each vacancy; (2) that Census HRD evaluate the candidates based on their application materials and create a "best qualified list" of up to 10 competitive candidates to send to the selecting official; (3) each competitive permanent Census candidate be interviewed, except in special circumstances; (4) that selecting officials document whether qualified candidates were contacted or interviewed, their decisions, and whether selectees declined; (5) a specific complaint process; and (6) that all vacancies be filled subject to competition from among the best qualified candidates available on the basis of merit, fitness, and qualifications without regard to, among other characteristics, race, color, or national origin.  See Exh. V (Smith Decl.) at ¶ 18.[33]

### b.    Performance Evaluations.

Currently, the Department has four distinct employee performance appraisal systems:  5-level, 2-level (pass/fail), Demonstration Project (Demo Project), and the Alternative Personnel Management System (APMS).  While the four systems include the basic tenets common to all appraisal systems, each system employs specific, objective requirements unique to that system. See Exh. S (Osver Decl.) at ¶¶ 3, 8.[34]  Consistent with Departmental policy, the Department's bureaus have developed and customized bureau-specific performance appraisal systems that are responsive to their unique business needs and organizational cultures, and these various

---

[33] Elsewhere, as examples of the different policies in effect at the various bureaus:  the NOAA National Weather Service MAP, established by Agreement with the NWSEO, inter alia, permits that union to place a representative on each rating board.  See Exh. T (Ribas Decl.) ¶ 16.F; see also, e.g., Exh. P (Kirkner Decl.) at ¶ 13.E (NIST candidates have the right to review records used to evaluate them); Exh. R (Meadows Decl.) at ¶ 11 (PTO MAP requires 5 days posting.)

[34] See also e.g., Exh. N (Focarino Decl.) at ¶ 3; Exh. X (Ott Decl.) at ¶¶ 4-7; Exh. U (Russell Decl.) at ¶¶ 4-5.

evaluation systems have changed over time.  See id. at ¶ 4.[35]

###### c.   Promotions.

Procedures and standards for promotion decisions vary according to bureau-specific personnel policies and also for particular positions, or jobs.  A presentation setting forth those standards for all 275 occupation series at the Department would fill scores of pages.  Instead, the following highlights the objective standards and procedures that limit individual subjectivity in promotion decisions for the predominant jobs at the Department's larger bureaus:  statisticians at Census, meteorologists at NOAA, and patent examiners at PTO.[36]

CENSUS (statisticians).  To be eligible for a vacancy to a higher-level position, a

---

[35]   Specifically, since 1995 and continuing to the present eight bureaus – BIS, EDA, MBDA, NTIA, NTIS, OIG, OS  and PTO – have operated under a 5-level rating system.  In 1998 three bureaus – Census, ESA and ITA adopted a 2-tiered pass/fail rating system.  NIST has operated under the APMS since 1995, which currently has a 6-level system, except that NIST WG employees, who are not under the APMS, have had a version of the 2-tiered appraisal system, since 1997.  Since 1998, BEA has operated under the Demo Project, which employs a multi-level rating system with a 100 point rating scale, as have certain units of NTIA, NOAA, OS, and TA.  After briefly transitioning to a 3-level system, those parts of NOAA not under the Demo Project have since 1998 operated under a 2-tiered evaluation system, while those parts of NTIA and OS not under the Demo Project have operated under a 5-level rating system.  See Exh. S (Osver Decl.) at ¶ 4.  In October 2005, the Department amended Department Administrative Order (DAO) 202-430, and established a new 5-level performance management system for all employees except PTO and those in the Demo Project and AMPS.  Eight bureaus have transitioned to the new system.  They are BIS, ESA, ITA, MBDA, NIST (non-AMPS), NTIA (non-Demo Project), NTIS, and OS.  OIG is scheduled to transition to the new 5-level system in June 2006.  Three more bureaus are scheduled to transition to the new 5-level system in October 2006.  They are Census, EDA, and NOAA (non-Demo Project).   PTO remains on their five-level under their own performance based organization (PBO) authority.  See Exh. S (Osver Decl.) at ¶ 5.

[36]  The standards and procedures used for making promotion decisions for physicists at NIST, not discussed herein, are set forth in Exh. P (Kirkner Decl.) at ¶¶ 16-18 and Exh. X (Ott Decl.) at ¶¶ 3-8.

statistician candidate must meet specific educational and experience qualifications.[37]  In addition,

each GS level has its own additional educational and/or experience requirements.[38]  See Exh. V

(Smith Decl.) at ¶¶ 27-30; Exh. U (Russell Decl.) at ¶ 8.

Career ladder (that is, non-competitive) promotions are based upon performance.  See

---

[37] The basic entry level qualifications requirements for a statistician are either (A) a degree that included 15 semester hours in statistics (or in mathematics and statistics, provided that at least six semester hours were in statistics), and nine additional semester hours in one or more specified fields of study or (B) an appropriate combination of the courses in (A) and experience in a full range of professional statistical work such as: (a) sampling, (b) collecting, computing, and analyzing statistical data, and (c) applying statistical technique such as measurement of central tendency, dispersion, skewness, sampling error, simple and multiple correlation, analysis of variance, and tests of significance.  See Exh. V (Smith Decl.) at ¶ 28.

[38] GS-9 statisticians must have a master's degree or two years of progressively higher level graduate education leading to a master's or equivalent graduate degree, or at least 1 year of specialized experience equivalent to at least a GS-7. GS-11 statisticians must have: a Ph.D. degree or three years of progressively higher level graduate education leading to a Ph.D. or equivalent doctoral degree, or at least 1 year of specialized experience equivalent to at least a GS-9. GS-12 or higher statisticians must have at least 1 year of specialized experience equivalent to at least the next lower grade.  See Exh. V (Smith Decl.) at ¶ 29.  In addition, the specialized knowledge that a GS-9 statistician must have includes: knowledge of statistical theories and techniques to resolve problems related to the review, analysis, and research of data; knowledge of organizational programs, terminology, procedures, and standards to apply to assigned projects; the ability to analyze factual information, trends, and to write technical reports on assigned studies; and the  ability to perform this work with minimal supervisor direction outside of the defined objectives, priorities, and deadlines. A GS-11 statistician must also be able to: evaluate critical factors relative to job assignments, draw rational inferences, and prepare technical reports of findings and methods; and initiate investigations, select and modify statistical techniques, evaluate alternatives to determine the appropriate methodology and procedures, and  prepare documentation of his/her procedures and findings.  A GS-12 or higher statistician also must have the ability to: analyze factual information and evaluate significant factors in order to solve complex problems with statistical data and to prepare comprehensive reports; plan, research, and implement the full scope of investigative projects requiring the application of statistical theory; adapt a variety of methods and develop new procedures to statistical projects; evaluate the statistical limitations and specify the range of logically possible explanations; and be prepared to recommend new or improved methods of statistical analysis.  See Exh. U (Russell Decl.) at ¶ 8.C.

Exh. U (Russell Decl.) at ¶ 3.  Critical elements[39] of performance are generally evaluated against

nine generic performance indicators.  Some of the indicators are subjective. Others, however, are

objectively quantifiable.[40] See id. at ¶ 4. Census is currently on a two-tiered pass/fail appraisal

system.  If the statistician meets the generic indicators and supplemental standards for their

critical elements they will receive a passing score of  "Meets Expectations," and otherwise

satisfies time-in-grade requirements, including demonstrating the ability to perform at the next

higher grade level they usually receive a career-ladder promotion.  See id. at ¶¶ 5-6.

For all competitive promotions and many new hires, Census uses the Automated

Commerce Employment System (ACES, or QuickHire), an internet-based announcement and

application receipt system.[41]  In the Economic Directorate, for example, the selecting official

conducts a job analysis and drafts eligibility criteria involving specific knowledge skills and

abilities necessary to perform the job.  Selecting officials then develop questions on education

---

[39] Examples of performance elements for statisticians in the Economic Directorate include: develop electronic census report forms and instruction sheets; develop edit plans; develop tabulations and publication plans for the 2002 Census; draft text and support files for the 2002 Census publications; develop clerical procedures and specifications; develop analytical plans for the 2002 Census; test the 2002 edits; test the processing routines; test the 2002 data tabulation and publication system; prepare test data sets that are accurate and comprehensive; provide accurate, timely information on products, services, and program activities; update supervisor on continuing work assignments.  See Exh. U (Russell Decl.) at ¶ 5.

[40] For example, one of the generic indicators is "timeliness," which evaluates whether work is completed " according to established deadlines;" another is "accountability," which assesses whether the statistician "accepts responsibility for work products and services over which he/she has control".  Other indicators, while not inherently quantifiable, are nevertheless objectively determinable.  For example, one indicator requires "accuracy and thoroughness with work that is correct and complete, " and another asks if "written work is . . . grammatically correct." See Exh. U (Russell Decl.) at ¶ 4.

[41] When posting vacancy announcements for new hires for statisticians, math statisticians, and IT specialists, Census uses OPM's Electronic Hiring System (EHS).  Exh. U (Russell Decl.) at ¶ 7.

training and experience used to rate and rank an applicant's qualifications.[42]  Questions are

weighted based on the importance and relevance to the job qualifications.  Candidates apply by

responding to these questions and submitting a resume, specifically addressing the qualifications

in the announcement. See id. at ¶ 7.A-B.  Census/HRD  reviews the applications, eliminates

those who do not minimally qualify,  ranks the candidates according to a predetermined

numerical scoring system, and submits a list of best-qualified candidates to the selecting official

without disclosing ranks or scores.  The selecting official interviews all best-qualified candidates

and makes a selection based on qualifications, as indicated in the application and interview.  See

id. at ¶ 7.E.

NOAA (meteorologists).  Meteorologist[43] career-ladder promotions at NOAA, which

---

[42] A set of sample questions follow:
   1. Do you have experience processing economic censuses?
   2. Do you have experience working with large, complex business firms consisting primarily of retail, wholesale, foodservice, or accommodation establishments to resolve conceptual data reporting problems?
   3. Do you have experience planning, writing, testing, or revising edits to evaluate and/or impute data?
   4. Do you have experience writing or modifying problem resolution specifications and procedures for clerical staff?
   5. Do you have experience working with interactive editing systems to resolve data reporting problems of retail, wholesale, foodservice, or accommodation establishments?
   6. Do you have experience analyzing summary data from economic censuses?
   7. Do you have experience using the North American Industry Classification System to classify retail, wholesale, foodservice, or accommodation establishments?
   8. Do you have experience giving technical directions to junior, less-experienced survey statisticians (or other professional series employees)?
   9. Do you have experience monitoring projects and communicating project status to supervisors and other senior level staff?
See Exh U (Russell Decl.) at ¶ 7.C.

[43]  NOAA uses the Department's established position description library for all meteorologist positions, except that if for a particular position an appropriate position description is not in the

usually are determined by the candidate's immediate supervisors, require: at least 52 weeks at the next lower grade; a current rating of "Meets or Exceeds Expectations;" demonstrated ability to perform at the next grade; sufficient grade-determining work; the absence of any administrative restrictions on the promotion; and satisfaction of grade qualification requirements.[44] See Exh. W (Valdez Decl.) at ¶¶ 4-5.

Competitive selections of NOAA meteorologists also involves the computerized ACES system.[45] The selecting official chooses questions for inclusion on the vacancy announcement from the ACES question library. Applicants electronically submit their application materials, including answers to those questions, following which ACES automatically determines the basic qualifications and eligibility of each applicant and ranks eligible applicants based on their responses, which NOAA human resources staff ("WFMO") then review. WFMO then submits a

library, the supervisor, in conjunction with other subject matter experts and/or the Human Resources Office, develops a specific position description based on the classification standards issued by OPM. See Exh. W (Valdez Decl.) at ¶ 5.A. Career-ladder potential for meteorologists depends upon their particular position. Some meteorologist positions have career-ladder potential; others do not, depending upon the needs of the particular unit when the position is filled. For example, meteorologists at the Meteorological Development Lab (MDL) generally are hired at the GS-5 or GS-7 level with career ladder promotion potential to GS-12, although they can be hired at any grade level within that range, while meteorologist vacancies at Office of Climate Water and Weather Services (OCWWS) are generally filled at the GS-12 level or higher. See id. at ¶ 4.

