## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JANET HOWARD, <u>et al.</u>      )
                     )
      **Plaintiffs,**      )
                     )
**v.**                 )     **Civil Action No. 05-1968 (JDB)**
                     )
**CARLOS M. GUTIERREZ,**      )
**Secretary, United States Department of**      )
**Commerce,**      )
                     )
      **Defendant.**      )
                     )

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS ALL INDIVIDUAL CLAIMS, TO DISMISS CLASS CLAIMS, AND TO STRIKE ALL CLASS CLAIMS</u>

Plaintiffs, by and through undersigned counsel, hereby submit Plaintiffs' Opposition to Defendant Department of Commerce's[1] Renewed Motion to Dismiss All Individual Claims and Class Claims and the Department's "Motion to Strike" All Class Claims (hereinafter D's Br.). Defendant's Motions must be denied because, <u>inter alia</u>, Defendant:  1) improperly relies upon unsupported and erroneous factual contentions, rather than any purported legal deficiency in Plaintiffs' claims; 2) quarrels with the factual claims in Plaintiffs' First Amended Complaint ("Complaint"), which must be accepted as true for purpose of deciding this 12(b)(6) motion[2];  3) ignores Rule 12(b)(6) jurisprudence which dictates that Plaintiffs' pleading must be read liberally

---

[1]  Throughout this brief, Department of Commerce is referred to as "DOC," "The Department," "Commerce," "Agency" or "Defendant."

[2]  Although Defendant cites to Rule 12(b)(3), it no longer presents arguments with regard to improper venue, therefore, that assertion is waived.

and accorded the benefit of all favorable inferences; and (4) prematurely and baselessly attacks Plaintiffs' class allegations, prior to discovery or even the filing of Plaintiffs' class certification motion.[3]

## I.    INTRODUCTION

### A.    Plaintiffs' Substantial Allegations Of Unlawful Discrimination.

Plaintiffs' Amended Complaint clearly states individual and class claims upon which relief can be granted and is thus more than sufficient to withstand a motion to dismiss on the pleadings under Federal Rule of Civil Procedure 12(b)(6).  Namely, the Amended Complaint alleges that the Department of Commerce's uniform policies regarding performance appraisals, promulgated by Headquarters and applicable across Bureaus, allow for a broad range of managerial discretion and excessive subjectivity and therefore serve as a conduit for race discrimination.  These challenged policies violate Title VII by creating a disparate impact on African-Americans in positions GS-9 through GS-15 or equivalent level white collar non-GS positions.  First Amended Class Action Complaint ("FAC") at ¶ 2-3.  Dr. David Martin, a Professor of Management and Human Resources Management at the Kogod School of Business Administration of American University and a noted expert on bias in performance appraisal systems, has concluded that the DOC's performance appraisal system is "probably the worst system [he has] critiqued."  FAC at ¶ 109-14.  In addition, Plaintiffs allege strong statistical evidence demonstrating that African-American employees of Commerce are grossly underrepresented in GS-9 through GS-15 levels and raising an inference that the subjective performance appraisals caused this disparity.  Anecdotal evidence also illustrates Departmental

---

[3] As explained infra., Defendant's claim that Plaintiffs' are out of time to file their class certification motion is also meritless.

race discrimination in advancement and promotion.  FAC at ¶ 115-22. [4]

Pursuant to well-established caselaw, these factual allegations must all be accepted as true for purposes of a 12(b)(6) motion, and as such, the allegations clearly state a claim for a putative Title VII class action under Rule 23.  See Cruz v. Beto, 405 U.S. 319, 322 (1972) (per curiam).

###    B.    Summary of Argument

Defendant's motions must be denied in their entirety.  Every argument made by Defendant in support of its motions improperly relies on facts and evidence external to the Amended Complaint, directly contrary to Fed. R. Civ. Proc. 12(b)(6)'s clear command that motions to dismiss be premised solely on facts that "appear on the face of the complaint itself." Carey v. Edgewood Mgmt. Corp., 754 A.2d 951, 954 (D.C. Cir. 2000).[5]

Notwithstanding Defendant's prohibited reliance on external facts, Defendant presents no basis for dismissal of any of the named Plaintiffs' individual Title VII claims or of any of the class claims.  As set forth below, Plaintiffs' individual claims should not be dismissed because each of the named Plaintiffs has exhausted her administrative remedies and none of their Title VII claims are barred by *res judicata*.  Even if the individual claims of named Plaintiffs are

---

[4] For example, Plaintiff Janet Howard was once informed by her supervisor that the promotion she was in line for was traditionally reserved for "white males." FAC at ¶ 6.  This is but one example of numerous instances of racially biased remarks or incidents reported by DOC employees.

[5] In the circumstances of this case, where there are countless disputed questions of fact, it would be inappropriate for the Court to convert Defendant's motions to dismiss into motions for summary judgment because the Court does not have before it all the information necessary to properly decide the case and Plaintiffs have not been provided a fair opportunity to conduct discovery to provide that information to the Court.  Cf. Minebea Co., Ltd. v. Papst, 13 F.Supp.2d 35, 42 (D.D.C. 1998).

somehow flawed, Plaintiffs are entitled to substitute other class members with viable claims as class representatives.

Defendant's Motion to Dismiss class claims is also meritless because it is premised entirely on the unfounded argument that Plaintiffs' class claims exceed the scope of the administrative complaint. This is simply not true: Defendant asserts that the administrative complaint did not encompass the entire Washington D.C. metropolitan area, but that assertion is contradicted by the express definition of the class stated on the face of the administrative complaint.[6]

Defendant's Motion to Strike the Class Claims must also be denied. First, Commerce's motion is premature because it attempts to litigate the issue of whether class certification is proper before the parties have even engaged in any discovery on the issue. Defendant states that its own "declarations establish conclusively that the various bureaus' discrete hiring, appraisal, promotion, and compensation systems are characterized by numerous objective processes" (D's Br. at 72-73), and proceeds to list a series of alleged supporting statements from various witnesses (D's Br. at 73-74). However, Plaintiffs' class claims are based almost exclusively upon facts and statistics in The Department's sole possession and control. The Court must provide Plaintiffs the opportunity for discovery on this issue before the Court resolves this issue for or against Plaintiffs. Indeed, Defendant's motion to strike is accompanied by a massive presentation of untested materials that only underscore the need for discovery before the briefing and a decision on class certification.

_____

[6] Defendant also alleges that anecdotal evidence is not admissible because it was not exhausted in the administrative process. This argument is off-base and unsupported by legal authority. There is no requirement that all evidence must be submitted at the administrative level. What is required is that all *claims* be exhausted, which Plaintiffs have done.

As this Circuit cautioned in <u>Wagner v. Taylor,</u> allowing sufficient discovery prior to undertaking the class certification analysis is important both to permit Plaintiffs to test and challenge Defendant's factual assertions in opposition to class certification *and* to allow the Court to exercise its discretion to craft an appropriate class:

> It may be possible . . . for the plaintiff to accumulate <u>through discovery</u> the information needed to make a "specific presentation" incorporating the elements called for by Rule 23. Additionally, the situation may prompt the District Court to exercise its broad discretion to redefine and reshape the proposed class to the point that it qualifies for certification under Rule 23.

836 F.2d 578, 589-90 (D.C. Cir. 1987) (emphasis added). In other words, both precedent and fairness dictate that Plaintiffs must be able to pursue discovery in order to gather supporting evidence and test Defendants' factual assertions prior to class certification briefing (let alone the Court's class certification *decision*). In any event, Defendant's arguments against class certification—while wholly inappropriate at this juncture—are also lacking in merit, and should be rejected.

Commerce's argument that Plaintiffs failed to move for class certification under Rule 23.1 within 90 days after the filing of their original Complaint and, consequentially, that this delay forecloses their ability to bring class claims is without merit. Even if Plaintiffs did fail to comply with Local Rule 23, they should be permitted ninety days from the filing of the First Amended Complaint to comply with the rule. Precedents in the D.C. and other circuits confirm that an amended Complaint serves as the operative pleading, rendering the original complaint void. As a logical outgrowth of this rule, the cases have consistently held that the timeliness of a class motion is measured from the filing of the amended complaint, not the original Complaint as the Department asserts. Under this standard, Plaintiffs have timely class counts under Rule 23.1 because this Court stayed Plaintiffs' Rule 23.1 obligations within 90 days from when Plaintiffs

filed their amended complaint.  In any event, FRCP 6(b) excuses any non-compliance on the part of Plaintiffs where, as here, the failure to file for class certification within the prescribed time period resulted from excusable neglect, and there is no prejudice to the opposing party.

Third, Defendant's argument regarding the failure of Plaintiff Howard to timely notify an EEO counselor on her administrative class complaint must fail.  Despite the fact that more than ten years that have passed since the class charge was filed with the EEOC, Defendant has never before raised this argument.  Defendant has therefore waived this argument.

### C.    Procedural History at the EEOC and Before this Court

#### 1.    The Howard Class Complaint.

After years of suffering racial discrimination, Janet Howard, an African-American female and a Commerce employee since 1983, filed a timely class complaint on February 22, 1995, alleging that the DOC engaged in race discrimination against a class of African-American employees who worked for the DOC in the metropolitan area of Washington, D.C.  D's Ex. A (Howard Complaint).

Specifically, the Howard Complaint alleges that the Commerce has maintained a system of racially discriminatory and subjective employment practices with respect to promotions, awards, performance ratings, career-enhancing work assignments, timely training for advancement, and job assignments.  D's Exhibit A at 1-4.  The Howard Complaint also alleges that the Department's subjective decision-making has prevented African-Americans from advancing according to their merit by leading, and continuing to lead, to discriminatory promotion denials and other discriminatory employment decisions that adversely affect job advancement, including performance evaluations, job assignments, training, awards and recognition.

### 2. Class Members Have Relied on the Pendency of the Class Action Since 1995.

Since 1995, a great amount of publicity has surrounded this lawsuit. An Internet Web site regarding the case has been created (http://communities.msn.com/feldf); rallies have been held throughout the District of Columbia; fundraising efforts have been ongoing for years to support the litigation; and there have been extensive communications between Ms. Howard and class members, and between the Department of Commerce and class members.

For example, a letter from Leroy J. Warren, Jr., Chairman of the NAACP Federal Sector Task Force to William Daley, Secretary of Commerce, dated September 16, 1999, described the complaints received by the NAACP of race discrimination at the DOC:

> The NAACP has for many years been the recipient of a number of very serious allegations of [rampant employment discrimination routinely faced by many racial minorities employed by the Department of Commerce] . . . . Today's Protest Demonstration is being conducted because of the non-responsiveness of senior Commerce officials to what the Task Force strongly believes are legitimate complaints of employment discrimination, racism, abuse of authority, and an overall lack of equality and justice within Commerce. ***The EEO program at Commerce is basically malfunctioning and inoperative***.

(Letter dated September 16, 1999 from Leroy J. Warren, Jr., Chairman, NAACP Federal Sector Task Force, to William Daley, Secretary of Commerce) (emphasis in original).

Given the history of publicity of the <u>Howard</u> matter, it is reasonably certain that hundreds if not thousands of absent class members have relied on the pendency of this class action in the time since the <u>Howard</u> Complaint was filed in 1995.

### 3.    Administrative Decisions Regarding Class Certification.

On July 20, 2000, five years after the <u>Howard</u> class charge was filed with the EEOC, in an exhaustive and scholarly opinion, the Office of Federal Operations ("OFO") provisionally certified a department-wide class composed of:

> African-American, non-supervisory employees and former employees of the Agency's [Department of Commerce] Headquarters' offices in the metropolitan area of Washington, D.C., who allegedly have been denied career advancement to one or more white collar positions in the agency's Headquarters' offices at grade levels GS-9 through GS-15, or equivalent level white collar non-GS positions, and who may have been denied related promotional opportunities[7] in those same offices based on their race during the period of time beginning two years prior to the filing of the class complaint on February 22, 1995, and continuing to the date a final determination is rendered on the class complaint claim.

P's Ex. A (July 20, 2000 OFO Decision) at 10.  The OFO found that the "class complaint states a claim that the agency has delayed and limited, and continues to delay and limit, the career advancement of class members because of their race." <u>Id.</u>  The OFO certified this class because "existing information suggests that significant numbers of African-American employees have been denied advancement to [GS-9 through GS-15 or equivalent] positions and, thus, that common questions of fact and law exist as to those positions." <u>Id.</u>

The EEOC held that the class complaint satisfied the commonality requirement, given that it appeared that "common standards govern agency promotion and performance appraisal decisions in the Washington, D.C. metropolitan area." <u>Id.</u> at 11.  Such common standards include:  the agency's issuance of a Department Administrative Order (DAO), implementing the

---

[7]    The OFO clarified that "[r]elated promotional opportunities include training, assignments, details, awards, etc., that would have enhanced a class member's qualifications for promotion to such a position, whether the promotion would have been a career ladder promotion, a competitive promotion, or an accretion of duties promotion." <u>Id.</u> at 10.

federal merit promotion policy agency-wide; and the agency's promulgation of agency-wide principles governing the issuance of performance appraisals.  The Commission also found that the complainant possessed the same interest and suffered the same injury as the members of the class, and that numerosity and adequacy were satisfied.  Id. at 10; 14.

In addition, the Commission took administrative notice of the information in the EEOC's Annual Report on the Employment of Minorities, Women and People with Disabilities in the Federal Government for the Fiscal Year 1998 ("EEOC Report"), which documented the following:

a.     The average white collar grade for the agency's white employees was 10.60, while the average white collar grade for the agency's black employees was 8.78.  EEOC Report, Table I-16.

b.     The discrepancies in grade level were also evident in professional positions where the average grade for white agency professional employees in FY 1998 was 12.77 while the average grade for black agency professional employees was 11.62.  EEOC Report, Table I-17.

c.     The percentage of black employees in the agency's white collar positions GS-9 and above in FY 1998 declines as the grade level increases.  In contrast, the percentage of white employees in the agency's white collar positions increased in the higher graded positions.

d.     Several affidavits and over forty unsworn survey forms that were completed in September 1998 which indicate that numerous individual class members believe they have been denied advancement-related opportunities based on their race.

e.     Hundreds of race discrimination complaints agency-wide.

On December 17, 2002, in a 53-page brief, the DOC moved to narrow coverage of the class by eliminating approximately 85% of the class members from the class. In response, Plaintiffs' prior counsel filed a one-and-one-half page opposition.

