

RECEIVED
LC Received 12/20/07
DEC 1 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JANET HOWARD, JOYCE E. MEGGINSON,
and TANYA WARD JORDAN

        Plaintiffs,

v.

CARLOS M. GUTIERREZ,
Secretary, United States Department of
Commerce,

        Defendant.

Case No. ~~1:04-CV-00756~~

*1:05-CV01968*

JUDGE JOHN D. BATES

JURY TRIAL DAMANDED

## SECOND AMENDED COMPLAINT

### I.   OVERVIEW OF THIS ACTION

1. Plaintiffs bring this action to redress racial discrimination in promotion and related promotional opportunities as current African-American, non-supervisory (at grade levels GS-9 through GS-15, or equivalent level white collar non-GS positions), salaried employees of the Department of Commerce ("Commerce").

2. Commerce's uniform policies regarding performance appraisals, promulgated by the main office and applicable across Bureaus, adversely affect promotions and related promotional opportunities for these plaintiffs.

3. The performance appraisals allow for a broad range of managerial discretion and therefore sever as a conduit for excessive subjectivity and race discrimination which has resulted in a disparate impact on these plaintiffs in violation of Title VII.

4. Statistical evidence demonstrates that African-American employees of Commerce are grossly underrepresented in GS9 through 15 levels, and overwhelming anecdotal evidence illustrates Departmental race discrimination in advance and promotion.

### II.   HISTORY OF THE CASE

5.  Ms. Janet Howard, an African-American female and twenty-two year employee of Commerce, filed a timely Class Complaint with an Equal Employment Opportunity Counselor on February 22, 1995 (Janet Howard, et al. v. Donald L. Evans, Secretary U.S. Department of Commerce, EEOC No. 100-A1-7429X, Agency No. 95-55-0278) ("EEO Class Complaint":). Ms. Howard alleged that Commerce engaged in race discrimination against her and a class of similarly situated African American employees who worked for Commerce in the metropolitan area of the District of Columbia.

6.  Specifically, Ms. Howard alleges that Commerce has maintained a system of racially discriminatory and subjective employment practices with respect to promotions, awards, performance ratings, career-enhancing work assignments, timely training for advancement, and job assignments. This subjective decision/making in performance evaluations has prevented her from advancing according to merit, and it has disadvantaged her.  Ms. Howard was once informed by her supervisor, that the promotion she was in line for was traditionally reserved for "white males."  That same supervisor was overheard saying to a white female, "You are tall and blonde; you will do well here."

7.  Since 1995, Commerce employees have filed hundreds of complaints alleging race discrimination; have produced an expert opinion from the nation's leading performance appraisal expert regarding the subjective, unfair appraisal system in place at Commerce; have produced statistics that demonstrate a pattern of race discrimination in pay and promotions; and have submitted over one hundred and twenty-five survey forms evidencing race discrimination.  Despite that history, Commerce has remained non-responsive in its investigation and treatment of discrimination claims made by its employees.  After ten years of discovery ad motions practice, certification of a class, partial decertification, extraordinary delay at the administrative level, and increased levels of futility, anger, confusion, and frustration among class members, Plaintiffs brought this action in the United States District Court for the District of Columbia to redress the racial discrimination evident throughout Commerce.

## III.  **JURISDICTION AND VENUE**

8. This Court has jurisdiction of the claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(3)-5(f), *et seq.*, as amended ("Title VII"), Additionally, this Court Has jurisdiction of Tanya Ward Jordan's claim pursuant to the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, as amended ("The Rehab Act"), to redress and enjoin employment practices of Commerce in violation of these statues.

9. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices are alleged to have been committed in this judicial district.

10. The District of Columbia is also the most logical forum in which to litigate the claims of the plaintiffs in this case. Commerce is headquartered in Washington, District of Columbia and the performance evaluation procedures challenged here issue from its centralized Office of Human Resources Management of the Office of the Secretary. Further, plaintiffs resided in and around the District of Columbia, and work in the District of Columbia.

## IV. CONDITIONS PRECEDENT TO SUIT UNDER TITLE VII

11. The Plaintiffs have fulfilled or are fulfilling all precedent conditions necessary to the institution of this action under Title VII.

## V. PROCEDURAL HISTORY

12. After years of suffering racial discrimination, Janet Howard, an African-American female and a Commerce employee since 1983, contacted an EEO Counselor. Ms. Howard filed her EEO Class Complaint on February 22, 1995. In her EEO Class Complaint, Ms. Howard alleges that Commerce engaged in race discrimination against her.
In a letter from Leroy J. Warren, Jr., Chairman of the NAACP Federal Sector Task Force to William Daley, Secretary of Commerce, dated September 16, 1999, Warren describes the complaints received by the NAACP of race discrimination at Commerce:

> The NAACP has for many years been the recipient of a number of very serious allegations of [rampant employment discrimination routinely faced by many racial minorities employed by the Department of Commerce].... Today's Protest Demonstration is being conducted because of the non-responsiveness of senior

3

Commerce officials to what the Task Force strongly believes are legitimate complaints of employment discrimination, racism, abuse of authority, and an overall lact of equality and justice within Commerce. **The EEO program at Commerce is basically malfunctioning and inoperative.**

Letter from Leroy J. Warren, Jr., Chairman, NAACP Federal Sector Task Force, to William
Daley, Secretary of Commerce, dated September 16 1999 (emphasis in original).

13. In addition, the Commission took administrative notice of the information in the <u>EEOC's Annual Report on the Employment of Minorities, Women and People with Disabilities in the Federal Government for the Fiscal Year 1998</u> ("EEOC Report"), which documented the following:

- The average white collar grade for the agency's white employees was 10.60, while the average white collar grade for the agency's black employees was 8.78. EEOC Report Table 1-16.

- The discrepancies in grade level were also evident in professional positions where the average grade for white agency professional employees in FY 1998 was 12.77 while the average grade for black agency professional employees was 11.62. EEOC Report, Table 1-17.

The percentage of black employees in the agency's white collar positions GS-9 and above in FY 1998 declines as the grade level increases. In contrast, the percentage of white employees in the agency's white collar positions increased in the higher-graded positions.

The Commission also noted that the record contained:

Several affidavits and over forty unsworn survey forms that were completed in
September 1998 which indicate that numerous individual class members believe
they have been denied advancement-related opportunities based on their race.

Hundreds of race discrimination complaints agency-wide.

The Commission found that the complainant possessed the same interest and suffered the same injury as the members of the class. The Commission also found that numerosity and adequacy were satisfied.

4

VI.    **PARTIES**

14. Plaintiffs are as follows:

A. **Plaintiff Janet Howard** has been employed by Commerce for approximately twenty-two years as a non-supervisory employee. She is currently employed in the Bureau of export Administration.

B. **Plaintiff Joyce Megginson** is an African-American female who has been employed for approximately 34 years by the U.S. Department of Commerce, assigned to the National Telecommunications and Information Administration ("NTIA").

C. **Plaintiff Tanya Ward Jordan** is an African-American female who has been employed by Commerce at the Office of the Secretary for approximately twenty years.

15. **Defendant United States Department of Commerce** is a government entity doing business in Washington, D.C., and is an employer under 42 U.S.C. § 2000e(b).

16. Commerce is a highly centralized departmental agency in the Executive Branch of the United States Government. To accomplish Commerce's goal to "foster, promote and develop the foreign and domestic commerce," the Department is divided into fifteen interrelated bureaus, including ten interior bureaus in Washington, D.C. and five exterior metropolitan area bureaus.

17. The interior bureaus include: the Office of the Inspector General ("OIG"); the Office of the Secretary ("OS"); the International Trade Administration ("ITA"); the Bureau of Industry and Security ("BIS"); the Economic Development Administration ("EDA"); the Minority Business Development Agency ("MBDA"); the National Telecommunications and Information Administration ("NTIA"); the Economics and Statistics Administration ("ESA"); the Technology Administration ("TA"); and the Bureau of Economic Analysis ("BEA").

18. The exterior bureaus include: the Bureau of the Census ("Census"); the National Institute of Standards and Technology ("NISI"); the National Oceanic and Atmospheric Administration ("NOAH"); the United States

Patent and Trademark Office ("PTO"); and the National Technical Information Service ("NTIS").

19. Each bureau is subject to the centralized control of well-established Department of Commerce policies, with directives being issued by the Office of Human Resources Management of the Office of the Secretary ("OHRM") to all bureaus in Washington, D.C. and the metropolitan area. Commerce Department personnel policies are tightly controlled and directed by OHRM, which bears ultimate responsibility for the racially discriminatory employment practices that the plaintiffs complain of in this case.

