# Howard 2
# (No. 88-51-01020)

| New | Save | Complainant: Janet Howard | 11 of 27 | Case # 88-51-01020 c |

Find Case | Informal | Formal/Intake | Formal 2 | Allegations | Investigation | Hearing/FAD | EEOC | Settle/Withdraw | ADR/Court/Relief | Notes | Misc.

**Informal Basis**
unspecified (for grandfathered data only)

**Informal Issue**
unspecified (for grandfathered data only)

Complainant Info: SSN:
**Specify Complainant**   P.O. Box 1454
                         Spotsylvania, VA 22553
**Go to Complainant**

Case Status:
Closed
as of 07/06/2000
(previously: Closable/Appeal decision > 100 days)

Counselor:
Visibility code: 51
Personnel Office:

**Organization code list**
Org. Code:
Series/Pay:
Empl. Stat: Unknown

Initial Contact: 05/12/1988
Anonymous? ☐
Extension:         for       (days)
NRF due on 06/13/1988
NRF Issued: 07/27/1988
NRF Received:

Created: 11/17/1998 07:16:33   by CITS          Last Save: 04/07/2004 13:14:37   by KHAWKER          ID: 5585

| New | Save | Complainant: Janet Howard | | | | | | | Case # 88-51-01020 c |

Find Case | Informal | Formal/Intake | Formal 2 | Allegations | Investigation | Hearing/FAD | EEOC | Settle/Withdraw | ADR/Court/Relief | Notes | Misc.

**Formal Basis**
Title VII - Race - Black
Title VII - Sex - Female

**Formal Issue**
Promotion / Non-selection
Evaluation / Appraisal

Complaint filed: 08/01/1988
Complaint type:
120/180 Due Date:

Counseling Report
Requested:
Received:

Further info requested:
Complaint Accepted: 09/29/1988
Complaint Dismissed: 09/29/1988
Partially Dismissed:

Case held in abeyance
Date:
Reason:

**Dismissal Type**
unspecified (for grandfathered data only)

Intake
Received from Specialist:
☐ Partial Acceptance
Assignment: 09/29/1988
Specialist:

Remand
Intake:
Acceptance:
Specialist:
Action date:
Action:

Representative
Specify Representative    Name: Nelms, Dorothy E. Esq.
Go to Representative      Contact:
Remove Representative     Notification:



EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)                                     Page 1

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)

E.E.O.C.
***1** Office of Federal Operations

**Janet Howard**, Appellant,
v.
Barbara H. Franklin, Secretary, Department of Commerce, Agency.

Appeal No. 01920393
Agency Nos. 88-01-0051; 88-01-0102
Hearing No. 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X

June 30, 1992

DECISION

INTRODUCTION

On October 29, 1991, **Janet Howard** (hereinafter referred to as appellant) initiated an appeal to the Equal Employment Opportunity Commission (EEOC) from the final decision of the Secretary, Department of Commerce, (hereinafter referred to as the agency), dated October 8, 1991, concerning her equal employment opportunity complaint which alleged discrimination based on her race (Afro-American), color (dark complected), sex (female) and in reprisal for prior EEO participation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq. The agency failed to supply a copy of a certified mail return receipt or any other material capable of establishing the date appellant received the agency final decision. Accordingly, since the agency has not fulfilled its obligation to transmit its final decision by a method enabling it to show the date of receipt (see 29 C.F.R. 1613.221(b)(1)), the appellant's appeal is considered timely (see, 29 C.F.R. 1613.233(a)), and is accepted in accordance with EEOC Order No. 960, as amended.

ISSUES PRESENTED

(1) Whether appellant proved, by a preponderance of evidence, that she was discriminated against because of her race (Afro-American), color (dark complected) and sex (female) when, on March 9, 1988 she was notified that the within-grade increase for which she would be eligible in three days was being withheld.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)                                                    Page 2

(2) Whether appellant proved, by a preponderance of evidence, that she was discriminated against because of her race (Afro-American), color (dark complected), sex (female), and in reprisal for prior EEO participation when, on April 20, 1988 and continuing thereafter, her security clearance was temporarily revoked; she was required to turn in her office key; and she was placed on paid administrative leave.

