# Megginson 1
## (No. 95-61-01610)



**UNITED STATES DEPARTMENT OF COMMERCE**
National Telecommunications and
Information Administration
Washington, D.C. 20230

February 3, 1995

MEMORANDUM FOR:     Courtland Cox
                    Acting Director of Civil Rights

FROM:               *Joyce E. Megginson*
                    Joyce E. Megginson
                    Complainant

SUBJECT:            Improper Processing of Informal Complaint

Attached you will find the formal complaint of discrimination that I have submitted as a written account of circumstances and situations surrounding my allegations. However at this point I would like to enter this statement as it relates to the manner in which my informal compliant was processed.

On December 16, 1994, I conferred with Tina Shat, EEO Counselor, informing her fully of all facts and circumstances surrounding my allegations of sexual harassment. I made it perfectly clear to her that reoccurring incidents with Bill Gamble were the result of sexual harassment.

Ms. Shat taking all facts into consideration, advised me that the matter would be investigated in its entirety. I identified Bill Gamble as being the sexual harasser, giving her permission to contact him, and providing names of witnesses knowledgeable of the persistent sexual harassment. Ms. Shat advised me to obtain written statements from my witnesses. Ms.

On January 13, 1995, I inquired via memo to Courtland Cox, regarding the status of my sexual harassment complaint (Attachment 7). On January 17, 1995, I received via e-mail a response to my memo from Al Corea (Attachment 8).

Mr. Corea's memo denied the fact that the Office of Civil Rights (OCR) was ever advised of my allegations of sexual harassment. Mr. Corea requested the name of the alleged harasser, information that had already been given to Ms. Shat on December 16, 1994.

On January 17, 1995, I also received a phone call from Mr. Corea, again requesting the name of my harasser, as well as my permission to speak with an unidentified person in position of authority. I responded to this request from Mr. Corea, via a memo to Courtland Cox (Attachment 9), advising you that it was not unnecessary for me to grant redundant permission, as Ms. Shat had been granted that permission 1 month earlier (December 16, 1994).

As a result of the aforementioned memos, I again met with Ms. Shat on January 19, 1995. During this meeting, Ms. Shat informed me that the reason she failed to pursue my sexual harassment complaint was that she thought that I would be signing a settlement agreement. I however, informed Ms. Shat on December 20, 1994, and several dates thereafter, that I had no intentions of signing any agreement associated with my sexual harassment complaint, as the agreement focused on a job offer that was completely separate from my allegations of sexual harassment. Ms. Shat also informed me during this meeting, that the first contact she had with my alleged harasser (Bill Gamble) occurred on January 12, 1995, for the discrimination complaint, and on January 17, 1995, for the sexual harassment complaint, both 1 month after I filed my complaints with OCR.

In summary, I maintain that I did in fact notify Ms. Shat on December 16, 1994, that I was filing a sexual harassment complaint against Mr. Gamble. It is my contention that my sexual harassment complaint was never taken seriously, moreover, completely ignored and mishandled by Ms. Shat. I can only concluded that Ms. Shat wanted me to pretend as though sexual harassment had not taken place. Ms. Shat appeared bias in her attempt to settle this dispute, and always in Management's favor, constantly discouraging me to proceed to the formal stages.

In support of my claim, I offer these comments which are direct quotes made by Ms. Shat in her memo to me dated January 6, 1995, in her attempt to convince me to sign a settlement agreement, which would have precluded me from filing a formal complaint. "It may not give you everything you want, but if you step back, you should evaluate it in terms of the broader picture. It may not right all of the injustices, but does it give you what you need to proceed with your work? You should also take into account whether or not you can prove discrimination. The burden of proof lays with the Complainant, whereas the Agency only needs to show a legitimate non-discriminatory reason for their actions. Even if you were to win your case, disciplining your supervisor is not one of the available legal remedies. You would only be placed in the position (in your case grade level) where you should have been if discrimination did not exist." Some of these statements made by Ms. Shat are questionable, and are very misleading. I am therefore, requesting that as this matter proceeds, that I will be granted all considerations entitled to me as a Complainant in the formal stages.

FORM CD-498
(Edition 1-89)
(Pres. by DAO 215-5)

Attachment 2

# COMPLAINT OF DISCRIMINATION
## AGAINST THE U.S. DEPARTMENT OF COMMERCE
## BECAUSE OF RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, PHYSICAL OR MENTAL HANDICAP OR RETALIATION

DEPARTMENT NUMBER
95-61-0161

FILING DATE
February 3, 1995

1. COMPLAINANT'S NAME
Joyce E. Megginson

COMPLAINANT'S STREET ADDRESS
310 Bogota Drive

CITY: Ft. Washington, MD  STATE  ZIP CODE 20744

TELEPHONE (INCLUDE AREA CODES)
HOME: 301-292-3308  WORK: 202-482-0486

2. NAME OF COMMERCE ORGANIZATION THAT DISCRIMINATED AGAINST YOU
Nat'l Tele. & Info. Admin./OSM

STREET ADDRESS OF OFFICE
14th Constitution Ave., N.W., Room 4099

CITY: Washington,  STATE DC  ZIP CODE 20230

4. DO YOU WORK FOR THE FEDERAL GOVERNMENT? ☐ NO ☒ YES. MY MOST RECENT TITLE AND GRADE IS (OR WAS):
Program Analyst 343-9/8

3. GIVE THE DATE ON WHICH THE MOST RECENT DISCRIMINATION TOOK PLACE:
MONTH: December  DAY: 16  YEAR: 1994

NAME AND ADDRESS OF ORGANIZATION WHERE YOU WORK (OR APPLIED)
Dept. of Commerce/NTIA/OSM
14th & Const. Ave, NW, Wash., DC 20230

5. (A) DESCRIBE HOW YOU WERE TREATED DIFFERENTLY THAN OTHER EMPLOYEES OR APPLICANTS BECAUSE OF YOUR RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, HANDICAP OR RETALIATION. (B) DESCRIBE THE ACTION YOU BELIEVE WAS DISCRIMINATORY. (C) GIVE THE DATES WHEN THIS ACTION OCCURRED. (D) WHAT HARM, IF ANY, CAME TO YOU IN YOUR WORK SITUATION AS A RESULT OF THIS ACTION?. (YOU MAY ATTACH EXTRA SHEETS).