[44] The qualification standards for NOAA meteorologists, including the specialized education and experience requirements for grade levels 9 though 12 are set forth at Exh. T (Ribas Decl.) at ¶¶ 17-20.

[45] Eligibility for all competitive vacancies is routinely made as extensive as possible in an attempt to ensure the best qualified workforce. See Exh. W (Valdez Decl.) at ¶ 6.A.

list certifying the ten best qualified applicants to the selecting official.[46]  See id. at ¶ 6.B.

The routine practice is for a panel of at least three persons, including the selecting official and at least one person outside the unit where the position will be filled, to independently score the certified candidates to determine who among them will be interviewed.   A new panel, composed of the members of the first panel that reviewed the application materials plus at least one other individual, then interviews the chosen candidates.  The panel asks each and every candidate the same predetermined questions that relate to the skills, abilities and knowledge that are sought for the position. Each panelist individually evaluates each candidate's response to each question according to a set of predetermined criteria, which are scored in writing, generally on a three-level rating, according to a predetermined matrix.  See id. at ¶ 6.C-D.  After the interview, the panelists convene to discuss their evaluations of the interviewed applicants, and then make a recommendation to the selecting official.[47]  Selecting officials may select any of the best qualified, but generally accept the recommendation of the interview panel.  See id. at ¶ 6.D.

PTO (patent examiners).  Patent examiners work in a production driven environment.

---

[46] If only non-Department candidates are being considered, the list generally includes the top 3 to 5 candidates.  Prior to the use of automated systems,  NWS would convene panels consisting of 3-4 individuals to review applications based on a predetermined crediting plan.  The reviewing panel would always include at least one subject matter expert from outside the unit.  See Exh. W (Valdez Decl.) at ¶¶ 6.B.

[47] In the event two or more of the interviewed applicants are determined by the panel to have been too close to distinguish, a third panel is convened with additional members to re-interview the top candidates.  This panel asks more specific and more focused questions.  Again, only predetermined questions are asked and all re-interviewed candidates are asked the same set of questions.  As in the first interview, the scoring and evaluating process for this second group interview is done in writing by each panelist individually according to a set of predetermined criteria which are scored according to a predetermined matrix.  The panelists then meet to discuss their evaluations of the re-interviewed applicants.  The candidate evaluated most highly by the panel will be offered the position. See Exh. W (Valdez Decl.) at ¶ 6.F.

Career Ladder promotions for PTO Patent Examiners[48], which may start at the GS-5 grade level and end with promotion to the GS-13 grade level, require satisfaction of the critical elements of their Performance Appraisal Plan ("PAP")[49], demonstrated ability to perform at the next higher grade level[50], and satisfaction of time in grade requirements[51]. See Exh. N (Focarino Decl.) at ¶ 3. PTO does not use ACES to announce patent examiner vacancies, but instead uses its own web-based electronic vacancy announcement system, the Job Application Rating System, which allows it to maintain a standing inventory register for patent examiner positions.

---

[48] Patent Examiners' work involves the utilization of the basic and advanced concepts of the natural sciences, the techniques of all branches of engineering and of the industrial arts, and the application of those aspects of procedural and substantive law generally, and of the statutory and case law applied to patents specifically, which are applicable to the patent examining process. See Exh. R (Meadows Decl.) at ¶ 21. The minimum qualifications for patent examiners who specialize certain engineering and applied physical science fields, including the specialized experience required for grades 9 through 12 are set forth in Exh. R (Meadows Decl.) at ¶¶ 23-26.

[49] Those critical elements include "Productivity," "Quality," and "Workflow Management." Productivity is the primary indicator of whether an Examiner is ready for promotion to the next grade level. Productivity goals are quantitative factors strictly calculated according to examination time and expected output. After the Examiner serves a one-year probationary period, the promotion standards are the same for each Examiner at each grade level. Productivity goals are adjusted for the technology area. For example, the Examiners examining televisions have 23.6 hours per application at a GS-12 grade, whereas the Examiners examining batteries have 19.7 hours at a GS-12 grade. Whether an Examiner satisfies this factor is entirely based on the individual's gross output. See Exh. N (Focarino Decl.) at ¶ 3.A-C.

[50] Career ladder promotions for Examiners are governed by a series of labor agreements and long standing practices with POPA, pursuant to which, the examiner must work at a rate of at least half-way between the requirement of the present grade and the requirement for the next higher grade to demonstrate the ability to meet production requirements of that higher grade. See Exh. R (Meadows Decl.) ¶ 14.

[51] Patent Examiners hired at the GS-5, 7, or 9 grade levels are eligible for a one-time accelerated promotion after six months in grade. Other than the one-time accelerated promotion, the time in grade requirement is 52 weeks. See Exh. N (Focarino Decl.) at ¶ 3.D.

The Signature Authority ("Sig") program generally[52] establishes the promotion standards and requirements for Examiners moving from the GS-13 grade level to the GS-14 grade level through accretion of duties.[53]  Under the Sig Program,  an Examiner at the GS-13 grade level who has been in grade and performed each element of their PAP at least at the "Fully Successful" level for a minimum of ten consecutive pay periods (eligibility period) is granted temporary Partial Signatory Authority to make non-patentability decisions on applications.  The grant of temporary Partial Signatory Authority begins a trial period consisting of thirteen (13) consecutive pay periods.  In order to achieve permanent Partial Signatory Authority, the Examiner must complete at least 700 hours of actual examining time in paid status during this period, and perform all elements of the Partial Signatory Authority PAP at least at the Fully Successful level. PTO awards temporary Full Signatory Authority to make all patentability decisions on applications to Examiners with permanent Partial Signatory Authority at the GS-13 grade level who have been in grade and performed for a minimum of ten consecutive pay periods at least at the Fully Successful performance level in each element of their PAP.  The grant of temporary Full Signatory Authority begins a trial period of thirteen (13) consecutive pay periods, during which  the Examiner must complete at least 700 hours of actual examining time in paid status and perform the elements of the Signatory Authority PAP at least at the Fully Successful level to

---

[52] OPM has assigned a "point total" to Examiners at each grade, The minimum point total for a GS-13 Examiner is 55 points.   In addition to the Sig Program, GS-13 Examiners can earn the 10 extra credit points required to attain the GS-14 grade in a number of ways known as "Extra Credit Items," which are discussed more fully infra in the discussion of Examiner promotions from GS-14.  See Exh. N (Focarino Decl.) at ¶ 5.

[53] Successful completion of the Sig program accords Examiners the ability to sign all their work. Until then, all work must also be signed by an Examiner with the full signatory authority (a Primary Examiner).  See Exh. N (Focarino Decl.) at ¶ 4.

achieve permanent Full Signatory Authority, whereupon the Examiner will be promoted to the GS-14 grade level (Primary Examiner). See Exh. N (Focarino Decl.) at ¶ 4.A-D.

Primary Examiners have several means to obtain a promotion to the GS-15 grade level. They may choose to compete for bargaining and non-bargaining unit GS-15 positions that are advertised as they become available, qualifications for which are set forth in each vacancy announcement. More often, GS-14 Examiners attain promotion to a GS-15 position by earning the 10 additional required points by demonstrating Extra Credit Items[54] on one or more of five tracks: Ph.D/Doctorate Level (which earns 10 points); Masters Level (which earns 5 points); Generalist (which earns 5points); Senior Examiner (which earns 5 points); and/or Expert (which earns 10 points). See id. at ¶ 6. For example,[55] a Primary Examiner may qualify for promotion on the Ph.D/Doctorate Level track by possessing a Masters Degree and at least 1/3 of the required hours for a Ph.D in a subject matter directly related to the technology area in the Examiner's docket; the technical subject matter encompassed by the Primary Examiner's docket embraces technological concepts which cannot normally be acquired in a Bachelors/Masters curriculum, which the Examiner has thoroughly mastered, and which arise in a significant number of cases on which the Examiner works at least 50% of the time; the Examiner's supervisors certify that the Examiner has demonstrated by the quality of his work that he employs a Ph.D. level knowledge of the technology examined and legal criteria necessary for determining patentability; and, the Examiner is recognized as an authority in the technology, as demonstrated

---

[54] See note 50, supra.

[55] The specifics of the Extra Credit Item requirements for each track are set forth in Exh. N (Focarino Decl.) at ¶ 6.B.1-5.

by publications, awards by technical societies, presentations or papers to symposia, or by leading

training programs, or providing guidance for policy development. See Exh. N (Focarino Decl.) at

¶ 6.B.1.

### III.  SUMMARY OF ARGUMENT

Plaintiffs bring this action under Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. §§ 2000e, et seq., purporting to represent "all African-American, non-supervisory

employees and former employees of Commerce's bureaus in the metropolitan area of

Washington, D.C., who have been denied career advancement to one or more white collar

positions in the agency's offices at grade levels GS-9 through GS-15 levels, or equivalent level

white collar non-GS positions, and who have been denied related promotional opportunities in

those same offices, based on their race during the period of time beginning two years prior to the

filing of the administrative class complaint on February 22, 1995, and continuing to present."

Am. Compl. ¶ 166.  Plaintiffs' 198-paragraph Amended Complaint challenges alleged

department-wide "systemic racial discrimination" in the form of "excessively subjective"

performance evaluation practices and promotional procedures that have an alleged "disparate

impact on the promotions and related promotional opportunities of African-American Plaintiffs

and the class they represent."  Am. Compl. ¶¶ 10, 185-189 (Count One).  Individual Plaintiff

Tanya Ward Jordan additionally alleges that Defendant "has discriminated against Ms. Ward

Jordan by denying her reasonable accommodation for her disabilities, including respiratory

problems and occupational stress, in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§

710 et seq., as amended."  Am. Compl. ¶ 194 (Count Two).

Neither the named Plaintiffs' individual claims nor their purported class claims may go

42

forward. To the extent that each of the named Plaintiffs is asserting any individuals claims, those

claims should be dismissed. Most of Ms. Howard's individual claims, to the extent there are any,

must be dismissed as untimely, and any individual claims of the two remaining Plaintiffs, Jordan

and Megginson, must be dismissed, respectively, on *res judicata* grounds and for failure to

exhaust administrative remedies. Further, the class claims far exceed in scope the class claims

Plaintiff Howard asserted in her administrative class complaint and that class complaint was

untimely; thus, Plaintiffs' class allegations must be dismissed for failure to exhaust

administrative remedies. Finally, the class claims must be stricken because Plaintiffs' "across-

the-board" allegations of disparate-treatment race discrimination, involving a host of different

job actions and job classifications across distinct Department of Commerce bureaus, each with

their own bureau-specific personnel policies and procedures, fail to meet the commonality,

typicality, and adequacy-of-representation requirements of Fed. R. Civ. P. 23(a) and the

requirements of Fed. R. Civ. P. 23(b).[56]

## IV.  MOTION TO DISMISS ANY INDIVIDUAL CLAIMS

The only individual claim presented in Plaintiffs' First Amended Complaint is Ms. Ward

Jordan's disability claim. Am. Compl. at Count 2. Nonetheless, in an abundance of caution,

and to the extent that the Court construes the First Amended Complaint to contain any other

individual claims, all of the individual claims, including Ms. Ward Jordan's, fail as a matter of

law—for either failure to exhaust administrative remedies, failure to timely file suit, or on *res

judicata* grounds—and therefore must be dismissed. Moreover, because the individual claims

---

[56] In addition, as discussed below and in Defendant's Opposition to Plaintiffs' Motion For
Extension of Time, Plaintiffs have failed to comply with LCvR 23.1(b) by not moving for class
certification within 90 days of filing their complaint. See Def. Opp., Document No. 31.

fail, the purported class representatives are ineligible to bring class claims, and their class claims

themselves also fail.  See East Texas Motor Freight System Inc. v. Rodriguez, 431 U.S. 395, 403-

06 (1977) (upholding trial court's dismissal of class allegations where three named plaintiffs'

individual claims had been dismissed because named plaintiffs were not "members of the class of

discriminatees they purported to represent" and therefore could not "'fairly and adequately

represent the interests of the class.'") (quoting Fed. R. Civ. P. 23(a)).