On August 20, 2003, in a one-page order ("Decertification Order"), Judge Varice Henry granted Defendant's Motion to Redefine the Class, without offering any rationale or factual support. FAC at ¶ 25-27. This decision completely disregarded the careful analysis by the OFO, and cavalierly swept aside the OFO's metropolitan-wide class ruling. Id. The Decertification Order virtually eliminated the entire class previously certified by the OFO by excising five of the 15 bureaus of the OFO-certified class (removing approximately 4500 of the 5300 class members[8]) and confining the class to Commerce's African-American employees in Washington, D.C. proper.

At the end of 2003, Plaintiffs' prior counsel withdrew, and Plaintiffs' current counsel subsequently entered their appearances. FAC at ¶ 28-29. After receiving word from the DOC that it planned to send notice to class members notifying them that they were excluded from the class, Plaintiffs' counsel requested leave to file a motion to reconsider Judge Henry's Decertification Order, which Judge Kravetz granted in January 2004. FAC at ¶ 30.

On March 4, 2004, Plaintiffs moved for reconsideration of the Decertification Order and reinstatement of the OFO's certification of a D.C. metropolitan-wide class of African-American DOC employees.[9] Id. That Motion and its hundreds of pages of accompanying exhibits

---

[8] These numbers represent a snapshot of African-American employees in the 15 bureaus as of October 1, 2003.

[9] Plaintiffs' Brief in support of their Motion for Reconsideration of Judge Henry's Decertification Order, Or In The Alternative, Their Motion To Subclass The D.C. Metropolitan Bureaus before the EEOC ("P's EEOC Brief"), without its accompanying Appendix of exhibits,

demonstrate the likelihood that Plaintiffs will be able to successfully obtain class certification in this case after appropriate discovery.

In April 2004, Judge Kravetz assured the parties that he would grant or deny the motion for reconsideration within months.  Id.    However, after several telephone conferences with Judge Kravetz and the parties, no opinion was rendered.

### 4.    The Present Lawsuit.

After waiting approximately eighteen months for Judge Kravetz's reconsideration decision, in addition to the decade this case had already spent in litigation, Plaintiffs made the decision to file in this Court.  Id. Upon receipt of Plaintiffs' declaration of intent to file a classification in federal court, Judge Kravetz dismissed this suit's administrative predecessor in an Order dated September 30, 2005.  FAC at ¶ 31.  The Plaintiffs then exercised their rights to file a civil action on October 5, 2005, by filing the initial Complaint in this Court.  D's Exhibit A (Howard Complaint).

On March 17, 2006, Defendant filed a Motion to Dismiss All Individual Claims, to Dismiss Certain Class Claims, and to Strike All Class Claims.  Docket Sheet (DS) at 19.  On June 8, 2006, Plaintiffs filed their Opposition to Defendant's Motion and, at the same time, filed for leave to amend their Complaint. DS at 25-27.  On June 13, 2006, the Court granted Plaintiff's Motion for Leave to File the First Amended Class Action Complaint ("Amended Complaint"), which addresses and renders moot many of the issues raised by Defendant in its Motion to Dismiss regarding the alleged deficiencies of the previous Complaint.  Plaintiffs' Amended Complaint (1) names only the three proper class representatives in this District, thus voiding the venue issues set forth in Defendant's Motion; (2) redefines the class to explicitly conform to the

is attached to this Opposition as P's Exhibit B.

scope of the administrative complaint; and (3) modifies the named Plaintiffs' claims to reflect only allegations not barred on the basis of timeliness or *res judicata.*

On June 23, 2006, Plaintiffs filed a Motion for Enlargement of Time to Move for Class Certification, and, on July 7, 2006, Defendant opposed Plaintiffs' motion. DS at 30, 31. On September 1, 2006, the Court ordered that Plaintiffs' obligation under Local Civil Rule 23.1(b) to file a motion for class certification was stayed, pending further order of the Court. As demonstrated below, (pages 18-34) Plaintiffs' time to move for class certification began running from the filing of the amended complaint and their motion is therefore not late under Local Rule 23.1(b). On July 31, 2006, Defendant filed its Renewed Motions to Dismiss All Individual Claims, to Dismiss Class Claims, and to Strike All Class Claims. DS at 35. With this background in mind, Plaintiffs will proceed to explain why the motion to dismiss must be denied.

## II.    DEFENDANT'S MOTION TO DISMISS ALL INDIVIDUAL CLAIMS SHOULD BE DENIED BECAUSE EACH NAMED PLAINTIFF HAS EXHAUSTED ALL CLAIMS ASSERTED IN THIS ACTION AND DEFENDANT PRESENTS NO OTHER BASIS FOR DISMISSAL.

### A.    Janet Howard's Claims

Faced with repeated events evidencing Defendant's discrimination, *pro se* litigant Janet Howard filed 21 administrative claims against the Department of Commerce in a diligent, good-faith effort to comply with administrative exhaustion and limitations rules. Defendant's contention that none of Janet Howard's administrative complaints against the Department of Commerce provide a basis upon which she can proceed with any individual action is wrong.[10]

---

[10] Plaintiffs use the same system for identifying Ms. Howard's EEO complaints as did Defendant, i.e., referencing them in chronological order of filing.

Defendant incorrectly asserts that Ms. Howard's class charge—the charge giving rise to the present lawsuit, which Defendant refers to as Howard 6—did not include individual allegations. That charge alleges discrimination in promotions, assignment of duties, performance evaluations and awards on the basis of race. See D's Ex. A and Ex. Y (Anderson Decl.). It also contains Ms. Howard's express allegation of having personally suffered discrimination: "I and all participants in the class have been racially discriminated against." D's Ex. A. From the language of the EEOC charge, it is plain that the allegations contained therein refer not only to a class but also to Ms. Howard herself.

Additionally, Howard 14, 15, 17, 19, 20 and part of Howard 18 are all still valid, ripe charges for purposes of this litigation. Defendant concedes this point by acknowledging that Howard 14, 15, 17, 19, 20, and part of 18, are still pending in the administrative process. See D's Br. at 46, n.61. Defendant nevertheless asserts that the administrative claims should be dismissed as a basis for Ms. Howard's individual claims because Plaintiffs did not advance a short and plain statement of these claims in the Amended Complaint. That assertion is unsubstantiated because these six EEOC charges all pertain in whole or in part to discriminatory failure to promote, performance appraisals, training, and awards. Howard 14 (Agency No. 00-67-03254) alleges failure to provide training based on race. Howard 15 (Agency No. 01-67-00128) alleges failure to promote based on race. Howard 17 (Agency No. 02-67-00037) alleges discrimination in performance appraisals based on race. Howard 19 (Agency No. 04-67-00078) alleges discrimination in the granting of training and awards based on race. Howard 20 (Agency No. 05-67-00075) alleges discrimination in the granting of awards on the basis of race. Consistent with these administrative charges, Plaintiffs' Amended Complaint expressly states that "Commerce has subjected Ms. Howard to discrimination by denying her promotions" and

that the subjective decision making associated with "promotions, cash awards, training, enhanced job assignments, and performance appraisals has had a direct and adverse impact on [her] employment at Commerce."  FAC at ¶ 11-12.  Because the Amended Complaint  explicitly provides a short and plain statement regarding Ms. Howard's claims of discrimination in promotion, performance appraisals, training, and awards, claims contained in Howard 14, 15, 17, 19, 20 are ripe and litigable here.[11]

### B.    Joyce Megginson's Claims

Ms. Megginson's individual claims are properly before this Court because she has exhausted her administrative remedies and her membership in the class has equitably tolled the statute of limitations.

Ms. Megginson has been involved in this class action from the time the original class complaint was filed in 1995.  She received a final agency decision regarding her individual claims of discrimination on October 19, 1997.   On December 12, 1997, she filed a lawsuit alleging retaliation in violation of Title VII.  D's Exhibit DD (Megginson Complaint).  On October 27, 2000, Judge Hogan ordered that her case was voluntarily dismissed **without prejudice**.  D's Exhibit EE (Meggisnson Order).   Ms. Megginson dismissed her case shortly after the EEOC certified the class because Judge Hogan advised her that she should pursue her class claims first and that, once the class claims were resolved, if she still wanted to litigate her individual claims she could file another court action.

---

[11] Moreover, even if any of Ms. Howard's allegations are arguably time-barred, they are still probative and admissible as evidence in support of her timely claims of discrimination.  See Pleasants v. Allbaugh, 285 F.Supp.2d 53, 55 (D.D.C. 2003) (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105 (2002) and concluding that evidence of time-barred discrimination claims is admissible as background in proving timely claims).

Defendant argues that Ms. Megginson's filing of the "same claims" as part of the class action is outside Title VII's 90-day limitation period for filing suit. Defendant first errs in describing Ms. Megginson's December 12, 1997 suit as involving the "same claims" as the class complaint. The December 1997 suit involved Title VII claims of retaliation and hostile work environment—not the claims of race discrimination under a disparate impact theory that are before the Court in the Amended Complaint. Thus, Ms. Megginson's prior individual suit did not involve the "same claims" as the class complaint, and her individual allegations cannot be rejected on that basis.

Defendant's argument that Ms. Megginson's individual disparate impact claims are time-barred is also in direct conflict with the well-established principle that the filing of a class action tolls the running of the "the applicable statute of limitations as to all members of the class" in their individual capacities. Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 176 (1974) (citing American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974)); see also Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345, 352-353 (1983); Bailey v. Sullivan, 885 F.2d 52, 65 (3rd Cir. 1989). Similarly, "a class representative's EEOC complaint [also] tolls the statute of limitations for all class members." Williams v. Owens-Illinois, Inc. 665 F.2d 918, 923 (9th Cir. 1982). "[A] plaintiff may bring a class action on behalf of those who have not filed charges with the EEOC, and thus toll the statute of limitations for all members of the class." Velez v. QVC, Inc., 227 F.Supp.2d 384, 399 (E.D.P.A. 2002).

Here, Ms. Megginson's individual disparate impact claims are not time-barred because class actions concerning those claims have been pending since she received her final agency decision from Commerce in 1997. Specifically, after receiving a final decision from Commerce in October 1997, Ms. Megginson had the option of either appealing to the EEOC within 30 days

or filing a civil action in 90 days. See 29 C.F.R. §§ 1614.408(a), 1614.402(a). However, because Ms. Megginson was a member of the administrative class action pending before the EEOC when she received that final agency decision, these limitation periods were equitably tolled. Thereafter, upon the completion of the EEOC's adjudication in September 30, 2005 (when Judge Kravetz dismissed the EEOC claim), the filing of the October, 5, 2005 Class Complaint with this Court continued to toll Ms. Megginson's 90-day limitation period for filing a court action. If anything, Ms. Megginson's filing of a court action within 90 days of receiving her final agency decision strengthens her argument that she complied with the limitations requirements, thus preserving her individual claims.

### C.    Tanya Ward Jordan's Claims

It would be inappropriate and unfair to apply *res judicata* to any of Ms. Jordan's claims. As an initial matter, it is important to recognize that Ms. Jordan has two different kinds of claims: (1) Title VII claims, which qualify her to act as a class representative; and (2) Rehabilitation Act claims, which are unrelated to the class claims and are set forth in a separate count of the complaint.

Defendant does not dispute the viability of Ms. Jordan's Title VII claims. D's Br. at 47-8. Despite Defendant's broad caption that "Any Individual Claims of Plaintiff[] Tanya Ward Jordan . . . Are Barred . . . by *Res Judicata*," Defendant fails to argue that Ms. Jordan's Title VII claims are barred. D's Br. at 47-49. Defendant concedes that Ms. Jordan's Title VII claims were dismissed without prejudice on May, 25, 2006, after the D.C. Court of Appeals modified the District Court's Order.[12]  Id.; see also D's Exh. A-2. Defendant therefore does not contest Ms.

---

[12] The District Court for the District of Columbia dismissed Ms. Ward Jordan's Title VII claims of race discrimination on August 11, 2005 with prejudice for failure to exhaust administrative remedies. On August 22, 2005, Ms. Ward Jordan received a final agency decision and notice of

Jordan's ability to pursue her Title VII claims individually or to act as a class representative on the basis of those Title VII claims.

Defendant's only argument with respect to Ms. Jordan's individual claims is that her Rehabilitation Act claim should be dismissed. But, contrary to Defendant's assertions, Ms. Jordan never litigated her Rehabilitation Act claim.[13] In a December 3, 2004, order, the Court separately denied Ms. Jordan's motion for leave to file a second amended complaint to add a Rehabilitation Act claim. See P's Ex. K. In the August 11, 2005 decision, the Court noted in passing that leave to amend was denied because Ms. Jordan had not exhausted her administrative remedies by obtaining a final agency decision. Jordan v. Evans, 404 F.Supp.2d 28, 30 (D.D.C. 2005). On August 22, 2005, the Department issued its final agency decision; therefore, Ms. Jordan has now exhausted her administrative remedies. The Complaint, which included Ms. Jordan's Rehabilitation Act claim, was then filed on October 5, 2005, within ninety days after Ms. Ward Jordan received her final agency decision and her right to sue, thus tolling Ms.

---

right to sue in that matter. See P's Ex. C (excerpted right to sue letter dated Aug. 22, 2005). On October 7, 2005, Ms. Ward Jordan appealed that decision to the D.C. Circuit, arguing that her as yet unripe claims should have been dismissed without prejudice, thus allowing her to exhaust any remaining administrative remedies and refile her suit. The Circuit Court summarily affirmed the District Court on March 13, 2006. Ms. Ward Jordan filed a petition for rehearing of that decision on March 28, 2006. On May 25, 2006, the United States Court of Appeals for the District of Columbia Circuit issued an Order rendered upon consideration of the petition for panel rehearing. The Order stated in relevant part: "ORDERED that the petition be denied, but that the district court's order be modified to reflect that the dismissal of appellant's Title VII claims, for failure to exhaust administrative remedies, was without prejudice." Therefore, pursuant to this Court's holding in Delgado v. Ashcroft, because the class action was filed on October 5, 2005, within ninety days after Ms. Ward Jordan received her right to sue, Ms. Ward Jordan's claims may be properly included in this lawsuit. 368 F.Supp.2d 3 (D.D.C. 2004) (holding that the filing of a class action tolls the statute of limitations for members of the class and citing Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345 (1983)).

[13] Although Defendant maintains that the ADA claim was dismissed with prejudice in the District Court's August 11, 2005 decision, the Order paragraph of that decision does not refer to the Rehabilitation Act. The ADA claim was dismissed because federal employees do not have a cause of action under that Act. Jordan , 404 F.Supp.2d at 30-31.

Jordan's 90-day limitation period for filing a court action.