20. **Secretary Carlos Gutierrez** is the thirty-fifth United States Secretary of Commerce.

## VII.    **ALLEGATIONS OF PLAINTIFFS**

### **Janet Howards' Claims:**

21. In the course of Ms. Howard's employment, commerce has subjected Ms. Howard to discrimination in employment based on her race (African-American), by denying her promotions in favor of less senior, less qualified white employees, and subjecting her to a racially hostile work environment and other forms of discrimination The subjective decision making associated with promotions, case awards, training, enhanced job assignments and performance appraisals has had a direct and adverse impact on Ms. Howard's employment at Commerce. Because of Commerce's promotion system and how it is used, Ms. Howard has been denied opportunities that are available to white employees. Ms. Howard supervisor used subjective decision making to discriminate against Ms. Howard because of her race.

22. Since 1983, when Ms. Howard was hired by Commerce, she has been discriminated against on several occasions. For example, in approximately 1986, Ms. Howard applied for a GS-9 position and was told that the position was reserved for white males. In approximately 1992, Ms. Howard completed performance evaluations for African-American employees she was supervising, only to have her white male supervisor Thomas Andrukonis reject her recommendations. He subsequently gave the employees significantly lower ratings. Mr. Andrukonis would not

discuss the difference in ratings with Howard, nor would he reconsider his decisions.

23. In approximately 1984 or 1985, Ms. Howard overheard her supervisor saying to a white female "you are tall and blonde, you'll do well here."

24. In approximately 1989, Ms. Howard asked Personnel Specialist Jean Cheeks how long she would be held in a lateral position without being promoted. Cheeks responded: "Until a reasonable manager comes along."

25. In 1995, Ms. Howard filed a class wide complaint alleging race discrimination at Commerce, alleging that she and a similarly situated class of African-American employees had been denied promotions in favor of less qualified white employees, subject to disparate terms and conditions of employment, a hostile work environment, and other forms of discrimination.

26. One example of the discrimination Ms. Howard has experienced was when, from 1996 to 1998, six GS-12 Export Compliance Specialist vacancies were announced in Ms. Howard's office.

27. Ms. Howard applied for each position and though qualified, was not selected. Ms. Howard's white supervisor, Mr. Andrukonis, did not call Ms. Howard in for an interview for any of the positions.

28. Another example of discrimination occurred during the 1996-1998 period, when Mr. Andrukonis hired a white male whose skills were unrelated to the duties listed in the GS-12 Export Compliance Specialist vacancy announcement. The skills required for the position related directly to the very duties Ms. Howard was performing daily.

29. On another occasion, Mr. Andrukonis decided to cancel a vacancy so he would not have to hire Ms. Howard to fill it.

30. In an investigative report, Mr. Andrukonis said the "Janet does good work and she makes the office look good, but it carries no particular weight."

31. Ms. Howard was denied a promotion for the 1801 series GS-12 position for five years before she finally received a GS-12 promotion. She received

that promotion at the exact same time the GS-7s whom Ms. Howard had supervised received their promotions to GS-12.

32. In 1999, a GS-13, 1803 Export Compliance Specialist position was announced.

33. Although Ms. Howard was qualified for the position, she was not considered because of the subjective decision made by her supervisor had prevented her from advancing to a GS-12 in a timely manner.

34. In December 1999, two vacancies for GS-13 positions in Ms. Howard's unit were to be posted on a Monday.  By the time, Ms. Howard had served enough time in-grade to compete for the GS-13 level.  However, Mr. Andrukonis rescinded the vacancies.

35. Approximately two months later, the two GS-13 slots were posted in an announcement for Division Directors.  Ms. Howard applied for the position in her office, but was not selected.

36. In approximately 1993, after receiving a "fully successful" rating, Ms. Howard's supervisor explained that she received that rating because she was a "rookie."

37. Prior to July 22, 2001, Ms. Howard had requested, with support from the department's physician, reasonable accommodation for a medical condition.  Instead of receiving a reasonable accommodation Ms. Howard was placed on a Performance Improvement Plan (PIP).  Ms. Howard believes the denial of a reasonable accommodation was because of her race.

38. In approximately 2002, Ms. Howard's rating ws undeservedly and subjectively lowered to "marginal."

**Case Number: 05-67-00200**

39. Complainant Janet Howard submitted her request in February 2005 to attend Black In Government Conference in Orlando, Florida, during the period August 1-6, 2005, management did not inform her of their approval until July 28, 2005 at 3:30 pm, 30 minutes prior to the end of her scheduled work day.

40. On July 28, 2005 at 3:30 pm Tom Andrukonis informed Complainant that Wendy Wysong had denied her request for a rental car while attending the Blacks In Government Conference.

41. Mr. Andrukonis told her that he would pay for her to use 100 taxis before he would approve the use of one (1) rental car.

42. Complainant therefore relied on taxi service and upon her return to work, management informed he that they would only pay $42.00 toward her taxi cab vouchers totaled $252.00.

43. Although the Agency paid $60.00 in advance for Ms. Howard to attend the closing plenary session, Wendy Wysong insisted that Ms. Howard leave the Conference prematurely before conclusion of the conference session.

44. The closing plenary started Friday evening, which means, Ms, Howard would have to stay over night Friday and fly back to Washington on Saturday.

45. Wendy Wysong, told Ms. Howard, she had to be out of Orlando before Noon.

## Case Number: 97-67-0043w

### 99-67-00140

46. Complainant alleges that in retaliation for her prior EEO activity, her supervisor denied her a career ladder promotion since 1992, most recently when he reneged on an agreement to promote her to GS-12 effective the pay date of 1/14/99.

47. 1992 Ms. Howard a GS-11 Export Compliance Specialist, was detailed twice in a GS-13 Criminal Investigator Supervisory position.

48. Ms. Howard supervised 7, GS-7 Export Assistance for two 120 day detail.

49. The agreement between Ms. Howard and Mr. Andrukonis was that in exchange for pay, Ms Howard would receive credit in supervisory experience.

50. With the understanding that the GS-13 Position would be advertised as a GS-12/13 Support Supervisory position.

## Case Number: 99-67-00722- 98-67-00270w

### Allegation: Promotion/non selection/assignment of duties/ awards evaluation/appraisal

51. Complainant alleges that she did not receive a cash award or promotion in Fiscal year 1997.

52. Ms. Howard applied for a GS- 12 Vacancy Announcements  with the same exact duties performed by her in her job description.  Ms. Howard was never interview or selected for any of the positions.

53. Although Ms. Howard received a high commendable rating she did not receive a cash award for Fiscal year 1997.

54. Complainant alleges that Agency denied her request for per diem payments to attend the Blacks In Government (BIG) Conference held during the period August 21-25, in Washington.

55. Complainant's residence is 85 miles way from Washington, DC. Complainant asked for per diem to attend BIG Conference day and night sessions.

56. Complainant was told to drive back and forth to the Training.

57. n retaliation for prior EEO complaint activity she was rated marginal for Fiscal Year 2001.

58.    Amended 1 (4/5/02) as a result of the marginal rating, Complainant was denied the opportunity to participate in the Office of Civil Rights Mentoring Program.

## Case Number 01-67-00128; Allegation:  Promotion/Non selection.

59.    Complainant was retaliation against when she was not selected for a Policy Analyst Position.

60.    Before creating this Policy Analyst position, Complainant was assigned to perform the duties of this position dealing with high performance computers.  This position was announced as a supervisory position.

61.    The employee hired into this position was paid $20,000 dollars above what she was making in the private sector.

62.    The employee hired into this position supervised one (1) employee.

## Case Number 03-67-00036; Allegation:  Disability Accommodation / Evaluation? Appraisal/ Other- request to telecommute denied.

63.    Complainant alleges that she as denied reasonable accommodation, necessary to enable her to perform the essential functions of her position.

64.    Complainant is currently in litigation before U.S. Federal Judge Friedman in an ADA case against the department for failure to accommodate.

65.    As an additional accommodation her attending physician had request that Ms. Howard be permitted to telecommute on Mondays and Fridays, the request was denied.

66.    The department said Ms. Howard's position was not suitable for telework, even though a white female performing the same duties as Ms. Howard was permitted to tele work for years without providing the required medical. Documentation.

11

## Case Number 01-67-00321: Disability Accommodation/ Harassment Non-Sexual.

67.  Complainant is diagnosed with Post Traumatic Stress Disorder, High blood pressure and Depression.

68.  On June 22, 2001, Ms. Howard's' supervisor removed her furniture,

     telephone and computer from 4066 and attempted to relocate her to room 4065, outside of the office of a supervisor who had harassed her for years.