## CONTENTIONS ON APPEAL

On appeal, appellant contests the final agency decision in its entirety. Appellant contends that the agency's dismissal of the Administrative Judge's credibility determination was in error; that the agency's failure to acknowledge that a prima facie case of discrimination was established displayed a disposition towards discrimination; that the agency's failure to acknowledge that under the personnel system there is room for supervisory discretion was also animus towards discrimination.

## BACKGROUND

The appellant initiated a complaint, dated April 21, 1988, wherein she alleged that because of her race (Afro-American), color (dark complected) and sex (female) on March 9, 1988 she was notified that the within-grade increase for which she would be eligible in three days was being withheld. On May 17, 1988, the agency accepted the complaint (#88-01-0051) (Complaint #1), and conducted an investigation. On August 1, 1988, appellant initiated a second formal complaint (#88-01-0102) (Complaint #2), wherein she alleged that because of her race (Afro-American), color (dark complected), sex (female), and in reprisal for prior EEO participation on April 20, 1988 and continuing thereafter, her security clearance was temporarily revoked; she was required to turn in her office key; and she was placed on paid administrative leave, whereas no other persons in the Office of Export Intelligence were subject to such actions. After an unsuccessful attempt at an informal resolution of complaint # 1, the agency issued a Proposed Disposition (PD) on September 8, 1988, finding no discrimination. Being dissatisfied with the agency's PD on complaint #1, appellant requested a hearing before an Equal Employment Opportunity Commission (EEOC) Administrative Judge (AJ) on September 21, 1988.

**\*2** On September 28, 1988, the agency accepted complaint #2. [FN1] On October 13, 1988, the AJ remanded complaint #1 to the agency stating that the allegations appear to be a mixed case which may be appealed to the Merit System Protection Board (MSPB) pursuant to 29 C.F.R. 1613.402(a). On October 25, 1988, the agency issued a new PD on complaint #1 with mixed case appeal rights attached. Subsequently, appellant requested a final agency decision (FAD) without a hearing. Based on the affidavits, exhibits and record evidence, the agency issued its final decision on complaint #1 dated December 27, 1988, making a final determination that no discrimination had occurred.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)                                    Page 3

On March 1, 1989, the MSPB dismissed appellant's appeal because complaint #1 from which she appealed was not a mixed case complaint. With regard to complaint #2, after an unsuccessful attempt at an informal resolution, the agency issued a PD on May 4, 1989, during no discrimination. Being dissatisfied with the agency's PD, appellant requested a hearing before an AJ on May 16, 1989. On May 23, 1989, complaints #1 and #2 were consolidated for joint processing. On September 22, 1989, a status conference was held. As a result of the status conference, the case was transferred to the National Security Agency (NSA) because of certain classified information which may be raised during a hearing. NSA assigned an AJ and a hearing was held on May 17 and 18, 1990. Based on the testimony and record evidence, on July 31, 1991 the AJ determined that appellant had been discriminated against because of her race, color, sex, and reprisal. The agency received the AJ's recommended decision on August 12, 1991. The agency, thereafter, issued its FAD dated October 8, 1991, which rejected the AJ's recommended decision finding of discrimination and issued a decision finding no discrimination. It is from this decision that appellant now appeals.

Appellant began working for the agency in 1983 as a Clerk-Typist, GS-4. In January 1984, appellant was promoted to Computer Clerk, GS-5. In March 1985, appellant was promoted to Computer Assistant, GS-6 and in March 1986 appellant was promoted to Computer Assistant, GS-7. In December 1986 appellant applied for the position of Computer Programmer Analyst, GS-334-7, under vacancy announcement ITA-86-281. Appellant was competitively selected for the position and her assignment became effective in February 1987.