See Attachment 2

6. ANSWER BELOW WHY YOU BELIEVE YOU WERE DISCRIMINATED AGAINST:

☒ RACE (STATE RACE)  Black

☐ COLOR (STATE COLOR)

☐ RELIGION (STATE RELIGION)

☒ SEX (STATE YOUR SEX)  Female

☐ NATIONAL ORIGIN (STATE NATIONAL ORIGIN)

(STATE COUNTRY OF BIRTH)

☐ AGE (STATE DATE OF BIRTH)

☐ PHYSICAL HANDICAP (DESCRIBE IT)

☐ MENTAL HANDICAP (DESCRIBE IT)

☒ RETALIATION (EXPLAIN YOUR PRIOR CONNECTION WITH THE EEO PROCESS) I filed a discrimination complaint with OCR on December 15, 1994

7. DID YOU DISCUSS ALL MATTERS REPORTED IN NO. 5 WITH AN EEO COUNSELOR? ☐ NO ☒ IF YES, COUNSELOR'S NAME
Tina Shat

8. DID YOU FILE A GRIEVANCE ☒ NO ☐ YES OR AN MSPB APPEAL ☐ NO ☐ YES ON THE MATTER (S) DESCRIBED IN NO. 5? IF YES, GIVE DATE (S)

9. THE REMEDY I SEEK IS:

See Attachment 3

10. I CERTIFY THAT, TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL OF MY STATEMENTS ARE TRUE, CORRECT, COMPLETE AND MADE IN GOOD FAITH.
COMPLAINANT'S SIGNATURE (Sign in dark ink)
*Signature*

11. DATE OF SIGNATURE
MONTH: 2  DAY: 3  YEAR: 95

USCOMM-DC 89-1535

ATTACHMENT 3

## COMPLAINT OF DISCRIMINATION AGAINST THE U.S. DEPARTMENT OF COMMERCE BECAUSE OF RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, PHYSICAL OR MENTAL HANDICAP OR RETALIATION

Complainant:         Joyce E. Megginson
Agency Number:       95-61-0161
Filing Date:         December 16, 1994

5A.   **DESCRIBE HOW YOU WERE TREATED DIFFERENTLY THAN OTHER EMPLOYEES OR APPLICANTS BECAUSE OF YOUR RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, HANDICAP OR RETALIATION.**

1. I was physically threatened.
2. I was referred to as a gopher and that my position was without substance.
3. I was subjected to intimidation and a hostile work environment as a matter of routine.
4. I was the target of verbal abuse, which included being talked down to and yelled at in a very demeaning manner.
5. I was admonished and compared to a 6 year old child.
6. I was told my speech pattern had to be changed.

5B.   **DESCRIBE THE ACTION TAKEN AGAINST YOU THAT YOU BELIEVE WAS DISCRIMINATORY.**

I will begin by describing the most recent incident of harassment inflicted upon me by Mr. Gamble, additionally I will describe those that are most memorable.

On Thursday, December 15, 1994, at approximately 4:17 p.m., Celia Nogales and I were engaged in a conversation in my office, when my supervisor, Bill Gamble, Deputy Associate Administrator, OSM, interrupted and informed me that he needed to talk to me. Mr. Gamble habitually conducted meetings just prior to the end of my tour of duty, which is 4:30 p.m., (I relayed this fact to Tina Shat, the EEO Counselor assigned to my case). Celia and I discontinued our talk and I immediately reported to Mr. Gamble's office.

From the moment I arrived in his office, I noticed that he was very irritated and very hostile towards me. I also noticed, that Mr. Gamble who usually closed his office door, chose not to do so on this occasion. Below is my official statement of what transpired on Thursday, December 15, 1994, between Mr. Gamble and I.

2

⊙    Mr. Gamble asked if I had sent the weekly report to Michele Farquhar.

I attempted to reply affirmatively.

⊙    However, Mr. Gamble interrupted me in mid-sentence and said that he did not ask me if I had sent the weekly report to Ms. Farquhar, and cautioned me that I should wait until he was finished.  Mr. Gamble then asked if I proofread the report before sending it to Ms. Farquhar.  Mr. Gamble said that he had received a call that morning from Ms. Farquhar who complained that she had found a typo in the report.

⊙    I asked Mr. Gamble what the typo was.

Mr. Gamble said, "that he could not remember".

⊙    Mr. Gamble also said that Ms. Farquhar wanted to know whether he had intended to make public some remarks about the SPS receiving letters from the public commenting on a project.  Mr. Gamble then asked me if I had e-mailed him a copy of the weekly report that I had e-mailed to Ms. Farquhar.

I told Mr. Gamble that I had not e-mailed him a copy of what I sent to Ms. Farquhar, because what I sent to her I pulled directly from the monthly report that he had proofread and approved for public dissemination.  I also informed Mr. Gamble that I was following direct orders that I had received from his boss, Dick Parlow, Deputy Associate Administrator, OSM, to extract portions of the monthly report and forward upcoming meetings to Ms. Farquhar for the weekly report.  After I explained this to Mr. Gamble, he then resolved that it was ok for me to have forwarded the remarks about the SPS to Ms. Farquhar.  I told Mr. Gamble that in the future I would seek his approval before forwarding anything to Ms. Farquhar for the weekly reports, and that I would be extremely careful when proofing my work.  At this point, I inquired about the typo again. I explained to him that I ran the report through spell check, and told him that if Ms. Farquhar called him that morning, he should be able to remember the exact typographical error.

⊙    Mr. Gamble at that point informed me that the typo he was referring to, was that "the or that" was used when it should have been "those", he could not remember the exact word.

I told Mr. Gamble that based on my understanding and training, a typo was a misspelled word and that what he had just described to me, in my estimation, was a grammatical error or just a misplaced word.

⊙    Mr. Gamble debated for a few minutes then concluded by saying that "it was a typo".

I said whatever it was, I would make sure that it didn't happen again.

3

- Mr. Gamble said at that time that he wanted to discuss my employee comments regarding my performance rating (Attachment 5) that I sent to Mr. Parlow requesting a meeting, (I also sent Mr. Gamble a copy). Mr. Gamble apologized for having sent my performance plan in a U.S. government messenger envelope without having a verbal discussion with me. He said that he sent Mr. Corrado's and Mr. Lady's performance plans in the same kind of envelope.

I then asked Mr. Gamble if either of the aforementioned employees attached comments.

- Mr. Gamble said that they did not.

I said that this difference was critical, and that I was very disappointed in the manner in which my performance plans and comments were returned to me. I also expressed my disappointment that there was no discussion from him and no reply from Mr. Parlow with whom I had requested a meeting. I might add at this point (Feb. 3, 1995), Mr. Parlow has yet to respond to my memo of December 14, 1994, requesting a meeting with him.

- To that end, Mr. Gamble said that he did not change the fully successful rating (I thought that I deserved an outstanding rating) that he had given me and that the performance plan had gone forward. At that time, Mr. Gamble said that he wanted to discuss my comments on page 2, totally ignoring my comments on page 1. He then proceeded to ask me to explain what I actually did as a personal property custodian. Mr. Gamble seemed more interested in the word <u>inventory</u> that I referred to in my comments, opposed to the work I actually performed.

I told Mr. Gamble that I had been performing the same duties that he had given me several years ago. However, I proceeded to explain my assigned duties as a personal property custodian. I told him that when an OSM staff member in Washington had an item(s) that were no longer needed, they would call me to make the necessary arrangements to have the item(s) removed. I would advise the staff member to place the item(s) on the e-mail first to see if anyone in OSM wanted the item(s). If there were no takers, then an e-mail would be sent to the rest of the NTIA staff. If there were still no takers, a CD-50 would be prepared to surplus the item(s). I would then make arrangements with the movers to have the item(s) removed. Then I explained to Mr. Gamble that if any of the item(s) had a department bar code on them, that would mean that they are accountable items. If they were accountable items, I would then receive a computer printout from the warehouse in Capital Heights, MD, so that the item(s) could be deleted from our inventory list. I explained that all items had to be included on the CD-50 whether they are accountable items or not. I then explained to Mr. Gamble that I maintain individual printouts until the department issues a new and complete inventory. I gave Mr. Gamble an example of my experience and expertise gained over the years in dealing with surplused properties.