**A.    Any Possible Individual Claims of the Three Named Plaintiffs Must Be Dismissed.**

**1.    Ms. Howard's Administrative Complaints Fail to Provide a Basis for Her Individual Claims in this Action Because of Untimeliness, Principles of Contract Law Relating to Settlement Agreements, *Res Judicata*, and Her Failure to Exhaust Administrative Remedies.**

Ms. Howard has filed twenty-one administrative complaints against the Department of

Commerce alleging discrimination of various kinds and for various impermissible purposes.  See

Exh. Y (Anderson Decl.) at ¶ 5.  None, however, provide a basis upon which she can proceed

with any individual claims in this action.  One complaint, Howard 6,[57] is her class complaint; it

contains no individual allegations, and is discussed fully below.  Eight of Ms. Howard's

complaints long ago exhausted the administrative process, the 90-day limitation for filing suit has

expired, and they are time-barred.[58]  29 C.F.R. 1614.407(a) and (c); National Railroad Passenger

---

[57] The numerical designation of Ms. Howard's administrative complaints used herein tracks the designations employed in the Anderson Declaration where they are numbered chronologically.

[58] Specifically, Howard 1 and Howard 2 exhausted the administrative process with a decision by EEOC's Office of Federal Operations (OFO) that affirmed the findings of no discrimination as to each complaint on June 30, 1992.  See Exh. Y (Anderson Decl.) at ¶¶ 5.A and 5.B.  Howard 5, Howard 7, and Howard 8 were the subject of an OFO decision of September 22, 1999 that sustained the no discrimination findings as to each.  Id. at ¶¶ 5.E, 5.G, and 5.H.  Howard 11 was the subject of a FAD issued on August 16, 1999 that accepted the administrative judge's recommendation and found no discrimination, and Ms. Howard did not appeal that

Corp. v. Morgan, 536 U.S. 101, 110 (2002); Bowden v. United States, 106 F.3d 433, 437 (D.C.

Cir. 1997); Williams v. Munoz, 106 F. Supp. 2d 40, 42 (D.D.C. 2000); see also Wilson v. Pena,

79 F.3d 154 (D.C. Cir. 1996); Holley v. Dep't of Veterans Affairs, 165 F.3d 244, 246 (3d Cir.

1999).  Two of Ms. Howard's administrative complaints were resolved by Settlement

Agreements, and are barred by principles of contract law.[59]  See, e.g., Sirmans  v. Caldera, 138 F.

Supp. 2d 14, 19, 34  (D.D.C. 2001).  Ms. Howard previously has filed suit on four of her

administrative complaints, and is precluded from litigating those claims here either by

application of res judicata or because they are unrelated claims.[60]  See United States v. Mendoza,

104 S. Ct. 568, 571 (1984); Montana v. United States, 440 U.S. 147, 153 (1979); American

Employers Insurance Company v. American Security Bank, 747 F.2d 1493, 1498 (D.C. Cir.

1984); I.A.M. National Pension Fund v. Industrial Gear Manufacturing Company, 723 F.2d 944,

947 (D.C. Cir. 1983); Jack Faucett Associates, Inc. v. American Telephone and Telegraph

Company, 566 F. Supp. 296, 299 (D.D.C. 1983); Cutler v. Hayes, 549 F. Supp. 1341, 1343

---

determination.  Id. at ¶ 5.K.  Howard 12 was the subject of a FAD issued on February 7, 2000
that found no discrimination, and Ms. Howard did not appeal that determination. Id. at ¶ 5.L.
Finally, Howard 13 was dismissed as untimely on August 25, 1999, and Ms. Howard did not
appeal that determination. Id. at ¶ 5.M.

[59] Specifically, Howard 3 was resolved by Settlement Agreement on July 11, 1994, and Howard 4
was resolved by settlement agreement on July 11, 1994.  See Exh. Y (Anderson Decl.) at ¶¶ 5.C
and 5.D and Attach. 1.

[60] Specifically, Howard 9 was litigated in federal district court, and a judgment was entered
March 30, 1999 rejecting Ms. Howard's claims.  See Exh. Y (Anderson Decl.) at ¶ 5.I.  A
judgment was entered in Howard 10 on March 30, 1998 rejecting Ms. Howard's claims.  See Id.
at ¶ 5.J and Attach. 7; Howard v. Evans, Civ. Action No.  97-2877 (D.D.C.).  Howard 16 and the
failure to accommodate claim of Howard 18 are being litigated in Howard v. Evans, Civ. Action
No. 04-0756 (D.D.C.), which action this court previously determined is unrelated to the one at
bar. See Exh. Y (Anderson Decl.) at ¶¶ 5.P and 5.R and Attach. 9.

(D.D.C. 1983).[61]

**2.    Any Individual Claims of Plaintiffs Ward Jordan and Megginson Are Barred, Respectively, by *Res Judicata* and Title VII's Statute of Limitations.**

Under the related doctrines of res judicata and collateral estoppel, a final judgment on the merits of an action precludes the parties from relitigating issues that were or could have been finally decided; and once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first action.  Allen v. McCurry, 449 U.S. 90, 94 (1980); United States v. Mendoza, 104 S. Ct. 568, 571 (1984); Montana v. United States, 440 U.S. 147, 153 (1979); American Employers Insurance Company v. American Security Bank, 747 F.2d 1493, 1498 (D.C. Cir. 1984); I.A.M. National Pension Fund v. Industrial Gear Manufacturing Company, 723 F.2d 944, 947 (D.C. Cir. 1983); Jack Faucett Associates, Inc. v. American Telephone and Telegraph Company, 566 F. Supp. 296, 299 (D.D.C. 1983); Cutler v. Hayes, 549 F. Supp. 1341, 1343 (D.D.C. 1983).

Application of the doctrine of collateral estoppel "represents a decision that the needs of judicial finality and efficiency outweigh the possible gains of fairness or accuracy from continued

---

[61] Specifically, Howard 14, Howard 15, Howard 17, Howard 19, Howard 20, and Howard 21 are all still pending in the administrative process, as are those claims from Howard 18 that were not severed and brought in Howard v. Evans, Civ. Action No. 04-0756 (D.D.C.).  See Exh. Y (Anderson Decl.) at ¶¶ 5.N, 5.O, 5.Q, 5.S, 5.T, and 5.U and Attach. 9; see note 63, supra.  To the extent that those administrative complaints would provide any basis for any individual claim by Ms. Howard, such claims would have to be dismissed because Ms. Howard has not made a short and plain statement of any individual claim.  Ms. Howard's plethora of administrative complaints combined with the insufficient specificity of many of her individual allegations here make it impossible to definitively correlate allegations raised here with particular administrative complaints.  Therefore, the Department moves for dismissal or, in the alternative, for a more definite statement of any individual claim asserted by Ms. Howard, pursuant to Fed. R. Civ. P 12(e).

litigation of an issue that previously has been considered by a competent tribunal." Nasem v. Brown, 595 F.2d 801, 806 (D.C. Cir. 1979). Application of the doctrine thereby serves to relieve parties of the burdens of multiple lawsuits; conserves judicial resources; minimizes the risk of forum-shopping, piecemeal litigation, and inconsistent decisions; and provides finality in the resolution of disputes. United States v. Mendoza, 104 S. Ct. at 571; Cutler v. Hayes, 549 F. Supp. at 1343; see Hardison v. Alexander, 655 F.2d 1281, 1288 (D.C. Cir. 1981).

        Count 2: Plaintiff Ward Jordan's Disability Claim Should be Dismissed.

        Plaintiff Jordan already has litigated in federal court the very claims she seeks to assert in this lawsuit. Specifically, Jordan brought virtually the same claims pled here in Jordan v. Evans, Civil Action 04-356 (D.D.C.). See Jordan, First Amended Complaint, attached hereto as Exhibit AA. The Court dismissed Jordan's Title VII claims with prejudice by Memorandum Opinion dated December 3, 2004, a copy of which is attached hereto as Exhibit BB. The Court dismissed her disability claims by Memorandum Opinion dated August 10, 2005, a copy of which is attached hereto as Exhibit CC. Ms. Ward Jordan took an appeal to the United States Court of Appeals for the District of Columbia Circuit, Appeal No. 05-5381. The Court of Appeals issued two unpublished orders that resolved the appeal. On March 13, 2006, the Court of Appeals granted the government's motion for summary affirmance, affirming the district court's dismissal of the entire lawsuit with prejudice. Exh. A-1 attached. Ms. Ward Jordan petitioned for rehearing. On May 25, 2006, the Court of Appeals denied the petition but modified the district court's order of dismissal such that Ms. Ward Jordan's Title VII claims were dismissed without prejudice. Exh. A-2 attached.

        Plaintiffs' Opposition to Defendant's initial motion to dismiss, Document No. 27, argues

that "Ms. Ward Jordan's claims are not precluded as *res judicata*, as claimed by Defendant."

Document 27, Pl. Opp. at 14.  Plaintiffs rely on a May 25, 2006 Order of the Court of Appeals

modifying the district court's order such that the dismissal of Ms. Ward Jordan's Title VII claims

was without prejudice.  While the May 25, 2006 Order did modify the district court's order,

Plaintiffs' argument misstates both the facts and the law.  Plaintiffs' quote from the May 25,

2006 Order is incomplete, leaving the Court with the misimpression that all of Ms. Ward

Jordan's individual claims can go forward, including Court 2 of the First Amended Complaint,

which sets forth Ms. Ward Jordan's disability claims against Defendant.  As mentioned above,

the district court treated Ms. Ward Jordan's Title VII claims and disability claims in separate

orders.  The Court of Appeals affirmed the dismissal of the entire lawsuit.  Ms. Ward Jordan

petitioned for rehearing.  On May 25, 2006 the Court of Appeals:

> ORDERED that the petition be denied, but that the district court's order be
> modified to reflect that the dismissal of appellant's Title VII claims, for failure to
> exhaust administrative remedies, was without prejudice.  See 28 U.S.C. § 2106.
> The district court's order dismissing the remainder of petitioner's case with
> prejudice is unaffected by this order.

Ex. A-2 at 1.

Plaintiffs' Opposition, Document 27 at 14, quotes only the first part of the Court of

Appeals' Order.  This does a serious disservice to the Court.  By omitting the latter part of the

order, which explicitly states that the dismissal of Ms. Ward Jordan's disability claims with

prejudice "is unaffected by this order," Plaintiffs misrepresent both the facts and the legal import

of the proceedings in the Court of Appeals.  Because Ms. Ward Jordan's disability claims were

dismissed with prejudice, the Court should reject Plaintiffs' attempt to smuggle them into this

lawsuit in Court 2 of the First Amended Complaint and dismiss Count 2.  Under the doctrine of

res judicata, these rulings bar Ms. Ward Jordan from relitigating the same claims in the instant case.

            Any Individual Claims by Plaintiff Megginson Should be Dismissed.