The Court must not apply *res judicata* to Ms. Jordan's Rehabitation Act claim for several reasons. First, application of *res judicata* to the new claim is inappropriate because her receipt of a final agency decision constitutes an intervening change in a significant fact. "The doctrines of collateral estoppel and res judicata, . . . apply only in cases where controlling facts *and* law remain unchanged. Consequently, res judicata and collateral estoppel are inapplicable where, between the first and second suits, an intervening change in the law or modification of significant facts create new legal conditions." Spradling v. City of Tulsa, 198 F.3d 1219, *1222 -1223 (10th Cir. 2000) (citing Commissioner v. Sunnen, 333 U.S. 591, 599-600 (1948); See also Black v. Tamamian, 49 A.2d 547, 548 (D.C. App.1946) ("[I]f plaintiff is able to show new facts and changed circumstances, the former judgment does not operate as a bar to the second action."). The Supreme Court has also recognized that "changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues." Montana v. U.S., 440 U.S. 147, 159 (1979) (citing United States v. Certain Land at Irving Place & 16th Street, 415 F.2d 265, 269 (2nd Cir.1969); Metcalf v. Commissioner of Internal Revenue, 343 F.2d 66, 67-68 (1st Cir. 1965); Alexander v. Commissioner of Internal Revenue, 224 F.2d 788, 792-793 (5th Cir. 1955).

In Price v. U.S, a Pennsylvania federal district court declined to apply *res judicata* in circumstances very similar to this case. The district court determined that its prior decision dismissing the plaintiff's claim for failure to exhaust administrative remedies did not preclude the court from later finding that the plaintiff had followed the necessary administrative procedures. The court noted that "a judgment dismissing a suit because of the non-existence of a fact essential to the plaintiff's cause of action conclusively adjudicates that the fact is essential,

but is not a conclusive adjudication that the essential fact will never exist."   466 F.Supp. 315, 316 (D.C. PA. 1979) (citing 1B Moore's Federal Practice P 0.415 at 2054 (2d Ed. 1974)).

Ms. Jordan's receipt of a final agency decision from Commerce is a significant and controlling change in fact that creates "a new legal condition" from which she can pursue her Rehabilitation Act claim.  Spradling, 198 F.3d 1219, 1222 -1223.  The Court's previous decision to deny her the opportunity to amend her complaint to add a Rehabilitation Act charge turned exclusively upon the fact that she had not yet obtained a final agency decision.  See Jordan, 404 F. Supp. 2d at 30.   With the issuance of that final agency decision, Ms. Jordan's factual circumstances have changed her cause of action.    Although it is clear that the lack of a final agency decision was a fact essential to the Court's decision denying leave to amend in Ms. Jordan's first cause of action, "it is not a conclusive adjudication" that she could never properly exhaust her administrative remedies.   Price, 466 F.Supp. at 316.   Given the change in that essential fact, *res judicata* must not be applied.  Id.

Second, the Court could not have possibly intended to dismiss Ms. Jordan's Rehabilitation Act claim with prejudice because that claim was never "litigated on the merits." See Interdonato v. Interdonato,  521 A.2d 1124, 1132 (D.C.,1987) ("The crucial element of *res judicata* is a final judgment on the merits.").  Ms. Jordan was never even granted leave to assert her Rehabilitation Act claim because the Court determined that she was first required to exhaust her administrative remedies. Moreover, "dismissal of an action on the ground of failure to exhaust administrative remedies is not on the merits." Wyatt v. Terhune,  315 F.3d 1108, 1119 - 1120 (9th Cir. 2003) (quoting Heath v. Cleary, 708 F.2d 1376, 1380 n. 4 (9th Cir.1983)).

Third, even assuming that the Court finds that the technical requirements of *res judicata* are met, the Court must not apply that doctrine mechanically because it would result in a severe

injustice to Ms. Jordan.  The D.C. Circuit has long recognized that *res judicata* "must be weighed against competing necessities: situations may arise which call for exceptions." Spilker v. Hankin, 188 F.2d 35, 38 (D.C. Cir. 1951).  "Res judicata, as the embodiment of a public policy, must, at times, be weighed against competing interests, and must, on occasion, yield to other policies." Id.

"It is well settled [] that 'even where the technical requirements of *res judicata* have been established, a court may nonetheless refuse to apply the doctrine." Chestnut Hill Development Corp. v. Otis Elevator Co., 739 F.Supp. 692, 696 -697 (D. Mass. 1990) (citing Loring v. Marshall, 396 Mass. 166, 175, 484 N.E.2d 1315 (1985) (O'Connor, J., dissenting) (quoting International Harvester Co. v. Occupational Safety & Health Review Comm'n, 628 F.2d 982, 986 (7th Cir.1980)).  Courts have also recognized that *res judicata* is to be applied "so as to render rather than deny justice. The rule is intended to serve the aims of fairness and efficient judicial administration and need not be applied mechanically where those ends would not be served." Boucher v. Dramstad, 522 F.Supp. 604, 607 (D.Mont.1981) (citing Dore v. Kleppe, 522 F.2d 1369, 1374 (5th Cir 1975); see also Chestnut Hill, 739 F.Supp. 692 at 697 ("Because the doctrine of res judicata is grounded upon considerations of fairness and efficient judicial administration, the doctrine should not be applied rigidly where such interests would not be served.")  "Underlying principles of public policy, fairness and equity must temper application of the doctrine of res judicata where rigidity, injustice or unfairness would ensue." In re Scientific Control Corp., 80 F.R.D. 237, 243 (S.D.N.Y.1978).

Ms. Jordan will suffer a great loss if she is barred from ever litigating her disability claims under the Rehabilitation Act.  The policy interest in efficient judicial administration must be weighed against the unfairness of such an undeserved result.  The requirement of

administrative exhaustion should not be applied in such a harsh manner so as to preclude the filing of a court action if the claimant should ever take one misstep. Ms. Jordan has now satisfied her obligation to exhaust her administrative remedies and the Court should grant her a fair opportunity to be heard.

### D.    Any Hypothetical Deficiencies Would Not Undermine Class Action

Even if the individual claims of the remaining named Plaintiffs were flawed, Plaintiffs should be allowed to substitute class members with viable claims as new class representatives. The D.C. Circuit has held that, where a named plaintiff does not have live claims, a court may respond by permitted substitution of a new class representative, and "[s]uch action is especially appropriate" where the deficiencies with original class representatives' claims are of an individual rather than a classwide nature. In re Richard Thornburgh, 869 F.2d 1503, 1509 (D.C. Cir. 1989) (citing several cases in the D.C. Circuit as well as the Supreme Court[14]). A number of other courts have substituted new class representatives after finding the claims of the original class representatives to be lacking. See, e.g., Davis v. Bethlehem Steel Corp., 600 F.Supp. 1312, 1323 (D. Md. 1985) (holding that although the original class representatives failed to timely file their EEO charges, this would not "effect [sic] the viability of the class action" and ordering plaintiffs to substitute new class representatives); Hassine v. Jeffes, 846 F.2d 169, 176 n.3 (3d Cir. 1988) (new class representatives substituted for class representatives who were no longer representative of class members); In re Telectronics Pacing Systems, Inc., 172 F.R.D. 271, 283 (S.D. Ohio 1997) (substituting new class members and holding that new class members need not

---

[14]    Samuels v. District of Columbia, 770 F.2d 184, 193 n.5 (D.C. Cir. 1985); Basel v. Knebel, 551 F.2d 395, 397 n.1 (D.C. Cir. 1977); Swan v. Stoneman, 635 F.2d 97, 102 n.6 (2d Cir. 1980); Silva v. Vowell, 621 F.2d 640, 650 (5th Cir. 1980), cert. denied, 449 U.S. 1125 (1981); Rivers v. Califano, 86 F.R.D. 41, 45-46 (S.D.N.Y. 1980)

have filed individual actions to be representative of the class). Thus, any hypothetical deficiencies in the allegations of the remaining class representatives would not automatically render this putative class action untenable.

### III. THE CLASS CLAIMS DO NOT EXCEED THE SCOPE OF THE ADMINISTRATIVE COMPLAINT AND THERE IS NO BASIS FOR THEIR DISMISSAL

#### A. The Class Definition in the Administrative Complaint Clearly Encompasses Employees Throughout The Washington D.C. Metro Area

Defendant concedes that, from the beginning, Ms. Howard's February 1995 administrative complaint expressly included employees throughout the "Washington metropolitan area." D's Ex. A at 2; see D's Br. at 52. [15] In the face of this express class definition in the administrative complaint – the appropriate document at which to look to determine the scope of the asserted class – Defendant nonetheless claims that the administrative complaint did not include employees outside of Washington, D.C. Defendant's contention is supported by nothing more than a tortured reinterpretation of a 1998 letter Ms. Howard allegedly drafted and submitted *pro se* stating that "[t]he class comprises 'all non-supervisory Department of Commerce, Washington, D.C. Headquarters employees that are of African-American [descent]." See D's Ex. D (Howard Response) at ¶ 5. Defendant's argument that this letter

---

[15] Defendant also concedes that the administrative class charge filed with the EEOC encompassed all other aspects of the class definition in this case:
- racial discrimination in promotion
- and related promotional opportunities
- on behalf of current and former African-American,
- non-supervisory (at grade levels GS-9 through GS-15, or equivalent level white collar non-GS positions),
- salaried employees

D's Brief at 52.

should be read to reduce the scope of the class by 85% is wrong for several reasons:

(1)  Submissions by *pro se* litigants are liberally construed in their favor, and, fairly read, the letter itself includes all "headquarters employees," a term Defendant itself understood at the time to include employees throughout the Washington, D.C. Metropolitan Area.  The mere omission of the words "metro area" by a *pro se* litigant in one letter to the EEOC should not result in the drastic reduction of the class size when there is no indication whatsoever of her intent to do so.

(2) The EEOC clearly understood the Complaint (even after the letter) to include a class encompassing the entire metropolitan area, and an ALJ certified a class that included employees throughout the metropolitan area in 2001.

(3) Defendant itself has conceded through its sworn interrogatory responses that the class included employees located throughout the metropolitan area.   Agency's Interrogatory Responses.

(4)  Class members employed in the metropolitan areas have relied on their membership in the class after receiving notice of certification from the EEOC and participating in the class action.

### 1.  More Lenient Standards Apply to Submissions by *Pro Se* Litigants

Even assuming *arguendo* that Howard's letter introduced some ambiguity concerning the class definition she was asserting (and, as demonstrated above, it did not), submissions by *pro se* litigants are construed more liberally in their favor.  See Haines v. Kerner, 404 U.S. 519, 520-21 (1972); see, e.g., Kokal v. Massanar, 163 F. Supp.2d 1122, 1129 (N.D. Cal. 2001) (finding greater leniency applies to a plaintiff unrepresented by counsel during the administrative process, and such plaintiff will not be readily deemed to have waived arguments not raised during

unrepresented state.);  see also Sparrow v. Reynolds, 646 F.Supp. 834, 836 -837 (D.D.C.1986) ("A pro se litigant, even one as experienced as plaintiff, is entitled to have his complaint construed most liberally.").  It would turn the required rule of liberal construction on its head to read Howard's letter in such a narrow fashion, particularly given that it was not interpreted that way either by Defendant or the EEOC.

When the correspondence in question was submitted, Howard and her prior attorneys had terminated their relationship, and she had not yet retained alternative counsel.  Thus, Howard did not have legal guidance at that time.

Howard has further declared that these Responses "can only be considered an aberration in light of a record that overwhelmingly refers to, relies upon, and supports" her original definition of the class in the February 22, 1995 Howard Complaint of Discrimination.  Id. at ¶5. Howard's original Complaint initiated her case by defining the class of African-American Commerce employees that she sought to represent as "employees within the *Washington, D.C. metropolitan area*." (emphasis added).  Id.  Howard was informed, and believed, that African-American employees throughout Commerce's bureaus in metropolitan Washington, D.C. were suffering race discrimination.  P's Ex. D (February 6, 2004 Howard Declaration) at ¶4.  Howard did seek, and continues to seek, to represent a class of all African-American Commerce employees working in bureaus throughout metropolitan Washington, D.C., including bureaus in the District of Columbia, Maryland, and Virginia.  Id. at ¶4, ¶7.

Additionally, in two 2003 letters to Administrative Judge Joel A. Kravetz of the EEOC, Howard denied having agreed to limit the class and reiterated that her intent was to represent a class "as originally framed in the class complaint filed 2/22/95 (which specifically covers the *Washington Metropolitan area*, thereby encompassing DC, Maryland and Virginia headquarter

offices)." (emphasis added).  P's Ex. E (October 2, 2003 Howard Correspondence to Kravetz).

The overwhelming evidence in the record is clear:  Howard's original intent was to represent a class comprised of African-American Commerce employees throughout metropolitan Washington, D.C., including the District of Columbia, Maryland and Virginia.

### 2.  The EEOC Unquestionably Understood That The Class Encompassed The Entire Metropolitan Area

The fact that the EEOC, the party to whom the correspondence was addressed, never interpreted it as limiting the scope of the class to Washington D.C. proper exposes the fallacy in Defendant's argument that Plaintiff Howard narrowed the class definition in the administrative complaint.   In a July 20, 2000, Decision, nearly two years after that correspondence, the EEOC determined that "the class should be defined as composed of African-American, non-supervisory employees and former employees of the agency's Headquarters' offices in the ***metropolitan area of Washington, D.C***."  (emphasis added).  P's Ex. F (July 20, 2000 Certification Decision) at 10.

The class was certified in February 2001, and notice was sent to potential class members consisting of "all African-American, non-supervisory employees and former employees of the agency's Headquarters' offices in the ***metropolitan area of Washington, D.C.*** . . ."  (emphasis added).  P's Ex. G (May 18, 2001 Notice) at 1.   On May 14, 2001, the EEOC's Order Acknowledging Class Complaint again defined the class it had certified as being "composed of African-American, non-supervisory employees and former employees of the agency's headquarters' offices in the ***metropolitan area of Washington, D.C.***" (emphasis added).  P's Ex. H (May 14, 2001 Odom Order Acknowledging Class Complaint) at 2.  The Class Complaint cannot be dismissed for failure to exhaust claims with respect to employees outside Washington, D.C. when the very Agency responsible for reviewing those claims understood them to remain as part of Plaintiffs' case, and, indeed, certified a class including all African American headquarters

employees in the Washington, D.C. metropolitan area.