69.  This is the same supervisor named in the more than 25-filed EEO complaints.

70.  The actions taken against Ms. Howard were done despite a letter from her physician warning that permanent or irreversible harm could result.

71.  When Complainant objected to the move, supervisor Thomas Andrukonis told her that she should see if the Office of Civil Rights or the Office of General Counsel had a desk for her to sit at.

72.  Mr. Andrukonis said the elevator would be the best place, but the doors opened on every floor.

73.  Andrukonis in a hand written sticker to Ms. Howard said that Dave Panansky Office of General Council attorney told him not to address Ms. Howard's request for reasonable accommodation.

74.  Instead of following the instruction provided by Ms. Howard's physician Dr. Kraff and Commerce physician Dr. Wills, Mr. Andrukonis offered Ms. Howard a dusty storage room with no window, located next too an employee who cut's herself and preferred to sit in a dark room with the b blinds drawn.  She could not tolerate voices or sounds.

75.  On August 24, 2001 Andrukonis rescinded previously approved travel orders, for Ms Howard to attend the 2001 BIG conference.

76.    Additional retaliation for requesting a reasonable accommodation was that Ms. Howard was placed on a Performance Improvement Plan (PIP)

**05-67-75**    **Awards:**

77.    In retaliation for prior EEO Activity, Ms. Howard received a performance award for FY 2004 after receiving a Commendable rating.

**04-67-78**    **Awards/ Training:**

78.    Thomas Andrukonis devised an arbitrary formula, which dictated that only employees receiving numerical scores of 490 or higher would receive cash awards.

79.    Andrukonis denied Ms. Howard's request to attend a May 12, 2004 professional development workshop sponsored by Georgetown University Center at a cost or $299.00.

80.    Andrukonis denied Ms. Howard an opportunity to attend a no cost (free) Japanese delegation meeting on June 1 & 2, 2004, which her immediate s supervisor Carol Bryant had suggested she attend.

**Other Complaints Involving Promotion/Non selection/ Appraisal/ Evaluation/Assignment of Duties, Training/ Awards are:**

81.    88-51-00510c,

88-51-01020c,

90-51-01020c,

94-67-00800w,

95-67-00260w,

95-67-02780,

95-67-03850w,

13

95-67-03960w.

96-67-01940w

## Case Number 06-67-00207:  Allege Time & Attendance:

82.    Ms. Howard Allege in retaliation to prior EEO Complaints she was informed a month later that her request for advanced sick leave request was not approved.

83.    Ms. Howard submitted the leave slips on August 25 and 31, 2006.

84.    The leave slips had been approved for processing and given to the timekeeper on July 2006.

85.    The leave slips visible showed that the approving official and date had been sloppily white out...

## 07-67-10    Assignment of Duties PIP Other- Developmental detail:

86.    Ms. Howard a 24-year GS-12 employee was denied a detail opportunity, which was given to a 2 year GS-9 white male.

87.    Ms. Howard had taken a three year condensed supervisory executive leadership development-training course.

88.    The white male had taken two supervisory classes.

89.    Ms. Howard alleges that in retaliation for the instant complaint. Ms. Howard was placed on a Performance Improvement Plan (PIP) for a period of 90 days.

90.    A month prior to being placed on the PIP, Ms. Howard had received a Bronze Medal Awards, Within Grade increase, days off Award.

14

91.    Due to her placement on a performance improvement plan, Thomas Andrukonis disqualified her as a candidate from applying for two (2) GS-1801-13, Export Compliance Specialist/ Analyst Positions located in the office of Enforcement Analysis.

## Case Number 06-67-00124 Allege: Training

92.    April 7, 2006 Ms. Howard request to attend the BIG Government Conference from August 21 to August 26 was denied.

93.    In retaliation for filing complaints against Wendy Wysong in cases

**05-67-00200** and **06-67-00207,**   Wendy Wysong without input from

Other BIS Top Level managers, re-wrote a new training policy

restricting Ms. Howard from attending BIG Conferences.

94. As a result of Commerce's discriminatory actions, Ms. Howard has suffered extreme harm.

## Joyce Megginson's Claim

**95. Joyce Megginson** is a member of a protected class (African-American) who has been employed for approximately 37 years by the U.S. Department of Commerce, assigned to the National Telecommunications and Information Administration ("NTIA").

96. In the course of Ms. Megginson's employment, Commerce has subjected her to discrimination in employment based on her race (African-American), sex (female), age (over 40) by denying her promotions in favor of less senior, less qualified white employees, and subjecting her to a racially hostile work environment and other forms of discrimination.

97. The subjective decision making associated with promotions, case awards, training, enhanced job assignments and performance appraisals has had

15

a direct and adverse impact on Ms. Megginson's employment at Commerce. Because of commerce's promotion system and how it is used, Ms. Megginson has been denied opportunities that are available to white employees. Ms. Megginson's supervisor used subjective decision making to discriminate against Mr. Megginson because of her race.

98. For example, in approximately 1995, after Ms. Megginson had-for year-been trying unsuccessfully to advance to the GS-13 P Program/Management Analyst target position via the Upward Mobility career ladder position she held, but her supervisor, a white male named William B. Gamble, told Ms. Megginson, in substance: "Joyce, you can work for me for ten years and I will never promote you. The only way I will ever promote you is if Fred Wentland [a white male in her department at a higher level] dies in a plane crash. Then and only then maybe I will promote you to a GS-12 or 13."

99. Ms. Megginson's supervisor, Mr. Gamble invented various pretexts to unfairly and discriminatorily suppress Ms. Megginson's advancement.

100. Ms. Megginson's claims that her supervisor's excuses were arbitrary and subjective-and adverse to African-Americans-are confirmed by the fact that while she was languishing at GS-9, at least seven other white employees at NTIA, who were either below or at Ms. Megginson's level, achieved promotions to higher levels during the 1990s.

101.    Finally, in approximately 1995, Ms. Megginson accepted a GS-11 position in NTIA, and a promotion was prepared. However, the promotion was withdrawn after Ms. Megginson refused to drop her complaints. Ms. Megginson being offered this position had nothing to do with her immediate office nor the complaints which she filed with The Office of Civil Rights. Ms. Megginson sought and received this position on her own accord and efforts.

102.    Per Commerce policy, all employees were supposed to receive mid-point employment reviews and ratings. However, Ms. Megginson was signaled out by repeatedly not receiving such reviews and ratings. This negatively impacted here and prevented her from receiving cash awards given to other employees at Commerce. In fact, in approximately 1996, all the white and male employees who served under Ms. Megginson's supervisor, Mr.

Gamble, (for more than 120 days) shared in a $25,500 award. Ms. Megginson was the only African-American and female employee that Mr. Gamble supervised.

103.  In approximately 1996 or 1997, Ms. Megginson was the only one in her office who had not been given a performance evaluation. After a news article citing this fact, Ms. Megginson's then supervisor (Richard Parlow) awarded Ms. Megginson a 1% cash award. This was very traumatic for Ms. Megginson, because she then became known as the "1% girl" by her co-workers who often time would tease her, which left her in tears.

104.  Ms. Megginson frequently asked Mr. Gamble how she could improve and what she needed to do to get a higher rating on her performance evaluations. All Mr. Gamble would say was that there were no job enhancing assignments and, even if there were, there was no money to support a promotion. Ms. Megginson has continually been denied a promotion in her career ladder position at the U.S. Department of Commerce.

105.  Because of her race (African-American), (sex was withdrawn during the investigation) and in retaliation for filing a prior EEO Complaint.

106.  Ms. Megginson was required to pay all travel expenses to attend the 18th Annual Training Conference of Blacks in Government (BIG), held in Atlanta, Georgia on August 26-30, 2996, while the Agency paid travel costs for others similarly situated. When her EEO counselor inquired of this practice, she was told that it was a new policy. When asked to produce this policy, the counselor was told that it was a new policy, there was nothing in writing, and Ms. Megginson was the first person that this policy was applied to.

107.  Ms. Megginson's immediate supervisor (William Gamble) handled her training request differently than similarly situated employees; he had to contact personnel before approving Ms. Megginson's travel. Upon her return from training, her second level supervisor (Richard Parlow) approved all of her training, but Gamble and the Budget Director Gaye Shrum disallowed. There was money

allocated to pay all her training but they refused to reimburse Ms. Megginson.