### DENIAL OF WITHIN-GRADE INCREASE

In September 1987, appellant received a marginal rating on her performance appraisal. The Acting Director (hereinafter Responsible Official (RO) 1)), Operations and Support Division (O&S Division) testified that appellant was the only subordinate of his to ever receive a marginal rating. Hearing Transcript (HT), page (p.) 14. He indicates that appellant's performance on two critical elements was marginal for the appraisal period ending September 30, 1987, and that this resulted in an overall marginal rating. The Federal Personnel Manual Chapter 531.404 states in part that in order for an employee to receive a within-grade increase (WGI), their performance must be at an acceptable level of competence. Investigative File (IF), Complaint #1, Exhibit (Ex.) 23, p. 7. Therefore, the RO 1 reasoned that appellant's marginal appraisals for the period ending September 30, 1987 and subsequent mid-point performance indicated that appellant was not performing at an acceptable level of competence to receive the WGI.

**\*3** The Acting Director, Office of Export Intelligence (OEI) [FN2] (hereinafter RO 2) sent a memorandum to the staff of the OEI about the results of an Inspector General Audit of his organization, that had not included the Secure Automated Screening System (SASS) function. Attached to this memorandum was a summary of about 20 or 25 deficiencies found by the Office of the Inspector General (OIG).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)                                    Page 4

IF, Complaint #1, Ex. 5, pp. 33-36. Shortly, after the audit by OIG, the RO 2 sent a memorandum to the RO 1 and appellant stating that an audit would be conducted of SASS.

The RO 1 testified that the RO 2 participated in the audit. HT, p. 28 and 51. Appellant testified that the RO 2 conducted the audit and that the RO 1 was not involved. HT, p. 444. The RO 2 testified that the audit disclosed SASS security problems which were very serious. HT, p. 154, 237. Contrarily, appellant testified that the problems revealed from the audit were not very serious and involved a different interpretation of policy by the RO 2. Further, appellant testified that the problems were rectified within a matter of two or three days. HT, pp. 447-448. The results of the audit were incorporated into the notice to withhold appellant's WGI. IF, Complaint #1, Ex. 39. When asked about appellant's performance the RO 2 testified that appellant would have gotten a fully successful rating but for the requirements that she had to be rated overall in the marginal area. The RO 2 also testified that he and the RO 1 consulted with the personnel office several times in the weeks prior to appellant's eligibility for the WGI. The RO 1 characterized the three meetings with personnel as 'trying to find some way to perhaps get around that policy. ' HT, p. 243-245.

Appellant contends that the marginal performance rating she received in September 1987, which later contributed to her denial of her WGI, was discriminatory. In order for an employee to receive a WGI the employee must demonstrate an acceptable level of competence. This assessment is made by comparing an employee's performance to the performance plan. IF, Complaint #1, Ex. 23. Appellant received a marginal rating in two critical elements of her responsibilities; the Office of Export Enforcement (OEE) Automated Application Screen, including the SASS; and the OEE Enforcement/Intelligence Data Base.

The first element in which appellant was rated marginal contained five major activities. The five areas of deficiencies were listed as follows: (1) SASS screen list copies not properly classified and sequence numbered; (2) SASS screen list copies not properly documented, records of copy distribution and disposition not accurate; (3) SASS screen list copies not properly destroyed pursuant to classified material control destruction procedure; (4) SASS records and files not accurate nor in fully updated status pursuant to established internal directions, policies and procedures; and (5) failure to successfully complete your January 22, 1988 assignment to (a) review the SASS screen and identify those entries from which there are no screen control forms, and (b) to index screen control forms in a manner which facilitates easy access and location of specific entries. The other element in which appellant was rated as marginal contained seven major activities. Three items were listed in the criteria for evaluation for that element. The rating official based his rating on appellant's handling of Dun & Bradstreet (D&B) database which was not listed under major activities or criteria for evaluation. IF, Complaint #1, Ex. 31, pp. 7-8.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)                                    Page 5

**\*4** The record indicates that the weighing factors in the Performance Plans were empty. The weights reflect the level of importance and/or amount of time devoted to accomplishing the element. IF, Exs. 30 and 32. The RO 1 testified that it was an 'oversight in not putting something in the blocks...' HT, p. 18. The RO 2 testified that if the weighing factors had been blank he would have asked 'if the plan was missing something or was deficient, if I observed it and saw it and detected it myself.' HT, p. 621-22.