4

. I took the opportunity to remind him of the removal and rearrangement of items in the reception area that Shirley Almalel occupies. On December 2, 1994, when Ms. Almalel wanted to surplus Brenda Stone's old typewriter, computer table and secretarial desk, I took Ms. Stone's typewriter (mine was broken) and I advised Ms. Almalel to offer the computer table to other staffers via the e-mail, but she did not. I personally called Ed Dinkle who came up and claimed the computer table. That only left Ms. Stone's broken secretarial desk and my broken typewriter. Of those two items only one was an accountable item (typewriter) because it had a bar code, the secretarial desk did not meet a certain dollar amount, was not an executive desk, and therefore it was not an accountable item.

At that point a highly hostile Mr. Gamble insisted that the sofa I was sitting on, and his desk both were accountable items.

I politely told Mr. Gamble that the sofa definitely was not an accountable item, that perhaps his desk could very well be if it met the dollar amount criteria. Then Mr. Gamble rose from his chair and proceeded to his desk and a small credenza next to it.

A very irritated Mr. Gamble still insisted that his desk and credenza were accountable /trackable items, and he further insisted that the sofa and chairs also were accountable.

I very politely told Mr. Gamble that since personal property custodianship had been under my purview, the credenza, sofa and chairs and his desk were not accountable properties.

Mr. Gamble brought my attention to a small label on the credenza (it was not a department issued bar code) but rather a small mail label with a partial number visible.

For a closer look, I got up from the sofa and went to the credenza and told Mr. Gamble that I had no idea what the small label on the credenza was, and returned to the sofa and sat down. I told Mr. Gamble once again that since I had been a property custodian those items had never been accountable. I looked at my watch and asked if we could continue our discussion the next day.

Mr. Gamble looked at his watch and said that it was not 4:30.

I told Mr. Gamble that my watch had 4:30.

At that Mr. Gamble said you still have 30 seconds.

Mr. Gamble still was trying to debate with me about the items being accountable.

5

I told Mr. Gamble maybe when we were known as the Office of Telecommunications Policy or the Office of Telecommunications perhaps that's what the small mailing label on the credenza was related to.

Mr. Gamble returned to his chair, while still standing, he yelled at me and said, "Joyce, these are accountable items or they used to be."

Given his hostile tone and posture I told Mr. Gamble that the meeting was over, that he had no right to yell at me; I reminded him that I had asked him a few minutes before if we could please carry this meeting over to the next day; I informed him that he was out of line, and expressed that I did not appreciate him raising his voice at me.

I had barely finished making the above statement when Mr. Gamble yelled, In a very nasty and loud voice "Joyce be quiet."

I got up from the sofa and again said that the meeting was over, and headed for the door. But, just as I got to the door, considering that I had just filed a discrimination complaint against Mr. Gamble that morning and I did not want to be charged with insubordination, I stopped and asked in the doorway if we could continue our meeting the next day. Again I said that I was not his child, that he had no right to raise his voice at me, and that I had asked him several times to please continue our discussion the next day.

Mr. Gamble came over to the doorway and stood very close in front of me (right in my face), much too close for a professional setting.

I told Mr. Gamble to get out of my face, I took one large step back, to put a little more distance between us.

Mr. Gamble then replied, "Does this look like your face, am I threatening you?"

I said no comment, and headed for Mr. Parlow's office. I looked in Mr. Parlow's office and he was not there. I started to my office, Mr. Gamble was standing by the left side of his door with his hands clasped behind his back. Mr. Gamble started to follow me to my office, very closely on my heels.

Mr. Gamble said again, "am I threatening you, get back in here", and continued to follow me to my office.

While I was returning to my office, in a raised shaken voice, I again said, I'm not your child you have no right to raise your voice at me or to tell me to be quiet. Just as I was about to enter my office, Janet Healer had started out, however, when she heard me telling Mr. Gamble that I was not his child, she turned around and reentered her office. Upon entering my office, it was about 4:37 p.m., I was visible shaken, my voice was broken, as I tried to log off of my computer, Mr. Gamble stood just over my left

6

shoulder. I was so upset, that I pressed the wrong keys and somehow the calendar came up on the computer screen and the computer locked up, and I had to turn the computer off by the surge switch on the floor.

Mr. Gamble was still asking me if he was threatening me and asking me about the inventory list.

I again told Mr. Gamble that the meeting was over, could we please continue our meeting the next day. Again, I said that I was not his child, and he had no right to raise his voice or to tell me to be quiet. I sat down in my chair, unlocked my desk, got my purse out and my eyeglass case, while Mr. Gamble stood over me staring in my purse. When I removed my eyeglass case, Mr. Gamble backed up against my file cabinet.

By this time Mr. Gamble had stopped talking, he just stood there at my file cabinet with his hands still clasped behind his back, he was really pale (white), rolling his eyes at me and just staring. I was praying to God that he would leave, I was shaking and trembling, and it was very noticeable. There was only one way out of the office and Mr. Gamble stood between me and the door. I finally got up to get my coat, it was behind the door and I had to brush past Mr. Gamble to get it. Just as I got to the door, Norbert Schroeder was coming in to talk to me and I asked him if it could wait until tomorrow and he said that it would only take a second. Lee Cline, from our Annapolis office called and wanted me to call him, he wanted to know if I planned on attending the Annapolis Xmas party on Tuesday. While I spoke to Norbert, Mr. Gamble stood staring at me. His eyes followed me as I returned to my desk to get my purse and briefcase. Trembling and shaking I somehow managed to get my coat on and put my purse on one arm and my briefcase on the other. Mr. Gamble was still leaning against my file cabinet with his hands behind his back, still staring at me. Once I moved from my chair, Mr. Gamble turned and left my office. With Mr. Gamble gone, I walked into Janet's office, and I said "Janet". Janet rose from her desk and rushed to me, kissed me on my cheek and hugged me and I collapsed in her arms. She said that she was afraid to come out of her office, when she saw Mr. Gamble on my heels and heard me saying that I was not his child, she knew something was wrong. Janet then asked me, "why is he doing this to you, and why is he treating you this way?" I told her that there was a reason for it. I told her that I would tell her about it the next day. I felt so relieved to see a non-violent and non-threatening face, and to hear a friendly voice.

## MORE MEMORABLE ACTS OF THE PERSISTENT HARASSMENT

1.  On December 14, 1994, Mr. Gamble brought a draft keyword list that I had been working on for the Front Office back to me and quizzed me on a few words, he was very loud and said, "Joyce now what does SPAC mean", I gave him an answer, but it wasn't right, and he kept asking me what does it stand for, then he went to another word and did the same thing, I did not know the answer for that one either. When Bill left, Janet Healer came out of her office and asked, "why is he treating you like this? He

7

disrespected you, he treated you just like a child, and I don't mean his older child, I mean his younger one, that's about 8 or 9.