        Similarly, Plaintiff Megginson previously asserted the same, or substantially similar, claims in Megginson v. Daley, Civil Action 97-2970 (D.D.C.), which she filed on December 12, 1997. See Megginson, Amended Complaint, attached hereto as Exhibit DD. On October 27, 2000, she took a voluntary dismissal of her case without prejudice. See Court's Order, attached hereto as Exhibit EE. While her claims were timely filed in Megginson v. Daley (see Exhibit DD at ¶ 4, reciting that she received the Agency's FAD on September 23, 1997), her filing of the same claims as part of the instant lawsuit is far outside Title VII's 90-day limitations period. "Complainants must timely exhaust these administrative remedies before bringing their claims to court." Bowden, 106 F.3d at 437; see also Park v. Howard University, 71 F.3d 904, 907 (D.C. Cir. 1995)(holding that a plaintiff must exhaust applicable administrative remedies and that a plaintiff cannot raise new allegations or charges in court that were not brought in the prior administrative proceedings); Williams v. Munoz, 106 F. Supp. 2d 40, 42 (D.D.C. 2000) ("timely administrative charge is a prerequisite to initiation of a Title VII action"). Accordingly, to the extent that Plaintiff Megginson is asserting any individual claims in this lawsuit, they must be dismissed. See 42 U.S.C. 2000e-16(c); 29 C.F.R. § 1614.408. See also Wilson v. Pena, 79 F.3d 154 (D.C. Cir. 1996); Holley, 165 F.3d at 246.

## V.  MOTION TO DISMISS THE CLASS CLAIMS.

**A.      Standard of Review**

Under Title VII, courts have authority only to hear claims that are (1) contained in the plaintiff's administrative complaint or claims "like or reasonably related" thereto, and (2) claims for which the plaintiff exhausted administrative remedies.  Powell v. Castaneda, 390 F. Supp.2d 1, 8 (D.D.C. 2005) (quoting Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995)).  The Congressional purpose in enacting the Title VII voluntary settlement and conciliatory procedures illuminates the importance of exhausting the administrative remedies prior to instituting suit in district court.  "'The principal functions of the EEOC filing requirement' are to enable 'the EEOC to provide the alleged wrongdoer with notice and to permit possible conciliation.'"  Medina v. Reinhardt, 686 F.2d 997, 1013 (D.D.C. 1982) (quoting Foster v. Gueory, 655 F.2d 1319, 1323 (D.C. Cir. 1981)).  "[T]he exhaustion requirement is intended to give the agency the opportunity to right any wrong it may have committed."  McRae v. Librarian of Congress, 843 F.2d 1494, 1496 (D.C. Cir. 1988).

Title VII's statutory language and legislative history reflect a firm congressional preference for the resolution of employment discrimination disputes through informal administrative processes over adjudication in court.  As one court explained:

> By establishing the EEOC, Congress provided an inexpensive and
> uncomplicated remedy for aggrieved parties, most of whom were poor and
> unsophisticated.  Conciliation also was designed to allow a respondent to
> rectify or explain his action without the public condemnation resulting
> from a more formal proceeding.  Furthermore, the absence of direct
> government coercion was thought to lessen the antagonism between
> parties and to encourage reasonable settlement.  The need for voluntary
> compliance was stressed since more coercive remedies were likely to

50

> inflame respondents and encourage them to employ subtle forms of
> discrimination.

Kinsey v. Legg Mason & Co., 60 F.R.D. 91, 95 (D.D.C. 1973).

Courts liberally construe factual contentions in charges of discrimination in order to accomplish the purposes of the Civil Rights Act. Id. at 97. They do so because "[a] large number of the charges with the EEOC are filed by ordinary people unschooled in the technicalities of the law . . . ." Evans v. Frito-Lay, 1974 WL 1148 * 5 (N.D. Ohio). Therefore, a court should determine whether "the scope of the judicial complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Park v. Howard University, 71 F.3d 904, 907 (D.C. Cir. 1995); Kinsey, 60 F.R.D. at 96 (applying the Sanchez v. Standard Brands, Inc., 431 F.2d 455 (5th Cir. 1970) rule).

Nevertheless, courts remain loathe to deprive the alleged wrongdoer of notice and frustrate the purpose of the administrative process. Park, 71 F.3d at 907 (stating that "[a] court cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the Title VII administrative process."); see Kinsey, 60 F.R.D. at 97 (stating "[i]f parties were given complete freedom to litigate claims of discrimination never presented to the EEOC for investigation and conciliation, it would result in the frustration of the statutory scheme and policies favoring informal persuasion and voluntary compliance."). This is true in class actions, as well as individual cases. See Evans, 1974 WL 1148 at *5. Moreover, a major reason for the solicitude accorded complainants—that most are poor and unsophisticated, see Kinsey, 60 F.R.D. at 95—applies with significantly less, if any, weight for federal employees than for many others.

**B.**    **Plaintiffs' Class Claims Exceed the Scope of the Administrative Class Complaint**.

Plaintiffs' class claims, as set forth in their First Amended Complaint, are barred because they are not like or reasonably related to any class claims raised in the administrative process.  At their most expansive, the class claims set forth by Ms. Howard during the administrative process were discrimination in awards, low performance ratings, and promotions and related promotional opportunities brought on behalf of a class of African-American non-supervisory salaried employees at the Department's headquarters offices in Washington, D.C.  See supra  at Part II.A.2.  Ms. Howard's administrative complaint refers to Department employees in the "Washington metropolitan area" and states that if it is "necessary to delineate the class by name and specific location of employees, it will be supplied [if required]." Ex. A at 1.  However, when the EEOC later asked her to clarify the scope of the putative class, Ms. Howard responded  that "[t]he class comprises 'all *non-supervisory* Department of Commerce, *Washington, D.C. Headquarters employees* that [sic] are of African-American decent. [sic]"  See Howard Response, Exh. D at 7 (emphases added) (thus excluding organizations like the USPTO with offices in Alexandria, Virginia, which is within the metropolitan area but not in Washington, D.C. itself).  The Court should hold Plaintiffs to Ms. Howard's refinement of the putative class.  Thus, Plaintiff have failed to exhaust their administrative remedies as to any definition of the class that extends beyond the Department's headquarters in Washington, D.C.

Moreover, Plaintiffs' recent focus on the alleged subjectivity of certain performance and promotion practices was not exhausted administratively.  Claims of discrimination in selection, hiring, compensation, or pay, were never raised or considered in the administrative process; neither was a claim of discrimination in the subjective nature of performance evaluations ever

presented to the EEOC.  Plaintiffs present these, and possibly other,[62] class claims for first time

in this action.

Plaintiffs' own First Amended Complaint makes clear that certain of its allegations or

claims are entirely new and were not raised in the administrative process.  For example, in an

attempt to cure the infirmities in the Complaint that Defendant identified in his Motion to

Dismiss, Plaintiff's First Amended Complaint focuses on "managerial discretion [causing]

excessive subjectivity and race discrimination."  Am. Compl. at ¶ 3.  See also Am. Compl. at ¶¶

109-14 (alleging performance evaluation process is "excessively subjective").  Plaintiffs' First

---

[62]  The allegations in the Amended Complaint are remarkably open-ended and vague.  See, e.g.,
Am. Compl.  ¶ 166 ("who have been denied career advancement . . . and who have been denied
related promotional opportunities.").  It is thus unclear whether Plaintiffs are asserting other class
claims that are also neither like nor related to those that were at issue before the EEOC.  To the
extent that Plaintiffs are articulating any additional new class claims, they must be dismissed.
For example, in the administrative process, Plaintiffs never presented a class hostile environment
or harassment claim to the EEOC independent of the Class Agent's class retaliation claim, and
Plaintiffs' opposition to Defendant's first motion to dismiss stated that they were not asserting a
hostile work environment claim.  See Pl. Opp. at 15.  Nonetheless, Plaintiffs' Amended
Complaint alleges that they have "substantial anecdotal evidence showing that a racially hostile
work environment existed at Commerce."  Am. Compl.  ¶ 144; see also Am. Compl. ¶¶ 153-55,
158.  The Amended Complaint also alleges that Defendant has subjected Ms. Ward Jordan to "a
racially hostile work environment and other forms of discrimination."  Am. Compl. ¶ 76.
Therefore, to the extent Plaintiffs are now attempting to present a hostile work environment
claim, they are asserting a new claim not presented below, and any such claim must be
dismissed.
    Additionally, in the administrative process, Plaintiffs alleged that job assignments were
discriminatory, and the EEOC considered the allegations as promotion-related opportunities and
thus part of the promotion claim.  However, throughout the EEOC process, the term "job
assignments" referred to and was understood as tasks that employees were given.  If, as it
appears, Plaintiffs are now challenging the positions into which employees are placed upon hire,
they are asserting new claims unrelated to those at issue below, and those claims must be
dismissed.  See e.g., Am. Compl. ¶¶ 147 ("Moving African-American[s] to different positions at
the same level which hinders progression to the next GS level . . ."), and 171 ("two separate
workforces . . . . [o]ne, . . . which is primarily white . . . [t]he other . . . which is primarily African
American").

Amended Complaint describes Ms. Howard's administrative complaint, upon which the instant

class allegations rely, as discussing "career advancement" generally and alleging that African-

American employees "had been denied promotions."  Am. Compl. at ¶¶ 7, 47.

Moreover, Ms. Howard had multiple opportunities and ample time—more than ten

years—in the administrative process within which to include the claims that are asserted for the

first time in this complaint, and she did not do so.  To the contrary, she knowingly and explicitly

defined and limited the scope of her administrative charge.  See supra at Part II.A and Exh. D.

Nor was Ms. Howard an unsophisticated novice in the requirements of the administrative

process; she is a seasoned veteran of the process and a prolific filer with 21 complaints filed

against the Department since 1988.  See Exh. Y (Anderson Decl.) at ¶ 5.   And Ms. Howard was

not left to her own lay devices in the prior administrative proceedings; rather she was represented

before the EEOC by a host of experienced counsel and the EEOC's changing cast of AJs took a

very active role assisting her in framing and defining the class claims.[63]  Indeed, it was the

EEOC—not Ms. Howard—that unilaterally expanded the class beyond the Class Agent's

asserted and intended geographical scope to include the entire Washington, D.C. metropolitan

area.  Doing so expanded the class to include employees at PTO, for example, in Alexandria,

Virginia.  Furthermore, Ms. Howard voluntarily abandoned the administrative process at a time

of her choosing before that process had run its full course.

---

[63] The formal Requests for Information that the EEOC AJs issued to the Class Agent were
comprehensive, detailed and clearly designed to assist in defining the scope and nature of her
claims.  See e.g., Letter from Matthew Bradley, EEOC AJ, to Janet Howard and William Biglow,
Esq., DOC counsel (Apr. 12, 1995) attached hereto as Exh. FF; Letter from Kathryn Brown,
EEOC AJ, to Michael Subit, Esq., class counsel, and William Biglow, Esq. (Aug. 4, 1998)
attached hereto as Exh. GG.

On no occasion during that lengthy administrative process with its numerous filings and conferences and constant stream of correspondence and conversations did Ms. Howard or class counsel ever suggest, much less contend, that she also was challenging the <u>subjective</u> nature of promotional and performance evaluation policies and procedures, hiring practices, or alleging discrimination in pay.  <u>See</u>, <u>e.g.</u>, Exh. A at 2 (alleging "low performance rating . . . denial of promotion and awards").  The claims that Plaintiffs seek to assert for the first time before this Court are vastly larger and substantively different from the claims at issue before the EEOC. Simply put, claims of discrimination in promotion are unlike and not related to claims of discrimination in the nature of performance evaluation procedures, hiring or pay.  <u>Chacko v. Patuxent Institution</u>, 429 F.3d 505, 509 (4th Cir. 2005)("[a] claim will also typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits"); <u>Contreras v. Ridge</u>, 305 F. Supp. 2d 126, 134 (D.D.C. 2004) (claims of harassment/hostile work environment and compensation not reasonably related to class claim of denial of promotions and promotions-related activity); <u>Kidane v. Northwest Airlines</u>, 4 F. Supp. 2d 12, 16 (D.D.C. 1999) (discriminatory demotion and discharge not sufficiently related to hostile work environment claim); <u>Park</u>, 71 F.3d at 907 (dismissing claim of national origin hostile work environment where administrative charge alleged discrimination based on national origin).