### 3. Defendant Repeatedly Acknowledged that the Class Included Metropolitan Area Employees

Defendant cannot now deny that the administrative class definition included all employees in the Washington, D.C. metropolitan area when its own prior submissions acknowledge, accept, and rely upon the fact that the class that Howard sought to represent, and, before the Order relating to Commerce's Motion for Reconsideration, represented, consisted of all African-American Commerce employees in the metropolitan area of Washington, D.C., including Maryland and Virginia. In its June 8, 2001 Interrogatories, Commerce specified that: "'Agency' refers to the Department of Commerce and all organizations, bureaus, offices and services within the Department of Commerce" without qualification or limitation to Washington, D.C. offices, only. June 8, 2001 Agency's Interrogatories. Commerce further argued that: "Moreover, this class action involves Headquarters' offices employees in the *metropolitan area of Washington, D.C.* Thus, only information pertaining to promotions and promotional opportunities in the Agency's Headquarters' offices in the Washington, D.C. area is relevant." (emphasis added). P's Ex. I (August 14, 2001 Agency's Objections and Responses to Class Agent's Requests For Production) at 5.

In addition, Commerce specifically delineated bureaus in the District of Columbia., *Maryland and Virginia* as those whose non-supervisory African-American employees should be considered Class Members:

> The Agency's March 16, 2001 correspondence noted that there were 15 bureaus that fell within the EEOC's class notification requirements which, in relevant part, limited potential class members to the *Washington, D.C. metropolitan area*. Those bureaus with offices in the Washington, D.C. metropolitan area include: 1) Office of the Secretary (OS); 2) Economic

Development Administration (EDA); 3) Minority Business Development Agency (MBDA); 4) Bureau of Export Administration (BXA); 5: Bureau of Economic Analysis (BEA); 6) Economics and Statistics Administration (ESA); 7) International Trade Administration (ITA); 8) Office of the Inspector General (OIG); 9) National Telecommunications and Information Administration (NTIA); 10) Technology Administration (TA); 11) National Oceanic and Atmospheric Administration (NOAA); 12) National Institute of Standards and Technology (NIST); 13) Bureau of the Census (Census); 14) National Technical Information Services (NTIS); and 15) Patent and Trademark Office (PTO)." (emphasis added)

P's Ex. I at 1-2.

Commerce also clarified that non-supervisory African-American employees of the *Maryland* office of NOAA should be considered potential Class Members: "As the Department advised the Class Agent, 'headquarters' offices' for NOAA were defined as *Silver Spring, MD* and Washington, D.C. in the creation of the database. This is the common understanding of the location of NOAA headquarters' offices, and this was also *the definition agreed to by the parties* and used to send notices to class members following the provisional certification." (emphasis added). P's Ex. J (May 24, 2002 U.S. Department of Commerce's Motion to Clarify The Term "Headquarters' Offices") at 2.

### 4. Metropolitan Area Class Members Have Relied on their Inclusion in the Class

After the EEOC certified the class in February 2001, notice was sent to potential class members consisting of "all African-American, non-supervisory employees and former employees of the agency's Headquarters' offices in the *metropolitan area of Washington, D.C.* . . . ." (emphasis added). May 18, 2001 Notice, attached at App. A, Ex. 8. African-American

Commerce employees working in the metropolitan area offices in Maryland and Virginia have reasonably relied on their participation in the class, and they have, accordingly, submitted surveys, affidavits, and other evidence of discrimination in support of the class charge. In light of their participation in the suit up until this point, the exclusion of these metropolitan employees may prejudice their interests in obtaining relief for the discrimination they have experienced while working at Commerce.

### B. Anecdotal Evidence and Evidence of Subjectivity in Performance Evaluations Are Not Claims That Must be Administratively Exhausted

Defendant argues that anecdotal *evidence* and *evidence* of excess subjectivity in the uniform appraisal system used by Defendant are new claims that have not been exhausted administratively. D's Brief at 62, n. 70. This is nonsense. Title VII requires exhaustion of *claims*, not *evidence*.[16]

Anecdotal evidence is not a claim unto itself, rather it is evidence that can be used in combination with statistical evidence to support a discrimination *claim*.[17] Similarly, evidence of subjectivity is not a claim in and of itself, rather it is evidence supporting Plaintiffs' claim of disparate impact in promotions and performance appraisals. A violation of Title VII can be demonstrated when "there is evidence that the subjective decision-making process coincides with

---

[16] Defendant also acknowledges that Plaintiffs' Opposition to Defendant's first Motion to Dismiss stated that Plaintiffs were not asserting a hostile work environment claim. D's Brief at 53 n. 62. Yet Defendant continues to needlessly argue that to the extent that Plaintiffs are articulating any additional new class claims for hostile environment and harassment they must be dismissed. Because Plaintiffs are not asserting such arguments, Defendant's contentions are moot. Similarly, Defendant's contention that Plaintiffs cannot raise class claims pertaining to hiring practices is superfluous because Plaintiffs are not raising claims with regard to hiring of new applicants.

[17] Although it is unnecessary to demonstrate discriminatory intent in a disparate impact case, "plaintiffs may offer anecdotal evidence to bolster their claims" of disparate impact. Clayborne v. Omaha Public Power Dist., 211 F.R.D. 573, 592 (D. Neb. 2002).

a 'significant disparity in the representation of a particular group.'" Gaines v. Boston Herald, Inc., 998 F.Supp. 91, 108 (D. Mass. 1998) (quoting Mohammed v. Callaway, 698 F.2d 395, 401 (10th Cir.1983)).

Defendant essentially suggests that every single piece of evidence that is not presented in the administrative complaint must be excluded from a subsequent suit in federal court for failure to exhaust. Such an evidentiary exclusionary rule finds no support in the caselaw, because it would run directly contrary to the very purpose Congress intended in mandating an administrative procedure for Title VII complaints in the first place: to encourage speedy and conciliatory resolution of employment discrimination claims. Contrary to this Circuit's teachings, Defendant's rule would require discrimination victims to navigate a "procedural labyrinth[]." Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir. 1985). But "an administrative charge is not a blueprint for the litigation to follow . . . . [and] the exact wording of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow." White v. New Hampshire Dept. of Corrections, 221 F.3d 254, 263 (1st Cir. 2000) (citing Powers v. Grinnell Corp., 915 F.2d, 915 F.2d 34, 38 (1st Cir. 1990). Instead, "the critical question is whether the claims set forth in the civil complaint come within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Id. As set forth above, anecdotal evidence and evidence of subjectivity in evaluations are prevalent forms of evidence that are commonly used to support Title VII claims. Moreover, they are clearly encompassed within the scope of the EEOC investigation of "low performance ratings and continued denial of promotions and awards." See D's Ex. A ¶ 1.

IV.    **OPPOSITION TO MOTION TO STRIKE ALL CLASS CLAIMS**

A.    **Plaintiffs' Class Claims Are Timely and Not Precluded By Local Rule 23.1(b).**

Defendant argues that Plaintiffs' class claims must be stricken for a purported failure to comply with Local Rule 23.1(b), which provides that a motion for class certification be filed "[w]ithin 90 days after the filing of a complaint in a case sought to be maintained as a class action." This argument is incorrect:  Plaintiffs have not violated Local Rule 23.1(b) because at the time of the Court's September 1, 2006, Minute Order staying Plaintiffs' Rule 23.1(b) obligations, 90 days had not passed since the filing of Plaintiffs' Amended Complaint.  In cases involving an amended complaint, both the text of Local Rule 23.1(b) and the regular practice in this Circuit indicate that the 90-day deadline runs from the filing of the amended complaint, not the original one.  But even if Plaintiffs failed to comply with Local Rule 23.1(b)—which they did not—it does not follow, as Defendant claims, that Plaintiffs' class claims are automatically stricken.  To the contrary, the Court may permit the class claims to go forward despite any technical non-compliance with Local Rule 23.1(b) particularly where, as here, any failure of compliance: works no prejudice to Defendant, which benefited from several extensions for filing its Motion to Dismiss and which has been aware from the outset of this suit's class action nature; did not result from any bad faith on Plaintiffs' behalf, and, if anything, was due to excusable neglect, see Fed. R. Civ. P. 6(b); and would create an injustice to putative class members.

In relevant part, Local Rule 23.1(b) states:

> Within 90 days after the filing of *a* complaint in a case sought to be maintained as a class action, unless the court in the exercise of its discretion has extended this period, the plaintiff shall move for a certification under Rule 23(c)(1), Federal Rules of Civil Procedure, that the case may be so maintained.

Local Rule 23.1(b) (emphasis added).  On June 30, 2006, Plaintiffs filed their Amended

Complaint in this case which, among other things, narrowed the class allegations from those in Plaintiffs' October 5, 2005, initial Complaint. Thereafter, Plaintiffs made a motion for enlargement of time of the 90-day period set forth in Local Rule 23.1(b) to file their class certification motion, based on the need for discovery regarding class certification, particularly concerning Defendant's already voluminous factual investigation and submissions. By Minute Order dated September 1, 2006, the Court granted Plaintiffs' motion in part, staying Plaintiffs' obligation to file a class certification pending further order of the Court.

As this chronology indicates, 90 days have not yet passed since Plaintiffs filed their Amended Complaint, and this Court has stayed Plaintiffs' Rule 23.1(b) obligations. Accordingly, because Plaintiffs have not failed to file a class certification motion "[w]ithin 90 days after the filing of *a* complaint in a case sought to be maintained as a class action," Local Rule 23.1(b) (emphasis added), they have not failed to comply with Local Rule 23.1(b).

Defendant makes the erroneous argument that the Local Rule requires submission of a motion for class certification within 90 days of the *initial* complaint. That is not, however, what Local Rule 23.1(b) says. Rather, the Rule requires that a class certification motion be filed "[w]ithin 90 days after the filing of *a* complaint in a case sought to be maintained as a class action." Local Rule 23.1(b) (emphasis added). The plain meaning of the term "a complaint" encompasses both initial and amended complaints. The Local Rule does not specify that the 90-day requirement applies only to the "initial" complaint in a case, or that amended complaints cannot reset the 90-day period. Had the Rule meant to specify that the 90-day requirement applied only to "initial" complaints, it could have said so—as other Local Rules do. See, e.g., M.D. Fla. Local Rule 4.04(b) ("Within ninety (90) days following the filing of the *initial* complaint in such an action, unless the time is extended by the Court for cause shown, the named

plaintiff or plaintiffs shall move for a determination under Rule 23(c)(1) as to whether the case is to be maintained as a class action. (emphasis added)).[18]

Practice in this Circuit is entirely consistent with the language of Local Rule 23.1(b), as courts in this Circuit regularly compute the 90-day period from the filing of an amended complaint in cases involving amended complaints.  See, e.g., In re Baan Co. Sec. Litig., 271 F. Supp. 2d 3, 11 (D.D.C. 2002) (running the 90-day time period from the filing of the amended complaint); Richard v. Bell Atlantic Corp., 976 F. Supp. 40, 51-52 (D.D.C. 1997) (same).  So do courts in other jurisdictions with similarly worded local rules.  See, e.g., Murray v. Sevier, 145 F.R.D. 563, 570 n.4 (D. Kan. 1993) (applying "a complaint" language in analogous local rule to include the plaintiffs' second amended complaint); Seligson v. Plum Tree, Inc., 55 F.R.D. 259, 260 (E.D. Pa. 1972) (applying "a complaint" language in analogous local rule to include the plaintiffs' amended complaint).  In contrast to this relevant precedent supporting Plaintiffs' reading of Local Rule 23(b)(1), Defendant cites inapposite authority, including two cases not involving amended complaints, see Def. Br. at 57, and one case specific to the local rules on summary judgment, see id. at 58.[19]

Defendant's unsupported reading of Local Rule 23.1(b) also conflicts with the well-established rule "'that an amended complaint supercedes an original complaint and renders the original complaint without legal effect.'"  Tolen v. Ashcroft 377 F. 3d 879, 882 n.2 (8th Cir.

---

[18] Notably, the Court's September 1, 2006 Minute Order used the language "initial complaint" to describe Defendant's argument—language that stands in contrast to the "a complaint" language of the Local Rule.

[19] If anything, Defendant's case involving summary judgment supports *Plaintiffs'* position. There, the D.C. Circuit cautioned against dismissal of potentially meritorious claims based on technical noncompliance with local rules, and, indeed, stated that a "district court does not abuse its discretion by declining to invoke the requirements of the local rule in ruling on a motion for summary judgment."  Burke v. Gould, 286 F.3d 513, 518 (D.C. Cir. 2002).

2004) (quoting <u>Karnes v. Poplar Bluff Transfer Co.</u> <u>(In re Atlas Van Lines</u>), 209 F.3d 1064, 1067 (8th Cir. 2000)); <u>accord</u>, <u>e.g.</u>, <u>Flannery v. Recording Indus. Assoc. of Am.</u>, 354 F.3d 632, 638 n.1 (7th Cir. 2004) ("It is axiomatic that an amended complaint supersedes an original complaint and renders the original complaint void." (citing <u>Fuhrer v. Fuhrer</u>, 292 F.2d 140, 144 (7th Cir. 1961)); <u>Al-Beshrawi v. United States</u>, Civ. No. 04-0743, 2005 U.S. Dist. LEXIS 35410, at *9 (D.D.C. 2005) (explaining that "the second amended complaint supercedes both the original complaint and the first amended complaint," and thus "the second amended complaint has become the operative complaint in the case, and the original complaint no longer controls the litigation"); <u>National City Mortgage Co. v. Navarro</u>, 200 F.R.D. 102, 106 (D.D.C. 2004) (discussing the settled rule that the "amended complaint supersedes the original complaint," such that "the amended complaint is now the operative complaint").