108.    Ms. Megginson alleges that because of her race (African-American), sex (female) and retaliation for filing pervious complaints, her supervisor discriminated against her.

109.    Ms. Megginson did not receive the mandatory mid-point review which was due April 30, 1996. In fact, Ms. Megginson complained t to personnel about her supervisor (William Gamble) continued refusals to comply with departmental directives to do so. This particular rating period was not the first instance, Ms. Megginson, the NTIA's Administrative Officer, the office's secretary had also constantly complained of this departmental violation.

110.    Approximately, December 1996, Mr. Gamble attempted to coerce Ms. Megginson into signing the signature page of her performance appraisal even though the actual pages of the valuation were missing. Mr. Gamble was again in complete violation of Departmental policy when he did not complete Ms. Megginson's appraisal by the required date of September 30, 1996. Ms. Megginson complained to personnel as well as to her second level supervisor, Richard Parlow, as a result of late evaluations, she could never expect to receive a cash bonus. In December of 1996, after Ms. Megginson repeatedly refused to sign her performance evaluation, Mr. Gamble appeared in her office and tried to forcibly make her sign it. As a result of Gamble's strong arm tactics, Ms. Megginson was taken to the DOC's Health unit, and when her blood pressure elevated to 253/190. The departmental physician was concerned with the elevated blood pressure and tightness in her chest that he though Ms. Megginson was going to have a stroke or heart attack. The physician decided that Ms. Megginson should be taken to George Washington Hospital via ambulance.

111.    Ms. Megginson alleges because of her race (African-American), sex (female, age, over 40), she was harassed and in retaliation for filing previous complaints, her supervisor (Richard Parlow) ordered to physically clean the filthy private office of a white GS-15 (Janet Healer) co-worker who had for years refused to clean her own personal office space. Mr. Parlow told Ms. Megginson not to look

upon it as a cleaning assignment but rather organizing for the good of the agency.

112. The above assigned was given to Ms. Megginson after her return from a 30-day stress leave of absence from being harassed by her previous supervisor, William Gamble.

113. Ms. Megginson alleges that her supervisor (William Gamble) constantly refused to promote her via the career ladder position that she was hired under the Upward Mobility Program. Ms. Megginson was only allowed to advance to the bridge position of GS-9 Program/Management Analyst position. Ms. Megginson should have advanced and promoted to the target position of a GS-11 Program Analyst position non-competitively.

114. Ms. Megginson alleges that she was harassed and discriminated against because of her race (African-American), Color (Black), Sex (Female), disabilities (Post Traumatic Stress Disorder and major depression), in retaliation for her prior EEO activity. And, because of a hostile work environment, combined with intimidation, and harassment that had a negative effect on Ms. Megginson's health, she applied for, and was accepted into the Worker's Compensation Program with the Department of Labor because of this workplace injury. Mr. Gamble would make fun of Ms. Megginson's speech, called her lazy with her words, and compared her to his young daughter.

115. On January 19, 1995, NITA canceled Ms. Megginson's promotion to a GS-11 for which she had been selected for in December 1994. The cancellation was directly related to Ms. Megginson's involvement in the EEO process.

116. At Ms. Megginson's performance appraisal meeting on June 21, 1995, her immediate supervisor, William Gamble did harass and intimidate her by calling her into his office and telling her that he was not ready to rate her, but proceeded to ask her how her EEO complaints that she had filed against him were processing. Mr. Gamble continually interfered with Ms. Megginson's work environment by creating an intimidating, hostile, and offensive

work environment. These acts are a part of a broader pattern of harassment. .

117.    After filing a formal complaint against her supervisor, William Gamble, in an effort to intimidate and harass her, Ms. Megginson was prevented from performing some of the official and critical duties contained in her position description because of her involvement in the EEO process.

118.    These abusive discriminatory policies have had an extreme impact upon Ms. Megginson.

## Tanya Ward Jordan's Claims

119.    **Tanya Ward Jordan** has been employed by Commerce at the Office of the Secretary for approximately 20 years.

120.    In the course of Ms. Ward Jordan's employment, Commerce has subjected her to discrimination in employment based on her race (African-American) and gender (female) by denying her training, promotions and career advancement opportunities in favor of less senior, less qualified white employees and subjecting her to a racially hostile work environment and other forms of discrimination and retaliation.

121.    The systemic discrimination, retaliatory and subjective decision making associated with promotions, case awards, quality step increases, enhanced job assignments and performance appraisals had had a direct and adverse impact on Ms. Ward Jordan's employment at Commerce. Because of commerce's promotion system and how it is used, Ms. Ward Jordan has been denied opportunities that are available to white employees.

122.    In approximately June 1998, Ms. Ward Jordan, who had previous EEO complaint activity, was transferred from the Office of Financial Management into the Office of Executive Budgeting and Assistance management ("OEBAM") in a Management and Program Analyst GS-14 level position..

123.    In this capacity, Ms. Ward Jordan primarily served as the Office of Secretary's Departmental Management (DM) "Audit Liaison." Ms. Ward Jordan was responsible for reporting on functions, activities and initiatives related to DM funds. As a part of the routine business of her job as audit liaison, Ms. Ward Jordan regularly handled documents containing information that identified areas of concern to civil rights groups.

124.    Despite Ms. Ward Jordan's repeated notification to Commerce that managers were subjecting her and other African-Americans to illegal racial discrimination, Commerce managers have continued to discriminate against Ms. Ward Jordan and other African-Americans.

125.    For example, on approximately October 2, 2000, Ms. Ward Jordan filed a formal complaint (Agency Case No. 00-51-03163) alleging that she was denied a career- enhancing promotion position as the Department of Commerce's GS-15 Diversity Program Manager. The basis cited for the filing was due to her race (African-American), sex (female) and in retaliation for engaging in prior EEO activity.

126.    Circa May 2000, the Director of OHRM asked who had applied for the position. After seeing that Ms. Ward Jordan had applied and qualified for the position; and after the vacancy closed, Commerce "reassigned" a Caucasian of Hispanic origin to the position. The employee, who wrote a note stating he wanted the job and subsequently received the job after the vacancy had closed, was listed, in personnel records as a "White Male".

127.    Other examples, when Commerce initiated discriminatory and retaliatory treatment against Ms. Ward Jordan occurred on or about July 18, 2003. Ms. Ward Jordan filed a complaint in this regard which captures events. The complaint was recorded with the Commerce Department as Agency Complaint No: 03-51-00203.

128.    On or about July 27, 2003, Otto Wolff, Chief Financial Officer and Assistant Secretary for Administration ("CFO/ASA"), a white male, transferred Ms. Ward Jordan (GS-14) from the Office of Executive

21

budgeting within OEBAM to the Office of Budget ("OB") under the direction of Barbara Retzlaff, a white female.

129. On or about July 27, 2003, Ms. Ward Jordan was the only employee reassigned from the abolished Office of Executive Budgeting (OEB) to the Office of Budget, whereas other former OEB employees retained their same first level supervisor, their duties, and were merged under the Office of Financial Management (OFM), with which she had a history of EEO activity.

130. Once joining the OB staff Ms. Ward Jordan was denied the opportunity to serve in an acting capacity in the vacant GS 15 Chief of the Systems and Policy Division, whereas three White males, Bill Tatter, Doug Allis, and Peter Maxey were allowed to serve in this role.

131. On July 27, 2003 Ms. Ward Jordan, African-American female (GS-14) was constructively demoted when she was instructed to report to Bill Tatter, a lower graded White mail (GS-13) employee, who was afforded the opportunity to serve as "Acting Director".

132. Circa August 8, 2003, Ms. Ward Jordan (GS-14), serving in the Systems and Policy Division was instructed to report to a supervisor outside her unit, Doug Allis, Chief of the Trade and Information Program Division, whereas, Mr. Tatter (GS-13) reported directly to Victoria Ditoto, Acting Deputy Director of OB.

133. During her employment with OB, Ms. Ward Jordan complained to Commerce managers regarding the treatment to which she was being subjected, including Ms. Retzlaff and Peter Maxey, a white male, to no avail. Ms. Ward Jordan additionally complained to Bernadette Worthy, a black female, of commerce's Office of Civil Rights ("OCR").

134. On February 13 and 27, 2004, OB management denied her requests to attend three training courses: 1) USDA Guaduate School, Auditing Performance Outcomes, 2) USDA Graduate School, Performance Measurement and Budgeting and 3) Blacks in Government Training.