Appellant contends that her performance plan for the fiscal year in question did not designate her SASS responsibilities as critical, and she was therefore not given adequate notice to maintain a fully successful performance in that element. Further, appellant contends that she was unfairly rated marginal on element 3 of her performance plan because the D&B responsibilities were not specifically listed. Appellant contends that since the D&B function was not specifically listed, the RO 1 should not have rated her on deficiencies.

Further, appellant contends that the SASS audit was 'targeted' at her, since it was the only OEI program singled out for an internal audit. Appellant also questions the timing of the SASS audit, which occurred immediately prior to her time-in grade anniversary, when she became eligible for the WGI. Appellant points out that there was a one-day turnaround time between the SASS audit results and the denial of her WGI.

### SECURITY CLEARANCE REVOKED, ADMINISTRATIVE LEAVE AND OFFICE KEYS TAKEN.

Appellant has further alleged a case of discrimination and retaliation against her when on April 20, 1988, her security clearance was temporarily suspended, she was asked to surrender her office keys, and she was placed on administrative leave. In May 1987, the Security Officer for the agency received a 'hot line' referral that appellant and another employee allegedly abused some overtime. Also, appellant approached the RO 1 in 1987 concerning approximately 40 hours of compensatory time she had earned. At appellant's request, the RO 1 reviewed her time and attendance records, and found inconsistencies in appellant's compensatory and overtime claims. The RO 2 directed the RO 1 to look into the matter, which was ultimately referred to a special investigator. HT, p. 129. The investigator felt there was sufficient basis to conclude there had been some overtime abuse. The RO 2 then took the results of that investigation to personnel. The whole matter was eventually referred to the OIG in September 1987. HT, p. 134. In January 1988, the RO 2 inquired about the progress of the investigation in OIG. In early April 1988, the OIG notified appellant's superiors that they considered the evidence against appellant serious enough to warrant the suspension of her security clearance. HT, p. 366. The agency proposed to remove appellant from federal employment. However, when the Deputy Undersecretary reviewed the proposal and interviewed the Acting Director of Special Licensing Division, Office of Export Licensing (hereinafter RO 3), [FN3] he concluded that RO 3 had exercised improper supervisory control and that any action against appellant would therefore not be legally supportable. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)                                                    Page 6

RO 3 admitted that he condoned the payment of overtime to employees for work they had not yet performed. HT, p. 281-284, 411, 544. RO 3 had initially denied allowing employees to 'carry over' overtime they had not yet worked to the next pay period.

**\*5** Appellant presented the testimony of several co-workers to bolster her assertion that the RO 2 acted with discriminatory animus. Further, appellant alleged that her difficulties did not begin until she was promoted to the GS-7 level with promotion potential. Witness 1 race (African-American), color (dark complected), sex (female) testified that 'most of the analysts were white and the export compliance assistants were black.' HT, p. 524. She also testified that she experienced discrimination from the RO 2 when she was eligible for promotion. A white male was eligible at the same time, and rather than transfer them both, the RO 2 transferred the white male, and told Witness 1 she would have to wait until a replacement was selected and trained. HT, pp. 508-513.

Witness 2 race (Afro-American), color (light complected), sex (female) testified that she felt she was treated differently by the RO 2 after she testified on appellant's behalf during the investigation of her EEO complaint. HT, p. 500. She also stated that there were two sides to the office and that allegedly an employee must have a college degree to go over to the other side. HT, pp. 496, 498.

Witness 3 race (Afro-American), sex (female), testified that she thought reprisals were taken against her by the RO 2 based on her testifying in complaint #1. HT, p. 473. She stated that prior to testifying, the RO 2 had promised her a performance award. However, when she received her next performance appraisal it was lower that she had ever received in the past.

Witness 4 testified to reprisals she felt from the RO 2 because she filed an EEO complaint in another office before being transferred to his office. Witness 4 testified that in her previous job she was head secretary, but the RO 2 refused to give her a comparable job and instead required her to do menial tasks. Witness 4 also stated that there were two sides to the office and that white males seemed to have no problem being promoted to the 'white side.' HT, p. 527-528. Finally, Witness 4 stated that she had not received a promotion since coming to the section. HT, p. 521.