2. Mr. Gamble approached me on December 16, 1994, in a very condescending way, placing the entire blame on me for his threatening behavior of the day before. Even though Mr. Gamble's tone was much better than the day before, the content was not. He approached me and said, "We still need to continue our discussion of yesterday, I don't know how we got into that yesterday, better still I don't know how we got you into that yesterday." I never responded, I was just in awe, that he would have the nerve to place the blame on me for his own violent behavior. I felt so victimized and insulted, that I went to Mr. Parlow in tears and complained about Mr. Gamble's behavior on that day and the previous day.

3. On Tuesday, January 31, 1995, at Mr. Gamble's request (Attachment 6) we continued the meeting (from December 15, 1994) regarding my responsibilities as property custodian. Upon entering his office with Harriet Jacobi and LaVern James, I attempted to close his door for privacy, in a very harsh tone, Mr. Gamble said, "I would prefer to keep it open please". Then in a sarcastic tone he said, "thank you".

4. I asked Mr. Gamble if it was possible for OSM to pay for some college courses, I was interested in pursuing a degree, I even suggested that I would attend a weekend college. Mr. Gamble said I should submit my training form and they would see if they could pay the tuition. Mr. Gamble then asked how many college credits did I have. When I replied none, he laughed. There was no encouragement, I felt demeaned, so needless to say I never pursued it any further.

5. On another occasion when I asked Mr. Gamble if he would be my mentor and tell me what I needed to do in order to further develop my potential in the upward mobility position for which I was hired. Mr. Gamble's response was "the only way that you would receive a promotion in OSM is if Fred Wentland (who at the time was on official travel) should die in a plane crash, and then, and only then, would you possibly be promoted to a GS-12 or 13".

6. On October 28, 1984, when Mr. Gamble told me that I had been selected for my upward mobility position, he told me with a smirk on his face, "I want you to know that you are not my choice."

7. Yet on another occasion, Mr. Gamble told me that my job was nothing more than that of a "gopher".

8. Mr. Gamble also told me on another occasion that I would have to change my speech pattern.

8

9. Once during a briefing with Mr. Gamble in his office on unliquidated obligations, I was explaining to Mr. Gamble what items had been deobligated. I had called several companies by name, but, because of a slight speech impediment, when I got to a certain company (Hewlett Packard), Mr. Gamble had a copy of the paper I was talking from, I told Mr. Gamble that item ---- had been deobligated, he asked me what the company's name was, instead, I game him a line item number and he insisted that I pronounce the company, I gave it my best shot and I could not pronounce the word Hewlett, Mr. Gamble forced me to, I kept mispronouncing the word, then Mr. Gamble said, "say it Joyce, you don't even try to pronounce your words, you're lazy with your words". I started to cry, we sat silent for a few minutes, and he finally said that we would continue the meeting later, I left his office in tears and ran to the ladies room and cried my heart out.

10. At another time when I approached Mr. Gamble about promoting me, he told me "Joyce you can work here in OSM for 10 years and I'll never promote you".

11. Once Mr. Gamble gave me a task to perform and his final words were "now don't let me have to do you like I do my 6 year old daughter, and have to come and ask you for it, you bring it to me when you get through, do you hear, now don't let me have to come to you for it".

## 5C.    GIVE THE DATES WHEN THIS ACTION OCCURRED.

From October 28, 1984, when Mr. Gamble informed me I had been chosen for the upward mobility position, up to and including January 31, 1995.

## 5D.    WHAT HARM, IF ANY, CAME TO YOU IN YOUR WORK SITUATION AS A RESULT OF THIS ACTION?

Mr. Gamble's constant and blatant harassment constitutes unwelcome conduct, which unreasonably interferes with the my work performance, and my well-being. Mr. Gamble's constant and systematic harassment created a very hostile work environment which caused me great pain, suffering, humiliation, degradation, mental anguish and undue stress.

For a significant period of time I have felt so intimidated by Mr. Gamble that I developed an intolerance for him. I have entrusted and shared my feelings toward Mr. Gamble with my family, friends and some close co-workers. I often talk about the hostile work environment that was created by Mr. Gamble and the amount of fear I have of him. I felt I could never do anything right, as Mr. Gamble often left me feeling belittled and disrespected. I would always have to prepare myself, both mentally and

9

verbally before any meetings with Mr. Gamble. I would practice my words and speech so Mr. Gamble would not ask me to repeat what I said. I am very self-conscious of how I speak around Mr. Gamble, I'm always aware that he is monitoring my speech.

With the harassment that was inflicted upon me on December 15, 1994, I feel that it was in direct retaliation for my having filed a discrimination complaint on that very same day. The harassment that was inflicted upon me on the December 15, 1994, was so severe that I had to seek medical attention for my nerves. I actually broke out in hives. With so much violence in the workplace and the severity of this most recent act of harassment, my fears were no longer mere feelings, they were a reality. As a result, I had to resort to medication in the form of tranquilizers to help calm my nerves. Presently I am still on the prescribed medication. This is the first time in my entire life that I have ever resorted to such medication, even with the passing of my son in August 1993 I did not need to be medicated. I dealt with my heartache and loss through my inner strength and trust in God. But with this violent and deliberate act of intimidation, I was so distraught and unable to handle or cope with the threatening conduct of Mr. Gamble. I had removed myself from a very vulnerable situation, only to be further harassed and threatened by Mr. Gamble for the decision I made to avoid any further confrontations. Mr. Gamble far exceeded his authority when he entered my workspace in a menacing and threatening manner. I can only conclude that his irrational and violent behavior was in retaliation for my having filed a discrimination complaint against him earlier that day.

10

COMPLAINT OF DISCRIMINATION AGAINST THE U.S. DEPARTMENT OF
COMMERCE BECAUSE OF RACE, COLOR, RELIGION, SEX NATIONAL ORIGIN,
AGE, PHYSICAL OR MENTAL HANDICAP OR RETALIATION

Complainant:        Joyce E. Megginson
Agency Number:      95-61-0161
Filing Date:        December 16, 1994

9.    THE REMEDY I SEEK IS:

As referenced in his Diversity Policy Statement, dated July 21, 1994, U.S. Department
of Commerce Secretary Ronald H. Brown, I offer this excerpt. As a Federal employee I have
a right to a workplace free of unlawful sexual harassment. Sexual harassment is prohibited by
Title VII (seven) of the Civil Rights Act of 1964. I have a right to freedom from retaliation for
filing an EEO complaint, participating in the EEO process, or opposing unlawful discrimination
of any type. Supervisors and managers are responsible for ensuring that the workplace is free
of sexual harassment. Once a manager becomes aware of an allegation of sexual harassment,
immediate and appropriate action must take place. This includes investigating the facts and
taking measures to stop offensive behavior. To my knowledge, an investigation was never
conducted, I, nor were any of my witnesses ever contacted by Management. Department
Administrative Order (DAO) 215-8 clearly states, "it is Management's responsibility to take
immediate action to resolve such matters, without regard to which forum an employee might
choose to complain." DAO 215-8 further states, "failure of managers and supervisors to address
issues of sexual or racial harassment will almost always result in serious consequences to the
employing operating unit or Departmental office." Therefore, my recommendations and the
level of punishment that I suggest for the Department level officials listed below are fully and
clearly justified.

    a.    Bill Gamble, Deputy Associate Administrator, OSM, for his deliberate and
threatening behavior on December 15, 1994, and for his persistent sexual harassment since
October 28, 1984, I am seeking his removal from his Senior Executive Service (SES) position,
and requesting that he not be transferred to, nor be considered for any other supervisory or
managerial positions within the U.S. Department of Commerce.

    b.    Dick Parlow, Associate Administrator, OSM, Bill Gamble's immediate supervisor
should be reprimanded for his failure to take appropriate action after being informed of my
allegation of sexual harassment against Mr. Gamble, and for his failure to conduct a timely
investigation. Mr. Parlow was duly made aware of the seriousness and the severity of this
harassment on December 16, 1994, and as of February 3, 1995, he has yet to discuss the sexual
harassment allegation with me.