Allowing Plaintiffs to litigate substantial class claims in this action that were not presented in the EEOC process would contravene Congress's purpose in making administrative exhaustion a statutory prerequisite to suit.  To allow these expanded claims to proceed unfairly

would deprive the DOC of its right to prior notice of those allegations and of its statutorily

provided opportunity to determine whether they could be resolved informally prior to suit.  In

sum, Plaintiffs' class claims of discrimination in promotional and performance evaluation

policies or procedures, any possible class allegations of harassment, as well as any other claims

not presented to or considered by the EEOC, must be dismissed because Plaintiffs failed to

exhaust their administrative remedies as required by Title VII.  Assuming they are otherwise

permitted to proceed,[64] Plaintiffs can only pursue class promotion and related promotional

opportunities claims on behalf of certain current and former African-American, non-supervisory

white-collar employees of the Department's Headquarters' offices in Washington, D.C.

subsequent to Ms. Howard's EEO contact for the administrative class complaint.  There is no

basis to extend the class complaint back two years prior to its filing; doing so would simply pull

untimely claims into this case.

## VI.  MOTION TO STRIKE CLASS CLAIMS

Plaintiffs' class claims fail on three grounds.  First, Plaintiffs have failed to timely move

for class certification.  Second, Plaintiffs failed to timely file their class administrative complaint.

And third, Plaintiffs' class claims cannot satisfy the requirements of Fed. R. Civ. P. 23.

## A.    Plaintiffs Have Failed to Comply with Local Rule 23.1(b)

Local Rule 23.1(b) requires that:  "Within 90 days after the filing of a complaint in a case

---

[64]  References in Plaintiffs' Amended Complaint to "anecdotal evidence" and a "hostile work environment" fail to assert relevant and properly exhausted claims, see Am Compl. ¶¶ 144-159, and thus, even if any of Plaintiffs claims in this case proceed, Plaintiffs may not obtain discovery on these "anecdotal" assertions.  See Fed. R. Civ. P. 26(b) (1) (limiting discovery to that "relevant to the claim of defense of any party").

sought to be maintained as a class action, unless the court in the exercise of its discretion has

extended this period, the plaintiff *shall* move for a certification . . . that the case may be so

maintained. . . . A defendant may move at any time to strike the class action allegations or to

dismiss the complaint." (Emphasis added). Plaintiffs filed their Complaint on October 5, 2005,

but still have not moved for class certification. For this reason alone, Plaintiffs' class claims

should be stricken. See Thomas v. Knight, 257 F. Supp. 2d 86, 91 n.5 (D.D.C. 2003) ("In

addition, the Court notes that although the plaintiff has asserted a class action claim, he has failed

to file a motion to certify the class within 90 days of the filing of the complaint as required by

this Court's Local Rule 23.1(b). . . .Therefore, this Court will deny the plaintiff's request for

class certification and consider his claim only with respect to himself as an individual."). See

also Martin v. Middendorf, 1977 WL 821, *2 (D.D.C. 1977) (refusing to reconsider order

denying class certification on ground, *inter alia*, that "the 90-day deadline for seeking class

action certification . . . expired long before counsel filed the instant motion.").

     In an attempt to cure this deficiency, Plaintiffs moved for leave to file an Amended

Complaint on June 8, 2006, Document No. 25, which the Court subsequently allowed.

Document No. 28. Plaintiffs then asked the Court to extend the time within which they were

required to move for class certification. Document No. 30. However, as set forth in more detail

in Defendant's opposition to Plaintiffs' motion, Document No. 31, Plaintiffs' assumption that the

filing of their First Amended Complaint reset their time to move for class certification is contrary

to the plain text and intent of the Court's Local Civil Rules and contrary to legal authority. See

LCvR 23.1(b)("Within 90 days after the filing of a complaint in a case sought to be maintained as

a class action, unless the court in the exercise of its discretion has extended this period, the

57

plaintiff <u>shall</u> move for a certification . . . that the case may be so maintained. . . .  A defendant may move at any time to strike the class action allegations or to dismiss the complaint.")(emphasis added); <u>cf.</u> <u>Burke v. Gould</u>, 286 F.3d 513, 517 (D.C. Cir. 2002) (upholding requirements of the local rules of this Court).

To allow Plaintiffs to circumvent Local Rule 23.1(b) by filing an amended complaint would undermine the rule's purpose and, in fact, render the rule itself a nullity.  <u>See</u> LCvR 23.1(b).  Plaintiffs could ignore Rule 23.1(b)'s time limitations with impunity, confident that they would restart their time for moving for class certification at any point in the proceedings merely by amending their complaint to add a comma or an extra space.  Because Plaintiffs in this case failed to comply with Local Civil Rule 23.1(b), the Court should strike Plaintiffs' class claims.

**B.** **The Class Claims Must Be Stricken For Failure to Exhaust the Administrative Process Because Plaintiff Howard Failed to Timely Contact an EEO Counselor On Her Administrative Class Complaint.**

Janet Howard is the only Plaintiff in the case at bar who even attempted to pursue a class administrative complaint.  <u>See generally</u> Exh. Y (Anderson Decl.).[65]  Indeed, it is Ms. Howard's class complaint upon which Plaintiffs rely for their contention that they have satisfied all necessary conditions precedent to the filing of this action.  <u>See</u> Am. Compl. ¶ 5.  Because Plaintiff Howard failed to timely contact an EEO counselor on her administrative class complaint, however, the prerequisites to suit on her class claims have not been satisfied.

---

[65] Plaintiffs never even allege in their First Amended Complaint that they exhausted any of their claims administratively, including their class claims.

Howard first contacted Commerce's Office of Civil Rights ("OCR") to seek counseling regarding her class claims on October 21, 1994.  See Exh. Y (Anderson Decl.), Attach. 3 (Howard's Letter of December 16, 1994), and Attach. 6 (Class Action Counselor's Report) at 1. In the counseling process, she identified the following as her complaint:  "Racial Discrimination against African Americans based on the preponderance of incidents of African Americans being discriminated against by DOC officials in promotion, awards, recognition and training."  Id. at Attach. 4 (Class Action Response[66]) at 1.  On February 10, 1995, the EEO Counselor gave Howard notice of her right to file a formal class complaint within 15 days.  Id. at Attach. 5 (Notice of Right to File).  On February 22, 1995, Howard filed the formal class complaint that is the subject of this lawsuit.  Id. at Attach 2 (Complaint of Discrimination); see also Compl. ¶ 55.

Howard's October 21, 1994, contact with OCR to seek informal counseling was untimely. Specifically, under the applicable regulations, a putative class agent is required to seek counseling within 45 days of the alleged discrimination.[67]  As the Supreme Court has instructed, a Title VII claimant must timely pursue administrative remedies "or lose the ability to recover for it."  Morgan, 536 U.S. at 110.  Here, Ms. Howard failed to identify any discriminatory act that had occurred within 45 days of when she first sought counseling on October 21, 1994.  See Exh. Y (Anderson Decl.) at Attach. 4 (Class Action Response) at 1.  To the contrary, in her formal complaint of class discrimination filed on February 22, 1995, Howard specifically averred that

---

[66] The document is misdated as January 20, 1994.  The actual date of the letter was January 20, 1995, as is clear from the fact that it responds to a letter requesting information about the class claim dated January 17, 1995 (attached hereto as Exhibit JJ).

[67] 29 C.F.R. § 1614.204(b) makes explicit that the requirements of 29 C.F.R. § 1614.105 apply to administrative class complaints.  29 C.F.R. § 1614.105 (a)(1) requires counseling within 45 days of the alleged discrimination.

the "date on which the most recent discrimination took place" was August 5, 1994. Id. at Attach.

2 (Complaint of Discrimination) at 1. That date obviously was not within 45 days of October 21,

1994. Having failed to timely initiate EEO counseling, Howard lost her right to pursue the

claims that are the subject of both the class administrative complaint and this lawsuit.[68]

Moreover, Plaintiffs' own First Amended Complaint, at ¶ 44, makes clear that Ms.

Howard knew about the allegedly overly subjective and/or discriminatory system of promotions

and performance evaluations purportedly employed by the Department no later than 1992, when,

according to the First Amended Complaint, Ms. Howard's supervisor gave African-American

employees "significantly lower ratings." Therefore, the class claims should be dismissed. See

Torres v. Mineta, Memo. Op. at 12, Civ. No. 04-0015 (GK) (D.D.C., May 13, 2005) (dismissing

Title VII putative class action for untimely EEO counselor contact because plaintiffs had learned

of the allegedly discriminatory policies and practices they were challenging and thus knew, or

should have known, about the alleged discrimination, more than 45 days before they contacted an

EEO counselor).

This is underscored by Ms. Howard's own performance evaluations for the years between

1987 and 1995. The undersigned counsel of record has reviewed those evaluations, which are

---

[68] Federal agencies do not waive a timeliness defense by accepting and investigating an administrative complaint of discrimination. Brown v. Marsh, 777 F.2d 8, 15 (D.C. Cir. 1985); Boyd v. U.S. Postal Service, 752 F.2d 410, 414 (9th Cir. 1985). The situation here is unlike Bowden v. U.S., 106 F.3d 433, 438-39 (D.C. Cir. 1997), where the government's failure to challenge timeliness both at the administrative level and in initial suits in the district court and the Court of Claims, combined with the government's prolonging the litigation and its "procedural run-around" of the plaintiff, amounted to a waiver of that defense. In contrast, the government here is asserting its timeliness defense at its very first judicial opportunity and was in no way responsible for the length of time that this matter languished in the administrative process.

attached as Exhibits A-3 through A-8. The forms used in, and the process of, evaluating Ms. Howard's performance was substantially the same, if not the same, throughout that period. The forms themselves are nearly identical. For example, Exhibit A-3 is Ms. Howard's evaluation for the period of April 1, 1987 through September 30, 1987. Exhibit A-3, at page 3, appears to be the same as page 2 of Exhibit A-7, Ms. Howard's appraisal for the period October 1, 1994 through September 30, 1995. Each contains a section for "Performance Element and Objective[s]," with "Weighting Factor[s]," "Major Activities" and "Criteria for Evaluation." The descriptions of each of the above, which are preprinted on the forms, appear to be exactly the same in 1994/95 as they were in 1987.

Just as in Torres, Ms. Howard complains of a policy and practice, here the performance evaluation process, that was used by her office many years before her EEO counselor contact, here at least by April 1, 1987. Yet, Ms. Howard waited until October 1994 to bring her class complaint to the attention of an EEO counselor. Ms. Howard's EEO contact, thus, was extremely untimely. As explained above, at least one named plaintiff must have exhausted her administrative remedies as to the putative class in order for a putative class action to go forward. Since Ms. Howard is the only Plaintiff who even filed a putative class complaint at the administrative level, this lawsuit must be dismissed for failure to exhaust administrative remedies. Ms. Howard knew, or should have known, about her office's performance evaluation process and promotion policies and procedures long before she contacted an EEO counselor. And, of course, even then, she did not specifically raise the issue of an overly subjective process at all.