Lacking support for its strained reading of Local Rule 23.1(b), Defendant also makes the hyperbolic claim that permitting the 90-day time period to run from the filing of an amended complaint would "render the rule itself a nullity" as plaintiffs would "ignore Rule 23.1(b)'s time limitations with impunity," regularly flouting the Local Rule and then filing amended complaints "to add a comma or extra space." D's Br. at 58. Given the clear plain meaning of the Rule, Defendant's unsupported appeal to policy arguments is misplaced. In any event, Defendant's purported concerns about the subversion of Rule 23.1(b) have no relevance here, in which Plaintiffs have not filed an Amended Complaint with a new comma as an end-run around Local Rule 23.1. Rather, Plaintiffs' Amended Complaint was a good faith effort to narrow their class allegations so that this lawsuit may be conducted as efficiently as possible, and it has created no prejudice to Defendant. Plaintiffs' straightforward interpretation of Local Rule 23.1(b) also poses no threat to the Rule more broadly. Because an amended complaint made after an initial

responsive pleading may only be accepted upon consent of the parties or with leave of court, see Fed. R. Civ. P. 15(a), there is no real risk that plaintiffs will be able to abuse Rule 15 to circumvent the requirements of Local Rule 23.1.[20]

In any event, even assuming *arguendo* that Plaintiffs failed to comply with Local Rule 23.1(b), Defendant incorrectly claims that Plaintiffs' class allegations are automatically eliminated. That is not the law. Rather, courts regularly assess the equities before striking a plaintiff's class action allegations for alleged failure to comply with Local Rule 23.1(b), particularly where, as here, any delay in filing a motion for class certification occurred *prior* to any class discovery and *during* the pendency of a defendant's dispositive motion. See, e.g., Richard, 976 F. Supp. at 51-52 & n.19. As in Richard, Defendant's equities argument falls flat given the history of this litigation. This is not a case where Plaintiffs have attempted belatedly to insert class allegations to Defendant's prejudice. To the contrary, Defendant has been aware from the outset of this case (as it was aware throughout the lengthy administrative proceedings prior to this lawsuit) that Plaintiffs' suit is a class action. No class discovery has yet taken place. Rather, the near-year since the filing of Plaintiffs' original Complaint on October 5, 2005 has been consumed with litigation of Defendant's Motions to Dismiss. Notably, in the months following the filing of the original complaint, defense counsel requested and obtained Plaintiffs' consent to *five* motions to extend the time for response to the original Complaint, in sum extending Defendant's time for responding to the initial complaint for over three months from December 12, 2005 to March 17, 2006. In light of the lengthy pendency of the parties' litigation

---

[20] The text of Federal Rule of Civil Procedure 15 also supports Plaintiffs' interpretation of Local Rule 23.1, as the Federal Rule distinguishes between "the original pleading" and "an amended pleading" as two subspecies of "pleading." Analogously, "a complaint" includes both "the original complaint" and "an amended complaint."

concerning Defendants' motions to dismiss, during which Defendant has been fully aware of the class action nature of this case, it would be inequitable to strike plaintiffs' class action allegations, particularly where, as here, there is no prejudice whatsoever to Defendant.

Federal Rule of Civil Procedure 6(b) further supports rejecting Defendant's motion to strike.  Under Rule 6(b), where the specified period for the performance of an act has elapsed, a district court may enlarge the period and permit the tardy act where the omission is the "result of excusable neglect."  As the Supreme Court explained in interpreting the comparable Bankruptcy Rule 9006(b), in applying Rule 6(b), the Courts of Appeals have generally recognized that "excusable neglect" may extend to inadvertent delays.  Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership, 507 U.S. 380, 392-92 (1993) (noting that "excusable neglect" is a somewhat "elastic concept" and is not limited strictly to omissions caused by circumstances beyond the control of the movant).  The Supreme Court held that the determination of whether there has been "excusable neglect" is an equitable one, "taking account of all relevant circumstances surrounding the party's omission."  Id. at 395.  The Court stated that the factors included (1) the danger of prejudice to the nonmovant, (2) the length of delay and its impact on the efficient administration of judicial proceedings, (3) the reason for delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith. Id.  The determination of whether excusable neglect has been demonstrated is committed to the sound discretion of the trial court.  Id.

Plaintiffs' purported failure to file a motion for class certification within the time period prescribed by the Local Rule resulted from excusable neglect.  Under the first factor in Pioneer, the failure to follow the Local Rule did not prejudice Defendant.[21]  This case was treated as a

---

[21]  Defendant does not claim to be prejudiced, but rather simply urges strict application of the

class action throughout its ten-year history at the administrative level and Defendant has been generally aware of the scope of the class; this is not a case where the plaintiffs have caught the defendant unaware. The second factor also weighs in favor of a finding of excusable neglect. Howard, et al. v. Gutierrez is at the very earliest stages of litigation in this Court, and any delay has had no negative impact on the judicial proceedings. Moreover, as set forth more fully below, a motion for certification almost certainly would not have been decided any earlier even if it had been timely filed. Given the very early posture of the case, Defendant will have ample opportunity to confront the class allegations. As for the third and fourth factors, Plaintiffs' consent to Defendant's five motions for extensions on its response to the Complaint should not operate to deprive Plaintiffs of the opportunity to move for class certification.

### B.    Defendant Has Waived Its Administrative Exhaustion Argument.

Defendant asserts that Plaintiff Howard failed to timely contact an EEO counselor regarding her administrative class Complaint, and thus that the administrative exhaustion prerequisites to suit on her class claims have not been satisfied. D's Br. at 58. But Defendant *never* raised this defense during the more than ten years the class charge remained pending at the EEOC. Accordingly, Defendant has waived this exhaustion argument, which, in all events, lacks merit.

Brown v. Marsh, 777 F.2d 8 (D.C. Cir. 1985) is directly on point and demonstrates Defendant's waiver. In Brown, the D.C. Circuit addressed whether a Title VII action which had been pending in the administrative and judicial systems for ten years should be dismissed based on the defendant's argument that the plaintiff had not exhausted administrative remedies by failing to meet deadlines in the EEO process ten years prior. Although, as Defendant notes,

---

rule on its face with no further discussion. See D's Brief at 56-58.

Brown did recognize that "an agency investigation alone does not constitute a waiver," id. at 15, this case does not involve a mere agency investigation. Rather, as in Brown, the government has waived its exhaustion argument by failing to raise it over the course of 10 years of litigation. In language directly applicable here, the D.C. Circuit explained:

> We think in fairness there must come a point where an agency's approach to a matter will preclude it from deploying the exhaustion doctrine to pull the rug out from under a Title VII plaintiff. We are persuaded that the point has been reached in this case. Ten years is too long to permit litigation to continue only to dismiss upon a ground, which if available at all, should have been pressed and resolved at the outset.

Id. at 15.

As in Brown, "[f]airness—which is the heart and soul of all notions of equity—prohibits us from permitting the government to raise, at this late date, a defense it ought to have pressed long ago, if it intended to press it at all." Id. at 17.

Over the past eleven years, numerous aggrieved Commerce employees have relied on the pending class action. Never once, until now, has Defendant raised an administrative exhaustion defense concerning Ms. Howard's consultation with EEO counselors. In the words of the Brown Court, this matter has been "extensively pursued at both the administrative and judicial level" for more than a decade. Accordingly, Defendant has waived any objection concerning Ms. Howard's participation in the administrative process.

Also indistinguishable from Defendant's waiver is the defendant's conduct in Bowden v. U.S., 106 F.3d 433, 438-39 (D.C. Cir. 1997). In Bowden, the defendant agency, which—as here—bore the burden of raising the affirmative defense of failure to exhaust, waived that defense by waiting too long to challenge plaintiff's compliance with the applicable thirty-day complaint filing requirement. Id. at 437, 438. In coming to this conclusion, the D.C. Circuit explained:

[t]o begin with, the agency never raised the thirty-day time limit during the administrative proceedings. Although agencies do not waive a defense of untimely exhaustion merely by accepting and investigating a discrimination complaint, [cites omitted], we have suggested that if they not only accept and investigate a complaint, but also decide it on the merits – all without mentioning timeliness - their failure to raise the issue in the administrative process may lead to waiver of the defense when the complainant files suit. [cites omitted] **Because the INS responded to the merits of Bowden's complaint without ever questioning its timeliness, we think the agency now has no legitimate reason to complain about a judicial decision on the merits.**

Bowden, 106 F.3d at 438-39.

Defendant has presented no explanation for its failure to raise the exhaustion defense during the past ten years—in the administrative process or otherwise. Rather, the government argues that its delinquency should simply be ignored because it allegedly asserted the timeliness defense "at its very first judicial opportunity," and was "in no way responsible for the length of time that this matter languished in the administrative process" (D's Br. at 60 n.68). That argument—other than confirming Plaintiffs' point that they have spent more than sufficient time in the administrative process—is unavailing. Brown, Bowden, and similar authorities do not distinguish between waiver in the course of judicial or administrative adversary proceedings. Rather, those cases demonstrate that where, as here, the government fails to raise an administrative exhaustion defense during years of litigation, that defense is waived.

While the Department clearly waived its administrative exhaustion defense, its argument is additionally without merit because Ms. Howard complied with 29 C.F.R. § 1614.105, which states that "[a]n aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." The government concedes that Ms. Howard contacted an EEO counselor on October 21, 1994. She made contact on that date because *just one day prior*, on October 20, 1994, she was required to sign a receipt of notice of her performance rating—a rating that resulted in her denial of a promotion. See P's Ex. L. During

her October 21, 1994, meeting with the EEO counselor, Ms. Howard complained, among other things, of discrimination in promotions, which was directly connected with the performance rating she received the day before. Because Ms. Howard initiated contact with an EEO counselor just one day after a performance appraisal that resulted in her denial of promotion, and because the denial of a promotion was the "matter alleged to be discriminatory," Ms. Howard unquestionably satisfied the requirements of § 1614.105.

### C. Defendant's Substantive Argument Against Class Certification Is Premature; It Also Lacks Merit.

As Plaintiffs' Amended Complaint details, and as Plaintiffs will demonstrate upon filing their Motion for Class Certification, Plaintiffs satisfy all requirements for class certification under Rule 23 and this case is most fairly, efficiently, and justly pursued as a class action. Nonetheless, it would be premature and improper to decide these substantive class certification issues at this juncture. Defendant's voluminous submission against class certification is sorely premature, particularly given that the submission relies almost entirely on untested factual material far beyond the four corners of the Amended Complaint. Plaintiffs must be permitted discovery on class certification issues before the Court assesses class certification under Rule 23. Although the Court need not reach the issue, Defendant's Rule 23 arguments also lack merit. In all events, Defendant's Motion to Strike should be denied.

### 1. Plaintiffs Must Be Permitted Discovery Regarding Class Issues Prior To Adjudication Of Class Certification.

The "rigorous analysis" required for adjudication of class certification demands a comprehensive review of the facts, to be gathered in the discovery process. See Bradford v. Sears, Roebuck & Co., 673 F.2d 792, 795-98 (5th Cir. 1982) (cited by the D.C. Circuit in Wagner, 836 F.2d at 589) (reversing District Court for failure to develop adequate information

concerning facts of the case before ruling on class certification when the pleadings raised serious questions of commonality and typicality).    To strike class allegations before discovery commences in this Title VII class action lawsuit would improperly and unfairly divest Plaintiffs of their claims without allowing them the opportunity to investigate and prove those claims.  See, e.g., Alexander v. F.B.I., 971 F.Supp. 603 (D.D.C. 1997) (denying the defendants' motion to strike the class action allegations and deferring a decision on plaintiffs' motion for class certification until plaintiffs had an opportunity to take discovery); Yaffe v. Powers, 454 F.2d 1362, 1366 (1st Cir. 1972) ("To pronounce finally, prior to allowing any discovery, the non-existence of a class or set of subclasses, when their existence may depend on information wholly within defendants' ken, seems precipitate and contrary to the pragmatic spirit of Rule 23."); Briggs v. Aldi, Inc., 218 F.Supp.2d 1260, 1265 (D. Kan. 2002) (the appropriate time to address whether a plaintiff has met the requirements necessary to maintain a class action is after the plaintiff has filed a motion for class certification, not the 12(b)(6) dismissal stage); Branch, et al. v Reynolds Metals Co., 1972 WL 266, at *1 (E.D. Va. 1972) (preliminarily certifying a class and noting that placing plaintiffs' counsel in the "anomalous position of not being able to sustain its class conclusions for lack of evidentiary support, yet unable to adduce such support by reason of its inability to prove class standing" would "be a perversion of the liberal spirit of the federal discovery rules.").

Defendant asserts that its own "declarations establish conclusively that the various bureaus' discrete hiring, appraisal, promotion, and compensation systems are characterized by numerous objective processes" (D's Br. at 72-73), and proceeds to list a series of alleged supporting statements from various witnesses (D's Br. at 73-74).  At this juncture, however, Defendant's contentions are entirely untested by the adversary process—Plaintiffs have not yet

had the opportunity to depose any of Defendant's witnesses or request relevant documents. Moreover, Plaintiffs' class claims are based upon facts and statistics largely in Defendant's sole possession and control, and Plaintiffs are entitled to develop that evidence prior to adjudication of class certification. To date, Plaintiffs have not had the opportunity to depose any of these witnesses or request documents relevant to these contentions. Any information Plaintiffs obtained during administrative proceedings is by now incomplete and outdated, as substantial time has passed since that discovery and the grant of class certification by the OFO in 2000. Plaintiffs are entitled to discovery for additional, recent evidence of the alleged discriminatory practices, as well as for updated statistical data supporting class certification. Accordingly, Plaintiffs must be permitted discovery on class issues before the Court entertains Defendant's Rule 23 arguments.

> **2.    Plaintiffs' Amended Complaint Satisfies The Rule 23 Requirements For Class Certification.**

In their pending First Amended Class Action Complaint, Plaintiffs have pled every element necessary to sustain a disparate impact claim on behalf of a proper class of African-American, non-supervisory employees and former employees of DOC's bureaus in the metropolitan area of Washington, D.C., who have been denied career advancement to one or more white collar positions at grade levels GS-9 through GS-15, or equivalent level white collar non-GS positions, and who may have been denied related promotional opportunities in those same offices based on their race during the period of time beginning two years prior to the filing of the administrative class complaint on February 22, 1995. FAC at ¶ 41-182. As discussed more fully below, the DOC's uniform performance evaluation practices, which allow an excessive amount of subjectivity, have resulted in an adverse impact on the advancement of African-American employees as compared to white employees. These allegations of disparate

impact discrimination clearly state a claim for a class action under Federal Rules of Civil Procedure 12(b)(6) and 23.

> ### a.    Defendant Disregards The Standard Applicable To Rule 12(b)(6) Motions.

As Defendant recognizes, it is of course true that a class action complaint must allege "facts from which [a] district court could reasonably infer that the mandatory prerequisites of Fed. R. Civ. P. 23(a) [have] been met." Smith v. Transworld Systems, Inc., 953 F.2d 1025, 1033 (6th Cir. 1992). But, contrary to Defendant's request, a court will not dismiss a complaint under Rule 12(b)(6) for failure to state a claim unless the court concludes beyond reasonable doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to the relief requested. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Accordingly, when considering a motion to dismiss, the court must look only to the four corners of the complaint, accept the allegations in the complaint as true, construing them in favor of the pleader, and then evaluate the legal viability of the allegations contained therein.[22] See Fed. R. Civ. P. 12(b)(6); Cruz v. Beto, 405 U.S. 319, 322 (1972) (per curiam); Doe v. U.S. Dep't of Justice, 753 F.2d 1092, 1102 (D.C. Cir. 1985) (for the purposes of a motion to dismiss for failure to state a claim upon which relief can be granted, "the factual allegations of the complaint must be taken as true, and any ambiguities or doubts concerning the sufficiency of the claim must be resolved in favor of the pleader"); see also Holy Land Foundation for Relief & Development v. Ashcroft, 333 F.3d 156, 165 (D.C. Cir. 2003) (same). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support

---

[22]  Analogously, adjudicating a motion for class certification neither requires nor permits a court to determine the merits. See, e.g., In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 21 (D.D.C. 2001); Wagner v. Taylor, 836 F.2d 578, 587 (D.C. Cir. 1987) (the court is not authorized to conduct a preliminary inquiry on the merits to justify class certification).

the claims." <u>Scheur v. Rhodes</u>, 416 U.S. 232, 236 (1974) (overruled on other grounds).