135. On or about February 27, 2004, Ms. Ward Jordan, who had recently filed an EEO cojlaint against the OB Director, received notice from personnel that she was to be transferred out of her Management and Program Analyst, GS-14 position within OB, to a Staff Accountant position in the Office of Financial Management (OFM). The transfver was to become effective March 7, 2004.

136. None of Ms. Ward Jordan's OB supervisors ever informed her of their intentions to transfer her out of the office. Rather, in a management directive memo dated February 27, 2004, Deputy Director of Human Resources conveyed that Ms. Ward Jordan's transfer was in being effected **"in the best interest of the government"**.

137. Subsequently, when Ms. Ward Jordan (GS-14) was transferred out of the OB office, Bill Tatter (white male) was promoted from GS-13 to GS-14 within OB.

138. On or about March 7, 2007, Ms. Ward Jordan, was removed from the GS series, placed under "pay banding" which precluded her from receiving the money associated with step-level (7) being added to her base pay.

139. On or about March 7, 2007, Ms. Ward Jordan, who has once served as Acting Director of the Office of Financial Management prior to filing any EEO activity, was put under a "team leader" of lateral rather than senior ranking employee in that very same office.

140. Tanya Ward Jordan alleges the Department has had ample notice of its rampant, systemic discrimination and has continually failed to redress its discriminatory policies, practices, and procedures.

141. To illustrate Ward Jordan, who had served as a Diversity Council Member with Commerce, cites the increasing disparity between African-Americans and white employees at DOC as African-Americans ascend upper level grades.

142. The 1998 findings from Commerce's Organizational Climate study disclosed that fair career advancement opportunities for

individuals of diverse racial makeup was a weakness throughout the Office of the Secretary where Ms. Ward Jordan worked.

143.    During the time of Ms. Ward Jordan's 2000 EEO complaint, Commerce records disclose that of the **131 total GS-14 positions**, Ms. Ward Jordan was **(1) one of the only (8)** eight African-Americans in the Office of the Secretary at the GS-14 level.

144.    During the time of Ms. Ward Jordan's 2000 EEO complaint, African-American employees saturated the GS-8 and below positions while approximately, **(.037) or 3.7%** of African-American females occupied GS-14 positions throughout Department of Commerce's 14-15 bureaus.

**145.    In 2000, of the reported GS-15 Commerce positions totaling 53,935, African-American women comprised only (.026) or 2.6% at this grade level.** The amount of African-American females, who like Ms. Ward Jordan file EEO complaints, are virtually non-existent within the Office of the Secretary at the GS-15 or comparable compensation level.

Office Department-wide personnel management oversight responsibilities. For example:

Department-wide staff responsibility by Human Resources Director for all aspects of human resources management and administration...

including employee recognition, moral, and performance appraisal.

146.    Responsibility for the Department's discrimination against its African-American employees ultimately rests with the centralized Office of the Secretary. For it is here, that DOC is supposed to: [d]evelop and administer the personnel management policies and programs

of the Department, including the direction, administration, and processing of all

matters involving personnel...[and] [c]onduct activities to ensure equal employment opportunity in the Department, including affirmative action for employees, and job applicants, and to

ensure nondiscrimination in Federally-assisted programs, activities, and projects. (emphasis added)

147.    The OS's Director for Civil Rights is charged with protecting against precisely the form of extensive, Department-wide discrimination manifest in this case. The Director for Civil Rights has:

Department-wide staff responsibility for ensuring EEO, including affirmative action, for employees and job applicants within the Department...[shall] [d]evelop, direct, and coordinate department programs, policies, and activities to ensure the accomplishment of EEO and civil rights responsibilities, and evaluate the implementation of these actions...[p]rocess EEO complaints within the Department and ensure that remedies ordered as a result of discrimination complaints or affirmative action initiatives.

148.    Performance appraisal ratings are recognized by the federal government as being very important to the career of a Federal civil service employee.

149.    Commerce's Office of Human Resources Management website states:

[Performance appraisals] are used in a variety of critically important ways.
For example, performance ratings have an impact during a reduction-in-force (RIF). A performance rating is also a factor in making promotion selections, and in most cases in determining who will receive a performance award...In short, the performance rating that you give an employee can have a major impact onn the employee's career.

## VIII.    OVERVIEW OF PLAINTIFFS' DISPARATE IMPACT CLAIMS

150.    Overall personnel management of the Department's roughly 30,000 employees stems from the OS. The OS issues department-wide personnel policies and directives. These policies and directives must be followed and adhered to by all the bureaus.

25

151.    The Secretary of the DOC—the top of the Organizational tree—
         reserves to itself "coequal" authority in personnel management of
         all 15 bureaus encompassed by the OFO's class order.

152.    All of the DOC bureaus are subject to a centralized system of
         department-wide personnel policies.  The Office of the Secretary
         issues these standard policies through its Human Resources
         Management Office (OHRM), which administers a department-
         wide human resources management program.  The Office of the
         Secretary/OHRM mandates a uniform set of policies and protocols
         for the DOC bureaus' personnel practices, including evaluations
         and promotions.

153.    OS/OHRM requires that all 30,000+ DOC employees (except certain
         management) be reviewed annually on standard evaluation
         forms.

154.    The HR Director has ultimate responsibility to ensure that the DOC's
         centralized; Department-wide personnel goals are met.  Through
         constant monitoring and oversight of all fifteen bureaus, the
         Director scrutinizes:

         administration of pay, bonuses and incentives; administration of
         leave and hours of work; administration of payroll support and
         time-and-attendance controls; workforce planning, recruitment
         and employment; training and career development; employee
         recognition; morale and performance appraisal; employee
         relations, benefits, and services; labor management relations;
         workers compensation; organizational restructuring guidance,
         oversight of unique human resources systems...evaluation of
         human resources management activities Department-wide;
         examination of adherence to merit principles and prevention of
         prohibited personnel practices; the promotion of effective human
         resources management; and the development of policies and
         procedures...

The Office of the Secretary is empowered by Department Orders
reaffirming that Office's Department-wide personnel management
oversight responsibilities.  For example:

Department-wide staff responsibility by Human Resources Director for all aspects of human resources management and administration...including employee recognition, moral, and performance appraisal.

155.   Responsibility for the Department's discrimination against its African-American employees ultimately rests with the centralized Office of the Secretary.  For it is here, that DOC is supposed to:

[d]evelop and administer the personnel management policies and programs of the Department, including the direction, administration, and processing of all matters involving personnel...[and] [c]onduct activities to ensure equal employment opportunity in the Department, including affirmative action for employees, and job applicants, and to ensure nondiscrimination in Federally-assisted programs, activities and projects. (emphasis added)

156.   The OS's Director for Civil Rights is charged with protecting against precisely the form of extensive, Department-wide discrimination manifest in this case.  The Director for civil Rights has:

Department-wide staff responsibility for  ensuring EEO, including affirmative action, for employees and job applicants within the Department...[shall] [d]evelop, direct, and coordinate Department programs, policies, and activities to ensure the accomplishment of EEO and civil rights responsibilities, and evaluate the implementation of these actions...{p}rocess EEO complaints within the Department and ensure that remedies ordered as a result of discrimination complaints or affirmative action initiatives.

157.   Performance appraisal ratings are recognized by the federal government as being "very important to the career of a Federal civil service employee."

158.   Commerce's Office of Human Resources Management website states:

[Performance appraisals] are used in a variety of critically important ways.  For

Example performance ratings have an impact during a reduction-in-force (RIF). A performance rating is also a factor I making promotion selections, and in most cases in determining who will receive a performance award...In short, the performance rating that you give an employee can have a major impact on the employee's career.

159.  Emphasizing the importance of the results of the appraisal process, the website notes that the results "are to be used as a basis for training, rewarding, reassigning, promoting, reducing in grade, retaining, or removing employees."

160.  The DOC mandates the use of performance standards at either five or two rating levels.  "For bureaus using five rating levels, the standards...are generic and cannot be changed."

## IX.  COMMERCE'S PERFORMANCE EVALUATION PROCESS IS EXCESSIVELY SUBJECTIVE

161.  Dr. David Martin, a Professor of Management and Human Resources Management at the Kogod School of Business Administration of American University, specializes in, among other areas, performance appraisal and organizational management. For years, Dr. Martin has assisted several federal agencies with preparing and implementing their performance appraisal systems, and he has decades of experience in teaching, publishing books and articles, consulting, and training employees (including hundreds of federal employees) in the area of performance appraisals.