A personnel officer from the agency testified that 'there are not many job occupations that require that you have a positive education requirement. You either must have education or you must have qualifying experience. HT, p. 559.

The graph below depicts the staff of the OEI division in July 1988. Appellant and several witnesses testified that the office had a 'white side' and a 'black side'. The agency represents that whites and males were underrepresented in the Operations and Support Division.

Research and Development Division

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)                                    Page 7

Name Grade Race Sex Employee 1 Chief Black Male Employee 2 GS-12 White Male Employee 3 GS-12 White Male Employee 4 GS-12 White Male Employee 5 GS-9 White Female Employee 6 GS-9 White Female Employee 7 GS-9 White Female Employee 8 GS-9 Black Female Employee 9 GS-9 Hispanic Female Employee 10 GS-7 White Female Employee 11 GS-7 White Male Employee 12 GS-7 White Male Employee 13 GS-6 Black Female

**\*6** Operations and Support Division

Name Grade Race Sex Employee 1 (RO 1) Chief White Male Employee 2 GS-11 Black Male Employee 3 (appellant) GS-7 Black Female Employee 4 GS-7 White Female Employee 5 GS-6 Black Female Employee 6 GS-6 Black Female Employee 7 GS-6 Black Female Employee 8 GS-6 Black Female Employee 9 GS-5 Black Female Employee 10 GS-5 Black Female Employee 11 GS-4 Black Female Employee 12 GS-4 Black Female

In addition there were four employees not assigned to either division, which includes the RO 2 (white male), two black females at the GS-4 level, and a third female (race unknown) at the GS-4 level.

                    The Administrative Judge's Recommended Decision

The AJ found that based on the evidence contained in the complaint file, the briefs submitted by the parties, and the testimony presented at the hearing, that the agency did discriminate against appellant on the basis of race, color, sex, and reprisal.

The AJ pointed out that appellant achieved regular promotions and fully successful performance appraisals until she applied for and was selected in February 1987 for a position with promotion potential to the GS-11 level. HT, pp. 562-564. Appellant applied and was selected for the position of Computer Programmer Analyst with advancement potential. In March 1987 appellant was given a WGI and certified as performing at an acceptable level of competence. IF, Complaint #1, Ex. 5, p.22. Both appellant and the RO 2 testified that the RO 2 was unaware that appellant had been selected into a position with promotion potential, until appellant approached the RO 2 about getting promoted. The RO 2 insisted there was no promotion potential, and even went to personnel to check. Until now there had been no adverse comment on appellant's work performance but they began with the appraisal covering the period April 1, 1987-September 30, 1987 and continued up to the point of withholding her WGI. HT, pp. 585-586.

The AJ states that the documentation to support the marginal appraisals was almost non-existent, and highly subjective. The AJ states that the pretext extended to trying to show marginal work by evaluating of the D&B function, a minor part of appellant's workload. It included trying to cite as major some deficiencies in a system designed and implemented by the appellant, and operated solely by her. Further, the AJ found that the supervisors involved did not follow the instructions for completing the Performance Plan, Progress Review and Appraisal Record. The AJ states that he found the RO 2's rating of appellant as marginal in the two ele-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)                                    Page 8

ments was not a true reflection of the appellant's performance. The AJ states that 'it appears that the immediate supervisor (RO 1), either on his own or in concert with the second line supervisor (RO 2) subjectively decided to rate the appellant 'marginal' and then created reasons to support that rating.' AJ's Decision, page 19. The AJ found that the supervisors failed to follow the department's instructions which were clearly designed to avoid such subjective ratings.

**\*7** The AJ also found that there was discriminatory animus and motive on the part of the RO 2, as shown by the testimony of the appellant and her co-workers and a deliberate attempt by him to keep the office segregated based on race, color and sex.