11

c.    Larry Irving, Assistant Secretary, NTIA, Michele Farquhar, Director, OPCM, and Jim Hartman, Management Division, OPCM, having been duly informed and fully aware of sexual harassment allegations, I am requesting that each be reprimanded for their failure to ensure that the appropriate action was taken. The above referenced personnel, are Department level officials and to date neither has in any forum attempted to discuss this allegation with me.

d.    I allege that Management, as they failed to take appropriate action, condoned and ultimately allowed the sexual harassment to continue. In full and complete settlement of the this sexual harassment complaint against the U.S. Department of Commerce (Agency) by way of relief I seek the following:

1.    **EDUCATION:**    The Department shall allocate funds for the advancement of my education.

2.    **MEDICAL FEES:**  The Department shall absorb any and all fees associated with any counseling or medical attention that I received or may seek as a result of the long-term sexual harassment.

3.    **LEGAL FEES:**    Any legal fees that I may incur as a result of any litigation associated with this complaint.

4.    **COMPENSATORY DAMAGES:**    $350,000 and any other remedies deemed fair by the Court.

5.    **PUNITIVE DAMAGES:**    $350,000 and any other remedies deemed fair by the Court.

December 14, 1994

MEMORANDUM TO:      Dick Parlow
                    Associate Administrator, OSM

FROM:               Joyce E. Megginson

SUBJECT:            Employee Comments to Classification & Performance
                    Management Record

On Friday, December 2, 1994, just prior to my departure for the day, Bill Gamble presented me with my appraisal. At that time, I voiced my concerns regarding the performance rating (fully successful) that I was given by Mr. Gamble. Even though I signed my performance rating, my intentions were to prepare comments over the weekend. I personally presented my comments to Mr. Gamble just prior to my departure for the day on Monday, December 5, 1994.

Today, Wednesday, December 14th, I received a copy of my performance plan with my comments attached in a U.S. Government messenger envelope. My rating remains unchanged, and there was never an acknowledgement, nor a verbal discussion regarding my comments requesting reconsideration of my performance rating. Also, I am not sure that you are aware of the concerns raised, as you signed my performance rating prior to the submission of my comments. A copy of my appraisal and my comments are attached for your information. At this time, I am requesting a meeting with you regarding this issue. I expected and feel that I am fully entitled to a personal consultation, as the manner in which my appraisal was returned to me is very disappointing.

Attachment

cc:  Bill Gamble

J 1994

## Employee Comments to Classification & Performance Management Record

Employee:    Joyce E. Megginson
SSN:

The following factors is my basis for asking for reconsideration of performance rating.

Sheet #4 of 4, Item 5:

1. Mr. Gamble asked me to compile a draft calendar of events and present to program managers at staff meeting for their inputs, which I did. I incorporated program managers inputs into a new draft and represented to Mr. Gamble, per his instructions for his input. On at least one occasion I inquired about draft calendar, and was told by Mr. Gamble that it was still in his in box, he had not had a chance to critique it. It is correct that Mr. Gamble did ask me to compile and maintain a generic calendar of reoccurring events, however I never received clearance from him to proceed;

2. While it was mentioned in my performance rating, more emphasis should be placed on my overtime supporting Dr. Rush's projects. Mainly, I worked approximately 400 hours of overtime during the time frame of Feb. 6-Sep. 30, 1994. Those hours were accumulated by working late into the evenings, and sometimes working both Saturdays and Sundays. Even though work was not directly related to my assigned division, it was performed in support of the accomplishment of the overall mission of the agency. During this time I helped with the data entry of over 10,000 names and other pertinent information being added to the TIIAP data base, assembling and mailing of those packages. Also I helped with the assembly and mailing of approximately 3,000 packages for PTFP, and assembling and mailing of approximately 750 packages for NECET, and

3. Training conference that I attended Aug. 1-5, 1994, through my own initiative was also not given its due weight. I attended the 13th Annual Training Conference of Blacks in Government (BIG). This conference was of the best organized and most fulfilling conferences I've ever attended in my entire 28 years of government service, and I hope I'm allowed to attend next year. The make-up of the conference consisted of about 65 different workshops, whereas participants attended workshops of their choice. The 10 workshops (1/2 day each) I attended were:

1.   Diversity, Productivity & Quality:  Exploring the Synthesis
2.   Empowering Yourself
3.   Career Developments Strategies
4.   Interpersonal Skills
5.   Drugs:  Impact on the Work Place
6.   Writing Without Fear: Your Key to Career Advancement
7.   Balancing Career and Family Responsibilities
8.   Self Image & Attitudes
9.   Enhancing the Quality of Work
10.  Preparing Today's Youth for Tomorrow's World



Attachment 6

**UNITED STATES DEPARTMENT OF COMMERCE**
National Telecommunications and
Information Administration
Washington, D.C. 20230

January 27, 1995

MEMORANDUM FOR Joyce Megginson

FROM:         Bill Gamble

SUBJECT:      Property Custodianship

As you are well aware, within the last year some of the personal property custodian functions have been pushed down in the organizational structure or decentralized to the individual units.  I understand that this has placed some additional workload on you.

As part of this change, some training was conducted for those involved in this function.  You indicated in your note to me that you were going to attend this training on November 15, 1994.

You have indicated, as part of your comments on your 1994-1995 performance rating, that you "maintain a complete inventory of all property."

In an effort to better understand the implementation of this function in OSM, both for you and for other OSM personnel, I would like to <u>start</u> a series of discussion with you on this.  I would like to discuss your efforts and plans for this function, including your plans for maintaining the inventory, any assistance needed from others in OSM, any paperwork/forms that need to be submitted by you or others, any requirement to submit the inventory to others in NTIA or the Department, and any requirement for audits.

Also, I would like a copy at this first meeting of the complete inventory of property which you maintain, as indicated in your comments on your performance rating.

I would like to meet with you on Tuesday, January 31 at 9:00, 1:00 or 1:30 in my office to start on these items.

I'm also asking that someone from OPCM, familiar with property management, attend.



**UNITED STATES DEPARTMENT OF COMMERCE**
National Telecommunications and
Information Administration
Washington, D.C. 20230

January 30, 1995

MEMORANDUM FOR:     Bill Gamble
                    Deputy Associate Administrator

FROM:               *Joyce E. Megginson*
                    Joyce E. Megginson

SUBJECT:            Property Custodianship

Reference is made to your memo dated January 27, 1995, subject as above, requesting a meeting with me on property custodianship. As you should recall, I briefed the OSM staff meeting on Monday, November 21, 1994, about what transpired in the one day training class on personal property management that I attended on November 15, 1994.