61

**C.**    **Plaintiffs' Class Claims Do Not Satisfy the Requirements of Rule 23**.

Plaintiffs seek to pursue class claims on behalf of all African-American, non-supervisory, current and former employees, regardless of job classification, grade level (GS-9 to GS-15 or equivalent level white collar non-GS positions), or work site, who allegedly have experienced race discrimination at any of the Department's 15 bureaus at any time since 1993.  See Am. Compl. ¶¶ 10, 166.  The only class claim presented in the First Amended Complaint alleges "systemic" race discrimination in a battery of employment practices, including in performance evaluation practices and promotion procedures and "refusal to establish or follow policies, procedures, or criteria that reduce or eliminate disparate impact or racial stereotypes in Commerce's decision making process."  Id. ¶ 186; see also, id., ¶¶ 10, 185, 187.[69]  These "across-the-board" allegations cannot possibly form the basis for a proper class action.

Far from identifying specific discriminatory performance evaluation practices or promotion procedures in each of the Department's distinct bureaus affecting all purported class members uniformly, Plaintiffs simply make generalized accusations and jumble together a host of dissimilar individual claims and "anecdotal evidence" linked only by their alleged "subjectivity."[70]  The dissimilarities include:  (1) dissimilar types of employer actions (non-selections, non-promotions, transfers, and "anecdotal" references to a hostile work environment); (2) a host of different alleged discriminators; (3) dissimilar types of employment (statisticians,

---

[69] The full extent of the class claims Plaintiffs seek to pursue is uncertain given their repeated use of non-specific allegations that class members were subjected to "systemic racial discrimination" with a "disparate impact on their employment opportunities."  E.g., id. ¶ 185.

[70]  Again, none of the "anecdotal evidence" has been properly exhausted in the administrative process, and all of the allegations contained therein should be dismissed.

patent examiners, paralegals); and (4) dissimilar bureaus governed by discrete personnel policies. The myriad dissimilarities—both as among the named plaintiffs themselves, and as between the named plaintiffs and the absent class members—preclude Plaintiffs from establishing commonality, typicality, and adequacy of representation under Rule 23(a). In addition, Plaintiffs' inability to identify a discriminatory practice common to all their claims, combined with their decision to seek significant monetary relief, prevents them from meeting the requirements of Rule 23(b).

### 1.    Standard of Review

Class certification is governed by Fed. R. Civ. P. 23, the provisions of which are designed principally to promote the efficient and economical conduct of litigation. American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 553 (1974). A class action generally enables courts "to treat common claims together, obviating the need for repeated adjudication of the same issues." In re General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 783 (3rd Cir.), cert. denied, 116 S. Ct. 88 (1995). The class action device is "'an exception to the rule that litigation is conducted by and on behalf of the individual named parties only.'" General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 155 (1982) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-701, (1979)).

Rule 23(a) of the Federal Rules of Civil Procedure sets forth four prerequisites to a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or

63

defenses of the class, and (4) the representative parties will fairly and adequately
protect the interests of the class.

Fed. R. Civ. P. 23(a).  If these prerequisites are met, a class action may be maintained if, *inter*

*alia*,

> (2) the party opposing the class has acted or refused to act on grounds generally
> applicable to the class, thereby making appropriate final injunctive relief or
> corresponding declaratory relief with respect to the class as a whole;  or
>
> (3) the court finds that questions of law or fact common to the members of the
> class predominate over any questions affecting individualized members, and that a
> class action is superior to other available methods for the fair and efficient
> adjudication of the controversy.

Fed. R. Civ. P. 23(b).  The party seeking class certification bears the burden of proof as to each

element.  McCarthy v. Kleindienst, 741 F.2d 1406, 1414 n. 9 (D.C. Cir. 1984).  Failure to prove

even one of these elements requires dismissal of the class complaint.  Id.; Kas v. Financial

General Bankshares, Inc., 105 F.R.D. 453 (D.D.C. 1985); Pendleton v. Schlesinger, 73 F.R.D.

506, 508 (D.D.C. 1977).

Consistent with the exceptional nature of class actions, the Supreme Court has cautioned

that class actions may be certified only where a "rigorous analysis has shown that the

requirements of Rule 23(a) have been satisfied."  Falcon, 457 U.S. at 161.  In other words,

"actual, not presumed, conformance with Rule 23(a) [is]  .  .  . indispensable."  Id. at 160 (noting

potential unfairness to class members bound by unfavorable judgment); see also Wagner v.

Taylor, 836 F.2d 578, 594 (D.C. Cir. 1987).  Mere conclusory averments are insufficient to

obtain class certification.  See In re American Medical Systems, Inc., 75 F.3d 1069, 1083, 1086

(6th Cir. 1996); Gonzalez v. Brady, 136 F.R.D. 329 (D.D.C. 1991).

Whether to certify a class is within the broad discretion of the trial court.  Fed. R. Civ. P. 23(c)(1); Hartman v. Duffey, 19 F.3d 1459, 1471 (D.C. Cir. 1994).  Further, while in no way a determination of the merits, inspection of "the circumstances of the case is essential to determine whether the prerequisites of . . . Rule 23 have been met."  Wagner, 836 F.2d at 587; see also Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 (1978) ("class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action"); Rodriquez v. U.S. Dept. of Treasury, 131 F.R.D.1, 8 (D.D.C. 1990) ("an analysis of the nature of the proof which will be required at trial is directly relevant to a determination whether the matters in dispute are principally individual in nature or are susceptible of proof equally applicable to all class members").

A class action complaint must allege "facts from which [a] district court could reasonably infer that the mandatory prerequisites of Fed. R. Civ. P. 23(a) [have] been met," Smith v. Transworld Systems, Inc., 953 F.2d 1025, 1033 (6th Cir. 1992), and deficient class allegations may be struck.  Id.; LCvR 23.1(b) ("A defendant may move at any time to strike the class allegations or to dismiss the complaint.").  As the Supreme Court has instructed, "sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim . . . ."  Falcon, 457 U.S. at 147. Moreover, the need to state a factually viable claim at the outset of litigation is particularly pressing in class actions where the mere filing of a class complaint creates fiduciary obligations to members of the putative class, upon which putative class members may rely even though a class has not been certified.  United Airlines, Inc. v. McDonald, 432 U.S. 385, 393-94 (1977).

65

2.     **"Across-the-Board" Allegations of Discrimination Rarely Meet the Requirements for Class Certification Under Rule 23(a)**.

As this Circuit has recognized, Rule 23 inquiries in the context of Title VII suits "have presented courts with a peculiar set of problems." Wagner, 836 F.2d at 588. Recognition of the fact that "'racial discrimination is by definition class discrimination,' . . . has left uncertain the degree of permissiveness tolerable in applying the requirements of Rule 23 in Title VII litigation, and has promoted a difference of opinion as to the proper standard for certifying Title VII classes." Id. (quoting Falcon, 457 U.S. at 157). Prior to the Supreme Court's landmark opinion in Falcon, many courts employed an "'across-the-board' approach to Title VII class certification, in which "any case featuring a proposed class composed of all members of a minority group connected in some fashion with a particular employer is deemed to present common questions of law or fact, regardless of individual variations in terms of discriminatory practices suffered or injuries sustained, merely by virtue of an allegation that racial discrimination had occurred." Id. These courts "permitted a named plaintiff in one job category to represent employees in another job category, or a discharged employee to represent current employees, reasoning that although different members of the class may have been harmed in different ways, 'the Damoclean threat of a racially discriminatory policy hangs over the racial class [and] is a question of fact common to all members of the class.'" Id. (quoting Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122, 1124 (5th Cir. 1969)).

In Falcon, the Supreme Court rejected the "across-the-board" approach, overturning a trial court's certification of a class consisting of both Mexican-American employees who were denied promotions and Mexican-American job applicants who were denied employment. 457

U.S. at 152, 155. The Supreme Court reasoned that the "across-the-board" approach failed to "evaluate carefully the legitimacy of the named plaintiff's plea that he is a proper class representative under Rule 23(a)." Id. at 160. As the Court explained:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For [the plaintiff] to bridge that gap, he must prove much more than the validity of his own claim. Even though evidence that he was passed over for promotion when several less deserving whites were advanced may support the conclusion that [the plaintiff] was denied the promotion because of his national origin, such evidence would not necessarily justify the additional inferences (1) that this discriminatory treatment is typical of [the defendant's] promotion practices, (2) that [the defendant's] promotion practices are motivated by a policy of ethnic discrimination that pervades [the plaintiff's work site], or (3) that this policy of ethnic discrimination is reflected in [the defendant's] other employment practices, such as hiring, in the same way it is manifested in the promotion practices.

Id. at 157-58. Accordingly, the Court held that, "a Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Id. at 160.

While criticizing the presumption of commonality and typicality inherent in the "across-the-board" approach, the Supreme Court nevertheless recognized two situations in which "across-the-board" classes might be appropriate:

> If [the defendant] used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a). Significant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested

67

> itself in hiring and promotion practices in the same general fashion, such as
> through entirely subjective decisionmaking processes.  In this regard, it is
> noteworthy that Title VII prohibits discriminatory employment *practices,* not an
> abstract policy of discrimination.  The mere fact that an aggrieved plaintiff is a
> member of an identifiable class of persons of the same race or national origin is
> insufficient to establish his standing to litigate on their behalf all possible claims
> of discrimination against a common employer.

457 U.S. at 158, n. 15 (emphasis in original).  Thus, "across-the-board" class actions cannot even

"*conceivably*" be maintained unless they meet the stringent standards set forth in Falcon.

(Emphasis added).  Plaintiffs' First Amended Complaint attempts to survive dismissal by relying

on Falcon's reference to a class challenging an "entirely subjective decisionmaking process[]."

Id.  However, Plaintiffs' efforts fall flat.  As explained below, Plaintiffs do not even allege that

the Department's practices are "entirely" subjective as required by Falcon, nor could they.  See

Am. Compl. at 22 (complaining of "excessively subjective" performance evaluations).  Instead

the Department's performance appraisal system contains significant objective elements.

Moreover, Plaintiffs' challenge is exactly the "across-the-board" attack on a policy that Falcon

proscribes.  See, e.g., Am. Compl. at ¶¶ 97 (complaining of policies), 144 (complaining of

"racially hostile work environment"), 160-64 (purported survey evidence).

### 3.    Plaintiffs' "Across-the-Board" Claims Lack Commonality.

The commonality and typicality requirements of Rule 23 "tend to merge."  Falcon, 457

U.S. at 157 n. 13.  "Both serve as guideposts for determining whether under the particular

circumstances maintenance of a class action is economical and whether the named plaintiff's

claim and the class claims are so interrelated that the interests of the class members will be fairly

and adequately protected in their absence."  Id.  As to commonality, this Circuit has interpreted

<u>Falcon</u> as follows: "What the Court demands from those seeking certification of a class cutting across employment status or job categories is a 'specific presentation' identifying the questions of law or fact common to the class representative and the members of the class proposed." <u>Wagner</u>, 836 F.2d at 589 (quoting <u>Falcon</u>, 457 U.S. at 158).  Indeed,

> [a]s <u>Falcon</u> made clear, there is more to a showing of commonality than a demonstration that class plaintiffs suffered discrimination on the basis of membership in a particular group . . . .  [A] plaintiff need not isolate the particular practice and prove that such practice *caused* the discrimination, [but] plaintiffs must make a significant showing to permit the court to infer that members of the class suffered from a common policy of discrimination that pervaded all of the employer's challenged employment decisions.

<u>Hartman</u>, 19 F.3d at 1472.  <u>See also</u> <u>Bynum v. District of Columbia</u>, 217 F.R.D. 43, 46-47 (D.D.C. 2003) ("a single aspect or feature of the claim must be common to *all* proposed class members.") (emphasis added).