Defendant's brief disregards the standard applicable to a Rule 12(b)(6) motion by providing a carefully-manicured and incomplete evidentiary presentation to the Court. Indeed, Defendant's factual recitation alone consists of forty pages of briefing, citing to hundreds of pages of exhibits. Defendant's factual presentation is controverted by Plaintiffs' allegations in the Amended Complaint and will be further controverted by evidence (including evidence from class discovery) that Plaintiffs will present to the Court at the proper juncture. Accordingly, Defendant's request for a class certification ruling at the Rule 12(b)(6) stage of the case is wholly improper.

> **b.  Defendant Improperly Characterizes Plaintiffs' Allegations As An "Across-The-Board" Attack.**

Plaintiffs' allegations here, that overly subjective performance evaluations promulgated by Commerce Headquarters and applied across Bureaus resulted in a disparate impact upon the promotions and related promotional opportunities of a defined class of African-Americans, suffice to state a class claim under Rule 12(b)(6). <u>See</u> <u>Morgan</u>, 169 F.R.D. at 156 (commonality requirement can be met where the company combines "subjective, decentralized system of decisionmaking" with personnel policies that are "uniform throughout the country and are promulgated by the national corporate office").

Framing Defendant's entire Rule 23 argument is the erroneous assertion that Plaintiffs make "across-the-board allegations," in purported contravention of <u>General Telephone Co. of Southwest v. Falcon</u>  457 U.S. 147, 154 (1982). In <u>Falcon</u>, the plaintiffs alleged a broad-based attack on all of an employer's allegedly discriminatory practices, including those related to both hiring and promotion. The Supreme Court ruled that discrimination in hiring and promotion constitute different injuries and create potential conflicts in the class. 457 U.S. at 158-59; <u>see</u>

Schwartz v. Harp, 108 F.R.D. 279, 282 -83 (C. D. CA 1985); Tidwell v. Schweiker, 677 F.2d 560, 566 (7th Cir.1982).

As this description of Falcon indicates, the present lawsuit is completely distinguishable because, unlike Falcon, Plaintiffs do not request certification of a class including both *applicants* who allege discriminatory hiring and *employees* who allege discrimination in promotions.  To the contrary, the class at issue here is composed entirely of employees alleging discrimination in promotions and related promotional opportunities, based largely on overly subjective performance evaluations promulgated by Commerce Headquarters and applied across Bureaus. Such allegations do not raise the class cohesiveness concerns identified in Falcon.    See Schwartz, 108 F.R.D. at 83 (holding that Falcon "is distinguishable" from cases focusing on one specific employment practice, such as promotions, because in Falcon "the Title VII plaintiff sought 'across the board' certification not only of those who had not been promoted but also of those who had not been hired," which constituted "two sets of persons whose claims raised entirely different legal and factual issues."); see also Adair v. England  209 F.R.D. 5, 10 (D.D.C. 2002)(holding that Falcon was "easily distinguishable" in a case wherein an "overriding theme [was present in] all the claims"); see, e.g., Morgan, 169 F.R.D. at 156 (commonality requirement can be met where the company combines "subjective, decentralized system of decisionmaking" with personnel policies that are "uniform throughout the country and are promulgated by the national corporate office").

Thus, Defendant is left to inaccurately describe the Amended Complaint as including "dissimilar types of employment action" such as "hostile work environment."  D's Br. at 62. However, Plaintiffs' complaint does not allege class claims of hostile work environment.  Rather, as the Amended Complaint makes clear, Plaintiffs have identified a specific discriminatory

practice common to all their claims: overly subjective performance evaluations applied classwide, resulting in a disparate impact upon promotions and related promotional opportunities.

### c.    The Amended Complaint Satisfies Rule 23.

Plaintiffs clearly meet the requirements of Rule 23.  Parties seeking to maintain a class action must satisfy all of the prerequisites for class certification under Rule 23(a) and at least one subsection of Rule 23(b).  Rule 23(a) requires that:  (1) the class be so numerous that joinder of all the members is impracticable; (2) questions of law or fact be common to the class; (3) the claims or defenses of the representative parties be typical of the class; and (4) the representative parties fairly and adequately protect the interests of the class.  Fed.R.Civ.P. 23(a).  Under Rule 23(b)(2), the party opposing the class also must have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as  whole.  Fed.R.Civ.P. 23(b)(2).  Under Rule 23(b)(3), a class action is appropriate where questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23(b)(3).

### (1)    Plaintiffs Adequately Allege Numerosity

Defendant does not contest the satisfaction of the numerosity requirement under Rule 12(b)(6): that the "class [be] so numerous that joinder of all members is impracticable . . ."  Fed. R. Civ. P. 23(a)(1).  Plaintiffs allege a class of hundreds of putative members, clearly too numerous to make joinder practicable.  FAC at ¶ 167; see also Ps' EEOC Brief at 55-56.

(2)    **Plaintiffs Adequately Allege Commonality and Typicality**

"The commonality and typicality requirements of Rule 23(a) tend to merge." Falcon, 457 U.S. at 157 n.13.  In essence, Plaintiffs must show that the class has the same basic interests and has suffered the same basic injury as the named plaintiffs.  Id. at 157.  To do this in the Rule 12(b)(6) context, Plaintiffs must allege the existence of questions of law or fact common to the class, and claims or defenses of the representative parties typical of the class.  See Rule 23(a)(2) & (a)(3).

(a)    **Commonality**

The discrimination in promotions alleged by Plaintiffs involves Defendant's standardized use of excessively subjective performance appraisals, which adversely affect the overall selection of African-Americans for vacant GS-9 through GS-15 or equivalent level white collar non-GS positions, as well as the selection of African-Americans to be trained for and receive employment-enhancing work experience, training and awards.  Commerce's Office of the Secretary requires that all 30,000-plus DOC employees (except certain management personnel) be reviewed annually on standard evaluation forms.  FAC at ¶ 100; see also DAO-430, Section 3.01(b), (App. B, Ex. 16); DAO 202-250 Section 6,  (App. B, Ex. 12); OHRM website (App. C, Ex. 9,17,32).  Plaintiffs' claim is that these evaluations and related processes are flawed because, among other things, they are excessively subjective.  Thus, Plaintiffs have identified in their Amended Complaint a specific practice within Commerce that has an adverse impact on African-Americans, consistent with the disparate impact theory of discrimination under Title VII.  See Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656 (1989) (a plaintiff is "'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities,'" quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994

(1988)); <u>compare</u> <u>Smith v. City of Jackson, Miss.</u>, 544 U.S. 228 (2005) (plaintiffs failed to allege more than simply the fact of a disparate impact on older workers).[23]

The Supreme Court has acknowledged expressly that a disparate impact class action can be based upon an employer's subjective hiring and promotion practices, and courts across the country have applied that very principle.  <u>Watson</u>, 487 U.S. at 990 ("disparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests.  In either case, a facially neutral practice, adopted without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices."); <u>see also</u> <u>McReynolds v. Sodexho Marriott Services, Inc.</u>, 208 F.R.D. 428 (D.D.C. 2002) (finding that plaintiffs' anecdotal evidence of discriminatory hiring, statistical proof that African-Americans were underrepresented in higher-echelon positions, and the company's subjective employment and promotion criteria all raised common and predominating issues warranting class certification); <u>District Council 37, AFSCM v. New York City Dep't of Parks & Recreation</u>, 113 F.3d 347, 351 (2nd Cir. 1997) ("[D]isparate impact claims can also be used to challenge subjective employment practices . . ."); <u>Bergal v. Metropolitan Waste Control Comm.</u>, 873 F.2d 1166 (8th Cir. 1989) (per curiam) (disparate impact analysis may be applied to subjective decision making); <u>Griffen v. Carlin</u>, 755 F.2d 1516, 1523 (11th Cir. 1985) ("use of the disparate impact theory to challenge the end result of multi-component selection processes and to challenge subjective elements of those processes is appropriate"); <u>Williams v. Colorado Springs Sch. Dist.</u>, 641 F.2d 835, 839-42 (10th Cir. 1981) (adverse impact standards of proof must be applied in a class case alleging the adverse impact of the employer's allegedly subjective hiring

---

[23] Notably, "[a]s is now well recognized, the class action commonality criteria are, in general, more easily met when a disparate impact rather than a disparate treatment theory underlies a class action."  <u>Stastny v. Southern Bell Tel. & Tel. Co.</u>, 628 F.2d 267, 274 n.10 (4th Cir. 1980).

and promotion practices).

Defendant attempts to limit Plaintiffs' ability to use an employer's subjective practices as a basis for commonality to circumstances where plaintiffs have alleged that a company utilizes practices that are <u>entirely</u> subjective. D's Brief at 68-75. But Defendant's argument in this regard again relies on an inaccurate reading of <u>Falcon</u> with regard to "across-the-board" attacks on both promotional and hiring practices. In <u>Falcon,</u> the Supreme Court recognized that a general policy of discrimination "conceivably could justify **a class of both applicants and employees** if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through **entirely subjective** decisionmaking processes." 457 U.S. at 159. As this language in <u>Falcon</u> makes clear, the Supreme Court's "entirely subjective" language applies in the situation of otherwise disfavored "across-the-board" allegations of discrimination in hiring *and* promotion. This language simply has no application where, as here, there are not "across-the-board" allegations of discrimination involving both applicants and incumbent employees.[24]   <u>See</u> <u>Schwartz,</u> 108 F.R.D. at 282 -83; <u>Tidwell,</u> 677 F.2d at 566.

Setting aside Defendant's reliance on the inapposite language in <u>Falcon,</u> "courts have

---

[24]   Notably, nearly every one of the decisions cited by Defendant with regard to objective decision-making processes was rendered after discovery. <u>See</u> D's Brief at 73 (citing <u>Vuyanich v. Republic Nat'l Bank of Dallas</u>, 723 F.2d 1195 (5th Cir. 1984) (examining a post-discovery class cert decision); <u>Wilkins v. University of Houston</u>, 654 F.2d 388 (5th Cir. 1981) (same); <u>Garcia v. Veneman</u>, 211 F.R.D. 15 (D.D.C. 2002) (same); <u>Int'l Union v. LTV Aerospace & Defense Co.,</u> 136 F.R.D. 113 (N.D. Tex. 1991) (same); <u>Califano v. Yamasaki</u>, 442 U.S. 682 (1979) (same); <u>McCarthy v. Kleindeinst</u>, 741 F.2d 1406 (D.C. Cir. 1984) (ruling on class cert after some discovery); <u>Hartman v. Duffey</u>, 19 F.3d 1459 (D.C. Cir. 1994) (examining a class cert ruling which was issued after discovery); <u>Wagner v. Taylor</u>, 836 F.2d 578 (D.C. Cir. 1987) (same); <u>Cooper v. Southern Co.</u>, 390 F.3d 695, 704, 715 (11th Cir. 2004) (same); <u>Bacon v. Honda of America Mfg., Inc.</u>, 370 F.3d 565, 571-72 (6th Cir. 2004) (same); <u>Bradford v. Sears, Roebuck & Co.</u>, 673 F.2d 792, 794-95 (5th Cir. 1982) (reexamining a class cert decision and holding that district court had to hold an evidentiary hearing before granting class certification); <u>Stastny v. Southern Bell Tel. & Tel. Co.</u>, 628 F2d 267, 278-79 (4th Cir. 1980) (examining class cert decision that was made post-discovery)).

long recognized that the deliberate and routine use of <u>excessive</u> subjectivity is an 'employment practice' that is susceptible to being infected by discriminatory animus."[25] <u>Dukes v. Wal-Mart Stores, Inc.</u>, 222 F.R.D. 137, 149 (N.D. Cal. 2004) (emphasis added); <u>McReynolds</u>, 349 F.Supp.2d at 20 (holding that excessive subjectivity in evaluation and promotion criteria leads to "[g]reater possibilities for abuse" and that courts must be sensitive to possible bias arising from subjectivity) (internal citation omitted); <u>Stewart v. Rubin</u>, 948 F.Supp. 1077, 1088 (D.D.C. 1996) (granting class certification and holding that commonality was present because "[a]ll of the allegations . . . arise from the Defendant's alleged discriminatory employment policies and practices which allegedly rely upon excessive subjectivity in the employment-related decision-making process . . . [which] apply nationwide to all class members."); <u>Cook v. Billington</u>, 1992 WL 276936, *5 (D.D.C. 1992) (granting partial summary judgment to plaintiffs because "plaintiffs . . . presented evidence of a specific employment practice - namely, some subjectivity in the measurement of qualifying criteria during the first two stages of the Library's competitive selection process, and pronounced subjectivity in both the establishment and measurement of criteria during the interview stage," and quoting plaintiffs' expert, who stated that "if you have excessive subjectivity, some element of racial bias in a process is almost guaranteed.").

Defendant's additional argument, that resolution of Plaintiffs' discrimination claims would require a "highly individualized factual inquiry" contrary to the effective management of a class action (D's Brief at 75), misses the point of a disparate impact class claim. Plaintiffs' allegations necessitate no such inquiry on the merits. The class agents here challenge the use of

---

[25] Excessive subjectivity in employment decisions is traditionally viewed with skepticism by courts, as subjectivity is often a convenient pretext for discriminatory practices. <u>Cook v. Billington</u>, 1992 WL 276936, *5 (D.D.C. 1992) (citing <u>Moore v. Hughes Helicopters, Inc.</u>, 708 F.2d 475, 481 (9th Cir. 1983); <u>Payne v. Travenol Laboratories, Inc.</u>, 673 F.2d 798, 824 (5th Cir. 1982), <u>cert. denied</u>, 459 U.S. 1038 (1983); <u>Nanty v. Barrows Co.</u>, 660 F.2d 1327, 1334 (9th Cir. 1981) (overruled on other grounds)).

common discriminatory components *per se*, and not merely the individualized manifestations of their use. Thus, commonality exists, even assuming *arguendo* that the common components may vary or be applied somewhat differently by various individual decision-makers. See Morgan, 169 F.R.D. at 356 (decentralized decision-making does not defeat certification of a class; the personnel policies at issue "include the subjective, decentralized system of decision-making which the plaintiffs allege is discriminatory.")[26]

Here, Plaintiffs allege an excessively subjective performance evaluation process which causes a disparate impact on promotions and promotion-related opportunities for African-Americans. This claim is supported by allegations and evidence common to the class:

First, Plaintiffs allege that performance appraisal ratings are recognized by the federal government as being "very important to the career of a Federal civil service employee." FAC at ¶ 105; see also Office of Human Resources Management website, managers/how_eval_performance.htm at 1, (App. C, Ex. 9). Commerce's Office of Human Resources Management website states:

> [Performance appraisals] are used in a variety of critically important ways. For example, performance ratings have an impact during a reduction-in-force (RIF). **A performance rating is also a factor in making promotion selections, and in most cases in determining who will receive a performance award. . . . In short, the performance rating that you give an employee can have a major impact on the employee's career.**

---

[26] McReynolds stresses that to adopt "defendant's view of the commonality test would preclude class certification . . . against any company that has decentralized its personnel policies . . . . This position would permit companies to escape Title VII class actions by minimizing the amount of control that they exercise over individual managers." 208 F.R.D. at 443-44, n.23. Commerce's arguments urge precisely such a strategy. Indeed, decentralization may strengthen the need for class certification because it demonstrates that the contested policies, practices, and procedures are so loose and subjective that the promotional decisions made pursuant to them can vary from one decision-maker to another. See id. at 443-44; Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1557-58 (11th Cir.), cert. denied, 479 U.S. 883 (1986).