162.  Dr. Martin reviewed examples of performance reviews from Census (Samuel Reynolds, 1996-1999), Headquarters/Office of the Secretary (Janet Hoard, 1995-96), Headquarters/Office of Human Resource Management (John Austin, 1998), and the Patent and Trademark Office (John Kuong, 2000).

163.  Having review performance appraisal forms used by the DOC, Dr. Martin concluded that "there are several areas where the [DOC performance appraisal system] is deficient."

164.  Those deficient areas, in summary form, are as follows:

- Transition from generic to specific elements in the evaluation
- Failure of the DOC to require that the standards for performance be determined and presented to the employee prior to the beginning of the rating period.
- Failure of the DOC to require that employees be made aware of what is required to receive an "outstanding," "commendable," "marginal," or "unacceptable," rating for each element prior mto the beginning of the rating period.
- The '§ubjectivity [in the performance appraisal system] allows raters to inject any non-work related issue such as bias, discrimination, personal like/dislike, or any other characteristic which would wrongly influence an employee's performance rating." Id. At 1.
- "[A]ny human resource decision, such as promotion, pay, training, etc. which is based on this type of performance appraisal is also flawed."

165.    As a result of these deficiencies, Dr. Martin concluded that the DOC's Performance Appraisal system, as indicated by the performance appraisals he reviewed, are "flawed by the excessive amount of subjectivity which is permitted in arriving at the rating for the individual elements.  The use of the performance appraisals which contain the excessive subjectivity cited above for any human resource action (promotion, pay, training, separation, etc) is certainly questionable."

166.    Dr. Martin concluded that the DOC's performance appraisal system is "probably the worst system [he had] critiqued."

## X.    STATISTICAL EVIDENCE CLEARLY DEMONSTRATES THAT COMMERCE'S EVALUATION SYSTEM HAD A DISPARATE IMPACT ON AFRICAN-AMERICAN EMPLOYEES GENERALLY, AND THESE PLAINTIFFS PARTICULARLY

167.    Statistics show that, for example, in 1998, the percentage of African-Americans in GS levels 5-15 declined at DOC as the GS level increased, while the percentage of white employees increased as the GS levels increased.  The percentage of African-Americans at GS-11 was 13.51%, at GS-12 the percentage was 14.25%, and at GS-13 the percentage dropped significantly to 9.6%.

The percentage of white employees at GS-11 was 76.61%, at GS-12, it was 76.93%, and at GS-13 it jumps up to 80.48%

168.    Throughout its bureaus, DO"C employs a disproportionate number of whites in GS-9 through GS-15 level positions and SES professional positions as compared to African-American employees. See, e.g. the following bar graphs representing the racial composition of the DOC workforce (GS9-15 and SES levels from March 1993 through January 1997).

169.    According to Fiscal Year 1997 statistics:

- At NOAA, white employees held 90.8% of 5485 professional positions; whereas African-Americans held 3.9%;
- At ESA, white employees held 80% of 33 professional positions; African-Americans held 2.4%;
- At ITA, white employees held 88% of 122 professional positions; African-Americans held 3.2%; and
- At NTIA, white employees held 100% of 86 professional positions; African-Americans held none.

170.    Administrative complaints of discrimination based on race and/or color are routinely filed by African-American employees throughout the DOC bureaus. Between October 1992 and August 1998, of the 492 discrimination complaints filed by African-American Commerce employees, 327 discrimination complaints (or 66%) were from the "outside" bureaus:

- Census filled 48 positions at the GS-13 level or higher. Of these, 36, or 75%, were white; six, or 13% were African-American;
- NOAA filled 102 positions at the GS-13 level or higher. Of these, 88, or 86%, were white; four, or 4%, were African-American;
- PTO filled 41 positions at the GS-13 level or higher. Of these, 27, or 66% were white; three, or 7% were African-American;
- NISI filled 16 positions at the GS-13 level or higher. Of these, 11, or 69%, were white; one, or 6%, was African-American; and

- NTIS filled 7 positions at the GS-13 level or higher. Of these, 6, or 86% were white; one, or 14%, was African-American.

171.   Throughout the DOC, African-Americans are selected for positions of GS-15 at rates lower than their overall representation at DOC. Of 591 DOC hires at the GS-15 level, 453, or 76.6%, were white; 59, or 10% were African-American. The numbers are comparable throughout the DOC's Outside Bureaus:

- At Census, 76.4% of GS-f15 hires were white; 10.4% were African-American;
- At NOAA, 92.6% of GS-15 hires were white; 3.4% were African-American;
- At PTO, 65.9% of GS-15 hires were white; 8.9% were African-American;
- At NISI, 75% of GS-15 hires were white; 7.1% were African-American; and
- At NTIS, 100% of GS-15 hires were white; none were African-American.

172.   Statistics show that in 1998, the percentage of African-Americans in the higher GS levels declined at DOC as the GS level increased, while the percentage of white employees increased as the GS levels increased. The percentage of African-Americans at GS-11 was 13.51%, at GS-12 the percentage was 14.25%, and at GS-13 the percentage dropped significantly to 9.6%. The percentage of white employees at GS-11 was 76.61%, at GS-12, it was 76.93%, and at GS-13 it jumps up to 80.48%.

173.   The data illustrate the increasing disparity between African-Americans and white employees at DOC as GS level increases, when viewed by groupings, i.e., GS-5-8, GS-9-12, and GS-13-15:

| GS Level | African-American | White |
|----------|------------------|-------|
| GS-5-GS-8 | 35.9% | 57.3% |
| GS-9-GS-12 | 20.2% | 69.5% |
| GS-13-GS-15 | 7.1% | 83.3% |

## XI.   COMMERCE HAS BEEN ON NOTICE OF SYSTEMIC DISCRIMINATION FOR YEARS

174.  The Department has had ample notice of its rampant, systemic d discrimination and has continually failed to redress its discriminatory policies, practices, and procedures. According to the DOC Affirmative Employment Program for Minorities and Women, FY 1994 Accomplishment Report and FY 1995 Plan Update:

175.  "As of September 1994, over one-half of all white, black, Hispanic, and American Indian/Alaska Native women continue to be concentrated in the entry grades (GS-01 through GS-08), while over three-quarters of the black men and Asian American/Pacific Islander women were dispersed throughout grades GS-1 through GS-12.

176.  "As of September 1995… [b]lack men comprised 5.0 percent of all GS and SES positions. They exceeded this rate at the following grade ranges – GS-05 through GS-08, and GS-09 through GS-12, and fell below it at GS-01 through GS-04, GS-q13 through GS-15, and in the SES…38.5 percent of black men were employed at GS-08 and below… The mode GS grade range for this group was GS-09 through GS-12.

177.  According to the DOC Affirmative Employment Program for Minorities and Women, FY 1995 Accomplishment Report and FY 1996 Plan Update:

178.  "Black women made up 13.3 percent of GS and SES jobs. They exceeded this rate at the GS-05 through GS-08 range only – an indication of concentration. "They comprised less than 13.3 percent in…GS-09 through GS-12 and GS-13 through GS-15 grade ranges as well as the SES. Nearly 2/3 of all black women, or 64.9 percent, are employed in grades at GS-08 and below. Employment rates decline considerably at GS-13 and above. Only one black woman was in the SES."

179.  "As of September 19096..l. [b]lack men comprised 5.1 percent of all GS and SES positions. They exceeded this rate in grade ranges GS05 through GS-08 and GS-9 through GS-12. They fell below it at

...GS-13 through GS-15 and in the SES. Over one-third (37.6 percent of [black men] worked at GS-08 and below."

180.   According to the DOC Affirmative Employment Program for Minorities and Women, FY 1996 Accomplishment Report and FY 1997 Phn Update:

181.   "Black women made up 13.2 percent of GS and SES jobs. They exceeded this rate at the GS-05 through GS-08 range...an indication of concentration...Nearly two-thirds of all black women of 62.3 percent, were employed in grades at GS-08 and below."

182.   "As of September 1997...[b]lack men comprised 4.9 percent of all employees in GS and SES positions. They exceeded this rate in grade ranges GS-05 through GSk-08 and GS-09 through GS-12. They fell below it at...GS-13 through GS-15 and in the SES. Over one-third (35.6 percent) of these employees worked at GS-08 and below...

183.   "Black women made up 13.1 percent of employees in the GS and SES. They exceeded this rate at the GS-05 through GS-08 ranged-an indication of concentration. Nearly two-thirds of all Black women, or 61.1 percent, were employed in grades at GS-08 and below."

184.   According to the DOC Affirmative Employment Program for Minorities and Women, Annual Affirmative Employment Program Accomplishment Report FY 1997:

185.   "Action Item" for GS 13-15: "Improve the representation of women of all races and [b]lack men in this grade range above 9/97 levels."