With regard to the credibility of witnesses, the AJ found most of the witnesses for the appellant and the agency to be credible. However, the AJ found that the RO 1 and RO 2 constantly contradicted each other on many points. Specifically, that AJ points to the RO 2's testimony that there was nothing he could do to avoid denying appellant her WGI, not credible. When reminded that he had the discretion to write a memorandum, HT, pp. 244-245, the AJ states that he was 'shocked' by the way in which the RO 2 changed his testimony when he was caught in a contradiction. Finally, the AJ specifically found the RO 2 not to be credible and appellant to be credible.

## ANALYSIS AND FINDINGS

In order to prevail on her complaint of discrimination appellant must initially establish a prima facie case of discrimination. The traditional analysis for evaluating a discrimination claim, where there is no direct evidence of discrimination, may be found in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The prima facie elements are determined by the circumstances of the case and the bases of discrimination alleged. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 358 (1977). However, after appellant has established the elements of the prima facie case which is not an onerous burden, the agency must then articulate a legitimate, nondiscriminatory reason for its action. Finally, the burden is on appellant to prove, by a preponderance of evidence, that the agency's ostensibly legitimate and nondiscriminatory reasons are pretextual. Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 875 (1984); U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711, 715-6 (1983); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).

In the present case, appellant can establish a prima facie case of discrimination based on race, color and sex by showing: (1) that she is a member of the protected groups; (2) that she was subjected to adverse treatment by the agency and, (3) that employees not in her protected groups were not subjected to adverse treatment under circumstances which, if unexplained, would support an inference of discrimination. Here, appellant satisfies element (1) in that she is a member of three protected groups, i.e., race (Afro-American), color (dark complected), and sex

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)                                    Page 9

(female). Elements (2) and (3) are satisfied since appellant was subjected to adverse treatment under circumstances which, if unexplained, would support an inference of discrimination.

**\*8** In accordance with the burdens as set out in McDonnell Douglas Corp. v. Green and Hochstadt v. Worcester Foundation for Experimental Biology, Inc., 425 F. Supp. 318 (D. Mass), aff'd 545 F.2d 222 (1st Cir. 1976), appellant may establish a prima facie case of reprisal by showing that: (1) she engaged in Title VII protected activity; (2) the agency was aware of her protected activity; (3) subsequently, she was subjected to adverse treatment by the agency; and, (4) there is a causal connection between the protected activity and the adverse employment action.

Appellant has successfully established a prima facie case of reprisal. The record indicates that element (1) is satisfied since appellant filed a formal complaint on April 21, 1988; element (2) is satisfied in that the agency officials were aware of appellant's EEO participation. Element (3) is satisfied in that appellant's security clearance was temporarily revoked; she was required to turn in her office key; and she was placed on paid administrative leave. Finally, element (4) is satisfied because the prior EEO activity and the agency's actions were close in time and the same agency officials named as responsible officials in the prior EEO complaint took the adverse actions against appellant.

Since appellant established a prima facie case of discrimination based on race, color, sex, and reprisal the burden shifts to the agency to establish legitimate and nondiscriminatory reasons for its actions.

To that end, the agency persuasively argues that appellant did not receive her WGI because she received a marginal appraisal and a subsequent marginal mid-point performance review which indicated that she was not performing at an acceptable level of competence to receive the WGI. With regard to the security clearance, the office keys, and being placed on administrative leave the agency contends that the investigation by the OIG originated in 1987 prior to appellant engaging in protected activity. Further, the agency argues that the OIG investigation was based on a hotline referral and appellant's own inquiry into compensatory time. Finally, the agency argues that the decision to revoke her security clearance was made by officials in the OIG and not the named responsible officials.

We find that the agency has articulated a legitimate, nondiscriminatory reason its actions. The burden of persuasion now shifts to appellant to prove that these proffered reasons are without credence and are not to be believed or that the reasons are pretextual in nature, masking the agency's motivation to discriminate against appellant based upon her race, color, sex and in reprisal for prior EEO participation.

### DENIAL OF WITHIN-GRADE INCREASE

Appellant contends that the agency's reasons for denying her WGI were pretextual.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)                                             Page 10

First, appellant argues that the marginal rating on the performance appraisal was not justified. Second, appellant contends that the audit of SASS was targeted at her, since it was the only OEI program singled out for an individual internal audit.