As part of that briefing I informed the program managers and other staff that was present, that the Department had proposed to transfer the complete personal property custodian functions to each individual Agency. As I have previously said, this transfer was supposed to take place in January 1995 or soon after. It should also be noted that during my briefing, I informed the staff that I would make them aware when this function was actually transferred from the Department to the Agency.

As of this date, I have not received any notice from the Department that this function has been transferred. You indicated in your memo that you have requested that someone from OPCM familiar with property management attend this first meeting between us, and you verbally indicated to me on Friday, January 27, 1995, that person would in fact be Harriet Jacobi. Perhaps Harriet has received further guidance and will be in a position to share this information with us on Tuesday. In retrospect, it's never too early to begin preparations for implementing pending changes in the personal property custodianship.

Your memo also states that I indicated, as part of my comments on my 1994-1995 performance rating, that I maintain a complete inventory of all property. Please be advised that I made those comments regarding my 1993-1994 performance rating, and I will provide you with a copy of the latest inventory as you requested, during our meeting scheduled for Tuesday, January 31, 1995, at 1:30 p.m.

cc: Dick Parlow

Attachment 7



**UNITED STATES DEPARTMENT OF COMMERCE**
National Telecommunications and
Information Administration
Washington, D.C. 20230

January 13, 1995

MEMORANDUM FOR:     Courtland Cox
                    Acting Director, Office of Civil Rights

FROM:               Joyce E. Megginson
                    Complainant

SUBJECT:            Sexual Harassment

I have not been provided any counseling on my sexual harassment complaint filed with the
Office of Civil Rights on December 16, 1994. After filing my sexual harassment complaint
with the Office of Civil Rights, the only counseling received was a recommendation from
Tina Shat and Al Corea that I combine this complaint with my discrimination compliant
which was filed on December 15, 1994. I, however, adamantly rejected this
recommendation.

I duly informed the Office of Civil Rights that persistent and alarming incidents of sexual
harassment had taken place. However, it is my feeling that I have been denied my
administrative rights by the Office of Civil Rights by not providing me with quick and
professional counseling.

It is my desire at this time to be counseled as a class action agent for the sexual harassment
which has been perpetrated upon me, and which is consistent with similar harassment in the
agency.

cc:  A. Corea
     T. Shat

From:        ALFRED A COREA
("G=ALFRED;I=A;S=COREA;U=PPS;O=OCR;P=G
            OV+COMM.BAN;A=ATTMAIL;C=US")
To:          NTIADC.NTIAHQ(JMEGGINSON)
Date:  Friday, January 13, 1995  5:03 pm
Subject:     Subject Unspecified.


I am in receipt of your January 13, 1995 memo to Mr. Courtland Cox, wherein
you allege sex harassment and request to be counseled as a class agent in
that regard.   I must state for the record, that this is the first indication
that you have given to me or Tina Shat that you are alleging sex harassment.
Please contact me so that we may set a time for counseling to begin on your
class allegation.

I also request that you provide the name of the individual that you allege
has sexually harassed you so that I may refer your allegation to NTIA
management for appropriate action under DAO 215-8.

I look forward to hearing from you.

CC:          NTIADC40.X400("G=CHRISTINA;I=C;S=SHAT;U=PPS;O=OCR;

Attachment 9



**UNITED STATES DEPARTMENT OF COMMERCE**
National Telecommunications and
Information Administration
Washington, D.C. 20230

January 17, 1995

MEMORANDUM FOR:     Alfred Corea
                    EEO Officer, Office of Civil Rights

FROM:               *Joyce E. Megginson*
                    Joyce E. Megginson
                    Complainant

SUBJECT:            Sexual Harassment Compliant

I am in receipt of your memo via e-mail, dated Jan. 13, 1995, Subject: Subject Unspecified. I must however, emphatically and categorically maintain that I did in fact promptly notify the Office of Civil Rights (OCR) that blatant, persistent and alarming acts of sexual harassment had taken place. The occurrence of the incident on December 15, 1994, precipitated my filing a sexual harassment compliant with the OCR on December 16, 1994. In support of the fact that I notified the OCR of the sexual harassment, I possess other data that will clearly substantiate my claim.

Your memo directed me to provide the name of the individual that I am charging with sexual harassment. I suggest that you confer with Tina Shat, the EEO Specialist that's assigned to my discrimination, as well as my sexual harassment complaints. As I have already provided Ms. Shat with my superior's name, as well as all the relevant facts pertaining to his sexual harassment of me when I filed my sexual harassment complaint with the OCR on December 16, 1994.

If your telephone call today, January 17, 1995, was to request my permission to speak with some unknown high authority, permission was granted to Ms. Shat on December 16, 1994. In summary, if you want redundant permission, it's not necessary for me to grant, because it was previously given.

cc:  Courtland Cox
     Tina Shat



**UNITED STATES DEPARTMENT OF COMMERCE**
**Chief Financial Officer**
Assistant Secretary for Administration
Washington, D.C. 20230

FEB 1 0 1995

CERTIFIED MAIL

Ref.: 95-61-0161
Filing Date: February 3, 1995

MEMORANDUM FOR   Joyce E. Megginson

FROM:              Kimberly H. Walton
                   Acting Chief, Compliance Division
                   Office of Civil Rights

SUBJECT:           Acknowledgement of Receipt of Discrimination
                   Complaint

## Important information

We received your complaint of discrimination which was filed on
February 3, 1995.  Hereafter, that date is the Filing Date.

Your complaint has been given the following number: 95-61-0161.
To avoid delays in processing your complaint, it is very
important that you use this number in all correspondence
regarding this complaint, regardless of the person to whom
your correspondence is sent.

If your complaint is not dismissed the Department of Commerce
will conduct a complete and fair investigation of your complaint
within **180 calendar days** from the filing date unless you and the
Department of Commerce agree in writing to extend that period.
(29 C.F.R. § 1614.106(d)(2)).  In your case, the 180th day is
August 1, 1995 (filing date + 179 days).  We will need your
cooperation in order to meet this deadline.

## Here are your rights

If the 180th day arrives, and you have not received the Report of
Investigation with the notice explaining your right to request a
hearing, on the 181st day or thereafter, you may request a
hearing by an Administrative Judge appointed by the EEOC. (29
C.F.R. § 1614.108(f)).  Alternatively, you may file a civil
action in an appropriate U.S. District Court.  29 C.F.R. §
1614.408(b).