At the outset, it is apparent that Plaintiffs in the case at bar seek to bring a true "across-the-board" class action.  They propose the following class definition:  "The class consists of all African-American, non-supervisory employees and former employees of Commerce's bureaus in the metropolitan area of Washington, D.C., who have been denied career advancement to one or more white collar positions in the agency's offices at grade levels GS-9 through GS-15 levels, or equivalent level white collar non-GS positions, and who have been denied related promotional opportunities in those same offices, based on their race during the period of time beginning two years prior to the filing of the administrative class complaint on February 22, 1995, and continuing to present," (i.e. since 1993).  Am. Compl. ¶ 166.  They even purport to represent both "future African-American employees," <u>id.</u> at ¶ 168;  they make no effort to limit the class to

69

any specific job category, grade level between GS-9 and GS-15, personnel system, or bureau; and they seek to challenge "systemic" discrimination in employment practices, including alleged discriminatory promotions, awards, performance ratings, work assignments, and training.  See id. ¶ 6; see also, id., ¶¶ 185-89.  Thus, as Plaintiffs candidly acknowledge, they seek to prove that Commerce has subjected them to "systemic racial discrimination," which has had an "unlawful disparate impact on their employment opportunities," and "Commerce has continuously engaged in, condoned and ratified discrimination . . ."  Id. at ¶¶ 185, 189.

By comparison, the Court in Falcon considered the plaintiffs' suit to be an "across-the-board" action because they sought to represent Mexican-Americans in two types of employment decisions:  hiring and promotion.  457 U.S. at 152, 155.  Similar to that case, it is equally apparent that Plaintiffs here can identify no single feature of their claims that is common to all class members, other than the fact that they all receive some sort of a performance evaluation during their employment with each bureau.  Plaintiffs posit that the "common component" for all prospective class members is "the use of excessively subjective performance appraisals, which adversely affect the overall selection of African-Americans for vacant GS-9 through GS-15 or equivalent level white collar non-GS positions."  Am Compl. ¶ 169.  Plaintiffs additionally suggest that all prospective members have been subjected to "Commerce's selection practices and procedures for promotions," which allegedly have had a disparate impact on African-Americans.  Id. ¶ 170.  However, more than this is required to meet the "specific presentation" requirement of Falcon.  The D.C. Circuit has rejected "the common threat of discrimination that confronts all members of the class" as plainly insufficient to establish commonality.  See Wagner, 836 F.2d at 593.

70

Plaintiffs' vain attempt to identify a specific employment practice that operated to discriminate against all proposed class members in the same manner by suggesting that the Department of Commerce engaged in a practice of subjective performance evaluations is plainly insufficient to establish commonality across such a broad spectrum of job classifications, personnel systems, and grade levels. See Am Compl. ¶ 3 ("The performance appraisals allow for a broad range of managerial discretion and therefore serve as a conduit for excessive subjectivity and race discrimination, which results in a disparate impact on African-Americans in violation of Title VII"). First, the allegation misses the point of Falcon, which suggested that commonality conceivably could be established in an "across-the-board" putative class action if an employer manifested discrimination through "entirely subjective *decisionmaking processes*"—not the use of subjective *criteria*. See McReynolds, 208 F.R.D. at 441-42. Indeed, there is nothing inherently suspect about the use of some subjective criteria in hiring and promotion decisions. See Watson v. Ft. Worth Bank & Trust, 487 U.S. 977, 999 (1988) ("It is self-evident that many jobs . . . require personal qualities that have never been considered amenable to standardized testing."). Compare Kwon v. Billington, 370 F. Supp. 2d 177, 186 (D.D.C. 2005) ("Title VII's concern that over reliance on subjective criteria might mask discrimination is not meant to render performance in an interview as an irrelevant consideration in personnel decisions."); Horvath v. Thompson, 329 F. Supp. 2d 1, 9 (D.D.C. 2004) (the selecting official "was entitled to emphasize the need for initiative, a quality listed in the job description").

Second, Plaintiffs cannot possibly show that the Department's personnel decision-making processes were *entirely* subjective. Defendant's declarations establish conclusively that the various bureaus' discrete hiring, appraisal, promotion, and compensation systems are

characterized by numerous objective processes, including, *inter alia*:

- Collective bargaining agreements ("CBA") between bureaus and various unions which govern:

  - hiring for new positions (e.g., until this year, the CBA at Census required internal candidates to be considered for new career ladder positions before external candidates were considered—Exh. V (Smith Decl. ¶ 20);

  - performance appraisals (e.g., at NOAA, National Weather Service CBA gives covered employees the option of a pre-appraisal meeting to note specific accomplishments, and permits the union to place a union member on rating boards—Exh. T (Ribas Decl.) at ¶ 16) (e.g., at Census, CBA mandates pass/fail rating system—Exh. V (Smith Decl.) at ¶¶ 21, 24 ); and

  - promotions and awards (e.g., at PTO, CBA identifies requirements for career-ladder promotions and for special awards programs—Exh. R (Meadows Decl.) at ¶¶ 13, 14);

- online posting of patent examiner vacancies at PTO through its Job Application Rating System (Exh. R (Meadows Decl.) at ¶ 22), and at other bureaus through ACES (Exh. U (Russell Decl.) at ¶ 7); Exh. M (Jefferson Decl.) at ¶ 27;

- specialized educational and experience qualifications for various job categories (e.g., at NIST, applicants for a physicist vacancy must have a degree in physics or an appropriate combination of education and experience with course work in electricity and magnetism, heat, light, mechanics, and sound—Exh. P (Kirkner Decl.) at ¶ 17) (e.g., at BEA, economist candidates must have a degree in economics—Exh. Q (Martin Decl.) at ¶ 22); see also ¶ 23 (NTIA electronics engineers), ¶ 24 (MBDA business development specialists), ¶ 25 (BIS trade and industry analysts and export compliance specialists, ¶ 20 (ITA trade representatives);

- objective criteria for career-ladder promotions (e.g., at PTO, patent examiners must meet specified productivity requirements—Exh. N (Focarino  Decl.) at ¶ 3);

- systems to prevent favoritism or bias in competitive promotions (e.g., at NOAA's NWS, use of structured panel system, uniform scoring system, and pre-established

72

        interview questions for selection of meteorologists—Exh. W (Valdez Decl.) at
        ¶ 6);

-       objective performance criteria (e.g., at Census, quantifiable "generic performance
  indicators" must be incorporated into employees' performance plans—Exh. V
  (Smith Decl.) at ¶ 24);

-       systems to prevent favoritism or bias in performance-related compensation (e.g.,
  the APMS, under which NIST operates, vests final decision authority over
  performance scores, pay increases, and bonuses in Pay Pool Managers—Exh. P
  (Kirkner Decl.) at  ¶ 12.K); and,

-       requirements that negative decisions be explained and documented (e.g., at
  Census, for any performance rating of "Does Not Meet Expectations," the rating
  official must document her reasons in writing and describe a solution—Exh. V
  (Smith Decl.) at ¶ 24.D).

Thus, Commerce's personnel practices clearly cannot be described as entirely subjective.  To the

contrary, they are characterized by numerous objective processes and criteria.  Compare

Vuyanich v. Republic Nat'l Bank of Dallas, 723 F.2d 1195, 1199-200 (5th Cir. 1984) ("The

district court's finding that the Bank relied on two objective inputs—education and experience—

in its necessarily subjective hiring process . . . precludes reliance on this 'general policy of

discrimination' exception"); Wilkins v. University of Houston, 654 F.2d 388, 409 n.37 (5th Cir.

1981) ("[W]hile we . . . do not decide the question, it may be that claims of [discrimination] with

respect to . . . positions requiring diverse and specialized qualifications relating to education and

work experience simply are inappropriate claims for class actions that rely on statistical proof.")

(cited with approval in Valentino v. U.S. Postal Service, 674 F.2d 56, 67 (D.C. Cir. 1982));

Garcia v. Veneman, 211 F.R.D. 15, 20 & n. 4 (D.D.C. 2002) ("where, as here, a number of

objective factors guide the decision-making process, the proposed class fits less neatly into the

*Falcon* exception."); Int'l Union v. LTV Aerospace & Defense Co., 136 F.R.D. 113 (N.D. Tex.

1991) (fact that collective bargaining agreement covered some of the decision-making process

precluded finding that process was entirely subjective).[71]

The prevalence of objective decision-making processes, and the decentralization of

personnel authority among Commerce's various bureaus, make it abundantly clear that resolution

of any claim of discrimination by any purported member of the putative class would require a

"highly individualized" factual inquiry.  See McCarthy v. Kleindeinst, 741 F.2d 1406 (D.C. Cir.

1984) ("serious drawbacks to the maintenance of a class action are presented where initial

determinations, such as the issue of liability vel non, turn upon highly individualized facts").  For

instance, determining whether a physicist at NIST was discriminated against in failing to receive

a promotion to the ZIP-IV level would necessitate an analysis of how his accomplishments

compared to the objective requirements of having twenty or more publications in top refereed

journals, senior authorship in 20% or more of the publications, etc.  See Exh. X (Ott Decl.) at ¶ 5.

By contrast, commonality only exists where "it is unlikely that differences in the factual

backgrounds of each claim will affect the outcome of the legal issue."  Califano, 442 U.S. at 701.

Importantly, this case is analogous to numerous others in which Courts have declined to

---

[71] It also is instructive to contrast this case with McReynolds, in which the Court certified a
narrow class of employees who sought promotion to high-level managerial positions upon a
finding that the company's "promotion practices with respect to this group of individuals is
entirely subjective."  208 F.R.D. at 443.  The Court based this finding on the facts that positions
were filled without being posted at all; that the company allowed each manager to make
promotion decisions "based on whatever criteria he or she chooses, with no guidance or rules";
and that hiring managers were not required to document the reasons for their decisions, making
them unreviewable.  Id. at 433, 441.  As shown above, none of these features apply to the
Department of Commerce's personnel practices.

certify class actions sought to be maintained on behalf of employees (or applicants) in diverse job

types, employed at different facilities with decentralized decision-making, or who were subject to

different employment criteria.  See, e.g., Hartman, 19 F.3d at 1474 (declining to affirm class

certification encompassing both civil service and foreign service applicants to United States

Information Agency); Wagner, 836 F.2d at 581 (affirming lower court's denial of motion to

certify class of all "professional, administrative, and technical employees graded GS-9 and

above" at the Interstate Commerce Commission).  Compare Cooper v. Southern Company, 390

F.3d 695, 704, 715 (11th Cir. 2004) (no commonality for putative class claims of discrimination

regarding promotion opportunities, performance evaluations, compensation, and hostile

environment where workforce was diverse, and management structures, working environments,

and criteria for employment decisions varied substantially); Bacon v. Honda of America Mfg.,

Inc., 370 F.3d 565, 571-72 (6th Cir. 2004) (no commonality for promotion claim where diverse

group of workers subject to differing promotion criteria that included objective measures and

were spread over numerous departments in different locations); Bradford v. Sears, Roebuck &

Co., 673 F.2d 792, 794-95 (5th Cir. 1982) (no commonality where geographically dispersed

facilities had autonomy with regard to challenged employment decisions); Stastny v. Southern

Bell Tel. & Tel. Co., 628 F2d 267, 278-79 (4th Cir. 1980) ("substantial degree of and perhaps

almost complete local autonomy in separate facilities . . . cuts against any inference for class

action commonality purposes that local facility practices were imposed or enforced state-wide

with respect to a statewide class").  Compare Valentino, 674 F.2d at 67 ("When the . . . number

and diversity of the occupations involved in this case became apparent, the district court might

appropriately have revisited the certification to determine whether further trimming, refinement

by subdivision, or even retraction was warranted.").

In short, Plaintiffs cannot possibly meet their burden of making a specific presentation of issues of law or fact common to all class members of their proposed "across-the-board" action, as required under Rule 23(a)(2). This failure, in and of itself, dooms their request for certification.

### 4. The Named Plaintiffs' Claims Are Not Typical of the Proposed Class Claims.

The next requirement of Rule 23(a) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[T]he court must consider whether [the class representatives] suffered injury from a specific discriminatory promotional practice of the employer in the same manner that the members of the proposed class did, and whether [the class representatives] and the class members were injured in the same fashion by a general policy of employment discrimination." Wagner, 836 F.2d at 591.