Id. at ¶ 106 (emphasis added).  Emphasizing the importance of the results of the appraisal process, the website notes that **the results "are to be used as a basis for training, rewarding, reassigning, promoting, reducing in grade, retaining, or removing employees**." Id. at ¶ 107. The DOC mandates the use of performance standards at either five or two rating levels.  "For bureaus using five rating levels, the standards . . . are generic and cannot be changed." Id. at ¶ 108.

Second, Plaintiffs' allegations include the opinion of one of the nation's leading experts in performance appraisal systems, Dr. David Martin.  For years, Dr. Martin has assisted several federal agencies with preparing and implementing their performance appraisal systems, and he has decades of experience in teaching, publishing books and articles, consulting, and training employees (including hundreds of federal employees) in the area of performance appraisals. FAC at ¶ 109.  After reviewing performance appraisal "standards" at the DOC,[27] Dr. Martin concluded that Commerce's performance appraisal system permits an excessive amount of subjectivity, allowing raters to inject bias and discrimination in the ratings. Id. at ¶ 112.  Dr. Martin concluded that the DOC's performance appraisal system is "probably the worst system [he has] critiqued." Id. at ¶ 114.

Plaintiffs thirdly allege that statistical evidence reveals that a disproportionate number of African-American employees are denied access to advancement and higher-paying positions within the Department of Commerce.  Statistics show that, for example, in 1998, the percentage of African-Americans in GS levels five through fifteen declined at DOC as the GS level

---

[27] Dr. Martin reviewed examples of performance reviews from Census (Samuel Reynolds, 1996-1999), Headquarters/Office of the Secretary (Janet Howard, 1995-96), Headquarters/Office of Human Resource Management (John Austin, 1998), and the Patent and Trademark Office (John Kuong, 2000).  FAC at ¶ 110.

increased, while the percentage of white employees increased as the GS levels increased.  FAC at ¶ 115.  The percentage of African-Americans at GS-11 was 13.51%, at GS-12 the percentage was 14.25%, and at GS-13 the percentage dropped significantly to 9.6%.  Id.  The percentage of white employees at GS-11 was 76.61%, at GS-12, it was 76.93%, and at GS-13 it jumps up to 80.48%.  Id.

The data set forth in the Amended Complaint illustrates the dramatic disparity between African-Americans and white employees at DOC as GS level increases, when viewed by groupings, *i.e.*, GS 5-8, GS 9-12, and GS 13-15 (Id. at ¶ 122):

| GS Level | African-American | White |
|---|---|---|
| GS-5 - GS-8 | 35.9% | 57.3% |
| GS-9 - GS-12 | 20.2% | 69.5% |
| GS-13 - GS-15 | 7.1% | 83.3% |

Fourth, significant anecdotal evidence from DOC's African-American employees confirms that class members are routinely denied promotions because of their race and subjected to a racially hostile work environment.  FAC at ¶ 144-159.  For example, Class Representative Howard overheard her white superior tell a white employee, "You're tall and blonde, you'll do well here."  Id. at ¶ 45.  In addition, "Buckwheat" was one term of endearment a DOC supervisor bestowed on an African-American employee.  Id. at ¶ 153.

Dennis Gosier, a Chief Steward and EEO representative since 1993, has personally attempted to assist more than 100 African-Americans redress discrimination suffered at the DOC.  Id. at ¶ 145-47.  According to Gosier, white managers frequently deny African-Americans advancement with subjective, negative assessments, such as "not having shown leadership."  Id. at ¶ 146.  In addition, managers will single out an employee's supposedly

negative performance despite having the same performance exhibited by white employees.

Id. Mr. Gosier has witnessed a pattern and practice of discrimination in promotions against

African-Americans that has resulted in the following:

     i.   Denying African-American employees' promotions to higher GS levels at the Census Bureau;

    ii.   Showing preferential treatment to whites in promotional opportunities;

   iii.   Denying African-Americans adequate or appropriate training necessary to advance to the next level;

   iv.   Moving African-American to different positions at the same level which hinders progression to the next GS level; and

    v.   Arbitrary and subjective negative personnel reviews of African-Americans that have resulted in thwarting of employment advancement.

Id. at ¶ 147.

These allegations serve to state a claim under Rule 12(b)(6) for common questions under

the facts or law under the commonality prong of Rule 23.  Fed.R.Civ.P. 23(a)(2).

### (b)    Typicality

To adequately allege typicality under Rule 12(b)(6), plaintiffs must state that the named

class representatives have suffered similar injuries from the same or similar employment

practices as other members of the class.  See Wagner v. Taylor, 836 F.2d 578, 591 (D.C. Cir.

1987) (considering class certification under Rule 23).  Thus, for example, an unsuccessful

applicant for one particular job can challenge discriminatory hiring for different job categories

where "the primary practices used to discriminate in the different categories are themselves

similar." Hartman, 19 F.3d at 1471.

Here, the named Plaintiffs' claims of promotional discrimination are typical of the class.

Ms. Howard, Ms. Megginson, and Ms. Ward Jordan allege that they applied for and were denied

promotions to vacancies at the GS-9 through GS-15 level at Commerce, although they were

qualified for these positions.  They also claim that African-American Commerce employees were

disadvantaged in the areas of awards, performance ratings, career-enhancing work assignments, timely training for advancement, and job assignments. Thus, their claims arise from the same events or course of conduct as the claims of the class, and those claims will proceed under the same legal theory: namely, the adverse impact of the Defendant's subjective performance evaluation practices upon African-Americans' promotions and related promotional opportunities. Additionally, the DOC's defense in this case, as in any disparate impact case, will involve common questions of fact and law, likely focusing on the common question of whether the Defendant is able to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. Section 2000e-2(k)(1)(A)(i).

Established law is directly contrary to Defendant's arguments that even mere factual variations automatically destroy typicality. D's Brief at 77-79 (criticizing plaintiffs' allegations as atypical because they did not work in each of the Bureaus covered by the class, they are not members of the "predominant" job classification at each Bureau, and their claims concern few supervisors in "relatively uncommon" positions rather than a common group of managers). That a plaintiff's job is not identical to that of other class members does not make the plaintiff's claims atypical, so long as the claims of all class members are not widely divergent and arise out of the same basic legal or remedial theory. "Typicality is not defeated because of the varied promotional opportunities at issue, or the differing qualifications of plaintiffs and class members." Wagner, 836 F.2d at 591 (internal quotation omitted); see also Advocate Health Care v. Mylan Labs, Inc., 202 F.R.D. 12, 27 (D.D.C. 2001) (differences among class members do not mandate a finding of atypicality, as long as the claims arise out of the same legal or remedial theory; class members need not be clones of each other). See also In re Vitamins Antitrust Litig., 209 F.R.D. 251, 261 (D.D.C. 2002) ("There is nothing in Rule 23(a)(3) which requires the

named plaintiffs to be clones of each other or other class members."); Senter v. General Motors Corp., 532 F.2d 511 (6th Cir. 1976); Anderson v. Garner, 22 F.Supp.2d 1379, 1385 (N.D. Ga. 1997) ("The requirement may be satisfied 'even though varying fact patterns support the claims or defenses of individual class members.'"); Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir. 1984) (stating that "a sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same . . . pattern or practice and are based on the same legal theory"); 7A Wright, Miller & Kane, Federal Practice and Procedure, Section 1764, at 235-41; compare KAS v. Financial General Bankshares, Inc., 105 F.R.D. 453, 461 (D.D.C. 1984), aff'd, 796 F.2d 508 (1986) (where the legal or factual position of the representative is "markedly different" than that of the class, it is not typical).

As stated by the D.C. Circuit in Wagner: "[T]he fact that the jobs performed by the named plaintiffs are, in some sense, unique, is not a bar to their being class representatives.  If it were, no class of professional employees could ever be certified."  Id., citing Meyer v. Mac Millan Publishing Co., 95 F.R.D. 411, 414 (S.D.N.Y. 1982) and Paxton v. Union Nat'l Bank, 688 F.2d 552, 562 (8th Cir. 1982) (holding that "[t]ypicality is not defeated because of the varied promotional opportunities at issue, or the differing qualifications of plaintiffs and class members.");  Adames v. Mitsubishi Bank, Ltd., 133 F.R.D. 82, 91 (E.D.N.Y. 1989) ("[t]he named plaintiffs need not possess the same qualifications or have the same employment status as the purported class members.")  The relevant consideration is not the uniqueness of the named plaintiffs' positions, but rather "whether [the named plaintiffs] suffered injury from a specific discriminatory promotional practice of the employer in the same manner that the members of the proposed class did, and whether [the named plaintiffs] and the class members were injured in the same fashion by a general policy of employment discrimination."  Wagner, 836 F.2d at 591.

In Wagner, the D.C. Circuit determined that the named plaintiff satisfied the typicality requirement where he claimed that the defendant conducted its performance evaluations "in a discriminatory manner, producing a disproportionate share of low ratings for black employees." Wagner at 591. Wagner also avered that he applied for and was refused promotions and that his chances for future promotion were dim because of his race. Id. The Court determined that:

> Along with other employees of the defendant, Wagner is subject to performance analyses, and is exposed to possible adverse consequences if the results of the analyses are lowered for discriminatory reasons. Though Wagner is a member of an "elite" service,[28] he has an interest, like all other members of the class, in being fairly evaluated. If Wagner's allegations are true, his individual claim of promotional discrimination is typical of the claims of those who would comprise the proposed class.

Defendant ignores the actual nature of Plaintiffs' disparate impact claim when it protests that no Plaintiff alleges that any individual "from the Office of the Secretary or OHRM had anything to do with the decisions of which they complain." D's Brief at 79. As shown by Wagner, Rule 23 does not require such allegations when Plaintiffs allege a common practice such as overly subjective and discriminatory performance evaluations which operate to adversely affect the class. Wagner, 836 F.2d at 591.

In addition to relying on the same theory of liability and injury as applicable to the class, the named Plaintiffs seek the same relief for themselves as they do for the class, including injunctive and declaratory judgments and back and front pay. Moreover, the Plaintiffs will present exactly the same evidence at trial on the merits whether there is one class trial or scores of individual trials, including the same historical, anecdotal, and statistical evidence. Accordingly, Plaintiffs have satisfied Rule 23's typicality requirement.

---

[28]  Wagner, who held a Senior Executive Service position, sought to represent all Interstate Commerce Commission African-American professional, technical, and administrative employees in positions graded GS-9 and above, and all black applicants for those positions. Id. at 583, 590.

### 3.    Plaintiffs State a Claim of Adequate Representation of The Class

Rule 23(a)(4) permits certification of a class only if "the representative parties will fairly and adequately protect the interests of the class." This adequacy of representation requirement focuses on "concerns about the competency of class counsel and conflicts of interest." <u>Falcon</u>, 457 U.S. at 157 n.13.

No legitimate question exists here regarding current class counsel's competence and its means to prosecute this case as a class action. As alleged in Plaintiffs' Amended Complaint, Plaintiffs' counsel in this matter have significant nationwide experience in litigating employment discrimination class actions and are highly qualified to prosecute the claims of the class. FAC at ¶ 174.

In the final paragraphs of its 83-page manifesto, Defendant launches into scurrilous attacks against Plaintiffs' law firm, all of which are unsubstantiated. Plaintiffs respond to each of these allegations, as follws

First, Defendant's argument that Plaintiffs improperly sought to designate this case as related to <u>Howard v. Guitierrez</u>, 04-756 is exaggerated and unmerited. Common questions of law and fact existed between Howard's individual claim and the instant case and the mere fact that the Court did not decide in our favor does not demonstrate that Plaintiffs counsels' efforts were "improper."

Second, Defendant unjustifiably criticizes Plaintiffs counsel's initial decision to include Guinyard as a representative. Guinyard voluntarily chose to be a class representative and she only abandoned that role because Commerce ultimately granted her a promotion when it became aware of her participation in the class action. Plaintiffs' counsel was not made aware of Guinyard's decision to withdraw herself from the case when naming her as a class

representative.

Third, Defendant's allegation that claims in this action are not encompassed within the administrative class is inaccurate. Plaintiffs have diligently amended their complaint to cure any discrepancies, as is their right under F.R.C.P 12(b).

Fourth, Defendant's contention that the initial complaint raised questions regarding venue and res judicata are superfluous because Plaintiffs have amended their complaint to avoid these issues.

Fifth, Defendant unreasonably criticizes this firm's statements that Dennis Gosier's case had been stayed. An appeal is still pending, and the Plaintiff's counsel has reason to believe that it is held in abeyance until the resolution of the class claims.

Moreover, Defendant's allegations are exaggerated and unjustified. For years, Plaintiffs' class counsel have successfully represented other classes in both the employment discrimination field and in other areas of Federal and state litigation; for example, David Sanford has been lead class counsel in over 25 class actions nationwide during the past seven years. Id. The attorneys now representing Plaintiffs have sufficient time and skill to vigorously prosecute the class claims in the case at bar. Id.