186.   "As of September 1998... [b]lack men comprised 5.3 percent of all employees in GS and SES positions. They reached or surpassed this rate in grade ranges GS-05 through GS-08 [and] GS-9 through GS-12. They fell below it at ...GS-13 through GS-15. Almost one-third were employed at GS-08 and below....

187.  According to the DOC Affirmative Employment Program for
      Minorities and Women, Annual Affirmative Employment Program
      Accomplishment Report FY 1998.

186.  "Black women made up 13.3 percent of employees in the GS and
      SES.  Almost two-thirds were concentrated in grades GS-08 and
      below, while almost one-third were found in grades GS-09 through
      12.  Less than 10 percent of Black women were employed in the
      GS-13 through GS-15 grade range."  "Black men comprised 5.3
      percent of all employees in GS and SES positions.  They surpassed
      this rate in grade ranges GS-5 through GS-08 and GS-9 through GS-
      12, where over two-thirds were concentrated.  Black men were
      below 5.3 percent in ...GS-13 through GS-15 and the SES...."

187.  According to the DOC Affirmative Employment Program for
      Minorities and Women, FY 1999 Accomplishment Report and FY
      2000 Phn Update:

188.  "Black women made up 13.2 percent of employees in the GS and
      SES.  Almost half were concentrated in grades GS-05 through GS08.
      Almost a third were employed in grades GS-09 through GS-12, and
      less than one-eighth were in grades GS-13 through GS-15.  Fewer
      [sic] than one percent of Black women were employed in the SES."

189.  "African-American men comprised 3.9 percent of all employees in
      GS and SES positions.  They surpassed this rate in the GS-9 through
      GS-12 grade range, where almost one-third were employed."

190.  According to the DOC Affirmative Employment Program for
      Minorities and Women, FY 2000 Accomplishment Report and FY
      2001 Plan Update:

191.  "African-American women made up 9.4 percent of employees in
      the GS and SES.  Almost two-thirds were concentrated in grades

GS-05 through GS-08 and GS-09 through GS-12...Just under three thousandth were employed in the SES.

## XII. PLAINTIFFS HAVE ANECDOTAL EVIDENCE OF THE IMPACT OF COMMERCE'S RACE DISCRIMINATION

192.    Plaintiffs also have substantial anecdotal evidence showing that a racially hostile work environment existed at Commerce, demonstrating that the disadvantage African-American employees suffer is based upon discriminatory animus.

For example, Dennis Gosier is currently employed as a Social Science Analyst by the DOC.  He joined the DOC, Census Bureau, in 1970.  In his role as Chief Steward and EEO representative since 1993, he has personally attempted to assist more than 100 African-Americans redress discrimination suffered at the DOC.

193.    According to Gosier, white managers also frequently deny African-Americans advancement with subjective, negative assessments. Managers will label employees as "not having shown leadership." In addition, managers will single out an employee's supposedly negative performance despite having the same performance exhibited by white employees.

194.    Mr. Gosier has witnessed a pattern and practice of discrimination in promotions against African-Americans that has resulted in the following:

- Denying African-American employees promotions to higher GS levels at the Census Bureau;
- Showing preferential treatment to whites in promotional opportunities;
- Denying African-Americacns adequate or appropriate trainingnecessary to advance to the next level;
- Moving African-Americans to different positions at the same level which hinders progression to the next GS level; and
- Arbitrary and subjective negative personnel review of African-Americans that have resulted in thwarting of employment advancement.

35

195.    In 1999, African-American Commerce employee Charme Taliaferro was denied a promotion to Program Specialist, a GS-9 level position, in favor of an euqlly or less qualified white employee.

196.    In 1999, Ms. Taliaferro was denied a promotion to Decennial Specialist, a GS-7 position. After being interview for the position, a white manager, Thomas McNeal, told Ms. Taliaferro that she was well-qualified for the promotion and would likely be selected. However, a less qualified white female was selected for the position.

197.    In approximately 2001, African-American Commerce employee Luis Gyles' supervisor, Peter Lydon, a white male, told Mr. Gyles that he would receive a GSA1 position. Shortly after making this declaration, however, Mr Gyles was inexplicably transferred from his current department, Office O Scientific Operation ("OSO") to the Office of Scientific Technology ("OST"), where he was told that no GS-11 position was available.

198.    A white employee, Mike Clark, was subsequently transferred into Mr. Gyles' former position at OSO. Clark, who possessed only a GED, had previously been working as a GS07 employee. In addition, Clark had significantly less experience than Mr. Gyles did.

199.    In 1997, African-American Commerce employee Claude Travis applied for a promotion to an XS-14 Lithographic Supervisor position, a position equivalent to the GS12 level of employment. The position was awarded to Bob Hall, a less qualified, less experienced white employee who did not possess a degree. Bow Hall was subsequently promoted to a GS014 level position.

200.    Ernestine Gladden, another African-American Commerce employee, experienced overt racial hostility at Commerce. On approximately February 6, 2004, Dar Davis, a white female, Commerce manager and Ms. Gladden's direct supervisor, subjected Ms. Gladden to racial harassment, humiliation, and mental anguish. Davis made racial comments regarding

36

Buckwheat, an African American character on the television show "Little Rascals."

201.  In addition, Davis addressed Ms. Gladden as "Buckwheat," including saying "Okay, Buckwheat" in response to Ms. Gladden's actions and/or statements. In September 1998, Brian Grove a white manager, made references to slavery by referring to Sonia Jones, an African-American program Assistant, as "cheap labor" in a way that had distinctly racial overtones. And that referring to African American as "his" constituted a reference to slavery as it involved the ideal of ownership.

202.  African-American DOC employee Denise Miller has been unable to advance beyond a GS-7 position at the PTO, having received "unfair and inaccurate performance appraisals designed to halt and/or have halted [her] progress because of [her] race."

203.  Ms. Miller observed that a vacant Program Analyst position in her office was filled by Leslie Fansler, a white female from CAFC. After she was hired, Mr. Miller heard that either the solicitor or deputy solicitor made the comment that the new Analyst looked better than "the others", and all the "other" women in Ms. Miller's office were African-American.

204.  In approximately 2001, Nancy Slutter, a white female, was acting deputy solicitor. She was rude to the African-Americans in Mr. Miller's office, treating Mr. Miller and other African-American employees harshly and being verbally abusive. She would, for example, throw things across their desks instead of handing them. She treated the white paralegals much more cordially.

205.  African-American DOC employee William C. Bums has received discriminatory performance evaluations since 1979.

## XIII.  PLAINTIFFS HAVE SURVEY EVIDENCE OF COMMERCES RACIAL DISCRIMINATION

206.　One hundred, twenty-five survey forms submitted by current and former African-American employees evidence race discrimination at the DOC.  Surveys were distributed to African-American Commerce employees in February 2004.  To date, approximately 125 surveys have been returned.  These surveys provide date concerning the types of discrimination (in promotions, training, performance evaluation, awards, work assignment, hostile environment, and racial harassment) that African-American employees at various Commerce bureaus report that they have experienced.  The responses of the approximately 125 surveys received to date overwhelmingly demonstrate that African-American employees experience racial discrimination throughout Commerce's bureaus in metropolitan Washington, D.C., including the District of Columbia, Maryland, and Virginia, and that Commerce subjects African-Americans throughout its bureaus to similar kinds of racial discrimination in employment.

207.　Twenty-four African-Americans employees from the Bureau of the Census have submitted surveys.  Seventeen of these twenty-four African-American respondents, or 71%, have been dined a promotion.  Sixteen, or 67%, have failed to receive training.  Thirteen report a hostile work environment, and twelve have been harassed by white Census supervisors.  Fourteen African-American respondents indicate that Census has failed to provide them with employment-enhancing work assignments.  Fourteen respondents report that they have received unfair performance evaluations, and thirteen have been denied cash awards.

208.　Thirty-seven African-American employees from the National Oceanic and Atmospheric Administration have submitted surveys.  Of the thirty-seven respondents, twenty-six, or 70%, have been denied a promotion.  Nineteen African-American NOAA respondents have been denied training.  Twenty-one report a hostile environment, and twelve have been harassed by white supervisors.  Twenty-two, or 59%, of NOAA respondents have been denied an employment-enhancing work experience.  Eighteen African-American respondents have been unfairly evaluated.  NOAA has denied nineteen of the thiry-seven respondents cash awards.