***9** Appellant contends that the performance plan in question did not designate her SASS responsibilities as critical. Further, appellant contends that she was unfairly rated marginal on element 3 of her performance plan because the D&B function was not specifically listed on her performance plan. The agency represents that, although the SASS responsibilities were not designated as critical, prior to the denial of the WGI she had been rated using performance plans wherein her SASS responsibilities were labelled as critical elements. Specifically, the agency points to three months prior to the denial of the WGI when appellant signed for a performance plan designating the SASS as 'critical.' With regard to the D&B reports, the agency argues that appellant was made aware as early as 1985 of the importance of the monthly requirement to print and distribute the D&B report each month. In 1986, a memorandum was issued to all OEE employees setting forth specific procedures for handling D&B reports, including the requirement for monthly printing and distribution. Appellant's testimony that she was responsible for all D&B functions during the rating period is inconsistent with her denial of the responsibility to distribute the D&B report.

The RO 2 conducted an audit of SASS which revealed SASS security problems. The agency contends that because the SASS is a topsecret, national security program conducted under the oversight of the Central Intelligence Agency, the OIG could not conduct the audit along with OEI. As relates to the timing of the SASS audit, which occurred immediately prior to appellant's time-in-grade anniversary, the agency argues that appellant's marginal rating on her SASS performance in the past necessitated an audit.

   SECURITY CLEARANCE REVOKED, ADMINISTRATIVE LEAVE AND OFFICE KEYS TAKEN.

Here, in addition to alleging discrimination based on her race, color and sex, appellant also contends that the agency acted in reprisal for prior EEO participation (i.e., complaint #1). In May 1987, the Security Officer for the agency received a 'hotline' referral that appellant and another employee had allegedly abused overtime. Also, in 1987 appellant requested that the RO 1 review her time and attendance records because she felt she was owed approximately 40 hours of compensatory time. As a result of appellant's request, the RO 1 reviewed her time and attendance records and found inconsistencies in appellant's compensatory and overtime record. Eventually, both matters were investigated by the OIG in 1987. Appellant contacted an EEO Counselor concerning complaint #1 in March 1988. Based on the record, it is improbable that the agency acted in reprisal for appellant's protected activity since the OIG investigation was initiated prior to appellant filing complaint ##1.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)                              Page 11

In January 1988, the RO 2 inquired about the progress of the investigation in OIG. The record also indicates that the OIG office was contacted on several other occasions. In early April 1988, the OIG notified the RO 1 and RO 2 that they considered the evidence against appellant serious enough to warrant the suspension of her security clearance. Appellant was placed on paid administrative leave because at the time the agency had no non-sensitive positions to which she could be transferred. The agency proposed to terminate appellant's employment. The Deputy Undersecretary, however, reviewed the proposal and determined that the RO 3 had exercised improper supervisory control of the overtime utilized in his unit and therefore any action against appellant would not be legally supportable. While, the RO 2 made inquiries to the OIG office subsequent to appellant filing a formal complaint of discrimination this is insufficient to indicate reprisal since the OIG investigation was already in progress.

**\*10** Finally, appellant contends that the entire matter could have been avoided if the RO 3 was consulted directly. The record indicates the RO 3 was less than forthright in his testimony regarding the use of overtime. While the RO 3 ultimately admitted that he condoned the payment of overtime to employees for work they had not yet performed. RO 3 had initially denied allowing employees to 'carry over' overtime they had not yet worked to the next pay period. Based on the evidence, it is doubtful whether the issues appellant raised concerning her compensatory time would have been resolved satisfactorily by approaching the RO 3. Finally, the OIG investigation originally concerned a 'hotline' inquiry which did not involve the alleged responsible officials.

### THE ADMINISTRATIVE JUDGE'S RECOMMENDED DECISION

The AJ occupies a unique position with respect to the credibility of witnesses. While the Commission has consistently held that credibility determinations require more deference than other findings of fact, it also has stressed that an AJ may not 'insulate his (or her) findings from review by denominating them credibility determinations.' See e.g., John F. Fitzhugh v. John O. Marsh, Jr., Secretary, Department of the Army, EEOC Appeal No. 01890981 (May 12, 1989), citing Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985). In deciding whether or not to believe a witness, the AJ must consider more than demeanor and inflection; he/she also must look at documents and objective evidence which might contradict the witness's testimony. In addition, the AJ must assess whether the witness's testimony is so internally inconsistent or implausible that it cannot be credited. See Anderson, supra.