If this Office dismisses all or part of your complaint, or when we issue a Final Decision on the merits of your complaint, you will have the right to appeal the Dismissal or the Final Decision to:

> The Director
> Office of Federal Operations
> Equal Employment Opportunity Commission
> P.O. Box 19848
> Washington, D.C. 20036

You will be told how to file an appeal at the appropriate time.

cc: Alfred Corea

bcc: Subject
      Compliance

Z 117 029 700

Receipt for
Certified Mail
No Insurance Coverage Provided
Do not use for International Mail
(See Reverse)

Joyce E. Megginson
310 Bogota Drive
Ft. Washington, MD

FEB 1 0 1995

FINAL DECISION

BY THE

U.S. DEPARTMENT OF COMMERCE

IN THE DISCRIMINATION COMPLAINTS OF

JOYCE E. MEGGINSON

COMPLAINT NUMBERS:

95-61-0141
95-61-0161
95-61-0255



P 059 322 022

Receipt for
Certified Mail
No Insurance Coverage Provided
Do not use for International Mail
(See Reverse)

Ms. Joyce E. Megginson
310 Bogota Drive
Fort Washington, MD 20744

| | |
|---|---|
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, and Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | NOV 26 1996 |

PS Form 3800, June 1991

000086

EXHIBIT 27
PAGE 1 OF 3 PAGES

This is the Department's final decision to accept the portions of complaints 95-61-0141 and 95-61-1061 previously held in abeyance and to dismiss complaint number 95-61-0255 filed by Joyce E. Megginson (Complainant), a Program Analyst, GS-0343-09, with the Office of Spectrum Management, National Telecommunications and Information Administration (Agency), U.S. Department of Commerce (Department).

## BACKGROUND AND PROCEDURAL HISTORY

On **February 3, 1995**, Complainant filed complaint 95-61-0161.  On **February 23, 1995**, she filed complaint 95-61-0141. On **March 10, 1995**, she filed class complaint 95-61-0255.

On **April 10, 1995**, the Department transmitted the class complaint to the Equal Employment Opportunity Commission (EEOC) for a recommended decision on certification of the class.  On April 20, 1995, the Department issued a Final Agency Decision (FAD) accepting two allegations from Complaint 95-61-0161 and holding in abeyance the remaining allegations of that complaint and all of Complaint 95-61-0141.[1]  The decision to hold certain allegations in abeyance was based on the Department's determination that they were identical to claims raised in the class complaint.  Complainant appealed the FAD, and on May 30, 1996, the EEOC issued its decision affirming the FAD.

On **November 6, 1996**, Complainant notified the Office of Civil Rights and the Agency Representative via electronic mail that she wished to withdraw Complaint 95-61-0255 as a class complaint and proceed with it as an individual complaint.  On November 7, the EEOC Administrative Judge assigned to the class complaint granted the Agency's Motion to Dismiss.  She remanded the case to the Department for further processing.

---

[1]    The investigation of the accepted allegations was completed on July 28, 1995.  Complainant requested a hearing but asked that the hearing request to the EEOC be postponed until the allegations held in abeyance are processed.

EXHIBIT
PAGE 2 OF 2 PAGES

2                                    95-61-0141
                                     95-61-0161
                                     95-61-0255

### ALLEGATIONS

95-61-0141

Complainant alleges that because of her race (African American) and sex, her supervisor, Deputy Associate Administrator William Gamble, has harassed her and adversely affected her career development by:

1. telling her, in October 1984, that she was not his first choice for the Upward Mobility position she encumbered;

2. refusing to promote her to her full performance level of GS-11 and telling her that the only way she could get a promotion in the Office of Spectrum Management was if another employee were to die;

3. not assigning her duties which would have fostered her career development;

4. denying her cash awards;

5. criticizing her speech patterns;

6. failing to give her accurate and timely performance plans and ratings; and,

7. becoming increasingly hostile and condescending to her and attempting to transfer her out of her division after she requested, in November 1994, that the Office of Human Resources Management intervene in the matter of her promotion to GS-11.

EXHIBIT 29
PAGE 3 OF 3 PAGES

3                              95-61-0141
                              95-61-0161
                              95-61-0255

95-61-0161²      ___.

Complainant alleges that because of her race (African American) and sex, her supervisor, Deputy Assistant Administrator William Gamble, harassed her when:

1.  he told her, in October 1984, that she was not his first choice for the Upward Mobility position she encumbered;

2.  *on December 14, 1994, he spoke to her in a condescending manner about her understanding of the acronym "SPAC;"*

Complainant alleges that because of her race (African American), sex and in retaliation for contacting an EEO Counselor on December 15, 1994, her supervisor, Deputy Assistant Administrator William Gamble, harassed her when:

3.  on December 15, 1994, he called her into a meeting thirteen minutes before her scheduled departure time and:

    a.  criticized her for a typographical error in a report;

    b.  during the course of discussing her comments on her performance rating, he became hostile and condescending about Complainant's understanding of accountable inventory items;

    c.  denied Complainant's request to adjourn the meeting until the following day and remarked sarcastically that she had 30 seconds left in her work day;

    d.  told Complainant to "be quiet" when she objected to him raising his voice to her;

    e.  as Complainant attempted to leave, he followed her to the door and stood intimidatingly close to her;

_____

    ²  Allegations 2 and 5 (in italics) are the allegations previously accepted and investigated.

EXHIBIT 29
PAGE 1 OF 12 PAGES

4                                95-61-0141
                                 95-61-0161
                                 95-61-0255

    f.  Complainant told him to get out of her face, after which he followed her out of the office, shouting "Does this look like your face? Am I threatening you? Get back in here;" and,

    g.  he frightened Complainant by following her to her office and staring at her as she prepared to leave.

4.  on December 16, 1994, he approached her to continue the meeting and said "I don't know what got into you yesterday;"

5.  on January 31, 1995, he spoke to her in a sarcastic manner;

6.  he laughed at her when she asked about Agency-paid college courses;

7.  he refused to promote her to her full performance level of GS-11 and told her that the only way she could get a promotion in the Office of Spectrum Management was if another employee were to die;

8.  he told her she was nothing more than a "gofer;"

9.  he criticized her speech patterns and told her she was "lazy with [her] words;"

10.  after giving her an assignment, he compared her to his six year old daughter and admonished her not to make him ask where the work was; and,

11.  Complainant further alleges that Associate Administrator Dick Parlow, Assistant Secretary Larry Irving, Office of Policy Coordination and Management Director Michele Farqhar and Management Division Chief Jim Hartman were aware of the harassment but took no corrective action.

95-61-0255

Complainant alleges that because of her race (African American), sex, and in retaliation for seeking EEO counseling:

EXHIBIT ___
PAGE ___ OF ___ PAGES

5

95-61-0141
95-61-0161
95-61-0255

1.   William Gamble told her, in October 1984, that she was not ___
     his first choice for the Upward Mobility position she
     encumbered;

2.   Gamble refused to promote her to her full performance level
     of GS-11 and told her that the only way she could get a
     promotion in the Office of Spectrum Management was if
     another employee were to die;

3.   he compared her to his six year old daughter;

4.   Gamble's level of hostility increased after she asked the
     Office of Human Resources Management ("Personnel") to
     intervene in the matter of her promotion and he attempted to
     transfer her out of the Division;

5.   Gamble criticized her speech patterns and told her that she
     was lazy in the way she pronounced her words;

6.   Gamble laughed at her when she asked about Agency-paid
     college courses;

7.   she has been denied cash awards;

8.   on December 15, 1994, Gamble verbally abused her and
     physically threatened her when he:

     a.   during the course of discussing her comments on her
          performance rating, he became hostile and condescending
          about Complainant's understanding of accountable
          inventory items;

     b.   denied Complainant's request to adjourn the meeting
          until the following day and remarked sarcastically that
          she had 30 seconds left in her work day;

     c.   told Complainant to "be quiet" when she objected to
          him raising his voice to her;

     d.   as Complainant attempted to leave, he followed her to
          the door and stood intimidatingly close to her;

EXHIBIT 29
PAGE 6 OF 13 PAGES

6                          95-61-0141
                                   95-61-0161
                                   95-61-0255

e.  ~~Complainant~~ told him to "get out of [her] face," after
    which he followed her out of the office, shouting "Does
    this look like your face?  Am I threatening you?  Get
    back in here," and,

f.  he frightened Complainant by following her to her
    office and staring at her as she prepared to leave.