A review of the allegations of the three named Plaintiffs herein makes abundantly clear that their claims are not typical of the purported class claims. As shown above, the policies, standards, procedures, and decision-makers relevant to the promotion and other employment practices Plaintiffs challenge vary by bureau, and sometimes within bureaus, and by position. In fact, twelve bureaus—BEA, Census, EDA, ESA, ITA, MBDA, NIST, NOAA, NTIS, OIG, PTO, and TA—are conspicuous in that not one of the proposed class representatives is, was, or ever sought to be, an employee at any of them.[72] See, e.g., Am. Compl. ¶¶ 41, 63, 75; Def. Exh. A.

---

[72] Plaintiffs mistakenly state that Ms. Howard currently works for the "Bureau of Export Administration." Am. Compl. at ¶ 41. Ms. Howard currently works for the Bureau of Industry and Security (BIS). Before being renamed "BIS" that agency was called the Bureau of Export Administration (BXA).

76

Even if decision-making were not decentralized and policies not bureau-specific, it strains credulity that any of the purported class representatives could have individual discrimination promotion claims typical of any that a trade representative at ITA, a statistician at Census, or a Patent Examiner at PTO might have.  Compare Hines v. Widnall, 334 F.3d 1253 (11th Cir. 2003) (affirming refusal to certify class of all current, former, and future African-American employees and applicants for jobs at Eglin Air Force Base on grounds, *inter alia*, that employees would be included in class holding job classifications to which none of named plaintiffs belonged).

Moreover, with one exception—Janet Howard, an export compliance specialist at BIS— the proposed representatives hold positions and complain that they were denied promotions to positions that are not among the most predominant either at their particular bureau or Department-wide.  Tanya Ward Jordan is a management and program analyst (see Am. Compl. ¶ 75), not an attorney, at OS, and there are objective standards that apply to attorney promotion decisions that apply neither to Ms. Jordan nor to any of the other proposed class representatives. Any individual claims of promotion discrimination that any of the proposed class representatives might have would thus not be typical of the discrimination claims that a class member who is an attorney could have.  Similarly, Ms. Megginson is currently a management analyst at NTIA, a bureau where electronic engineers are the predominant occupational series out of the small number of approximately 250 employees.  See Am. Compl. ¶63; see also Exh. Q, (Martin Decl.) ¶ 27.[73]  Simply put, any individual discrimination claims that any of the class representatives

---

[73]  Likewise, even the individuals included in Plaintiffs' "anecdotal evidence" section do not present claims which would be among the most predominant either at their particular bureau or Department-wide.  For example, William Burns, is a computer operation monitor (see Compl. ¶ 131), not a statistician, at Census.

might have would simply not be typical of claims that the overwhelming majority of the purported class could have.

Further, the allegations made by the named plaintiffs regarding their individual claims refer to particular actions within relatively small units of their respective bureaus that concern a very few people in relatively uncommon positions. Each of those allegations are fact-specific, distinctive and limited:  in one instance non-selections are at issue (Am. Compl. ¶ 48-51, 54-55); another concerns cancellation of a vacancy announcement (id. ¶ 56-57).  One allegation complains of the denial of promotions (id. ¶¶ 66, 68, 69), and of cash awards (id. ¶ 70), while another concerns lateral transfers (id. ¶¶ 82, 83).  Furthermore, with regard to Ms. Ward Jordan, the allegations of racial animus are intertwined with allegations that the conduct complained of was based upon her alleged disability.  See id. ¶¶ 84-89.  At the same time, there is not a single allegation that anyone from outside the particular unit within the specific bureau at which any of the named plaintiffs worked had any involvement with the events or the decisions of which the named Plaintiffs complain.  No individual Plaintiff (except Ms. Jordan, who is an OS employee) maintains that anyone from the Office of the Secretary or OHRM had anything to do with the decisions of which they complain.

The allegations taken together do not identify a common group of managers as responsible for the decisions of which Plaintiffs' complain; instead each named Plaintiff complains about different individual supervisors.  Compare Garcia, 211 F.R.D. at 22 ("Commonality is defeated—not only by plaintiffs' inability to correlate the discrimination they allege with subjective . . . criteria—but also by the large numbers and geographic dispersion of the decision-makers.").  In sum, the claims of the named Plaintiffs are not typical of the class

78

claims and therefore cannot satisfy Rule 23(a)(3). For this reason as well, Plaintiffs' putative class claims cannot proceed.

**5.      The Named Plaintiffs Are Not Adequate Class Representatives**.

Finally, Plaintiffs must show that they will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy this requirement, a "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Rodriguez, 431 U.S. at 403. As this Circuit has explained, "[b]asic consideration of fairness require[s] that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representatives at all stages of the litigation where absent members will be bound by the court's judgment." National Association for Mental Health, Inc. v. Califano, 717 F.2d 1451, 1457 (D.C. Cir. 1983). In evaluating whether a named plaintiff will fairly and adequately protect the interests of the class members, this Circuit has "considered two principal requirements: 1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representatives must appear able to vigorously prosecute the interests of the class through qualified counsel." Id. at 1458. See also Wagner, 836 F.2d at 595-96.

At the outset, the named plaintiffs do not possess the same interest as the absent class members. As shown in Part IV, above, all the named plaintiffs' individual claims fail as a matter of law. The Supreme Court in Rodriguez made clear that, where named plaintiffs' individual claims lack merit, such plaintiffs are not "members of the class of discriminatees they purported to represent" and therefore cannot "'fairly and adequately represent the interests of the class.'"

79

431 U.S. at 403-06.  See also Everitt v. City of Marshall, 703 F.2d 207, 211 (5th Cir.), cert. denied, 464 U.S. 894 (1983) (upholding denial of certification where class representative's claims were dismissed at trial; once dismissal occurred, class representative no longer was "a member of the class of discriminatees" she sought to represent, and therefore was ineligible to represent the class).

In addition to their not possessing the same interest as members of the putative class, the named Plaintiffs have interests which arguably *conflict* with those of absent class members. First, while Plaintiffs purport to represent Commerce employees at various grade levels – from GS-9 to GS-15 and equivalent level white collar non-GS positions – in all job classifications, and at various levels of responsibility – from paralegals to attorneys – the named plaintiffs do not hold positions representative of all of these groups of Commerce employees and the potential source of conflict raises a serious question about the named plaintiffs' ability to pursue this suit as class representatives.  Moreover, at least one of the three named class members in this suit complain of the actions of *other members of the putative class*.  Specifically, Ms. Jordan complains of decisions made by other African-American employees.  See Am. Compl. ¶¶ 87, 88, 91-93, 195-197.  The Court in Wagner considered this precise circumstance—Wagner accused his own supervisor, who was a potential member of the class, of race discrimination—as casting "doubt concerning [a named plaintiff's] suitability to manage the class action."  836 F.2d at 595.

Finally, while the attorneys who seek to represent the proposed class have alleged that they have "significant nationwide experience in litigating employment discrimination class actions," Am. Compl. ¶ 174, Defendant would note that those attorneys already have made a number of errors which at least call into question their competency to prosecute a Title VII class

action.  Specifically, opposing counsel:

- improperly sought to designate this case as related to <u>Howard v. Guitierrez</u>, 04-756.  <u>See</u> Memorandum Opinion dated December 19, 2005 (Dkt. 11) referring case to Calendar Committee for random reassignment;

- improperly named as a class representative a person who had previously advised counsel that she did not want to be involved in this action, <u>see</u> Exh. Z (Guinyard Decl.) at ¶ 5; Dkt. 12;

- asserted claims in this action not encompassed within the administrative class complaint, <u>compare</u> Compl. and First Am. Compl.;

- asserted claims in this action on behalf of named plaintiffs lacking proper venue, see Exh. S, which Plaintiffs now have abandoned, and asserted claims that are barred by <u>res judicata</u> and failure to exhaust their administrative remedies; indeed, the original Complaint failed to cite the proper venue requirements for Title VII cases.  <u>See</u> Compl. ¶ 13;

- failed to comply with Local Rule 23.1(b), which requires a plaintiff seeking to pursue a class action to file a motion for certification within 90 days of the filing of the complaint.  <u>Compare</u> <u>Rodriguez</u>, 431 U.S. at 405 ("the named plaintiffs' failure to protect the interests of class members by moving for certification surely bears strongly on the adequacy of the representation that those class members might expect to receive."); and

- misstated that an EEOC complaint filed one of the originally named plaintiffs, Dennis Gosier, had been "stayed on April 19, 2004 pending the outcome of Janet Howard's class action suit against Commerce," <u>see</u> Complaint ¶ 161, when in fact: (1) on May 18, 2004, the EEOC had denied counsel's motion to stay Gosier's complaint "pending resolution of class certification issues" in Ms. Howard's administrative class complaint (which motion counsel had labeled as "Unopposed" when it was in fact opposed by the Department), and had dismissed Gosier's complaint for failure to comply with Orders to initiate discovery, produce a prehearing statement, and produce a witness list, <u>see</u> <u>Gosier v. Evans</u>, EEOC Case No. 120-2004-00250X, (Order of Dismissal of Hearing dated May 18, 2004), Exh. HH; and (2) on December 19, 2005, the EEOC had affirmed the dismissal of Gosier's complaint.  <u>See</u> <u>Gosier v. Gutierrez</u>, EEC Appeal No. 01A44851, 2005 EEOPUB LEXIS 5872, Exh. II.

For all these reasons, Plaintiffs cannot carry their burden of showing that they would fairly represent the interests of the class. Thus, Plaintiffs' class claims also fail under Rule 23(a)(4).

**6.    Plaintiffs Cannot Satisfy Rule 23(b) Because the Department Has Not Acted On Grounds Generally Applicable to the Proposed Class.**

Plaintiffs seek to certify the proposed class under Rule 23(b)(2) on the ground that "Commerce has acted on grounds generally applicable to the class . . . ." See Am. Compl. ¶¶ 181-82. However, as shown above, Plaintiffs cannot meet the requirements of Rule 23(b)(2) because they have utterly failed to identify any common policy or practice of the Department that affects all potential members of the class in the same manner. Furthermore, Plaintiffs have sought, as a component of their relief, monetary damages in the form of back pay, front pay, and lost job benefits. See Am. Compl., Prayer for Relief, ¶ k. Because a showing of liability would not automatically entitle any potential class member to back pay, front pay or lost job benefits, determining the amount of damages to which potential class members are entitled would require numerous individualized inquiries and destroy the efficiency of the class mechanism. See Eubanks v. Billington, 110 F.3d 87, 95 (D.C. Cir. 1997) ("the underlying premise of (b)(2) certification—that the class members suffer from a common injury that can be addressed by classwide relief—begins to break down when the class seeks to recover back pay or other forms of monetary damages to be allocated based on individual injuries."). Indeed, because Plaintiffs estimate their class size to be in the range of "hundreds, if not thousands" of members, see Am. Compl. ¶ 167, numerous individualized inquiries would be required to establish that class members actually had been damaged to an extent justifying specific monetary relief incidental to

82

any equitable relief.  For these reasons, Plaintiffs cannot satisfy the requirements of Rule

23(b)(2), and their class claims must be stricken.

## VII.  CONCLUSION

For the foregoing reasons, Plaintiffs' First Amended Complaint should be dismissed with

prejudice.

Respectfully submitted,


_____/s/_____
KENNETH L. WAINSTEIN, D.C. Bar #451058
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney


_____/s/_____
PETER S. SMITH, D.C. BAR # 465131
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
(202) 307-0372/FAX: (202) 514-8780


_____/s/_____
MEGAN L. ROSE, N.C. BAR # 28639
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W. - Civil Division
Washington, D.C.  20530
(202) 514-7220


83