Additionally, there are no conflicting interests between the Class Agent and the proposed class. First, as set forth above, Plaintiffs' allegations in the First Amended Class Action Complaint do not fail as a matter of law. See D's Brief at 79. Second, in response to Defendant's argument that the named Plaintiffs do not hold positions representative of all Commerce employees in all job classifications from GS-9 to GS-15, as set forth above "[t]here is nothing in Rule 23(a)(3) which requires the named plaintiffs to be clones of each other or other class members." In re Vitamins Antitrust Litig., 209 F.R.D. at 261. Third, the Amended

Complaint renders moot Defendant's complaints about the named Plaintiffs' failure to hold positions above the GS-14 level and thus their ability to represent supervisory employees, since the alleged class does not include supervisors, but rather only a class of GS-9 through GS-15 or equivalent employees.   FAC at ¶ 1.   Fourth, because the alleged class does not include supervisors, the Amended Complaint nullifies Defendant's arguments about Plaintiffs who claim discrimination by supervisors who were members of the putative class. [29]   See D's Brief at 80. Thus, Plaintiffs state a claim of adequate representation under Rule 23(a)(4).

### 4.    Plaintiffs Adequately Allege Facts to Satisfy Rule 23(b)

In addition to the four requirements of Rule 23(a), the Court must consider whether Plaintiffs' Amended Complaint states facts sufficient to satisfy the requirements of any of the subsections of Rule 23(b), of which subsections (b)(2) and (3) are relevant to this case.

### a.    Plaintiffs State a Claim for Certification Under Rule 23(b)(2)

Rule 23(b)(2) has two requirements: the defendant's conduct must be "generally applicable" to the class, and final injunctive or declaratory relief must be requested for the class. Wright, Miller, & Kane, Federal Prac. & Proc., Section 1775 at 448-49 (1986).  As held by the U.S. Supreme Court in Falcon, itself a Rule 23(b)(2) class action, the judicial economy and efficiency in cases such as this, where class members are adversely affected by a common procedure, make certification under Rule 23(b)(2) particularly compelling:

---

[29] Defendant also argues that named Plaintiffs do not possess the same interests as absent class members because one named class member, Ms. Jordan, complains of the actions of another member of the putative class, an African-American supervisor.  The Complaint alleges that the black supervisor wanted to promote Ms. Jordan in light of her "outstanding" performance but that he was disallowed from doing so by another supervisor who limited the number of "outstanding" ratings.  FAC at ¶ 19. The Complaint is not alleging a claim directly against the black supervisor.  In fact, the Complaint suggests that the black supervisor was unable to promote Ms. Jordan because of the subjective performance appraisals, which allowed a higher level supervisor to overrule his decision, thus contributing to the disparate impact in promotions.

> Class relief is "peculiarly appropriate" when the issues involved are common to the class as a whole and when they "turn on questions of law applicable in the same manner to each member of the class." For in such cases, "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23."

Falcon, 457 U.S. at 155 (internal citations omitted).

The facts alleged here fall squarely within the parameters of a Rule 23(b)(2) class action. First, DOC's alleged agency-wide subjective decision-making process applies to the class as a whole and injunctive and declaratory relief is not only appropriate, but essential. Rule 23(b)(2) was specifically adopted to govern civil rights cases such as this one. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615 (1997). Back pay is considered class-wide "equitable" relief for which Rule 23(b)(2) certification was designed. See, e.g., Hartman v. Powell, No. 00-5356, 2001 WL 410461, at *2 (D.C. Cir. Mar. 15, 2001) (holding that settlement that provided individualized Teamsters hearings before Special Master to decide individual class members' back pay claims is "consistent with class certification under Rule 23(b)"). Significantly, courts have routinely awarded class-wide back pay damages without the need for individualized hearings. See, e.g., Hartman v. Wick, No. 77-2019, 1988 U.S. Dist. LEXIS 14908, at *4 (D.D.C. Apr. 15, 1988); Trout v. Garrett, 780 F. Supp. 1396, 1407-08 (D.D.C. 1991).

Therefore, because Plaintiffs allege conduct by Defendant generally applicable to the class, and request final injunctive or declaratory relief for the class, Plaintiffs state a claim for a 23(b)(2) class action.

### b.    Plaintiffs State a Claim for Certification Under Rule 23(b)(3)

Plaintiffs likewise allege facts sufficient for certification under Rule 23(b)(3), which states that an action can be maintained as a class action when "the court finds that the questions of law or fact common to the members of the class predominates over any questions affecting

only individual members, and that a class action is superior to other available methods  for the

fair and efficient adjudication of the controversy."  Fed.R.Civ.P. 23(b)(3).  "In determining

whether common questions of law or fact predominate, liability issues are the primary focus."  In

re Vitamin Antitrust Litig., Nos. MISC 99-197(TFH), MDL 1285, 2001 WL 856292, at *4

(D.D.C. July 23, 2001).  Additionally, the common issues do not have to have to be dispositive

of the litigation.  In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. at 29.  An issue

will predominate when an element of the claim will be proven on a "simultaneous, class-wide

basis."  Id.

Plaintiffs' alleged class action satisfies the predominance requirement because common

liability and damages issues discussed above concerning the DOC's subjective decision-making

in connection with performance evaluations constitute major elements of the class members'

claims and will shift the burden to the DOC to adduce evidence that business necessity justified

utilization of the forms at issue.  See Smith v. Jackson, 125 S.Ct. 1536, 1546 (2005) (under the

business necessity test, the employer must show that there are other ways for the employer to

achieve its goals that do not result in a disparate impact on a protected class).  If Plaintiffs prove

their disparate impact theory of discrimination, then only limited individualized hearings, if any,

might occur.  See International Bhd. of Teamsters v. United States, 431 U.S. 324, 361-63 (1977);

Segar v. Smith, 738 F.2d 1249, 1285 (D.C. Cir. 1984).

Plaintiffs' allegations also meet the requirements of superiority; utilizing the class action

device here would save judicial resources and prevent the likelihood of inconsistent verdicts.

Hundreds of members comprise the putative class.  Without certification of a class, individual

plaintiffs would be obliged to bear the cost and risk of individual trials on liability and remedy,

burdening the judicial system and presenting the potential for inconsistent verdicts.  See, e.g., In

re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. at 31; Lewis v. National Football
League, 146 F.R.D. 5, 8 (D.D.C. 1992).  Given that Plaintiffs' allegations indicate that common
issues on liability and damages would predominate and a class action is superior to hundreds of
individual adjudications, Plaintiffs state a claim for certification under Rule 23(b)(3).[30]

> **c.    Plaintiffs Satisfy Rule 23(b) Because the Department Has
> Acted on Grounds Generally Applicable to the Proposed Class.**

Contrary to the great onus of jurisprudence upholding class-wide awards of back pay for
remedying discrimination, Defendant speciously contends that the number of class members in
the instant matter precludes class-wide remedial relief under 23(b).  Indeed, the number of
putative class members, "hundred, if not thousands," see Am. Compl. ¶ 167, only underscores
the pervasiveness of the discrimination and the appropriateness of class-wide remedy.  If
anything, such numbers should be construed against Defendant.

> **(1)    Class Wide Back Pay Should Be Administered.**

The instant class-action is exactly the type for which back pay and other remedial relief is
appropriate under Title VII.  Title VII empowers a court that has found illegal discrimination to
"order such affirmative action as may be appropriate, which may include, but is not limited to,
reinstatement or hiring of employees, with or without back pay." Segar, 738 F.2d 1249, 1289-90
(D.D.C. 1984) (citing 42 U.S.C. § 2000e-5(g)(1976)).  The Court has recognized that back pay is
not a "mere adjunct of some more basic equity" but is an "integral part of the whole relief which
seeks, not to punish the respondents but to compensate the victim of discrimination." Pettway v.
American Cast Iron Pipe Co., 494 F2d. 211 (5th Cir. 1974) (citing United States v. Georgia
Power Co., 474 F. 2d 906 (5th Cir. 1973.))  Upon finding of economic loss from a discriminatory

---

[30] The subcategories of Rule 23(b) are not mutually exclusive.  A class may be certified under
more than one category.  See Eubanks v. Billington, 110 F.3d 87, 91 (D.C. Cir. 1997).

employment practice, back pay should be awarded unless special circumstances are present.  Id. at 252-3; see also Hameed v. Int' Ass'n of Ironworkers, 637 F.2d 506, 518-520 (8th Cir. 1990) (holding that after a finding of unlawful discrimination, back pay should be denied only for reasons which, if applied generally, "would not frustrate the statutory purposes of eradicating discrimination through the economy and making persons whole for injuries suffered through past discrimination" where the court granted class wide given the "apparent complexity and uncertainty" of identifying which individuals qualified for back pay.)

In the case at bar, Plaintiffs will demonstrate a finding of discriminatory impact, and will thus be eligible for remedial relief, including back pay.  Further, there are no special circumstances here that would preclude back pay.

Back pay is commonly awarded in a class-wide manner, in cases very similar to the one at bar.  The argument that back pay will vary from class member to class member is not compelling.  Pettway, 494 F2d. at 257.  Once a class-wide discrimination has been demonstrated to result in disproportional earnings, a class-wide decision that back pay is appropriate can be discerned without deciding which members of the class are entitled to what amounts.  Id.

Indeed, not awarding class wide relief poses graver concerns.  Requiring separate actions for back pay would burden courts and counsel alike with duplicative tasks and repetitive paperwork.  Pettway at 258.  Additionally, reconstructing an individual's work history and calculating the amount of back pay owed presents an exercise in futility.  When "class size or the ambiguity of promotion or hiring practices or the multiple effects of discriminatory practices or the illegal practices continued over an extended period of time calls forth the quagmire of hypothetical judgment" a class-wide approach to the measure of back pay is needed.  Id. at 261.

In Segar v. Smith, 738 F.2d 1249, 1289-90 (D.C. 1984),  the Court upheld the lower

court's order invoking class-wide back pay to African-American DEA agents above the GS-11 level, because the "exact reconstruction of each individual claimant's work history, as if discrimination had not occurred, is not only imprecise but impractical."  Id. (citing Pettway v. American Cast Iron Pipe Co., 494 F2d. 211 (5th Cir. 1974) (5th Cir. 1974) (finding it impossible to "calculate the precise amount of back pay" in a class wide award because "there is no way of determining which jobs the class members would have bid on and have obtained if discriminatory testing, seniority, posting and bidding system, and apprenticeship and on-the-job-training programs had not been in existence."); see also Thompson v. Boyle, 499 F. Supp. 1147 (D.D.C. 1980) (holding that class wide back pay was warranted because it was "practically impossible to determine which class members would have been promoted absent discrimination, a formula approach to back pay [was] indicated," where the court found that there was "no way of determining which jobs the class members would have bid on and have obtained absent the discrimination" in a gender discrimination action.); see also Stewart v. General Motors Corp., 542 F.2d 445, 453 (7th Cir. 1976) (finding it necessary to use a class-wide procedure in awarding back pay as compensation for defendant's failure to promote black employees to salaried positions because utilization of an individualized method of calculation would be impossible and "any supposed accuracy in result [of individualized calculation] would be purely imaginary.")

### (2)    Back Pay Can be Administered by The Court in Its Discretion.

.       Courts routinely devise formulas for calculating class-wide back pay.  In doing so, two basic principles are employed: "(1) unrealistic exactitude is not required, [and] (2) uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating employer."  Id. (citing Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 (5th Cir. 1974)).  In Pettway, the court set forth the period for which back

pay extended by considering when discriminatory testing limited employees' advancement.  Id. The court then determined that those employees who worked in the class denied supervisory positions or entrance into apprenticeship and on the job training are eligible for back pay.  Id. at 258-59. Next, the individual employee garnered the light burden to describe the harmful effect of the discrimination and that back pay is warranted, followed by the employer then assuming a heavy burden of rebutting the employee's entitlement to back pay.  Id.

In Pettway, the court held that the formula for awarding class-wide back pay should be based upon a class of whites which would be comparable to the members of the effective class but for the discrimination.  After the total award for the entire class is determined, individual claims would be calculated on a pro rata share for those workers of similar ability and seniority claiming the same position.  Finally, claimants dissatisfied with their portion of the award would be allowed to opt out in order to prove that they were entitled to a larger portion.  Id.

Notwithstanding the above formula, courts have reconciled the complexities in computing approximate pay rates in a variety of ways.  Id. at 263; United States Steel Corp., 520 F.2d 1043, 1055-56 (5th Cir. 1975) (holding that the district court should strive to award back pay by reconstructing hypothetically each eligible claimant's work history and but noting the alternative of using a pro rata distribution passed on a linear progression formula); see also United States v. Local 416, Wire & Metal Lathers, 328 F.Supp. 429, 443-45 (S.D.N.Y. 1971) (holding back pay should be awarded to class members on a monthly basis who meet objective eligibility criteria, based on the average earnings of white union members compared to the lesser amount the claimant earned or should have earned) ; Stamps v. Detroit Edison Co., 365 F.Supp. 87, 121-22 (E.D. Mich. 1973) (ordering defendants to pay each member of the affected class an amount equal to the average earnings of "skilled trades high opportunity jobs" less the amount

each member of the affected class actually earned during that designated time period.)  Thus, the court can employ a variety of mechanisms to determine the class wide back pay rate.

## V.    CONCLUSION

The Amended Complaint pleads disparate impact class allegations that satisfy the requirements of Title VII and Rule 23 under controlling law.  To precipitously strike class allegations before discovery commences, after Plaintiffs have endured ten years in the administrative process—including a class certification by the OFO relied upon by countless individuals—would be completely contrary to the pragmatic spirit of Rule 23 and the principles of the civil rights laws.  Accordingly, Plaintiffs respectfully request that the Court deny Defendant's Motions to Dismiss and its Motion to Strike Plaintiffs' class allegations.

Dated: September 18, 2006            Respectfully submitted,

**SANFORD, WITTELS & HEISLER, LLP**

By:    /s/   David Sanford
David W. Sanford, D.C. Bar No. 457933
Meenoo Chahbazi, CA Bar, Admitted Pro Hac Vice
Shayna M. Bloom, MD Bar, Admitted Pro Hac Vice
1666 Connecticut Avenue, NW
Suite 310
Washington, D.C. 20037
Telephone: (202) 742-7777
Facsimile:  (202) 742-7776

Grant Morris, D.C. Bar No. 926253
**LAW OFFICES OF GRANT E. MORRIS**
1666 Connecticut Avenue, NW
Suite 310
Washington, D.C. 20037
Telephone: (202) 742-7783
Facsimile:  (202) 742-7776

Bruce V. Spiva, D.C. Bar. No. 443754
Kathleen R. Hartnett, D.C. Bar. No. 483250
**SPIVA & HARTNETT LLP**
1776 Massachusetts Avenue, N.W.
Suite 600
Washington, D.C. 20036
Telephone: (202) 785-0601
Facsimile:  (202) 785-0697

*Attorneys for the Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 18, 2006, a copy of the foregoing was filed electronically. Notice of filing will be sent to the following parties by operation of the Court's electronic filing system. The parties may access this filing through the Court's system.

Peter Smith, Esq.
Megan Rose, Esq.
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0372

_/s/_David Sanford _____
David Sanford