209.   Thirty-one African-American employees of the Commerce's United States Patent and Trademark Office have returned surveys. Twenty-one, or 68%, have been denied a promotion. Fourteen report that they have been denied training. Nineteen African-American respondents have received an unfair performance evaluation, and twelve have been denied a cash award. Of the thirty-one respondents, fifteen have been denied the opportunity to complete an employment-enhancing work assignment. Fourteen indicate that USPTO creates a hostile work environment, and eleven African-American respondents have been subjected to racial harassment.

210.   Considering the sum of all surveys received (including those for which the respondent's Bureau assignment was inadvertently omitted or illegible), 75% of African-American Commerce respondents report that they have been denied promotions. Commerce has denied 58% of African-American respondents training opportunities. 53% percent have received an unfair performance evaluation; 56% have been denied a cash award. Commerce has denied 58% of African-American respondents employment-enhancing work opportunities. 54% report a hostile work environment, and 43% have been subjected to racial harassment by white Commerce supervisors.

211.   The plaintiffs have been denied related promotional opportunities in those same offices.

## D. Common Questions of Law and Fact

212.   The discriminatory aspect of the selection procedure for promotions alleged by Plaintiffs involves the common component of the use of excessively subjective performance appraisals, which adversely affect the overall selection of African-Americans for vacant GS-9 through GS-13 or equivalent level white collar non-GS positions, as well s the selection of African-Americans to be trained for and receive employment-enhancing work experience, training and awards.

213.  Commerce's selection practices and procedures for promotions have had a disparate impact on the plaintiffs.

214.  As a result of the illegal policy and/or patterns or practices described herein, there are in fact two separate workforces at Commerce. One workforce, who is primarily white, enjoys preferential treatment, better job opportunities, and a swift path to advancement into management positions. The other workforce, which is primarily African-American, holds a disproportionate share of the lowest level positions is denied equal terms and conditions of employment and, with few exceptions, has not been allowed to advance to better positions. The plaintiffs are in the African-American workforce.

215.  This action in part seeks to enjoin Commerce from continuing to utilize excessively subjective performance evaluation procedures that have injured and continue to injure Plaintiffs and other African-American employees of commerce.

216.  Plaintiffs seek the following relief: 1) a declaratory judgment that Commerce has engaged in systemic racial discrimination in limiting the employment opportunities of African-American to low classifications and compensation; 2) a permanent injunction against such continuing discrimination as described in I(1) above; 3) restructuring of Commerce's performance evaluation procedures so that African-Americans are able to learn about and fairly compete in the future for better classifications, compensation levels, and terms and conditions of employment traditionally enjoyed by white employees; 4) restructuring of Commerce's workforce so that African-Americans are assigned to the classifications, locations and compensation levels they would have now held in the absence of commerce's past racial discrimination; and 5) injunctive relief, back-pay, and other equitable remedies necessary to make all plaintiffs who from Commerce's past discrimination and retaliation.

## **COUNT ONE**

**VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42
U.S.C.§§2000(e), et seq., AS AMENDED RACE DISCRIMINATION – FAILURE
TO PROMOTE ANND PROVIDE RELATED PROMOTIONAL OPPORTUNITIES**
**(All Plaintiffs against Defendant)**

217.   The plaintiffs re-allege and incorporate by reference each and
       every allegation contained in each and every aforementioned
       paragraph as though fully set forth herein.

218.   This Court is brought on behalf of the three plaintiffs.

219.   The plaintiffs have been subjected to systemic racial discrimination
       in the form of performance evaluation practices that have an
       unlawful disparate impact on their employment opportunities.

220.   Commerce's promotional procedures incorporate the following
       racially discriminatory practices: 1) reliance upon subjective
       performance appraisal criteria which permit and encourage the
       incorporation of racial stereotypes and bias of Commerce's
       predominantly white managerial staff, and 2) refusal to establish or
       follow policies, procedures, or criteria that reduce or eliminate
       disparate impact or racial sterotypes I Commerce's decision
       making process.

221.   Commerce's performance evaluation procedures have a
       disparate impact on the promotions and related promotional
       opportunities of these African-American Plaintiffs._Such procedures
       are not valid, job related or justified by business necessity.  There
       are objective and structured performance assessment procedures
       available to Commerce which has less disparate impact on
       African-Americans and equal or greater validity and job
       relatedness, Commerce has refused to consider or to use such
       procedures.

222.   Commerce's procedures have adversely affected the plaintiff by
       excluding them, as African-Americans from traditionally white
       positions.

223.   Commerce has continuously engaged in, condoned and ratified discrimination which constitutes a continuing violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000(e), et seq., as amended.

224.   Plaintiffs have no plain, adequate or complete remedy of law to redress the wrongs alleged herein, and this suit for back pay, front pay, an injunction, other equitable relief, and a declaratory judgment is their only means of securing adequate equitable relief. The plaintiffs are now suffering and will continue to suffer irreparable a injury from Commerce's unlawful policies and practices as set forth herein unless enjoined by this Court.

225.   By reason of Commerce's discriminatory employment practices, the plaintiffs have experienced economic harm, including loss of back and front pay and other employment benefits.

226.   By reason of the discrimination suffered at Commerce, the plaintiffs are entitled to all equitable remedies available under Title VII.

227.   Attorneys' fees should be awarded under 42 U.S.C. §2000(e)-5(k).

## COUNT TWO
## VIOLATIONS OF 29 U.S.C.§§710 et seq., THE REHABILITATION ACT OF 1973
### (Plaintiff Tanya Ward Jordan against Defendant)

228.   Plaintiff Tanya Ward Jordan re-alleges and incorporated by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

229.   Commerce has discriminated against Ms. Ward Jordan by denying her reasonable accommodation for her disabilities, including respiratory problems and occupational stress, in violation of the Rehabilitation Act of 1973, 29 U.S.C.§§ 710 et seq., as amended.

42

230.     Commerce has conducted itself intentionally, deliberately, willfully, and in callous disregard of the rights of Ms. Ward Jordan.

231.     By reason of commerce's discrimination, Ms. Ward Jordan is entitled to all legal and equitable remedies available under the Rehabilitation Act.

232.     Attorneys' fees should be awarded under 29 U.S.C. §§794(a)(1).

## XVI. PRAYER FOR RELIEF

Wherefore, Plaintiffs request the following relief:

a.   Acceptance of jurisdiction of this cause;

b.   Declare and adjudge that Commerce has violated Plaintiffs' rights under Title VII;

c.   A temporary injunction against Commerce and its partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with it, from engaging in any further unlawful practices, policies, customs, usages, racial discrimination by Defendant set forth herein;

d.   A permanent injunction against Commerce and its partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with it, from engaging in any further unlawful practices, policies, customs usages, racial discrimination by Defendant set forth herein;

e.   An Order requiring Defendant to initiate and implement programs that (1) provide equal employment opportunities for African-American employees; (ii) remedy the effect of Commerce's past and present unlawful employment practices; and (iii) eliminate the continuing effects of the discriminatory practices described above,

f.   An Order requiring Defendant to initiate and implement systems of assigning, training, granting awards, and promoting African-American employees in a non-discriminatory manner;

g.   An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described above, which would provide for (i) the monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report

43

setting forth information relevant to the determination of the effectiveness of the programs described above; assigning, training, granting awards, and promoting African-American employees in a non-discriminatory manner.

h. the programs described above, which would provide for (i) the monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described above;

i. An Order restoring plaintiffs to those jobs they would now be occupying but for Commerce's discriminatory practices;

j. An Order directing Commerce to adjust the wage rates and benefits for Plaintiffs to the level that they would be enjoying but for Commerce's discriminatory practices;

k. An award of back pay; front pay; lost job benefits; preferential rights to jobs, and other equitable relief for the Plaintiffs.

l. An award of litigation costs and expenses, including reasonable attorneys' fees, to the Plaintiffs.

m. Pre-judgment and post-judgment interest; and

n. Such other and further relief as the Court may deem just and proper.

## XVII.   DEMAND FOR JURY

Plaintiffs demand trial by jury of all issues triable of right to a jury.

Respectfully submitted,


Janet Howard
Pro Se
P.O. Box 1454
Spotsylvania, VA  22563
Janet_17771@netzero.net
(540) 895-5779


Joyce E. Megginson
Pro Se
310 Bogota Drive
Ft. Washington, MD  20744
Joymegg@aol.com
(301) 292-3308


Tanya Ward Jordan
Pro Se
3003 Keverton Drive
Upper Marlboro, MD  20774
TanyaW.Jordan@verizon.net
(301) 390-4306