Here, the Commission will not disturb the AJ's credibility judgments with regard to the RO 1 and RO 2's testimony. However, the Commission finds that appellant's case was insufficient to show that the agency's legitimate articulated reasons were pretext for discrimination.

After careful consideration of appellant's contentions, including those conten-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.) Page 12

tions which were not explicitly addressed herein, and after carefully weighing the evidence of record, we find that the agency's decisions were unrelated to her race, color, sex, or reprisal.

CONCLUSION

Based on a review of the record and for the reasons cited above, it is the decision of the Commission to AFFIRM the agency's final decision of no discrimination or reprisal.

STATEMENT OF RIGHTS - ON APPEAL

RIGHT TO REQUEST REOPENING (M0391)

The Commission may, in its discretion, reopen and reconsider the decision in this case if the appellant or the agency submits a written request containing arguments or evidence which tend to establish that:

1. New and material evidence is available that was not readily available when the previous decision was issued; or

2. The previous decision involved an erroneous interpretation of law or regulation or misapplication of established policy; or

*11 3. The decision is of such exceptional nature as to have effects beyond the actual case at hand.

Requests to reopen, with supporting arguments or evidence, MUST BE FILED WITHIN THIRTY (30) CALENDAR DAYS of the date you receive this decision, or within twenty (20) calendar days of the date you receive a timely request to reopen filed by another party. Any argument in opposition to the request to reopen or cross request to reopen MUST be submitted to the Commission and to the requesting party WITHIN TWENTY (20) CALENDAR DAYS of the date you receive the request to reopen. See 29 C.F.R. 1613.235. All requests and arguments must bear proof of postmark and be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reopen shall be deemed filed on the date it is received by the Commission.

RIGHT TO FILE A CIVIL ACTION (S0391)

You have the right to file a civil action in an appropriate United States District Court WITHIN THIRTY (30) CALENDAR DAYS of the date that you receive this decision, unless within that time you decide to file a request to reopen. The limitations period for filing a civil action under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. 621 et seq. (ADEA) may differ from the period set out for the filing of civil actions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., and the Rehabilitation Act of 1973, 29 U.S.C. 791. You

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)                              Page 13

may be foreclosed from filing a civil action on any claim brought under the ADEA if you fail to file within the limitations period applied by the Court in the jurisdiction in which your action is filed. If you file a civil action, YOU MUST NAME AS THE DEFENDANT IN THE COMPLAINT THE PERSON WHO IS THE OFFICIAL AGENCY HEAD OR DEPARTMENT HEAD, IDENTIFYING THAT PERSON BY HIS OR HER FULL NAME AND OFFICIAL TITLE. Failure to do so may result in the dismissal of your case. 'Agency' or 'department' means the national organization, and not the local office, facility or department in which you work. Filing a civil action will terminate the administrative processing of your complaint.

                        RIGHT TO REQUEST COUNSEL (Z0391)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. 791, 794(c). The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action MUST BE FILED WITHIN THIRTY (30) CALENDAR DAYS of the date you receive the Commission's decision.


FOR THE COMMISSION:

**\*12** Ronnie Blumenthal
Director
Office of Federal Operations

[FN1]. The agency rejected appellant's allegation #1, which alleged that on March 9, 1989, she was denied a within-grade increase, because that claim was pending before the agency. The agency accepted allegation #1 on May 16, 1988 and was awaiting a hearing before an Equal Employment Opportunity Commission Administrative Judge.

[FN2]. In October 1987, the Acting Director of OEI became the Acting Director of Operations and Support Division.

[FN3]. From April 1986 until early 1987, appellant worked overtime in the Special Licensing Division, Office of Export Licensing under the supervision of the Acting Director.

EEOC DOC 01920393, 1992 WL 1370130 (E.E.O.C.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.