9.   on December 16, 1994, Gamble approached her to continue the
     meeting and said "I don't know what got into you yesterday;"

10.  Gamble told her she was nothing but a "gofer;"

11.  Gamble has failed to give her accurate and timely
     performance plans and ratings;

12.  Gamble did not assign her duties which would have
     fostered her career development; and,

13.  Associate Administrator Dick Parlow and Assistant Secretary
     Larry Irving, Office of Policy Coordination and Management
     Director Michele Farqhar and Management Division Chief Jim
     Hartman were aware of the harassment but took no corrective
     action.


**ANALYSIS**

1.  <u>Further Processing of Complaint 95-61-0255</u>

EEOC regulations at 29 C.F.R. § 1614.204(d)(7) provide in
pertinent part:

>    The dismissal of a class complaint shall inform the agency
>    either that the complaint is being filed on that date as an
>    individual complaint of discrimination and will be processed
>    under subpart A, or that the complaint is also dismissed as
>    an individual complaint in accordance with § 1614.107.

See also *Lehmkuhl v. USPS*, EEOC Request No. 05910684 (November
20, 1991).

EXHIBIT 29
7   12

7                                    95-61-0141
                                     95-61-0161
                                     95-61-0255

2.  Identical Matters

EEOC regulations at 29 C.F.R. § 1614.107 (a) provide that:

    The agency head or designee shall dismiss a complaint
    or a portion of a complaint:
    (a) That ... states the same claim that is pending before or
    has been decided by the agency or Commission....

A comparison of Complaints 95-61-0141, 95-61-0161 and 95-61-0255
shows that the following allegations are identical:

| 95-61-0141 | 95-61-0161 | 95-61-0255 |
|---|---|---|
| Allegation 1 | Allegation 1 | Allegation 1 |
| Allegation 2 | Allegation 7 | Allegation 2 |
| Allegation 3 | ------------- | Allegation 12 |
| Allegation 4 | ------------- | Allegation 7 |
| Allegation 5 | Allegation 9 | Allegation 5 |
| Allegation 6 | ------------- | Allegation 11 |
| Allegation 7 | ------------- | Allegation 4 |
|  | Allegation 3 | Allegation 8 |
|  | Allegation 4 | Allegation 9 |
|  | Allegation 6 | Allegation 6 |
|  | Allegation 8 | Allegation 10 |
|  | Allegation 10 | Allegation 3 |
|  | Allegation 11 | Allegation 13 |

Every allegation in Complaint 95-61-0255 is also stated in one or
both of the previously-filed complaints.  Therefore, Complaint
95-61-0255 must be dismissed in its entirety because it states
claims identical to those pending in complaints 95-61-0141 and
95-61-0161.

In its FAD of April 20, 1995, the Department consolidated
Complainants 95-61-0141 and 95-61-0161.  Therefore, we need not
dismiss those claims that are identical between those two
complaints.  The allegations are renumbered and accepted for
investigation as set forth below.


EXHIBIT
PAGE __ OF __ PAGES

8                          95-61-0141
                           95-61-0161
                           95-61-0255

## DECISION

Complaint 95-61-0255 is dismissed because it states the same claims that are pending before the Department. 29 C.F.R. § 1614.107(a) (1992).

Complaint 95-61-0141 and the portion of 95-61-0161 not previously processed are accepted for investigation.

## ACCEPTED ALLEGATIONS

### Complaint 95-61-0141

Complainant alleges that because of her race (African American) and sex, her supervisor, Deputy Associate Administrator William Gamble, has harassed her and adversely affected her career development by:

1.  telling her, in October 1984, that she was not his first choice for the Upward Mobility position she encumbered;

2.  refusing to promote her to her full performance level of GS-11 and telling her that the only way she could get a promotion in the Office of Spectrum Management was if another employee were to die;

3.  not assigning her duties which would have fostered her career development;

4.  denying her cash awards; — *w/d/sex*

5.  criticizing her speech patterns; *w/d/sex*

6.  failing to give her accurate and timely performance plans *w/d/sex* and ratings; and,

7.  becoming increasingly hostile and condescending to her and attempting to transfer her out of her division after she requested, in November 1994, that the Office of Human

000094

EXHIBIT 29
PAGE 2 OF 2 PAGES

9                    95-61-0141
                     95-61-0161
                     95-61-0255

Resources Management intervene in the matter of her
promotion to GS-11. — w/drew retaliation

95-61-0161

Complainant alleges that because of her race (African American),
sex and in retaliation for contacting an EEO Counselor on
December 15, 1994, her supervisor, Deputy Assistant Administrator
William Gamble, harassed her when:

Withdrawn!    on December 15, 1994, he called her into a meeting thirteen
             minutes before her scheduled departure time and:

    a.   criticized her for a typographical error in a report;

    b.   during the course of discussing her comments on her
         performance rating, he became hostile and condescending
         about Complainant's understanding of accountable
         inventory items;

    c.   denied Complainant's request to adjourn the meeting
         until the following day and remarked sarcastically that
         she had 30 seconds left in her work day;

    d.   told Complainant to "be quiet" when she objected to him
         raising his voice to her;

    e.   as Complainant attempted to leave, he followed her to
         the door and stood intimidatingly close to her;

    f.   Complainant told him to get out of her face, after
         which he followed her out of the office, shouting "Does
         this look like your face?  Am I threatening you?  Get
         back in here;" and,

    g.   he frightened Complainant by following her to her
         office and staring at her as she prepared to leave.

2.  on December 16, 1994, he approached her to continue the
    meeting and said "I don't know what got into you yesterday;"


EXHIBIT
PAGE __ OF __ PAGES

10                                95-61-0141
                                  95-61-0161
                                  95-61-0255

3.    he laughed at her when she asked about Agency-paid
      college courses;    *w/drew sex & retaliation*

4.    he told her she was nothing more than a "gofer;"  *w/drew sex & retal.*

5.    after giving her an assignment, he compared her to his six
      year old daughter and admonished her not to make him ask
      where the work was; and,    *w/drew retaliation*

6.    Complainant further alleges that Associate Administrator
      Dick Parlow, Assistant Secretary Larry Irving, Office of
      Policy Coordination and Management Director Michele Farqhar
      and Management Division Chief Jim Hartman were aware of the
      harassment but took no corrective action.   *w/drew sex*

### ATTORNEY'S FEES

As I have made no finding of discrimination and there is no other
basis for an award, I have determined that an award of attorney's
fees is not appropriate.  29 C.F.R. §§ 1614.110, 1614.501(e).
Therefore, this is the Department's final action on the dismissed
allegations.

Courtland Cox
Director, Office of Civil Rights

EXHIBIT 29
PAGE 11 OF 13 PAGES